# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | | |
|---|---|---|
| RAY JEFFERSON CROMARTIE, | : | |
|     Plaintiff, | : | Civil Case No. |
| | : | |
| v. | : | |
| | : | |
| BRADFIELD SHEALY, Southern | : | |
| Judicial Circuit District Attorney; | : | **THIS IS A CAPITAL CASE** |
| | : | **Execution Scheduled for week of** |
| RANDA WHARTON, Clerk of | : | **October 30, 2019** |
| Superior Court, Thomas County, | : | |
|     Defendants. | : | |

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Aren Adjoian (ID No. 325488)
Eric J. Montroy
Federal Community Defender for the
  Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Aren_Adjoian @fd.org
Eric_Montroy@fd.org

Attorneys for Ray Jefferson Cromartie

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................1

JURISDICTION.................................................................................3

VENUE ...........................................................................................3

PARTIES..........................................................................................3

FACTUAL AND PROCEDURAL BACKGROUND .............................4

CLAIMS FOR RELIEF ....................................................................16

First Claim for Relief: Denial of Due Process...................................16

Second Claim for Relief: Access to Courts .......................................20

Request for Injunctive Relief: Release of Evidence for Testing ...........21

PRAYER FOR RELIEF ...................................................................22

**INTRODUCTION**

1.     Plaintiff Ray Jefferson Cromartie has been convicted of capital murder and is currently scheduled to be executed by the State of Georgia during the week starting October 30, 2019. The State intends to carry out Mr. Cromartie's death sentence in spite of the facts that physical evidence is available that has never been DNA tested, and that such testing could prove that Mr. Cromartie was not the person who shot Richard Slysz, and thus is not guilty of malice murder, the conviction on which his death sentence is based. This suit is brought to enjoin Defendants from violating Mr. Cromartie's federal constitutional rights by denying him access to that evidence for purposes of forensic DNA testing.

2.     The State of Georgia collected physical evidence from two crime scenes—the Madison Street Deli robbery/assault, and the Junior Food Store robbery/homicide. At the time of the crime and trial, the science of DNA testing was in its infancy. Attempting to test the evidence at that time would probably have yielded no usable results, while consuming trace amounts of physical evidence, thus preventing any future testing.

3.     "Modern DNA testing can provide powerful new evidence unlike anything known before." *Dist. Attorney's Office v. Osborne*, 557 U.S. 53, 62 (2009). Based on scientific advances that now permit meaningful testing of the physical evidence, Mr. Cromartie has demanded that the evidence be tested to prove he did

1

not commit the shooting and identify the shooter, but the State has opposed such testing and Georgia courts have denied his requests.

4.     The Georgia legislature has recognized the utility of DNA evidence in the post-conviction context, and passed O.C.G.A. § 5-5-41(c) "to provide for post-conviction requests for DNA testing in cases where a person is sentenced to death," where "DNA testing may be exculpatory." *See* Georgia Bill History, 2003 Reg. Sess. S.B. 119 (Ga. Gen. Assem. May 27, 2003).

5.     Mr. Cromartie properly filed a motion for DNA testing under O.C.G.A. § 5-5-41(c), but his request was denied after an evidentiary hearing. Mr. Cromartie filed a request for a discretionary appeal to the Georgia Supreme Court. The request for a discretionary appeal is pending in the Georgia Supreme Court.

6.     This action under 42 U.S.C. § 1983 ("Section 1983") challenges the constitutionality of § 5-5-41(c) both on its face and as applied by the Georgia courts. Given the unique ability of DNA evidence to identify the actual killer in this case, the State's refusal to allow Mr. Cromartie to test key evidence in its possession denies him due process of law and access to the courts.

7.     Defendants' refusal to release the biological evidence for testing violates Plaintiff's Fourteenth Amendment right to due process, his First Amendment right to access the courts, and his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff requests of this Court an order

declaring that Defendants' continued withholding of the evidence violates Plaintiff's constitutional rights and requiring that Defendants release the evidence to Plaintiff under a reasonable protocol regarding chain of custody and preservation of the evidence, in order that Plaintiff can have the evidence tested at his own expense. Relief is necessary here to preserve Plaintiff's liberty interest in accessing the Georgia statutory procedure to conduct forensic DNA testing.

