# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | | |
|---|---|---|
| RAY JEFFERSON CROMARTIE, | : | |
| Plaintiff, | : | Civil Case No. |
| | : | |
| v. | : | |
| | : | |
| BRADFIELD SHEALY, Southern | : | |
| Judicial Circuit District Attorney; | : | THIS IS A CAPITAL CASE |
| | : | **Execution Scheduled for week of** |
| RANDA WHARTON, Clerk of | : | **October 30, 2019** |
| Superior Court, Thomas County, | : | |
| Defendants. | : | |

## APPENDIX TO COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Aren Adjoian
Assistant Federal Defender
Federal Community Defender for the
 Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Aren_Adjoian @fd.org

Attorney for Ray Jefferson Cromartie

# Index to Appendix

**Volume I**

Order Denying Defendant's Extraordinary Motion for New Trial and Request for DNA Testing Pursuant to O.C.G.A § 5-5-41(c), 9/16/19........................................................A1

Transcript of Hearing for Extraordinary Motion for New Trial and Post-Conviction DNA Testing, 6/24/19 ..................................................................................................A35

Defendant's Exhibits in Support of Motion for Post-Conviction DNA Testing .....................A181

Transcript of State Habeas Proceedings, 8/12/08 ....................................................A359

Transcript of State Habeas Proceedings, 8/13/08 ....................................................A529

**Volume II**

Transcript of State Habeas Proceedings, 8/14/08 ....................................................A568

Trial Transcript, Volume V, 9/19/97 & 9/22/97 ......................................................A719

Trial Transcript, Volume VI, 9/23/97 ...................................................................A1091

**Volume III**

Trial Transcript, Volume VII, 9/24/97...................................................................A1426

Trial Transcript, Volume VIII, 9/25/97 .................................................................A1755

Trial Transcript, Volume IX, 9/26/97, 9/29/97 - 10/1/97 .........................................A2026

## IN THE SUPERIOR COURT OF THOMAS COUNTY
## STATE OF GEORGIA

STATE OF GEORGIA,        *

                             *   **Indictment No. 94-CR-328**

v.                     *   THOMAS COUNTY
                             *   CLERK OF COURT
                                FILED IN OFFICE

RAY JEFFERSON CROMARTIE, *

                             *   SEP 16 2019

Defendant.         *

                                       CLERK DEP. CLERK

## ORDER DENYING DEFENDANT'S
## EXTRAORDINARY MOTION FOR NEW TRIAL AND REQUEST
## FOR DNA TESTING PURSUANT TO O.C.G.A. § 5-5-41(c).

Defendant Ray Jefferson Cromartie has filed an extraordinary motion for new trial and seeks DNA testing on various items that were introduced as evidence during his trial for the murder of Richard Slysz. O.C.G.A. § 5-5-41(a) allows the filing of an extraordinary motion for new trial outside the 30-day window for motion for new trials based on extraordinary circumstances. O.C.G.A. § 5-5-41(c) allows for DNA testing after certain requirements are met. The Court finds Defendant cannot establish that "[t]he requested DNA testing would raise a reasonable probability that [Defendant] would have been acquitted or that the verdict(s) would have been different if the results of DNA testing had been available at the time of conviction, in light of all the

evidence in the case". O.C.G.A. § 5-5-41(c)(6)(E).  Additionally, this Court finds Defendant has failed to establish that his motion was not filed for the purpose of delaying his execution.  O.C.G.A. § 5-5-41(c)(4)(A).  His extraordinary motion for new trial and motion for DNA testing are DENIED.

## PROCEDURAL HISTORY

### A.   Trial Proceeding and Direct Appeal (1994-1999)

Defendant was indicted by the Thomas County Grand Jury on October 20, 1994 for one count of malice murder, one count of armed robbery, one count of aggravated assault, one count of aggravated battery and four counts of possession of a firearm during the commission of a crime. *Cromartie v. State*, 270 Ga. 780, 781 n.1 (1999). On September 26, 1997, following a jury trial, Defendant was convicted as charged in the indictment. *Id.*

Following the sentencing phase of trial, on October 1, 1997, the jury found that the following statutory aggravating circumstances existed to impose the death penalty: 1) that the offense of murder was committed while the defendant was engaged in the commission of another capital felony, to wit; armed robbery; 2) that the defendant committed the offense of murder for himself, or another, for the purpose of receiving money or any other thing of monetary value; and 3) that the offense of murder was outrageously or wantonly vile,

horrible, or inhuman, in that it involved depravity of mind, or aggravated battery to the victim prior to the death of the victim. *Id.* at 780. The jury recommended a sentence of death on October 1, 1997. *Id.* The trial court sentenced Defendant to death, and to consecutive sentences of life imprisonment for armed robbery, twenty years for aggravated battery, and five years for each count of possession of a firearm during the commission of a crime. *Id.* at 780-81 n.1.

The Georgia Supreme Court affirmed Defendant's convictions and death sentence on March 8, 1999. *Cromartie v. State*, 270 Ga. 780, *cert. denied, Cromartie v. Georgia*, 528 U.S. 974, 120 S. Ct. 419 (1999), *r'hrg. denied*, 528 U.S. 1108, 120 S. Ct. 855 (2000).

## B.   State Habeas Proceeding (2000-2014)

Defendant filed a petition for writ of habeas corpus on May 9, 2000, in the Superior Court of Butts County. An amended petition for writ of habeas corpus was filed on December 9, 2005. Defendant was represented by a team of attorneys from the Georgia Resource Center and pro bono counsel Martin McClain.

After eight years of discovery, the state habeas court held an evidentiary hearing on August 12-14, 2008. On February 9, 2012, the state habeas court entered an order denying relief. Defendant filed a motion for reconsideration based upon new testimony from a trial

3

witness and, after further discovery and briefing, the state habeas court denied the motion on October 9, 2012.

Defendant filed an application for certificate of probable cause (CPC) to appeal in the Georgia Supreme Court. The Georgia Supreme Court summarily denied Defendant's CPC application on September 9, 2013. Defendant filed a petition for writ of certiorari in the United States Supreme Court, which the Court denied on April 21, 2014. *Cromartie v. Chatman*, 572 U.S. 1064, 134 S. Ct. 1879 (2014).

## C.   Federal Habeas Proceedings (2014-2018)

Defendant filed his federal habeas petition on March 20, 2014. On March 31, 2017, the district court denied Defendant's request for federal habeas relief and declined to issue a certificate of appealability as to any of Defendant's claims. Defendant timely filed a motion for with the Eleventh Circuit Court of Appeals on August 24, 2017. His motion was ultimately denied on March 26, 2018. Defendant filed a petition for writ of certiorari in the United States Supreme Court, which the Court denied on December 3, 2018. *Cromartie v. Sellers*, 139 S. Ct. 594 (2018).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.   Items requested by Defendant for DNA testing.

Defendant seeks DNA testing of the following items:

#### A.   Madison Street Deli Evidence

1.  Shell casing obtained from the Madison Street Deli crime scene (State Ex. 156; TT:2505-06);

2.  A black knit cap, found in the yard of David McRae, located one block from the Madison Street Deli the morning after the crime (State Ex. 30A, TT:1842-43, 3073); and

3.  A "green pullover sweatshirt," found in the yard of David McRae, located one block from the Madison Street Deli the morning after the crime (State Ex. 30B; TT:1842-43, 3074).

#### B.   Junior Food Store Evidence

1.  Two shell casings obtained from the Junior Food Store crime scene (State Ex. 159 & 160; TT:2446);

2.  Basic Lights 100 cigarette pack obtained from the Junior Food Store crime scene near Slysz's body (State Ex. 9; TT:2450, 2456);[1]

---

[1] Defendant initially sought DNA testing for a torn portion of a Budweiser beer carton found outside the Junior Food Store, which contained his thumb print (State Ex. 4; TT:2430-31, 2591-2600), and two Budweiser beer cans found near the torn portion of the Budweiser beer carton (State Exs. 2 & 3; TT:2590-2600). However, at the hearing on this motion for DNA testing, Defendant withdrew his request for testing of these items. EMNT, p. 64.

### C.   Miscellaneous Evidence

1. A .25 caliber Raven Arms pistol, identified as the weapon used in both the Madison Street Deli shooting and the Junior Food Store armed robbery and murder, which was recovered near train tracks between the Jail-Justice Center and the Cherokee Homes, where Gary Young testified at trial he threw the weapon down when the police arrived after a shootout between himself and another individual (State Ex. 162; TT: 1986-89, 2119-20, 2154-55, 2506-11);

2. Clothing taken from Defendant, Young, and co-defendants Clark and Lucas (State Exs. 14, 16, 17-22, 27; TT:2556, 2561-68); and

3. A cutting from the shirt sleeve of Junior Food Store victim Richard Slysz which contained blood (State Ex. 1; TT:2450).

## II.   Standard of Review

O.C.G.A. § 5-5-41(c) governs requests for DNA testing in conjunction with a motion for new trial. If a hearing is granted subsection (c)(6)(E) allows the parties to be heard on the issues of whether the petitioner's motion complies with the requirements of paragraphs (3) and (4) of this subsection, whether upon consideration of all the evidence there is a reasonable probability that the verdict would have been different if the results of the requested DNA testing had been available at the time of trial, and whether the requirements of

6

paragraph (7) of this subsection have been established. The requirements of O.C.G.A. § 5-5-41(c)(3)-(4) are that:

(3)  The motion shall be verified by the petitioner and shall show or provide the following:

(A)  Evidence that potentially contains deoxyribonucleic acid (DNA) was obtained in relation to the crime and subsequent indictment, which resulted in his or her conviction;

(B)  The evidence was not subjected to the requested DNA testing because the existence of the evidence was unknown to the petitioner or to the petitioner's trial attorney prior to trial or because the technology for the testing was not available at the time of trial;

(C)  The identity of the perpetrator was, or should have been, a significant issue in the case;

(D)  The requested DNA testing would raise a reasonable probability that the petitioner would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case;

(E)  A description of the evidence to be tested and, if known, its present location, its origin and the date, time, and means of its original collection;

(F)  The results of any DNA or other biological evidence testing that was conducted previously by either the prosecution or the defense, if known;

(G)  If known, the names, addresses, and telephone numbers of all persons or entities who are known or believed to have possession of any evidence described by subparagraphs (A) through (F) of this paragraph, and any persons or entities who have provided any of the information contained in

petitioner's motion, indicating which person or entity has which items of evidence or information; and

(H) The names, addresses, and telephone numbers of all persons or entities who may testify for the petitioner and a description of the subject matter and summary of the facts to which each person or entity may testify.

(4) The petitioner shall state:

(A) That the motion is not filed for the purpose of delay; and

(B) That the issue was not raised by the petitioner or the requested DNA testing was not ordered in a prior proceeding in the courts of this state or the United States.

O.C.G.A. § 5-5-41(c)(7) governs the Court's grant of DNA testing and provides that:

(7) The court shall grant the motion for DNA testing if it determines that the petitioner has met the requirements set forth in paragraphs (3) and (4) of this subsection and that all of the following have been established:

(A) The evidence to be tested is available and in a condition that would permit the DNA testing requested in the motion;

(B) The evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(C) The evidence was not tested previously or, if tested previously, the requested DNA test would provide results that are reasonably more discriminating or probative of the identity of the perpetrator than prior test results;

(D) The motion is not made for the purpose of delay;

8

A8

(E)  The identity of the perpetrator of the crime was a significant issue in the case;

(F)  The testing requested employs a scientific method that has reached a scientific state of verifiable certainty such that the procedure rests upon the laws of nature; and

(G)  The petitioner has made a prima facie showing that the evidence sought to be tested is material to the issue of the petitioner's identity as the perpetrator of, or accomplice to, the crime, aggravating circumstance, or similar transaction that resulted in the conviction.

As explained by the Georgia Court of Appeals, "the trial judge reviewing a motion for DNA testing sits as the trier of fact and based on the evidence presented must determine whether the criteria set forth in OCGA § 5-5-41 (c) (7) have been met". *White v. State*, 346 Ga. App. 448, 451, 814 S.E.2d 447, 451 (2018).  Part of that criteria is O.C.G.A. § 5-5-41(c)(3)(D) which requires the defendant establish "a reasonable probability that the petitioner would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case".  To determine whether there was a reasonable probability of an acquittal, the Georgia Supreme Court has approved of "weigh[ing] [the] hypothesized DNA testing results against the overwhelming evidence actually presented at [defendant's] trial under the proper Georgia statutory standard".  *Crawford v. State*, 278 Ga. 95, 97 (2004).

9

Additionally, the Georgia Supreme Court and the Georgia Court of Appeals have instructed that a defendant is not required "to 'prove' the hypothetical [DNA] result[s] will be obtained through actual testing" but merely that the item has the "potential" to yield DNA results which are "assumed valid". *Crawford v. State*, 278 Ga. at 97; *see also White v. State*, 346 Ga. App. at 455.  In other words, the Court assumes for the purpose of determining whether Defendant shall obtain his requested testing that if the item of evidence has the potential for DNA matter, Defendant's hypothetical results would yield valid DNA results.

With these principles in mind, the Court determines that Defendant has failed establish the necessary requirements to obtain his requested DNA testing.

## III. Facts of the Crimes Presented at Trial

### A.   Madison Street Deli Shooting

On April 7, 1994, Dan Wilson, the clerk of the Madison Street Deli was shot in the face as he was washing dishes in the back kitchen. TT:1779, 1854.  He was shot with a .25 caliber handgun which Defendant had borrowed from his cousin Gary Young. *Id.* at 1806, 1850-51.  Wilson survived the attack. *Id.* at 1804-07.

A surveillance video camera recorded the events proceeding the shooting of Wilson and captured an individual resembling Defendant

10

A10

and showed an unsuccessful attempt to open the cash register. *Id.* at 1810-13, 1827-30, 2133.

Witnesses testified that Defendant obtained Young's handgun prior to the Madison Street Deli shooting and Defendant made statements implicating himself in the Madison Street Deli shooting. *Id.* at 1854, 1933. Specifically, Carnell Cooksey testified that on the night of the Madison Street Deli shooting he saw Young give Defendant his handgun, which Cooksey identified as the handgun shown at trial to be the weapon used in both convenience store shootings. *Id.* at 1850-52, 1858, 1863-64. Cooksey also testified that Defendant asked him if he was "down with the 187" which was "slang for robbery" and Cooksey told Defendant he was not interested. *Id.* at 1854.

In corroboration, Young testified that he gave the handgun to Defendant identified as the weapon used in the Madison Street Deli shooting. *Id.* at 1915. Young also testified that Defendant confessed to him that he shot the clerk at the Madison Street Deli.[2] *Id.* at 1933, 1939.

---

[2] Additionally, Katina Washington testified that Young gave his handgun to someone on the night of the Madison Street Deli shooting and Defendant was there when that occurred. *Id.* at 2259-60. However, because Washington did not see the hand-off she could not positively identify to whom Young gave his handgun. *Id.* at 2261.

11

With regard to the green sweatshirt and knit cap, the State
presented David W. McRae who testified that on the morning of April
8, 1994 (the morning after the Madison Street Deli shooting), he found
a knit cap (State Ex. 30-A) and sweatshirt (State Ex. 30-B) in his
"yard". *Id.* at 1842-43; *see also id.* at 1936-37.  McRae lived
approximately one block from the Madison Street Deli.  *Id.* at 1842.
McRae called the police, and the clothing was collected by Detective
Chuck Weaver that morning.  *Id.* at 2105.  Young testified that he saw
Defendant wearing similar clothing when he gave Defendant the
handgun.  *Id.* at 1936-37

Det. Weaver testified that the sweatshirt and knit cap were sent to
the Federal Bureau of Investigation (FBI) and to his knowledge no
hairs were found on either.  *Id.* at 2184-86.  Additionally, the FBI could
not determine whether the perpetrator in the Madison Street Deli video
was wearing the sweatshirt and knit cap collected from McRae's yard.
*Id.* at 2185-86.

**B.   Junior Food Store Armed Robbery and Murder**

Approximately two days later, nearly identical crimes were
committed at the Junior Food Store—only this time the store clerk died
as a result of being shot in the head.  During the early morning hours
of April 10, 1994, Thaddeus Lucas (Defendant's step-brother) drove
Defendant and Corey Clark to the Junior Food Store located in

12

Thomasville, Georgia, ostensibly in order for Defendant and Clark to steal beer from the store. *Id.* at 2302, 2309. Lucas testified, corroborated by Clark's testimony, that after dropping Defendant and Clark off near the side of the Junior Food Store, Defendant instructed Lucas to wait for him and Clark at "Providence Plaza" apartments which was located nearby. *Id.* at 2309, 2359. Upon entering the store, Clark testified he walked to the beer cooler in the back of the store while Defendant walked down the first aisle to the front cash register. *Id.* at 2360.

As with the first victim, the store clerk Richard Slysz was shot twice in the head as he sat on a stool behind the register. *Id.* at 2360-61. Clark testified he was "shocked" and the shots were "unexpected". *Id.* at 2360. Ballistics tests confirmed that the same Raven .25 caliber pistol was used in both the Madison Street Deli and Junior Food Store shootings. *Id.* at 2501-10.

Clark testified that he saw Defendant unsuccessfully attempt to open the cash register. *Id.* at 2361-62. Clark then went behind the counter and tried to open the cash register while Defendant went to the back of the store and stole two twelve packs of Budweiser beer from the store's cooler. *Id.* at 1860, 2362-63. Both men then fled the scene. *Id.* at 2362. Clark testified that as Defendant was fleeing the scene, one of the cases of Budweiser tore open, spilling beer cans onto the muddy

13

ground. *Id.* at 2363; *see also id.* at 1856, 1877. Clark gathered all of
the cans but two and subsequently got into Lucas' car at Providence
Plaza with the beer and the trio returned to the Cherokee Apartments.
*Id.* at 2363; *see also id.* at 2310-11.

Walter Seitz,[3] who worked at the Jack Rabbit Foods store, which
sat across a well-lit street from the Junior Food Store, corroborated
Clark's testimony. Seitz explained that he had a clear view[4] into the
Junior Food Store and "never lost sight of the store" after he heard the
gunshots. *Id.* at 2245-47. He testified that he heard the gunshots, then
saw a "light skinned black" person, which was shown at trial to be
Defendant, (*id.* at 2362, 2697-98), run from the front of the store "where
the clerk was to the back of the store", then run from the store with
"two twelve packs of beer" (*id.* at 2246-47). Following this individual,
Seitz saw another male, "darker in complexion and thinner"[5] exit the
store in the same direction as the first male. *Id.* at 2248-49.

---

[3] Seitz called in the original complaint to the police regarding the
Junior Food Store shooting. *Id.* at 1909-10.

[4] Specifically, Seitz testified that "There's glass in front of the Junior
Food Store and my store is surrounded by glass. And it's like looking
two TV sets in the night." *Id.* at 2245. However, Seitz admitted that
his view was obstructed where the clerk sat. *Id.* at 2248. The Court
also notes, as pointed out by Defendant during his June 24, 2019
hearing that there were advertisements in windows obstructing the
view. EMNT, p. 98.

[5] Clark testified at trial that he was 6'2" and weighed 189 lbs. and was
approximately the same size at the time of the crimes. *Id.* at 2354.

14

William Taylor also corroborated Clark's testimony. Taylor testified that on the night of the crimes he was driving by the Junior Food Store and saw two black individuals come out of the Junior Food Store, run to the left of the store, "drop something perhaps and go back to pick it up". *Id.* at 1876. Taylor stated he thought the item the individual was carrying was beer. *Id.* at 1877.

On the same side of the store in which Taylor testified he saw the individuals drop what he thought was beer, the police found a footprint, which was identified as a possible match for Defendant's shoes but not Young's, Clark's or Lucas' (*id.* at 2599-2600), a couple of beers, and a portion of a Budweiser beer carton with Defendant's thumb print, containing 15 points of comparison (*id.* at 2027-28, 2035, 2605). *See also id.* at 1905, 2088-90, 2427-30, 2437-38, 2697.

Law enforcement brought in the canine unit to track the perpetrators of the Junior Food Store crimes. The dogs tracked to the Providence Plaza apartments' parking lot where the trail ended. *Id.* at 2091, 2309, 2359.

Finally, Cooksey testified that Defendant confessed to him that he committed the murder at the Junior Food Store. *Id.* at 1857.

---

He also testified that he was taller and darker in skin tone than Defendant. *Id.* at 2362.

## IV. Prior Relevant State Court Decisions

In Defendant's state habeas proceeding, he attacked his convictions under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972), and *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173 (1959), with recantations from trial witnesses—Corey Clark, Carnell Cooksey, and Gary Young— and new testimony from individuals—Terrell Cochran and Keith Reddick—claiming to have seen Gary Young running from the Madison Street Deli on the night of the shooting. The state habeas court either dismissed the claims as procedurally defaulted and/or denied the claims as without merit. State Habeas Final Order, 2/9/2012, pp. 39- 77; State Habeas Order, 4/25/2012, pp. 1-4. The state habeas court determined that all of the evidence in support of these claims lacked credibility as the record contradicted the witnesses' new testimony and the witnesses had lengthy criminal records. *Id.*

In his CPC application to the Georgia Supreme Court, Defendant challenged the state habeas court's determination of his *Brady, Giglio* and *Napue* claims. The Georgia Supreme Court summarily denied Defendant's CPC application. In *Redmon v. Johnson*, 302 Ga. 763 (2018), the Court explained that the denial of a CPC application was a decision on the merits.

16

A16

O.C.G.A. § 9-11-60 (h) states "any ruling by the Supreme Court ...in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court ...as the case may be". Additionally, the Supreme Court's "unreported nonprecedential decisions are still binding on the parties, for they establish the law of the case as provided by OCGA § 9-11-60 (h)". *Rooney v. State*, 287 Ga. 1, 2, 690 S.E.2d 804, 807-08 (2010) (quoting *Moreton Rolleston, Jr., Living Trust v. Kennedy*, 277 Ga. 541, 542 (2004)). The Supreme Court has held this applies in both civil and criminal cases and between civil and criminal cases. *McDonald v. State*, 305 Ga. 5, 6, 823 S.E.2d 280, 282 (2019) ("We have held that this statutory 'law of the case' rule is not confined to civil cases, but applies also to rulings made by appellate courts in criminal cases."); *Roulain v. Martin*, 266 Ga. 353, 354 (1996) (holding that in a "civil action, the habeas court, as well as this Court, would certainly be bound by the ruling" of the Georgia Supreme Court in the criminal direct appeal under the "'law of the case' doctrine".).

The Court is mindful that the appellate court's decision concerned a similar but still different decision of law than is currently before the Court. However, the Court will not ignore the decisions of the state habeas court and the Georgia Supreme Court—giving specific attention to the credibility determinations made regarding these witnesses. Consequently, as this evidence was found to be too unreliable to

17

support *Brady*, *Giglio* and *Napue* claims, the Court gives it little to no weight in its determination of Defendant's request for DNA testing.[6]

## V. Defendant has not established a reasonable probability that he would be acquitted of his crimes or a reasonable probability of a different verdict.

O.C.G.A. § 5-5-41(c)(7) states that the Defendant must establish the "requirements" of paragraph (3) in order for this Court to grant DNA testing.  O.C.G.A. § 5-5-41(c)(3)(D) requires the Defendant to establish that "[t]he requested DNA testing would raise a reasonable probability that the petitioner would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case".  Having reviewed all the evidence, including the evidence presented at trial and before this Court at the June 24, 2019 hearing, the Court finds he has not established that even if the DNA results were valid that there is a "reasonable probability"

---

[6] Additionally, contrary to Defendant's assertions to this Court, neither Reddick nor Cochran testified that they heard a gunshot *and then saw Young* running from the Madison Street Deli. (Def. Motion at 20).  As correctly found by the state habeas court:

> *Neither Reddick nor Cochran testified that they heard gunshots on the night of the Madison Street Deli shooting,* what time exactly they saw Mr. Young allegedly running from the Madison Street Deli, or that they witnessed Mr. Young commit a crime or witnessed Mr. Young with a weapon.

State Habeas Final Order, p. 40 (emphasis added).

that Defendant would have been acquitted or that the verdict(s) would have been different in light of all of the evidence in the case.

## A.   Madison Street Deli Evidence

### 1.   Shell casing obtained from the Madison Street Deli crime scene

Defendant alleges that DNA from this shell casing collected at the Madison Street Deli (State Ex. 156) could exclude him or prove to have Gary Young's DNA—the person Defendant has identified as the Madison Street Deli Shooter.  However, this proposed evidence would not create a reasonable probability of an acquittal for the Madison Street Deli crimes as there was no controversy at trial that the handgun used to commit the Madison Street Deli shooting did not belong to Defendant.  Young testified at trial (TT:1915) that he gave the handgun to Defendant and the Court finds there was no evidence or testimony that the handgun did not contain the bullet that was housed in the shell casing found at the Madison Street Deli when Young gave it to Defendant.  Neither of Defendant's new experts, Dr. R. Thomas Libby or Dr. Laura Schile, disputed that Defendant did not have sole possession of the murder weapon.  EMNT, pp. 54-55, 109.  Therefore, even if DNA on the shell casing included Young's, the Court finds it would not create a reasonable probability of an acquittal or different

19

A19

verdict(s) of the Madison Street Deli crimes in light of all the evidence in the case.

### 2.    Black Knit Cap and Green Sweatshirt

Defendant also requests testing of a black knit cap and "green pullover sweatshirt," found in the yard of David McRae the morning after the crime, which was located one block from the Madison Street Deli.  State Ex. 30A & 30B; TT:1842-43, 3074.  Defendant argues that similar clothing was seen worn by the shooter in the Madison Street Deli video of the crime and DNA on the garments could presumably belong to Young.  The Court notes that the video of the shows someone wearing clothes similar to the knit cap and the sweatshirt, but the FBI could not determine whether they were the same clothes or not.  TT: 2185-86.  Also, the Court notes the clothing was not found until the following day in a yard approximately a block away.  *Id.* at 1842-43, 3073.  There was no evidence presented at trial or during the hearing before this Court showing how the clothing came to be at that location, when they were placed there, or who placed them there.  Nor was there evidence that these items of clothing were only worn by one person.[7]

---

[7] The Court also takes note of Defendant's assertion that blowback from the shooting of Mr. Wilson could have resulting in Mr. Wilson's DNA being on this clothing.  However, Defendant has not requested or identified a source of DNA from Mr. Wilson to which any results could be compared.  While the Court is mindful that it must assume Defendant will obtain valid DNA results, there is no precedent stating

In addition, Defendant's theory that Young committed the Madison Street Deli shooting and Clark committed the Junior Food Store shooting is belied by the record. As found by the Georgia Supreme Court, "In this case, the two shootings were similar, occurred only three days apart, involved the same gun, and were part of a single scheme or plan to rob convenience-type stores". *Cromartie*, 270 Ga. at 783. There was no evidence linking Clark to both crimes. And Young's only link to the crimes was the murder weapon that he acknowledged was his at trial.

The video evidence at trial showed there was only one shooter at the Madison Street Deli. And the evidence at trial only pointed to one individual as the shooter at the Junior Food Store—Defendant. Clark testified at trial that Defendant shot the victim at the Junior Food Store and described what happened in the store that was consistent with the testimony of the two eyewitnesses—Seitz and Taylor—who were not involved in the crimes. TT:2360-66, 2697-98, 2246-49, 1876-77. Additionally, on the same side of the store which Taylor testified he saw the individuals drop what he thought was beer, the police found a footprint, which was identified as a possible match for Defendant's shoes but not Young's, Clark's or Lucas' (*id.* at 2599-2600), and a

---

that the Court must also assume there is a viable source of DNA to which to compare the results.

21

portion of a Budweiser beer carton with Defendant's thumb print (*id.* at 2027-28, 2035).

There was no evidence presented at trial or in the current proceeding before this court suggesting that Young had any involvement in the Junior Food store crimes. Instead, the physical evidence—the shoeprint and the thumb print—conclusively proved that Defendant was present during the Junior Food Store crimes. The evidence also proved, based upon the testimony of eyewitnesses Seitz and Taylor, that only two perpetrators were in the Junior Food Store when the crimes occurred—and Clark admitted, and never recanted, he was the other perpetrator. Additionally, there was no evidence that Clark was involved in the Madison Street Deli shooting.

Therefore, the Court finds Defendant has not shown a reasonable probability that he would be acquitted of his crimes or of different verdict(s) being reached if DNA from the garments do not match his given: that there is no way to establish that the clothing was worn by the perpetrator of the Madison Street Deli shooting; that the crimes at the Madison Street Deli and the Junior Food Store were committed in a nearly identical manner with the same weapon; that Defendant was conclusively shown to be at the Junior Food Store when Slysz was murdered; that a video at the Madison Street Deli showed the perpetrator as someone who resembled Defendant in appearance; and

that Defendant confessed to committing the Madison Street Deli shooting to both Cooksey and Young, whose attempts at recantation were rejected by the state habeas court and Georgia Supreme Court.

### B.   Junior Food Store Evidence

#### 1.   Two shell casings obtained from the Junior Food Store crime scene

As with the shell casing from the Madison Street Deli shooting, even if DNA evidence from the shell casing from the Junior Food Store crime scene (State Ex. 159 & 160) does not include Defendants and does include any other individual, this would not contradict the evidence presented at trial by the State in support of Defendant's conviction.  As stated *supra*, Young testified that he provided the handgun to Defendant and there was no testimony identifying who loaded the weapon.  Although Clark testified at trial that he did not have the handgun on the night of the Junior Food Store shooting (TT:2364), he also testified that he knew prior to the Junior Food Store shooting that the handgun belonged to Young and he had previously seen the handgun on a dresser in Washington's apartment (*id.* at 2379). And Clark did not affirmatively testify that he never handled the handgun.

Therefore, the Court finds that the evidence at trial showed the handgun did not belong to Defendant; that there was no evidence at

trial regarding who loaded the handgun; that Clark admitted to knowledge of the handgun and its location prior to the Junior Food Store shooting; that Defendant's thumb print conclusively linked him to the Junior Food Store crimes; that both convenience store shootings were committed by one person; and that there was no evidence that Clark was linked to the Madison Street Deli shooting. Thus, this Court finds that DNA that excludes Defendant or includes Clark, or anyone else, from the shell casings would not create a reasonable probability of an acquittal or of different verdict(s) as to the Junior Food Store shooting when viewed in light of all the evidence in the case.

### 2. Basic Lights 100 cigarette pack obtained from the Junior Food Store crime scene

Defendant alleges the cigarette pack (State Ex. 9) found at the Junior Food Store crime scene may contain Clark's DNA. The evidence presented at trial, and not contradicted in collateral proceedings, proved that only two individuals, in addition to the victim, were in the Junior Food Store when the shooting occurred—Defendant and Clark. Clark admitted that he went behind the counter (TT:2362, 2366), where the cigarette pack was collected (*id.* at 2450), and attempted to open the cash register (*id.* at 2362). And there was no testimony or evidence presented at trial that Defendant touched the cigarette pack. Therefore, this Court finds that even if the DNA evidence did not

24

include the Defendants or included Clark that would not be contrary to the evidence presented by the State at trial.  Consequently, the Court finds Defendant has not shown how his suggested DNA results would have created a reasonable probability of an acquittal or of different verdict(s) as to the Junior Food Store shooting in light of the all the evidence in the case.

### C.   Miscellaneous Evidence

### 1.   The .25 caliber Raven Arms pistol

There was no evidence that the weapon (State Ex. 162) used in both convenience store shootings was ever in the exclusive control of Defendant.  Indeed, the evidence at trial showed that Gary Young: gave the handgun to Defendant; took the handgun back after the Junior Food Store shooting; subsequently used the handgun in a shootout; and tossed the handgun next to a train track and left it there where it was later discovered by law enforcement.  In fact, Young testified during Defendant's state habeas proceeding that he did not "hide" the handgun but kept it in his closet which "[e]verybody knew".  Young deposition, p.16.  Therefore, the Court finds that no matter whose DNA is possibly found on the handgun, it would not create a reasonable probability of an acquittal or of different verdict(s) as to any of Defendant's crimes.

25

## 2.   Items of clothing

Defendant asks for DNA testing of clothing taken from Young, Defendant, and co-defendants Clark and Lucas (State Exs. 14, 16, 17-22, 27), and a cutting from the shirt sleeve of Junior Food Store victim Richard Slysz which contained blood (State Ex. 1).   Defendant argues that the victims' DNA may be found on the clothing of Clark, Lucas, and Young.[8]   However, the clothing from Clark, Lucas, and Young was collected four days after the Junior Food Store shooting when they were initially incarcerated and Defendant has not shown there was any evidence this was clothing worn during the commission of the crimes or that his clothing was in the individuals' exclusive control.   TT:2561-66. As shown above, there was overwhelming evidence proving Defendant was the shooter at both the Madison Street Deli and the Junior Food Store, given the tenuous link between the clothing and the crimes, the Court finds Defendant's proposed DNA results would not create a reasonable probability of an acquittal or of different verdict(s) in light of the evidence in the case.

---

[8] The Court again notes that there is no viable DNA source for Mr. Wilson that has been requested by Defendant.   Additionally, the Court notes that Defendant has not identified a reliable source of DNA for Clark, Young, and Lucas.   Although Defendant proposes that their clothing could reveal the habitual wearer of the clothing, that is not conclusive proof, as admitted by Defendant's expert, that this is each individual's DNA as there is no evidence they were the habitual wearers of the clothing.   EMNT, p. 57.

26

## VI. Defendant has failed to establish that his motion was not filed for purpose of delaying his execution.

Prior to obtaining a hearing on his motion for DNA testing,

O.C.G.A. § 5-5-41(c)(4)(A) required Defendant to *"state"* that the motion

for DNA testing was not filed for the purpose of delay. However, before

this Court is authorized to grant DNA testing, O.C.G.A. § 5-5-

41(c)(7)(D) requires that Defendant *"establish"* that the motion is not

made for the purpose of delay. "Although 'establishing' a fact is not

necessarily the same as 'proving' it, a trial judge will necessarily be

called upon to resolve factual issues in determining whether the

[defendant] has 'established' this "criteria". *White v. State*, 346 Ga.

App. 448, 451 (2018).

Additionally, O.C.G.A. § 5-5-41(c)(1) states that a request for DNA

testing is "subject to the provisions of subsections (a)". O.C.G.A. § 5-5-

41. O.C.G.A. § 5-5-41(a) requires that "[w]hen a motion for a new trial

is made after the expiration of a 30 day period from the entry of

judgment, *some good reason must be shown why the motion was not*

*made during such period,* which reason shall be judged by the court".

(Emphasis added).[9] The Georgia Supreme Court has explained that

---

[9] *See generally Bharadia v. State,* 297 Ga. 567, 571 n.5, 774 S.E.2d 90, 94 (2015) ("Moreover, subsection (c) begins by saying '[s]ubject to the provisions of subsections (a) and (b),' one of which, as discussed above, is showing 'good reason,' including due diligence, for not filing the new trial motion within 30 days of trial.").

"*regardless of the basis* for an extraordinary motion for new trial" and "*before considering the merits* of the [untimely] motion," "O.C.G.A. § 5-5-41 (a) requires the moving party to show a 'good reason' why the motion was not filed during the 30-day period after the entry of judgment." *Ford Motor Co. v. Conley*, 294 Ga. 530, 539, 540-41 (2014). (emphasis added). And "[g]ood reason exists only where the moving party exercised due diligence but, due to circumstances beyond its control, *was unable previously to discover the basis for the claim it now asserts*". *Id.* at 541 (emphasis added). This makes sense as "the diligence requirement ensures that cases are litigated when the evidence is more readily available to both the defendant and the State, which fosters the truth-seeking process". *Drane v. State*, 291 Ga. 298, 304 (2012).

## A.   Defendant has failed to establish no undue delay or "good reason" for his untimely filing.

Defendant committed his crimes in 1994 and his trial was held in 1997. *Cromartie v. State*, 270 Ga. 780, 781 n.1. Seven years prior to his trial, the Georgia Supreme Court determined DNA testing results were admissible. *Caldwell v. State*, 260 Ga. 278 (1990) ("The admissibility of DNA identification evidence is an issue of first impression in this court."). Defendant knew about all of the items prior

28

to trial that he now requests to be tested. Like the defendant in
*Bharadia v. State,* 297 Ga. 567 (2015), he avoided the risk that pre-trial
DNA testing on some of the items might implicate him in the crimes
and waited until now to request these tests. At no point, as admitted by
Defendant, in the twenty-four years since he committed his crimes has
he requested DNA testing. So far, the only reasons offered by
Defendant to excuse the delay in bringing this action are that:  1) he
has been busy litigating his state and federal habeas petitions; and 2)
the DNA testing methods he is requesting only became available in
recent years.  EMNT, pp. 135-36.

The Court acknowledges that subsection (c) of O.C.G.A. 5-5-41 was
not enacted until 2003, however, the Court finds that neither of the
reasons given by Defendant are a good reason for the delay in filing
said motion following the enactment of said subsection.

### 1.   Failure to litigate DNA request in proper venue does not establish that this motion was not filed for the purpose of undue delay.

During the hearing held before this Court, counsel for Defendant
argued that his litigation in his habeas proceedings had not allowed
him the opportunity or the time to litigate a request for DNA testing.
EMNT, p. 135.  However, the Court finds there was no proof of this
presented to the Court.  As mentioned above, Defendant has known
about the physical evidence since the time of trial and has been

continuously represented by counsel through both his state and federal habeas proceedings.  Moreover, the proper venue for seeking DNA testing has always been in the trial court through O.C.G.A. § 5-5-41. *See Fryer v. Stynchcombe*, 228 Ga. 576, 577 (1972) ("It is not the function of the writ of habeas corpus to determine the guilt or innocence of the petitioner."); *Bush v. Chappell*, 225 Ga. 659, 661, 171 S.E.2d 128, 130 (1969) ("If the evidence which the appellant presented at the habeas corpus hearing was newly discovered evidence, his remedy is by extraordinary motion for new trial, and not by habeas corpus.").  Defendant has not established that he could not have pursued his extraordinary motion at the same time as his habeas proceedings or requested a stay in his habeas proceedings to pursue his extraordinary motion.  *See, e.g., Drane v. State*, 291 Ga. 298, 304 (2012).  Consequently, the Court finds Defendant has not established that he was unable to file in the proper venue but instead chose not to do so in order to use an extraordinary motion later to delay his lawful execution.

> ### 2.   Defendant's new DNA testing methods have been available too long to serve as a "good reason" to excuse the untimely filing of his motion.

The Court also finds Defendant has not shown "good reason" as he has not shown he "exercised due diligence but, due to circumstances beyond its control, *was unable previously to discover the basis for the*

*claim it now asserts".* *Ford Motor Co.,* 294 Ga. at 541. When considering whether a defendant has been diligent in bringing an extraordinary motion, the Georgia Supreme Court has held that diligence during one proceeding—even regarding the same claim—will not carry over to diligence in another proceeding. *See, e.g., Bharadia v. State,* 297 Ga. 567, 573, 774 S.E.2d 90, 96 (2015) ("diligence before trial will not be inferred from diligence after conviction") (quoting *Timberlake v. State,* 246 Ga. 488, 491, 271 S.E.2d 792, 796 (1980)). Moreover, also when assessing diligence, the courts "look to the *action and inaction of the defendant,* including his counsel and defense team". *Bharadia,* 297 Ga. at 573 n.9. And the Georgia Supreme Court has "reject[ed]" the argument "that the circumstances of indigence and incarceration since arrest mitigate in favor of a showing that [the defendant] acted with due diligence in pursuing the evidence at issue in this case". *Id.* at 574 n.11.

Defendant asserts that some of the requested DNA testing methods were not available until recently—specifically "touch" DNA testing and "probabilistic genotyping." However, the Court finds that although these methods may not have been available until after the enactment of subsection (c), they were available years before he filed his extraordinary motion. Defendant's expert agreed during the hearing held on June 24, 2019, that "touch" DNA testing for clothing

31

became available around 2006 or 2007.  EMNT, pp. 47-48.  Indeed,

around 2007, "touch" DNA testing was performed by the State on the

handle of a revolver in a murder case. *Davis v. State*, 304 Ga. 547, 549

(2018).

According to Defendant's expert, "probabilistic genotyping", a

method used to place different "weight" on separate DNA contributors,

became available in 2017.  EMNT, p. 49.  However, in the state of

Pennsylvania, where Defendant's current counsel practice, the Erie

County Forensic Laboratory has used "probabilistic genotyping

software called "STRmix" "since August 2012." *United States v.*

*Pettway*, No. 12-CR-103S (1), 2016 U.S. Dist. LEXIS 145976, at *4

(W.D.N.Y. Oct. 21, 2016).  Moreover, the "kits" suggested by

Defendant's expert, "GlobalFiler" and "PowerPlex Fusion," have also

been available since prior to 2017. *See, e.g. United States v. Williams*,

No. 3:13-cr-00764-WHO-1, 2019 U.S. Dist. LEXIS 72028, at *7 (N.D.

Cal. Apr. 29, 2019)  (noting that the "newer GlobalFiler kit" had been

"validated in *December 2016*") (emphasis added); *United States v.*

*Barton*, No. 8:14-cr-496-T-17AEP, 2016 U.S. Dist. LEXIS 124485, at

*11-12 (M.D. Fla. Sep. 9, 2016) (PowerPlex Fusion kit—which was used

to determine the "DNA profile of a 'major donor,' that is the donor with

the larger percentage of DNA in the tested sample"—was *held to be*

*admissible in 2016*) (emphasis added).

32

Defendant did not file his current motion until December 27, 2018—approximately twelve years after "touch" DNA became available and at a minimum two years after "probabilistic genotyping" became available. The Supreme Court has held that waiting two years to raise allegedly exculpatory evidence in an extraordinary motion for new trial shows a lack of diligence. *Llewellyn v. State*, 252 Ga, 426, 428-429 (1984); *see also Davis v. State*, 283 Ga. 438, 445 (2008). Therefore, this Court finds Defendant has not shown "good reason" for the delay of his filing of his extraordinary motion for DNA testing.

In sum, Defendant sat on this request until all other avenues were closed. And there is nothing in the record showing that Defendant was precluded from requesting DNA testing in what could be considered a timely manner considering the facts and circumstances of this case.

## CONCLUSION

Defendant's extraordinary motion for new trial and motion for DNA testing are DENIED.

SO ORDERED, this *14* day of *SEPTEMBER*, 2019.

Frank D. Horkan, Senior Judge
Southern Judicial Circuit

33

A33

Prepared by: ( And moderately amended by the Court)

/s/*Bradfield Shealy*
Bradfield Shealy
District Attorney

34

IN THE SUPERIOR COURT OF THOMAS COUNTY
STATE OF GEORGIA


STATE OF GEORGIA,

vs.                              CASE NO.:  94-CR-328

RAY JEFFERSON CROMARTIE,

         Defendant.
_____/      VOLUME I

EXTRAORDINARY MOTION FOR NEW TRIAL AND POST-CONVICTION DNA
         TESTING PURSUANT TO O.C.G.A. 5-5-41(C)
         BEFORE THE HONORABLE FRANKLIN D. HORKAN, SENIOR
      JUDGE, ON MONDAY, JUNE 24th, 2019 at 9:00 A.M.
            AT THE THOMAS COUNTY JUDICIAL BUILDING

APPEARANCES

FOR THE STATE:

SABRINA D. GRAHAM, SENIOR ASSISTANT ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia  30334
(404) 656-7650
sgraham@law.ga.gov



BRAD SHEALY, DISTRICT ATTORNEY
Southern Judicial Circuit
P.O. Box 99
Valdosta, Georgia  31603
(229)671-3256
bshealy@pacga.org


FOR THE DEFENDANT:

AREN ADJOIAN, ASSISTANT FEDERAL DEFENDER
Federal Community Defender Office
For the Eastern District of Pennsylvania
Suite 545 West - The Curtis Building
60 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Aren_Adjoian@fd.org

LOREN STEWART, ASSISTANT FEDERAL DEFENDER
Federal Community Defender Office
Capital Habeas Unit
Suite 545 West - Curtis Building
601 Walnut Street
Philadelphia, Pennsylvania  19106
(215) 928-0520
Loren_Stewart@fd.org

1    REPORTED BY:

2

3    JULIE F. ROBINSON LAWRENCE, CCR
     Certificate Number B-1865
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    JULIE F. ROBINSON LAWRENCE, CCR
                         POST OFFICE BOX 56
20                      BOSTON, GEORGIA  31626
                       stenoj28@windstream.net
21

22

23

24

25

1                    INDEX TO EXAMINATIONS              Page

2    RANDELL THOMAS LIBBY

3    Direct Examination By Federal Defender Stewart:        12
     Cross-Examination By Assistant Ag Graham:              46
4    Redirect Examination By Federal Defender Stewart:      60
     Examination by The Court The Court                     64
5    Further Redirect Examination By Federal Defender Stewart: 75
     Recross Examination By Assistant Ag Graham:            77

6

7    LAURA SCHILE

8    Direct Examination By Federal Defender Adjoian:        78
     Voir Dire Examination By Assistant Ag Graham:          85
9    Cross-Examination By Assistant Ag Graham:             109
     Redirect Examination By Federal Defender Adjoian:     122
10   Further Cross-Examination By Assistant Ag Graham:     124

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    INDEX OF EXHIBITS

2   Exhibit Number            Description            Page

3   **Exhibit No. 4 (not identified but stipulated to)

4   Exhibit No. 1           Libby Vitae              13
    Exhibit No. 2           Dr. Libby Declaration    18
5   Exhibit No. 3           Power Point Presentation 18
    Exhibit No. 5           Schile Vitae             79
6   Exhibit No. 7           Materials Reviewed       84
    Exhibit No. 6           Schile Report            84
7   Exhibit No. 1-65  Trial Evidence*Stipulated    126

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         PROCEEDINGS
 2          THE COURT:  Ladies and gentlemen, we'll call the
 3     case of State of Georgia versus Ray Jefferson
 4     Cromartie.  We're here on Mr. Cromartie's petition, an
 5     Extraordinary Motion for New Trial, request for DNA
 6     testing pursuant to Official Code of Georgia Annotated
 7     5-5-41C.
 8          I would like, for purposes of the record, if we
 9     could have Mr. Cromartie's counsel identify themselves,
10     please.
11          FEDERAL DEFENDER ADJOIAN:  Good morning, Your
12     Honor.  Aren Adjoian from the Federal Defender Office
13     on behalf of Mr. Cromartie.
14          THE COURT:  Adjoian?
15          FEDERAL DEFENDER ADJOIAN:  Adjoian, Your Honor.
16     Thank you.
17          FEDERAL DEFENDER STEWART:  Good morning, Your
18     Honor.  Loren Stewart, also from the Federal Defender
19     Office representing Mr. Cromartie.
20          THE COURT:  Thank you, gentlemen.  And for the
21     State?
22          ASSISTANT AG GRAHAM:  Good morning, Your Honor.
23     Sabrina Graham here on behalf of the Georgia Attorney
24     General's Office.
25          DISTRICT ATTORNEY SHEALY:  Brad Shealy with the
```

6

A40

1        District Attorney's Office.

2              THE COURT:  Ladies and gentlemen, any matters that

3        we need to address prior to presentation of evidence?

4              FEDERAL DEFENDER ADJOIAN:  Your Honor, we do have

5        a couple of brief housekeeping matters we have

6        discussed with opposing counsel, some stipulations

7        regarding chain of custody and evidence foundation type

8        of issues that we were hoping to put on the record

9        before we call our first witness.  And we have two

10       witnesses here present with us in the courtroom.  They

11       are both expert witnesses, and we would ask of the

12       Court that our second expert be permitted to observe in

13       the courtroom to observe our first expert's testimony

14       by way of housekeeping.

15             ASSISTANT AG GRAHAM:  We have no objection to

16       that, Your Honor.

17             THE COURT:  Very well.

18             FEDERAL DEFENDER ADJOIAN:  And I don't know if the

19       Court is interested in a brief overview of what we

20       intend to present here today.  I'm happy to do so, but

21       if the Court would prefer just getting straight to the

22       witnesses, we're happy to do it that way, as well.

23             THE COURT:  Mr. Adjoian, of course I've read your

24       motion.

25             FEDERAL DEFENDER ADJOIAN:  Yes, Your Honor.

7

1          THE COURT:  Your brief accompanying your motion

2     and likewise, the State's.  If there's anything that

3     you think you need to add to that, feel free to do so.

4     Otherwise, as I said, I've read it, looked at it

5     multiple times.

6          FEDERAL DEFENDER ADJOIAN:  Yes, Your Honor.  We're

7     happy to get right to it, so.

8          THE COURT:  Very well.  Do you-all wish to

9     announce your stipulations, first?

10          FEDERAL DEFENDER STEWART:  That's precisely what

11     I'd like to do, Your Honor.  Good morning.

12          First, there are the two stipulations, and I

13     express gratitude to counsel.  I think we obviated the

14     need to call a whole lot of foundational and chain of

15     custody witnesses with these stipulations, so hopefully

16     we can move things along.

17          The first stipulation, there's a stipulation by

18     and between counsel: the chain of custody was

19     maintained as to the physical evidence that is the

20     subject of this motion, all of which is currently in

21     the possession of the Town -- Thomas County Clerk of

22     Courts.  Specifically, the following individuals -- all

23     of whom are members of law enforcement or court staff

24     or officers at various times took custody of the

25     physical evidence.  Ken Collins from the Georgia Bureau

1    of Investigation, Fran Everett, the evidence custodian

2    of Thomas County, Special Agent Douglas A. Goodwin from

3    the FBI, Special Agent James C. Grady from the FBI.

4         THE COURT:  Excuse me, Mr. Stewart.  If you could

5    slow down just a little bit.

6         FEDERAL DEFENDER STEWART:  Sure.  Your Honor --

7         THE COURT:  Douglas Goodwin?

8         FEDERAL DEFENDER STEWART:  If the Court please, I

9    have an extra copy should the Court want a copy of the

10   same.  I also have one for the court reporter if the

11   court reporter would like that.

12        THE COURT:  All right, sir.  That would be

13   helpful.

14        FEDERAL DEFENDER STEWART:  May I approach, Your

15   Honor?

16        THE COURT:  Yes, sir.  Thank you, sir.

17        FEDERAL DEFENDER STEWART:  Shall I continue?

18        THE COURT:  Yes, sir.

19        FEDERAL DEFENDER STEWART:  I was, Your Honor,

20   midway down the list at James W. Howard, criminalist,

21   Georgia Bureau of Investigation; David Hutchings, the

22   former clerk of this Court; Sergeant Glenn Hutchinson

23   with the Thomasville Police Department; Lieutenant

24   Melven E. Johnson of the Thomasville Police Department;

25   Defense Attorney Michael Mears; Police Officer Kathy M.

1    Murphy with the Thomasville Police Department; Dr. John

2    Parker, the medical examiner; Detective Willie Spencer

3    of the Thomasville Police Department; Detective Bobby

4    Stephens of the Thomasville Police Department;

5    Detective Charles Weaver of the Thomasville Police

6    Department; and Randa Wharton, the current Clerk of

7    Courts.  If called to testified -- well, strike that.

8         Chain of custody over the physical evidence was

9    demonstrated at trial in 1997.  Since that time the

10    evidence has been maintained by the Thomas County Clerk

11    of Courts.  If called to testify, representatives from

12    the Thomas County Clerk of Courts would testify that

13    they have complied with all rules and regulations of

14    their offices and have, thereby, maintained chain of

15    custody of the physical evidence since trial.  That

16    concludes the first stipulation.

17         THE COURT:  All right, sir.

18         FEDERAL DEFENDER STEWART:  The second stipulation

19    to the second page of what I've handed to the Court and

20    to the stenographer, there is a stipulation by and

21    between counsel that all evidence offered by either

22    party from the State Court record in this case is

23    authentic and need not be authenticated by calling

24    foundational witnesses.  Such evidence includes, but is

25    not limited to, law enforcement investigative reports,

1    crime scene photos, the physical evidence, photos of

2    the physical evidence, including photos taken by

3    Mr. Cromartie's defense team of the evidence maintained

4    in the Thomas County Clerk of Court's Office, trial and

5    pre-trial transcripts, trial exhibits, State habeas

6    transcripts and State habeas exhibits.

7        By and through this stipulation, the parties may

8    offer as evidence and base arguments on documents,

9    testimony or other evidence in the State court record.

10   The parties remain free to dispute the truth of the

11   matters asserted in any document or testimony from the

12   State Court record.

13       Your Honor, with those stipulations entered, may I

14   call my first witness?

15       THE COURT:  Yes, sir.

16       FEDERAL DEFENDER STEWART:  And, Your Honor, before

17   I do, just to facilitate our hearing today, initially,

18   I was going to use technology.  I understand the

19   Court's technology has suffered from some lightning

20   locally, so we'll be using paper today.  What I've done

21   is I have compiled packets of exhibits that I'll

22   provide to the witness, to counsel and to the Court so

23   we can all be in the same place in looking at exhibits.

24   May I approach?

25       THE COURT:  Yes, sir.

11

1          FEDERAL DEFENDER STEWART:  To pass one to the

2      court?  Shall I give one also to the Clerk of Courts,

3      Your Honor?

4          THE COURT:  If you have an extra one.

5          FEDERAL DEFENDER STEWART:  I do.  May I approach

6      the witness stand?

7          Your Honor, Mr. Cromartie calls for the first

8      witness Dr. Randell Thomas Libby.  Your Honor, should I

9      swear the witness?

10          THE COURT:  That would be fine.

11                  (Witness sworn.)

12          FEDERAL DEFENDER STEWART:  Is that adequate, Your

13      Honor?

14          THE COURT:  It is.

15  THEREUPON,

16                  RANDELL THOMAS LIBBY

17  was called as a witness, having been previously duly sworn,

18  was examined and testified as follows:

19                  DIRECT EXAMINATION

20  BY FEDERAL DEFENDER STEWART:

21      Q    Can you state your name for the record, please.

22      A    Randell T. Libby, R-A-N-D-E-L-L, L-I-B-B-Y.

23      Q    Dr. Libby, what is your profession?

24      A    I am a neuro geneticist by training.

25      Q    And can I direct you to the very first item in the

1    packet before you, what's been marked for identification as

2    Defense Exhibit Number 1, behind the index.

3        A    Yes.

4        Q    Do you recognize that document?

5        A    Yes, this is a copy of my vitae.

6        Q    Your vita, that is your resume, as it were?

7        A    Yes, that's correct.

8             (Thereupon, Defendant's Exhibit No. 1 was marked

9    for identification.)

10            FEDERAL DEFENDER STEWART:  Your Honor, I would

11       like to proceed with some questions to qualify

12       Dr. Libby as an expert if I may.

13            THE COURT:  Yes, sir.

14   BY FEDERAL DEFENDER STEWART:

15       Q    Dr. Libby, can you describe for the Court your

16   educational background.

17       A    I have a bachelor of science in animal sciences

18   and physiology, a master's in microbial genetics, molecular

19   genetics, and a Ph.D. also in molecular genetics.

20       Q    And can you please describe for the Court what

21   your current work and research involves.

22       A    Our research over the last 20 years or more

23   relates to the development of molecular strategies for

24   defining the events underlying certain upper motor and

25   neuron disorders such as Parkinson's Disease, Huntington's

1   Disease and some other spinal cerebellar ataxias, all

2   related to an SGR type repeat.

3        Q    And just in layperson's terms, do those disorders

4   relate to DNA in any manner?

5        A    Yeah, they all relate -- all the studies we have

6   done over the last number of years relate to DNA, the

7   analysis of DNA, the manipulation of DNA and strategies for

8   altering the DNA to correct certain genetic defects.

9        Q    You talk about things that "we have done," is the

10  words that you used.  Where do you work and with whom?

11       A    That work is done at the University of Washington

12  School of Medicine.

13       Q    And do you maintain your own private business?

14       A    As GeneQuest Diagnostics.

15       Q    And is -- what kind of work do you do at

16  GeneQuest?

17       A    So that focuses on specifically forensic identity

18  issues, and also some issues related to neurological issues

19  for testing.

20       Q    Have you yourself ever done any DNA testing?

21       A    Many times, yes.

22       Q    And where do you do that, or where have you done

23  that?

24       A    Well, in the past that was done at the University

25  of Washington.

1              Presently, it's done at many laboratories across

2     the United States.

3        Q    Have you ever done any academic work, either

4     publication or lecturing?

5        A    Many times, yes.

6        Q    Can you give the Court a very short synopsis of,

7     say, publications, first?

8        A    At least 40 publications, all in, say, high impact

9     peer-reviewed journals, so those would include journals such

10    as PNAS, Proceedings of the National Academy of Sciences,

11    human molecular genetics, so a variety of journals such as

12    that.

13       Q    And have you also lectured or taught in any

14    capacity?

15       A    Yes, many times.

16       Q    Have you ever testified before a court of law

17    before?

18       A    Yes, I have.

19       Q    And approximately how many times if you could say?

20       A    About 200 -- over 200 times.

21       Q    What jurisdictions?

22       A    Many jurisdictions in the United States, so

23    starting from the west coast, I suppose Washington, Oregon,

24    California, Arizona, Nevada, Michigan, Texas, Louisiana,

25    Florida, North Carolina, Indiana and Illinois.  So there is

                                                          15

1  probably 25 or -- at least states and jurisdictions.

2      Q   I take it you haven't testified in Georgia before;

3  is that right?

4      A   I don't think I have, Counselor.

5      Q   Have you testified in state court or federal

6  court?

7      A   Both.

8      Q   Has there ever been a time where you have been

9  proffered but not accepted as an expert to a Court?

10     A   No.

11         FEDERAL DEFENDER STEWART:  Your Honor, I would ask

12     that the Court qualify Dr. Libby as an expert in

13     forensics and human molecular genetics.

14         If counsel has questions on qualifications before

15     we do that, I would concede to counsel.

16         ASSISTANT AG GRAHAM:  No questions, Your Honor.

17     No objection.

18         THE COURT:  The Court will recognize Dr. Libby as

19     an expert in the field of forensics and human molecular

20     genetics.

21         FEDERAL DEFENDER STEWART:  Thank you, Your Honor.

22  BY FEDERAL DEFENDER STEWART:

23     Q   Dr. Libby, did my office retain you to work as an

24  expert in this case?

25     A   Yes, they did.

1      Q     Did my office provide you any materials for your

2    review?

3      A     Yes, they did.

4      Q     If I could ask you to turn in the exhibit packet

5    to the fourth item which is marked D Exhibit 4.

6      A     Yes, I have Exhibit 4 in front of me.

7      Q     Do you recognize that document?

8      A     Yes, I do.

9      Q     And does -- where do you recognize that document

10   from?

11     A     These are items which have been provided to me in

12   the past to review in relation to this particular case.

13     Q     And approximately how many pages of materials do

14   you think you reviewed for this case.

15     A     I would guess five to six thousand pages, maybe

16   something in that range.

17     Q     As a result of your review of those materials,

18   were you able to form opinions in this case?

19     A     Yes.

20     Q     And the opinions that you did form and that you

21   express today, are those opinions to a reasonable degree of

22   scientific certainty?

23     A     Yes.

24     Q     And those opinions, are they based on -- in your

25   opinion, generally accepted scientific principles?

1      A    Yes.

2      Q    Did you produce a report in this case?

3      A    Yes.

4      Q    Can I direct you to item 2 in the packet before

5    you?  It's Defense Exhibit 2.

6           (Thereupon, Defendant's Exhibit No. 2 was marked

7    for identification.)

8      A    Yes, I have it in front of me.

9      Q    And is that the report that you authored?

10     A    Yes, it is a 32-page document.

11     Q    And, finally, did you prepare anything additional

12   in preparation for your testimony today?

13     A    Yes.

14     Q    I'd like to direct you to the third item in the

15   exhibit packet Defense Exhibit 3.

16     A    Yes, I have it in front of me.

17     Q    And what is it that you prepared in preparation

18   for today?

19     A    It is a 17-page slide deck for a Power Point

20   presentation.

21          (Thereupon, Defendant's Exhibit No. 3 was marked

22   for identification.)

23          FEDERAL DEFENDER STEWART:  And, Your Honor, if I

24     may, we initially were hoping to use the Power Point

25     for everyone to see visually in the court; however,

1          I've provided the paper copies, and in light of the

2          issue with the technology, I would just ask that we

3          follow along with the presentation as it is on paper.

4                THE COURT:  Yes, sir.

5    BY FEDERAL DEFENDER STEWART:

6          Q     Dr. Libby, I would now like to ask you a series of

7    questions along with the Power Point on paper that you have

8    before you.  I'd ask you to turn to the second page of that

9    Power Point.

10         A     Yes.

11         Q     Just briefly, by way of background, can you please

12   provide the Court with some information about sources,

13   traditional sources, of DNA, deoxyribonucleic acid.

14         A     Yes.  What I've indicated on this particular slide

15   two as indicated in the lower right-hand corner, is just the

16   traditional sources of where DNA could be obtained and it's

17   just illustrated both schematically in the picture as well

18   as to the left, so those would be from nuclear sources such

19   as blood, white blood cells, semen, saliva, urine, hair,

20   teeth, bone and other tissues.  So all of these are

21   relatively good sources of DNA, urine being less of a source

22   where you would get -- obtain high levels of DNA.  But what

23   I've indicated in the bottom is that you can obtain DNA in

24   nanogram quantities down to picogram quantities, so that's

25   in the 10 to the minus 9th range, 10 to the minus 12th grams

1    of DNA.

2        Q    So for those of us who aren't familiar with

3    picograms, when you talk about 10 to the minus 9th or 12th

4    picograms, what does that look like to the naked eye?

5        A    So you would not be able to see it, of course, so

6    mathematically, it's 0.000000001 nanograms -- or grams.  And

7    that would be a nanogram.  And then three more zeros added

8    to it would be a picogram.  So we are talking about very

9    small quantities of DNA.

10        Q    As to these sources of DNA, you said these

11    traditional sources are nuclear, I believe you said?

12        A    What I'd indicated on the slide, these are where

13    you obtain DNA from -- this would be nuclear, that's

14    correct.

15        Q    And what is non-nuclear DNA, if you can explain

16    briefly?

17        A    So that would be DNA that would be obtained in

18    other types of tissue, which there is not a nucleus.  For

19    example, the shaft of a hair you could obtain DNA from.

20        Q    I would like to turn to the next slide, so we're

21    still on Defense Exhibit Number 3, now we are on page 3 of

22    it.

23        A    Yes.

24        Q    There are page numbers in the lower right-hand

25    corner.  Can you please tell the Court briefly just about

                                                        20

1  how DNA testing works?

2      A    Yeah.  So what I had indicated here, this is a

3  slide taken from the literature, so there is many different

4  versions out in the literature, but basically there is three

5  major steps to performing DNA analysis.  There is the

6  biology step, then the technology step, and then the --

7  excuse me -- the genetic step.  So this is all involved --

8  every step, every DNA test would involve these sort of three

9  basic steps.  So within each step there was sub-steps.  So

10  the biology step would involve the actual DNA extraction

11  from the cells, and once that DNA is removed from the cell,

12  it is released by various chemical means.  The amount of DNA

13  that is obtained is quantitated so that one can get an

14  estimate of how much DNA is present so you know what type of

15  test you are able to perform successfully.  Once that is

16  obtained and you know what the quantity of the DNA and the

17  quality of the DNA, then the next step is to amplify a

18  certain region within the gene, so we're not trying to look

19  at the whole genome, we're trying to look at certain regions

20  which differ from one individual to the next, which are

21  called polymorphic regions within the genome.  So once we

22  amplify or sort of molecularly copy certain regions of the

23  DNA, we try to separate the fragments of the DNA that differ

24  from one individual to the next, and these are called

25  alleles, and then those alleles are genotyped to determine

21

1   what the exact type is, if you are a type A, B or 3, 4 or

2   whatever -- whatever type test we're performing.

3            Once you have that information, the last step is

4   the genetics step and that's where you determine if there's

5   a match between the given evidence sample and a given

6   reference sample, so you look to see where the matches are.

7   Once a match is determined to be present -- and the

8   statistics is applied, so you apply some weight to the

9   evidence.  So whether it is a frequency of one in 1,000; one

10  in a 10,000, that you might find this profile amongst the

11  general population, so those are generally steps we

12  generally perform.

13       Q    And at this juncture -- I'll wait.  Take a sip.

14            You talked about presence and quantity of DNA.  At

15  this juncture, the evidence in this case, do you know

16  anything as to whether there is and how much DNA, what

17  quantity there is present on any particular item?

18       A    We do not at this point.

19            FEDERAL DEFENDER STEWART:  Your Honor, if the

20       Court, please, Dr. Libby could provide further

21       background information regarding general DNA processes,

22       but if the Court finds that adequate, I could move on.

23            THE COURT:  Yes, sir, you can move on.

24  BY FEDERAL DEFENDER STEWART:

25       Q    Dr. Libby, turning to the next page of your

1    presentation to page 4 --

2         A    Yes.

3         Q    -- can you describe for the Court the current

4    technology of this PCR-based STR technology.

5         A    Sure.  So, currently, that is in the year of 2019

6    now, the way DNA testing is performed, it is not performed

7    at a single site, it is performed at numerous genetically

8    independent sites.  So greater than 30 regions are looked at

9    on the chromosomes, some kits, even many more sites.  These

10   can all be amplified simultaneously in the same small test

11   tube, if you will, and one can amplify less than 50

12   picograms of -- that's that 10 to the minus 12th, which is a

13   really very small quantity of DNA, which can be amplified.

14   So it's capable of amplifying mixtures of DNA, as well as

15   DNA which is graded.  It's conducted using fluorescent dye

16   system which different colors of dye are associated with

17   different primers, which are then designed to amplify

18   various regions within a chromosome.

19             It's fast, so we're talking about an amplification

20   process requiring about an hour in the laboratory, that's

21   after we get the preliminary steps done.  And then it

22   provides a very high-powered discrimination, so these are

23   providing numbers in with this septillion, that is 10 to the

24   24th, so enormously high statistical frequencies.  So it's

25   a -- it's now a very efficient procedure for amplifying very

23

1    small quantities of DNA.

2        Q    And the procedure you just described, in your

3    expert opinion in the scientific community, is that a

4    procedure that has been accepted with verifiable certainty?

5        A    Absolutely.

6        Q    Have you ever used that procedure?

7        A    Yes.

8        Q    And have you ever testified about that procedure

9    in other courts of law?

10       A    Yes.

11       Q    If I may, let's turn to the next page of your

12   presentation, it's page 5.  You describe the technology as

13   it exists in 2019.  Could you please describe for the Court

14   how technology in DNA testing has evolved.  And since 1997

15   is what I would like you to opine on.  I choose 1997 because

16   that was the year of the trial in this case.

17       A    Yes.  So what I have indicated on slide 5

18   indicated in the lower right-hand corner is sort of the

19   major steps that one goes through in DNA typing.  A

20   collection of DNA evidence, the extraction that we talked

21   about before, the quantitation and then PCR amplification,

22   separation and detection, the data analysis.  And then

23   within each one of those sections there has been enormous

24   improvements in the process of DNA typing which has been

25   developed.  So, for example, the extraction step:  It used

1  to be done by purely an inorganic differential extraction

2  using phenol, various chemicals.  That's over the years been

3  replaced by much more efficient systems, such as DNA IQ I

4  indicated in 2004, parentheses, it just happens to be the

5  company that produces that kit, charts which have been

6  developed by ABI and then PrepFiler 2008 and then QIAamp DNA

7  Investigator 2012.

8          So each one of these steps has been a progression

9  in the improvements in the efficiency of extracting DNA from

10  samples which are expected to contain low quantities of DNA.

11  So it's made the extraction much more efficient,

12  particularly at getting at low quantity DNA such as touch

13  DNA.

14          The quantitation that is determining how much DNA

15  has similarly evolved over the years from the early days

16  when we used to do hybridization slot bots with radioactive

17  isotopes has been improved to presently we're doing

18  essentially quantifier type testing.  So the present systems

19  out now are indicated at the top, Plexor HY and then Power

20  Point 2018.  So these allow for a realtime analysis for

21  determining the quantities, low level quantities, of DNA and

22  what the level of degradation of that sample might be.

23          And then the particular steps regarding the

24  amplification, that is the next step on the quantitation has

25  probably been developed the most over the last 20 years --

1    well, since 1996, '97, so it's gone from a system in which

2    there has only been a handful, maybe two or three of STR

3    sites which have been amplified at the same time, originally

4    just one site to systems such as GlobalFiler and Fusion 6c,

5    which is the fourth one up from the bottom.  That system was

6    developed in the range of 2013 to 2015, and it targets

7    either 21 independent genetic loci or 24 independent genetic

8    loci.

9            And then there has been further development since

10   that time; for example, the Forensic DNA Signature kit is

11   actually now getting at sequencing the genomes, so it's been

12   a systematic progression of the development of the testing

13   procedure in terms of the identification of various allelic

14   forms within a sample.

15           And then, of course, there's been improvements on

16   the technology end or side of the process for the --

17   actually detecting the alleles which are present.  So we've

18   gone from a very -- I don't want to call it primitive, but

19   one of the earlier forms of capillary electrophoresis, it's

20   called the EDI 310 system.  It's one in which a sample is

21   injected through a small capillary, passes through a laser

22   where the laser excises the fluorochromes and then that's

23   detected.  These then developed into the ADI 3500 XL system

24   which is a much more intense laser beam and provides more,

25   greater sensitivity and detection.  And then lastly is the

1    steps of evaluating the genetics of a match and the weight

2    of the evidence, and we have moved now from random match

3    probabilities of testing to what is called probabilistic

4    genotyping.  So the random match probability testing is in

5    the lower portion where I have just indicated the dinosaur,

6    not that it's a dinosaur yet, but it is surely becoming

7    that.

8         And so we're developing into other procedures

9    which allows one to evaluate a mixture and put a weight on

10   the particular different genotypes which are detected within

11   the mixture.

12   Q    Okay.  As a non-scientist, if I may ask a couple

13   of follow-up questions?

14   A    Sure, absolutely.

15   Q    You said that you could, I guess, distinguish

16   amongst different genotypes in a mixture.

17   A    Yes.

18   Q    Does that mean that if you have a sample where

19   multiple people have contributed to it or touched it, that

20   you're better able to distinguish sort of who is who than it

21   used to be?

22   A    That is correct.  And to apply a weight to it, as

23   well.  So what percentage of a mixture is genotype A versus

24   what percentage is genotype B or C or D.

25   Q    As to separation and detection, you talked about

27

1    the more sensitive, I'll say, labor that exists currently --

2         A    Yes.

3         Q    -- to detect very small quantity -- is it very

4    small quantities of DNA?

5         A    Yes, that's correct.

6         Q    And how over time has that changed?

7         A    Well --

8         Q    In ability to detect.

9         A    Oh, I see.  In terms of the sensitivity?

10        Q    Yeah.

11        A    It's probably increased at least 10 to the 3rd

12   fold, a thousand fold.

13        Q    10 to the 3rd fold over what period of time, if

14   you could put years on it?

15        A    Since about '94, '95.

16        Q    In say the last 10 years has some of that 10 to

17   the 3rd sensitivity change occurred in the last, say,

18   decade?

19        A    Oh, yes, absolutely.

20        Q    Could you put a number on that, approximately?

21        A    Of what percent has changed?

22        Q    Yes, if you could.  If not --

23        A    Well, I think that the -- in the past you would

24   not have been able to detect the low level of DNA that we're

25   detecting today, so the low levels of DNA we are detecting

1   today would not have been detectable in '94, '95 and '96.

2   So that data would have been discarded.

3       Q    And what of, say, 2005, 2008 compared to today,

4   detectability of --

5       A    Yeah, it's probably at least another factor of 10

6   more sensitive.

7       Q    Okay.  And if I could turn you to the next page,

8   page 6 of your presentation.  I think we've just been

9   talking about low level.  Is that touch or contact DNA that

10  you have depicted on this slide?

11      A    It is.  It has been referred to.  So it's been

12  referred to as touch DNA or contact DNA.

13      Q    And what -- in the real world, what is touch or

14  contact DNA?

15      A    So it's simply -- as I have kind of indicated with

16  picture format, it is simply when one touches an item or an

17  object indicated as a gun on the left panel in the middle,

18  it's another item, I think it's a metal bar or touching a

19  doorknob, it's the transfer of DNA cells from your hand,

20  your skin to the -- an object.  And it's then the ability to

21  detect that type of genotype, that DNA which is on that

22  item.

23      Q    And so as your hand rests on the stand before you

24  right now, might you be leaving touch DNA?

25      A    Yes, that is correct.  And, of course, it changes

1    a little bit depending on the substrate of the type of

2    object you are touching, but basically one can detect a

3    profile from as few as seven to eight cells, so that's a

4    really small quantity of DNA.

5        Q    And the seven to eight cells, is that visible to

6    the human eye?

7        A    No, not at all.  You would not be able to see

8    this.

9        Q    Dr. Libby, I would like to change gears now and

10   ask you some questions about the case.  If you could turn to

11   page 7 of your presentation.

12       A    Yes.

13       Q    First, I'd like to ask you some questions about

14   specific exhibits that were trial exhibits in the case, and

15   this is physical evidence from this case.  Do you recognize

16   the photographs in page 7 of your presentation?

17       A    Yes, I do.

18       Q    And can you describe what you see depicted there

19   in the photograph?

20       A    So on slide 7 is item 156, it is a cartridge

21   casing, and this was obtained from the Madison Street

22   Delicatessen.

23       Q    And just to be clear, you can't see the cartridge

24   casing; is that correct?

25       A    That is correct.  You cannot see it.  It's inside

30

1    the cartridge indi -- the round cartridge labeled at State's

2    Exhibit 156.

3              FEDERAL DEFENDER STEWART:  And with the parties'

4         stipulation, Your Honor, relating to the exhibits and

5         the foundation of those exhibits, I would submit to the

6         Court that that Exhibit 156 from trial was described at

7         trial as a cartridge casing recovered from the Madison

8         Street Deli shooting and was recovered by Detective

9         Chuck Weaver at that time.

10   BY FEDERAL DEFENDER STEWART:

11        Q    What, if any, significance from a forensic

12   perspective would this exhibit have in your view?

13        A    Well, in my opinion, spent cartridges are

14   potentially a good source of obtaining DNA from handling a

15   cartridge prior to loading it into a magazine, so it would

16   be -- it would be something we would want to sort of look at

17   and see if we can obtain a profile from them.  It would give

18   an indication of who has handled that object beforehand.

19        Q    Is it then possible to get DNA off of fired

20   cartridge casings?

21        A    Oh, absolutely, yes.

22        Q    Have you ever heard of cases where that has been

23   done?

24        A    Yes, yes.

25        Q    Have you ever examined those cases yourself or

1    simply read about it in the literature?

2        A    No, I've had cases of that nature, yes.  And

3    it's -- there is a fair amount of body of literature on

4    this.

5        Q    And I don't need you to turn to it now, but at the

6    conclusion of the presentation, the last three slides, I

7    believe, is there some of the literature on which you

8    relied?

9        A    That is correct.

10       Q    And that is both also in the report that you

11   produced?

12       A    That is correct, yes.

13       Q    So would you recommend to the Court any type of

14   testing if the Court were to order testing on this

15   particular exhibit?

16       A    It would be my recommendation that one of the more

17   advanced forms, present-day forms, of STR testing be done in

18   this item 156, yes.

19       Q    Could I turn you to the next page of your

20   presentation, page number 8 to this?

21       A    Yes.

22            FEDERAL DEFENDER STEWART:  And, Your Honor, before

23       I ask the questions relating to these three items, I

24       represent to the Court as part of the stipulation

25       between counsel that at trial, items State Exhibit 159

1        and 160 were cartridge-fired cartridge casings that

2        were recovered at the Junior Food Store shooting.  They

3        were recovered by Detective Chuck Weaver and Ken

4        Collins from the Georgia Bureau of Investigation

5        jointly.  And then the cigarette packaging was also

6        recovered from the Junior Food Store crime scene.  It

7        was State's Exhibit 9 at trial.

8    BY FEDERAL DEFENDER STEWART:

9        Q    Dr. Libby, starting first with -- there is some

10   sort of a -- strike that question.

11            FEDERAL DEFENDER STEWART:  Before I ask, there is

12       one more item depicted here, which at trial was State's

13       Exhibit -- Court's indulgence briefly.  It was State's

14       Exhibit 138 at trial.  I have it marked in my exhibit

15       packet as Defense Exhibit 28 for purposes of this

16       motion, that that item is a diagram that was drawn by

17       Ken Collins of the Georgia Bureau of Investigation, it

18       was admitted at trial, and that item depicts a diagram

19       of the crime scene that shows where the deceased was

20       and also shows two cartridge casings relative to where

21       the deceased's body was.

22            THE COURT:  Okay.

23   BY FEDERAL DEFENDER STEWART:

24       Q    Dr. Libby, first, I'd like to ask you about what's

25   identified as item 159.  It's the first -- it's actually

33

1    labeled cartridge casing number 2.

2        A    Yes.

3        Q    And you don't need to go into as much detail

4    because we did just talk about a cartridge casing, but what,

5    if any, testing would you recommend as to this cartridge

6    casing if a Court were to order testing?

7        A    I would recommend the same, for the same reasons.

8    So the same type of STR-based testing in order to determine

9    what profiles could be detected on those cartridges.

10       Q    Let me ask you:  You reviewed the trial in this

11   case; right?

12       A    Yes.

13       Q    The trial transcripts?

14       A    Yes.

15       Q    Do you recall that the cartridge casing was

16   examined ballistically; is that right?

17       A    Yes.

18       Q    If it had been handled, say, in a ballistics lab,

19   would there be a chance there would be a mixture of DNA on

20   the cartridge casing?

21       A    It is possible.

22       Q    Is that something -- would testing still be

23   advisable?

24       A    Yes.

25       Q    And how?  How would you deal with a mixture if

                                                              34

1  there were a mixture?

2      A    Well, it would be the same means of using a

3  probabilistic approach for resolving out the individual

4  components of a mixture.  My guess is -- I'm not sure on

5  this especially, but my guess is that whoever handled it

6  probably wore gloves.  So I'm thinking that is probably less

7  of an issue.

8      Q    That's your guess; we don't know that for the

9  record, do we?

10     A    That is correct.

11     Q    So would your opinion as to that item number 160

12 that's the second cartridge casing, would you have the same

13 opinion as to that?

14     A    Yes, I would.

15     Q    And item -- what is listed as State's Exhibit 9,

16 what is that?  Can you tell the Court about that?

17     A    That is a package of cigarettes which were found

18 next to the decedent and Mr. Slysz?

19     Q    Yes?

20     A    I'm thinking there would be someone most likely

21 handled those cigarettes.  It could have been just the

22 victim or could have been whoever committed this homicide,

23 so that would be also another item that I would recommend

24 testing on.

25     Q    I would like you to turn to the next slide.

1          FEDERAL DEFENDER STEWART:  Your Honor, at trial

2     these two items were identified as State's Exhibit 30A

3     and 30B.  They were admitted as evidence at trial, and

4     they also have larger photographs of every item in Dr.

5     Libby's presentation.  There are larger photographs in

6     the exhibit packet.

7          For purposes of these questions, the green-hooded

8     sweatshirt is Defense 8 through 10 here, and the black

9     cap is Defense 11 and 12.  And just again, by way of

10    the stipulations from trial, in the State court record,

11    it's established that the black cap and the

12    green-hooded sweatshirt were recovered at 229 West

13    Monroe Street here in Thomasville, which the testimony

14    indicated was about one block from the Madison Street

15    Deli.

16         A resident of that address, Mr. David McCrae

17    (phonetic) testified that the morning of April

18    8th, 1994, which was the morning after the Madison

19    Street Deli shooting, that he went outside and observed

20    these items in his yard, knew of the shooting from the

21    night before and called the police, and they were

22    received by a Detective Chuck Weaver at that time and

23    admitted as State's evidence at trial.

24  BY FEDERAL DEFENDER STEWART:

25       Q    Dr. Libby, first as to item 30A, that black

36

A70

1   knitted cap, do you have any recommendation as to what could

2   be done with that item if any testing were ordered?

3       A    Yes.  So 30A, the black knitted cap could be

4   evaluated for the habitual wearer status or who would have

5   normally worn the hat.  So, again, we would be looking

6   for -- so for autosomal DNA, so epithelial cells that might

7   be on the brim, the inside brim of the cap that would have

8   contact with an individual's skin.  So we would be looking

9   for a profile from that, as well as there could be hairs in

10  there, which would be subject to analysis, either by

11  autosomal or mitochondrial DNA, depending on whether a

12  telogen or root was associated with any of the hairs which

13  might be found there.

14          So that is one level; the other level is if there

15  was any evidence of the victim's DNA on there as a result of

16  any blow-back from the firearm.

17      Q    And very well.  As to the green-hooded sweatshirt,

18  which is the next item, item 30B?

19      A    The green-hooded sweatshirt with similar would

20  be -- I would recommend testing for habitual wearer status.

21  I would also recommend that we examine those regions on the

22  sweatshirt; for example, the pockets in the front.  I'm

23  assuming this has the pockets in the front where one might

24  have put their hands or might have put the weapon in, but

25  there might be a transfer of the -- of any evidence from the

1    crime scene; that is, any blood from Mr. Slysz.

2         Q    I'm sorry.  This was the Madison Street Deli

3    shooting, this particular --

4         A    Oh, I'm sorry.  Yeah, from Mr. Wilson.

5              So any evidence of any DNA from that individual,

6    as well, that might be detected on the sweatshirt.  So it

7    could be the pocket areas; it could be the rims around the

8    bottom of the sweatshirt, as well.

9         Q    And, in general, when you talk about habitual

10   wearer, are you talking about friction skin cells or sweat

11   or what could produce it?

12        A    Yeah.  I'm talking about, as counselor indicated,

13   friction transfer from maybe around the neck area onto the

14   sweatshirt itself or around the wrist where the garment is.

15        Q    Okay.  And just as to those two items, I'm sorry,

16   what type of testing did you say you would recommend?

17        A    So it would be both autosomal, so it would be both

18   probably GlobalFiler or Fusion or Fusion 6C.

19        Q    Is that YSTR testing?

20        A    Those are STR forms of testing.

21        Q    STR.

22        A    And then probably Y -- the Y testing would be

23   something like Y23.  So it would be another form, just from

24   looking at -- well, that is from Mayo but mitochondrial is

25   another form of testing we would be looking at.

                                                            38

1      Q    If I could have you turn to the next slide in your

2    presentation, page 10.

3          FEDERAL DEFENDER STEWART:  Your Honor, State's

4          Exhibit 162 at the trial, a .25 caliber Raven Arms

5          semi-automatic pistol that was recovered between the

6          Jail Justice Center and the Cherokee Homes near the

7          railroad tracks.  And the ballistics evidence that was

8          admitted at trial indicated that both decedents were

9          shot by this firearm, was what the testimony was, and

10         we're not disputing that as we are here today.

11   BY FEDERAL DEFENDER STEWART:

12     Q    Dr. Libby, what, if any, testing would you suggest

13   as to the firearm in this case?

14     A    So it would be the same type of transfer DNA that

15   we're looking at where skin cells might have been

16   transferred to the weapon itself, either -- there are

17   various regions on the weapon, so the slide on the weapon,

18   the trigger, the trigger guard, the handle, anywhere where

19   an individual who had been handling that weapon might have

20   transferred their cells to the hand gun.  And that could

21   also include the magazine, as well, or when it's loading the

22   magazine bullets.

23     Q    And why the magazine in particular?

24     A    Because that is one in which there would be a lot

25   of friction as one's holding on to that item as you are

1    inserting, you know, various bullets into the -- in the

2    magazine, so I would expect that there would be a reasonably

3    good expectation to find a profile there.

4        Q    If the firearm was handled during the trial as an

5    exhibit, would that change your opinion?

6        A    It wouldn't change my opinion, just you would have

7    to take into consideration at the end the testing:  Do we

8    have other profiles there?  And we would resolve those

9    profiles based on the mixture in which we develop.

10       Q    And would this also be you recommend autosomal

11   testing on these?

12       A    It would, yes.  On this particular, it would.

13       Q    Turning onto page 11, Dr. Libby, the next three

14   slides all depict various items of clothing.

15           FEDERAL DEFENDER STEWART:  And before I ask you

16       questions about them, Your Honor, just by way of

17       background, the State Court record indicates that items

18       14A and 14C are clothing that was collected from Corey

19       Clark.  Mr. Clark was a co-defendant in this case who

20       is alleged to have been and convicted of being present

21       at the Junior Food Store shooting.

22           Item 16, these are -- the numbers I'm referring to

23       are the State's exhibit numbers at trial.  Item 16 is

24       shoes from Thaddeus Lucas.  He was a co-defendant at

25       the time of trial who was convicted of being a driver

1      at the Junior Food Store shooting.  Item 27A, B and C

2      on the next slide are clothing and shoes that were

3      taken from Gary Young.  Gary Young testified that this

4      firearm was his, that he had the gun before the

5      shootings, that he had the gun after the shootings and

6      that he fired the gun on April 12th.  That was clothing

7      from Gary Young.

8          And then the third page of clothing is, Your

9      Honor, is evidence that was put on the property receipt

10     that was collected from my client Mr. Cromartie, a pair

11     of shoes and a green flannel shirt, those are items 18B

12     and 20.

13  BY FEDERAL DEFENDER STEWART:

14     Q    Dr. Libby, what I would like to do is first just

15  ask you questions, generally, about the collection of

16  evidence from these items and then sort of ask why.  So

17  first as to the shoes, there are shoes from each individual

18  that I just described?

19     A    Yes.

20     Q    Is it possible to lift DNA from shoes, and how

21  would that be done?

22     A    Answer to the first question is yes.  Answer to

23  the second question is usually by swabbing the area on the

24  shoes, which could be at the bottom of the shoes, the top of

25  the shoes, the shoe laces as an example.  So we lift DNA

1  from those areas, and then start the extraction at that

2  point.

3      Q    Do you do DNA from the interior, from the

4  exterior, both?

5      A    You can do it from there, as well, yes.

6      Q    And why would you try to get DNA from the shoe in

7  this case, from each pair of shoes?

8      A    Well, in this instance -- and of course, you want

9  to look to see if there is any evidence connecting the shoe

10  with the crime scene, so we're looking from DNA from any one

11  of the victims in this case.  We're also looking to confirm

12  the identity of the individual who wore the shoes, so that

13  could be obtained by swabbing the area on the shoe laces as

14  one ties their shoes.  That would be a rich source of DNA as

15  cells slough off on the shoe strings.  So it's both to

16  determine who was wearing the shoes and what other evidence

17  is on the shoes which connected those shoes to the two crime

18  scenes or the one crime scene.

19      Q    And, in your opinion, and based on the record in

20  this case, why would there be DNA of a victim on the shoes

21  or why could you expect that?

22      A    I could imagine it as a result of blow-back

23  from -- from discharging the weapon.

24      Q    And would that -- I guess that is at close range;

25  is that right?

1        A    Yes.   I mean, it could be, yeah, close range but

2   it could be -- may not necessarily be visible to your eye.

3   You may not actually see the blood spatter, or you might

4   very well obtain a profile.

5        Q    And how is that -- if say on a white shoe there

6   was blood but you don't see it today, why would that happen?

7        A    Well, I mean, over time that heme in that blood

8   might have been oxidized.  It may not be very visible these

9   days.

10       Q    So the heme, is that HEME?

11       A    H-E-M-E.

12       Q    Is that what produces the color of the blood --

13       A    That's correct.

14       Q    -- as we know it?

15       A    That is correct.  So these shoes have been around

16  for what, over 20 years?  So depending on, you know, if they

17  were stored in sunlight or not, that would affect that, as

18  well.

19       Q    If you did find biological material on one of the

20  victims on the shoe, on any one of these shoes, could it

21  tell you what someone did, what the shoe wearer actually

22  did?

23       A    Maybe you could explain more.  I'm not sure.

24       Q    Sure.  I can rephrase it.  Would it show you that

25  someone had been in proximity?

1     A    Oh, I see what you are asking.  Yes, absolutely.

2     Q    So proximity, yes.  And would it tell you more

3  than just proximity?

4     A    It would tell you they were somehow close enough

5  to the incident that there would be some transfer of those

6  cells, either blood or whatnot to those shoes.

7     Q    Okay.  So the second item on this I'd like to ask

8  you about is item 14C, this is a pair of pants that were

9  taken from Corey Clark.

10    A    Yes.

11    Q    What, if any, testing would you recommend be done

12 on that item?

13    A    Well, on the green pair of jeans, certainly we

14 would check the waistband, as well, for habitual wearer

15 status, but also around the pocket regions where one might

16 put their hands into the pockets.  And if the individual was

17 in close proximity to the victim, there might be transfer of

18 DNA from that individual's cells to his pockets, the inside

19 pockets or maybe near the rim of the pockets, so we would

20 certainly look closely in those areas.

21    Q    And based on your experience, have you ever

22 examined clothing for DNA or pants in particular?

23    A    Many times, yeah.

24    Q    Have you found there to be DNA in pocket regions

25 or waistbands?

44

1          A      Yes.

2          Q      As to these green jeans, based on the record, you

3    don't know, do you, whether Mr. Clark was wearing those at

4    the time of the crimes?

5          A      I do not know that, that's correct.

6          Q      Turning to the next page, there is clothing -- so

7    this is items 27A and 27B, clothing that was described

8    that's taken from Gary Young and it's described as a white

9    T-shirt, a green polo -- and green polo shorts?

10         A      Yes.

11         Q      What kind of testing, if any, would you recommend

12   on those items if the Court were to grant testing?

13         A      Again, I would recommend an autosomal type test

14   that we've talked about that being either GlobalFiler or

15   Fusion, Fusion 6C.  They are very sensitive tests

16   particularly for low-level contact DNA.

17         Q      And as to the shoes, I take it that would be the

18   same as you already described; is that correct?

19         A      That's correct, yes.

20         Q      And, finally, there are the items on page 13 of

21   your presentation that were taken from Mr. Cromartie, item

22   18B and item 20.  Do you recommend the same type of testing

23   as you've described for Mr. Cromartie?

24         A      I would, yes.

25                FEDERAL DEFENDER STEWART:  With the Court's

1           indulgence if I may?

2                 THE COURT:  Yes.

3                 FEDERAL DEFENDER STEWART:  Your Honor, the only

4           thing I would add is as to the photographs in Dr.

5           Libby's presentation, they are rather small here.

6           Larger versions of all of those items are present in

7           the exhibits that I've presented in the package before.

8           I'm not going to go through those items with Dr. Libby,

9           but I will be asking that they be made of record at the

10          end of the hearing when we move the evidence in.

11                THE COURT:  All right, sir.

12                FEDERAL DEFENDER STEWART:  And with that, I pass

13          the witness.

14                THE COURT:  Ms. Graham.

15                             CROSS-EXAMINATION

16    BY ASSISTANT AG GRAHAM:

17          Q    Good morning, Dr. Libby.

18          A    Good morning.

19          Q    I'm Sabrina Graham.  Nice to meet you.

20                I just have a few questions here.  I want to clear

21    up some things.  All right.  Let's go to page -- lets see.

22    Page 56 of your Power Point presentation regarding when DNA

23    testing of certain types of DNA extraction, testing, all

24    that became available.

25          A    Yes.

1       Q    So there was DNA testing in 1997; is that correct?

2       A    That is correct.

3       Q    Let's look at just -- let's take a couple of items

4    here.  Let's take the clothing and the knit hat and the

5    sweatshirt that was found at Mr. McCrae's house a block from

6    the Madison Street Delicatessen.

7       A    Yes.

8       Q    Could they have done DNA testing on that at that

9    time?

10      A    Well, they could have done DNA testing, but the

11   likelihood of detecting any sort of trace or testing it

12   would not be very high.

13      Q    When did touch DNA become available?

14      A    Well, the concept of touch DNA has been talked

15   about for a number of years.  Probably goes back to '90 --

16   well, actually before that.  Let's see.  '89, I guess.  So

17   the concept has been around.  The development, in terms of

18   the really ability to detect small quantity is more recent.

19      Q    Can you give me a year when touch DNA testing

20   became available?

21      A    Say that first part again.

22      Q    Can you give me a year when touch DNA became

23   available?

24      A    I would say it became more of an accepted

25   procedure, if you will, around middle of 2006, '7, something

1  around there.

2      Q    So could they have tested that clothing in 2006

3  and 2007 for touch DNA?

4      A    It could have.  It would still be -- that's when

5  the beginning of the type of type testing began, and there

6  is certainly some body of literature there, but what I'm

7  speaking of is the kits that were supporting this type of

8  testing have become available more recently.

9      Q    And can you give us a year, please, when you say

10 more recently.

11     A    I want to say around 2010 and '11.

12     Q    So 2010 or '11 they could have had that tested for

13 touch DNA at that time?

14     A    Well, the kits were more developed at that point

15 to allow that type of testing, and the instrumentation.

16     Q    This is just a little education here for me.  When

17 was it possible to separate the DNA samples?  What year

18 could you start separating the DNA samples?

19     A    Well, I have to ask the context you are speaking

20 of because, of course, we have been separating DNA for --

21     Q    Sure.  That's a very accurate question.

22     A    The concept of capillary electrophoresis, so if

23 you --

24     Q    What I'm referring to is, let's say if you took

25 the knit cap and you got three different possible DNA

48

A82

1    samples or a whole bunch of information there, when was it

2    possible to take that and separate it out into three

3    different DNA identifiers?

4        A    Oh, I understand what you're saying.  The

5    different contributors?

6        Q    Correct.

7        A    So I would say in a more reliable method, if you

8    will, it would be we're talking about probabilistic

9    genotyping, that's really been only the last couple of

10   years, so it's been very recently.

11       Q    Could you have done it before that time?

12       A    No.  The development of that -- those algorithms,

13   if you will, was not in place to do that.  So no crime lab

14   could have had that available at that time.

15       Q    So prior to 2017, you could not have taken DNA

16   samples or contributors from -- on a piece of clothing where

17   there were three or more than one person and separate it and

18   said there is three different DNA samples there?

19       A    You would be able to see different alleles

20   indicative of different contributors or potential

21   contributors, but the next step in terms of relying --

22   putting weight to those different contributors did not come

23   about for the last couple of years.

24       Q    Okay.  So what do you mean by weight?  Do you mean

25   how much they contributed to the item or that's how you

1    identify them?

2        A    Well, identification.  So let's say you've got

3    four different alleles, okay?  One, two, three and four.

4    And it was a mixture.  So the available technology now would

5    allow, for example, with 95 percent confidence that that

6    mixture contained a type 2-3 versus a type 1-3, so it would

7    allow for one to have greater confidence in the

8    interpretation of the mixture.  And it's based on -- it's

9    based on mathematical algorithms, which I won't bore you

10   with, that have been around for a little while.

11       Q    So you're saying -- okay.  So in 2017 you could

12   have taken DNA from a piece of clothing at that time and

13   said this has three different contributors and identify --

14   gotten a DNA allele or whatever you want to call it for

15   those three people?

16       A    And apply a weight to it.

17       Q    Okay.

18       A    Yeah.

19            THE COURT:  Ms. Graham, could I ask a question?

20            ASSISTANT AG GRAHAM:  Sure.

21            THE COURT:  Dr. Libby, when you're speaking of a

22       mixture --

23            THE WITNESS:  Yes.

24            THE COURT:  Can you give me a little better idea

25       of exactly what you're speaking about?  I mean, if

1          you're looking at a piece of clothing that more than

2          one individual wore and you can identify more than one

3          contributor of DNA to that item --

4               THE WITNESS:  Yes.

5               THE COURT:  I mean, how is there -- I can

6          understand in a sexual assault, possibly a mixture of

7          DNA, but from the wearing of clothing, how does a

8          mixture occur?  Maybe I'm not understanding what

9          you're --

10              THE WITNESS:  Yeah, sure.  I'm sorry.  So a

11         mixture can occur from several people handling an item,

12         several people wearing an item where you would have

13         their genetic profiles of two or three different

14         individuals on there that could be mixed in with some

15         evidence sample which might have -- I'm just using an

16         example -- a blow-back from the weapon or whatnot onto

17         the items.  You might have multiple different sources

18         of DNA on there.

19              So what one would look at is the peak heights of

20         DNA that you would see in the profile.  And the present

21         technology that allows then one to associate by using

22         various mathematical modeling which peaks are

23         associated with one another, most likely associated

24         with it, and it allows them to put a weight, meaning a

25         statistical frequency called a likelihood ratio, how

1   likely that profile is, would be found in the

2   population.

3        THE COURT:  So that's what you -- when you say

4   weight, you're referring to that?

5        THE WITNESS:  That is correct.  And it's based on

6   what's called a Monte Carlo -- Markov chain Monte Carlo

7   approach for a statistical genotyping.  So and this

8   type of testing has only become more recent -- made

9   available in the last couple of years so systems such

10  as STRmix or TrueAllele, the system developed by Mark

11  Perlin, have been available and accepted in courts in

12  various jurisdictions throughout the United States.

13       THE COURT:  All right.  Ms. Graham.

14  BY ASSISTANT AG GRAHAM:

15  Q    Can I clarify, just to make sure I understand

16  about the weight again.  What you're saying, again, with

17  weight, is that that particular DNA contributor, there is

18  one in a one million chance, or whatever it is, that that is

19  who that person is, that that's that contributor?

20  A    Right.  So the way it would work is on the

21  probabilistic modeling approach, it's based on plus or

22  minus, so it's not binary.  Either you include it or don't

23  include it.  It's based on sort of a continuous spectrum, so

24  in the plus direction, favoring the prosecution's hypothesis

25  that these individuals are involved; or if it's a negative,

52

A86

1  it's more favorable to the defense hypothesis.

2        So if you had an individual who -- they have

3  contributed to that mixture, you'd come up with a likelihood

4  ratio of 10 to the 24th or in this septillion that it would

5  be anybody else, so almost you are saying it is almost

6  impossible it could be anybody else, down to another

7  individual who might be at a likelihood ratio of 10.  So

8  there is a huge difference in the likelihood ratios meaning

9  if one is down to 10, it's a good chance that they did not

10 contribute to that.  The one in 10 to the 24th septillion, a

11 good chance that they did, almost impossible that they did

12 not.  And as you move more negative or below one, then it

13 favors the defense hypothesis -- but without going into the

14 details of how this works, that's basically what you're

15 doing.

16     Q    But anybody who wore the hat could have left

17 behind the DNA?

18     A    Anybody who had contact with the hat potentially

19 could have left a profile, that's correct.

20     Q    So Mr. McCrae, who found the garment, could have

21 left his DNA; any of the law enforcement individuals who

22 picked up the garment could have left their DNA?

23     A    Anyone who might have touched it could have.  The

24 individual who was a habitual wearer would have a much

25 stronger profile, so there would still be an enormous

1    difference.  So if -- I forgot the names of the individuals

2    you just cited, but they would have -- maybe if they would

3    have touched it, maybe they'd have a low LR ratio, a low LR,

4    likelihood ratio.  I don't know.  I'm using numbers 10, 100,

5    that is low.

6         A person who is a habitual wearer could be in the

7    septillion or beyond, so there would still be an enormous

8    difference in that likelihood ratio.

9         Q    And even after all these years, having been

10   stored, you could still find out who the habitual wearer of

11   the item is?

12        A    Oh, absolutely.  Absolutely.

13        Q    Have you done that before?

14        A    Yes, it has been done on many cases, yes.

15        Q    Okay.  You gave some testimony regarding the

16   cartridge casing and the weapon that was used as -- in this

17   case.

18        A    Yes.

19        Q    So you are aware that the weapon did not belong to

20   the defendant?

21        A    I'm not aware who -- well, I think I do know that.

22   I think it belonged to or was borrowed from Gary Young.

23        Q    Correct.  And you understand that the weapon was

24   given back to Mr. Young; correct?

25        A    I think that is my understanding, that's correct.

1      Q     Then you understand that the weapon was recovered

2   at a railroad track where he had thrown it?

3      A     That's correct.   That is my understanding.

4      Q     And you are aware that Mr. Clark is the one who

5   led the police to that weapon at the railroad tracks?

6      A     I'm not particularly aware of that.

7      Q     So that weapon was touched by at least two people

8   that we know of, or at least one other person that we know

9   of, Mr. Young; is that correct?

10     A     Could have been, yes.

11     Q     And if law enforcement touched it, then they would

12  have left -- they could have left behind DNA on it, as well?

13     A     It is possible.

14     Q     And because the weapon belonged to Mr. Young, he

15  could have loaded the cartridge casings into the weapon; is

16  that right?

17     A     I have no knowledge of -- on that end, that's

18  correct, Counselor.   I think the important -- I mean, the

19  gun absolutely is important, and I think that should be

20  looked at, in particular the magazine where one is actually

21  holding onto the cartridge and the spent cartridges, I think

22  those all would be important and fruitful to look at.

23     Q     It -- okay.   Just to clarify, when you say

24  important, do you mean important because it's a possible

25  source of DNA?

1        A    That is correct.

2        Q    You're not saying -- you're not giving some sort

3   of weight to the importance of the actual evidence in the

4   case, are you?

5        A    Oh, I see what you're asking.  No, no, I'm not.

6        Q    You're just saying that --

7        A    I'm just saying from a biological standpoint,

8   right.

9        Q    Okay.  Going to the clothing that was taken from

10  the co-defendants, Mr. Clark and Mr. Lucas and clothing that

11  was also taken from Mr. Young, you stated that you could

12  find out the habitual wearer of that clothing?

13       A    I would expect so, yes.

14       Q    Okay.  Is that how you normally get a positive DNA

15  sample from someone?

16       A    That would not be a -- you would not use that

17  unless everything else failed and you had no other recourse,

18  to use as a reference sample, if that's what you're asking.

19       Q    Yes.

20       A    Right.  And that is in large part due to the

21  quantity of DNA, you would obtain lower quantities.  It's

22  just like in the early days of DNA testing, for example,

23  RFLP, the only thing people used was blood sources.  Well,

24  as technology developed further, then they began using oral

25  swabs and now they can use less invasive procedures for

1    determining the genotype or a reference type of an

2    individual.  So, yeah, I mean, we had blood from some of

3    these individuals.  I'm not sure what's available in that

4    regard, we might use that, but habitual wearer status

5    oftentimes will produce a complete profile.

6        Q    Okay.  So, for example, if Mr. Clark had picked up

7    somebody else's shoes and worn them the day that he was

8    arrested, it would show that the habitual wearer wouldn't

9    necessarily be Mr. Clark, it could be someone else, it could

10   be the original owner of the shoe?

11       A    No.  I would think you would be able to sort much

12   of that out through the method I talked about.

13       Q    I'm sorry.  So if someone else had worn the shoes

14   20 times and then he took them that day and he wore them one

15   time, are you saying that he would then become the habitual

16   wearer of the shoe?

17       A    I'm saying the person who wore them the most over

18   time would have a -- probably a stronger profile.

19       Q    Okay.  So it may or may not be Mr. Clark,

20   depending on whose shoes they belong to?

21       A    Well, if Mr. Clark bought a pair of new shoes and

22   they're his shoes and he gave them to someone else to wear,

23   they are still his shoes.  The other person has been wearing

24   them, that profile would show up.  So whoever has been

25   wearing those shoes, that item, or worn that garment for a

1  long period of time or a longer period of time would be

2  expected to have a stronger genetic profile.  And that would

3  be -- that information would be revealed when performing

4  this type of analysis.

5       Q    But you wouldn't typically take a habitual wearer

6  DNA identifier and say that that is necessarily the person

7  who you obtained the clothing from?

8       A    Well, it wouldn't be the best, I agree with you.

9  Of course, you'd want a reference sample, so.  But it is not

10 always available.  So Mr. Slysz' case, I'm not sure a

11 reference sample from him in particular is available, but

12 certainly his blood-stained shirt which was obtained would

13 be almost as good.

14      Q    But you have his blood on his shirt?

15      A    Sure.

16      Q    Correct?

17      A    That's correct.

18      Q    So you know -- we know that that was his shirt he

19 was wearing --

20      A    That is correct.

21      Q    You have the picture; that's his blood?

22      A    That's correct, Counselor.

23      Q    Right?  Okay.

24           Okay.  Let's go to the blood, you said there could

25 possibly be blood on the tennis shoes that were collected.

1   And let me see.  I will take you to -- it's page 11 of your

2   Power Point slide and we have here Corey Clark's tennis shoe

3   and Thaddeus Lucas' tennis shoe, and as counsel pointed out,

4   they are white shoes and you said, well --

5        A    I'm sorry.  I missed a couple -- the last

6   sentence, if you could just --

7        Q    I'm sorry.  You had stated that, you know, these

8   are white shoes and I think counsel, everyone has

9   acknowledged these are white tennis shoes; therefore, you

10  were explaining that you still may not be able to see the

11  blood after all of these years; is that correct?

12       A    It may not be that visible.

13       Q    So how would you identify where on the shoe there

14  was any of the victim's blood if you were going to do the

15  testing?

16       A    Well, you would end up swabbing different areas on

17  the shoe.  So you may not -- as I mentioned, you may not be

18  able to see it visually, so you would end up swabbing a wet

19  swab on various regions of the shoe, the outside of the

20  shoe, most likely.

21       Q    So just random swabbing?

22       A    Say it again.

23       Q    Just random swabbing of the shoe?

24       A    You would have them do that, that's correct.  That

25  is correct.

1      Q    And you are aware that Mr. Clark went behind the

2  counter where Mr. Slysz was found?

3      A    I am aware of it, yes.

4      Q    And that was also where the cigarette pack was

5  found?

6      A    That is correct, yes.

7           ASSISTANT AG GRAHAM:  Could I have a moment, Your

8      Honor?

9           THE COURT:  Yes, ma'am.

10          ASSISTANT AG GRAHAM:  No further questions of Dr.

11     Libby.

12          FEDERAL DEFENDER STEWART:  I just have a brief

13     redirect.

14          THE COURT:  Yes, sir.

15                    REDIRECT EXAMINATION

16  BY FEDERAL DEFENDER STEWART:

17     Q    Dr. Libby, I just have four, really just four

18  areas of questioning I'd like to follow up.

19     A    Sure.

20     Q    First, counsel asked you a little bit about

21  mixture interpretation.

22     A    Yes.

23     Q    And you talked about what the probabilistic

24  algorithms that have existed since 2017?

25     A    Yes.

1        Q     Was there some manner in which mixtures were

2   interpreted before 2017, at least in a rudimentary fashion?

3        A     There were.   There were.

4        Q     And what is your opinion about those processes

5   versus what is available now?

6        A     Well, basically, yes, there were some procedures,

7   lab use in the past, but in large part it was guess work.

8        Q     What do you mean by that?

9        A     Well, I mean, you really didn't have any -- every

10  lab would do it differently.   You didn't really have a sense

11  of which alleles you could include or should include.   And,

12  in fact, many times in the past, yes, you would see a

13  mixture of low level DNA, and those were simply not included

14  in the analysis, so they weren't included in the

15  interpretation, they were regarded as inconclusive.   So as

16  counselor asked was the ability to detect mixtures available

17  in the past, in part yes, but it's the analysis and the

18  interpretation of the mixture now which is important.   So a

19  lot of that data -- excuse me.   A lot of that data in the

20  past would have been discarded.

21       Q     And you said different labs did it differently,

22  used different approaches and protocols.   Would you say that

23  before the probabilistic algorithms that it was generally

24  accepted when different labs were doing different things, or

25  it was reliable in your expert opinion?

1      A    If I can ask you to rephrase that.

2      Q    Sure.

3      A    If you don't mind.

4      Q    The -- you described that before the current

5    algorithms, that different labs would interpret mixed

6    samples in different ways.  Would you opine that at that

7    time that it was generally accepted in the scientific

8    community to use a particular method of interpretation or

9    that it wasn't yet really well-established?

10     A    I don't think it was well-established.  I think

11   different labs use different -- so the interpretation one

12   might obtain from one lab on a particular item of evidence

13   may be different when analyzed at a different lab, so ...

14     Q    Second question, in the early days of touch DNA,

15   and I guess also now, is it frequent that small samples of

16   DNA are consumed in the testing; that is, they are used up?

17     A    Very common, yes.

18     Q    So had touch DNA been done on this evidence, say,

19   10 years ago and been unsuccessful, do you think any sample

20   would be left today, as a general matter?

21     A    No, I do not.  It generally would have been

22   consumed.

23     Q    Regarding reference samples from individuals,

24   counsel asked you about habitual wearer as a manner of

25   getting a reference sample.  Have you seen other manners of

62

A96

1  getting reference samples from suspects?

2      A    Sure.  I mean, of course, blood samples, oral

3  samples and other forms would be items which have been

4  discarded and which have been known to be used by an

5  individual.  So, for example, cigarette butts, cans of --

6  drinking, you know, cans somebody has drank out of.  So

7  those would be common sources which would be used in the

8  past.

9      Q    And then I guess Courts, sometimes in the proper

10 circumstances, ordered that a reference sample be obtained

11 from a particular individual.  Have you had that experience

12 or is that --

13     A    Yes, yes, absolutely.

14     Q    Okay.  And then, finally, counsel asked you a

15 little bit about people sharing shoes.

16         Do you recall from the record how these shoes were

17 seized when these men were arrested?  That's in that -- the

18 materials that you reviewed; right?

19     A    I did review -- you might have to refresh my

20 memory on that.

21     Q    Do you recall that the last person to wear each of

22 these shoes was the person to whom they are identified?

23     A    That was my understanding.

24         FEDERAL DEFENDER STEWART:  Your Honor, I don't

25         have any further questions.

1           THE COURT:  Ms. Graham.

2           ASSISTANT AG GRAHAM:  No further questions, Your

3      Honor.

4           THE COURT:  Mr. Stewart, as part of your motion,

5      you also requested testing of a Budweiser beer carton

6      and beer cans.  I have not heard any reference to that.

7      Are you abandoning those particular items in your

8      motion?

9           FEDERAL DEFENDER STEWART:  I think so.  Yes, Your

10     Honor, we are abandoning our request as to those items.

11     Yes.

12                          EXAMINATION

13          THE COURT:  All right, sir.

14          Dr. Libby, I gather most of the time when you go

15     through the process of trying to obtain DNA and you get

16     to the point where you can weigh it, you know, within

17     the general population --

18          THE WITNESS:  Uh-huh.

19          THE COURT:  The next step, I gather, most of the

20     time -- or certainly a lot of the time -- is trying to

21     match that DNA sample with an individual?

22          THE WITNESS:  That is correct.  That would

23     actually take place before you would sort of compute

24     any frequencies, so.

25          THE COURT:  Okay.  So you are using the test

                                                              64

1      results from your sample and in comparison with a

2      sample taken from an identified person?

3          THE WITNESS:  That is correct, yes.

4          THE COURT:  That reach that weight?

5          THE WITNESS:  Right, that's correct.  So that just

6      obtaining the profile from the evidence sample in and

7      of itself, absent any other DNA to compare it to, is

8      meaningless.

9          THE COURT:  Okay.

10          THE WITNESS:  So we would have to have reference

11      from other individuals who are potential suspects.

12          THE COURT:  Okay.  And that's my question.  Can

13      you tell me how we would get a sample from Mr. Slysz,

14      the deceased, from the Junior Food Store?

15          THE WITNESS:  Yeah, right.

16          THE COURT:  In the same -- the blood from the

17      shirt?

18          THE WITNESS:  Yes, the shirt.  And that's a good

19      question, but the answer is the shirt, which was

20      obtained from him at the time of the incident, was, in

21      my view of the evidence and reading of the data which

22      was sent to me, is that the shirt was stained in his

23      blood, so that's -- clearly his DNA type could be

24      obtained from him, so there should be no problem

25      whatsoever in that.

1          THE COURT:  Is that what you've referred to as a

2     reference sample?

3          THE WITNESS:  That is correct, yeah.  Often

4     people -- I'm sorry.

5          THE COURT:  Go ahead.

6          THE WITNESS:  Oftentimes, people in the literature

7     would refer to a reference source as if I took your

8     blood directly or an oral swab from you directly as a

9     reference, but many times these days when you have a

10    blood sample soaked in an individual such as this

11    Mr. Slysz, that is actually a good source of his

12    reference.

13         THE COURT:  Dan Wilson, where are you going to get

14    a reference sample?  He was the victim of the Madison

15    Street Deli shooting.

16         THE WITNESS:  Yeah.  Mr. Wilson, I am assuming he

17    is still alive.  I don't know for sure.  But one would

18    have to obtain some type of personal item from him, a

19    reference source from him, either oral or blood sample

20    from him to have his profile.

21         THE COURT:  All right, sir.  And if you didn't

22    obtain it directly from him such as blood, saliva,

23    something of that nature, I mean someone's hands, a

24    hair brush, says it's his hair, you have to assume that

25    that's accurate?

1          THE WITNESS:  You would be making a leap.

2          THE COURT:  Would be making a leap?

3          THE WITNESS:  Yeah, you would be making an

4     assumption.  But it's been done in the past.  I mean,

5     people have -- a body is not found and the only thing

6     they have is a hair brush, and that has been used in

7     the past for a reference.

8          THE COURT:  Okay.  So Mr. Cromartie is available.

9          THE WITNESS:  I'm sorry.  Say that again.

10         THE COURT:  Mr. Cromartie is available to provide

11    a reference.

12         THE WITNESS:  Yeah, I am guessing he is available,

13    yes.

14         THE COURT:  And may already be on file with the

15    GBI DNA bank.

16         FEDERAL DEFENDER STEWART:  Indeed, Your Honor.

17    And furthermore, if the Court were to order testing,

18    the Court is required to order that a reference sample

19    be taken as part of the Court's order.

20         THE COURT:  Gary Young, where are we going to get

21    a reference sample?

22         THE WITNESS:  Gary Young is deceased, and I would

23    have to give more thought to that actually because

24    that's the only one individual who I don't

25    necessarily -- other than his shoes -- so the shoe

1    laces where he is tying his shoes certainly could be

2    used as a source.  It is not a typical reference source

3    of course, but --

4        THE COURT:  But you're assuming that any material

5    you get from the shoes, that you can identify by DNA

6    analysis is material from him?

7        THE WITNESS:  That is correct.

8        THE COURT:  You're making that assumption?

9        THE WITNESS:  That is correct.  And if we have

10   other clothes of his that were also tested for habitual

11   wearer status, that would be used to confirm the

12   profiles.

13       THE COURT:  Is that -- in the industry in general,

14   is that -- I say industry.  The scientific community?

15       THE WITNESS:  Yes.

16       THE COURT:  In identifying DNA in a source of the

17   DNA, is that generally accepted to try to match a DNA

18   profile to an individual from what you assume?  I mean

19   you're assuming this individual is the habitual wearer.

20       THE WITNESS:  Yes.

21       THE COURT:  Isn't that rather dangerous?

22       THE WITNESS:  Yeah.  It's not generally -- I would

23   agree it's not done that often, I would agree.  So,

24   yeah, I mean, the best would have been, of course, the

25   blood sample, an oral sample.  If the individual was

1     incarcerated in the past, I would expect they would

2     have that profile on record somewhere.  So that could

3     also be used to confirm a more complete profile that

4     one might have -- not a complete.  A profile that has

5     more low site or more genetic sites that you're looking

6     at which would have been obtained from a shoe lace or

7     something like that.  So I would expect the -- if the

8     individual -- and I'm not sure he has been or not, but

9     if the individual has been in the Department of

10    Corrections in the past 10 or 15 years, then most

11    likely his profile is on file.

12         THE COURT:  Okay.  Same question as to Corey

13    Clark?

14         THE WITNESS:  Yes, same answer.

15         THE COURT:  Where are we going to get reference

16    material?

17         THE WITNESS:  So Corey Clark is not deceased, is

18    my understanding.  So I'm not sure if the Court can

19    order a sample from that individual.  That would be the

20    best source.  And, again, we have the same issues in

21    matching a profile obtained from any evidence sample,

22    his shoes or whatnot, with his potential authentic

23    reference profile.

24         THE COURT:  All right.  And, of course, same as to

25    Thaddeus Lucas?

A103

1        THE WITNESS:  That is correct, yes, sir.

2        THE COURT:  Okay.  You indicated that you had

3    reviewed, I think, between five and six thousand

4    pages --

5        THE WITNESS:  I think so.

6        THE COURT:  -- of the record.

7        THE WITNESS:  Yes.  Whatever counsel has provided

8    to me.

9        THE COURT:  Yes, sir.

10       Did you review the Georgia Code section that the

11   motion is based upon?

12       THE WITNESS:  I'm not sure.  If I had, it's

13   probably escaped my memory.

14       THE COURT:  I just had a couple of questions

15   arising from that.  You know, part of that -- and this

16   goes to if the Court, in fact, orders testing.

17       THE WITNESS:  Sure.

18       THE COURT:  The Court shall order that the

19   evidence be tested by the Division of Forensic Sciences

20   of the Georgia Bureau of Investigation.

21       THE WITNESS:  Yes.

22       THE COURT:  One question arises:  You had

23   mentioned that any sample obtained could, in obtaining

24   and/or testing that particular sample, result in the

25   destruction of the sample.

1          THE WITNESS:  An assumption, correct.

2          THE COURT:  I mean, what happens if tests are

3     ordered as to one or more items and the Court is

4     required to send it to the GBI or order them to test

5     it, I gather, first, what happens if in their testing

6     there is no more sample for you to test?

7          THE WITNESS:  Yeah.  Well, I speak in a particular

8     area.  There would be multiple areas that potentially

9     could be tested, so probably they wouldn't consume all

10    of the areas.  They might consume one area to be

11    tested.  If it's an issue of consumption, at least I

12    can speak to how other jurisdictions have handled this.

13    A lab is chosen and in this case it might be the GBI,

14    or it might be another independent lab, but one in

15    which representatives from both the prosecution and the

16    defense could be there to monitor that testing, so.

17         THE COURT:  And that was another question that,

18    you know, the Court may al -- it goes on to state that

19    the Court may also authorize the testing of the

20    evidence by a laboratory that meets the standards --

21         THE WITNESS:  Yes.

22         THE COURT:  -- of the DNA Advisory Board

23    established pursuant to the DNA Identification Act of

24    1994.

25         THE WITNESS:  Yes.

1          THE COURT:  Which was a federal statute.  I gather

2     you are familiar with that statute?

3          THE WITNESS:  I know of it.

4          THE COURT:  If it were going to be tested at an

5     independent lab such as you had referenced before --

6          THE WITNESS:  Yes, sir.

7          THE COURT:  -- would that lab be in compliance

8     with this particular law?

9          THE WITNESS:  It would be.  It is -- if I can just

10     add to that, Your Honor.

11          THE COURT:  Yes, sir.

12          THE WITNESS:  And it would also depend on the

13     capabilities of the particular lab.  So, for example,

14     the GBI -- I'm not saying they do or do not, but if

15     they did not have online certain types of testing, for

16     example, mitochondrial, we might have to choose a lab

17     that could perform that type of testing, so ...

18          THE COURT:  Have you been through a similar

19     process before where an individual convicted of a crime

20     has filed a motion for new trial or something similar

21     in a different jurisdiction requesting DNA testing of

22     this nature?

23          THE WITNESS:  I have.

24          THE COURT:  My question is:  From the time period

25     that the Court ordered such until the Court had the

1      results from such testing, what kind of time period is

2      it?

3            THE WITNESS:  I would say generally a couple

4      months at most.  In this particular case maybe even

5      faster because the evidence items are known, we know

6      they're present, counsel has looked at them, and so the

7      location is known.  So it's a matter of transferring

8      the items to the appropriate lab and getting them

9      scheduled in the queue, but generally these days I

10     would say at most two months or less, so probably four

11     to six weeks.  I mean, if the -- depending on the

12     Court's schedule, if it was really something that

13     needed to be taken care of straight away, some labs

14     would expedite, so ...

15           THE COURT:  Can you tell me approximately when you

16     were brought into the case?

17           THE WITNESS:  Yes.  I think November of 2018, I

18     think was about that time.  It was -- it was late

19     November.

20           THE COURT:  And what amount of time, typically,

21     based on the information you were provided to review --

22     I'm just assuming, let's say you were provided that

23     information expeditiously.  What typical time period

24     would it take to review that information and render an

25     opinion?

1           THE WITNESS:  You mean on some punitive future

2      testing?  Is that what the Court is asking?

3           THE COURT:  Well, what you did in this case.

4           THE WITNESS:  Yes.

5           THE COURT:  I don't know if you looked at it a

6      bit, then put it aside and did other stuff, looked at

7      it a bit, put it aside, did other stuff.

8           THE WITNESS:  Yes.

9           THE COURT:  Say you were hired 11/18, say you were

10     provided the information at that time --

11          THE WITNESS:  Yes.

12          THE COURT:  -- typically how long would it take

13     you to review it and render an opinion?

14          THE WITNESS:  Oh, I see what you're asking.  It

15     depends on the quantity of materials, if you will, but

16     oftentimes, 30 to 40 hours or more, so it could take me

17     a while.

18          THE COURT:  It could have been done within a month

19     or less?

20          THE WITNESS:  If you worked straight through, yes,

21     right.  If you worked straight through.

22          THE COURT:  Dr. Libby, I believe those are all of

23     the questions I have at this time.

24          Mr. Stewart, do you have any other questions for

25     Dr. Libby?

1            FEDERAL DEFENDER STEWART:  May I ask one follow-up

2        based on Your Honor's questioning?

3            THE COURT:  Sure.

4                          REDIRECT EXAMINATION

5   BY FEDERAL DEFENDER STEWART:

6        Q    Dr. Libby, are you familiar with combined DNA

7   information system CODIS?

8        A    Yes.

9        Q    In the event that you have an unknown profile,

10  let's say an unknown male DNA profile --

11       A    Yes.

12       Q    Is it your experience that -- well, I guess first,

13  what is CODIS?

14       A    So it's an acronym for, as you mentioned, a

15  combined DNA index system, so it's a national database.

16       Q    So that is combined systems from the several;

17  right?

18       A    That is correct.

19       Q    And if you have an unknown male profile, let's say

20  in the event that you weren't comparing to a particular

21  reference sample, what -- how can CODIS assist you?

22       A    So CODIS can assist by -- it would interrogate

23  that database for profiles which are matching at various

24  levels of stringency, at 8 loci -- 10 loci, all loci and

25  would assist you in narrowing down your search of the

1   individual who could have contributed that sample.

2       Q    And as to the -- so that would be like an upload

3   of the unknown profile; is that right?

4       A    That is correct.  So the lab would -- after it

5   would have conducted its testing, it would upload the

6   profile -- a qualified lab would upload the profile to

7   CODIS, and it would do so on a continuing basis until a hit

8   was obtained or not obtained.

9       Q    And if I told you that Corey Clark, Gary Young and

10  Thad Lucas had all been convicted of felonies in Georgia,

11  and that's in the State Court record in this case what, if

12  anything, would that mean to you as to a CODIS upload?

13      A    Yes.  That is what I was -- maybe not doing so in

14  such an artful way, but what I was trying to indicate to the

15  Court is that those profiles are probably there, and so that

16  would assist in confirming the identity or the origin of

17  those profiles.

18      Q    So even if you did not have a reference sample

19  from the evidence here; is that correct?

20      A    That is correct.  So I would expect their profiles

21  to be in a DOC Department of Corrections file or in CODIS

22  directly.

23          FEDERAL DEFENDER STEWART:  Thank you.  Your Honor,

24      I don't have further questions based on that.

25          ASSISTANT AG GRAHAM:  Your Honor, I have a couple

1        of questions, if you don't mind, about CODIS.

2              THE COURT:  Yes, ma'am.

3                          RECROSS EXAMINATION

4    BY ASSISTANT AG GRAHAM:

5        Q    Dr. Libby, it is my understanding that -- please

6    correct me if I'm wrong.  I haven't talked to the GBI.

7        A    I'm sorry, Counsel.  If I can ask you to repeat

8    the first few words.

9        Q    Sure, sure.  My southern accent?

10       A    That's okay.  Maybe I'm not hearing as well.

11       Q    Regarding CODIS, if you are seeking out

12   information from CODIS, you can't ask whether or not a

13   specific individual is in CODIS; is that correct?

14       A    That is correct.

15       Q    Therefore, all that would be put into CODIS would

16   be the DNA results from the testing that is done in this

17   particular case to see if you get a match that is currently

18   in CODIS?

19       A    That is correct.

20       Q    Do you know when they started taking DNA samples

21   from inmates and putting it into the CODIS?

22       A    That's a good question.  I don't know the specific

23   date.  I would be guessing.  I don't know exactly.

24       Q    You can guess.  That's fine.

25       A    I would guess, I don't know, '94, '93, something

                                                              77

```
 1   like that.
 2               ASSISTANT AG GRAHAM:  All right.  No further
 3        questions about that, Your Honor.
 4               THE COURT:  Thank you, sir.  You can step down.
 5               FEDERAL DEFENDER STEWART:  Your Honor, Mr.
 6        Cromartie would next call Laura Schile.
 7               Your Honor, may we take just a five-minute
 8        bathroom break?
 9               THE COURT:  Yes, sir.
10               FEDERAL DEFENDER STEWART:  Thank you very much.
11               THE COURT:  Be in recess for five minutes.
12               (RECESS.)
13   THEREUPON,
14                            LAURA SCHILE
15   was called as a witness, having been previously duly sworn,
16   was examined and testified as follows:
17                        DIRECT EXAMINATION
18   BY FEDERAL DEFENDER ADJOIAN:
19        Q    Ms. Schile, would you please state and spell your
20   name for the record.
21        A    Laura, L-A-U-R-A, Schile, S-C-H-I-L-E.
22        Q    And, Ms. Schile, what is your profession?
23        A    I'm a forensic scientist.
24        Q    And do you have any exhibit package with you?
25        A    I certainly do.
```

78

1      Q    Would you turn to Item 5 in that package?

2      A    Yes.

3      Q    Do you recognize that document?

4      A    Yes, I do.

5      Q    What is it?

6      A    It is my CV, my curriculum vitae.

7           (Thereupon, Defendant's Exhibit No. 5 was marked

8      for identification.)

9      Q    Can you tell us just briefly, give us a brief

10     synopsis of your educational history.

11     A    I went to school in Leavenworth, Kansas.  I --

12     upon finishing undergraduate school, I started graduate

13     school.  During graduate school I was recruited by UT MD

14     Anderson to do molecular work in their genetics lab and

15     after about three and a half years, that's when the Texas

16     Department of Public Safety started DNA in their crime

17     laboratories and the Texas Department of Public Safety -- I

18     was then recruited by them to start DNA and learn how to

19     become a forensic scientist.

20     Q    And can you tell us a little bit more about your

21     work background following your work at the Texas Department

22     of Public Safety?

23     A    As far as training from the Texas Department of --

24     Q    No.  Just a brief summary of your work history

25     basically.

1       A    So with the University of Texas MD Anderson, I was

2   in charge of several laboratories writing the protocols,

3   dealing with DNA, breakage and repair research as well as

4   R&A research.  We were the laboratory responsible ultimately

5   for the blood tests that we now have for identification of

6   breast cancer and prostate cancer.  That was -- that was the

7   summation of my career at UT MD Anderson before moving on to

8   be a forensic scientist.

9       Q    And then can you just tell us a little bit about

10  your forensic science career?

11      A    So I was trained by the Texas Department of Public

12  Safety, I went through the DNA training that everybody else

13  did.  I had already known the DNA part of it, but then I was

14  trained as a criminalist, so I was trained for crime scenes,

15  trace comparisons, blood spatter, evidence collection,

16  handling, hair comparisons.  I was cross trained for a year

17  at Austin at headquarters, and then I was assigned Houston

18  and 37 counties in and around Houston was my coverage area.

19      Q    And then following the Texas Department of Public

20  Safety, did you move on elsewhere?

21      A    I did.  After I rose in the ranks as far as I

22  could go with the Texas Department of Public Safety, I went

23  on to have my own laboratory with the Oklahoma City Police

24  Department where I wrote the protocols and opened the DNA

25  crime lab for the Oklahoma City Police Department.

80

1       Q    And after you worked with the police department of

2    Oklahoma City, where did you move on to from there?

3       A    I moved on to the Oklahoma Indigent Defense as the

4    first forensic scientist in the country that a state public

5    defender had access to.

6       Q    And then how about currently, how are you

7    currently employed?

8       A    So in 2006 I opened a company to do cases for the

9    prosecution on the side, and in 2010 I just took that

10   company full time for defense and prosecution, but while I

11   was with Oklahoma Indigent Defense, I needed the business if

12   I needed to help prosecutors.

13      Q    And you did that on your own time?

14      A    Yes, sir.

15      Q    If you could just tell us briefly what is forensic

16   science.  If you could just give us a very brief snapshot.

17      A    Forensics -- there's a lot of different

18   disciplines in forensics.  The disciplines that I deal with

19   are mostly biological disciplines, DNA, serology.  That's

20   the -- serology would be the study of biological fluids as

21   it pertains to criminal cases.  DNA, again forensic DNA, the

22   DNA analysis -- all forensic science is a comparison type

23   analysis, so hair, you're going -- ballistics, you're taking

24   an evidentiary sample and comparing it to a known sample.

25   And so -- and then the other discipline that I am skilled

1  in, or proficient in, is crime scene analysis and evidence

2  handling.

3       Q    So if you could just tell us a little bit more

4  about that, what goes into crime scene analysis and evidence

5  handling.

6       A    Mainly making sure that the protocols are

7  followed, not just by you as a crime scene person, but by

8  all of the people that are responding to that crime scene.

9  Making sure that they're trained in how to process a crime

10  scene and what is the best processing method, collection

11  method, storing method, handling methods.

12      Q    And I believe you briefly touched on this, but

13  have you received training in each of these disciplines?

14      A    Yes, I have.

15      Q    Have you traveled to crime scenes as part of your

16  work?

17      A    Yes, I have.

18      Q    How many times would you say you've traveled to

19  crime scenes over the course of your career?

20      A    I still do crime scenes that are not being held by

21  the police, but I still consider them crime scenes -- more

22  than a hundred.

23      Q    Have you been responsible for collecting evidence

24  at crime scenes?

25      A    Yes, I have.

1      Q     Are you familiar with generally accepted evidence
2    handling techniques and protocols?
3      A     Yes.
4      Q     Have you done any sort of teaching or training
5    yourself in the disciplines with which you're familiar?
6      A     Yes.
7      Q     Have you worked on homicide cases before?
8      A     Many.
9      Q     Would that include capital cases?
10     A     That's correct.
11     Q     And have you worked on capital cases both in your
12   career as -- with law enforcement and on the defense side?
13     A     Yes.
14     Q     Have you worked on a capital case on the law
15   enforcement side where an individual has been sentenced to
16   death or executed?
17     A     I have.
18     Q     And have you worked on a capital case on the
19   defense side where a person has been exonerated?
20     A     I have.
21     Q     And so you've been retained by my office in this
22   case; is that right?
23     A     That is correct.
24     Q     And what were you retained to do?
25     A     To look at the materials that I was -- that I

1   received from you-all and to go over those, and ultimately

2   what I ended up doing is writing a report on my analysis of

3   the materials that I had reviewed.

4        Q    So if you would please turn to Exhibit 7 in the

5   packet and tell me if you recognize that.

6             (Thereupon, Defendant's Exhibit No. 7 was marked

7   for identification.)

8        A    Yes.

9        Q    And is that an index of the materials that you

10  reviewed?

11       A    Yes, it is.

12       Q    And then if you would turn back to Exhibit 6.

13       A    Yes.

14       Q    Is that a copy of the report that you authored in

15  this case?

16       A    It certainly appears to be, yes.

17            (Thereupon, Defendant's Exhibit No. 6 was marked

18  for identification.)

19            FEDERAL DEFENDER ADJOIAN:  Your Honor, with that,

20       we would tender Ms. Schile as an expert in forensic

21       science and crime scene analysis.

22            THE COURT:  Ms. Graham.

23            ASSISTANT AG GRAHAM:  Can I actually ask Ms.

24       Schile a couple of questions?

25            THE COURT:  Yes, ma'am.

1              ASSISTANT AG GRAHAM:  Just so I understand exactly

2         what she's here for and what you're proffering her for.

3                     VOIR DIRE EXAMINATION

4    BY ASSISTANT AG GRAHAM:

5         Q    Hi, Ms. Schile.  My name is Sabrina Graham.  I

6    think we were staying at the Best Western together.  Did I

7    see you --

8         A    Oh, maybe.

9         Q    Okay.  So just -- so I'm here for the Georgia

10   Attorney General's Office.  Just a couple of questions.  You

11   talked about you had expertise in how you collect

12   information from a crime scene; is that correct?

13        A    How to collect evidence, yes.

14        Q    Are you a crime scene reconstructionist expert?

15        A    I have done crime scene reconstruction, but I was

16   not.  That's not what I was doing in this case.

17        Q    Have you been qualified as a crime scene

18   reconstructionist?

19        A    Yes.  That's usually hand-in-hand with the blood

20   spatter interpretation.

21        Q    Okay.  So it's just regarding blood spatter that

22   you've been qualified as an expert or in other areas of

23   crime scenes?

24        A    Well, with the blood spatter trajectory, those

25   types of things.

1      Q    So in this particular case you're just testifying

2   regarding collection of DNA and how it relates to the case?

3      A    Collection, processing, yes.  What could have been

4   done perhaps.

5           ASSISTANT AG GRAHAM:  Okay.  No further questions,

6      Your Honor.  We don't object to her being qualified in

7      the area that Mr. Adjoian requested.

8           THE COURT:  Very well.  Mr. Adjoian.

9                    FURTHER DIRECT EXAMINATION

10  BY FEDERAL DEFENDER ADJOIAN:

11     Q    Just to follow up briefly, Ms. Schile, when you

12  were working for law enforcement, you traveled to crime

13  scenes?  You processed crime scenes?

14     A    That is correct.  I was the person who was called

15  out to formulate the team and then to go to the crime scene.

16  That is correct.

17     Q    And you, as part of that, did crime analysis on

18  site as a member of law enforcement?

19     A    Yes.  I was mainly with the Texas Rangers Company

20  A.

21     Q    Thank you.  As part of your review of the

22  materials in this case, are you sort of generally familiar

23  with the facts underlying the incidents for which

24  Mr. Cromartie was convicted?

25     A    Yes.

1      Q    And you're familiar that there were two separate

2   shooting incidents at issue?

3      A    Yes.

4      Q    So I'd like to just turn first to the Madison

5   Street Deli shooting incident.  Are you aware from your

6   review of the materials whether that incident was captured

7   or partially captured on videotape?

8      A    Yes, I am aware.

9      Q    And was it?

10     A    It was -- I wouldn't say the incident, but

11  portions of the incident were captured on videotape.

12     Q    And have you been provided that videotape?

13     A    I have.

14     Q    Have you watched that videotape?

15     A    I have.

16     Q    Have you seen still photographs taken from frames

17  of that videotape?

18     A    Yes, I have.

19     Q    And if you could just sort of briefly describe

20  what the videotape depicts.

21     A    It's certainly not very clear, but it depicts a

22  person coming in, going off screen, coming back to a cash

23  register.

24     Q    And you touched on it briefly, but what is the

25  general quality of the videotape that you reviewed?

87

1    A    You can't make out anything -- I couldn't make

2  out, with glasses on, anything more than to tell just that

3  it's a person in dark clothes.

4    Q    If I could ask you to turn to Exhibit 19 in the

5  packet in front of you.

6    A    You bet.  This appears even to be worse.  Yes.

7    Q    Can you just tell the Court what Exhibit 19 is?

8    A    Exhibit 19 is a still shot from the video

9  surveillance from the Madison Street Deli.

10   Q    And if you could just sort of describe the quality

11 of that image.

12   A    It's extremely pixilated; you're able to just tell

13 the shape of a body essentially.

14   Q    And are you yourself able to identify anybody in

15 particular as being the individual depicted?

16   A    I am not.

17   Q    Are you aware of whether law enforcement -- or if

18 there was any testimony as to any identification based on

19 the videotape at the time of the trial?

20   A    I am with the FBI.

21   Q    I'm sorry.  Did they identify anybody in

22 particular by the videotape?

23   A    They were unable to.

24   Q    Are you aware of whether any fingerprint evidence

25 was collected from the Madison Street Deli?

1       A    Yes.

2       Q    And are you aware from your review of the

3   materials whether any fingerprint identification was able to

4   be made of anyone at the Madison Street Deli?

5       A    In the documentation it does not -- does not

6   appear that any identification was formulated to the lift

7   card, the print cards in the Madison Street.

8       Q    So are you aware though that fingerprint evidence

9   was in fact collected from Madison Street?

10      A    Yes.

11      Q    Are you able to tell from your review of the

12  materials what happened, what became of that evidence?

13      A    It appears that it's been thrown away, that all

14  the fingerprint lift cards have been thrown away.

15      Q    And in your experience, is it -- in your opinion,

16  is it proper protocol to throw away fingerprint cards in

17  that manner?

18      A    Absolutely not.

19      Q    I'm going to ask you to look next at Exhibit 16 in

20  the packet.

21      A    Yes.

22      Q    And tell us what that depicts.

23      A    Exhibit 16?

24      Q    Yes.

25      A    It is a photo partially of a counter and partially

1  to the left, to my left, is a counter and to my right is a

2  industrial type sink.

3      Q    And do you know does that depict the Madison

4  Street Deli scene?

5      A    Yes, from what I'm aware, it does.

6      Q    And if you would turn next to Exhibit 17 and tell

7  us what that depicts.

8      A    This is the depiction of the flooring of the

9  Madison Street Deli with an officer, I believe, pointing out

10 a shell casing with a pen.

11     Q    And then likewise for Exhibit 18.

12     A    This is a photograph of several tiles on the floor

13 of the Madison Street Deli with a single picture, no scale,

14 of a shell casing.

15     Q    And are you aware of whether any biological

16 forensic testing was done on any of these -- I'm sorry.  On

17 the cartridge casing from the Madison Street Deli at the

18 time of trial, or at any point in time?

19     A    I'm not aware of any biological testing being

20 performed.

21     Q    And I believe you heard Dr. Libby touch on it

22 briefly, but if DNA evidence were able to be recovered from

23 this cartridge casing, what significance would that be to

24 you as a crime scene analyst?

25     A    One of the significances is that when you're

1   loading a magazine, you're leaving a lot of skin cells

2   behind because it takes a lot of pressure and friction to

3   load a magazine, and you also usually have the bullets and

4   magazine in the same hand, and it would help to potentially

5   identify the person or a person who was holding the bullets

6   as well as loading the bullets into that magazine.

7        Q    Are you aware, Ms. Schile, of whether any clothing

8   was recovered at or around the Madison Street crime scene?

9        A    Yes.

10       Q    And what was that clothing?

11       A    There was -- a block away from the Madison Street

12  Deli the next morning was a dark green hooded sweatshirt as

13  well as some -- it's been described in various different

14  ways, but a black cap, or I think it's been described as a

15  toboggan ski cap, so something like that was collected.

16       Q    And do you recall roughly the time frame between

17  the incident and when the clothing was actually recovered?

18       A    I believe it was less than 24 hours.

19       Q    Do you recall how it came to be recovered?

20       A    I may not be right on that, but I believe.  A

21  gentleman who owned the house where it had been deposited,

22  called the police and said that there was some clothing in

23  his yard.  The police went over and collected the clothing

24  from that gentleman.

25       Q    And was the clothing entered into evidence at

91

1    trial?

2         A    Yes, it was.

3         Q    To your knowledge, was any biological forensic

4    testing done on either the hat or the sweatshirt?

5         A    To my knowledge, no.

6         Q    And if DNA evidence were able to be recovered from

7    either the hat or the sweatshirt, what significance would

8    that have from a forensic science perspective?

9         A    I think we heard Dr. Libby talk about wearer DNA.

10   He would say habitual wearer.  I know of nomenclature as

11   just wearer DNA found at various sites where the wearer is

12   going to be depositing a lot of epithelial cells or skin

13   cells, so certainly to be able to identify or potentially

14   identify wearer DNA on the hoodie and/or the hat as well as

15   potential back spatter or blow-back from the gunshot.

16        Q    And are you aware of whether there was any trial

17   testimony as to whether that clothing was in fact the

18   clothing that was worn by the assailant in the Madison

19   Street Deli shooting?

20        A    Would you repeat that.

21        Q    Sure.  Are you aware of whether there was any

22   testimony or evidence presented at trial as to that

23   clothing's relevance to the Madison Street Deli shooting

24   specifically?

25        A    I'm -- the State brought it in because they felt

1  like -- I mean, how it was presented and why it was brought

2  in is because they felt that it was in connection with that

3  shooting.

4       Q    And was there any testimony that you recall that

5  specifically described Mr. Cromartie as wearing that

6  clothing at the time of the Madison Street shooting?

7       A    Yes, I believe Gary Young testified to the fact

8  that that's the color and type of clothing that was being

9  worn.

10      Q    You mentioned just briefly blow-back.  If you

11  could just sort of -- and Dr. Libby alluded to it, as well.

12  Could you just give us a little bit more depth on what

13  blow-back is and how it comes to be found on clothing or

14  other items?

15      A    Okay.  So in blood spatter you have different

16  velocities.  You have a low velocity blood spatter which

17  would be a 90-degree drop where if you cut your finger and

18  you just dropped on the floor, it's going to be a round

19  circle that's almost perfectly round that will be on the

20  floor, that's a low velocity or low impact blood spatter.

21  And then if you had a sponge and you hit that with a hammer

22  as hard as you could, you're going to see other different

23  blood spatter patterns made.  That's a medium velocity.  But

24  when you actually shoot, say a melon, full of blood, when

25  you shoot that, that's going to be such a high impact blow

1   that it's actually going to aerosol -- excuse me.  I get

2   excited when I start talking.  It's going to aerosolize the

3   blood in that, let's say, melon.  And so that goes into

4   almost a vapor form where you wouldn't be able to see it.

5          Now, as the bullet is going towards that melon

6   full of blood, say a watermelon full of blood, as it enters

7   the watermelon, it enters with such a force that the blood

8   inside the watermelon actually comes back out towards the

9   entry point of the bullet or the projectile that's going

10  that fast.  And so you have -- now what you have is

11  aerosolized or aerosolized/vapor coming back at the

12  direction that the gun is or that the projectile came from

13  that gun.

14         So what we normally do, if we get a gun in,

15  depending on some of the circumstances, is that we will go

16  directly to that gun and look for blood in the barrel of

17  that gun.  And then we do other types of testing as well,

18  depending on the scenario that we're told or that we

19  discover when we're out at the scene.

20      Q   And, of course, here we're talking about a gunshot

21  wound to individuals.  In the scenario like that, at what

22  sort of range might you expect to see blow-back in terms of

23  the distance between the gun and the individual who has been

24  shot?

25      A   Closer range.  Between a foot or less.

1      Q    All right.  And I'd like to turn next to the

2    Junior Food shooting, if I may.  To your knowledge, was the

3    Junior Food shooting captured on videotape?

4      A    No, to my knowledge it was not.

5      Q    Are you generally familiar, nonetheless, with the

6    evidence and testimony regarding the Junior Foods

7    incident --

8      A    Yes, I am.

9      Q    -- from your review of the materials.

10          What is your understanding of the number of

11    individuals who were present in the store at the Junior

12    Foods incident from your review of the trial?

13     A    It -- it depends on who is testifying but --

14     Q    Sure.  From your review of the evidence that was

15    presented at trial.

16     A    From most of the evidence, two is the number.

17     Q    And so would that be two including the clerk or

18    not including the clerk?

19     A    I apologize.  Two individuals and then the clerk,

20    or as well as the clerk.  So three total in the store.

21     Q    Sure.  And was there any physical evidence

22    introduced at trial from Junior Foods indicating who the

23    shooter was?

24     A    Scientific evidence?

25     Q    Sure.  Any physical or scientific evidence

1    whatsoever demonstrating who shot the clerk inside the

2    store.

3         A    No.

4         Q    Was there any physical evidence demonstrating

5    presence at the store of any individual?

6         A    I apologize.  I'm having a hard time with your --

7         Q    Sure.  And I asked that poorly.  You just

8    testified that there was no evidence suggesting who the

9    shooter was.  Was there any evidence, physical evidence,

10   that revealed any particular individual's presence at the

11   scene, at the --

12        A    At the scene?

13        Q    Yes.

14        A    Or in the store?

15        Q    At the scene.

16        A    At the scene there was a fingerprint, yes.

17        Q    Was there anything else in addition to a

18   fingerprint?

19        A    There were casings.  There were two shell casings,

20   two beer cans, a cardboard flap from a Budweiser 12-pack,

21   some glasses, some pieces of glasses, a roll of paper towels

22   and a yellow wooden pencil, I believe is what was collected.

23        Q    Was there any footprint casting?

24        A    I apologize.  Yes, there were.  There were

25   pictures taken of footprints, as well as two castings made.

1     Q    So what was the testimony at trial regarding the

2    footprint?  Did that -- was that sort of identified as

3    belonging to or consistent with any particular individual?

4     A    It was consistent with the Adidas shoe.

5     Q    And who was the owner of the Adidas, according to

6    the trial --

7     A    Mr. Cromartie.

8     Q    And was that inside the store or outside the

9    store?

10    A    That was outside of the store.

11    Q    And, likewise, you mentioned a fingerprint.  Where

12   was that fingerprint located?

13    A    That was on the cardboard of the Budweiser -- the

14   flap of the Budweiser 12-pack.  And that was outside by the

15   footprints.

16    Q    So was there anything from the interior of the

17   store that suggested, as between the two individuals who

18   were there, who did what as far as physical evidence?

19    A    No.

20    Q    Do you know, were there fingerprints recovered

21   from the Junior Foods crime scene?

22    A    There was the one on the --

23    Q    I'm sorry.  From the interior of the store.

24    A    No, I don't believe any fingerprints were

25   developed.  I think that they tried, but they didn't get

1   any.

2        Q    I'd like you to take a look, please, at Exhibit

3   23.

4        A    Yes.

5        Q    And just tell us what that depicts.

6        A    This is an exhibit showing the exterior of Junior

7   Food Store.

8        Q    And is there anything that you find noteworthy

9   about this picture about the store itself?

10       A    There is a lot of advertising in the window -- in

11   the windows of that store.  It's not completely see-through

12   with the -- obviously the windows are see through, but when

13   you put the posters up, and the advertising, the ability for

14   somebody to be able to see clearly becomes diminished for

15   every poster that's been put up.

16       Q    And then next exhibit, 24, if you would take a

17   look at that.

18       A    Yes.

19       Q    And if you could just sort of tell me generally

20   what that depicts.

21       A    This is a picture of the inside of the Junior Food

22   Store, showing again more advertising, it shows the dairy

23   section and just a bunch of items for sale at the Junior

24   Food Store as well as a depiction of the cash register.

25       Q    And then to Exhibit 25.

1       A    This is another angle from inside the Junior Food

2  Store showing an inflatable Budweiser blimp, a display of

3  Budweiser and then it also shows the reverse of being able

4  to look out the store with the advertising posters on the

5  windows, not being able to get a clear view outside of the

6  store with those posters blocking or obscuring vision.

7       Q    And if you would turn to Exhibit 26 and tell me

8  what you see there.

9       A    This is looking from the front of Junior Food

10  Store across the street to the Jack Rabbit BP gas station.

11       Q    And what from your review of the materials was the

12  significance of the Jack Rabbit store?

13       A    The clerk at the Jack Rabbit store on the night of

14  the incident said that they had a direct view of what was

15  happening inside of Junior Food Store.

16       Q    And then I'm going to ask you to turn to Exhibit

17  28 and tell me what that depicts.

18       A    This is a non-scale drawing done by Ken Collins, I

19  believe, of Junior Food Store and the location of the

20  deceased behind the cash register.

21       Q    And does it indicate anything else as far as items

22  that were recovered from the store?

23       A    It does.  It shows the location of both of the

24  shell casings that were recovered.

25       Q    And if you could just describe where the shell

1   casings were recovered.

2        A    Item 1 was 5 feet, 6 inches on the north wall --

3   5 feet, 6 inches from the cash register on the north wall.

4   Both casings were found by the north wall on the floor --

5   I'm assuming and it's not super clear here.  And Item 2

6   appears to be 7 feet, 3 inches from the cash register to the

7   corner of the north wall, which would be behind the desk and

8   the chair that the clerk had.

9        Q    And where were they in relation to the decedent in

10  this case?

11       A    They're behind the counter and then they're behind

12  his desk and chair area all the way up against the wall.

13       Q    I would ask you to take a look next at Exhibits --

14  well, Exhibits 30 and 31.  Exhibit 30, if you could just

15  tell me what that depicts.

16       A    It is actually a fairly -- it's close to a

17  90-degree photograph of one of the shell casings which is

18  not identified with the scale.

19       Q    And how about Exhibit 31?

20       A    Again, it's a scaled photograph of a shell casing.

21       Q    And is it your understanding that these correspond

22  to the diagram of the two shell casings that were recovered?

23       A    That is my understanding.

24       Q    Are you aware of whether any biological forensic

25  testing was done on either of these shell casings?

1        A     Not to my knowledge.

2        Q     And as with the Madison Street shell casing, what

3    would be the significance from the crime scene or forensic

4    science perspective to finding DNA on either of these shell

5    casings that were able to be obtained?

6        A     Again, you've got a lot of friction and force

7    going into loading the magazine, so you're -- the potential

8    to have DNA is quite good.

9        Q     And what -- if that DNA were able to be recovered,

10   in fact, what would that tend to demonstrate from a crime

11   scene perspective?

12       A     It would -- it would quite possibly show who was

13   loading the magazine.

14       Q     Did you review, as part of your materials, the

15   autopsy photo -- excuse me, the autopsy report that was done

16   in this case?

17       A     Yes, I did.

18       Q     At the Madison Street incident.  Would you take a

19   look at Exhibit 39, please, for me.

20       A     You bet.

21       Q     I'm sorry.  Exhibit 40.

22       A     Yes.

23       Q     And tell me what that document is.

24       A     This is a form that the State of Georgia used for

25   their GBI record of the medical examiner.

1     Q    And is this a multi-page document?

2     A    It is.  Describing the medical examiner re -- it's

3  a medical examiner report.

4     Q    And if you would turn with me to page 3 of that

5  document -- it's actually page 2 of 5, but it's the third of

6  this exhibit.  Page 205 is printed at the bottom.

7     A    Yes.

8     Q    If you could just take a look at -- it's about

9  halfway down the page.  If you just read to yourself under

10  the heading: Gunshot Wound of Head, Gunshot Wound Number 2.

11     A    Yes.

12     Q    Do you see an indication in that paragraph about

13  stippling?

14     A    I did.

15     Q    And can you tell us what stippling is?

16     A    Stippling is where the very hot gunpowder will --

17  an example of stippling is where the gunpowder will scorch

18  the skin and actually burn the skin and leave marks.

19     Q    And what does that tell you from a crime scene

20  perspective?  What is the significance of stippling?

21     A    That the gunpowder or the gun is actually in close

22  proximity to the skin.

23     Q    Are you aware of whether the medical examiner in

24  fact testified about muzzle distance for the gunshot

25  indicated as Number 2 in this report?

102

 1      A     I am.

 2      Q     And what is your recollection of how far away the

 3   medical examiner testified the shooter was from the victim?

 4      A     I believe that it was five to six inches away from

 5   the entrance wound.

 6      Q     And, again, what is the significance, from a crime

 7   scene perspective, potentially, or from the DNA collection

 8   perspective, potentially, from having a very close range

 9   gunshot wound?

10      A     Well, the potential for blow-back or back spatter

11   is much greater.

12      Q     Where might you be interested in searching for the

13   victim's DNA via blow-back in light of the close range of a

14   gunshot wound, just generally speaking?

15      A     On arms of clothing, on the gun itself, the hands

16   obviously of the shooter, but where the hands would go after

17   something like this.  So I think Dr. Libby mentioned the

18   hoodie pouch, the kangaroo pouch that most hoodies have, in

19   there would be -- would be a potential area, as well as in

20   pockets of jeans or pants.

21      Q     Are you aware of whether clothing was recovered

22   from any of the suspects in this case?

23      A     I am, yes.

24      Q     And do you know for certain whether the clothing

25   that was recovered was, in fact, clothing that was worn on

1   the night of the incident?

2       A    Absolutely no, no, I cannot comment on that.

3       Q    And do you know whether for sure we know it was

4   not the clothing that was worn on the night of the incident

5   from your review of the materials?

6       A    No.  Based on -- based on police protocol and

7   based with dealing with this, I would have assumed that the

8   officers would have -- if that's why they were collecting it

9   and going after it, I would assume that those questions had

10  already been asked by the officers, but I didn't see

11  anything to that extent.

12      Q    So that was my next question.  Did you see any

13  indication or any documentation as to whether those

14  questions were sufficiently resolved by the officers who had

15  collected the evidence at the time?

16      A    I did not.

17      Q    Turning now to the gun itself, are you aware of

18  whether the gun that was used in both of these incidents was

19  ultimately recovered?

20      A    That's -- yes, that's what -- that's what has been

21  testified to, absolutely.

22      Q    There was testimony that -- well, strike that.

23           Where was the gun that was entered into evidence

24  in this case recovered?

25      A    It was by the railroad tracks between the Cherokee

1   Apartments and the justice center.  I'm -- I don't think

2   it's the police station, but over behind the Cherokee

3   Apartments by the railroad tracks.

4        Q    And do you know when the gun was recovered in

5   relation to the Junior Food shooting?

6        A    I believe it was -- some documentation actually

7   says the 19th, but I believe it was the 13th, it was

8   recovered.  And Junior Food happened on the 10th, I believe,

9   of April 1994.

10       Q    Are you aware of what the circumstances were that

11  sort of precipitated that gun being recovered, how did it

12  come to be found?

13       A    I believe one of the -- a person who was arrested

14  for an incident that had occurred over at Cherokee

15  Apartments was giving the police some information, and in

16  their statement they told the police where this gun was.

17       Q    So I'd ask you to take a look now at Exhibit 41,

18  please.

19       A    Yes.

20       Q    And what does Exhibit 41 depict?

21       A    A model 25 or model P-25, .25 caliber.  Actually

22  it doesn't say that on there, but that's going to be the

23  Raven Arms.

24       Q    And is it your understanding that this was the

25  weapon that was suggested at trial that was used in both

1   shootings?

2        A    That is my understanding, yes.

3        Q    And can you just briefly describe the weapon for

4   us.  What type of weapon is it?  I know the -- the -- that

5   Raven Arms is the manufacturer.  Is it a semi-automatic, a

6   revolver?

7        A    It is not a revolver.  It is a very small

8   semi-automatic, silver tone with wooden grips.

9        Q    And then if you would, turn with me to Exhibit 43.

10       A    Yes.

11       Q    And tell us what that is.

12       A    This is a picture of an empty magazine.

13       Q    And is it your understanding that this was the

14   magazine that was recovered with the Raven Arms?

15       A    That is my understanding, yes.

16       Q    Are you aware of whether any biological forensic

17   testing was performed on any portion of the gun or the

18   magazine?

19       A    No, to my knowledge, no testing has ever been

20   done.  Biological testing.

21       Q    If DNA evidence were able to be recovered from the

22   gun or from the magazine, what, to your expertise, would be

23   the significance of that potential evidence?

24       A    I think that that would give an idea of who was

25   loading the magazine, who was handling the magazine, who was

1   handling the gun.

2        Q    And are there any sort of areas of the gun --

3   let's start with the gun, that you would be particularly

4   interested in looking for DNA?

5        A    May I go back to pictures?

6        Q    Yes, absolutely.

7        A    Going back to Exhibit 41, the grip area that -- I

8   apologize.  Yes, the grip area is a very good choice, as

9   well.  Underneath the exhibit sticker would be -- I heard

10  testimony -- I heard talk during testimony of the

11  possibility of other people touching it.  If an exhibit

12  sticker is put over it, that protected that area at least if

13  other people had touched it, so underneath that exhibit

14  sticker somewhere, the exhibit sticker itself, the DNA

15  that's transferred onto that after you take it off would be

16  a good area.  The slide -- the grooves on the slide is a

17  good area of catching it.

18            And then if you go to Exhibit 43, again you have

19  the magazine and I spoke about that before.  Holding that

20  piece of plastic down as you're loading the bullets in that

21  magazine, you are applying pressure, you're possibly -- I've

22  only been -- I've only been here for a day, but I'm already

23  feeling the humidity.  And so the skin cells in humid

24  environments, we leave more skin cells even than we would

25  normally in dry environments.  But you're shedding a lot of

1    skin cells in the action of loading that magazine.  So that

2    magazine would be a good candidate for DNA testing.

3        Q    And we've heard a lot of talk, and as we saw from

4    the review of the materials, that a number of people may

5    have handled this weapon.  Would any information we might be

6    able to get about DNA profiles, nonetheless, be significant

7    to you as a crime scene analyst?

8        A    Well, if people -- even when this was -- in '94,

9    '95, '96, '97 people -- everybody should have been handling

10   this with gloves on, and so I would assume that if any law

11   enforcement or court officer handled it, it would have been

12   handled with gloves on, so the profiles on there could be

13   mixed profiles of other people, could be single profiles.

14       Q    Even if you found -- even if there were to be

15   recovered multiple profiles from individuals who had handled

16   the weapon prior to its recovery, would you want to know

17   that information as a crime scene analyst?

18       A    Yes.  I think we want to know all the information

19   that we can, through DNA.

20           FEDERAL DEFENDER ADJOIAN:  If I might just have

21       one moment, Your Honor.

22           THE COURT:  Yes.

23   BY FEDERAL DEFENDER ADJOIAN:

24       Q    Ms. Schile, every opinion that you have offered

25   here today, are those offered to a reasonable degree of

1    certainty within your respective field?

2         A    Yes, they are.

3              FEDERAL DEFENDER ADJOIAN:  Thank you, Your Honor.

4         I would pass the witness at this point.

5              THE COURT:  Ms. Graham.

6                        CROSS-EXAMINATION

7    BY ASSISTANT AG GRAHAM:

8         Q    Hello again, Ms. Schile.

9         A    Hello.

10        Q    I have a few questions for you.  Let's start off

11   with the murder weapon.  You are aware that the murder

12   weapon belonged to Mr. Young?  Gary Young?

13        A    Yes.

14        Q    You are aware that Mr. Young was the person who

15   had possession of it -- had possession of it after the

16   Junior Food Store shooting?

17        A    Yes.

18        Q    Do you know who else had possession of that

19   weapon?

20        A    I don't.

21        Q    Having someone's DNA on that weapon, does that

22   prove that they were the shooter at the Junior Food Store or

23   the Madison Street Deli?

24        A    No.

25        Q    Okay.  Let's go over a little bit of the actual

1    crimes.  Are you aware in the first -- in the first crime,

2    the Madison Street Deli, that Mr. Wilson testified that the

3    person came in and they shot him in the head?

4         A    Yes.

5         Q    So did he have any notice that this person was

6    going to shoot him in the head?  Did he testify that he had

7    any notice that the person was going to shoot him in the

8    head?

9         A    No.

10        Q    Okay.  And you talked about the blow-back there at

11   the Madison Street Deli shooting; is that correct?

12        A    Yes.

13        Q    Do you have an opinion as to how close the shooter

14   was when they shot Mr. Wilson?

15        A    I didn't see any pictures of that so, no, I don't.

16        Q    And is it your testimony that you have to be, I

17   think you said, at least a foot from the person to get the

18   blow-back; is that correct?

19        A    No, no.  Anywhere from right up against the person

20   to a foot away.

21        Q    Okay.  So if they were farther than a foot away,

22   there would not be blow-back on the shooter?

23        A    There would be blow-back, but you're absolutely

24   right.  The likelihood of there being -- unless there was

25   like a fan or something, the likelihood of it being on the

1    shooter is negligible, given that scenario.  The blow-back

2    is still going to happen because it's physics, but it's just

3    where it is deposited, so I couldn't say absolutely.

4         Q    And you don't know how far or close the shooter

5    was or the exact location the shooter was to Mr. Wilson when

6    he shot him?

7         A    No, I do not.

8         Q    And on the video that you watched, did it appear

9    that the person was attempting to open the cash register?

10        A    Yes, it did.

11        Q    And they were unable to open the cash register?

12        A    That's what it appeared to be, yes.

13        Q    So would it be a fair representation of the crime

14   that the person walked into the Madison Street Deli, they

15   shot the clerk and then they went and attempted to open the

16   cash register and were unable to do so?

17        A    Yes.

18        Q    You also testified about the fingerprint cards,

19   you said they were thrown away; is that correct?

20        A    Or lost.

21        Q    Or lost?

22        A    Yes.

23        Q    And is it under -- are you testifying that they --

24   they took fingerprints from that crime scene; is that

25   correct?

1      A    Yes.

2      Q    And they attempted to identify those fingerprints

3 from the crime scene?

4      A    Correct.

5      Q    But they were unable to find any matches?

6      A    Correct.

7      Q    Okay.  Regarding the clothing that was found one

8 block from the Madison Street Deli --

9      A    Yes.

10     Q    -- do you -- and maybe I misunderstood your

11 testimony.  You said that the police would have asked

12 questions to find out who wore that clothing.  Is that what

13 you were testifying to?  I just didn't understand.  I'm

14 sorry.

15     A    It's my accent now.  The -- I would -- in that

16 same situation, from my experience, the questions would be

17 asked:  Did you wear these on the certain dates?  So not --

18 it would be when, not where.

19     Q    And who would you have asked that question of?

20     A    Anybody that I was collecting clothing from.

21     Q    Okay.  And so it's the gentleman who found the

22 clothing, Mr. McCrae?

23     A    Oh, I'm sorry.  I meant from the clothing that --

24 not from him.  Yeah, I see where you're going.  That was

25 when I was being asked about the shoes and the pants that

112

1    were collected by all of the individuals that were

2    potentially involved in these different incidences.

3         Q    Okay.

4         A    As opposed to on the lawn.

5         Q    Okay.  Well, let's just focus on the lawn first

6    and then we'll go to the other clothing.

7         A    Yes.

8         Q    So you weren't stating that the police failed to

9    ask questions regarding the clothing that was found on

10   Mr. McCrae's lawn?

11        A    No.

12        Q    And you don't know who wore that clothing?

13        A    I do not.

14        Q    And you don't know if it could have had more than

15   one person wearing that clothing?

16        A    I would have no idea.

17        Q    Okay.  Going to the clothing that was obtained

18   from the co-defendants, Mr. Clark, Mr. Lucas and Mr. Young,

19   you're stating that the police should have asked them at

20   that time when they collected -- when they arrested them,

21   when they wore this clothing and if it was their clothing?

22        A    I'm suggesting that's how it happens in many

23   municipalities.  I'm not telling them what they should do

24   via their protocol, but you don't collect items of evidence

25   unless you know -- I mean, in my training items of evidence

1  wasn't just collected willy-nilly.  You wanted to make sure

2  that those -- otherwise, you just overflow the property

3  room, right?  So you want to make sure that there's

4  significance of evidentiary items that are coming in.

5      Q    And when someone is arrested for a possible

6  homicide and you're put into jail, don't they typically take

7  their clothes?

8      A    That is my understanding.

9      Q    Okay.  Let's go to the Junior Food Store, the

10  second crime.

11      A    Yes.

12      Q    So in that particular crime, is it your

13  understanding that the person came in and shot Mr. Slysz in

14  the head without warning?

15      A    There is not a video of that.  I don't know what

16  happened on that.

17      Q    Okay.  Well, let's talk a little bit about the

18  crime scene.  When Mr. Slysz's body was found, did it appear

19  that he had been holding a pencil?

20      A    I believe he was holding a pencil.

21      Q    Okay.  Would that have any suggestion to you about

22  if he was surprised by the shooting?

23      A    I know what you're going after.  I would have no

24  idea how much warning he would have had before he got shot.

25      Q    Okay.  Are you suggesting that the person looking

1   at -- this is Defendant's Exhibit Number 28 and that's the

2   diagram of -- do you have that?  Do you want to look at it?

3        A    I have it.

4        Q    Okay.  Looking at the diagram, does it appear to

5   you that the shooter was standing in front of the counter

6   when they shot Mr. Slysz?

7        A    I can't answer that question because I have some

8   confusion about that myself.  The measurements are extremely

9   difficult to go through, and the ballistics report does not

10  have information in it that I really would like in it.

11       Q    Are you saying --

12       A    But looking at -- but looking at the drawing by

13  Ken Collins, I couldn't make a statement to you about where

14  they were shot from.

15       Q    Okay.  So you can't tell from the trajectory of

16  the bullet where he was shot from?

17       A    We don't have a trajectory.  We have a --

18       Q    Okay.  So this diagram isn't indicating a

19  trajectory of the bullet?

20       A    No, this is not.

21       Q    Okay.  It's just saying that that's how far away

22  the bullet casing was found and where it was found in

23  relation to the crime scene?

24       A    Exactly.  The spent casing was found on that wall

25  and that wall is 5 feet, 6 inches from the cash register;

1   simply all that is saying.

2       Q    So what would you need in order to determine the

3   trajectory of the bullet, then?

4       A    Well, we would want to know -- so from the

5   ballistics report, we would want to know, first, does it

6   eject right, left, front, back; how far is that ejection

7   pattern, right; so what is the ejection pattern.  And so

8   you're not really doing a proper trajectory.  You're getting

9   an idea of the casing landing area.  Right?  The trajectory

10  has more to do with the projectile itself, so when we would

11  be looking at wound patterns and the bullet track patterns

12  within the skull of the victim, that would be a trajectory

13  as opposed to the likelihood of finding a casing here as

14  opposed to here, going right as opposed to left.

15      Q    So you can't say whether or not Mr. Slysz was shot

16  while the person was standing in front of the counter or if

17  the person came around the counter and shot him?

18      A    I cannot.

19      Q    But he was still holding his pencil when he died?

20      A    Yes.

21      Q    Okay.  And in that particular case, did the

22  perpetrator attempt to open the cash register?

23      A    There was testimony that somebody attempted to

24  open the cash register.

25      Q    Was there any money taken from the cash register?

116

1    Was there any evidence at trial that there was money taken

2    from the cash register?

3         A    There was -- no, there was not.

4         Q    So, again, we have a crime where the victim was

5    shot in the head and the person was unable to obtain any

6    money from the cash register?

7         A    Yes.

8         Q    Okay.  You were given some pictures of the Junior

9    Food Store to look at.

10        A    Yes.

11        Q    And I think that was in relation to the testimony

12   from the clerk from the Jack Rabbit Food Store.  Do you

13   recall that the clerk was outside of the Jack Rabbit Food

14   Store when he heard the shot?

15        A    Yes, he was emptying the trash bins, the small

16   trash bins.

17        Q    And so this was night when the crime occurred?

18        A    Yes.

19        Q    So the Junior Food Store would have been lit up

20   with lights?

21        A    Yes.  I'm assuming, yes.

22        Q    Okay.  So the person standing outside, even though

23   there are, I understand, advertisements in the windows, they

24   still would have been able to see inside of the Junior Food

25   Store?

1     A    Sure.  Sure.  To some -- I mean, to whatever

2    extent the visibility would have been there.

3     Q    And did that -- and also there was another

4    individual who testified at trial.  Do you recall that he

5    saw two people running from the Junior Food Store?

6     A    Well, yes, but the Jack Rabbit employee did as

7    well.

8     Q    Correct.  I'm just --

9     A    Or not running, but leaving.

10     Q    Correct.

11     A    Yes, I did.

12     Q    Yes.  So you had two people, two different

13    witnesses saying they saw two people inside the store.  And,

14    again, I understand you're saying that the other guy's view

15    was obstructed, but that was his testimony; is that correct?

16    The Jack Rabbit Food Store?

17     A    Not in the store, outside the store.  Right?

18     Q    The clerk from the Jack Rabbit Food Store, he

19    testified he saw two individuals inside the store.  Do you

20    recall that?

21     A    Now, I recall him testifying that he saw one

22    person inside of the store.

23     Q    Running back and forth?

24     A    Right.  Yes.

25     Q    All right.  Okay.  I think we're on the same page.

1        A     Okay.  Okay.

2        Q     So -- and that person and what he said, the

3   running back and forth, did that -- was that similar to the

4   testimony of Mr. Clark as to what occurred in the Junior

5   Food Store?

6        A     With -- if the Jack Rabbit -- the clerk from the

7   Jack Rabbit, they would have seen -- from Mr. Clark's

8   testimony, if I'm not getting this all mixed up, they would

9   have seen Mr. Clark by the beer aisle and then go down and

10  then come back up and two people exchanging places.

11       Q     Actually, didn't the Jack Rabbit Food Store clerk

12  testify that he wasn't looking until he heard the gunshot?

13  Is that correct?

14       A     Yes.  Yes.

15       Q     Okay.  So he may or may not have seen Mr. Clark go

16  down or come back up?

17       A     No.  You were just -- just based on your question,

18  that's where --

19       Q     Yeah.  I'm just asking, was it not similar

20  testimony in the sense that Mr. Clark said he went to the

21  front and the back of the store and that's what the Jack

22  Rabbit Food Store clerk testified to?

23       A     I think he testified -- and I may be completely

24  wrong, but I think that he said that the one person, he saw

25  the lighter-skinned person run from over by the cash

1     register to over by the beer.  And how Clark described it is

2     that you would have two individuals trading places almost.

3               ASSISTANT AG GRAHAM:  Can I have just one moment

4         to look at this?

5               THE COURT:  Yes.

6               THE WITNESS:  And that's based on my memory and I

7         apologize if that is inaccurate.

8     BY ASSISTANT AG GRAHAM:

9         Q    But if the records say something else then --

10        A    I would agree with the record obviously.

11        Q    Right.  We'll just let the record stand.  And

12    that's in our brief, as well, Your Honor.

13             So it's your testimony here today that DNA taken

14    from the handgun or from the shell casings would only show

15    who handled the weapon; is that correct?

16        A    It would show who handled the bullets, it would

17    show who handled the magazine, and it would show who handled

18    the gun.  Possible -- there's a possibility to -- and it all

19    depends on how much DNA we get, right, to what the DNA

20    actually tells us after the test is done.  Because the DNA

21    will describe different scenarios.  I mean, if there is a

22    major component versus a minor component.  So the --

23        Q    I'm sorry.  Could you explain that for a moment?

24    A major component and a minor component.

25        A    You bet.  So, for example, when Dr. Libby was

                                                              120

1   talking about the habitual wearer DNA, there -- if there

2   were multiple people handling that hoodie, there could be

3   several minor components or minor contributors, but the

4   major component would -- you would suspect to be the person

5   whose hoodie it is which is the wearer DNA.  And that's

6   going to be the -- the peak heights are going to be at a

7   level that you'll be able to distinguish that as a major

8   contributor.

9       Q    But you can't say whether or not that piece of

10  clothing -- when it was worn, who it was worn by at the time

11  of the shooting?

12      A    No.  You can -- you can say who the likelihood is

13  the wearer DNA.  You could say that Ms. Wilson's DNA is on

14  the sleeve of that, but DNA only answers the question:  Who

15  is it coming from?  Who this material is coming from?

16      Q    So if the shooter obtained the hoodie and the

17  sweatshirt from somebody an hour before the crime that had

18  already worn it, they could be the habitual wearer of the

19  clothing and not the person who actually did the shooting?

20      A    Yes.  But you will have -- you'll still have the

21  other skin cells there being deposited, but yes.

22      Q    And, again, going back to the weapon, since the

23  weapon belonged to Mr. Young, we know he had it before the

24  shootings, we know he had it after the shootings, so we know

25  somebody else had the weapon.  That's not going to show us

121

A155

1  necessarily who the shooter was either.

2       A    No.  It will only show you whose DNA is on the

3  gun.

4       Q    And we don't know if anybody else handled the

5  weapon other than Mr. Young, do we?  Other than

6  Mr. Cromartie.

7       A    I don't.  No.

8            ASSISTANT AG GRAHAM:  One second, Your Honor.

9            No further questions at this time, Your Honor.

10       Thank you.

11            FEDERAL DEFENDER ADJOIAN:  Just a few additional

12       questions, Your Honor.

13            Your Honor, may I approach the witness just to

14       show a portion of the transcript?  I've handed a

15       separate copy to opposing counsel.

16                      REDIRECT EXAMINATION

17  BY FEDERAL DEFENDER ADJOIAN:

18       Q    If I could ask you to look, Ms. Schile, about

19  halfway down the page marked 2632 on the right-hand side.

20       A    Yes.

21       Q    At line 13.  If you could just read lines 13

22  through 18.

23       A    Line 13.  Question:  "Okay.  What did you do with

24  those partial prints after you finished with them?"

25            Answer:  "I just -- I threw them away.  They were

                                                        122

1   of no value to me, no evidence."

2             "When did you throw them away?"

3             "That night."

4        Q    So the prints weren't, in fact, lost?

5        A    They were thrown away.  According to this

6   testimony.

7        Q    There were questions asked of you regarding the

8   Junior Food Store and whether you were able to tell where in

9   relation to the victim the shooter was standing.  Do you

10  recall that --

11       A    I do.

12       Q    -- series of questions?

13       A    Yes.

14       Q    And you testified that you weren't able to, in

15  fact, tell where the shooter was standing?

16       A    That is correct.

17       Q    And that was because there was some absence of

18  information in the records you reviewed?

19       A    That is correct.

20       Q    Can you tell us, when you were discussing the

21  ejector pattern of the shell casings, is that something you

22  would ordinarily expect to see in a ballistics report?

23       A    Yes.

24       Q    When you were discussing the lack of a bullet

25  trajectory in the medical examiner report, is that the type

1  of thing that you would expect to see in a medical examiner

2  report?

3      A    Yes.

4      Q    Does it make it more or less difficult to come to

5  these types of scientific conclusions if that evidence is

6  not documented contemporaneously?

7      A    It makes it impossible.

8           FEDERAL DEFENDER ADJOIAN:  I just beg the Court's

9      indulgence.

10          Your Honor, I would have no further questions for

11     Ms. Schile.

12          ASSISTANT AG GRAHAM:  Your Honor, I'd like to

13     clarify one thing.

14          THE COURT:  Yes.  Go ahead.

15                 FURTHER RECROSS-EXAMINATION

16 BY ASSISTANT AG GRAHAM:

17     Q    Going back to the Junior Food Store --

18     A    Yes.

19     Q    -- and the Jack Rabbit Food Store clerk's

20 testimony, okay, so do you recall that he testified that he

21 saw a light-skinned black person run from the front of the

22 store to the back of the store, and then he saw another

23 male, darker complexion, thinner, exit the store in the same

24 direction as the first male?

25     A    If you're reading that, I -- absolutely.

1    Q    Okay.  So the Jack Rabbit Food Store clerk did

2  testify that he saw two males at the store?

3    A    At the store, but not running around in the store.

4    Q    Okay.  That's -- so that's where our --

5    A    Yes.

6    Q    Okay.

7    A    And I don't have these memorized, so there are

8  thousands of pages of transcripts.

9    Q    Sure.

10   A    But, yeah, to my recollection, they were at the

11  store, not in the store.  Yes.

12   Q    And then the other eyewitness, Mr. Taylor, said he

13  saw two individuals come out of the store?

14   A    Yes.

15        ASSISTANT AG GRAHAM:  All right.  No further

16        questions.  Thank you, Your Honor.

17        FEDERAL DEFENDER ADJOIAN:  Nothing further, Your

18        Honor.

19        THE COURT:  Ms. Schile, let me ask:  It's my

20        understanding that your involvement in this matter was

21        to review the materials submitted to you and to render

22        an opinion as you have today; is that correct?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Okay.  You will not be doing any

25        testing or anything of that nature?

1              THE WITNESS:  No, sir.  I may be giving advice but

2         that's all, sir.

3              THE COURT:  Okay.  Thank you, ma'am.

4              THE WITNESS:  Thank you.

5              THE COURT:  You may step down.

6              Mr. Stewart, any other evidence to be presented?

7              FEDERAL DEFENDER STEWART:  No, Your Honor.  Only

8         in light of the stipulations on the record before we

9         began and the evidence adduced today, I would like to

10         move into evidence, for purposes of this motion, the

11         Exhibits 1 through 65 that have been proffered to the

12         Court and counsel.

13              (Thereupon, Defendant's Exhibit No. 1-65 was

14    marked for identification.)

15              ASSISTANT AG GRAHAM:  No objections.

16              THE COURT:  They are admitted.  I understand you

17         handed the clerk the originals or a copy of those at

18         the beginning.

19              FEDERAL DEFENDER STEWART:  That's right.  Exactly

20         the same that Your Honor has.

21              And then, Your Honor, we wanted to sort of leave

22         it to the Court how to proceed at this juncture.  I'm

23         prepared to argue the motion if we are to argue today.

24         The statute does allow for post-hearing briefing if the

25         Court prefers that approach, but I'm at Your Honor's

126

1    pleasure.

2         ASSISTANT AG GRAHAM:  I'm good with either one,

3    Your Honor.

4         THE COURT:  Ma'am?

5         ASSISTANT AG GRAHAM:  I'm good with either one,

6    Your Honor.

7         THE COURT:  Well, I would rather -- yeah, I think

8    I've got the information that I need, I've heard the

9    evidence, so there's going to be no more evidence

10   presented.  Unless you can think of something

11   specifically that you would argue in a post-hearing

12   briefing that's not already been argued in what's been

13   provided to me, then I don't know of any reason --

14        ASSISTANT AG GRAHAM:  I looked back over it last

15   night, Your Honor.  I feel like we've heard everything.

16   In -- we had spoken, in the event -- and certainly we

17   do oppose any testing, but if the Court were to grant

18   any kind of testing, Mr. Stewart and I talked about

19   this, and I also called the GBI Crime Lab to ask them,

20   you know, what kind of testing they would be able to

21   do, and we've also done this testing in a couple of

22   other death penalty cases, and we have an outside lab

23   that we normally use, and Mr. Stewart and I talked

24   about that, and he agreed to that lab.  If you have any

25   questions about that, I'm happy to answer it.  And I

1    did ask if Mr. Wilson is still alive to our victim

2    advocate's knowledge.

3         FEDERAL DEFENDER STEWART:  And I can represent to

4    the Court that my belief is that he is alive, or at

5    least that three or four months ago he was, so I

6    believe he still lives in the area.  Mr. Wilson, that

7    is.  To add --

8         THE COURT:  Y'all cannot tell me -- I gather from

9    what was indicated earlier, the questions asked

10   earlier, that as to Mr. Clark and Mr. Lucas and

11   Mr. Young, we can't even ask if their DNA is in the --

12   is it GBI DNA bank or you said CODEX [sic]?

13        ASSISTANT AG GRAHAM:  CODIS, yes.  And I called

14   the GBI to ask them about that, and they said, no, that

15   the way that the database is set up, there's not even

16   really a name associated with it, and the only way that

17   you can even run anything in CODIS is if it's an active

18   case and they take -- yeah, and they take whatever

19   sample you have and they run it through CODIS, but they

20   couldn't even tell us if those three individuals were

21   in CODIS or not.

22        THE COURT:  But if you had a match, it's going to

23   give you a name?

24        ASSISTANT AG GRAHAM:  Correct.  Yes, Your Honor.

25        FEDERAL DEFENDER STEWART:  And, your Honor, I can

                                                        128

1        represent to the Court from my own experience in other

2        cases that even post-conviction cases that are not

3        active as an active prosecution, that in the event that

4        testing is done on any evidence and a profile of any

5        sort is developed that with a ASCLD, A-S-C-L-D,

6        certified lab, they get approval to upload that profile

7        to CODIS and then CODIS kind of spits out the result,

8        basically tells you if there is a match and to whom.

9        That's something that I've done in other cases.

10            Ms. Graham and I also talked about specific labs

11       and we've agreed on a lab that could do it, and it's a

12       lab that I have experience with, as well.  The one

13       thing I do want to just add for Your Honor's

14       information, I think as much as I like Dr. Libby's,

15       perhaps, optimistic estimate of the time it would take,

16       my experience is it usually takes a bit longer than two

17       months for the, you know, identification of evidence,

18       sending to the lab, processing of evidence and getting

19       a result back.  But I just wanted to flag that for the

20       Court.

21            THE COURT:  Do you want to be more specific?

22            FEDERAL DEFENDER STEWART:  It can vary case to

23       case, but --

24            ASSISTANT AG GRAHAM:  Well, we've done it a couple

25       of times, so I checked during the break, and usually

1      it's only about a month with Bode Labs.

2            FEDERAL DEFENDER STEWART:  That's funny.  I have

3      another case with Bode Labs, Bode, B-O-D-E, is the lab

4      that we had discussed, another case that it's taken

5      much longer.

6            ASSISTANT AG GRAHAM:  It was more evidence or --

7            FEDERAL DEFENDER STEWART:  Yeah.  In any event,

8      Your Honor, as Ms. Graham indicated -- and I've had the

9      experience in other cases, as well, where either of the

10     parties can communicate jointly with the lab, in the

11     event that any particular item of evidence is going to

12     be consumed, we agree in writing that it may be

13     consumed.  Sometimes we even file that with the Court

14     to make sure everyone is on the same page just so

15     there's -- a steady hand is on the testing along the

16     way to make sure it's done well.

17           ASSISTANT AG GRAHAM:  I do think that determining

18     which pieces of evidence have enough DNA on it to test,

19     sometimes when you build that in, it does take a little

20     bit longer, the actual figuring out what you can test

21     does take a little while.

22           And, also, I wanted to explain to the Court, when

23     I spoke to the GBI, I sent them Dr. Libby's report and

24     all of the evidence they wanted testing, and there are

25     certain things that they can't test such as the bullet

1      casings, they won't test that.  And Mr. Stewart and I

2      talked.  If the Court were to grant testing of all

3      items, we'd want to use the same lab instead of

4      piecemealing it, but if the Court limited it to, say,

5      the clothing, then the GBI could do the testing for

6      that.  So it just depends on what's tested as to

7      whether or not they can do it.

8          THE COURT:  All right.

9          ASSISTANT AG GRAHAM:  And I haven't checked with

10     the GBI about mitochondrial DNA testing.  I didn't

11     realize that was the issue.

12         FEDERAL DEFENDER STEWART:  And, Your Honor, to the

13     extent that we were to proceed with testing perhaps

14     with Bode, Ms. Graham and I could make sure that we

15     submit to the Court what's required under the statute

16     to ensure that it complies with the DNA Identification

17     Act that is codified in the Georgia statute.

18         THE COURT:  And, again, unless -- we have no

19     reference -- as far as we know right now, we have no

20     reference insofar as Gary Young, Corey Clark or

21     Thaddeus Lucas, insofar as we know.

22         FEDERAL DEFENDER STEWART:  That's correct.  We

23     don't have a reference that would be submitted to the

24     lab.  However, I think there's a fair chance that all

25     three of them would be in the CODIS database.  I'm

131

1    almost certain that Corey Clark would be in there by

2    virtue of state prison incarceration from 2012 to 2014

3    for a parole violation on a case and actually he had a

4    new domestic case, as well, in the Atlanta area in that

5    time period.  I think he served two years.

6         ASSISTANT AG GRAHAM:  I would have less confidence

7    in Mr. Young being in CODIS because --

8         THE COURT:  Length of time?

9         ASSISTANT AG GRAHAM:  Correct.  And he was never

10   convicted of any crime after this particular -- after

11   this trial, he was never convicted of any crime or

12   sentenced or housed in any state institution, so it

13   would have been the early 90's when he was locked up,

14   so I just -- I'm not sure that we would have DNA from

15   him.

16        FEDERAL DEFENDER STEWART:  He definitely had a

17   prior felony.  He was charged with felony possession in

18   relation to this case, the Cherokee Homes shooting of

19   April 12th of 1994, so he had a predicate felony which

20   was a drug case, but I don't know -- I don't know one

21   way or another about his criminal history after this

22   case, nor do I know whether his DNA would have been

23   collected earlier.  I do know that in the courthouse

24   downstairs there are his shoes that were taken when he

25   was arrested and then that bag of clothing that's

132

A166

1    depicted there.  Socks, underwear, shorts, maybe a

2    shirt.

3        THE COURT:  You know, one of the statutory

4    requirements is that the motion not be filed for

5    purposes of delay.  That would -- a couple of

6    questions, raises a couple of questions.  When did

7    y'all initially begin your representation of

8    Mr. Cromartie?

9        ASSISTANT FEDERAL DEFENDER STEWART:  We were

10    appointed by the Federal District Court, Middle

11    District in October of 2014.

12        If I may, Your Honor, one point as to timeliness,

13    Mr. Cromartie, with his predecessor counsel, asserted

14    in state habeas that he was innocent of shooting

15    Mr. Slysz and of the Madison Street Deli shooting.

16    When the state habeas court dealt with that and in the

17    record below there's an opinion dated perhaps February

18    of 2012 where that particular claim of innocence of

19    being the shooter is denied as being inappropriate for

20    the state habeas mechanism at that time and, in fact, a

21    footnote on page 8 of that opinion indicates that the

22    appropriate mechanism for raising it at the right time

23    might be an extraordinary motion for a new trial, as we

24    filed here.

25        The next step from, of course, the state habeas

133

1      proceedings was federal habeas.  That is when our

2      office was appointed to represent Mr. Cromartie and, of

3      course, in federal habeas we were dealing with claims

4      that had been exhausted in the state court proceedings

5      below.  So in federal habeas that claim had been

6      procedurally denied.  We were able to proceed in the

7      United States District Court on the claims that had

8      been dealt with on the merits or the denial of merits

9      on the state habeas.  We proceeded through the United

10     States District Court, the 11th Circuit Court of

11     Appeals and the United States Supreme Court and filed

12     this motion before Your Honor within about four weeks

13     of the determination of that process.

14          THE COURT:  All right, sir.

15          ASSISTANT AG GRAHAM:  Your Honor, can I speak to

16     that, please?

17          THE COURT:  Well, let me -- I've still got a

18     question or two.  You came into the case October of

19     2014, and of course, this statute was in existence at

20     that time.  Was there anything to prevent you from

21     simultaneously filing this motion while you were

22     proceeding in the federal habeas matters?

23          FEDERAL DEFENDER STEWART:  I would say as a

24     practical and legal matter, there were great

25     difficulties.  Number one was, of course, coming into a

1    capital case that's been litigated for 20 years -- not

2    quite that long -- but we were in the procedure of

3    receiving from predecessor counsel, you know, 40

4    banker's boxes of the entire record of the case and

5    learning that with very, very tight deadlines in

6    federal court.  That's the sort of practical side.  And

7    we've been basically unceasingly litigating the case in

8    federal court until recently.  But as to the legal

9    matter, you know, that claim had been sort of shut down

10   in the state habeas proceeding, as I mentioned earlier,

11   so I think those are the main reasons.  If Your Honor

12   would like more detail, I would like to look through

13   our record on it and also, you know, we could provide

14   supplemental briefing on that if Your Honor chose to

15   hear that.

16        THE COURT:  All right, sir.  Well, I'm just -- I

17   think it's a legitimate question because it appears

18   that -- it appears that Mr. Cromartie got to the end of

19   the line, so to speak, on any appeal, any type of

20   appeal, habeas, whatsoever when the US Supreme Court

21   denied certiorari I guess, December --

22        FEDERAL DEFENDER STEWART:  Correct.

23        THE COURT:  -- of 2018, and then this was filed.

24   And it just appears that, on the face of it anyway,

25   that if there was valid reason for ordering testing of

135

A169

1          some item in the nature that you have requested, that

2          that reason has been in existence all this time and

3          this could have been pursued and acted upon in one way

4          or the other without pushing things down the road, so

5          to speak.

6                FEDERAL DEFENDER STEWART:  Well, and two things I

7          would say in response:  One, I think Dr. Libby's

8          testimony today, particularly about dealing with

9          mixtures and the probabilistic algorithms that are now

10         available he testified as of 2017, earlier than that

11         really -- I mean, particularly if we are dealing with

12         mixed samples, would have been problematic.

13               Second, we don't even know that answer until the

14         testing is actually done.

15               Third, you know, when the DNA statute was enacted

16         in 2003, the Georgia Supreme Court's first case really

17         interpreting it, Crawford versus State, I think Your

18         Honor may be aware of it, but two of the justices of

19         the Court, they said that -- and this is quoting

20         Crawford, page 406 of the Southeast (2d) version, they

21         said, "Recognizing that errors in the criminal justice

22         system may lead to the execution of innocent persons,

23         the legislature enacted OCGA 5-5-41(c) to help ensure

24         that only those who are actually guilty will be put to

25         death at the hands of the State."

1          What's never happened in this case is the testing

2     of that forensic evidence that could answer those

3     questions.  You know, the evidence could speak, the

4     forensics could speak.  So far in a trial, yeah, there

5     were witnesses, but a lot of them had tremendous

6     motivation to fabricate to save themselves.  What this

7     Court could do with DNA testing would be to allow

8     certainty, and particularly in a capital case where

9     there is testable forensic evidence in this courthouse,

10    and we have testimony that it could be tested.  So, you

11    know, I have more I could say in support of it and, of

12    course, addressing the various factors in the statute

13    but, you know, really the -- really at its heart, if

14    the Court's assessing whether this jury, whether

15    there's a reasonable probability that this jury would

16    have either acquitted or would have returned a

17    different verdict, you know, this jury deliberated on

18    penalty for three days in this case.  If this jury were

19    to have learned that there was DNA evidence on the

20    various items from the crime scene and that none of it

21    was Mr. Cromartie's, I dare say that would have swayed

22    them.  If the jury learned that there was DNA other

23    than from Corey Clark who was the one pointing the

24    finger at Mr. Cromartie, DNA evidence on the gun or the

25    cartridge casings, I dare say that would have caused

137

1        them to question his testimony.  So whatever the

2        greater picture, I think this is precisely the kind of

3        situation where DNA testing is appropriate.

4                THE COURT:  Ms. Graham?

5                ASSISTANT AG GRAHAM:  First, I'd like to address

6        the unreasonable delay.  Habeas, Your Honor, as I'm

7        sure you're aware, has nothing to do with actually --

8        you can't bring a --

9                COURT REPORTER:  I can't hear you.

10               ASSISTANT AG GRAHAM:  I am sorry, usually I am too

11       loud.

12               They could have filed an extraordinary motion for

13       new trial at any time.  And, in fact, we have habeas

14       cases, death penalty cases in which they have done that

15       during the middle of their state habeas case where

16       they've gone and filed an extraordinary motion for new

17       trial.  Mr. Leonard Drain (phonetic) did it, and the

18       Court stopped the habeas action while that was

19       litigated, and when it was denied, we came back and

20       picked up the habeas.  It's not -- that's exactly what

21       an extraordinary motion for a new trial is there for,

22       is for them, if they think they're innocent, to go back

23       and ask for that at the earlier possible time.  So, no,

24       there is nothing that would have kept them from that.

25               And Mr. Cromartie has been represented by counsel

1    since the time of trial.  He had a team of attorneys in

2    his state habeas action.

3        They could have asked for it at any time.  And

4    their theory throughout it was that Mr. Young was the

5    perpetrator for both of these crimes, or at least for

6    the Madison Street Deli crime; therefore, they had no

7    reason not to go back and ask for his DNA.  It's

8    exactly for that reason they didn't because now at the

9    very end they can ask for more time now to get their

10   testing and to forestall the execution.  So, at any

11   time, they could have asked for that.  So they have not

12   shown that it was for undue delay in this particular

13   case.

14       And I'd like to note to the Court that since

15   Mr. Cromartie filed his extraordinary motion for new

16   trial, the State of Georgia has had two more death row

17   inmates complete their appeals.  Donnie Lance and

18   Marion Wilson, who we executed last week.  Both of

19   those did the exact same thing.  They filed an

20   extraordinary motion, once that last cert petition was

21   denied by the United States Supreme Court.  Mr. Wilson

22   filed his.  The Court immediately found that he had not

23   shown a reasonable probability of a different outcome,

24   and he had also failed to show it wasn't for the

25   purpose of delay, because he waited until the

139

A173

1        expiration of all his appeals to file it.  And as I

2        said, we executed him last week, without DNA testing.

3            Mr. Lance is currently in the briefing process at

4        this time.  But also -- so that shows a pattern here

5        with our opposing counsel in our cases, that they are

6        now waiting until all of their appeals are done before

7        they're asking for these extraordinary motions knowing

8        that, hey, that's just one way for them to, you know,

9        come in and ask for more time in their case.

10           As far as a reasonable probability of a different

11       outcome, I don't think any of this DNA would show that.

12       Even if Mr. Cromartie's DNA isn't on any of that

13       evidence, it would not show that he wasn't involved in

14       those crimes.  You had nearly identical crimes.  The

15       clerk was shot in the head without warning and the

16       person attempted to open the cash register, and we know

17       for a fact that Mr. Cromartie was at the Junior Food

18       Store because his fingerprint was found on that beer

19       carton outside of the store and a shoe print that was

20       similar to his was found out.  We know he was there.

21       It just defies all logic to assume that two different

22       people were at the Madison Street -- committed these

23       crimes.  One was at the Madison Street Deli and one was

24       at Junior Food Store.  It doesn't make any sense, Your

25       Honor.

1          So we would submit that there is no DNA testing

2     that would exonerate Mr. Cromartie from these crimes or

3     create a reasonable probability of a different outcome

4     in this sentencing phase.

5          FEDERAL DEFENDER STEWART:  Your Honor, may I just

6     respond to two points --

7          THE COURT:  Yes, sir.

8          FEDERAL DEFENDER STEWART:  -- and then I'll sit

9     down.  I appreciate your indulgence.

10         Whatever other counsel do in other cases, I have

11    no control over, of course.  You know, as counsel just

12    stated, yeah, there is evidence that he was there, but

13    that's it.  And where is the co-defendant, Corey Clark?

14    There was evidence he was there, too.  He was released

15    on November 29th, 2005 in his sentence.  If the roles

16    were reversed -- if the forensics could tell us who the

17    shooter was, you know, perhaps then we have the wrong

18    people in the wrong places.

19         And then, third, I just want to comment to Your

20    Honor in our exhibits from the state court record below

21    there's an exhibit towards the end of your pack,

22    Exhibit 64, where the co-defendant Thaddeus Lucas, he

23    was the alleged driver, he stated -- this is to his

24    state parole officer.  And he and Mr. Cromartie are

25    half brothers, and he stated about this incident, Thad

1   Lucus did, "I was with my brother and his friend and

2   they went in this convenience store to take some beer

3   and his friend shot the clerk in the face."

4       Thad Lucas in this document, in Exhibit 64 here,

5   is casting yet more doubt on who the shooter was.  I

6   mean, he's saying it was Corey Clark, is what he's

7   saying.

8       Your Honor, it matters.  There's a lot of

9   confusion here.  There's confusion about Walter Slysc'

10  [sic] testimony.  All there is is words, but there

11  isn't evidence, there isn't forensics, and Your Honor

12  has the power and the position to do what I would

13  submit that the statute allows you to do and to clear

14  this up with evidence.

15      THE COURT:  All right, sir.

16      FEDERAL DEFENDER STEWART:  And, Your Honor, we do

17  request -- if the Court would allow it, we would

18  request post-briefing if the Court -- the statute says

19  you may proceed with post-hearing briefing.  It's

20  completely your call.  What would you ask for?

21      THE COURT:  Mr. Stewart, is that simply as to the

22  issue of delay?

23      FEDERAL DEFENDER STEWART:  I suppose it could be

24  to whatever issue Your Honor would like us to address.

25  But, yes, delay is the issue that I didn't anticipate

142

1      coming up, particularly because of the bonafides of

2      this motion; the substance to it.  You know, this is

3      not delay where it's a frivolous motion.  This is a

4      real motion with real testimony and real questions.

5      So -- but, yes, I would -- yes, I would address delay,

6      I would address anything else that the Court would ask

7      for.

8           THE COURT:  Ms. Graham?

9           ASSISTANT AG GRAHAM:  I don't see any need for a

10     post-hearing brief, Your Honor.  I think we've briefed

11     everything.  I think it's -- obviously it's for delay,

12     but if you would like briefing, obviously I would do

13     it.  I don't think there's any need for it.

14          THE COURT:  Okay.  Let me make one other inquiry,

15     and I'm simply inquiring.  I don't mind -- I certainly

16     don't mind doing it myself.  Insofar as an order in

17     regards to the motion, do y'all wish to submit proposed

18     orders, or would you prefer that I just do it?  I've

19     got the bones of one, but it's -- and if you submitted

20     one, it would -- I would ask for it to be in modifiable

21     form, and I'm absolutely sure I would modify -- you

22     know, I may adopt part of each of them, but if y'all

23     don't want to do that, that's fine with me.  I can do

24     it myself, no problem.

25          ASSISTANT AG GRAHAM:  I'm very happy to do that,

143

A177

1      Your Honor.  We do them all the time.  Whatever you'd

2      like.

3           THE COURT:  Well, I was really inquiring of your

4      desires because I don't particularly have one one way

5      or the other.

6           ASSISTANT AG GRAHAM:  Yes, I mean we would like

7      the opportunity to prepare a proposed order, Your

8      Honor.

9           THE COURT:  Mr. Stewart?

10          FEDERAL DEFENDER STEWART:  Sure, that is fine.

11     What time frame would Your Honor like those?  I

12     suppose -- I guess the first question will be, what

13     time frame would you like any post-hearing briefing and

14     then the second would be a proposed order.

15          THE COURT:  Y'all give me some idea of what -- you

16     know, y'all know your work loads; I don't.

17          FEDERAL DEFENDER STEWART:  I'm sorry, Your Honor?

18          THE COURT:  Y'all know your own work loads; I

19     don't.  I assume you're both busy, but I would like it

20     in a, you know, reasonable period of time.

21          ASSISTANT AG GRAHAM:  Sure.  I mean, if you want

22     post-hearing briefing on the delay, I'm sure we could

23     do that in 15 to 30 days.  Do you want simultaneous

24     briefing on the issue of delay, or do you want him to

25     file it and then us respond?

1          FEDERAL DEFENDER STEWART:  That is fine with me.

2          THE COURT:  You know, I would say give me your

3     briefing and proposed order.

4          ASSISTANT AG GRAHAM:  At the same time?

5          THE COURT:  Same time.

6          ASSISTANT AG GRAHAM:  Sure.

7          FEDERAL DEFENDER STEWART:  And why don't we do

8     that in 30 days, if that's all right with Your Honor.

9          THE COURT:  Thirty days is what I was thinking.

10         FEDERAL DEFENDER STEWART:  Your Honor, should the

11    post-hearing brief address only the question of delay

12    or shall it be broader than that?

13         THE COURT:  I would think only the question of

14    delay.  I mean, again, if you can think of something

15    that you think is substantial that you have not already

16    presented, I would certainly like an opportunity to

17    consider that, but I think y'all both have been very

18    thorough in your briefings to this point on the issues

19    that have been submitted.

20         FEDERAL DEFENDER ADJOIAN:  Thank you.

21         THE COURT:  Thank y'all.

22         Gentlemen from the Department of Corrections, this

23    hearing is completed.  Thank y'all.

24         (Whereupon, proceedings adjourned at 12:00 p.m.)

25

1                        CERTIFICATE OF REPORTER

2

3    STATE OF GEORGIA:
     COUNTY OF THOMAS:

4
             I, JULIE F. ROBINSON LAWRENCE, Court Reporter,
5        certify that the foregoing is a true and correct
         transcript of the proceedings taken down by me in the
6        case aforesaid.  The exhibits attached hereto, if any,
         are copies of documentary evidence only and the
7        physical evidence remains in the custody of the Clerk.
         This certification is expressly withdrawn and denied
8        upon the disassembly or photocopying of the foregoing
         transcript or any part thereof, including exhibits,
9        unless said disassembly or photocopying is done by the
         official undersigned court reporter and original seal
10       and signature attached hereto.

11           Dated this 2nd day of June 2019

12           _____
             JULIE F. ROBINSON LAWRENCE, CCR
             Certificate Number B-1865

13
     **********************************************
14

15

16

17

18

19

20

21

22

23

24

25

                                                            146

                                                           A180

## State v. Ray Jefferson Cromartie
No. 94-CR-328
Defendant's Exhibit List in Support of
Motion for Postconviction DNA Testing

### Expert Reports and *Curriculum Vitae*

| Def. Ex. # | Description |
|---|---|
| 1 | *Curriculum Vitae* of Dr. Randell Thomas Libby |
| 2 | Declaration of Dr. R. Thomas Libby |
| 3 | Powerpoint Presentation of Dr. R. Thomas Libby |
| 4 | Index of Materials Provided to Dr. R. Thomas Libby |
| 5 | *Curriculum Vitae* of Laura Schile |
| 6 | Affidavit of Laura Schile |
| 7 | Index of Materials Provided to Laura Schile |

### Exhibits Related to the Shooting at the Madison Street Deli, Apr. 7, 1994

| Def. Ex. # | Description |
|---|---|
| 8 | Photo of Evidence Bag containing Green Hooded Sweatshirt (State's Ex. 30-B) |
| 9 | Photo of Green Hooded Sweatshirt in Bag (State's Ex. 30-B) |
| 10 | Photo of Green Hooded Sweatshirt in Bag with Evidence Sticker (State's Ex. 30-B) |
| 11 | Photo of Black Knit Cap in Bag (State's Ex. 30-A) |
| 12 | Photo of Black Knit Cap in Bag (close up) (State's Ex. 30-A) |
| 13 | Photo of Sealed Metal Cylindrical Container Containing Cartridge Casing (State's Ex. 156) |
| 14 | Photo Depicting Top of Metal Cylindrical Container Containing Cartridge Casing (State's Ex. 156) |
| 15 | Photo Depicting Bottom of Metal Cylindrical Container Containing Cartridge Casing (State's Ex. 156) |
| 16 | Photo of Madison Street Deli Sink Area (State's Ex. 42) |

1

| 17 | Photo of Madison Street Deli Crime Scene Depicting Investigator Pointing at Cartridge Casing (State's Ex. 33) |
| 18 | Close Up Photo of Cartridge Casing on Floor of Madison Street Deli (State's Ex. 34) |
| 19 | Still Photo Taken from Madison Street Deli Surveillance Video Depicting Perpetrator Behind Cash Register (State's Ex. 149) |
| 20 | Photo of Booking Photo of Ray Jefferson Cromartie (Defense Ex. 6) |
| 21 | Excerpt of Trial Testimony of David McRae (Sept. 22, 1997) (pp. 1841-44) |
| 22 | Investigative Notes of Det. Sgt. Chuck Weaver, Thomasville Police Dept., re: Madison Street Deli (State Habeas Record pp. 10777-81) |

## Exhibits Related to the Shooting at the Junior Food Store, Apr. 10, 1994

| Def. Ex. # | Description |
| --- | --- |
| 23 | Photo of Exterior of Junior Food Store (State's Ex. 102) |
| 24 | Photo of Interior of Junior Food Store from Behind Counter (State's Ex. 135) |
| 25 | Photo of Interior of Junior Food Store (State's Ex. 113) |
| 26 | Photo from Junior Food Store Parking Lot, Looking Across W. Jackson St. Towards Jack Rabbit Foods (State's Ex. 91) |
| 27 | Photo of Diagram of Junior Food Store Drawn by Ken Collins (GBI) (State's Ex. 176) |
| 28 | Photo of Diagram of Junior Food Store Depicting Location of Victim and Cartridge Casings Drawn by Ken Collin (GBI) (State's Ex. 138) |
| 29 | Photo of Cartridge Casing on Floor of Junior Food Store (State's Ex. 64) |
| 30 | Photo of Cartridge Casing on Floor of Junior Food Store (State's Ex. 63) |
| 31 | Photo of Cartridge Casing on Floor of Junior Food Store (State's Ex. 62) |
| 32 | Photo of Evidence Bag Labelled "Shell Casing #2" (State's Ex. 159) |
| 33 | Photo of Evidence Bag Labelled "Shell Casing #1" (State's Ex. 160) |
| 34 | Photo of Reverse Side of Evidence Bag Labelled "Shell Casing #1" Depicting Red Sealed Evidence Tape (State's Ex. 160) |

| 35 | Photo of Evidence Bag Labelled "Pkg of Cigarettes From Floor in Blood Pool" (State's Ex. 9) |
| 36 | Photo of Cigarette Package Inside Evidence Bag (State's Ex. 9) |
| 37 | Photo of Evidence Bag Labelled "Cut Portion of Victim's Shirt – Left Sleeve with Blood Pattern" with Red Evidence Tape (State's Ex. 1) |
| 38 | Excerpt of Trial Testimony of Corey Clark (Sept. 24, 1997) (pp. 2385-88) |
| 39 | Excerpt of Trial Testimony of Dr. John Parker (Sept. 24, 1997) (pp. 2228-34) |
| 40 | Autopsy Report of Dr. John Parker (May 12, 1994) |

### Exhibits Regarding Physical Evidence Relevant to Both Crime Scenes

| Def. Ex. # | Description |
| --- | --- |
| 41 | Photo of .25 Caliber Raven Arms Semiautomatic Pistol with Trial Exhibit Sticker (State's Ex. 162) |
| 42 | Photo of Underside of .25 Caliber Raven Arms Semiautomatic Pistol (State's Ex. 162) |
| 43 | Photo of Magazine from .25 Caliber Raven Arms Semiautomatic Pistol Depicting Spring (State's Ex. 162) |
| 44 | Photo of Magazine from .25 Caliber Raven Arms Semiautomatic Pistol Depicting Apparent Ink Markings (State's Ex. 162) |
| 45 | Photo of Green Pants Collected from Corey Clark (State's Ex. 14-C) |
| 46 | Photo of Exhibit Sticker on Evidence Bag Containing Shoes Taken from Corey Clark (State's Ex. 14-A) |
| 47 | Photo of Evidence Bag Containing Shoes Taken from Corey Clark Reflecting Writing, "Corey Clark 940406722" (State's Ex. 14-A) |
| 48 | Photo of White Nike High Top Shoe with White Nike Swoosh Taken from Corey Clark (State's Ex. 14-A) |
| 49 | Photo of Sole of White Nike High Top Shoe with White Nike Swoosh Logo Taken from Corey Clark (State's Ex. 14-A) |
| 50 | Photo of Evidence Bag Containing Clothing Taken from Gary Young (State's Ex. 27) |
| 51 | Photo of Green and White Clothing Taken from Gary Young (State's Ex. 27-A) |

3

| 52 | Photo of Green and White Clothing Taken from Gary Young (State's Ex. 27-B) |
| 53 | Photo of Black Converse All-Star Low Top Canvas Shoes Take from Gary Young (State's Ex. 27-C) |
| 54 | Photo of Soles of Black Converse All-Star Low Top Canvas Shoes Take from Gary Young (State's Ex. 27-C) |
| 55 | Photo of Evidence Bag Marked "Thad Lucas 940406722" Containing Shoes Taken from Thad Lucas (State's Ex. 16) |
| 56 | Photo of Nike High Top Shoe with Black Nike Swoosh Logo Taken from Thad Lucas (State's Ex. 16-A) |
| 57 | Photo of Sole of Nike High Top Shoe with Black Nike Swoosh Logo Taken from Thad Lucas (State's Ex. 16-A) |
| 58 | Photo of White Adidas High Top Shoes Taken from Ray Jefferson Cromartie Partially in Evidence Bag (State's 18-A-B) |
| 59 | Photo of Evidence Bag Marked "#20" Containing Clothing Taken from Ray Jefferson Cromartie (State's Ex. 20) |
| 60 | Photo of Green Plaid Lined Button-Down Long-Sleeve Shirt Taken from Ray Jefferson Cromartie In Bag (State's Ex. 20) |
| 61 | Photo of Green Plaid Lined Button-Down Long-Sleeve Shirt Taken from Ray Jefferson Cromartie on Table (State's Ex. 20) |
| 62 | Close Up Photo of Green Plaid Lined Button-Down Long-Sleeve Shirt Bearing Trial Exhibit Sticker (State's Ex. 20) |

## Other Exhibits from the State Court Record

| Def. Ex. # | Description |
| --- | --- |
| 63 | Excerpt of Trial Testimony of Thad Lucas (Sept. 24, 1997) (pp. 2301-02) |
| 64 | Thaddeus Lucas, Personal History Statement, State Board of Pardons and Paroles (State Habeas Record pp. 4007-10) |
| 65 | Newspaper Article Dated Oct. 2, 1997, Noting Initial Penalty-Phase Vote of 6-6 (for Life-Death), and Ultimate Death Sentence |

A184

## *CURRICULUM VITAE*

### Randell T. Libby

#### *Personal*

Citizenship:   USA
Telephone:     425.869.9536 (Direct-Office)
               425.885.2932 (FAX)

#### *Address*

GeneQuest Diagnostics
Neuro and Forensic Genomics
Human Identity Analysis
4616 25th Avenue NE
Suite 708
Seattle, Washington   98105
USA

rlibby@genequest.com
rlibby@u.washington.edu

#### *Education*

Ph.D., Molecular Genetics, Oregon State University, 1981.
M.S., Microbial Genetics, California State University, 1977.
B.S., College of Agriculture & Environmental Sciences , University of California-Davis, 1974.

#### *Professional Experience*

*Co-Founder and Chief Executive Officer*, SNPgenomics™, Oncology, Pediatrics & Personal Genomics, Seattle, Washington (2014-2017).

*Principal Scientist,* Neuro and Forensic Genetics, GeneQuest Diagnostics, Human Identity Analysis, Seattle, Washington 98105 (1996-present).

*Affiliate Investigator*, Translational Research Program, Section of Neurology, Laboratory of Neurogenomics, Benaroya Research Institute, Virginia Mason Medical Center, Seattle, Washington  98101 (07/01/2009 – 01/01/2011)

EXHIBIT

A185

*Senior (Faculty) Research Associate*, School of Medicine, Department of Laboratory Medicine, University of Washington (2003 – 2009)


*Senior Fellow,* School of Medicine, Department of Laboratory Medicine, University of Washington, 1998 – 2003.

*Affiliate*, School of Medicine, Center for Human Health and Disability, Division of Medical Genetics, University of Washingto, 2001-present.

*Resident Consultant,* Department of Pathobiology and Molecular Biology, NeoRx Pharmaceutical Corporation, 1994 - 2000.

*Visiting Scholar*, Department of Genetics, University of  Washington, 1993 - 1994.

*Research Assistant Professor*, Department of Genetics, University of Washington, 1990 - 1992.

*Research Associate*, Department of Genetics, University of Washington, 1987 - 1989.

*Visiting Fellow*, Department of Cellular & Molecular Biology, Institut Jacques Monod, Universite de Paris VII, 1989.

*Staff Scientist*, Department of Molecular Biology, Immunex Corporation, 1984 - 1987.

*Senior Research Associate*, Department of Microbiology, The Ohio State University, 1982 - 1984.

*Visiting Research Fellow*, Department of Public Health & Microbiology, Michigan State University, 1981.


*Visiting Research Fellow*, Department of Microbiology, University of Iowa, 1981.

*Postdoctoral Research Associate*, Department of Microbiology, The Ohio State University, 1980 - 1982.

*Predoctoral Research Assistant,* Department of Microbiology, Oregon State University, 1978 - 1980.

*Teaching Assistant*, Department of Microbiology, Oregon State University, 1976 - 1978.

*Teaching Assistant*, Department of Microbiology, California State University, 1974 -1975.

## *Committees (Selected List)*

Member, International Society of Psychiatric Genetics, Genetic Testing Committee (2018 – present)

Member, International Society of Psychiatric Genetics, Ethics Committee (2018 – present)

## *Reviewer*

*Biochemistry Journal,* 1987 - present.

## *Research Support*

National Institutes of Health (GM 59356), Triplet Repeat Instability, Albert R. LaSpada, P.I. and Randell T. Libby, Senior Research Associate, 1998-2009.

National Institutes of Health (No. 13626-22), Control of Cell Growth, Jonathan A. Gallant, P.I. and Randell T. Libby, Research Assistant Professor, 1990 - 1992.

American Cancer Society (No. NP279H), Regulatory Nucleotides, Jonathan A. Gallant, P.I. and Randell T. Libby, Research Associate, 1988 - 1989.

National Research Service Awardee (No. 5 T32 AG00057-10 0071), Mechanisms of Error Reduction, Randell T. Libby, Research Associate. 1986 - 1987.

National Institutes of Health (No. R01-AG01546), Protein Stability & Aging in Anucleate Cells, John N. Reeve, P.I., and Randell T. Libby, Research Associate, 1980 - 1982.

Environmental Protection Agency (No. N0237093), Application of Recombinant DNA Technology to Methane Biogenesis, John N. Reeve, P.I., and Randell T. Libby, Senior Research Associate, 1982 - 1984.

## *Major Research Interest*

Molecular Neurogenetics: Molecular mechanisms of triplet repeat instability and neurotoxicity in the development of neurodegenerative disorders. Translational therapy in sporadic Amyotrophic Lateral Sclerosis (sALS).

Gene Therapy: development of non-viral gene therapy strategies for the treatment of vascular smooth muscle cell proliferation.

### *Postdoctoral Research*

University of Washington: Efforts have been directed towards identifying novel regulatory pathways required for the avoidance and correction of transcriptional errors.

The Ohio State University: Components of the transcription/translation apparatus prone to increased error frequency upon senescence were identified. An error catastrophe theory, due to the mistranslation of the early genes involved in *T7* development were established, and mechanisms whereby proteins are inactivated was investigated.

Additional studies were directed towards an examination of promoter structures in Archaebacterial DNA: the terminal enzyme in the methane biosynthetic pathway was cloned and expressed in *Escherichia coli*.

### *Predoctoral Research*

Oregon State University: The RNA polymerase from *Bacillus subtilis* was purified, and its enzymatic activities characterized.  The regulation of synthesis of the individual subunits of the enzyme were established.

California State University: Transformation of auxotrophic markers from *E. coli* were used to compliment equivalent lesions in yeast through the construction of *E. coli*/yeast shuttle vectors.

### *Scientific Affiliations*

International Society of Psychiatric Genetics
American Society of Human Genetics*
National Fragile X Foundation
Genetics Society of America*
American Society for Microbiology*
American Association for the Advancement of Science*
New York Academy of Sciences*
The RNA Society*
The American Society of Gene Therapy*
American Academy of Forensic Sciences
International Society of Forensic Genetics
National Fragile X Foundation
Society for Neuroscience
*, past*

A188

*Awards and Honors*

Wood/Whelan Fellowship: International Union of Biochemistry (1989), Universite de Paris VII.

National Research Service Awardee: Regulation of Transcriptional Fidelities, 1986 - 1987.

Hughes Scholarship: Regulation of Transcription in *Bacillus subtilis*, 1978.

*Patents*

PCT International Patent: Delivery Vehicles for Bioactive Agents and Uses Therof, Randell T. Libby, Lawrence L. Kunz, Thomas R. Tice, and Christopher W. McDaniel, PCT WO 99/21533

U.S. Patent Application: Delivery Vehicles for Bioactive Agents and Uses Therof, Randell T. Libby, Lawrence L. Kunz, Thomas R. Tice, and Christopher W. McDaniel, U.S. Patent No. 09/178,438

*Scholarly Activities (Selected List)*:

**Publications**

Genetic Testing and Psychiatric Disorders-Genetic Testing Statement.  International Society Psychiatric Genetics (ISPG), Statement of Testing 2018 (www.ISPG.net).

CTCF Mediated Trinucleotide Repeat Stability in a Human Androgen Receptor Transgenic Knock-In Mouse Models. Randell T. Libby, Paula Ladd, Andy Lieberman and Jamie Johansen. Human Mol. Genetics, Manuscript in Preparation (2018).

Expression Levels of DNA Replication and Repair Genes Predict Regional Somatic Repeat Instability in the Brain but are not altered by Polyglutamine Disease Protein Expression or Age. Amanda G. Mason, Stephanie Tomé, Jodie Simard, Randell T. Libby, Theodor Bammler, Richard Beyer, A. Jennifer Morton, Christopher E. Pearson and Albert R. La Spada.  Human Molecular Genetics 23(6):1606-1618, 2014.

CTCF Regulates Ataxin-7 Gene Expression Through Promotion of a Convergently Transcribed, Antisense RNA.  Bryce L. Sopher, Paula D. Ladd, Victor V. Pineda, Randell T. Libby, Susan M. Sunkin, James B. Hurley, Cortland P. Thienes, Terry Gasterland, Galina N. Filippova, & Albert R. La Spada.  Neuron 70:1071-1084 (23 June 2011).

Sporadic ALS has compartment-Specific Aberrant Exon Splicing and Altered Cellmatrix Adhesion Biology.  Stuart Rabin, Hugo Kim, Michael Baughn, Ryan T. Libby, Young Joo Kim,

Yuxin Fan, Randell T. Libby, Albert La Spada, Brad Stone and John Ravits.  Human Molecular Genetics: October 28, 2009 (Advanced On-Line Publication), doi: 10.1093/hmg/ddp498

CTCF *Cis*-Regulates Trinucleotide Repeat Instability in an Epigenetic Manner: A Novel Basis for Mutational Hot Spot Determination.    Randell T. Libby, Katherine Hagerman, Victor V. Pineda, Rachel Lau, Diane H. Cho,  Sandy  L. Baccam, Michelle Axford, John D. Cleary,  James M. Moore, Bryce L. Sopher, Stephen J. Tapscott,, Galina N. Filippova, Christopher E. Pearson & Albert R. La Spada.  PLOS Genetics (November 2008).

Thermoregulatory Defects in Huntington's disease Transgenic Mice Result from PGC-1 alpha Transcription Interference.   Patrick Weydt, Victor V. Pineda, Anne E. Torrence, Eduardo R. Lazarowski, Randell T. Libby, Terrence F. Satterfield, Merle L. Gilbert, Gregory J. Morton, Theodor K. Bammler, Andrew D. Strand, Libin Cui, Dimitri Krainc, Richard P. Beyer, Courtney N. Easley, Annette C. Smith, Serge Luquet, Ian R. Sweet, Michael W. Swartz and Albert R. La Spada. Cell (Metabolism) 4:349-362 (2006).

Bergmann Glia Expression of Polyglutamine-Expanded Ataxin-7 produces Purkinje Cell Degeneration and Implicates Glial-Induced Impairment of Glutamate Transport in SCA7.  Sara K. Custer, Gwenn A. Garden, Nishi Gill, Randell T. Libby, Stephen J. Guyenet, Lesnick E. Westrum, Bryce L. Sopher and Albert R. La Spada.  Nature Neurosciences (Submitted, 2005).

Neuronal Apoptosis Induced by the HIV-GP120* Coat Protein Involves P53 Mediated Down Regulation of XIAP.  Christina Tun, Weiqun Guo,  Bomy yun, Randell T. Libby, Richard S. Morrison and Gwenn A. Garden.  J. Biol. Chem. (Submitted, 2005).

A SCA7 CAG/CTG repeat Expansion is Stable in Drosophilia melanogaster Despite Modulation of Genomic Context and Gene Dosage.  Stephen M. Jackson, Alex J. Whitworth, Jessica C. Greene, Randell T. Libby, Sandy L. Baccam, Leo J. Pallanck and Albert R. La Spada.  Gene 347:35-41 (2005).

Androgen Receptor YAC Transgenic Mice Recapitulate SBMA Motor Neuronopathy and Implicate VEGF 164  Expression in The Motor Neuron Degeneration.  Bryce L. Sopher, Ph.D., Patrick S. Thomas, Michelle A. LaFevre-Bernt, Ph.D., Ida A. Holm, M.D., Scott A. Wilke, Carol B. Ware, Ph.D., Lee-Way Jin, M.D., Randell T. Libby, Ph.D., Lisa M. Ellerby, Ph.D.,  Albert R. La Spada, M.D., Ph.D  Neuron 41:687-699 (2004).

Genomic Context Drives SCA7 CAG Repeat Instability, while Expressed SCA7 cDNAs are Intergenerationally and Somatically Stable in Transgenic Mice. Randell T. Libby, Darren G. Monckton, Ying-Hui Fu, Refugio A. Martinez, John P. McAbney, R. Lau, David D. Einum, K. Nichol, Carol B. Ware, Louis J. Ptacek, Christopher E. Pearson & Albert R. La Spada. Hum. Mol. Genet. 12:41-50 (2003).

Polyglutamine-Expanded Ataxin-7 Promotes Non-Cell Autonomous Purkinje Cell Degeneration and Displays Proteolytic Cleavage in Ataxic Transgenic Mice.  Gwenn. A. Garden, Randell T. Libby, Ying-Hui, Fu, Yoshito. Kinoshita, Jing. Huang, Daniel. E. Possin, Annette. C. Smith, Refugio. A. Martinez, Gabriel. C. Fine, Sara. K. Grote, Carol. B. Ware, David. D. Einum, Richard. S. Morrison, Louis. J. Ptacek, Bryce. L. Sopher and Albert. R. La Spada.  J. of Neurosciences  22:4897-4905 (2002).

Polyglutamine-Expanded Ataxin-7 Antagonizes CRX Function and Induces Cone-Rod Dystrophy in a Mouse Model of SCA7.  Albert R. LaSpada, Ying-Hui Fu, Bryce L. Sopher, Randell T. Libby, Xuejiao Wang, Lili Y. Li, David D. Einum, Jing Huang, Daniel E. Possin, Annette C. Smith, Refugio A. Martinez, Kari L. Koszdin, Piper M. Treuting, Carol B. Ware, James B. Hurley, Louis J. Ptacek and Shiming Chen.  Neuron 31:913-927 (2001).

Molecular Modeling and Preclinical Evaluation of the Humanized NR-LU-13 Antibody.  Scott S. Graves, Stephen C. Goshorn, Diane M. Stone, Don B. Axworthy, John N. Reno, Becky Bottino, Stephen Searle, Andrew Henry, Jan Pedersen, Anthony R. Rees and Randell T. Libby. Clinical Cancer Research  5:899-908 (1998).

Phosphorolytic Error Correction During Transcription. Randell T. Libby and Jonathan A. Gallant. Molecular Microbiology 12:121-129, 1994.

The Role of RNA Polymerase in Transcriptional Fidelity.  Jonathan A. Gallant and Randell T. Libby. Molecular Microbiology 5:999-1004, 1991.

Transcriptional Proofreading in Escherichia coli.  Randell T. Libby, Jeffrey N. Nelson, Joseph M. Calvo, and Jonathan A. Gallant. EMBO 8:3153-3158, 1989.

Flag Peptide: A Short Polypeptide Marker Sequence Useful for Recombinant Protein Expression and Purification.  Thomas P. Hopp, Kathryn S. Prickett, Virginia Price, Carl J. March, Randell T. Libby, David L. Urdal, and Paul J. Conlon. BioTechnology 6:1204-1210, 1988.

Human Rhinovirus 3C Protease: Cloning and Expression of an Active Form in Escherichia coli. Randell T. Libby, David Cosman, Carl J. March, and Thomas P. Hopp. Biochemistry 27:6262-6268, 1988.

Structure and Expression of the Gene, mcrBDCGA, which Encode the Subunits of Component C of Methyl Coenzyme M Reductase in Methanococcus vannielii. D. S. Cram, B. A. Sherf, R. T. Libby, R. J. Mattaliano, K. L. Ramachandran and J. N. Reeve. Proc. Natl. Acad. Sci. USA. 84:3992-3996, 1987.

Expression and Purification of Native Human Granulocyte-Macrophage Colony Stimulating Factor (GM-CSF) from an Escherichia coli Secretion Vector.  Randell T. Libby, Gary Braedt, Teresa A. Chiaverotti, Shirley R. Kronheim, Carl J. March, David L. Urdal, Robert J. Tushinski,

and David Cosman.  DNA 6:221-229, 1987.

cDNA Cloning, Expression, and Activity of Human Granulocyte-Macrophage Colony Stimulating Factor.  Michael A. Cantrell, Dirk Anderson, Virginia Price, Michael Deely, Randell T. Libby, Kenneth H. Grabstein, Douglas Pat Cerretti, Diane Y. Mochizuki, Robert J. Tushinski, and David Cosman.  IN: Recombinant Lymphokines and Their Receptors, (ed. S. Gillis), Chapter IX, Marcel Dekker, Inc., New York, NY, 1986.

Mistranslation of the mRNA Encoding Bacteriophage T7 0.3 Protein.  Jacqueline B. Rice, Randell T. Libby, and John N. Reeve. J. Biol. Chem. 259:6505-6510, 1984.

Mistranslation in Bacteriophage-Infected Anucleate Minicells of Escherichia coli: A Test for Error Propagation.  Randell T. Libby.  Mech. Age. Develop. 26:23-28, 1984.

Expression of Coliphage T7 in Aging Anucleate Minicells of Escherichia coli.  Randell T. Libby, Jocelyn E. Shaw, and John N. Reeve.  Mech. Age. Develop. 27:197-206, 1984.

RNA Polymerase Subunit Biosynthesis in Bacillus subtilis. Randell T. Libby and Lyle R. Brown. Mol. Gen. Genet. 185:339-343, 1982.

Biosynthesis of RNA Polymerase in Bacillus subtilis During Induction of the Stringent Response.  Randell T. Libby, Sarah J. Kuhl, and Lyle R. Brown. IN: Sporulation and

Germination, Proceedings of the VIII International Spore Conference, Woods Hole, Massachusetts, pp. 145-149, 1981.


**Invited Presentations/Selected Abstracts**

Use of the Infinium SNP PsychArray System in a Criminal Trial: The First Case Study in Support of a Clinical Diagnosis of Schizophrenia and Implications for its Future Use in Legal Proceedings in the United States.  Randell T. Libby, Aruna T. Bansal, Alexander Axt and Susan Herrero.  World Congress of Psychiatric Genetics, Glasgow, Scotland (2018).

Illumina Accelerator Next Generation Sequencing Program.  NextGen Sequencing in AgriGenomics.  Randell T. Libby, David McAndrew, John Simeone and Elliott George, Ilumina, San Francisco, CA. 2015 (Presentation).

Exon Array Analysis Reveals Significant Aberrant Splicing in SALS Motor Neurons. Stuart Rabin, Randell T. Libby, Hugo Kim, Young Kim, Brad Stone, Al LaSpada and John Ravits. American Academy of Neurology (AAN), Seattle, Washington, 2009

CTCF Binding Regulates Ataxin7 Gene Expression: A Novel System for Transcription Control. R. T. Libby, B. L. Sopher, D. Cho, S. Baccam, S. J. Tapscott, G.N. Filippova and A. R. La Spada. American Society of Human Genetics (ASHG), Salt Lake City, Utah,  2005.

Body Temperature Links Metabolism and Transcriptional Dysregulation in a Mouse Model of Huntington's  Disease.  Patrick Weydt, Victor Pineda, Randell T. Libby, Annette C. Smith, Jenny Choi, Philamer Calses, Courtney Easley, Serge Luquest and Albert R. La Spada.  Gordon Research Conference on CAG Triplet Repeat Disorders,  Mount Holyoke College, Hadley, Massachusetts, 2005.

Body Temperature Links Metabolism and Transcriptional Dysregulation in a Mouse Model of Huntington's  Disease.  Patrick Wyedht, Victor Pineda, Randell T. Libby, Annette C. Smith, Jenny Choi, Philamer Calses, Courtney Easley, Serge Luquest and Albert R. La Spada. II. Meeting on the Molecular Mechanisms of Neurodegeneration.  Milan, Italy 2005.

Glial Expression of PolyQ Ataxin-7 is Sufficient to Cause Purkinje Cell Degeneration: A Model of Non-Cell Autonomous Cerebellar Ataxia.  Society for NeuroSciences, San Diego, 2004.

Microarray Expression analysis of a YAC Transgenic Mouse Model of Spinal & Bulbar Muscular Atrophy: Is Transcription Dysregulation Important for Androgen Receptor Polyglutamine Neurotoxicity?  R. T. Libby, L. Chakrabarti, A. C. Smith, and A. R. La Spada. Society for Neurosciences, 5th Brain Research Symposium, New Orleans, 2003.

HIV/gp120 Induced Neuronal Apoptosis Involves p53 Mediated Trans-Repression of XIAP .   C. Tun, W. Guo, R. Libby, R.S. Morrrison, G.A. Garden.  Society for Neurosciences, New Orleans, 2003

SCA7 Locus Information Drives Trinucleotide Repeat Instability in Transgenic Mice. R. T. Libby, R. Lau, D. D. Einum, K. Nichols, L. J. Ptacek, Y. H. Fu, C. E. Pearson and A. R. LaSpada.  American Society of Human Genetics, San Diego (October 2001).

Polyglutamine-Expanded Ataxin-7 Induces a Cone-Rod dystrophy in Transgenic Mice by Antagonizing the Function of the Nuclear Transcription Factor CRX.  A. R. LaSpada, Y.-H. Fu, B. L. Sopher, R. T. Libby, X. Wang, L. Y. Li, D. D. Einum, J. Huang, D. E. Possin, J. B. Hurley, L. J. Ptacek, and S. Chen.  American Society of Human Genetics, San Diego (October 2001).

Neurological Dysfunction in a Mouse Model of SCA7 is Associated with Proteolytic Cleavage og Polyglutamine-Expanded Ataxin-7.   Bryce L. Sopher, Ying-Hui Fu, Randell T. Libby, Yoshita Kinoshits, David D. Einum, ing Huang, Daniel E. Possin, Richard S. Morrison, Louis J. Ptacek and Albert R. LaSpada.  American Society of Human Genetics, San Diego (October 2001).

SCA7 Transgenic Mice Show a Cone-Rod Dystrophy Type of Retinal Degeneration and a Neurological Phenotype.  A. R. LaSpada, B. L. Sopher, R. T. Libby, D. D. Einum, J. B. Hurley,

J. Huang, D. E. Possin, L. J. Ptacek and Y. –H. Fu.  Keystone Symposia: The Molecular Basis of Neurodegenerative Disease.  2001.

Microfectin™ Gene Delivery Technology: Novel Non-Ionic Emulsion-Based Nucleic Acid Delivery Systems.  Christopher W. McDaniel, Lawrence L. Kunz and Randell T. Libby, AAPS Abstract, 1999.

Cytoskeletal Functions and Their Role in Restenosis: Inhibition of Chronic Vascular Remodeling by Cytochalasin B. Lawrence L. Kunz, Lauren M. Tatalick, Debora A. Libby, Randell T. Libby, Nicholas P. Ranieri, Robert W. Schroff.  Restenosis Summit VII, Cleveland (May, 1995).

U.C.L.A. Arrowhead Genetics Conference, The Secret Life of RNA Polymerase (Abstract), 1989.

Purification and Reconstitution of the Methyl Reductase Enzyme from Methanococcus vannielii.. Randell T. Libby.   American Society for Microbiology, 1984.

In-vivo and In-vitro Transcription Map of the *Bacillus subtilis* Bacteriophage, TSP-1.  Sarah J. Kuhl, Randell T. Libby, and Lyle R. Brown. American Society for Microbiology, 1981.

The RNA Polymerase of *Bacillus subtilis*: Regulation, Assembly, and Relative Rates of Subunit Biosynthesis. Randell T. Libby, Ph.D. Thesis, Oregon State University, Corvallis, 1980

## Conferences/Invited Lectures/Additional Training (Selected List)

American Academy of Forensic Sciences, 70th Annual Scientific Meeting, Seattle, Washington, February 19-24, 2018 (participant).

American Academy of Forensic Sciences, 70th Annual Scientific Meeting, Workshop-Moving from the Combined Probability of Inclusion (CPI) to Probabilistic Genotyping for DNA Mixture Interpretation, Seattle, Washington (2018). Mike Coble & Daniele Podini

The Evolution of SNPs as a Forensic Marker. NIJ-RTI International, Ken Kidd, Chris Phillips, Tom Parsons, Webinar (November 2017)

Record Linkage of CODIS Profiles with SNP Genotype, NIJ-RTI International, Webinar (October 2017)

Genotyping to Enable Large-Scale Precision Medicine Research Studies.  Mark Bouzyk, AKESOgen, Webinar (October 2017)

Predict Human Appearance from DNA Focusing on Pigmentation, Manfred Kayser & Susan Walsh, Forensic Technology Center for Excellence, RTI, Webinar (October 2017)

SelectScience-dd (Droplet Digital)SEQ Single-Cell Sequencing Technology and Applications, Webinar (October 2017)

Promega-Improved chemistry for NGS Cleanup and Size Selection, Webinar (October 2017)

American Academy of Forensic Sciences, 68th Annual Scientific Meeting, Las Vegas, Nevada, February 22-27, 2016 (participant).

American Academy of Forensic Sciences, 68th Annual Scientific Meeting, Workshop-Considerations for Implementing Next Generation Sequencing (NGS) Technologies Into a Forensic Laboratory, Las Vegas, Nevada (2016).

American Academy of Forensic Sciences, 68th Annual Scientific Meeting, Illumina 3rd Annual User Symposium, Las Vegas, Nevada (2016).

Johns Hopkins University, Bloomberg School of Public Health, Coursera Certification-Genomic Technologies (2016).

Personal Medicine World Conference-Silicon Valley, Mountain Vew, CA, Participant, January 26 -28, 2015.

University College London/Amicus Foundation. Forensic DNA Typing in the Courtroom: Past, Present and Future Considerations.  25 Gordon Street, London WC1H 0AY, United Kingdom. Invited Lecturer (29 October 2014).

Cambridge University/Amicus Foundation. Forensic Next Generation Sequencing Strategies and its use in the Courtroom. Cambridge CB2 1RU, United Kingdom.  Invited Lecturer (31 October 2014).

NIST DNA Analyst Workshop Series: Probabilistic Genotyping and Software Programs (Part 1).  Webcast/Charlotte Word/Ate Kloosterman/Craig O'Connor/Mike Coble/Todd Bille/Susan Berdine (28 May 2014).

American Academy of Forensic Sciences, Seattle, Washington (February, 2014).

Advances in Ion TorrentTM Next-Generation Sequencing   Life Technologies Webinar (February, 2014).

NIST DNA Mixture Interpretation Workshop/Webcast/John Butler/Michael Coble/Robin Cotton/Bruce Heidebrecht/Charlotte Word (April 12, 2013). Certification (8 hours) Mixture Interpretations.

Qiagen SA Bioscineces: PCR Array Technology/Copy Number Variation & Alteration Analysis Strategies. Webinar [Krishnan Allampallam, Ph.D.] (August 2012)

Golden Helix: Identification of Candidate Functional Polymorphism using Trio Family Whole Exome DNA Data. Webinar [Ken Kaufman, Ph.D.-Cincinnati Children's Hospital Medical Center] (August 2012)

Illumina: Integrated Analysis Tools for Next Generation Sequencing Data.  Webinar [Vamsi Veeramachaneni, Ph.D] (August 2012)

Promega: PowerPlex Y23 Discriminating Power in Stringent Endogamous and Consanguineous Situations.  Webinar (July 2012)

20th International Symposium on Human Identification, Las Vegas, Nevada, 2009

Agilent/Science, Noncoding RNAs: A Paradigm for Gene Regulation, 2008

Applied Biosystems, GeneMapper-X, Training, 2008

XVth International Symposium on Human Identification, Phoenix, Arizona, 2004

4th International Conference on Unstable DNA Elements, Banff, British Columbia, 2004.

Federal Defenders Conference, DNA Forensic Applications, New Orleans, LA, 2002

52nd Annual American Academy of Forensic Sciences Meeting, Reno, Nevada, 2000.

Perkin Elmer Gene Discovery A Systems Approach to Linkage Mapping, Seattle, Washington (1999).

Perkin Elmer ABI 310, ABI 377, ABI 3700 Sequencing Users' Meeting, Seattle, Washington (1999).

2nd International Conferences on Unstable DNA Elements, University of North Carolina, Chapel Hill, NC, 1999

University of Washington, Short Tandem Repeats (STRs) in Forensic DNA Genotyping, Invited Lecturer, 1999.

Perkin Elmer GeneScan User's Meeting, Seattle, Washington (1998).

VIIIth International Symposium on Human Identification (Participant), Scottsdale, Arizona, 1997.

1st International Conference on Gene Therapy: Delivery and Quantitation.  (Participant), La Jolla, California, (1997).

IInd International Conference on Advances in the Effective Delivery of Proteins, Peptides and Nucleic Acids.  Coronado, California, 1996. (Invited Participant).

Jacques Monod Conference: Morphogenic Functions of Actin-Associated Proteins, Centre National De La Recherche Scientifique (CNRS), Aussois, France, 1995 (Invited Participant).

Perkin Elmer Conference: Accelerating Gene Discovery & Mutation Detection - Breakthroughs In Human Genetics & Disease Research, Seattle, Washington, 1995.

VIth International Symposium on Human Identification (Participant), Scottsdale, Arizona, 1995.

International Symposium on Cellular and Molecular Biology of Phosphate and Phosphorylated

Compounds in Microorganisms (Invited Participant), Phosphorolytic Error Correction During Transcription,  Woods Hole, MASS, 1993.

IVth International Symposium on Human Identification, Scottsdale, Arizona, 1993.

IIIrd International Symposium on Human Identification, Scottsdale, Arizona, 1992.

Centre National de la Rescherche Scientific (CNRS), Jacques Monod Conference, Invited Participant, Roscoff, France, 1990.

Universite de Paris VII, International Congress of RNA Polymerases, Keynote Speaker, 1989.

University of Hawaii, Maintenance of Transcriptional Fidelity in *Escherichia coli*, Invited Speaker, 1989.

U.C.L.A. Arrowhead Genetics Conference, Transcriptional Error Monitoring in *Escherichia coli*, Invited Speaker, 1989.

U.C.L.A. Arrowhead Genetics Conference, The Secret Life of RNA Polymerase (Abstract), 1989.

XVIth International Congress of Genetics, Transcriptional Regulation in *Escherichia coli* (Abstract), Toronto, Canada, 1988.

Gordon Conference (Population Biology and Evolution of Microbiology), A Novel Immunological Method for the Characterization of rDNA Molecules (Abstract), Plymouth, New Hampshire, 1987.

NeoRx Corporation, Cloning and Expression of the Human Lymphokines IL-1 and GM-CSF. Invited Speaker, 1987.

California Institute of Technology, Beginning Genetics of Methanogenic Organisms, Invited Speaker, 1983.

Texas Tech University, Protein Instability in Anucleate Minicells of *Escherichia coli*. Invited Speaker, 1982.

European Molecular Biology Organization (EMBO): Workshop on Accuracy (III), Error Propagation in Bacteriophage-Infected Anucleate Minicells of *Escherichia coli*.  Grignon, France. Invited Speaker, 1983.

European Molecular Biology Organization (EMBO): Workshop on Accuracy (II), Catalytic Error Damping Systems in *Escherichia coli*.  Grignon, France.  Invited Speaker, 1981.

# Declaration
of
Dr. R. Thomas Libby

## I. Background and Qualifications

1./ I am Dr. R. Thomas Libby.  I hold a doctoral degree in the area of molecular genetics with extensive post-graduate fellowship training and experience in the areas of genotyping procedures and methodologies employed for the purposes of human identification.  My *Curriculum Vitae* is attached herein.

2./ I am trained in the use of polymerase chain reaction (PCR) methodologies as used in forensic genotyping, and have additional specific expertise in the areas of Recursive PCR (rPCR), Asymmetric PCR (aPCR), Quantitative Expression Real-Time PCR (QT-PCR), Reverse-Transcriptase PCR (RT-PCR), In Situ PCR (isPCR), PCR Cloning, PCR Genotyping, RACE PCR, Small Pool (spPCR), Exon-Array PCR (eaPCR), etc. and have published numerous articles in the peer-reviewed scientific journals.

3./ I have previously trained in the laboratories of Dr. John N. Reeve (Ohio State University), Dr. Lacy Daniels (University of Iowa), Dr. Ed Fritsch (Michigan State University), Dr. Jonathan Gallant (University of Washington-Genome Sciences), Dr. Albert LaSpada (University of Washington-School of Medicine), Dr. Jacques Ninio (Universite de Paris VII) and Dr. Phillip LeCompte (Universite de Paris VII) in the areas of DNA/RNA regulation of synthesis.  I was a Staff Scientist at the Immunex Corporation (Department of Human Genetics) where my efforts were directed towards the first cloning and expression of the human lymphokine gene, Granulocyte-Macrophage Colony Stimulating Factor (GM-CSF) which has since

1



**EXHIBIT**

A199

been approved by the Food & Drug Administration (FDA), and is currently the drug of choice for treatment of individuals who are either immunocompromised and/or have undergone bone marrow failure, as a result of radiation therapy. I was similarly responsible for the first cloning (by rPCR) methods of a hybrid mouse-human monoclonal antibody (Mab) for the treatment of various solid tumors in humans, as well as for the development of non-viral gene therapy procedures for the introduction of novel genes, such as the Vascular Endothelial Growth Factor (Vegf), via percutaneous transluminal coronary angioplasty (PTCA), otherwise known as the balloon cardiac catheterization procedure for the treatment of coronary heart disease.

4./ I previously served as an Affiliate Investigator at the Virginia Mason Medical Center, Benaroya Research Institute, Translational Research Program in the Laboratory of Neurogenomics, and Member in the School of Medicine at the University of Washington Medical Center, as well as Member in the Center for Neurogenetics & Neurotherapeutics and Center for Human Development & Disability within the Division of Medical Genetics. My academic work involved the molecular analysis of various human neurodegenerative disorders which are characterized by the hyper expansion of a short-tandem repeat (STR) within the coding region of either the Ataxin 7 or Androgen Receptor (AR) gene. Dynamic mutations of this nature result in either Spinocerebellar Ataxia Type 7 (SCA7) or Spino and Bulbar Muscular Atrophy (SBMA) [Kennedy's Disease] respectively. Both disorders are representative of upper motor neuron defects caused by the degeneration of specific neuronal populations in the cerebellum. While SCA7 is an autosomal dominant disorder, which has been mapped to a region on chromosome 3p, SBMA is an X-linked disorder. Both, however, exhibit classical Mendelian inheritance and clinical anticipation. This work was designed to provide a basic

2

14 December 2018

understanding of the molecular events of these disease states, as well as to develop novel genetic therapeutic strategies for the treatment of neurodegenerative diseases. These procedures are highly dependent on advanced bioinformatics and PCR approaches.

The (STR) DNA tests are part of my daily work which rely upon the same technologies and procedures, and further employ the same instrumentation and software (e.g. ABI 310 CE system, ABI 3100 CE system, ABI 3700 CE system, ABI3500/xL, ABI 377 gel electrophoresis system, TC 480, TC 2400, TC 9600, and TC 9700 thermal cyclers, GeneScan/Genotyper software, GeneMapper software, GeneMarker HID software, etc.), as are used in forensic laboratories across the United States, Canada and Europe.

5./ I have been retained on numerous criminal cases involving the use of DNA over the past approximately twenty years. I have evaluated data and rendered opinions as to the significance of the DNA data generated by numerous forensic laboratories, as well as providing advice and assistance on the analysis of samples which have yet to be tested. I have testified and given evidence in both state and federal courts in various jurisdictions across the country including, but not limited to, the states of Washington, Oregon, California, Arizona, New Mexico, Nevada, Idaho, Iowa, Illinois, Missouri, Indiana, Michigan, Minnesota, Colorado, Pennsylvania, Texas, Florida, Louisiana and North Carolina, as well as several Provinces in Canada in the areas of forensic DNA analysis, and have consulted on numerous additional cases in other states, and have further served as an expert in Court Martial cases both in Europe and the United States. Additionally, I have monitored and evaluated DNA related test results at numerous government and private laboratories throughout the United States and Canada over the past approximately twenty years.

14 December 2018

6./ I have lectured at numerous conferences and meetings including University College London (UK) and Cambridge University (UK) on issues related to forensic DNA analysis.

7./ I was the first in the U.S. to introduce genetic testing for schizophrenia in a criminal case which involved the use of a high density (~ 580,000) bead array including sophisticated bioinformatic approaches to identify the presence of DNA alleles which have been associated with various psychiatric disorders including schizophrenia.

8./ For over twenty years I have been the Chief Scientific Officer at GeneQuest Diagnostics (Seattle) specializing in human DNA identity analysis in criminal proceedings.

9./ I was a Co-Founder and CEO of SNPgenomics Incoporated (Seattle) which specialized in state-of-the-art pre-natal noninvasive testing methods for the screening and detection of fetal chromosomal abnormalities including Fragile X Syndrome and related X-chromosome aneuploidies.

10./ I hold a Bachelor of Sciences degree in Animal Science and Physiology (University of California), a Master's of Science degree in Microbial Genetics (California State University), and a Doctoral degree in Molecular Genetics (Oregon State University). I have held various positions at the University of Washington-School of Medicine in both the Departments of Genetics and Laboratory Medicine over the years, including as a Research Associate, Research Assistant Professor, Visiting Scholar (Universite de Paris VII), Senior Fellow and Senior (Faculty)

4

14 December 2018

Research Associate.

11./ My past and present scientific affiliations include the Society for Neuroscience, the American Academy of Forensic Sciences and the American Academy of Forensic Genetics, International Society of Psychiatric Genetics, as well as numerous other affiliations. Throughout my career I have published numerous articles in the peer-reviewed literature. A selected list of my articles is contained in my *Curriculum Vitae* (attached).

## II. Case of Ray Jefferson Cromartie v. State of Georgia (Case 94-CR-328)

12./ I was contacted by Mr. Loren D. Stewart (Federal Community Defender for the Eastern District of Pennsylvania), and counsel to Mr. Ray Jefferson Cromartie, to evaluate the potential significance of performing state of the art DNA testing on various items of evidence which were relied upon, but not tested, by the State of Georgia in Mr. Cromartie's criminal prosecution.

13./ Significant advances in DNA testing have been achieved since Mr. Cromartie's arrest and conviction which had not been developed, and thus unavailable to the Georgia Bureau of Investigation during the mid to late 1990's. These advances include enhanced methods for the detection and analysis of low-copy number touch DNA which allows for the determination of individual(s) who may have had contact with an evidence item during the commission of a crime. These techniques, coupled with advanced genetic test systems (e.g. GlobalFiler, PowerPlex Fusion 6C, etc.), as well as analytical genotyping equipment are capable of yielding highly discriminating data - useful for individualizing the origin of an evidence sample, and

5

14 December 2018

A203

thus allow for enhanced identity determination.

14./ I have been provided with the following documents by Mr. Stewart for my review and evaluation:

| Description | Page |
|---|---|
| **Volume I (Police Reports)** | |
| Thomasville Police Department Reports……………………………... | 01 |
| Georgia Bureau of Investigations Lab Report, Victim: Slysz………… | 298 |
| Supplemental Latent Print Report…………………………………… | 303 |
| Evidence Control Property Forms…………………………………… | 304 |
| Evidence Control Property Forms, cont'd…………………………… | 354 |
| Georgia Bureau of Investigations Lab Reports, Victims: Slysz & Wilson……………………………………………………………… | 371 |
| Video Property Report, FBI Laboratory Division/Video Enhancement Unit………………………………………………………………… | 380 |
| Handwritten Notes…………………………………………………… | 385 |
| Shoe Impression Photos……………………………………………… | 413 |
| **Volume II (State Habeas Record)** | |
| Discovery Compiled from State Habeas Record……………………… | 435 |
| **Volume III (Pretrial Transcripts)** | |
| Transcript of Commitment Hearing (06/17/94) ……………………… | 744 |
| Transcript of Pretrial Hearing (04/19/95) ………………………….... | 800 |
| Transcript of Pretrial Hearing (09/06/95) ………………………….... | 831 |
| Transcript of Pretrial Hearing (02/20/96) ………………………….... | 872 |
| Transcript of Ex Parte Pretrial Hearing (02/23/96) | 1164 |
| Transcript of Pretrial Hearing (02/23/96) ………………………….... | 1196 |

14 December 2018

A204

| Description | Page |
|---|---|
| **Volume IV** | |
| Transcript of Pretrial Hearing (03/19/96) …………………………….. | 1250 |
| Transcript of Pretrial Hearing (06/06/96) …………………………... | 1272 |
| Transcript of Pretrial Hearing (10/01/96 – 10/02/96) ………………… | 1280 |
| Transcript of Ex Parte Pretrial Hearing (10/02/96) …………………… | 1669 |
| **Volume V** | |
| Transcript of Pretrial Hearing (12/19/96) …………………………... | 1755 |
| Transcript of Pretrial Hearing (01/06/97) ………………………….. | 1768 |
| Transcript of Pretrial Hearing (08/15/97) ………………………….. | 1982 |
| Transcript of Pretrial Hearing (08/29/97) …………………………... | 2113 |
| **Volume VI (Trial Transcripts)** | |
| Index to Witnesses and Exhibits……………………….................. | 2229 |
| Trial Transcript (09/22/97) ……………………………………….. | 2246 |
| Trial Transcript (09/23/97) ……………………………………….. | 2493 |
| **Volume VII (Trial Transcripts)** | |
| Trial Transcript (09/24/97) ……………………………………….. | 2828 |
| Trial Transcript (09/25/97) ……………………………………….. | 3157 |
| **Volume VIII (Trial Transcripts/Motion for New Trial)** | |
| Trial Transcript (09/26/97, 09/29/97 – 10/01/97) …………………….. | 3428 |
| Transcript of Motion for New Trial (03/12/98) …………………….. | 3656 |
| **Volume IX (Finger Print Evidence)** | |
| Finger Prints from Jr. Food Store (04/10/94) …………………….. | 3778 |
| Print from Budweiser Carton (04/10/94) ………………………….. | 3802 |
| Print Card of Corey Clark (04/13/94) ……………………………. | 3807 |

7

| Description | Page |
|---|---|
| Print Card of Ray Cromartie (04/13/94) ..................................... | 3810 |
| Print Card of Gary Young (04/13/94) ..................................... | 3813 |
| Print Card of Thad Lucas (04/13/94) ..................................... | 3816 |
| Photos of Physical Evidence (08/11/15) ................................. | 3819 |
| Surveillance Video, Ex. 32 (Madison Street Deli) ......................... | |
| **Trial Exhibits** | |
| Trial Exhibit List................................................. | 3878 |
| Combined Trial Exhibits............................................. | 3894 |
| **Opinions** | |
| Opinion, Supreme Court of Georgia (03/8/99) ............................. | 4297 |
| Order Denying Motion for Reconsideration of Certificate of Appealability, 11th Circuit (03/26/18) ..................................... | 4312 |
| Images of evidence items photographed at Clerks Office by L. Stewart | 467 files |

15./ It is my understanding that DNA testing was not performed on any of the evidence collected by the Thomasville Police Department (TPD) in relation to either the Madison Street Deli (TPD Casefile 9406524) robbery/aggravated burglary or the Junior Food Store (TPD Casefile 9406722) attempted robbery/murder.

**III. Advances in DNA Testing Methodologies**

16./ The state of science in relation to DNA identification methodologies in and around the time of both incidences (above) were not capable of reliably detecting and resolving minute quantities of DNA and ascribing weight to potential contributors (in situations in which a mixture of DNA types is detected). Present

8

14 December 2018

day technologies are extremely sensitive with the capability of detecting sub-nanogram (i.e. less than 0.000000001g) of DNA, often times referred to as 'touch DNA'.

Through the use of advanced bioinformatic analysis, including the use of probabilistic genotyping methods, it is possible to identify with a high degree of confidence, the source attribution of the biological material obtained from any given evidence sample.  Had this approach been available at the time of the events in this matter it would have revealed additional information relative to the source(s) of DNA on the various items of evidence which were collected by the TPD.  Current state-of-the-art methodologies would additionally assist in identifying the habitual wearer of any item of clothing found and/or collected by the TPD which was believed to be associated with the perpetrator(s) of the crime(s).

17./ Advanced DNA testing methodologies rely upon a multi-locus system in which groups of loci (i.e. independent genetic sites on the chromosome) are amplified (i.e. copied) under stringent amplification conditions resulting in high yields of low copy input DNA (including touch DNA). Each loci group associated with 4-6 genetic sites are concurrently attached to a unique fluorochrome which allows for detection as schematically illustrated below for the GlobalFiler™ PCR Amplification Kit (ThermoFisher Scientific):

9

14 December 2018

A207



Use of an advanced highly sensitive system such as GlobalFiler™ will allow for the simultaneous detection of polymorphic regions across 21 autosomal loci (above) as well as providing interrogation at one Y-STR site (DYS391), one insertion/deletion site (Indel) on the Y-chromosome, as well as the amelogenin sex determining marker. The GlobalFiler™ system is particularly well suited for archived samples, or samples which have been stored for long periods of time, as it includes the use of 10 mini-STRs (< 220 base pair amplified product) which allows for maximum performance on degraded samples.

Additional highly advanced systems which provide similar levels of sensitivity are currently available including the PowerPlex Fusion 6C (Promega) which allows for the interrogation of 24 polymorphic autosomal STR sites, as well as three Y-STR loci (i.e. DYS391, DYS576, DYS570) as schematically illustrated below:

14 December 2018



18./ The use of either analytical approach (i.e. GlobalFiler$^{TM}$ or PowerPlex Fusion 6C), coupled with probabilistic genotyping to calculate Likelihood Ratios and infer probable genotypes associated with a particular forensic item, provides the best methodology for assessing the weight to be applied to an inferred genotype, and thus most likely contributor(s) of the evidence.

**IV. Proposed DNA Testing**

19./ In my professional opinion, testing should be conducted using either the GlobalFiler$^{TM}$ or PowerPlex Fusion 6C system in order to determine the origin of biological material found associated with the items collected in the Cromartie case. DNA typing of the following items are expected to yield newly discovered data useful in determining individual(s) associated with either the Madison Street Deli or Junior Food Store crime scenes (see Tables I – VII, below and Appendix I, attached herein):

14 December 2018

Table I – Madison Street Deli (401 N. Madison Street, Thomasville, GA)

| Exhibit | Description |
| --- | --- |
| 156 | Cartridge shell casing-collected at crime scene (shell casing 1) |

Table II – Junior Food Store (1335 West Jackson Street, Thomasville, GA)

| Exhibit | Description |
| --- | --- |
| 160 | Cartridge shell casing-collected at crime scene (shell casing 1) |
| 159 | Cartridge shell casing-collected at crime scene (shell casing 2) |
| 4 | Handle section of Budweiser beer carton |
| 9 | Basic Light 100 cigarette package |
| 2 | Budweiser beer can-collected outside at crime scene |
| 3 | Budweiser beer can-collected outside at crime scene |

Table III – Evidence from Secondary Crime Scenes

| Exhibit | Description |
| --- | --- |
| 30A | Black knitted cap with white emblem-collected at 229 W. Monroe, Thomasville, GA |
| 30B | Green hooded sweatshirt-collected at 229 W. Monroe, Thomasville, GA |
| 162 | Raven .25 Cal Semi-Auto Pistol-collected in the area between the Jail Justice Center and Cherokee Apartments (vicinity of 921 Smith Avenue, Thomasville, GA) |
| 162 | Magazine from Raven .25 Cal Semi-Auto pistol |

14 December 2018

A210

Table IV – Clothing Collected from Gary Young

| Exhibit | Description |
|---------|-------------|
| 27 | Bag of clothes collected from Gary Young: |
| 27 | -White T-shirt |
| 27 | -Green Khaki polo shorts (size 38) |
| 27-C | -Black Converse tennis shoes (size 10) |

Table V – Clothing Collected from Corey Clark

| Exhibit | Description |
|---------|-------------|
| 14 | Bag of clothes collected from Corey Clark |
| 14 | -Green colored jeans |
| 14-A | -Nike tennis shoes (size 11) |

Table VI – Clothing Collected from Thaddeus Lamar Lucas

| Exhibit | Description |
|---------|-------------|
| 16 | Shoes collected from Thaddeus Lucas |
| 16-A | -Nike Air shoes (size 10) |

14 December 2018

A211

Table VII – Clothing Collected from Ray Jefferson Cromartie

| Exhibit | Description |
|---------|-------------|
| 17-22 | Bag of clothes collected from Ray Cromartie |
| 17 | - Yellow shorts |
| 18 | -Adidas Tennis Shoe |
| 20 | -Flannel shirt/jacket |
| 22 | -White socks |

Table VIII – Reference Sample for Richard Slysz

| Exhibit | Description |
|---------|-------------|
| 1 | Cut portion of victim's short-left sleeve with blood pattern |

## V. Goals of DNA Testing

20./ <u>Exhibits 156, 159 and 160</u>:

STR based DNA testing using either the GlobalFiler™ or PowerPlex Fusion 6C system should be performed on the shell casings from both the Madison Street Deli and Junior Food Store in order to genotype the biological contributor of the individual who had contact with the .25 Cal shells (presumably as they were loaded into the clip).  Knowledge of this information would assist in determining the individual who had contact with bullets used in the Madison Street Deli and Junior Food Store crimes.  This information could be extremely useful in Mr. Cromartie's efforts to demonstrate he did not have contact with the cartridge casings collected at the crime scene.

14 December 2018

21./ <u>Exhibits 2, 3, 4 and 9</u>:

STR based testing of the beer cans, and piece of beer can carton obtained from outside of the actual crime scene at the Junior Food Store, as well as cigarette packaging obtained from inside the crime scene would assist in establishing the identity of the individual(s) involved in the shoot of Mr. Slysz, and thus could provide very useful information in Mr. Cromartie's defense.

22./ <u>Exhibits 30A and 30B</u>:

Items 30A (black knit cap) and 30B (green-hooded sweat shirt) were collected at a secondary site (remote from the Madison Street Deli), however, were presumed to have been worn by the suspect(s) involved in the robbery and assault of Mr. Wilson. It is essential that these items be tested for touch DNA in order to establish the habitual wearer of the item.  This information could be helpful in demonstrating that Mr. Cromartie may not have been involved in the Madison Street Deli assault.

23./ <u>Exhibit 162</u>:

Testing of the Raven .25 Cal auto pistol is essential in determining who had contact with the weapon (which allegedly was involved with both the Madison Street Deli and Junior Food Store assault/murder).  Extremely useful information may be obtained by examining the source(s) of contact DNA from both the exterior of the weapon as well as the associated magazine. Information of this nature could demonstrate that Mr. Cromartie had not handled the weapon during the assaults on Mr. Wilson or Mr. Slysz.  This determination is possible even IF the firearm had

15

14 December 2018

been previously handled by other individuals.  It is likely that probative evidence may be obtained from both the exterior of the weapon (i.e. trigger, trigger guard, barrel/slide, handle, etc), as well as parts associated with the interior of the weapon (i.e. magazine, etc.).

24./ Exhibit 27:

Testing for transfer or contact DNA on the clothing, including shoes, obtained from Gary Young (Exhibit 27) would be deterministic in assessing if Mr. Young was in close proximity and/or contact with the victims in either the Madison Street Deli or Junior Food store crimes.

25./ Exhibit 14:

Testing for transfer or contact DNA on the clothing, including shoes, obtained from Corey Clark (Exhibit 14) would be deterministic in assessing if Mr. Clark may have similarly been in close proximity and/or contact with the victims in either the Madison Street Deli or Junior Food store crimes.

26./ Exhibit 16:

In order to determine if Thaddeus Lamar Lucas was similarly in close contact with either Mr. Wilson or Mr. Slysz during the assault it is necessary that testing for contact/transfer DNA be conducted on the shoes obtained from Mr. Lucas.

14 December 2018

A214

27./ <u>Exhibits 17-22</u>:

DNA testing on Exhibits 17-22 (clothing and shoes obtained from Mr. Cromartie)
will be conducted to similarly assess any possible presence of transfer/contact from
victims in the Madison Street Deli or Junior Food Store assaults.

Executed on this 14th day of December 2018 in Seattle, Washington.

**Dr. R. Thomas Libby**

_Romdel J. Libby_
6/6/19

SUBSCRIBED AND SWORN TO BEFORE ME
this _6th_ day of _June_ 20 _19_

Notary Public, in and for the State of Washington
residing at _King County_

Notary Public
**State of Washington**
MIKI SHIMIZU
MY COMMISSION EXPIRES
JAN. 4, 2022

17

14 December 2018

A215

**Appendix I**

Table I – Madison Street Deli Evidence:

Exhibit 156
(container with shell casing inside)



14 December 2018

A216

Table II – Junior Food Store Evidence:

Exhibit 160 (Casing #1)*          Exhibit 159 (Casing #2)*



*, shell casing maintained inside evidence bag for security/sterility

Exhibit 4 (Portion ov Budweiser Beer Carton)



19

Exhibit 9 (Cigarette Package)



20

Exhibit 2 (Budweiser Can)          Exhibit 3 (Budweiser Can)



14 December 2018

Table III – Evidence from Secondary Crime Scenes

Exhibit 30A (Knitted Ski Cap)          Exhibit 30B (Green Sweatshirt)



22

Exhibit 162 (Pistol-Side View)     Exhibit 162 (Pistol Clip-Side View)



14 December 2018

Table IV – Clothing Collected from Gary Young

Exhibit 27 (Outside of Bag)          Exhibit 27 (Inside of Bag)



Item 13 (Converse Shoes-Top)          Item 13 (Converse Shoes-Bottom)



14 December 2018

A222

Table V – Clothing Collected from Corey Clark

Exhibit 14A (bag with clothing + shoes)



25

14 December 2018

A223

Exhibit 14 (green jeans)



14 December 2018

A224

Table VI – Clothing Collected from Thaddeus Lamar Lucus

Exhibit 16  (bag with shoes)



14 December 2018

A225

Table VII – Clothing Collected from Ray Jefferson Cromartie

Exhibit 22 (socks, T-shirt, etc.)



Exhibit 18A/18B (shoes)



28

14 December 2018

Exhibit 20 (bag of clothing)



Exhibit 20 (flannel shirt/jacket)



14 December 2018

A227



Exhibit 17 (bag with clothing)



14 December 2018

A228

Exhibit 17 (yellow shorts-front)



Exhibit 17 (yellow shorts-back)



14 December 2018

A229

Table VIII –Bag containing cut portion of victim's shirt

Exhibit 1



14 December 2018

A230

# Ray Cromartie v. Georgia

## (Indictment No. 94-CR-328)

Dr. R. Thomas Libby



EXHIBIT

3

A231

tabbies

**Traditional Sources of DNA**

- Blood
- Semen
- Saliva
- Urine
- Hair
- Teeth
- Bone
- Tissue



DNA may be present in significant quantities (nanogram [$10^{-9}$] range) or present in trace quantities (picogram [$10^{-12}$] range)

2

Steps to Forensic DNA Typing



## Biology

DNA Extraction → DNA Quantitation → PCR Amplification of Multiple STR markers

## Technology

Allele Separation and Detection → Sample Genotype Determination

## Genetics

Match Determination (between evidence and reference) → Comparison of DNA profile to known population databases → Report Statistical Weight of the Match

3

A233

**Current PCR-Based STR Technology**



➢ Numerous independent loci (i.e. > 30) may be amplified at the same time

➢ High level of sensitivity (i.e. < 50 pg DNA may be genotyped)

➢ Amplifies mixtures and degraded sample DNA

➢ Multi-fluorescent dyes used to discriminate alleles with overlapping sizes

➢ Efficient/fast procedure ( < 1 hour amplification)

➢ High power of discrimination (< 1 x $10^{-25}$ = 1 in 10,000,000,000,000,000,000,000,000)

**Likelihood Ratios (LR) > 1 Septillion ($10^{-24}$)**

Million ($10^6$)

Trillion ($10^{12}$)

Quintillion ($10^{18}$)

Septillion ($10^{24}$)

4

A234



Advances in DNA Typing Since ~ 1997

**Touch/Contact DNA**

Touch/Contact is a method for analyzing DNA left at the scene of a crime or on an article of clothing as a result of handling the item of evidence or wearing an item of clothing.  Touch DNA analysis only requires 7-8 cells from the outermost layer of human skin



Touch DNA from epithelial cells of skin

Transfer of epithelial cells from skin to physical evidence

6

A236

## Madison Street Delicatessen-Evidence Items
### (Victim: Dan Wilson)

| Item | Description | Image |
|------|-------------|-------|
| 156 | Cartridge Casing |  |

A237

## Junior Food Store-Evidence Items
### (Victim: Richard Slysz)

| Item | Description | Image |
|------|-------------|-------|
| 159 | Cartridge Casing # 2 (near left hip) |  |
| 160 | Cartridge Casing # 1 (near right hip) |  |
| 9 | Cigarette Packaging |  |

8

A238

## 229 W. Monroe-Evidence Items
### (Secondary Crime Scene)

| Item | Description | Image |
|------|-------------|-------|
| 30A | Black Knitted Cap |  |
| 30B | Green Hooded Sweatshirt |  |

9

A239

## Near Railroad Tracks by Jail Justice Center-Evidence Items
### (Secondary Crime Scene)

| Item | Description | Image |
|------|-------------|-------|
| 162 | Raven .25 Cal Semi-Auto Pistol + Magazine |  |

10

**Clothing-Evidence Items**
(Collected from Suspects)

| Item | Description | Image |
|------|-------------|-------|
| 14A | **Corey Clark**: Nike Tennis Shoes (Size 11) |  |
| 14C | **Corey Clark**: Green Pair of Jeans (Size 38) |  |
| 16 | **Thaddeus Lucas**: Nike Tennis Shoes (Size 10½) |  |

11

A241

## Clothing-Evidence Items
(Collected from Suspects)

| Item | Description | Image |
|------|-------------|-------|
| 27A | Gary Young: White T-Shirt |  |
| 27B | Gary Young: Green Polo Shorts |  |
| 27C | Gary Young: Black Coverse Tennis Shoes (Size 10) |  |

12

A242

## Clothing-Evidence Items
(Collected from Suspects)

| Item | Description | Image |
|------|-------------|-------|
| 18B | **Ray Cromartie**: Adidas Shoes |  |
| 20 | **Ray Cromartie**: Flannel Shirt/Jacket |  |

13

A243

Appendix I
Literature Citation

14

## Touch/Contact DNA Literature (Partial List)

Bowman ZE et al.   Detection of offender DNA following skin-to-skin contact with a victim. Forensic Science International:
Genetics, Vol. 37, p252–259.  Published online: September 17, 2018

Breathnach M, et al.  Probability of detection of DNA deposited by habitual wearer and/or the second individual who touch the garment.
Forensic Science International: Genetics, Vol. 20, p53–60.  Published online: October 7, 2015

Buckingham AK, et al.  The origin of unknown source DNA from touched objects.  Forensic Science International:
Genetics, Vol. 25, p26–33.  Published online: July 29, 2016

Burrill J, et al.  A review of trace 'Touch DNA' deposits: variability factors and an exploration of cellular composition.
Forensic Science International: Genetics, Vol. 39, p8–18.  Published online: November 27, 2018

Cale, CM, et al. Could secondary DNA transfer falsely place someone at the scene of a crime. J. Forensic Sci. 61:1 (2016), 196-203

Daly, DJ, et al.  The transfer of touch DNA from hands to glass, fabric, and wood. Forensic Sci. Int. Genetics. 6 (2012), 41-46.

Fonnelop AE, Egeland T and Gill, P.  Secondary and subsequent DNA transfer during criminal investigation.  Forensic Sci. Int.  Genetics
17 (2015), 155-162.

Hefetz I, et al.  Touch DNA: The effect of the deposition pressure on the quality of latent fingermarks and STR
Forensic Science International: Genetics, Vol. 38, p105–112.  Published online: October 29, 2018

Hulme, J.  Body Fluids Conference jointly hosted by the Forensic Science Society & the Centre for Forensic Investigation, University of Teesside:
18-19 April 2008 Conveners: Julie Allard and Brian Rankin.  Science & Justice 50 (2010), 100-109.

## Touch/Contact DNA Literature (Partial List)

Goray M, et al.  Investigation of secondary DNA transfer of skin cells under controlled test conditions.  Legal Medicine 12 (2010), 117-120.

Goray M, et al. Secondary DNA transfer of biological substances under varying test conditions.  Forensic Sci. Intl: Genet 4 (2010), 62-67.

Goray M, et al. DNA transfer within forensic exhibit packaging.  Potential for DNA loss and relocation. Forensic Sci. Int. Genet. (2011), doi 10.1016j.fsigen.2011.03.013

Kanokwongnuwut P, et al.  Detection of latent DNA.  Forensic Science International: Genetics, Vol. 37, p95–101.  Published online: August 8, 2018

Lehmann VJ et al.  Following the transfer of DNA: How does the presence of background DNA affect the transfer and detection of a target source DNA? Forensic Science International: Genetics, Vol. 19, p68–75.  Published online: June 22, 2015

Linacre, A, et al.  Generation of DNA profiles from fabrics without DNA extraction. Forensic Sci. Int. Genet. 4 (2010) 137-141.

Martin B, et al.  DNA profiles generated from a range of touched sample types.  Forensic Science International: Genetics, Vol. 36, p13–19.  Published online: June 2, 2018

Meakin G and Jamieson A.  DNA transfer: review and implications for casework. Forensic Sci. Int. Genet. 7 (2013) 434-443.

Montpetit S and O'Donnell P. An optimized procedure for obtaining DNA from fired and unfired ammunition.  Forensic Science International: Genetics 17 (2015) 70-74.

Oldoni F, et al.  Sensitive DIP-STR markers for the analysis of unbalanced mixtures from 'touch' DNA samples. Forensic Science International: Genetics, Vol. 28, p111–117. Published online: February 13, 2017

16

A246

## Touch/Contact DNA Literature (Partial List)

Quinones I and Daniel B.  Cell free DNA as a component of forensic evidence recovered from touched surfaces.
Forensic Sci. Int. Genet. 6 (2012), 26-30.

Schyma C, et al.  Persistence of biological traces in gun barrels after fatal contact shots.  Forensic Science International:
Genetics, Vol. 7, Issue 1, p22–27.  Published online: June 11, 2012

Szkuta B. et al.  Transfer and persistence of DNA on the hands and the influence of activities performed.  Forensic Science International:
Genetics, Vol. 28, p10–20.  Published online: January 10, 2017

Vandewoestyne M, et al. Presence and potential of cell free DNA in different types of forensic samples.  Forensic Science International:
Genetics, Vol. 7, Issue 2, p316–320.  Published online: January 14, 2013

Zoppis S. et al. DNA fingerprinting secondary transfer from different skin areas: Morphological and genetic studies.
Forensic Science International: Genetics, Vol. 11, p137–143.  Published online: March 24, 2014

17

A247

**Index to Background Materials**
**Re: Ray Cromartie**
**November 27, 2018**

**Volume I**

Police Reports

Thomasville Police Department Reports ................................................................01

Georgia Bureau of Investigations Lab Report, Victim: Slysz ....................................298

Supplemental Latent Print Report...........................................................................303

Evidence Control Property Forms ...........................................................................304

Evidence Control Property Forms, cont'd ...............................................................354

Georgia Bureau of Investigations Lab Reports, Victims: Slyz & Wilson ...................371

Video Property Report, FBI Laboratory Division/Video Enhancement Unit..............380

Handwritten Notes .................................................................................................385

Shoe Impression Photos.........................................................................................413

**Volume II**

Discovery Compiled from State Habeas Record ......................................................435

**Volume III**

Pretrial Transcripts

Transcript of Commitment Hearing, 6/17/94...........................................................744

Transcript of Pretrial Hearing, 4/19/95 ..................................................................800

Transcript of Pretrial Hearing, 9/6/95 ....................................................................831

Transcript of Pretrial Hearing, 2/20/96 ..................................................................872

Transcript of Ex Parte Pretrial Hearing, 2/23/96 ..................................................1164

Transcript of Pretrial Hearing, 2/23/96 ................................................................1196



EXHIBIT

tabbies

A24

**Volume IV**

Transcript of Pretrial Hearing, 3/19/96 ................................................................1250

Transcript of Pretrial Hearing, 6/6/96 ..................................................................1272

Transcript of Pretrial Hearing, 10/1/96 – 10/2/96................................................1280

Transcript of Ex Parte Pretrial Hearing, 10/2/96 ................................................1669

**Volume V**

Transcript of Pretrial Hearing, 12/19/96 ..............................................................1755

Transcript of Pretrial Hearing, 1/6/97 ..................................................................1768

Transcript of Pretrial Hearing, 8/15/97 ................................................................1982

Transcript of Pretrial Hearing, 8/29/97 ................................................................2113

**Volume VI**

Trial Transcripts

Index to Witnesses and Exhibits ..........................................................................2229

Trial Transcript, 9/22/97 ......................................................................................2246

Trial Transcript, 9/23/97 ......................................................................................2493

**Volume VII**

Trial Transcript, 9/24/97 ......................................................................................2828

Trial Transcript, 9/25/97 ......................................................................................3157

**Volume VIII**

Trial Transcript, 9/26/97, 9/29/97 – 10/1/97........................................................3428

Transcript of Motion for New Trial, 3/12/98........................................................3656

**Volume IX**

Finger Print Evidence

Finger Prints from Jr. Food Store, 4/10/94 ...................................................................3778

Print from Budweiser Carton, 4/10/94.......................................................................3802

Print Card of Corey Clark, 4/13/94...........................................................................3807

Print Card of Ray Cromartie, 4/13/94.......................................................................3810

Print Card of Gary Young, 4/13/94...........................................................................3813

Print Card of Thad Luca, 4/13/94 .............................................................................3816

Photos of Physical Evidence (taken 8/11/15) ...........................................................3819

Surveillance Video, Ex. 32 (non-fatal shooting)

Trial Exhibits

Trial Exhibit List......................................................................................................3878

Combined Trial Exhibits...........................................................................................3894

Opinions

Opinion, Supreme Court of Georgia, 3/8/99..............................................................4297

Order Denying Motion for Reconsideration of Certificate of Appealability, 11th Circuit,
3/26/18 ......................................................................................................................4312

**Index to Supplemental Background Materials
Re: Ray Cromartie
April 16, 2019[1]**

**Volume X**

Additional FBI and GBI Documents

FBI Forensic Fax, 10-2-96 ..................................................................................4345

FBI Report – Compare Clothing to Video, 7-1-94 ...............................................4349

GBI Forensic Fax, 10-3-96 ..................................................................................4352

GBI Forensic Report, 6-2-94 ...............................................................................4357

GBI Forensic Report, 10-25-96 ...........................................................................4361

GBI Property Receipts, 4-10-94 ...........................................................................4368

GBI Shoeprint Fax, 11-21-96 ..............................................................................4373

Misc Charging Docs, Prosecutor Notes ...............................................................4383

Slysz Autopsy Photos ..........................................................................................4429

Photographs of Crime Scenes

Madison Street Deli Crime Scene Photos .............................................................4439

Junior Food Store Crime Scene Photos ................................................................4475

Autopsy Photos (Richard Slysz) ..........................................................................4598

**Volume XI**

Photographs of Physical Evidence

Evidence Locker – Box 1 of 3 Photos ..................................................................4607
  - Includes suspect clothing, shoes, etc.

Evidence Locker – Box 2 of 3 Photos ..................................................................4635
  - Includes beer flap, projectiles, casings, firearm, magazine, fingerprints

Evidence Locker – Box 3 of 3 Photos ..................................................................4846
  - Includes beer cans, shoes, clothing

---

[1] Photos (4439-4903) were previously provided electronically without Bates stamping on December 7, 2018.

**Index to Background Materials**
**Re: Ray Cromartie**
**June 10, 2019**

**Volume XII**

<u>Select State Habeas Exhibits</u>

Petitioner Exhibit - Affidavit of Corey Allen Clark, 7/18/05 ...................................................4904

Petitioner Exhibit - Affidavit of Terrell Cochran, 7/26/05 ......................................................4907

Petitioner Exhibit - Affidavit of Carnell Cooksey, 9/17/05 .....................................................4909

Petitioner Exhibit - Affidavit of Keith Reddick, 7/23/05 ........................................................4913

Petitioner Exhibit - Affidavit of Gary Young, 3/22/12 ............................................................4915

Respondent Exhibit - Affidavit of Keith Reddick, 1/31/06 .....................................................4916

Exhibit 197 - Thad Lucas Parole Document ............................................................................4919

<u>State Habeas Evidentiary Hearing Exhibits</u>

Evidentiary Hearing Index ......................................................................................................4923

Evidentiary Hearing Transcript, August 12, 2008 ..................................................................4955

Evidentiary Hearing Transcript, August 13, 2008 ..................................................................5125

Evidentiary Hearing Transcript, August 14, 2008 ..................................................................5164

State Habeas Deposition of Gary Young, March 22, 2012 ......................................................5315

# LAURA SCHILE

*10826 Abbott Ave, Sun City, AZ  85351 Phone- 405-314-1532  e-mail- pefcllc@gmail.com*
*www.pocketexpert.net*

## *Employment*

**CEO OF POCKET EXPERT LLC**
Forensic Consulting
(MARCH 2006-PRESENT)

Performs forensic review and consultation on a variety of cases, including but not limited to; sex crimes, homicides, and capital trial litigation. Review materials, consult and advise on appellate and post-conviction cases. Performs training for prosecution, defense, police and universities in aspects of forensic science. Testifies and consults in Federal and State court as well as military court martials.

**CHIEF OF FORENSIC SERVICES**   (JULY 2002- JANUARY 2010) *OKLAHOMA INDIGENT DEFENSE SYSTEM*
*SAPULPA, OKLAHOMA*

In addition to the responsibilities as Forensic Science Specialist, duties now include overseeing all forensic requests made by the following divisions; capital trial, non-capital trial, capital direct appeal, general appeal, post-conviction and all conflict counsel. Assisting in identifying forensic needs for cases and securing forensic expert witnesses for testimony and/or affidavit. Assisting in the preparation for discovery motions as well as hearings associated with admissibility of forensic evidence/testimony and/or forensic analysts. Assisted in legislative reform for DNA and Forensic Science.

**FORENSIC SCIENCE SPECIALIST** (SEPTEMBER 2001-JULY 2002) *Oklahoma Indigent Defense System Norman, Oklahoma*

Responsibilities include but are not limited to: Serving as technical expert on forensic science issues to staff and attorneys by advising, educating and assisting in case investigations and court preparation. Provide guidance on the applicability of the results of forensic analysis and physical and biological evidence. Review and interpret analyses, reports and evidentiary materials generated by other forensic scientists for quality, accuracy and adherence to proper scientific methodologies and protocols. Performing physical, chemical, biological and microscopic examinations on forensic evidence. Provide forensic expert testimony in criminal court proceedings, trials, and evidentiary hearings when necessary. Continued responsibilities with the SART/SANE team. Provide training for in-house and contract attorneys.

**DNA MANAGER/TECHNICAL LEADER** YEARS EMPLOYED (2000-2001) *Oklahoma City Police Department Oklahoma City, Oklahoma*

Primary responsibilities were to establish and operate the Oklahoma City Police Department's DNA Laboratory. Establish and implement protocols and procedures for casework analyses. Provide training and education to analysts, police officers and attorneys in DNA technology and evidence handling procedures. Establish evidence handling protocols and revamping the entire storage of evidence to eliminate loss and inadvertent destruction. Examine and analyze DNA cases and manage the day-to-day activities and operations of the DNA Laboratory and supervise the DNA and Serology analysts that the OCPD employed. Established the SART and SANE programs for Oklahoma City. Head the board of the SART team and perform training to SART team, Sexual Assault Nurse Examiners and participating hospital staff.

**CRIMINALIST V** YEARS EMPLOYED (1998-2000) *Texas Department of Public Safety Houston, Texas*

Promoted from Criminalist IV



EXHIBIT
5
A253
tabbies

In addition to all duties of a Criminalist III and IV, my responsibilities included but were not limited to: Being lead person for crime scene investigations, maintaining contacts with other agencies in regards to expansion of CODIS and STR's which involved direct input on protocols and procedures used by the Houston DNA section, researching and validating new procedures, purchasing for the Houston DNA section and training new employees on protocols and procedures in the Houston laboratory.

**CRIMINALIST IV** YEARS EMPLOYED (1996-1998) *Texas Department of Public Safety Houston, Texas*

Promoted from Criminalist III
In addition to all duties of a Criminalist III, my responsibilities included but were not limited to: The establishment of the Combined DNA Index System as the local system administrator, validation of all equipment, reagents, and kits involved with the establishment of the STR program for the Houston DPS laboratory, completion of validations and proficiency test required by TWGDAM and ASCLD, in serology, hair comparisons and DNA, training and education of SANE nurses on protocols, equipment, techniques, and collection and preservation of evidence, education of attorneys and the community on the essentials and applications of DNA/forensic analysis.

**CRIMINALIST III** YEARS EMPLOYED (1995-1996) *Texas Department of Public Safety Houston, Texas*

Responsibilities included but were not limited to: Receiving and releasing evidence to maintain the chain of custody, perform serological analysis on biological evidence submitted by law enforcement agencies, perform hair comparisons, analyze evidentiary samples by DNA methods. Analyze and process crime scenes for various law enforcement agencies, maintain proper ASCLD procedure in the laboratory as well as maintaining knowledge of the most current procedures and protocols used in the forensic community. Testifying as an expert witness on results of hair comparisons, crime scene collection and processing, serology and DNA analysis.

**RESEARCH ASSISTANT** YEARS EMPLOYED (1992-1995) *U.T.M.D. Anderson Cancer Research Center Smithville, Texas*

Responsibilities included DNA breakage and repair experiments, RIAs, writing protocols, establishing experiments for preliminary grant data, tissue culture, elutriation (cell cycles) experiments, mutation experiments, running RFLP both Northern blots and Southern blots, isolation of tRNA and mRNA as well as DNA. Maintain laboratory needs including media preparation, stock solutions and ordering.

## *Education*

BACHELOR OF SCIENCE, BIOLOGY YEARS ATTENDED (1987-1991)
*Saint Mary College*
*Leavenworth, Kansas*

*Graduate Coursework for TWGDAM (1995-1996)*
*University of Houston*
*Houston, Texas*

## *Qualifications*

*2001 - ASCLD certification for Technical Leader/Technical Manager*

A254

## *Forensic Training, Teaching, and Presentations*

- ❖ *1995 Bob Henderson-Blood Spatter Interpretation and analysis (40 hrs.)*
- ❖ *1996 Texas Department of Public Safety-Serology (6month training)*
- ❖ *1996 Texas Department of Public Safety-Hair Comparisons (3month training)*
- ❖ *1996 STR, DNA training (80 hours) Perkin-Elmer*
- ❖ *1997 TWGDAM-STR workshop*
- ❖ *1997 FBI-CODIS administrator training (40hrs)*
- ❖ *1998 SWAFS-DNA/Genetics (20 hrs.)*
- ❖ *1998 Perkin-Elmer STR training (40 hrs.)*
- ❖ *1998 Promega Meeting/Courtroom Testimony training by FBI*
- ❖ *1999 Advanced Hair Comparison by Barry Gaudette {RCMP} (40 hrs.)*
- ❖ *1999 Perkin-Elmer STR training, advanced w/ Cofiler (40 hrs.)*
- ❖ *2000 Promega meeting-STR workshop*
- ❖ *2000 Promega STR Forum (presented)*
- ❖ *2001 NIJ Science and the Law*
- ❖ *2001 Adjunct Professor at OSU OKC (Intro into Forensic Science)*
- ❖ *2002 American Academy of Forensic Science*
- ❖ *2002 OCDLA (presented)*
- ❖ *2002 SWAFS (presented)*
- ❖ *2003 AFDAA*
- ❖ *2003 Use and Misuse of Forensic Science (OCU)*
- ❖ *2003 New Orleans Innocence Project (presented)*
- ❖ *2003 American Bar Association Annual Report (published)*
- ❖ *2003 Matagorda County Texas DA and Officer Training (presented)*
- ❖ *2003 Oklahoma Sociological Society (presented)*
- ❖ *2004 Oklahoma County DA's office/ OCCD Assoc. (presented)*
- ❖ *2004 KACDLA (presented)*
- ❖ *2005 Criminal Bar Association, Clinton, OK (presented)*
- ❖ *2005 Oklahoma Federal Public Defender, CLE (presented)*
- ❖ *2006 Promega DNA working group, St. Louis, MO*
- ❖ *2006 Oklahoma University School of Law (taught forensic evidence class)*
- ❖ *2006 Cleveland County Bar Association (presented)*
- ❖ *2007 OU Law School Criminal Defense Institute (Instructor)*
- ❖ *2008 OK Bar Association (presented)*
- ❖ *2009 OCDLA (attended)*
- ❖ *2009 NIJ Expert Systems Test bed Project*
- ❖ *2009 Association of Forensic DNA Analysts and Administrators*
- ❖ *2009 Patrick Williams Criminal Defense Institute (presented)*
- ❖ *2009 Clark County NV Public Defenders Office (presented)*
- ❖ *2009 University of Tulsa CLE (presented)*
- ❖ *2010 University of Oklahoma (taught 3hour criminology course)*
- ❖ *2010 Montana Criminal Defense (presented)*
- ❖ *2010 PIFC computer/phone forensics (40 hours)*

- ❖ *2010 Computer forensic boot camp (40 hours)*
- ❖ *2010 Wrongful Conviction Seminar (speaker and panelist)*
- ❖ *2010 Tulsa Bar Association (presented)*
- ❖ *2011 National Association of Criminal Defense (speaker and panelist)*
- ❖ *2011 AFDAA (presented)*
- ❖ *2011 Tulsa Bar Association (speaker)*
- ❖ *2012 AFDAA*
- ❖ *2012 Forensic Computing (cell phone data recovery)*
- ❖ *2013 AFDAA*
- ❖ *2014 AFDAA (presented)*
- ❖ *2015 NACDL Sexual Assault Cases (presented)*
- ❖ *2016 MN Federal Defenders (presented)*
- ❖ *2016 NACDL Annual Forensic Conference (presented)*
- ❖ *20016 Federal Forensic Boot Camp (presented)*
- ❖ *2017 NACDL Annual Forensic Conference (presented)*

## *Organizations*

- ❖ *1995-present Association of Forensic DNA Analyst and Administrators*
- ❖ *2010-2014 Vice Chair AFDAA (Association of Forensic DNA Analysts and Administrators)*
- ❖ *2010-2013 American Bar Association*
- ❖ *2010-2013 Texas Criminal Defense Lawyers Association*
- ❖ *2010-present National Criminal Defense Lawyers Association*
- ❖ *2010-2014 Tulsa Chamber*
- ❖ *2011-2014 OTC College Advisory Board*



I, Laura Schile, do affirm under oath that the following is true and correct to the best of my knowledge and belief:

1.    I am the CEO of Pocket Expert, LLC, a private forensic consulting firm. In this capacity, I perform forensic review and consultation on a variety of cases including, but not limited to, sex crimes and homicides. Some of my cases have involved capital charges.

2.    I have been employed in the fields of criminalistics and forensic investigation for over twenty years. For seven and a half years, I was the Chief of Forensic Services for the Oklahoma Indigent Defense System; I have held the position as DNA Manager and Technical Leader at the Oklahoma City Police Department in Oklahoma City; and I attained the level of Criminalist V at the Texas Department of Public Safety in Houston, where I led crime scene investigations, was directly involved with the implementation of protocols and procedures used by the

1



EXHIBIT

A257

Houston DPS DNA section, researched and validated new procedures, and trained new employees on protocols and procedures.

3.    I have had extensive training and experience in DNA analysis, serology, crime scene management, blood spatter analysis, collection and handling of evidence, crime scene and evidence photography, investigatory and crime scene protocols and procedures, and documentation, reporting, and implementation of crime scene investigations.

4.    I am certified as a Technical Leader by the American Society of Crime Laboratory Directors. I was also trained by the Science Applications International Corporation and the Federal Bureau of Investigation as a Combined DNA Index System Administrator.

5.    I also train prosecutors, defense attorneys, police, and individuals in academic settings in all aspects of forensic science.

6.    I have been qualified to testify to all of the above disciplines numerous times in federal, state and military courts. A copy of my curriculum vitae is attached to this document.

7.    I have been retained by Aren Adjoian and Loren Stewart of the Federal Community Defender Office to consult and provide expert forensic opinions regarding the crime scenes of the killing of Richard Slysz (the Junior Food Store) and the shooting of Dan Wilson (the Madison Street Deli) in Thomasville, Georgia.

2

8.    I have reviewed the following materials in reference to cases involving Mr. Slysz, (TPD #9406722), Mr. Wilson (TPD #9406524), and a shooting at the Cherokee apartments:

- Transcripts of pre-trial, trial, motion for new trial, and state habeas proceedings
- Opinions by the Georgia Supreme Court and Eleventh Circuit Court of Appeals
- Thomasville Police Department Reports
- Georgia Bureau of Investigations Lab Reports
- FBI Laboratory Video Enhancement Report
- Declaration of Dr. R. Thomas Libby
- Property Room Documentation
- Surveillance Video at the Madison Street Deli, April 7th, 1994
- Images of Trial Exhibits
- Shoe Impression Images
- Crime Scene and Autopsy Photographs
- Photographs of the physical evidence that was viewed at the Court in December 2018.

9.    I was asked by Mr. Adjoian and Mr. Stewart to opine on the significance of DNA profiles obtained from evidentiary items if testing occurred. My opinion is as follows:

10.    A very important aspect of the Madison Street Deli and Junior Food Store crimes is identity – the identity of the Madison Street Deli

3

perpetrator and the Junior Food Store shooter were contested at trial. The forensic crime scene investigation in each case was wanting in several respects. Although a fingerprint suggests that Mr. Cromartie was present outside the Junior Food Store, no forensic evidence from either crime scene was offered to prove who shot the two victims. Current DNA testing could provide significant new information regarding the identity of the shooter for both crimes.

11.   DNA and Serology are the only forensic disciplines that go directly to source and identity of biological material. Serology is the study of biological fluid as it pertains to crimes. Serology analysis allows the analyst to identify what type of biological substance is being worked with and DNA allows the analyst to identify from whom the biological material originated. Obtaining that information and using it to analyze the crime scene allows a perspective of what occurred at the crime scene and whose DNA was involved. Any time identity is an issue, forensic testing is necessary.

12.   There was no indication in the above referenced materials that any biological forensic testing was performed in either of these cases. No documentation of any serological or DNA analysis was identified. The clothing, shoes, .25 Raven Arms pistol, spent casings, recovered projectiles, etc., were not viewed using an alternative light source (ALS) or any other technique (for example, luminol, TMB, KM, microscopic examination) that would assist an analyst in the identification of

4

biological material.

13.   The State in this case argued, through testimonial evidence, that the clothing (a green hooded sweatshirt and a black knit cap) found at 229 West Monroe, Thomasville, GA, was associated with the shooting at the Madison Street Deli. There was also testimony by Detective Weaver (p000793, line 6-7, Transcripts of June 17th 1994) that only one person went in and shot Mr. Wilson and that the person appeared to be wearing a dark hooded sweatshirt and cap. By testing for "wearer" DNA from the green hoodie and black ski cap, the identity of the person wearing those items would be obtained. It would also be significant to obtain aerosol blood from the wrists and sleeves of the hoodie that could have been deposited on that clothing from the blowback of the shooting.

14.   The discipline of blood spatter divides velocity into 3 possibilities: low velocity, medium velocity, and high velocity. An example of low velocity would be 90-degree blood drops made as a person with a bleeding injury is walking or standing and dripping blood on the ground. An example of medium velocity would be that of hammer blows or blunt force blows after bleeding has started. High velocity blood spatter occurs when there is enough force that blood actually becomes aerosol and can be deposited onto items in close proximity of that high impact such as a gunshot. Often blood that is in aerosol form is not seen or identified by unaided vision. ALS, luminol, or

5

microscopic enhancement is needed to identify this high velocity blood spatter. DNA analysis of aerosol blood from blowback would identify the person that was being shot, and its recovery on the clothing of a different person could show who shot the victim.

15.   It is my opinion that all clothing items, including the shoes, should be analyzed for high velocity blood spatter or biological material that cannot be obviously visualized. After that testing is concluded, DNA testing and profile development should be conducted. In light of the evidence presented at Mr. Cromartie's trial, such testing could provide significant new information regarding the identity of the shooter.

16.   Many peer reviewed papers have been published on transfer DNA since 2000. DNA analysts have become very familiar with primary, secondary and tertiary transfer. It has become a topic of high importance due to the strides that have been made in the forensic DNA discipline. The kits that are used by forensic analysts now have the ability to identify alleles at 21 locations. The increase in loci has also been met with increased sensitivity. The target amount of DNA used is often 1.5 ng/ul (Nano grams per micro liter) It is often possible to obtain a full profile using amounts in Pico grams (much less than 1.5ng/ul).

17.   Primary transfer of DNA occurs when DNA or cells containing DNA come into contact with another individual or object. An example would be shaking hands, where skin cells transfer from one person's

6

hand to another's. Secondary transfer happens where one person who was shaking hands then holds a butcher knife, and the other person's skin cells are transferred to the handle of the knife, even though that person never touched the handle of the knife. {Cynthia Cale, Journal of Forensic Science Volume 61, Issue 1 January 2016 Pages 196-203}

18.   Individuals are constantly shedding and losing skin cells, or epithelial cells, throughout the day through, e.g., shaking hands, or touching faucets, doors, and steering wheels. It has also been documented that the more friction associated with skin, the greater the deposit of skin/epithelial cells. A good example of this is loading bullets into a magazine. An individual loading bullets into a magazine is holding the magazine in one hand and often holds the needed number of bullets in the other hand while pushing/forcing each bullet on top of the next, scraping skin cells onto the lip of the top of the magazine and all the way down the bullet many times until the magazine is filled. DNA profiles obtained from spent rounds, cartridges, and the magazine identify the individuals who loaded that magazine or held those bullets.

19.   In this specific case there are 3 spent shell casings and 3 projectiles. DNA could identify the individual that loaded the magazine that went into the .25 Raven firearm used at Madison Street Deli and Junior Food Store. Again, this information could provide meaningful circumstantial evidence as to the identity of the perpetrator of both crimes.

20.   A .25 Ravens Arms semiautomatic pistol was recovered and testimonial evidence was presented that that weapon was used in the shootings at the Madison Street Deli and the Junior Food Store. This particular gun has several areas that would "trap" skin cells by someone operating this gun. When pulling back the slide to chamber a bullet, a person would hold both sides of the gun and pull back. This specific gun has raised sections on the slide. As a person grips this slide and pulls back, they leave epithelial cells on that area of the gun. Those sections would be a good location to obtain DNA and the identity of a person that was sliding this piece of the gun back. The grips of this .25 gun appear to be wood. Wood is porous and makes for a good substrate to which skin cells would adhere. The magazine would have been handled by the person loading it. It also has areas to which skin cells would adhere. Sweating also produces more possibilities of shedding epithelial cells.

21.   In order to have science determine identity, DNA testing needs to occur. When Serology and DNA are utilized in this case, it will be possible to know the source and identity of profiles developed.

22.   The opinions contained within this affidavit are accurate to a reasonable degree of certainty within the fields of criminalistics and DNA analysis. I reserve the right to alter or adjust, or enhance my opinions should additional information be made available.

Laura Schile

Sworn to and subscribed before me this ___7th___ day of ___JUNE___, 2019.

Victoria L Flynn, Notary Public

July 19, 2020

Victoria L Flynn
Notary Public
Maricopa County, Arizona
My Comm. Exp. 07-19-2020

9

**Index to Background Materials**
**Re: Ray Cromartie**
**April 16, 2019**

**Volume I**

<u>Police Reports</u>

Thomasville Police Department Reports ...................................................................................01

Georgia Bureau of Investigations Lab Report, Victim: Slysz ....................................................298

Supplemental Latent Print Report....................................................................................303

Evidence Control Property Forms ..........................................................................................304

Evidence Control Property Forms, cont'd ...........................................................................354

Georgia Bureau of Investigations Lab Reports, Victims: Slyz & Wilson ..................................371

Video Property Report, FBI Laboratory Division/Video Enhancement Unit..............................380

Handwritten Notes ..............................................................................................................385

Shoe Impression Photos.....................................................................................................413

**Volume II**

Discovery Compiled from State Habeas Record .......................................................................435

**Volume III**

<u>Pretrial Transcripts</u>

Transcript of Commitment Hearing, 6/17/94.........................................................................744

Transcript of Pretrial Hearing, 4/19/95 ...............................................................................800

Transcript of Pretrial Hearing, 9/6/95 .................................................................................831

Transcript of Pretrial Hearing, 2/20/96 ...............................................................................872

Transcript of Ex Parte Pretrial Hearing, 2/23/96 ...............................................................1164

Transcript of Pretrial Hearing, 2/23/96 ...............................................................................1196



EXHIBIT
7
A266

**Volume IV**

Transcript of Pretrial Hearing, 3/19/96 ...................................................................1250

Transcript of Pretrial Hearing, 6/6/96 .....................................................................1272

Transcript of Pretrial Hearing, 10/1/96 – 10/2/96 ....................................................1280

Transcript of Ex Parte Pretrial Hearing, 10/2/96 .....................................................1669

**Volume V**

Transcript of Pretrial Hearing, 12/19/96 ..................................................................1755

Transcript of Pretrial Hearing, 1/6/97 .....................................................................1768

Transcript of Pretrial Hearing, 8/15/97 ...................................................................1982

Transcript of Pretrial Hearing, 8/29/97 ...................................................................2113

**Volume VI**

Trial Transcripts

Index to Witnesses and Exhibits ..............................................................................2229

Trial Transcript, 9/22/97 .........................................................................................2246

Trial Transcript, 9/23/97 .........................................................................................2493

**Volume VII**

Trial Transcript, 9/24/97 .........................................................................................2828

Trial Transcript, 9/25/97 .........................................................................................3157

**Volume VIII**

Trial Transcript, 9/26/97, 9/29/97 – 10/1/97 ...........................................................3428

Transcript of Motion for New Trial, 3/12/98 ...........................................................3656

**Volume IX**

<u>Finger Print Evidence</u>

Finger Prints from Jr. Food Store, 4/10/94 ...................................................................3778

Print from Budweiser Carton, 4/10/94.........................................................................3802

Print Card of Corey Clark, 4/13/94.............................................................................3807

Print Card of Ray Cromartie, 4/13/94..........................................................................3810

Print Card of Gary Young, 4/13/94.............................................................................3813

Print Card of Thad Luca, 4/13/94 ...............................................................................3816

Photos of Physical Evidence (taken 8/11/15) ...............................................................3819

Surveillance Video, Ex. 32 (non-fatal shooting)

<u>Trial Exhibits</u>

Trial Exhibit List.....................................................................................................3878

Combined Trial Exhibits............................................................................................3894

<u>Opinions</u>

Opinion, Supreme Court of Georgia, 3/8/99...............................................................4297

Order Denying Motion for Reconsideration of Certificate of Appealability, 11th Circuit,
3/26/18 ..................................................................................................................4312

**Volume X**

<u>Additional FBI and GBI Documents</u>

FBI Forensic Fax, 10-2-96........................................................................................4345

FBI Report – Compare Clothing to Video, 7-1-94 ........................................................4349

GBI Forensic Fax, 10-3-96........................................................................................4352

GBI Forensic Report, 6-2-94 .....................................................................................4357

GBI Forensic Report, 10-25-96 ..................................................................................4361

GBI Property Receipts, 4-10-94 ................................................................................4368

GBI Shoeprint Fax, 11-21-96 ..................................................................................4373

Misc Charging Docs, Prosecutor Notes ...................................................................4383

Slysz Autopsy Photos ...............................................................................................4429


Photographs of Crime Scenes

Madison Street Deli Crime Scene Photos ................................................................4439

Junior Food Store Crime Scene Photos ...................................................................4475

Autopsy Photos (Richard Slysz) ..............................................................................4598


**Volume XI**

Photographs of Physical Evidence

Evidence Locker – Box 1 of 3 Photos ......................................................................4607
  - Includes suspect clothing, shoes, etc.

Evidence Locker – Box 2 of 3 Photos ......................................................................4635
  - Includes beer flap, projectiles, casings, firearm, magazine, fingerprints

Evidence Locker – Box 3 of 3 Photos ......................................................................4846
  - Includes beer cans, shoes, clothing

**Index to Background Materials**
**Re: Ray Cromartie**
**June 10, 2019**

**Volume XII**

<u>Select State Habeas Exhibits</u>

Petitioner Exhibit - Affidavit of Corey Allen Clark, 7/18/05 ....................................................4904

Petitioner Exhibit - Affidavit of Terrell Cochran, 7/26/05 .......................................................4907

Petitioner Exhibit - Affidavit of Carnell Cooksey, 9/17/05......................................................4909

Petitioner Exhibit - Affidavit of Keith Reddick, 7/23/05 .........................................................4913

Petitioner Exhibit - Affidavit of Gary Young, 3/22/12.............................................................4915

Respondent Exhibit - Affidavit of Keith Reddick, 1/31/06 ......................................................4916

Exhibit 197 - Thad Lucas Parole Document.............................................................................4919

<u>State Habeas Evidentiary Hearing Exhibits</u>

Evidentiary Hearing Index .......................................................................................................4923

Evidentiary Hearing Transcript, August 12, 2008 ...................................................................4955

Evidentiary Hearing Transcript, August 13, 2008 ...................................................................5125

Evidentiary Hearing Transcript, August 14, 2008 ...................................................................5164

State Habeas Deposition of Gary Young, March 22, 2012.......................................................5315

EXHIBIT

8

A271



EXHIBIT

A272



**EXHIBIT**

A27$\mathcal{O}$



EXHIBIT

A27A/



**EXHIBIT**

A275





EXHIBIT

A27H



EXHIBIT

A278



**EXHIBIT**

tabbies

16

A279



STATE'S
33

-3078-

EXHIBIT

tabbies

A280



EXHIBIT

18

A281

EXHIBIT

19

A282



EXHIBIT

20

A283

IN THE SUPERIOR COURT OF THOMAS COUNTY

STATE OF GEORGIA

STATE OF GEORGIA                    CRIMINAL ACTION NO:  94-CR-328

      VS                          CHARGE:  AGGRAVATED ASSAULT
                                        (COUNT 1);
RAY JEFFERSON CROMARTIE                      POSSESSION OF A FIREARM
         DEFENDANT                   DURING THE COMMISSION OF
                                          A CRIME (COUNTS 2,4,6,8);
                                        AGGRAVATED BATTERY
                                        (COUNT 3);
                                        MURDER (COUNT 5);
                                        ARMED ROBBERY (COUNT 7)

                           CRIMINAL JURY TRIAL UNDER THE
                           UNIFIED APPEAL PROCEDURE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    The following transpired before the Honorable Frank D.
Horkan, Judge, Superior Courts, and a Jury, in the Thomas
County Courthouse, Thomasville, Georgia, with voir dire and
selection of the Jury commencing at 9:35 A. M. on Monday,
September the 15th, 1997, and concluding at 10:20 A. M. on
Friday, September the 19th, 1997, and the case-in-chief
commencing at 10:50 A. M. on Friday, September the 19th,
1997, and concluding at 10:40 A. M. on Wednesday, October
1st, 1997.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

APPEARANCE OF COUNSEL:
    Representing the State:  James E. Hardy, Esq.
                             Mark E. Mitchell, Esq.
                             Assistant District Attorneys

    Representing the Defendant:  Michael Mears, Esq.
                               Carl A. Bryant, Esq.
                               Gerard Kleinrock, Esq.

VOLUME V OF TEN VOLUMES
  (This volume contains the proceedings commencing at 9:05
A. M. and concluding at 12:35 P. M. on Friday, September
the 19th, 1997, and the proceedings of Monday, September
the 22nd, 1997, commencing at 9:00 A. M. and concluding
at 4:45 P. M.)

EXHIBIT

2L284

```
1        We'll be in recess for about ten minutes.

2        Everyone please remain seated while the jury retires.

3        (Whereupon the jury retires from the courtroom)

4        THE COURT:  We'll be in recess for about ten minutes.

5        (Whereupon the Court takes a brief recess, and upon

6        reconvening the following transpired outside the

7        jury's presence)

8        THE COURT:  You may bring the jury in.

9        (Whereupon the jury returns to the courtroom, after

10       which the following transpired)

11       THE COURT:  Mr. Hardy, who's your next witness?

12       MR. HARDY:  David McRae.

13       Go bring the witnesses up.

14       Take a seat up there, please, sir.

15       THE COURT:  If you'd have a seat right here, please,

16   sir?

17       If you'd raise your right hand, please, sir?

18       Do you solemnly swear or affirm that the evidence that

19   you will give to the Court and the jury in the case now

20   pending before the Court shall be the truth, the whole truth

21   and nothing but the truth, so help you God?

22       MR. MCRAE:  I do.

23       THE COURT:  Mr. Hardy?

24                   DAVID W. MCRAE

25       having been duly sworn, testified as follows:
```

```
 1                    DIRECT EXAMINATION
 2          BY MR. HARDY:
 3      Q    Would you state your name for us, please?
 4      A    David W. McRae.
 5      Q    Mr. McRae, where do you live, please, sir?
 6      A    At 229 W. Monroe Street.
 7      Q    How long have you lived there, please, sir?
 8      A    All my life.
 9      Q    Would you pull the mike to you there a little bit?
10      A    All my life.
11      Q    Pull the mike up to you.  Do you have a physical
12  problem right now?
13      A    Yeah.
14      Q    What's that?
15      A    My feets in bad shape and I've got cancer.
16      Q    Were you living there at Monroe back on the 8th day of
17  April of 1994?
18      A    Yes, sir.
19      Q    And where is your house in relation to the Madison
20  Street Deli, please, sir?
21      A    To where now?
22      Q    The Madison Street Deli, Singletary Tile.  Where is
23  your house in relation --
24      A    One block away.
25      Q    And which way would that be?
```

1842

A286

```
 1       A    Up the hill.

 2       Q    Okay.  Is that where you were living back on the 8th of

 3  April?

 4       A    Yes, sir.

 5       Q    Did you go out of your yard that morning and find

 6  anything?

 7       A    Yeah.  I was coming -- went out of my yard and found a

 8  bunch of clothes laying in my, in my yard.

 9       Q    Where were they in your yard?

10       A    There's a tree on, on the left side of my, where I go

11  out into the yard.  And they was to the left.

12       Q    Did you call anybody when you found the items?

13       A    Yeah.  I called the P. D.

14       Q    Did they come?

15       A    Yeah.  I had some pictures.  They took some pictures.

16       Q    Let me show you 30-A and B, Mr. McRae, and ask if you

17  can identify these items?

18       A    I know right, right now I probably can't because it's

19  been so long ago.

20       Q    You don't remember?

21       A    No.

22       Q    Okay.  Who did you turn the items over to?

23       A    To -- I don't know who the officer was I turned them

24  over to.

25       Q    Was it a policeman?
```

A287

```
1     A    Yeah.

2     Q    But you did find some items in the front yard?

3     A    Yeah.

4     Q    Were they yours?  Were the clothing items yours?

5     A    No.  Uh-uh.

6     Q    Did you put them there?

7     A    No.

8     Q    Do you know how they got in your yard?

9     A    No; I don't.

10    Q    That's about how far from the Madison Street Deli?

11    A    About a block away.

12         MR. HARDY:  Thank you.

13         THE COURT:  Any questions, gentlemen?

14         MR. BRYANT:  No questions, Your Honor.

15         THE COURT:  Gentlemen, may this witness be excused?

16         MR. HARDY:  We'd ask that he be allowed to go on home,

17    Judge.

18         MR. MEARS:  Yes, sir, Judge.

19         THE COURT:  All right.  You are excused.

20         Who's your next witness, Mr. Hardy?

21         MR. HARDY:  Carnell Cooksey.

22         THE COURT:  If you'd have a seat right here, please,

23    sir?

24         Would you raise your right hand, please, sir?

25         Do you solemnly swear or affirm that the evidence you
```

CASE # 9406524

MADISON STREET DELI

TODAY'S DATE IS 4-7-94. THE TIME IS 2245 HOURS. THIS IS DET. SGT. CHUCK
WEAVER, I'VE BEEN CALLED TO THE SCENE OF A ARMED ROBBERY AND SHOOTING.
THE LOCATION IS 401 NORTH MADISON CONVENIENCE STORE. PRESENT AT THE SCENE
UPON ARRIVAL IS OFFICER KATHY MURPHY, LT. JERRY BAKER, SGT. HENRY
WILLIAMS. I WAS CALLED AT APPROXIMATELY 25 TO TEN.
UPON ENTERING THE STORE, LOOKING TO MY RIGHT, THE RED TOP COUNTER, WITH A
CASH REGISTER TYPE LOTTERY MACHINE RIGHT TO THE SIDE OF IT IS A BEIGE COLOR
PHONE, COVERED IN BLOOD. THERE IS ALSO BLOOD ALL AROUND THE PHONE.
WALKING BACK BEHIND THE COUNTER, BEHIND THE FOOD SECTION, THERE IS BLOOD.
AS YOU START BACK BEHIND THE COUNTER, THERE IS BLOOD HEAVY ON THE FLOOR,
LEADING BACK TO THE COUNTER, AROUND THE CIGARETTE AND TOBACCO AREA.

I HAVE BEEN ADVISED BY THE OFFICERS THAT THE CLERK, NAME UNKNOWN AT THIS
TIME, WAS SHOT IN THE HEAD, AND A SHOTGUN IS THE WEAPON I WAS ADVISED HAD
BEEN USED. THE VICTIM IS AT THE EMERGENCY ROOM AS THIS TIME AND AN OFFICER
IS PRESENT THERE WITH HIM.

INITIAL PHOTOS WERE TAKEN UPON ENTERING. STARTING, GOING STRAIGHT
TOWARD THE BACK, TO THE BACK STORAGE AREA, RIGHT BEFORE YOU TAKE A RIGHT
TO GO BEHIND THE COUNTER, PICTURES WERE TAKEN OF BLOOD AND BLOOD ON THE
FLOOR. FIRST PICTURES BEING BLOOD ON THE FLOOR, BEHIND THE COOKING AND
DELI AREA. THE BLOOD IS THICKEST IN THIS AREA, DIRECTLY BEHIND THE DELI
AREA, AND THE AREA LEADING UP BEHIND THE MAIN COUNTER WHERE THE CASH
REGISTERS ARE.

CID COMMANDER, LT. JOHNSON, WAS ADVISED OF THE SITUATION AT 2300 HOURS.
CRIME SCENE TECH, SGT. GLENN HUTCHINSON, OF THE SHERIFF'S DEPARTMENT HAS
BEEN ADVISED AND IS ENROUTE AT THIS TIME.

AT THIS TIME WE WERE ADVISED THAT THERE WAS A VIDEO CAMERA INSIDE AND WE
ARE GOING TO LOOK AT THE VIDEO TO SEE IF WE CAN SPOT THE PLACE WHERE THE
SUSPECT MIGHT BE ON THE TAPE.

EXHIBIT # 4

10777



EXHIBIT

22
A289

THE TIME IS NOW 2310. MYSELF (SGT. CHUCK WEAVER), SGT. HENRY WILLIAMS, OFFICER KATHY MURPHY, SHERIFF'S DEPUTY GARLAND, AND LT. JERRY BAKER OBSERVED THE VIDEO IN THE AREA WHERE THE ROBBERY TOOK PLACE. OFFICER MURPHY IS TAKING THE VIDEO TO PUT IN EVIDENCE.

THE TIME IS NOW 2320. LT JOHNSON HAS JUST ARRIVED.

THE BLOOD, AS YOU WALK BEHIND THE COUNTER, STARTS AND GOES ALL THE WAY UP. THERE IS BLOOD SPATTERS, OR DROPS, AS YOU GO UP THE WALK PART BEHIND THE MAIN COUNTER WHERE THE CASH REGISTERS ARE.

AT THIS TIME, 2333, AFTER VIEWING THE VIDEO AND TALKING TO POLICE OFFICERS MURPHY AND SGT.WILLIAMS, IT HAS NOT BEEN DETERMINED YET WHETHER THE VICTIM WAS SHOT BEFORE THE ROBBER TRIED TO TAKE MONEY FROM THE CASH REGISTER, OR IF HE WAS SHOT ON THE WAY OUT.

THE TIME IS 1215 (AFTER MIDNIGHT). WE LOOKED AT THE VIDEO A SECOND TIME AND DETERMINED AT THIS TIME THAT THERE IS ONE SHOT, AND THAT THE PERPETRATOR SHOT THE CLERK AS HE CAME TO THE BACK OF THE STORE AND TURNED RIGHT TO GO BACK BEHIND THE COUNTER AREA. HE SHOT HIM AND WENT BACK TO THE CASH REGISTERS AND ATTEMPTED TO GET IN. IN LOOKING AT THE VIDEO IT DOES NOT LOOK LIKE HE WAS SUCCESSFUL. HE TURNED AROUND AND FLED THE STORE.

AT THIS TIME, CRIME SCENE TECH, SGT. GLENN HUTCHINSON, IS GOING OVER THE CRIME SCENE AND DUSTING THE CASH REGISTER AREA FOR POSSIBLE LATENT PRINTS. PICTURES OF THE BLOOD AREA HAVE BEEN TAKEN, PICTURES OF THE OUTSIDE, AND PICTURES OF THE CASH REGISTER AREA, THAT HE HAS DUSTED.

TIME IS 1225. OFFICER KATHY MURPHY, WHILE SEARCHING FOR THE EMPTY SHELL CASING FOUND WHAT APPEARED TO BE A .25 AUTOMATIC SHELL CASING. IT'S LOCATED ABOUT THREE INCHES FROM A STANDING ASHTRAY. PICTURES HAVE BEEN TAKEN OF THIS SHELL CASING.

TIME IS 1235. SGT. GLENN HUTCHINSON IS TAKING THE .25 AUTOMATIC SHELL CASING AND WILL PUT INTO EVIDENCE.

EXHIBIT # 4

10778

A290

TIME IS 1:15 A.M., 4-8-94. I AM AT THE ARCHBOLD EMERGENCY ROOM. I HAVE BEEN TO X-RAY. THE CLERK THAT WAS SHOT IS STILL IN X-RAY AT THIS TIME, AND I HAVE NOT BEEN ABLE TO SEE OR TALK TO HIM. I TALKED BRIEFLY TO THE EMERGENCY ROOM DOCTOR AND HE SAID THEY WERE DOING MORE X-RAYS AND POSSIBLE SURGERY LATER ON, DEPENDING ON THE EXACT LOCATION OF THE BULLET, WHICH IS LODGED SOMEWHERE AROUND THE NECK AND UPPER JAW AREA.

TIME IS APPROXIMATELY 1:15 A.M. I TALKED WITH DR. HALL, THE SURGEON ON CALL. I ALSO OBSERVED THE GUNSHOT ENTRANCE AND TOOK TWO PHOTOS. THE MAN HAD A LOT OF EMERGENCY EQUIPMENT ON HIM AND AROUND HIS FACE, SO I WAS UNABLE TO TELL MUCH ABOUT THE ENTRY WOUND FROM THE GUNSHOT. AT THIS TIME HE WILL BE GOING TO HAVE MORE SURGERY. THEY MIGHT POSSIBLY REMOVE THE BULLET FROM THE BACK AREA OF THE NECK AND HEAD. AT THIS TIME, IF IT IS REMOVED, DR. HALL WILL CALL MYSELF OR A POLICE OFFICER WILL RECOVER THE SHELL.

AFTER TAKING TWO PHOTOS AND LOOKING AT THE FACE OF THE CLERK AT THE EMERGENCY ROOM, MYSELF AND OFFICER KATHY MURPHY ASKED THE VICTIM SOME QUESTIONS IN REFERENCE TO THE GUN AND HEIGHT AND APPEARANCE OF THE MAN WHO CAME IN AND SHOT AND ROBBED THE VICTIM. THESE NOTES WERE TAKEN DOWN BY KATHY MURPHY AND WILL BE NOTED ON THE INCIDENT AND INVESTIGATIVE REPORT. THE VICTIM APPEARED TO BE IN A GOOD BIT OF PAIN. HE WAS TALKING, TRYING TO GIVE STATEMENTS. HE WAS BARELY AUDIBLE. YOU HAD TO LEAN CLOSE TO HEAR HIM. BOTH SIDES OF HIS FACE WERE BLOODY AND SWOLLEN. HE WAS IN EXTREME PAIN, AND AT THIS TIME MYSELF AND OFFICER KATHY MURPHY ENDED THE INTERVIEW.

I TALKED AGAIN WITH DR. HALL, WHO WILL BE DOING THE SURGERY. DR. HALL SAID THAT THERE COULD BE MORE COMPLICATIONS. THAT HE WAS NOT OUT OF THE DANGER ZONE BY ANY MEANS, AND THAT HE COULD EVEN POSSIBLY DIE. THERE WAS MANY NEUROLOGICAL THINGS THAT COULD HAPPEN, AND THAT IT WAS A TOUCH AND GO OPERATION AND THERE WAS A LOT OF UNANSWERED QUESTIONS. THEY WOULD JUST HAVE TO WAIT AND SEE.

10770

EXHIBIT # 1

WHILE TALKING WITH THE VICTIM AT THE EMERGENCY ROOM, WE WERE ADVISED BY
THE VICTIM THAT THE GUN THAT WAS USED IN THE SHOOTING WAS A CHROME PLATED
TYPE PISTOL. IT APPEARS TO BE A .25 AUTO. FROM THE SHELL CASING THAT WAS
FOUND AT THE SCENE.

AT APPROXIMATELY 2:30 A.M. ON 4-8-94, I WAS CALLED AT THE JAIL JUSTICE CENTER
TO GO TO THE EMERGENCY ROOM IN REFERENCE TO SOME EVIDENCE. AT THIS TIME,
I WENT TO THE EMERGENCY ROOM AND WAS ADVISED THAT DR. HALL WAS IN THE
PROCESS OF DOING SURGERY AND HE WOULD REMOVE THE BULLET WITHIN THE NEXT
FIVE MINUTES. AT APPROXIMATELY 2:55 A.M., I WENT TO THE EMERGENCY ROOM
AND DID OBSERVE DR. HALL WITH THE BULLET. DR. HALL HANDED THE BULLET TO AN
ASSISTANT. I THEN TOOK THE BULLET AND IT WAS PLACED INTO A RECEPTACLE. MY
INITIALS ARE ON IT AND THE TIME 3:00 A.M., 4-8-94. IT WAS FROM THE VICTIM OF
THE ROBBERY AND SHOOTING. THE VICTIMS NAME IS DAN WILSON.

TODAY'S DATE IS FRIDAY, 4-8-94. THE TIME IS 10:50. I AM TURNING TWO ROLLS OF
FILM OVER TO LT. JOHNSON TO BE DEVELOPED, IN REFERENCE TO THE MADISON
STREET DELI ARMED ROBBERY AND AGGRAVATED ASSAULT/SHOOTING THAT
OCCURRED THERE ON 4-7-94.

THE TIME IS 11:00 A.M., 4-8-94, I HAVE JUST TURNED IN ONE MORE ROLL, IN ADDITION
TO THE OTHER TWO ROLLS, OF FILM. I HAVE GIVEN THEM TO LT. JOHNSON TO BE
PROCESSED. THIS IS ON THE MADISON STREET DELI ARMED ROBBERY/AGGRAVATED
ASSAULT FROM 4-7-94.

ON 4-8-94 AT APPROXIMATELY 11:00 A.M., MYSELF, (DET. SGT. CHUCK WEAVER), LT.
MELVEN JOHNSON, SGT. GLENN HUTCHINSON OF THE THOMAS COUNTY SHERIFFS
DEPARTMENT, OFFICER ROOSEVELT DAVIS, MAJOR LARRY SINGLETARY, DET. WILLIE
SPENCER, VIEWED THE TAPE FROM THE MADISON STREET DELI, WHERE THE ARMED
ROBBERY AND AGGRAVATED ASSAULT OCCURRED ON 4-7-94. AFTER VIEWING THE
TAPE , IT WAS TAKEN BACK INTO EVIDENCE BY SGT. GLENN HUTCHINSON. BEFORE
GOING TO REVIEW THE TAPE, MYSELF, LT. MELVEN JOHNSON, DET. WILLIE SPENCER,
SGT. GLENN HUTCHINSON AND OFFICER ROOSEVELT DAVIS, WENT TO 229 WEST
MONROE, WHERE WE RECOVERED FROM THE YARD OF THIS RESIDENCE, A GREEN
HOODED SWEATSHIRT AND A BLACK SKI TYPE KNIT HAT, WITH A WHITE EMBLEM ON

EXHIBIT #_____ 4

10780

A292

IT, BELIEVE TO POSSIBLY BE THE CLOTHES WORN BY THE ARMED ROBBER FROM 4-7-94.

AFTER VIEWING THE VIDEO TAPE AT MAJOR SINGLETARY'S HOUSE, MYSELF, LT. MELVEN JOHNSON AND SGT. GLENN HUTCHINSON, WENT BY LAWS CAMERA AND LT. MELVEN JOHNSON DROPPED OFF THREE ROLLS OF FILM. THESE FILMS CONTAINED PHOTOS OF THE CRIME SCENE AND ITEMS FOUND AT THE CRIME SCENE.

THE GREEN HOODED SWEATSHIRT AND THE BLACK SKI TYPE HAT WAS BAGGED BY MYSELF,(DET. SGT. CHUCK WEAVER). I ALSO INITIALED ON THE TOP COLLAR PART UNDER THE LABEL, MY INITIALS AND DATE BOTH ON THE GREEN HOODED SWEATSHIRT AND THE BLACK SKI TYPE HAT, THE INITIALS C.W. AND THE DATE ON THESE ITEMS. BOTH THE GREEN SWEATSHIRT AND THE BULLET RECOVERED FROM THE SURGERY BY DR. HALL AND TURNED OVER TO ME, WILL BE ENTERED INTO EVIDENCE ON THE THOMASVILLE-THOMAS COUNTY EVIDENCE/PROPERTY FORM ON THIS DATE.

PHOTOGRAPHS OF THE GREEN SWEATSHIRT AND THE BLACK SKI TYPE HAT WERE TAKEN AT THE JAIL-JUSTICE CENTER CID OFFICE BY MYSELF, WITH SGT. GLENN HUTCHINSON WITNESSING. ALSO, LT. JOHN RICHARDS OF THE THOMAS COUNTY CID OFFICE WAS PRESENT.

ON 4-8-94, AT APPROXIMATELY 1355 HOURS, I ENTERED THE CLEAR PLASTIC MEDICAL -ML120CC CONTAINER, CONTAINING ONE BULLET REMOVED FROM VICTIM, DAN WILSON, AT THE ARCHBOLD SURGERY. AND, ALSO, ITEM NUMBER TWO, WHICH WAS A BROWN PAPER SACK CONTAINING ONE GREEN HOODED SWEATSHIRT AND ONE BLACK SKI TYPE HAT, WITH WHITE EMBLEM ON IT. THIS PROPERTY WAS OBTAINED FROM THE YARD AT 229 WEST MONROE STREET. THIS PROPERTY WAS TURNED OVER TO EVIDENCE CUSTODIAN, FRAN EVERETTE.

DET. SGT. CHUCK WEAVER

EXHIBIT # 4

10781

A293



EXHIBIT

23

A294



EXHIBIT

24

A295



EXHIBIT

25

A296



EXHIBIT

26

A297



OFFICE

STORAGE

COOLERS

SHELVES

SHELVES

CHECK OUT COUNTER

SHELVES

SHELVES

SIDE WALK

JR. FOOD STORE
S. PINETREE BLVD AND WEST JACKSON ST.

NORTH

DRAWN BY: K COLLINS
NOT TO SCALE

EXHIBIT #

EXHIBIT
27
A298



SHELVES

CHAIR

VICTIM

CASH REGISTER

CHECK OUT COUNTER

JR FOOD STORE

LEGEND

1. 25 CAL SHELL CASING
2. 25 CAL SHELL CASING.

ENTRANCE

NORTH

DRAWN BY: KCollins
NOT TO SCALE

STATE'S
138

-3181-

EXHIBIT #

**EXHIBIT**
28
A299



STATE'S
64

-3109-

EXHIBIT
29
A300