## JURISDICTION

8.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983. *See also Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (convicted state prisoner may seek DNA testing of crime-scene evidence in section 1983 action).

## VENUE

9.    Venue lies in this Court under 28 U.S.C. § 1391 because Defendants reside in the Middle District of Georgia. Venue is also proper because the execution will occur in this district.

## PARTIES

10.    Plaintiff Ray Jefferson Cromartie is a United States citizen and resident of the State of Georgia. He is currently incarcerated, under a sentence of death imposed by the Superior Court of Thomas County, at the Georgia Diagnostic and

Classification State Prison in Jackson, Georgia. He is scheduled to be executed during the week starting October 30, 2019.

11.    Defendant Bradfield Shealy is the District Attorney for the Southern Judicial District of Georgia, and maintains an office in that district in the city of Valdosta. He is being sued in his official capacity. Defendant Shealy has custody and/or control of the DNA evidence that is the subject of the DNA claims. Defendant Shealy has opposed Mr. Cromartie's request to conduct DNA testing on the items of evidence at issue in this case. A district attorney who opposes DNA testing is a proper defendant in a section 1983 action seeking DNA testing. *Skinner*, *supra*.

12.    Defendant Randa Wharton is the Clerk of the Superior Court of Thomas County, Georgia. Her office has custody of certain evidence designated below. Defendant Wharton is sued in her official capacity.

## FACTUAL AND PROCEDURAL BACKGROUND

*Trial Evidence*

13.    On the evening of Thursday, April 7, 1994, a single assailant shot Dan Wilson, the clerk at the Madison Street Deli in Thomasville, Georgia. *See* TT[1] 1779. Mr. Wilson survived the shooting. Surveillance video of the cash register area captured a view of the assailant (but not the shooting itself), but the assailant's face

---

[1] Trial Testimony

4

was covered up to his nose. TT 1829; ROA[2] 3192 (State's Ex. 149). He wore a dark knit hat and a dark-colored hooded sweatshirt. *Id.* Police also recovered a fired cartridge casing from the floor. TT 2101.

14.     On April 8, 1994, the morning after the shooting, police received a call from a man named David McRae who lived one block from the store. He noticed a black knit cap and dark green hooded sweatshirt in his yard that he had not seen there before; police retrieved the items. TT 1843. At trial, it was the State's theory that the shooter had worn and discarded the cap and sweatshirt. TT 1934-37.[3]

15.     In the early-morning hours of April 10, 1994, clerk Richard Slysz was shot twice and killed at the Junior Food Store in Thomasville. TT 1895-1903. Witnesses described seeing two men at or around the store at the time of the shooting. TT 2247-48. Police recovered two fired cartridge casings found on the floor near the deceased, TT 2447, two beer cans that had apparently been dropped outside the store, TT 2428, a piece of cardboard from a Budweiser beer case, TT 2428, and a box of cigarettes found near the deceased. TT 2665.

---

[2] Record on Appeal

[3] Terrell Cochran and Keith Reddick testified in state habeas proceedings that, on the night of and around the time of the Madison Street Deli shooting, they saw Gary Young running from the area of the Madison Street Deli wearing a dark colored hooded sweatshirt. State Habeas Transcript (SHT) at 144.

16.     On the evening of April 12, 1994, a shootout broke out at a housing development in Thomasville. Gary Young testified that he fired a gun during the shootout. TT 1953, 1968. Young attempted to hide the gun later that night by tossing it near adjacent railroad tracks. TT 1869.

17.     The following day, April 13, 1994, police detained and questioned Carnell Cooksey. TT 1869, 2119. Cooksey told them where Young had thrown the gun, and Cooksey implicated Mr. Cromartie in the two convenience-store shootings. TT 1850, 1854, 1857. Police arrested Mr. Cromartie that same day. They also arrested two alleged co-conspirators in the Junior Food Store shooting, Corey Clark and Thaddeus Lucas, as well as Young. Investigators collected the shoes and various items of clothing from the suspects.

18.     Police recovered the firearm that Young had thrown near the railroad tracks. TT 2120. A ballistics analysis of the gun and the fired cartridge casings from the two crime scenes revealed that the gun—a Raven Arms .25 caliber semiautomatic pistol—had been used to shoot both Mr. Wilson and Mr. Slysz. TT 2504-11. It was the same gun that Young testified he had fired at the housing development. Young admitted that the gun was his. TT 1956, 2206.

19.     In September 1997, Mr. Cromartie stood trial alone for the Madison Street Deli and Junior Food Store shootings.[4] The evidence that Mr. Cromartie committed the Madison Street Deli shooting consisted almost entirely of inculpatory statements allegedly made by him to Young, as well as testimony by Cooksey that he had seen Young hand his gun to Mr. Cromartie. During state habeas proceedings, Cooksey testified that he actually never saw Young hand a gun to Mr. Cromartie. SHT 127. There was no physical evidence tying Mr. Cromartie to the Madison Street Deli shooting, there were no witnesses to the shooting, and the surveillance video was of too poor quality to identify the shooter.

20.     As for the Junior Food Store shooting, the key testimony came from the alleged co-conspirators, Lucas and Clark. Lucas testified that he drove Clark and Mr. Cromartie to the Junior Food Store so that they could steal beer and then waited for them in a nearby parking lot. TT 2309. He also testified that he drove them from the scene of the crime. TT 2307.

---

[4] Lucas received a twenty-year sentence for robbery, with ten years to serve in custody. TT 2290. That sentence was concurrent with another identical sentence on an unrelated assault case. *Id.* Clark received a twenty-five-year sentence for robbery and hindering apprehension. TT 2351. He was paroled in 2005, after serving slightly more than ten years of his sentence. Young was initially charged in the Madison Street Deli shooting, ROA 3228, but those charges were later dropped, ROA 3227. His charge for being a felon in possession of a firearm was also dropped despite his admission to possessing and firing the gun. ROA 3227.

21.    Clark testified that both he and Mr. Cromartie went into the Junior Food Store. TT 2360. Clark stated that Mr. Cromartie walked to the counter at the front of the store while Clark went to the cooler at the back of the store to get the beer. *Id.* According to Clark, he then heard two shots, and Mr. Cromartie instructed him to run to the front of the store to attempt to open the cash register. TT 2361. Clark claimed that he did. TT 2362. Meanwhile, according to Clark, Mr. Cromartie—who was already standing at the front of the store—ran to the back of the store and took two twelve-packs of Budweiser. *Id.* Clark explained that, when they ran from the store, one of the two packs of beer ripped open and several beers fell on the ground. *Id.* Clark testified that he picked up several beers and they fled. TT 2363. The State also presented evidence that: (1) a fingerprint found on a piece of cardboard outside the Junior Food Store was Mr. Cromartie's, TT 2605; and (2) a footprint in the mud near the store was from an Adidas shoe, and that Mr. Cromartie had Adidas shoes. TT 2515.[5]

---

[5] Although this physical evidence shows that Mr. Cromartie was *present* at the Junior Food Store, no physical evidence established that he shot the victim or ever touched the gun. The State's primary evidence that Mr. Cromartie was the shooter came from Corey Clark's testimony. Clark had clear motive to lie; to convince investigators that he was not the shooter, he had to convince them that Mr. Cromartie was. Moreover, Clark's version is a complicated scenario in which the two men switched positions between the front and rear of the store. Given that Mr. Cromartie's fingerprint was present on a piece of cardboard from the stolen Budweiser case, it is at least equally plausible that he was always at the rear of the store taking the beer, and thus that Clark was the shooter.

22.    On September 26, 1997, the jury convicted Mr. Cromartie of malice murder and related charges.[6] After a brief penalty-phase hearing, the jurors debated Mr. Cromartie's fate over three days. Press reports indicated that the jurors were initially deadlocked six-six over whether to sentence Mr. Cromartie to death or life imprisonment without the possibility of parole. *See* Appendix 3 (Defense Ex. 65). The jury ultimately reached a verdict and sentenced Mr. Cromartie to death. Before trial, the District Attorney had offered Mr. Cromartie a plea deal to life with the possibility of parole, which, at that time, would have resulted in parole eligibility after seven years. SHT at 57.

*Procedural History*

23.    Mr. Cromartie's conviction and sentence were upheld on direct review. *Cromartie v. State*, 514 S.E.2d 205, 209 (Ga.), *cert. denied*, *Cromartie v. Georgia*, 528 U.S. 974 (1999). He later filed a petition for a writ of habeas corpus in the Butts County Superior Court, which was denied. After the Georgia Supreme Court denied

---

Carnell Cooksey also testified that Mr. Cromartie told him that Cromartie shot the Junior Food Store clerk. In state habeas proceedings, Cooksey testified that Cromartie had never made that statement to him, SHT at 127, but the state habeas court did not find Cooksey's recantation credible.

[6] The jury was not instructed to consider and did not convict Mr. Cromartie of felony murder. Thus, his conviction could only be sustained if he were in fact the shooter.

a certificate of probable cause, the U.S. Supreme Court denied certiorari. *Cromartie v. Chatman*, 572 U.S. 1064 (2014).

24.     In March 2014, Mr. Cromartie filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Georgia. On March 31, 2017, the district court denied habeas relief and a certificate of appealability. On January 3, 2018, a single judge of the Eleventh Circuit Court of Appeals also denied a certificate of appealability and, on March 26, 2018, a panel of the Eleventh Circuit denied Mr. Cromartie's motion for reconsideration by a vote of 2-1. On December 3, 2018, the United States Supreme Court denied certiorari. *Cromartie v. Sellers*, No. 18-5796, 2018 WL 4191087, at *1 (Dec. 3, 2018).

25.     Mr. Cromartie filed his Extraordinary Motion for New Trial and Postconviction DNA Testing and a Motion for Preservation of Evidence in the Thomas County Superior Court on December 28, 2018. The State filed a Response in Opposition on February 25, 2019. On April 15, 2019, the Superior Court entered a Consent Scheduling Order to hold an evidentiary hearing on Mr. Cromartie's motion.

26.     After hearing evidence from the defense only, on September 16, 2019, the Superior Court of Thomas County denied Mr. Cromartie's motion for new trial and DNA testing. *State v. Cromartie*, No. 94-CR-328, Order (Appendix 1).

27.     Mr. Cromartie timely filed a request for a discretionary appeal to the Georgia Supreme Court. In light of the fact that Mr. Cromartie's execution is scheduled for the week of October 30, he brings this action now and will withdraw or supplement it following any ruling by the Georgia Supreme Court.

*Evidence Presented at the Evidentiary Hearing*

28.     At the hearing, the parties stipulated that chain of custody over the physical evidence was maintained. *See* Appendix 2, DNA Transcript ("DNA-T") at 8-10. The parties also stipulated to, among other things, the authenticity of the record on appeal and the photographs of the physical evidence taken by Mr. Cromartie's defense team. *Id.* at 11.

Testimony of Dr. Randell Thomas Libby

29.     Dr. Libby has a Ph.D. in Molecular Genetics and has worked in the field for nearly forty years. The court qualified him as an expert in the area of forensics and human molecular genetics. *See* DNA-T at 16.[7] Dr. Libby described current DNA technology, noting that modern Polymerase Chain Reaction (PCR)-based Short Tandem Repeat (STR) technology permits the testing of extraordinarily small quantities of DNA to highly accurate results. DNA-T at 23. Dr. Libby explained that

---

[7] The court also admitted as evidence Defense Exhibits 1–65 at the hearing. The exhibits (and the index to the exhibits) are attached hereto as Appendix 3.

current testing can be conducted on less than fifty picograms[8] of DNA, an almost unimaginably minute amount of biological material. This was not possible at the time of Mr. Cromartie's trial in 1997. Dr. Libby testified that the newer, advanced DNA processes are accepted as having verifiable certainty in the scientific/genetics community. *Id.* at 24.

30.     Dr. Libby explained that DNA testing has changed dramatically over the years. Older DNA tests have "been replaced by much more efficient systems," and each incremental development "has been a progression in the improvements in the efficiency of extracting DNA from samples which are expected to contain low quantities of DNA." *Id.* at 25. Technological developments since the time of trial have sharply increased the chances of recovering and testing "low quantity DNA such as touch DNA." *Id.* Dr. Libby described how older, "primitive" methods of testing have been replaced by "a much more intense laser beam [that] provides more, greater sensitivity and detection." *Id.* at 26. He explained that the very recent development of probabilistic algorithms has significantly enhanced the ability to evaluate complex DNA mixtures—samples containing DNA from multiple people. *Id.* at 27.

---

[8] A picogram is "10 to the minus 12th," *id.* at 23, or 0.000000000001 grams, *id.* at 20.

31.     Dr. Libby testified that the ability to detect small quantities of DNA, including from degraded DNA samples, is probably about "one thousand times" greater today than it was in 1994 or 1995. *Id.* at 28.

32.     Dr. Libby further testified that "touch DNA" (the ability to obtain a DNA profile from a very small amount of skin cells left simply by touching an item with one's bare hands or other skin) first became an accepted procedure in 2006 or 2007 but was still not refined, and did not become more developed until 2010 or 2011. *Id.* at 47, 48. In any event, this technology was not available at the time of Mr. Cromartie's trial.

33.     Dr. Libby explained that the interpretation of complex DNA mixtures utilizing "probabilistic genotyping" has really been available "only the last couple of years, so it's been very recently." *Id.* at 49. Moreover, had small quantities of DNA been subjected to testing utilizing old technology, the samples would have been consumed and no result would have been achieved. *Id.* at 62

34.     Dr. Libby testified about the feasibility of testing the physical evidence that was collected in this case and never tested. Dr. Libby offered his expert opinion as to the DNA testing of the following evidence:

- Fired Cartridge Casing from the Madison Street Deli: When asked whether it was "possible to get DNA off of fired cartridge casing," Dr. Libby answered, "Oh, absolutely yes." *Id.* at 31; *see also* Appendix 3 (Defense Exs. 13-15). Dr. Libby recommended that "one of the more advanced forms, present-day forms, of STR testing be done [o]n this item." DNA-T at 32.

13

- <u>Fired Cartridge Casings from the Junior Food Store</u>: Dr. Libby recommended the same testing as to the two cartridge casings from the Junior Food Store shooting. *Id.* at 34; *see also* Appendix 3 (Defense Exs. 29-34 (photos of shell casings)).

- <u>Black Knit Cap Found Near Madison Street Deli</u>: The parties stipulated that this item and the next item (a green hooded sweatshirt) were found by David McCrae in his yard at 229 West Monroe Street, approximately one block from the Madison Street Deli, the morning after the shooting. DNA-T at 36. At trial, the State presented evidence and argument that this was the clothing worn by the shooter on the surveillance video. Dr. Libby testified that the cap should be tested for autosomal DNA—epithelial cells—that could reveal the cap's "habitual wearer." *Id.* at 37; *see also* Appendix 3 (Defense Exs. 11-12). Depending on the quantity of DNA present, it could be a "touch DNA" analysis. If hairs were recovered, they could be tested for autosomal DNA (if a telogen root was present) or for mitochondrial DNA if no root was present. DNA-T at 37.

- <u>Green Hooded Sweatshirt Found Near Madison Street Deli</u>: The sweatshirt was found with the cap and was presumptively worn by the Madison Street Deli shooter. Dr. Libby also recommended that the green hooded sweatshirt be tested for habitual wearer status. *Id.*; *see also* Appendix 3 (Defense Exs. 8-10). Depending on the quantity of DNA present, it could be a "touch DNA" analysis. He recommended specific regions, including the pocket area where the shooter might have concealed the firearm. DNA-T at 37.

- <u>Firearm Recovered Near Train Tracks</u>: Dr. Libby recommended that several areas of the firearm be tested for touch DNA, including the slide, the trigger, the trigger guard, the handle (grips), and the magazine. *Id.* at 39.

- <u>Package of Cigarettes Found Near Deceased at Junior Food Store</u>: Dr. Libby recommended that this item be tested for the presence of DNA, as the shooter could have been the person to knock the cigarette package to the ground. *Id.* at 35.

14

- Additional Clothing for Purposes of Reference Samples: Dr. Libby testified at some length regarding the development of reference samples from the victim, from Mr. Cromartie, and from other potential suspects in the case (Clark, Young, and Lucas). *See id.* at 40-45; *see also* Appendix 3 (Defense Exs. 37, 45-62). Dr. Libby testified that much of this testing would be conducted with "very sensitive tests particularly for low-level contact DNA." *Id.* at 45.

Testimony of Laura Schile

35.    Laura Schile was qualified as an expert in forensic science and crime scene analysis. DNA-T at 84, 86. Ms. Schile has an extensive background in crime scene analysis, evidence handling, trace comparison, serology, blood spatter, and hair comparison. *Id.* at 80, 82. She worked for the Texas Department of Public Safety as a criminalist, traveled to over 100 crime scenes, and worked on homicide cases (including capital cases) as an expert for both the prosecution and the defense. *Id.* at 82-83.

36.    Ms. Schile opined on what *meaning* a particular DNA result would have. For example, she testified that, if DNA evidence were recovered from a fired cartridge casing in one of the murders, that DNA profile would likely have originated from the person who loaded the cartridges into the magazine. *Id.* at 90-91, 101.

37.    With respect to the black knit cap and green hooded sweatshirt recovered near the Madison Street Deli shooting, Ms. Schile noted that the State offered these items at trial to suggest that the Madison Street Deli shooter was

wearing them at the time of the crime. *Id.* at 93. Ms. Schile opined that wearer DNA could reveal who that person was. *Id.* at 92-93.

38.     Ms. Schile explained the phenomenon of "blowback," which relates to the projection of blood from an entry wound of a gunshot victim back in the direction of the gun that fired the bullet. *Id.* at 93-94. Ms. Schile explained that examination of the clothing of various people in the case could reveal the blood of either victim, implicating that person as the likely shooter. *Id.* at 103.

39.     As to the killing for which Mr. Cromartie is on death row – the Junior Food Store shooting – Ms. Schile observed that the State had offered no physical or scientific evidence whatsoever to establish who shot the victim. *Id.* at 96-97.

## CLAIMS FOR RELIEF

40.     Mr. Cromartie re-alleges and incorporates herein by reference all the allegations contained in the preceding paragraphs of this Complaint.

### First Claim for Relief: Denial of Due Process

41.     Pursuant to O.C.G.A. § 5-5-41(c), when an individual sentenced to death, such as Mr. Cromartie, presents a motion that requests DNA testing of biological material which both still exists in a condition that makes testing possible and could yield exculpatory results, he or she is entitled to have the evidence tested as long as certain statutory criteria are satisfied. O.C.G.A. § 5-5-41(c)(7) (the court "*shall grant* the motion for DNA testing" so long as each of the seven factors listed

in the subsection have been "established" by the petitioner). The results of such testing may then form the basis for an extraordinary motion for a new trial. O.C.G.A. § 5-5-41(a), (b).

42.    Exculpatory DNA results are accepted under Georgia law as evidence that can be used to prove a claim for a new trial based on innocence, innocence of the death penalty, false or misleading testimony, and other constitutional violations. *See Westmoreland v. Warden*, 817 F.3d 751, 754 (11th Cir. 2016) (Georgia extraordinary motion for new trial can be an application for post-conviction review within meaning of 28 U.S.C. § 2244(d)(2)).

43.    Because the State of Georgia has created a procedure through which convicted persons can obtain DNA testing and then utilize exculpatory results from that testing to secure post-conviction or other collateral relief from their convictions and death sentences, the process employed by the State for obtaining access to DNA must not violate fundamental fairness. *See Osborne*, 557 U.S. at 69; *Skinner*, *supra*; *Cunningham v. Dist. Attorney's Office for Escambia County*, 592 F.3d 1237, 1260-61 (11th Cir. 2010) (applying fundamental fairness test from *Osborne*).

44.    Section 5-5-41(c) as construed by the Georgia Supreme Court violates fundamental fairness in at least two ways.

45.    First, the Georgia Supreme Court has required applicants to show both that the motion for DNA testing was not made for purpose of delay, § 5-5-

17

41(c)(7)(D), and, in order to obtain relief through a new trial motion, that the applicant was diligent, § 5-5-41(a). *Bharadia v. State*, 774 S.E.2d 90, 94 n.5 (Ga. 2014). And it has construed diligence as requiring the applicant to seek such relief as soon as possible. *Ford Motor Co. v.* Conley, 757 S.E.2d 20, 30 (Ga. 2014); *Drane v. State,* 728 S.E.2d 679, 683 (Ga. 2012).

46.   As applied to DNA testing, this combination of requirements is fundamentally unfair. As established by Dr. Libby's unchallenged testimony, DNA testing of the items Mr. Cromartie wants tested was not available at the time of trial or even the later time at which section 5-5-41(c) was enacted. The science has been rapidly evolving to enable testing of more and more minute traces of material, including touch DNA, and of samples containing biological material from more than one person. The effect of the Georgia Supreme Court's ruling is to place applicants between an arbitrarily constructed Scylla and Charybdis—if they seek DNA testing too soon, the sample will be consumed without producing meaningful results, DNA-T at 62, but if they wait a day too long they will be precluded from obtaining DNA testing for lack of "diligence."

47.   DNA testing—with the ability to scientifically include or exclude a person as the source of biological material associated with a crime—is unlike other evidence, as Georgia recognized in enacting section 5-5-41(c). The requirement that applicants show their motions were not filed for the purpose of delay is appropriate.

18

By adding the diligence requirement as it has been construed, the Georgia Supreme Court has placed an arbitrary and fundamentally unfair burden that is almost impossible for any applicant to meet.

48.     Second, section 5-5-41(c)(3)(D) requires a court to find a reasonable probability of an acquittal before DNA testing can be ordered. As construed by the Georgia Supreme Court, § 5-5-41(c) precludes testing on this ground if the evidence presented at trial was "overwhelming." *Crawford v. State*, 597 S.E.2d 403, 405 (Ga. 2004). As applied, this requirement has resulted in a totally subjective review of the trial evidence, with no meaningful assessment of the weaknesses in that evidence or the manner in which DNA test results could offset the trial evidence and change the entire evidentiary picture. As construed by the Georgia Supreme Court, that provision effectively precludes testing to establish innocence, and further precludes testing to establish innocence of the death penalty.

49.     In summary, there is a plethora of biological evidence that, if tested and exculpatory, would likely have resulted in a different outcome at trial. Moreover, even if it is assumed that Mr. Cromartie could have been convicted of felony murder, he was not tried or convicted of felony murder. Moreover, in a case where the jury labored for days over whether to impose death, evidence that Plaintiff was not the shooter would likely have resulted in a sentence of life without parole.

50.    By refusing to release the biological evidence for testing, and thereby preventing Plaintiff from gaining access to exculpatory evidence that could have led to his acquittal of the Madison Street Deli robbery and assault, and of the Junior Food Store robbery and homicide, and/or demonstrated that he is not death eligible because he was not a principal in Mr. Slysz's murder, Defendants have deprived Plaintiff of his liberty interests in utilizing state procedures to obtain an acquittal and/or reduction of his sentence, in violation of his right to Due Process of Law under the Fourteenth Amendment to the Constitution of the United States.

**Second Claim for Relief: Access to Courts**

51.    Mr. Cromartie has a fundamental right to access the courts, rooted in the First and Fourteenth Amendments, which requires that the states make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies. State law must ensure that prisoners like Mr. Cromartie have meaningful access to post-conviction remedies in order to vindicate this right. *Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to effectuate their constitutional right of access to courts).

52.    As alleged above, Mr. Cromartie has available remedies under Georgia law for access to post-conviction DNA testing, to judicial relief from his conviction and death sentence, and to executive clemency, based on the exculpatory results of

such testing. And, as alleged above, Georgia's restrictive procedure for obtaining access to DNA testing under O.C.G.A. § 5-5-41(c), and the Georgia Supreme Court's interpretation thereof, is not adequate, meaningful, or effective.

53.    Mr. Cromartie incurred actual injury when the Georgia courts denied his request for DNA testing that could potentially produce exculpatory evidence, and thus provide him with relief from his conviction and death sentence.

54.    As stated above, the Georgia Supreme Court's unreasonable interpretation of section 5-5-41(c) has prevented Mr. Cromartie from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder, and that he is innocent of the death penalty. These failures have deprived Mr. Cromartie of his fundamental right to access the courts under the First and Fourteenth Amendments.

### Request for Injunctive Relief: Release of Evidence for Testing

55.    For the reasons stated above, the Constitution requires declaratory relief that the denial of DNA testing to Mr. Cromartie violates the Constitution and that he be afforded the opportunity to conduct DNA testing on the evidence identified in this Complaint. Further, Mr. Cromartie requests injunctive relief compelling those Defendants who are custodians of the evidence identified in this Complaint to release the evidence designated below for DNA testing. Accordingly, Mr. Cromartie asks this Court to grant prospective injunctive relief compelling the Defendants to release

the evidence identified in this Complaint so that the requested DNA testing can be accomplished.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide relief as follows:

1.     A declaratory judgment that O.C.G.A. § 5-5-41(c), as applied by the Georgia Supreme Court, is unconstitutional because:

    a.     It imposes a fundamentally unfair limitation, in violation of due process and the First Amendment right of access to the courts, upon Plaintiff's access to statutory remedies available under Georgia law, and deprives Plaintiff of adequate, effective and meaningful access to such remedies. Those remedies include: (1) the statutory right to access post-conviction DNA testing pursuant to section 5-5-41(c); (2) the statutory right to pursue a motion for new trial under section 5-5-41(a), (b); and (3) executive clemency based on exculpatory DNA results.

    b.     It denies Plaintiff the protection of the Eighth Amendment of the Constitution, which requires that death sentences be reliable, and therefore guarantees persons facing the death penalty access to test evidence where realistically possible exculpatory results can prove innocence of the crime, innocence of the death penalty, or relevant mitigating factors concerning the circumstances of the offense.

2.     A preliminary and permanent injunction requiring Defendants to produce and release for DNA testing the evidence set forth below, pursuant to an appropriate protocol regarding chain of custody and preservation and return of such evidence after testing has been completed:

    1. The shell casing collected at the Madison Street Deli crime scene (State's Ex. No. 156);

2. The black knitted cap found near the Madison Street Deli crime scene, presumed to be the cap worn by the shooter in the surveillance video (State's Ex. No. 30A);

3. The green hooded sweatshirt found near the Madison Street Deli crime scene, presumed to be the sweatshirt worn by the shooter in the surveillance video (State's Ex. No. 30B);

4. The two shell casings collected at the Junior Food Store crime scene (State's Ex. Nos. 159 & 160);

5. The Basic Lights cigarette pack found near the body of the deceased at the Junior Food Store (State's Ex. No. 9);

6. The handle section of the Budweiser beer case found on the ground outside the Junior Food Store (State's Ex. No. 4);

7. Two Budweiser beer cans found outside the Junior Food Store (State's Ex. Nos. 2-3);

8. The .25 caliber Raven Arms pistol and magazine recovered from where Gary Young threw it near the train tracks between the Cherokee Homes and the Jail-Justice Center (State's Ex. No. 162);

9. Clothing recovered from suspects in the case, including Gary Young, Corey Clark, Thaddeus Lucas, and Ray Jefferson Cromartie (State's Ex. Nos. 27; 14; 16; & 17-22, respectively); and

10. A cut portion of victim Richard Slysz's shirt sleeve with blood on it (State's Ex. No. 1).

3.      A preliminary and permanent injunction prohibiting Defendants from executing Mr. Cromartie until they can do so in a way that does not violate his rights.

Respectfully submitted,


/s/ Aren Adjoian
Aren Adjoian
Eric J. Montroy
Federal Community Defender for the
  Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Aren_Adjoian @fd.org
Eric_Montroy@fd.org

Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I served the foregoing pleading and the

attachments thereto on the following person by ECF filing and first class mail:

Sabrina Graham
Senior Assistant Attorney General
40 Capitol Square, SW
Atlanta, GA 30334


/s/  Aren Adjoian
Aren Adjoian


Dated:        October 22, 2019