Case 7:14-cv-00099-MTT Document 18-13 Filed 07/14/14 Page 11 of 242

9th and, that's a Saturday night, --

A Um-hum (affirmative).

Q Okay. Look at the calendar, check me out and make sure I'm right now. Saturday, on the 9th, and there's the 10th?

A Okay.

Q Are you with me?

A Um-hum (affirmative).

Q Okay. Now, on that night you were at Tina Washington's house; were you not?

A Yes.

Q And you were hanging out with Corey Clark; weren't you? Your friend?

A That day; yeah.

Q That night too?

A Yeah.

Q Saturday night?

A Yeah.

Q Sunday morning about 1:00 o'clock you were with Corey Clark; weren't you, out in front of Tina's house, apartment?

A No.

Q Where were you?

A Huh?

Q Where were you?

A I was in Cherokee.

Q I'm talking, I'm talking about in the Cherokee

apartments.

A Yeah.

Q Okay. Let me back up.

A Okay.

Q Saturday night, April the 9th, you were in Cherokee Apartments?

A True.

Q And in Cherokee Apartments you were in Tina Washington's apartment; right? 119-B?

A I guess that's the number. I don't know the number.

Q I think I'm right. That may be wrong, but I think that's right.

A It might be. I don't know.

Q Okay. And you were there with Corey Clark; weren't you?

A Yeah.

Q And ya'll were drinking beer; weren't you?

A Yeah.

Q And during the night, sometime around 12:00 or 1:00 o'clock, ya'll went out and got some beer; didn't you?

A Huh, why you saying ya'll?

Q Did you not go out and get some beer?

A No.

Q Did anybody in your presence leave and then come back with beer before 1:00 o'clock?

A I ain't -- that day -- that night there I ain't seen Corey. I ain't seen Corey. I left Corey about what, 8:00, 9:00, 8:00 o'clock that night. So how you saying we was hanging out and all this and went out and got some more beer?

Q Do you recall earlier I asked you a question, in your interview with Det. Weaver? I asked you whether or not you denied knowing that Corey Clark was there that, with you that night and knowing that Corey Clark --

A With me where?

Q Remember I asked you a question, had you denied that Corey Clark was the third dude that had gone to Junior Foods?

A How many dudes went to the Junior Food?

Q Well, did you deny that Corey -- Let me just you ask this. Let me ask you to look at page five while the court reporter is changing tapes. Look at page five.

A Whereabouts?

Q Number 5. Look right in the middle of the page, beginning with where it says "Weaver". Right here, Mr. Young. Right there.

A All right.

Q Have you got it?

A Right here.

Q Let me show you.

A Okay.

Q Okay. Let's go back up and start right there. Do you

see where I'm pointing? Do you see where Det. Weaver asked you, "Okay. Who else was there when he told you about it?"

A About what?

Q Well, Mr. Mitchell asked you whether or not Mr. Cromartie had told you about doing something at the Junior Food.

A Let me see, now, what are we on? Weaver or Johnson?

Q You're Young. See, Weaver is where I'm pointing your direction to at this time.

A Okay.

Q Okay. Who else was there when he told you about it? Do you remember him asking you that question? Do you remember him asking you that question on April the 13th, 1994, Monday, about 2:14 P. M.?

A I'm on the wrong page.

Q You're on page five. Go back --

A I'm on Johnson.

Q Go back. Count five back.

A Two, three, four, five. Okay. Four, five. Okay.

Q Okay. Det. Weaver?

A Yeah. I see it right there.

Q Now, Det. Weaver asked you, "Okay. Who else was there when he told you about it"? You said, "Nobody. He just came in to me and then he said he wanted to go hit the Junior Food Store, so he went out there, all the way out there, went out there towards Tallahassee". Do you recall making that statement? You

Case 7:14-cv-00089-MTT Document 1-8 Filed 07/14/14 Page 115 of 242

said nobody else was there?

A Where I was? Well, whereabouts. Whereabouts was it?

Q Well, that's my question.

A Well, I'm trying --

Q You were asleep. If you weren't there around 1:00 o'clock, if you weren't there around them, how do you know what anybody said to you?

A Where I was?

Q How do you know that Jeff Cromartie said anything to you if you weren't there?

A Where I was? What you mean? What you talking about?

Q Look at the next question. It says, "Okay. About what time was it?" You said, "I was asleep when they came back". Then he asked you, then Lt. Melvin Johnson asked you, "When you say, they, who, who?" And you said, "Him and another dude".

A Him and other dude?

Q And another dude.

A Yeah.

Q Then Lt. Johnson said, "Who was the other dude?" And you said, "He said he had another dude with him".

A Yeah.

Q Then Johnson, Lt. Melvin Johnson said, "Who was the dude?"

A Um-hum (affirmative).

Q And you told him, "I don't know the other dude." That

was a lie; wasn't it?

A How many it was?

Q Mr. Young, the other dude was you; wasn't it?

A Me?

Q Yes, sir.

A No; it wasn't.

MR. MEARS: One moment, Your Honor.

Q I thought I was through, Mr. Young, but I wasn't. Just a couple of more questions.

A All right. Go ahead.

Q I asked you about your relationship with Mr. Corey Clark and you said he was your friend, good friend, real good friend.

A We're friends.

Q Do ya'll wear the same colors?

A What you mean, what you mean by colors?

Q Okay.

A What you mean by colors?

Q Okay. What about Carnell Cooksey?

A What about him?

Q He's your friend too?

A True.

Q Close friend?

A True friends.

Q True friends?

A True friends.

Q He was out there at Cherokee Apartments on the night the shooting took place; wasn't he?

A Talking about Cherokee? Yes.

Q He's the one that you tried to give the gun to after you ran out of bullets; didn't you?

A Yeah.

Q So, Corey Clark is your good friend?

A (Laughs)

Q Thad Lucas is your good friend?

A Um-hum (affirmative).

Q Carnell Cooksey is your good friend?

A We're friends, yeah.

Q Tina Washington is Corey Clark's sister-in-law? She's got children by his brother; right?

A Yeah.

Q You know that?

A Yeah.

Q And you didn't remember that he was the one there in Tina's apartment that night when they first asked you about this case; did you?

A Who is?

Q Corey. You told them you didn't know who that dude was?

A You say -- back up again.

Case 7:14-cv-00059-MTT Document 18-13 Filed 07/14/14 Page 118 of 242

Q When Lt. Melvin Johnson said, "Who. Who?" Remember he said, "Who. Who?"

A Um-hum (affirmative).

Q And you said, "I don't know"?

A All right. Go ahead.

Q You were lying to him; weren't you?

A About what?

Q About who the other dude was.

A Other dude? What you mean?

Q The other dude that had gone to Junior Food?

A So, who the other dude was?

Q Corey Clark; wasn't it?

A I don't know.

Q Your gun and your friends --

A Okay. What that supposed to mean --

Q -- and you denied it was your gun, you denied it was your friends and you denied knowing anything about it; didn't you?

A That was my gun.

Q Yes, sir; we know that. Thank you.

MR. MITCHELL: Judge, we -- Well, I was going to -- Never mind. I apologize to the Court.

THE COURT: Anything else?

MR. MEARS: Nothing, subject to recross, Your Honor.

THE COURT: Anything further from the State?

Case 7:14-cv-00180-MTT Document 1-8 Filed 09/24/14 Page 9 of 1053

MR. MITCHELL: No, sir.

THE COURT: Gentlemen, does this witness need to be excused, or is he to remain?

MR. MITCHELL: Judge, we'd like to have him remain, please.

THE COURT: Mr. Young, if you'll step down, please, sir. You need to remain in the witness room.

MR. HARDY: Chris Mullins.

THE COURT: Would you raise your right hand, please?

Do you solemnly swear or affirm that the evidence you shall give to the Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. MULLINS: I do.

CHRIS MULLINS

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for us, please, sir?

A Chris Mullins.

Q And back on April the 7th, 8th, 9th, 10th, 11th, where were you working then, please, sir?

A I was working for the Thomasville Police Department.

Q And where do you live now?

A I live in New Jersey.

Case 7:14-cv-00089-HL Document 18-13 Filed 07/14/14 Page 120 of 242

Q And what do you do up in New Jersey?
A I work for UPS in Staten Island, New York.
Q Is that where you're from?
A Yes, sir.
Q And how long were you a policeman here in Thomasville?
A About six years and ten months.
Q And what rank did you have when you left?
A I was a patrol sergeant.
Q Now, back on April the 10th of '94, were you working that particular day?
A Yes; I was.
Q And what shift were you working then, Chris?
A I was working the night shift.
Q And do you know David Allen?
A Yes. He was one of the patrol officers --
Q Ellis Jackson? Ellis Jackson?
A He was my lieutenant.
Q All right. On that particular night, did you get a call that night, late, after midnight?
A Yes, sir.
Q About what time was it, Chris?
A I didn't write down the exact time. It was late in the evening.
Q And where was the call to?
A It was to the Junior Food on W. Jackson Street.

Q And did you go there?
A Yes; I did.
Q And who was there?
A When I got there David Allen was the officer first on the scene.
Q And what did you do when you got there?
A When I got there David informed me they wasn't able to see the clerk, and so we have a procedure that we do for --
Q And what's that procedure?
A -- safety reasons. Well, you don't enter a building if you can't see the clerk. Usually we have them step outside and just make sure everything's okay. So with David not being able to see the clerk he waited for me to get there and then we went inside and cleared the store and made sure that nobody was inside.
Q Who did that?
A David Allen and myself.
Q Did you go inside?
A Excuse me?
Q Did you go inside?
A Yes, sir.
Q Did you see anything when you got inside?
A Didn't see any, any suspects. I went and, I went around to the counter and I could see what appeared to be the store clerk lying on his back in a pool of blood.

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 122 of 242

Q Anybody else in the store at that time?
A No, sir.
Q While they're looking at the other pictures, let me show you this one photograph, Number 53. Can you identify that for me, please, sir?
A Yes, sir. That's the gentleman I saw when I first entered the store, behind the counter.
Q Is that a fair and accurate representation of what you saw, Chris?
A Yes, sir.
Q Was he dead?
A I went back outside and put some gloves on because he appeared to be dead just by a visual. I didn't want to contaminate anything. I put some gloves on and went back inside and took a pulse, or attempted to and he didn't have any pulse or any type of respiration.
Q Let me show you these other photographs, 106 and 107.
MR. MEARS: Your Honor, could I ask that the photographs -- I know it's inadvertent -- that they not be displayed. Some of the jurors are quite close and until they're admitted into evidence I'd ask that they not be shown to the jury.
A I'm sorry. I didn't, I didn't realize --
BY MR. HARDY:
Q 51, 54, 55, 56, and 57, if you'd look at these for me,

please, sir, in addition to those?

Have you had a chance to look at them?

A Yes, sir.

Q Can you identify each of those photographs?

A That was the scene when I arrived. It's exactly the same.

Q What do they depict?

A The clerk that appeared to be shot in the head.

Q Did you notice a wound?

A I didn't initially until I came back and got close enough to see he was shot in the face.

Q Is that a fair -- Are those photographs that you just denominated the numbers, fair and accurate representations of what you saw?

A Yes, sir.

MR. HARDY: Your Honor, we'd offer each of these into evidence.

MR. MEARS: Your Honor, the objection would be to they are duplicative. They all show the same scene. It is a duplicate. And we'd object on that basis. Also we would object on the basis that the probative value of the photographs are outweighed by the inflammatory nature based upon the fact that there's no evidence that's in dispute that can be shown by those photographs. And we'd object on those two bases.

THE COURT: Mr. Hardy, let me see those specific ones, please, sir.

Mr. Hardy?

They're admitted into evidence over objection.

MR. HARDY: Could I publish them to the jury, Your Honor?

THE COURT: Yes, sir.

(Whereupon Mr. Hardy tenders photographs to the jury)

BY MR. HARDY:

Q Is that what you saw, Mr. Mullins?

A Yes, sir.

Q What'd you do after you checked his pulse?

A I went back outside and I had Off. Allen set up a perimeter with crime scene tape and gave him some instructions to identify and take a log of anybody entering the scene including EMT's and supervisors, detectives.

Q Is that the procedure? To rope off the area?

A Yes, sir.

Q Was it done?

A Yes, sir; it was.

Q These photographs number, which we've already, I think have been admitted, Your Honor, 103, 104 and 101, would you look at them for me, please?

Does that depict the crime scene roped off as you're saying it?

A Yes, sir.

Q Is that to keep people out from the area?

A Yes, sir. From contaminating the scene.

Q Was the detective called?

A Yes. I contacted Lt. Jackson, who, of course, was my immediate supervisor. So as soon as I made the exit out of the store I contacted him and informed him about the clerk and had the EMS to be sent. And then I contacted the dispatch to let Det. Weaver know. He was the on call detective. And also Sgt. Williams, the canine sergeant, based on the information that somebody had fled the store. We have a canine that can possibly track people.

Q Did Williams arrive?

A Yes; he did.

Q Weaver?

A Yes.

Q Collins?

A Yes. Ken Collins, G. B. I.

Q Were they, Collins and Weaver, allowed to go back in the store after you had exited?

A After I came out, basically the scene was turned over to Lt. Weaver.

Q So you left, you left --

A I got outside and started my notes and gave some of the patrol people some instructions to kind of halve the area and

start interviewing anybody on the street basically. It was so late, a lot of times people that are out may have seen somebody running or --

Q Was this a busy time of night or a slow time of night?

A Slow time of night. We consider it, like, most of the time the people that are out are usually just the cops and the bad guys, at this time of night.

Q Did you do anything else in your investigation, Chris?

A There was a vehicle that was stopped with two brothers. Their last name was Saft.

Q That was just routine procedure?

A Routine. Just in the area. We F.I.R.'d and called Det. Wea -- Det. Winkelman to come over and interview those guys. One guy was tall and had some dirt on his shoes, so we just tried to check everybody we possibly could.

Q Did they have anything to do with it?

A No. As far as I know they were cleared.

Q You were just trying -- anybody in the area or anybody --

A Anybody. We turned in F.I.R.'s, which is a field interview report of anybody on the street, what they're wearing, where they were, you know, what they may be doing out that time of night so the detectives can later on refer back.

Q Is that standard procedure?

A Right. They may have seen something.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 127 of 242

Q Were any other people on the scene talked to?
A I didn't. I walked the EMT's in and they confirmed the gentleman was dead and those are the only people I allowed in or out of the scene besides who David noted down, which was Weaver and Maj. Tyler and Ken Collins and --
Q The other lay people, there had been F.I.R.'s on them too?
A Those -- Excuse me?
Q The other people that were at the scene?
A No. The F.I.R. is just for people, civilians. We, of course, document all the law enforcement or anybody. But the F.I.R. is just a field report of who's out on the street late at night, maybe hanging around a business or in a parking lot where there's cars.
Q Is this business here in Thomas County?
A Yes, sir.
Q Did you ever go out and see the beers found on the ground?
A No; I did not.
MR. HARDY: He's with the Court, Your Honor.
MR. BRYANT: Your Honor, we have no questions.
THE COURT: Gentlemen, may this witness be excused?
MR. HARDY: Yes, sir, please.
MR. MEARS: Yes, Your Honor.
THE COURT: Your are excused.

MR. MULLINS: Thank you, Judge.

THE COURT: Gentlemen, it's my understanding that we've got some matters to take up at 12:00 o'clock outside the presence of the jury; is that correct?

Mr. Hardy, do you have another witness at this time?

MR. HARDY: Sam Brown, Your Honor, which should be fairly short.

THE COURT: All right, sir. Sam Brown.

Gentlemen, while Mr. Brown is taking the stand, let me inquire for purposes of the jury recess during lunch, how long do you anticipate the 12:00 o'clock matter is going to take to address?

MR. MEARS: Judge, I would like to say no more than an hour, but I would rather err on the side of having taken too much time. I would say probably an hour and a half. I wouldn't want the jury to come back and then be inconvenienced.

THE COURT: Thank you, sir.

Would you raise your right hand, please?

Do you solemnly swear or affirm that the evidence you shall give the Court and this jury in the matter now pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. BROWN: I do.

* * * * * * * * * * * * * * * * * * * *

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 129 of 242

SAMUEL A. BROWN

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for us, please, sir?
A Samuel A. Brown.
Q Mr. Brown, do you hold a public office in Thomas County?
A Yes, sir; I do.
Q And what's that?
A I'm the Thomas County Coroner.
Q How long have you been the Thomas County Coroner?
A Since 1981.
Q And were you called out on April the 10th to the Junior Food Store in Thomas County?
A Yes, sir; I was.
Q Did you respond?
A Yes, sir.
Q And did you see an individual there at that time?
A Yes, sir.
Q And what did you do as coroner?
A What did I do as coroner?
Q Yes, sir.
A I observed there was a body laying behind a counter.
Q Was he dead or alive?

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 130 of 242

A Excuse me. He was dead.

Q Did you see any injuries to him that you thought was indicative of death?

A Yes, sir; I did.

Q What was that?

A Gunshot wounds to the head.

Q Let me show you the photographs. Look at these photographs if you would, please, sir, 53, 55. Just look at those. Can you identify that?

A Yes, sir.

Q Is that the man you're talking about?

A Yes; it is.

Q Did you determine who he was?

A We did through his driver's license.

Q Who was he?

A Richard Slysz.

Q Is that the deceased, Richard Slysz?

A Yes, sir.

Q And did you turn the body over to someone else?

A Yes, sir. It was transported by the Thomas County EMS to Archbold Memorial for pickup and transported to the Atlanta Forensic Science Lab.

Q And why were you taking it to the forensic science lab?

A For an autopsy.

Q 48, 49 and 50, if you could look at these for me,

please, sir?

Q Okay, sir.

Q Can you identify them?

A Yes, sir.

Q What's 48?

A 48 is what appears to be a gunshot wound.

Q 49?

A It's what appeared to be the gunshot wound.

Q Where?

A Underneath his right eye.

Q 50?

A 50's a wound in the, I'd say temple area.

Q Are they fair and accurate representations of what you saw that night or that morning, Sam?

A Yes, sir.

MR. HARDY: I offer them into evidence, Your Honor, 48, 49 and 50.

MR. MEARS: Objection. Goes to the cumulative nature of the photographs, of the photographs already in evidence the Court has admitted. These add nothing to that. They're duplicative in nature. The photographs, the probative value of the photographs is outweighed by the inflammatory nature. And we would object to their admission.

THE COURT: Do you have any response, Mr. Hardy, in regards to the objection based on duplicity?

MR. HARDY: These show the nature of the wounds, Your Honor. Shows where the man was shot in the head twice. Show exactly where he was shot. If the Court would like to see them?

MR. MEARS: And, Your Honor, if I could just add, put this in first, also there is no issue in question that those photographs go to illustrate with regard to the manner and type of death Mr. Slysz suffered.

THE COURT: Admitted over objection.

MR. HARDY: Can I publish them, Your Honor?

THE COURT: Yes, sir.

(Whereupon Mr. Hardy tenders photographs to the jury)

BY MR. HARDY:

Q Is that your job, to pronounce people dead as coroner?

A It is.

Q Is that what you did that morning?

A That morning he was declared dead before I arrived there.

Q And you officially made it so?

A Yes, sir.

MR. HARDY: Thank you.

THE COURT: Mr. Bryant? Mr. Mears? Do you have any questions?

MR. MEARS: Just one moment.

CROSS EXAMINATION

BY MR. BRYANT:

Q    Good afternoon, Mr. Brown.

A    Good afternoon.

Q    Am I correct in understanding from you is that you examined the body there on the scene and you pronounced the man dead at the scene?

A    Yes, sir.

Q    Other than the two gunshot wounds, did you find any other evidence of anything else having been done to the body?

A    No, sir; I didn't.

Q    So that whatever happened presumably in terms of his death was caused by the two gunshot wounds?

A    That was my opinion; yes, sir.

Q    And you saw nothing else at all related to anything about his manner of death?

A    No, sir.

MR. BRYANT:  Thank you, sir.

THE COURT:  Gentlemen, may this, may this witness be excused?

MR. HARDY:  Please, Your Honor.

MR. MEARS:  Yes, Your Honor.

THE COURT:  You are excused.

Ladies and gentlemen, at this time I'm going to excuse you for the lunch recess based upon the estimate of time for us to address this matter which we need to address outside

your presence. I'm going to ask you to return to your jury room no later than 2:00 P. M. and hopefully we can begin the trial of this case promptly at 2:00 P. M.

Again, please remember and abide by the cautionary instructions.

(Whereupon the jury retires from the courtroom, after which the following transpired)

BAILIFF: Your Honor, excuse me. Should they leave their pads in the jury room?

THE COURT: I beg your pardon?

BAILIFF: The pads, leave their pads in the jury room?

THE COURT: Yes, ma'am. And lock the jury room up, please.

MR. MEARS: Your Honor, before we go I've got -- I found the conviction on the, on Mr. Young. We were able to secure the probation revocation and the adjudication of guilt based upon a felony conviction. Apparently there were two orders entered at different times, both of which took away his First Offender status. And I'm having those marked and I'll put those in the record.

THE COURT: All right.

MR. MEARS: And I should have had those to begin with.

THE COURT: That's fine. For purposes of the record I disagree with your earlier statement. I think it was the Court's error in admitting what the Court previously

admitted insofar as the First Offender conviction as opposed to any, as opposed to being misled by Defense Counsel. Thank you.

All right, gentlemen, are we ready to proceed?

MR. MEARS: This will be 4 and 5 for the record, Your Honor. I'm sorry. The conviction will be Defendant's Exhibits 4 and 5, as they relate to Mr. Young's conviction.

THE COURT: Any objections, gentlemen?

MR. MEARS: I showed them to Mr. Mitchell already.

MR. HARDY: They're in the proper form, Your Honor. He never did admit Number 2, Your Honor, earlier either.

THE COURT: He never tendered it.

MR. HARDY: He never tendered Number 2?

MR. MEARS: I never tendered that? That was the nol-pros on these two. That's part of this --

THE COURT: Mr. Hardy, were you asking a question or just simply making a statement in regards to proper form?

MR. HARDY: It was a rhetorical question, did he offer Number 2, Judge?

THE COURT: No. I'm talking about 3 and 4 -- 4 and 5.

MR. HARDY: Let me see them, Judge. I mean, I think they're all the same. Should be the same documents.

MR. MEARS: Well, for some reason there are two orders entered. I guess they wanted to make sure it was really revoked because there two different orders at two different

times.

THE COURT: Gentlemen, let me see them, please?

MR. MEARS: Apparently for the same offense. Looked like they might be trying to give him a second chance.

MR. HARDY: Did you offer Number 2, Mr. Mears?

MR. MEARS: I will.

MR. HARDY: Is Mr. Howard and Mr. Newt here? Are they both here? Make sure they're present.

SHERIFF POWELL: Mr. Howard is here.

MR. MEARS: It looks like they revoked his First Offender.

THE COURT: They're both based on the same allegations as to violation of general and special conditions of probation. They do have different dates on the orders. I do think they address the same previous First Offender probationary order of the Court.

Was there any objection?

MR. HARDY: No, Your Honor. I think they're in the proper form.

THE COURT: Admitted without objection.

MR. MEARS: Your Honor, we haven't marked Defendant's Exhibit Number 2. I failed to offer that into evidence. And I would offer that. Defendant's Exhibit 2, which is a motion to enter a nol-pros with regard to Gary Lamar Young in the case of 94-CR-330.

THE COURT: And an order thereon?

MR. MEARS: There's no -- there's an order at the bottom of it. It's one page. It appears to be an order at the bottom of that, that motion.

THE COURT: Any objection?

MR. HARDY: That's a nol-pros of charges against Mr. Young, Your Honor.

THE COURT: Yes, sir. Any objection?

MR. HARDY: It's in the proper form, I believe.

THE COURT: I assume that means no objection, Mr. Hardy?

MR. HARDY: No, sir.

THE COURT: Admitted without objection.

MR. MEARS: Mr. Hardy had trouble with no objection.

SHERIFF POWELL: May I approach the Bench, Judge?

THE COURT: Yes, sir.

Gentlemen, are there any -- Do we have all of our witnesses outside? Would it be appropriate to excuse them at this time with the exception of who?

MR. HARDY: Mr. Howard is here. Mr. Newt, I think, is somewhere.

THE COURT: All right. If you would, excuse the remainder of the witnesses until 2:00 P. M. unless you gentlemen have some specific request for someone to remain for any reason.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 138 of 242

MR. MEARS: Your Honor, may Dr. Newt remain in the courtroom during Dr. Howard's testimony? I know we have a rule of sequestration, but these are two experts in their field. At the conclusion of Mr. Howard's, excuse me, Dr. Howard's testimony there may or may not be any reason to put up Mr. Newt. And could he simply stay in the courtroom to assist me in formulating my cross examination of Mr. Howard, excuse me, Dr. Howard. If Dr. Howard, depends on how he testifies there may not be any reason for the necessity to put up Mr. Newt. I'm just asking if he could be allowed to stay in the courtroom.

THE COURT: Any response, gentlemen?

MR. HARDY: If he's going to listen to the testimony and then testify about what he said, I don't think he needs to be in the courtroom.

THE COURT: Gentlemen, I'll allow him to remain in the courtroom. I'll certainly take that into consideration in considering any testimony of his. And after Dr. Howard has finished his testimony, then he may remain in the courtroom and listen to Dr. Newt's testimony in case there is any rebuttal by the State.

Is that satisfactory?

MR. HARDY: Yes, Your Honor.

MR. MEARS: Yes, sir.

THE COURT: All right. Mr. Hardy, as I stated

yesterday, I have reviewed Dr. Howard's, the transcript of Dr. Howard's previous testimony in a hearing several times and I don't know that there's any reason to rehash that particular testimony, unless you need to cover something for purposes of today's testimony.

MR. HARDY: Judge, I don't know if we asked him all the correct questions the last time, Your Honor. If we could please call Dr. Jim Howard.

Can we stipulate that he is an expert in the field of forensic sciences, Mr. Mears? We won't have to go through all that.

MR. MEARS: Yes. Yes, Your Honor. We will stipulate to Dr. Howard's qualifications and expertise in the area of forensic evidence --

MR. HARDY: Ballistics, microanalysis. He's a man of many hats, I think.

MR. MEARS: We would so stipulate, Your Honor.

THE COURT: All right. Expert in what field are ya'll stipulating Dr. Howard to, gentlemen?

MR. HARDY: Forensic sciences, ballistics, microanalysis, shoeprints, hair. I think he even does blood work. He does it all, Judge.

THE COURT: Well, I don't know that all of that is relevant to this particular hearing or trial. Shoeprint?

MR. HARDY: Shoeprint analysis, hair analysis,

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 140 of 242

ballistics, microanalysis, Your Honor. He's --

THE COURT: Gentlemen, does this stipulation apply simply to this hearing, or does this also --

MR. HARDY: Yes, sir. This, this hearing.

THE COURT: -- apply to the trial?

MR. MEARS: Certainly. And I stipulate to Dr. Howard's expertise and his experience and credentials, but in no way waiving our objections to the use of shoeprint identification as falling within the parameters of the Harper standard.

THE COURT: Yes, sir.

Dr. Howard, if you would raise your right hand, please, sir?

Do you solemnly swear or affirm that the evidence you will be giving this Court and the jury at this time in the matter pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

DR. HOWARD: I do.

THE COURT: You may lower your hand.

Mr. Hardy?

DR. JAMES W. HOWARD

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q And you're Jim Howard with the Georgia Crime Lab in

Moultrie, Georgia?

A Yes, sir.

Q In reference to -- I think we've just been talking about the shoeprints. You compared, I think you were given four pairs of shoes?

A Yes, sir.

Q And you have some, two plaster casts?

A Yes, sir.

Q And you had some pictures of some shoeprints?

A Yes.

Q And you made a comparison using the plaster casts, and I think later on the shoeprints --

A The photographs.

Q -- pictures and --

A Yes.

Q -- the four pair of shoes?

A Yes.

Q Mr. Cromartie's shoes, Mr. Lucas' shoes, Mr. Clark's shoes, and Mr. Young's shoes?

A Yes, sir.

Q And you have done that by what method, please, sir?

A Uh, by method of visual comparison. In this case side by side comparison, which is an accepted method in shoeprint comparisons.

Q Any other ways?

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 142 of 242

A Uh, other than visual; no, sir.

Q The comparison performed, was it an accurate and reliable means of ascertaining the identity of the shoe and shoeprints?

A Uh, it, it is an accurate, or as accurate as we can get with our measuring instruments; yes, sir.

Q And have you done it that way before?

A Yes; I have.

Q Is that standard in the scientific community?

A It is the standard along with other methods, of course. But it has been accepted in, in the courts in the state of Georgia and in other states.

Q How long in Georgia?

A Uh, as far as I know, since before I started with the laboratory system in 1974.

Q Has the techniques, has the techniques you used, have they gained general acceptance in the scientific community?

A Yes; they have.

Q And have they been accepted in the scientific community for a number of years?

A Yes; they have.

Q Is that why you use them?

A Yes, sir.

Q Have you talked to other people at conferences or meeting or seminars about such as that?

A Yes. Not necessarily specifically at many conferences, but at several meetings I have discussed the, their techniques with them, and their techniques and our techniques, this being conferences of the Southern Association of Forensic Sciences and our techniques are the same as theirs.

Q Did you bring a book? Did we ask you to bring a book?

A Yes; I did. You asked me to bring a --

Q What's the book?

A -- a book. In this case it's Footwear Impression Evidence by William Bodziac (ph.). And this seems to be the bible in the, in the field currently.

Q Bodziac? Who is he?

A He is a supervisory special agent with the Federal Bureau of Investigation.

Q What is that book titled?

A Footwear Impression Evidence.

Q Have you ever read it?

A Yes; I have.

Q And does he talk about the techniques you use?

A Yes; he does.

Q Are they acceptable to him?

A They are and they are used by him in his everyday lab work.

Q Have you ever met him, or just read, read his book?

A I have not met the gentleman. I have read several

articles and his book and -- but I've not met the gentleman.

Q The techniques you used in this case, were they described by him in his book?

A Yes; they are.

Q And are they techniques that he uses?

A Yes.

MR. HARDY: Your Honor, we want to -- I don't want to take his book away from him, but we'll offer it into evidence for whatever it's worth and have it xeroxed or whatever Mr. Mears wants us to do. He may have seen it or --

MR. MEARS: Well, Your Honor, I think it's a, a, an accepted publication in the field of forensic scientific -- I don't know of any reason it needs to be put into evidence. We certainly don't have any objection to it. But I think the rules say that an expert can rely upon material that is published and generally accepted as authoritative in different fields without it being introduced into evidence. So, I certainly don't have any objection to Dr. Howard referring to it, making reference to it. I concur it is recognized as one part of the authority in this particular area.

THE COURT: All right, sir.

BY MR. HARDY:

Q You'll keep a copy if the Judge wants to see it or the

court record needs to have it xeroxed or whatever, we'll have it.

A If needed; yes, sir.

Q This edition and this copy of this book. Is that correct?

A Yes, sir.

MR. HARDY: We'd offer it but we can just let him keep it. Is that all right with you, Mr. Mears?

MR. MEARS: Yes, sir.

BY MR. HARDY:

Q And the Court can read it or look at it if the Court wants to. You have no problem with that; do you?

A It will be available; yes, sir.

Q Okay. This is the standard treatise on shoe impressions?

A It is one of several; yes, sir.

Q The methods you used, have they, in your opinion, reached a scientific stage of verifiable certainty to rest upon the laws of nature?

A The method, the method and procedures are, are based on the laws of nature in that we are using, uh, as an example, a scientific method, which includes observation, experiment and arrival at facts, if possible. Uh, the scientist, the forensic scientist, I, I would, would venture to say is a finder of fact if possible and he bases his opinion on those facts.

Q Is that what you did in this case?

Case 7:14-cv-00089-MTT Document 18-13 Filed 07/24/14 Page 146 of 242

A That's what I did in this case; yes, sir.

Q And for us lay folks, what did, what did it meant -- what does it mean that the scientific community rests upon the laws of nature?

A I think we are using, uh, science to arrive at facts and that science can include physics, chemistry, mathematics which are based on the laws of nature.

Q Is that what ya'll do, did, or do in the scientific community in reference to this particular field?

A Yes, sir. We do use methods that have been used in, in other fields of science. Forensic science is still relatively young. Its foundations probably go back, oh, a little over a hundred years. And, of course, compared to the other sciences we are an infant.

Q Can you say with verifiable certainty that the tests that you used are accurate, accurate and reliable means of ascertaining the comparison of the shoeprints, the pictures and the plaster casts from the known shoes?

A Well, they, they have been, they have been used now for some years. And, and I think the acceptance in the, the scientific community does give the validity to the reliability of the methods.

Q For what you did?

A For what I did.

Q What did you do exactly? The plaster casts --

Case 7:14-cv-00089-MTT Document 18-13 Filed 07/14/14 Page 147 of 242

A The plaster casts were, uh, were cleaned. They were --
Q Let me show you Number 13 here. Excuse me. Mr. Mears or his folks have seen these. What are these?
A Uh, there's no exhibit number on these yet?
Q 13.
A 13. All right. Exhibit 13 --
Q What's this box contain?
A -- is a box which contains two plaster casts, one of a left shoe impression and the other of a right shoe impression.
Q These are casts used in your analysis?
A These are the casts used in part in the analysis.
Q You also had, I think, four pair of shoes?
A There were four pair of shoes submitted.
Q You brought them to court too?
A Yes.
Q Excuse me. These boxes, did you bring them to court?
A Yes; I did.
Q Do they contain the four pair of shoes we're talking about?
A Yes, sir.
Q And also, I think, the pictures that you looked at?
A And, and the photographs that were also submitted.
Q These are the shoes you used in that comparison you just referred to?
A Yes, sir.

Q Did you also let Mr. Newt do the same thing?

A Yes. Dale was afforded the opportunity and he did do a comparison on the, uh, the plaster casts and the submitted shoes from Mr. Cromartie.

Q Did he do any tests that you didn't do?

MR. MEARS: Your Honor, I'm going to object. I'm going to object to the question. He can only testify as to what was done in his presence, unless he knows.

A I, I do know. Yes, he did make an overlay --

THE COURT: Overruled.

A -- which I did not. An overlay being a copy of the known shoe outsole. I did not do that in my comparison.

BY MR. HARDY:

Q Did you get a determination of the shoe size?

A Uh, from the cast?

Q Yes, sir.

A Not an exact shoe size. Just a, a relative shoe size. And they were of the same dimensions as the outsole dimensions on Mr. Cromartie's shoes.

Q Tread?

A Yes.

Q What'd you do on the tread?

A That was also similar.

Q And then just for the record, what is the opinion that the scientific community will give under those circumstances with

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 149 of 242

shoes, hair, et cetera?

A You can, you can arrive at a, at, at a degree of probability. A quantitative probability is not quoted. But that the probability exists that the known shoes of Mr. Cromartie could have made that impression.

Q That is the scientific terminology that you would use if you were to testify?

A Yes, sir.

Q You don't say beyond a reasonable doubt that these are the same thing you say --

A I, I cannot say that this is the only pair of shoes that made that impression.

Q That's just the scientific community's way of saying that?

A Yes, sir.

Q Is that what you would say if you were to testify?

A Correct.

Q And you would not be allowed to say, in my opinion these are his shoes, made this shoeprint?

A Not, not from the facts that I have.

Q One other thing. You say they look like they're the same?

A They, they are similar in appearance, and I could not eliminate them, which is the other alternative.

Q Could you eliminate the other three pairs?

Case 7:14-cv-00089-MTT Document 18-13 Filed 07/24/14 Page 150 of 242

A I did eliminate the other three pairs; yes.

CROSS EXAMINATION

BY MR. MEARS:

Q Good afternoon, Dr. Howard.

A Good afternoon.

Q Dr. Howard, my questioning -- And I think you understand the purpose of this hearing is to determine whether or not a testimony pursuant to what is commonly called the Harper Standard in Georgia, as to whether or not testimony with regard to this particular procedure and your findings in this particular area can be given as a scientific opinion as --

A I understand. Could you please, just briefly, explain the Harper decision?

Q Yes, sir. And I, I thought that may be the way I would start and I -- If you'd give me that opportunity?

A Yes, sir.

Q You understand that as a forensic scientist the Georgia courts, unlike other courts, the federal courts or other courts, have a somewhat different standard for determining the admissibility of scientific opinion.

MR. MEARS: And if I might be permitted, Your Honor, just to the Harper opinion at 292 Southeastern 2d., 389. It says that, "We hold that it is proper for the trial judge to decide whether the procedure or technique in question has reached a scientific stage of verifiable

certainty, or in the words of Professor Irvin Younger, attorney, whether the procedure rests upon the laws of nature."

Q I would submit as part of my questioning, I'm going to ask you questions about the laws of nature prong of that and the verifiable certainty prong.

A Yes, sir.

Q And if you will permit me, I would address some questions on each of those prongs.

A Go ahead.

Q Now, with, with regard to -- And, please understand, Dr. Howard, my questioning do not go to your expertise as a forensic scientist. It goes to the general nature of this particular procedure. You understand the nature of that?

A I do. Yes; I do.

Q Would you describe how this procedure of identifying foot, shoeprints falls within the laws of nature? Mr. Hardy asked you a question, but how would you describe this particular procedure that you have employed, how does that fit within or use the laws of nature?

A Good question. I, I would answer that by going back to what is a law of nature. I think that is a, a law that perhaps governs and has been arrived at through experimentation, observation and the application of, of theories to explain these laws of nature. A law of nature being something that may explain

why certain things occur the way they do in, in nature. But using the laws of nature, or the techniques that have been, that have been applied to, to try to explain the laws of nature were used in this case. That of observation which includes the comparison of one object to another to ascertain are there similarities, are there differences. And then the, the using of these observations to make conclusions. In this case one that is one of similarity, not, uh, one to one identification, in that these shoes are not identified as having been the only pair that could have made that shoeprint or that impression. But by using these, these techniques I think we are using the laws of nature to arrive at, hopefully what we call facts which is really what we're about. I'm not sure that I can add any more than that to it.

Q Let me ask a couple of questions to perhaps clarify, for my benefit, your response. You indicated that one of the laws of nature that you're applying to this procedure or to this technique involves the ability of the examiner to make visual observations and record those visual observations in some way as to say these patterns are the same, they're similar or they are not similar or not the same?

A Correct.

Q Is that correct?

A Yes, sir.

Q That would be different, would it not, from a more --

that would be different from a law of nature such as certain liquids turn to solids at certain temperatures; would it not?

A That's a certainty; isn't it?

Q That's right. A law of nature --

A That indeed is a law.

Q That water would freeze at a particular temperature given --

A Given certain conditions; right.

Q -- conditions?

A Right.

Q And you could, as a scientist you could verify that if it's water it's going to freeze under the same conditions each time at that temperature; is that correct?

A That's correct.

Q That would be different from the application of the more subjective visual observations that might be made, even by a trained examiner; would it not be?

A Correct.

Q That if a trained observer looks at certain shoeprints and makes those visual subjective determinations, there's no way to verify those findings by an application of the law of nature; isn't that correct?

A Define verify here for me?

Q Okay. Verify would be where you would have blind tests so that if you had, say, two shoeprint identifications and you

did those one hundred times, under the laws of nature if you are applying verifiable certainty, the same observations and the same results should occur each time those one hundred observations are made. Isn't that correct?

A That is correct, and, and should not vary from examiner to examiner.

Q That's correct.

A However, if the same techniques are used, if the same observations are used, and the same, uh, facts arrived at in the case are used, then the observation should lead to the same conclusion.

Q Is there any way to systematically verify that particular premise when it comes to the comparison of a shoeprint with, say, a shoe outer sole?

A To verify?

Q For example --

A To, to -- Go on. Go on.

Q If an examiner in Moultrie, Georgia makes an observation with regard to a determination that this shoeprint is similar to a known shoe sole, and the same examiner with the Canadian Royal Mounted Police looks at the same shoeprint and the same outer sole, is there a way to verify which one of those observations, should they differ, is correct and which one is false?

A There should be by the -- I, I would think that in this

case we would want a third opinion to verify which one of those may be correct.

Q Okay. Isn't it true, Dr. Howard, that in the field of forensic science that blind testing and peer review of testing is one method of determining whether or not a particular procedure is, has verifiable certainty?

A Yes. Yes.

Q Is there any study, to your knowledge, that would show that blind testing and peer review of test results have been done in the area of shoeprints?

A I'm not aware of one.

Q And you -- As many as --

A Even though the procedures of blind testing and peer review are employed in the, the Georgia lab system.

Q Granted. And, but as far as the general accepted scientific procedure that we're talking about, you know of no, of no peer review testing or blind testing of, say, a cross section of footprint identification in the United States? That has not been done; has it?

A I'm not aware that there has been a total peer review of examiners. It, it is a, if, if I'm not too far off the mark, a voluntary type of endeavor with the testing of, of all procedures, whether it be firearms or shoeprints or whatever.

Q By a --

A Or a matter of self-testing.

Q Right. But am I not correct in saying that that type of peer review, reviewal, it's been a long morning, --

A Review.

Q That type of peer review is done on a regular basis within the forensic laboratory across the United States to verify that you're using the proper procedure? That's what got the F. B. I. into recent trouble with -- there was some question about whether they were using proper techniques. That's correct? That's what you're referring to?

A Right. Right.

Q With regard to any studies or analyses based upon peer review articles and studies and, you know, things of that nature, there have been -- there has been nothing done yet in the area of shoeprint identification?

A I don't think there has been in shoeprints. I know there have been in several other endeavors, but --

Q But not in shoeprints?

A I don't think so.

Q Would you agree with me that Mr. Bodziac's book, while it talks about the methods used and things of that nature, it doesn't discuss the scientific basis for shoeprint examination nor the methods for verifying for forensic science procedures in this particular area? The book doesn't go into that?

A No; it does not. I believe he leaves that to other publications.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 157 of 242

Q Right. And, and basically there has been no, like we said back, because at this point in the development you said it was a rather infant science at this point --

A On, on forensic.

Q Forensic science.

A Yes. I believe it still is. I think we're, we're still learning, we're still growing, encompassing, using new methods as they become available.

Q Would you agree that, just for the sake of our discussion here, that laws of nature would be used to create identifiable patterns of recurrence of activity or events? That would be one of the attributes of a law of nature?

A I agree with that; yes.

Q And would you also agree that a law of nature provides a basis for a credible statement of cause and effect?

A Yes.

Q Water freezes at a certain --

A Yes. Yes. Of course, we're, we're using observation in, in the application of these laws. We're using experimentation in the application of these laws. And these are, are scientific procedures that are used in shoeprint comparisons.

Q And, and, but using those powers of observation and applying as perhaps Harper indicated it should be applied, a basis for a credible statement of cause and effect, you'd have to take into consideration not only the shoeprint and the

observations made of a plaster cast but the conditions and methods surrounding which the plaster cast was made as well? Would you agree with that?

A All of the variables, of course.

Q Which would include a, a test and a verification of the soil types in which the shoeprint was made? Would you agree with that?

A Explain that.

Q Different impression depths, widths, different types of impressions would be made in sand as opposed to clay.

A As opposed to clay; yes.

Q And loamus and other types of soil?

A The, the amount of class characteristics, the amount of identifiable characteristics can be governed by the soil type; very certainly.

Q And at this point in the use of shoeprint identification, at least in Georgia, there is no procedure in place whereby you test the soil or have testing done as to the variabilities of the types of print, size, width, that sort of thing, that could or could not be made in types of soil; is that correct?

A In types of soil. This would be a matter of training of the, of the examiner and, and what he has observed in his, uh, in his own experimentation. It is a recognized part of training procedures. But as applied to each case received; no.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 159 of 242

Q Okay. It goes back to the basic subject -- And I don't mean to denigrate this in any way, but it goes back to the basic subjective nature of making comparisons of a shoeprint and a shoe sole?

A Yes; it does. And, and we can't take the subjectivity out of shoeprint comparisons. We, we can't take the subjectivity out of hair comparisons or, or even firearms examinations or tool marks. That's why we do it.

Q One other issue with regard to the laws of nature. Would you agree that as applicable to a law of nature, a theory applying a law of nature could be proved false, if, in fact, it were false, or true, if it were true? The fact that water freezes --

Q We're getting back to the application of the scientific method or, or whatever you want to do.

Q Yes, sir. Right. I'm just trying to close out, at least my understanding, of Harper as it applies to the law of nature requirement under that. If a theory that is, that involved a law of nature, that theory, if it were false, could be, should be, could -- I'm sorry, Mr. Court Reporter.

A If, if you apply the laws of nature to that, it should be shown to be false at one point or another.

Q Thank you, Doctor. That's what I --

A I agree with that.

Q Okay. Now, with regard to the verifiable certainty

prong of Harper as I at least read it here today, would you agree that in order for a scientific procedure to have verifiable certainty, the procedure must have some type of error analysis applied to it, to determine whether or not errors can be made, and, if so, to what degree are those errors and how frequently those errors could --

A I agree with that; yes.

Q Now, let me go back to the soil sample. What error of analysis would have to be dealt with under verifiable certainty requirements? You would have to know what the soil sample was like in which the shoeprint was made, and whether or not -- the consistency of the soil, things of that nature? Would you agree with that?

A Yes; I would. I think we're getting into an area of not necessarily needing to be experimented with in each case, but depending on the experience of the examiner taking those factors into account in his opinion.

Q Would you agree that the variability of shoe outsoles, this tread designs, things of that nature, would have to be calculated as far as error analysis? As far as -- In other words, you've got to be able to verify that a particular shoeprint in the soil shows the same type of tread mark or characteristic of a particular shoe that you're looking at? Would you agree with that?

A Partly. We can't, I don't believe, put a quantitative

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/24/14 Page 161 of 242

factor on what you're referring to.

Q Let me ask you, and I don't mean to cut you off, but let me ask you with regard to that, Dr. Howard. Is there some method built into the procedures that you use to determine whether or not an outsole on a particular type of shoe relates consistently to the size of the upper portion of the shoe?

A Rephrase that a little bit.

Q Are, are you familiar with the manufacturing process that's used? Now, I'm specifically speaking about sports shoes. Are you aware of the manufacturing procedure whereby some manufacturers use a variable outsole size of 9, 9 1/2 or 10, using that as an example, of three different half sizes of an outsole on one upper --

A On the same upper --

Q -- upper side.

A I am aware that that does occur.

Q So that simply saying that an outsole measures to some degree of certainty to a size 10 shoe, assuming that you've taken into consideration soil, characteristics, things of that nature, that doesn't necessarily mean, would it, that the upper portion of the shoe would be the same size?

A Well, apparently not if, if we're assuming the procedure is used to match several different uppers to the outsole.

Q And I'm asking you --

A But we're not, we're not taking into consideration the uppers in our comparison procedure. We're only basing our opinion on what we are provided with in the impression or the print and we're comparing that to only the outsole.

MR. MEARS: Just one moment. Just one moment, Dr. Howard.

Q I'm going to use the shoes that were used in your analysis. Not -- This has -- This is not to determine whether or not your tests were correct or not. Just for explanatory purposes.

THE COURT: Mr. Mears, while you're recovering the shoes, let me ask a question.

Dr. Howard, let me ask you, in your prior testimony, it sounded like what you have done in this particular case was visually compare the plaster cast with the shoe; is that correct?

A That's correct.

THE COURT: All right, sir. Have you -- You came to a conclusion about similarity. You did not, did not exclude --

A Did not exclude nor did I --

THE COURT: It's not an identifiable --

A -- conclude as the one and only shoe.

THE COURT: I guess my question really comes down to whether or not you used any, anything more than your mere

visual observation? Did you use any data or analysis other than what one of the police officers may have used in comparing the plaster to the shoes? Did you do anything --

A Well, of course, measuring devices. In this case a twelve inch rule to arrive at similarities in length and width. But still not taking into account outside observations or outside data.

THE COURT: Thank you.

BY MR. MEARS:

Q Just using this --

A Yes, sir.

Q -- using this, is an Adidas shoe. I believe it's one you tested. And the sizes, or at least on the tab, it has, "U. S. at 10 1/2, Great Britain, 10"? That's what --

A Right. Yes, sir.

Q What I'm by asking -- trying to explain my question, I guess, is that are you aware of the technique that some manufacturers will use an upper 10 1/2 and then the same sole would be, would fit a 10, 10 1/2 or 11 size shoe? In other words, use the same sole and different size uppers?

A I'm, I'm not personally aware of that. But, it, to my knowledge, can happen. And we even get in, in, I think some statistical studies of shoe sizes and outsole lengths and so forth, shoe sizes in, say, the, a size 10. The actual length of the outsole can vary to a certain degree; yes. Yes.

Q So, when you measure any shoe, known shoe, such as this, and you determine that that shoe has a certain width, a certain length, then that, that doesn't necessarily mean that the upper portion of the shoe would corresponding to that in size, I guess is what I'm saying, because manufacturers use different outsoles --

A Right. Right.

Q Okay.

A Yes, sir.

Q Would you agree that the verifiable certainty requirement in a scientific method would also require that there be some type of technique to measure the variability? In other words, a margin of error would have to be established. And so, if you were to make an overlay, for example, over a pair of shoes and measure the overlay with the shoeprint in the soil, would it not be true that in order to have verifiable certainty you would have to be able to come to the same measurement each and every time within a very minimal margin of error?

A From a definable margin of error.

Q Yes, sir.

A I would agree with that. However, in the many variables that we encounter in the making of the impression at, at the site or the scene and the collection of that impression, for instance, in photography or, or casting, and the making of test impressions or, or overlays or, or whatever methods we are

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/24/14 Page 165 of 242

employing, there, there is a margin of, I'm not sure it's error, but a margin of variance that I don't believe we can really quantify.

Q And, and with regard to shoe ident -- shoeprint identification; is that correct?

A Correct. However, as part of the procedure and, and we can go back in this case to perhaps comparing this procedure to the procedure of fingerprint identification, there is a point at which, if there are enough variables, and, and we could call these accidental marks or scratches or gouges or, or whatever, we can arrive at an identification of a shoeprint having been made by a specific shoe.

Q That's not the case here?

A But that's not the case here.

Q And absent any minutia characteristics that you can identify with scientific certainty, the visual observation and measurement of, well, the measurement of the shoeprint, would require some form of variability of measurement technique in order to meet the verifiable certainty standard under Harper; would you agree?

A I, I think I would have to agree with that. Being if you're, you're applying absolute certainty to a procedure. We are, uh, were using in this case methods that can arrive at a certainty, but then with other variables factored in we have to, uh, subject our opinion to our experience, what we have to work

with and so forth. And I'm not sure that -- And this goes back to the point of the law perhaps, that, that we can be absolutely verifiable that there is, uh, either an exclusion or an inclusion, and because of these factors we, uh, I think we apply our subjectivity to other opinions here.

Q And as a scientist, as a scientist you do not want to give an opinion that's based solely on a subjective observation that can't be measured or quantified and then verified. Would that be a fair statement?

A Yes.

Q Okay. Now, those were, I guess, primarily attributes of verifiable certainty, using the verifiable part of it. Would you agree that the certainty part of verifiable certainty, and I apologize for being such a layman in this area, but if you're saying that something is verifiably certain, to be certain would you agree that the procedure must have some type of articulated evaluation criteria within the scientific community in order to --

A It must be, it must be that way.

Q Okay. And that goes back to peer review, blind tests and things of that nature?

A Correct. Correct.

Q Would you also agree that the, in order to be certain under the verifiable prong of that, that it must have articulated evaluation criteria in order for it to be objective, even within

the realm of subjective observations? In other words, there's got to be some way to evaluate what a particular scientist may do on each individual evaluation?

A Correct. I know of no variance from that in, in the field of peer review and so forth. There must be procedures set up to govern the criteria for, for what you're doing.

Q And that's the, really the crux of the scientific community's credibility when giving opinions, is that everyone must assume that the scientist's opinion has been subjected to an articulated evaluation by peer review, data collection, data analysis and that sort of thing? Wouldn't you agree?

A I agree. And, and as part of that would be the, the certainty that he has followed the procedures set forth in the scientific community.

Q With regard to -- And, thank you for that. I think that that are the questions I have with regard to the certainty aspect. But let me ask you, with regard to shoe analysis, shoeprint analysis, do you know whether or not there's any body of knowledge or data that would reflect the numbers of possible shoes that might fit a particular shoe pattern? Do you know of a data base, like the F. B. I.'s fingerprint data base of known fingerprints and things of that nature? Do you know of anything like that?

A An accessible data base?

Q Yes, sir.

A I have not used one before. I'm not sure. It, it could exist. I, I have not used it. I know that there are statistics that are available for the, the number of shoes or pattern outsoles that are made by the different manufacturers.

Q And, and that's exactly my point. I've asked you to look, and this is simply -- you were dealing with Adidas shoes. This is, Your Honor, for simply demonstrative purposes, this is the Adidas 1997 catalog. And the shoeprint, the shoes that you've identified, I think, there's a Pro model Adidas and a Super --

MR. HARDY: You said it's what now?

MR. MEARS: It's -- I'm sorry. I didn't show this to -- I'm sorry.

MR. HARDY: What addition?

MR. MEARS: The Adidas catalog showing --

MR. HARDY: What's the '97 catalog got to do with '94 shoes?

MR. MEARS: They made the same shoes from 1989 until 1997 with the patterns on them. I'm simply using it for instructive purposes to illustrate a point. I'm not, I'm not saying that this shoe is in that catalog. Okay.

Q Looking at this catalog, Dr. Howard, would that enable you as a, someone making observations in this particular area, would it be necessary to have some knowledge as to the number of different style shoes that may have the same tread design?

THE COURT: Mr. Mears, are you speaking of, in the sense of making a firm conclusion as to identity, or in an exclusionary process?

MR. MEARS: Making identification and exclusionary. For that reason, Your Honor, if I could use this shoe here that, and this is simply for explanation of my question.

Q The one with the -- this one here. Super Pro Model with the three lines.

A The Super Star or in this case --

Q Super Pro --

A The Super Pro Models. It has the high back.

Q Right. Would you look and see what type of soles are used on the high back Pro Model and the type of soles that are used on the low cut Super, what is it?

A That's called the Super Star there.

Q Can you tell from looking at that whether or not there are two different shoes that use the same tread, same sole?

A They, they look similar here.

Q If you would read the annotation that goes under each one of those? I think it gives the tread, the tread mark. Where it says, midsole, outsole.

A Outsole. One mentions -- All right. They're both of dye cut manufacturer on the midsole. Rubber coat sole with herringbone profile on the Pro Model, and the rubber outsole with herringbone profile on the Super Star. In terms of the actual

pattern, they appear to be the same.

Q The herringbone is a traditional pattern that's used in shoe manufacturing; is it not? Well, can you look at that and see just by making a visual observation? Does it appear that the herringbone model that's shown in the Super Pro Model is the same that's used in the other model?

A It appears to be the same.

Q It appears that the shoe manufacturers are selling us the same, the same sole with just different tops and different names; would it not?

A Well, this is customary. One manufacturer may have several different shoe models with the same sole pattern.

Q Okay. That, that would be important in making the determination as far as exclusionary shoes, the number of shoes that could be excluded from a particular print?

A Possibly; yes.

Q Just assume for my question that if there were, between 1989 and 1994, there were eight hundred and twenty thousand six hundred and fifty (820,650) pairs of the Pro Model shoes made in the United States --

A Um-hum (affirmative).

Q -- and during that same period of time there were one million three hundred and eighty-seven thousand four hundred and twenty-four (1,387,424) pairs of the Pro Model made in the United States --

A You mean of the Super Star?

Q Yes. Pro Model and Super Star.

A Okay.

Q So that you would have approximately, you know, over two and a half million (2,500,000) shoes with the same tread design. That would be important to consider in developing any data base to make comparisons and things like that; would you agree?

A It could be.

MR. MEARS: Just one moment, Dr. Howard.

I believe I'm through, Dr. Howard. Let me check with Dr. Newt to make sure.

Excuse me one moment, Your Honor.

Q Now, Dr. Howard, I understand that your laboratory, as other forensic laboratories in Georgia, undergo a periodic peer review of your procedures and things so that you maintain the standards that are required to be certified and to do scientific work. But within the area of shoeprint comparison, is there any procedures in place to verify under the standard that we've talked about, verifiable certainty, observations and identifications that are made, both exclusionary and inclusionary, with regard to shoeprints?

A Within the lab system?

Q Yes, sir.

A There, there is no current case review currently in the

Georgia system. However, we do go through the blind testing procedures. And to my knowledge, there have not been any insufficiencies in that regard.

Q And those blind testing procedures cover all the areas? Hair comparisons, fingerprints --

A Hair comparisons --

Q -- everything?

A -- shoeprints, firearms.

Q And those are done internally for the purposes of maintaining standards --

A Internally and externally in that we apply external testing to our scientists.

Q Okay. But, once again, there's been no, in the scientific community there's been no peer review articles that, where tests have been performed in a controlled environment so that those test results can be examined and submitted to peer review with regard to shoeprint identification; is that correct?

A I'm not aware of any.

THE COURT: You're speaking whether or not, you're speaking whether or not -- not whether or not it's been done but whether or not there are any articles about it? Is that what you're asking?

MR. MEARS: That's correct, Your Honor.

Q And let me ask you this. Is it not customary within the scientific community to publish peer articles and results of

tests and that sort of thing and submit them to peer review for the purpose of maintaining standards within the scientific community? That's not -- That's one of the ways that you do it?

A This is one of the ways that we more or less check ourselves.

Q All right. And with regard to shoeprint identification, that, you haven't reached that stage yet; is that correct?

A Correct.

MR. MEARS: Okay. I don't have any further questions, Dr. Howard. I appreciate your patience very much.

THE COURT: Mr. Hardy?

MR. HARDY: No other questions, Your Honor.

MR. MEARS: Your Honor, we at this point will submit the issue to the Court. I think that we've put about as much as we could put before the Court through Dr. Howard regarding this issue.

THE COURT: Thank you, sir.

MR. HARDY: He's needs to go to court in Cairo, Judge. He's got to testify in another case over there about right now.

THE COURT: Okay. Thank you, sir.

MR. MEARS: Your Honor, insofar as our --

THE COURT: Dr. Howard, let me just ask you a couple of quick questions before you get away from us. And I guess

it's going to be some of the same stuff that you've been asked. I'm trying to do it a little bit more directly.

And that is, and I think you've already asked -- been asked and answered this. Can you tell me whether or not in your opinion this particular procedure that you used for shoeprint comparison, in your opinion, has reached a state of verifiable certainty? I'm talking about the procedure that you used to make your comparison.

A In other words, do, do I believe the procedure I'm using is correct to the point that it can be verifiable and, and be certain in the results each time? I think that's what you're asking. The, the opinion of a hundred examiners should be the same if there were verifiably certain. And in terms of the possibility or probability, that opinion could vary from scientist to scientist.

THE COURT: Dr. Howard, you understand that DNA analysis, the opinions of persons who analyze DNA are not always the same?

A Correct.

THE COURT: DNA analysis has been held to satisfy, that particular procedure, those tests have been held to satisfy those particular legal criteria regarding admissibility?

A Yes, sir. Yes, sir.

THE COURT: As have other tests. I don't think, I don't think it's a correct characterization --

A That area of opinion --

THE COURT: I don't think it's a correct characterization that there can be no variance of opinion --

A In, in a verifiable --

THE COURT: -- as a result of following -- Not in a legal interpretation --

A You, you asked me if it were my opinion. And, and I would say yes in that we're following procedures that are used and would be used by another expert. We are arriving at facts based on that, on those observations and procedures. And, and in the application of peer review and blind testing we are attempting to fulfill the spirit of the law here, I believe.

THE COURT: All right, sir. I guess that follows up to another question in regards to blind testing both within and without particular agencies you've worked for as to the reliability of the procedure followed in establishing with sufficient certainty and reliability -- I may be asking the same question in another way.

A I think because we have arrived at procedures that we use now, and it's been one of trial and error, that the certainty aspects of the procedure are accepted. And, again, this would depend on the laboratory and the expertise of the, of the examiner.

THE COURT: You understand my interpretation, be it right or wrong, my interpretation is the test looks at the

procedure. It doesn't look at whether or not everyone who goes through this particular procedure when analyzing DNA, shoeprints, hair, fingerprints, et cetera, it doesn't mean that they've all got, got to ultimately form the exact same conclusion. That's not the test, in my opinion. The test is whether or not the procedure has reached a state of verifiable certainty and whether or not the procedure you followed can give results with some reasonable certainty.

A I believe that it can.

MR. MEARS: Your Honor, may I ask a question based on the Court's --

THE COURT: Yes, sir.

MR. MEARS: And I don't --

THE COURT: Yes, sir.

BY MR. MEARS:

Q You said that the procedure that you used. What about the verifiable part of that prong, Dr. Howard?

A The, the verifiable part in, in terms of peer review and blind testing --

Q And taking into consideration --

THE COURT: Mr. Mears, are you speaking of verifying the accuracy of the procedure?

MR. MEARS: Yes, sir.

THE COURT: Is that correct?

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/24/14 Page 177 of 242

MR. MEARS: Yes, sir. Not, not verifying the accuracy of the --

THE COURT: The ultimate opinion --

MR. MEARS: -- the ultimate results; no. Verifying the accuracy of the procedure. And my questions, that I understood earlier, that there's been no peer review analysis, there's been no data collected, been no tests to satisfy that particular prong of Harper.

THE COURT: I understand --

A However, he asked my opinion and, and that's what I'm giving.

MR. MEARS: No. And understand I'm not arguing, Judge, and I'm certainly --

THE COURT: I know there was testimony that there have been, you know, blind tests done in regards to this both inside and outside the agency. To what extent, from your knowledge, to what extent have these blind tests been done? And I'm speaking geographically, numerically? How long has this been carried on?

A I can only speak for our system, Your Honor. And we do undergo a yearly proficiency testing procedure. And included in that procedure are shoeprint and tireprint proficiency tests. Personally I, I have had two in the last eighteen months.

THE COURT: Who outside of the agency does the blind tests?

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 178 of 242

A There is a testing organization that provides these outside tests to the forensic community.

THE COURT: Specifically in shoeprint comparisons?

A As part of their testing procedure.

THE COURT: Are they a national organization --

A Yes; they are.

THE COURT: -- that provides this throughout the country?

A Yes; they are.

THE COURT: Are they international?

A They are the international -- I'm, I'm not sure.

MR. BRYANT: I'm sorry. I couldn't hear what you said.

A The --

THE COURT: Is the ASC, whatever? Do you recall the name of the organization?

A The -- I can't remember their name now. It escapes me. I know it's a national testing procedure. Whether it's international, I, I don't think so.

THE COURT: Do you know whether or not they, they do this blind testing for other agencies, persons, organizations in regards to shoeprint comparisons?

A I believe they do. They provide this service and it is a voluntary testing procedure that agencies can subscribe to.

THE COURT: Do you have any idea how long blind testing procedures have gone on in Georgia in shoeprint

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 179 of 242

comparison?

A I do not know that.

MR. MEARS: Could I ask another question with regard to hair comparison?

A Yes.

Q Would you place the procedures and techniques that are currently in place in using identification procedures for shoeprints the same level of verifiable certainty as hair comparisons?

A The same level?

Q Yes, sir.

A Let, let me answer it this way. There is, there is a, there's more subjectivity to hair comparison procedures than, than shoeprint comparisons.

Q Would you --

A Almost totally subjective.

Q Almost totally subjective. And absent any of the other variable, be it the measurement variables, those type of quantitative factors that you plug in, shoeprint is almost all subjective too; isn't it?

A No. I, I don't believe so. In my opinion, it's not almost totally objective. I think there are --

Q What, what --

A You mean subjective?

Q Right.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/24/14 Page 180 of 242

A There is some objectivity to it, more so than in hair comparison.

Q All right. What objective criteria apply under the verifiable certainty standard and the laws of nature standard that's required in Harper?

A Certainly, we want to -- and here we're talking --

THE COURT: I'm not absolutely sure he understands what Harper requires.

MR. MEARS: I'll be glad to let him look at the opinion, the laws of nature and verifiable certainty standard.

Q Do you want to look at the Harper --

A I, I almost get the impression here that, that this, that the application of Harper gives us no leeway. But apparently it does.

THE COURT: You're speaking of no leeway insofar as whether or not the ultimate results of the --

A Exactly. Right. Right.

THE COURT: -- facts can handle the variations --

A But apparently that's not true.

THE COURT: That is not correct.

MR. MEARS: Here. It's been delineated right there, at least that portion.

A I think what catches my eye here is that the procedure rests upon the laws of nature. And I'm not sure that shoeprint

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/24/14 Page 181 of 242

comparisons are to the point of fingerprint comparisons in that case. We, we have more variables, I believe, than, than are present in fingerprint comparisons. Yet we are still using the laws of nature for our procedures.

Q You're familiar that the federal courts use --

A Am I misinterpreting this particular --

Q Dr. Howard, you understand that there's, Georgia has a standard in this particular area that's different from a great number of jurisdictions. It's different from the federal standard which now applies the so-called Dolbert (ph.) standard. And the Georgia standard, based upon the Harper test, the Harper case is different from a great many other jurisdictions.

A How, how does this differ --

THE COURT: Let me just give you a little bit more information in regards to Harper.

A I, I am familiar with the Dolbert (ph.) case --

THE COURT: Mr. Hardy, Mr. Mears, if you think I'm misstating it, let me know. Basically, the test for admissibility opinion on a questioned principle, scientific principle, is whether or not, whatever word you use, whether it be test, technique or procedure, has reached a state of verifiable certainty. That is, whether it rests upon the laws of nature. And whether the reliability of the test has been established with sufficient certainty to make that particular test or test results admissible in

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 182 of 242

evidence during any particular court proceeding. Now, they say the court in deciding whether or not the procedure has reached that stage can consider evidence presented by the parties, expert testimony of the reliability and verifiable certainty of that particular procedure, exhibits, treatises.

A Exactly.

THE COURT: Rationale cases from other jurisdictions concerning that particular procedure, and whether the procedure has been recognized by a substantial number of courts, I mean, the procedure has been recognized by a substantial number of courts, then the court can take judicial notice of that procedure meeting those tests without having to hear any evidence on that particular matter.

A How does this --

THE COURT: And the scientific community consensus, that is, you know, the consensus --

A The, the application of the --

THE COURT: -- that is, the consensus themselves is not sufficient, that alone --

A All right. Isn't that part of the Dolbert's (ph.) decision --

THE COURT: That's part of the consideration, but that alone is not sufficient --

A Alone. Which was the old standard.

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 183 of 242

MR. MEARS: The Frye standard you're referring to.

A The Frye standard. Now, how does --

THE COURT: Of course, you know, in this case all we've talking about right now is whether or not -- I mean, Dr. Howard will be allowed to testify and give his opinion. It's a question right now of whether or not he'll do it as an expert or a lay person. If there's sufficient --

MR. MEARS: The magic question, can you to a reasonable degree of scientific certainty, is the magic question here as I understand the issue, Your Honor, is that if it doesn't, the procedure doesn't meet the Harper test now here in Georgia at this particular time, then an opinion as to a --

THE COURT: If Harper applies?

MR. MEARS: If Harper applies. He can't -- The question cannot be posed in such a way as to apply a reasonable degree of scientific certainty under Harper. Now, certainly, I think, over my objection, the shoeprint testimony will come in as to observations, comparisons and things like that. But to subject it to a, an opinion based upon a reasonable degree of scientific certainty as applied to the Harper standard, which includes the law of nature, which is not a part of the Dolbert (ph.) test.

A And that --

THE COURT: You're speaking of that these treads are

similar to a reasonable degree of certainty?

MR. MEARS: That's what I think shouldn't happen, Judge.

THE COURT: All right, sir. I could give you an example of some things that our appellate courts have held that Harper applies to and probably something as close to this as you're going to get. I think -- I've been informed there's a case in the Supreme Court at this time that hopefully will address whether or not hair analysis is or is not subject to Harper.

MR. MEARS: It's one of Ms. Santa Maria's cases. It's the Pace case that Ms. Santa Maria testified in.

THE COURT: An analysis of fibers has been held to be subject to. It's about as close as hair analysis to this.

A Well, there's, there's not as much subjectivity in fiber analysis as there is in hair analysis.

MR. MEARS: Judge, I don't think I have anything --

A I think I understand now the difference between the Harper and the Dolbert (ph.).

MR. MEARS: Thank you, Mr. Howard, Dr. Howard.

THE COURT: Thank you, sir.

DR. HOWARD: I hope we didn't muddy it too bad.

THE COURT: No, sir.

MR. MEARS: Your Honor, as Mr. Hardy wants to say on

occasion, I'll leave it with the Court.

THE COURT: All right, sir.

MR. HARDY: Mr. Howard is going to Grady County, Your Honor, and he'll be back over here once he gets through in Grady County, I think. If we could let him go on back to Moultrie, or check back with --

THE COURT: Gentlemen, let me, let me ask ya'll this question. That's fine. Let me ask ya'll this question.

MR. HARDY: Excuse me?

THE COURT: The expert testimony is admissible when it's the subject matter that's, or the conclusion addresses subject matter beyond the ken of the average juror; correct?

MR. HARDY: Not always. Lay people can give opinions as to whether somebody is crazy or not. They're asked all the time whether they --

THE COURT: Well, lay persons can give their opinion of whether -- there are cases and cases and cases of lay persons giving their opinion of whether or not a shoeprint left in mud or dirt or sand or otherwise is similar to a tread on a boot or a shoe or otherwise; correct?

MR. HARDY: Yes, sir.

THE COURT: Expert opinion is admissible when a conclusion is beyond the ken of the average juror; correct?

MR. HARDY: Yes, sir. But still the lay people can be

Case 7:14-cv-00089-MTT Document 18-13 Filed 07/24/14 Page 186 of 242

asked their opinion of whether they think somebody has suffered from delusional compulsion, know the difference between right and wrong all the time.

THE COURT: That's not what I'm talking about.

MR. MEARS: Your Honor, I understand --

THE COURT: What, what is the difference in, in -- if you want to qualify Dr. Howard as an expert in shoeprint comparison and from what I've heard he's going to -- I also anticipate you're going to put up some other witnesses who are going to testify in regards to their opinion of this plaster cast and these shoes, whether or not they are similar; is that correct?

MR. HARDY: Yes, Your Honor. I'll ask them whether they look similar or not, to look at all four pair of shoes.

THE COURT: And what have -- What has the lay person done differently to form that conclusion than what Dr. Howard has done? I mean, he's testified --

MR. HARDY: He said he measured it, I think, Judge.

THE COURT: It's something a lay person can do -- if a ruler is laying down beside the, beside the photograph of the shoeprints, what have they done differently? What has Dr. Howard done in addition to what these lay persons have done to reach that conclusion?

MR. HARDY: From what he's testified, about the same. I don't there's a ruler in these pictures, Judge. But they

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/24/14 Page 187 of 242

could -- if you gave them a ruler, I reckon they could go do whatever they wanted to do. Taken all four shoes in totality --

MR. MEARS: Judge, if I could -- And one thing that I think that the Court has already touched upon is, I believe, is that when you allow a scientific opinion, and I'm going to read from the notes that we've made, you're requiring the jury to make a decision about the value of expert evidence without the jury having any indication of the weight they should assign to that. But when an expert gets up and testifies you're going, you're probably going to give a charge about how they can deal with expert opinion which is different from other. And Mr. Hardy can argue if it's an expert opinion differently than he could if it were a lay opinion.

THE COURT: Give a charge at the conclusion of the case.

MR. MEARS: That's correct. And I, and I think that it's certainly not predisposing what charges you will or won't give. But I assume that that will be the question. That's the difference here. I certainly think that under Georgia law, whether I agree with it or not, lay people can give opinions as to different subjects as long as a foundation has been laid and -- they can give an opinion. In condemnation cases gravel pit operators can give opinions

about the quality of soil that can be on land without being an expert in, you know, hydrophysics. The difference is how the Court asks the jurors, or tell the jurors how they can apply that evidence and how it can be argued. In this case I just don't --

THE COURT: I'll tell them they can measure that witness'credibility just like every other witness and give it what weight they determine it's entitled to.

MR. MEARS: But when a scientist gives that opinion, it's like DNA now, and DNA, I think, is different, Judge, but now if you mention -- a scientist gets up there and says it's DNA, jurors take that as gospel because they've heard so much about it. If an expert gets up and gives an opinion without proper weight being assessed to it, and without it being within the Harper test, I think it would be inappropriate. We'd ask the Court to exclude scientific opinions with regard to the comparison shoeprint in this particular case.

THE COURT: Thank you, sir.

Gentlemen, let's go to lunch. Be back at five minutes until 2:00 and I'll give you a ruling and then we'll resume the trial.

(Whereupon the Court is recessed for lunch, and upon reconvening at approximately 2:00 P. M. the following transpired outside of the jury's presence)

THE COURT: Gentlemen, at this time based upon, at this time based upon a hearing that was conducted in this particular matter on January the 6th, 1997, and also taking into consideration the matters that the Court's heard today, first, I really don't see a lot of the case law dealing with the subject matter of the Harper test, et cetera, to use this terminology novel or new scientific test procedure, technique. I honestly do not see shoeprint comparison as I have had it related to me by Dr. Howard on these two particular dates as a new or novel scientific procedure or test or technique. It seems hardly to be the type of scientific procedure that Harper applies to. In my opinion, Harper is not applicable to this particular subject matter.

And taking it further, if, in fact, shoeprint comparison evidence is deemed to be subject to the Harper test, again based upon the testimony from January the 6th of this year and the testimony today, I do find that the procedure, not of the results, that is the opinion of the examiners, but the procedure used as testified to by Dr. Howard to compare shoeprint with known shoes has reached a stage of verifiable certainty as that term is applied to this particular subject matter. I don't think that we have to find that the procedure is inclusionary as opposed to exclusionary procedure, or at least the results are inclusionary as opposed to exclusionary, nor do we have to

find that it's invalid, so to speak, or that opinions based upon those procedures cannot vary among the experts.

I also find based upon the testimony and the other information considered that the procedure is an accurate, reliable method of comparison. And further, if there was an established protocol for Dr. Howard to follow in the procedure that he performed, that he did, in fact, follow the established method and protocol in making a comparison of the subject shoe and/or pairs of shoes and the plaster cast impression that was submitted to him.

In addition to that, it appears to me from my review of the, some of the case law in this area that the procedure, that being the shoeprint comparison procedure, has reached a stage of verifiable certainty based upon its recognition in the courts of this state for quite some period of time. It was recognized in Rhodes versus the State, a 1996 appellate court case. Expert opinion testimony was proffered in that case and received in that case. And Newman versus State, 216 Ga. App., 73, Holmes versus the State, 205 Ga. App., 168, Hickey versus the State, 202 Ga. App., 636, Carter versus the State, 192 Ga. App., 726, Dorsey versus the State, 192 Ga. App., 657. And Newman through Dorsey, I can't really discern from the cases whether it was expert or lay opinion testimony offered. But it was accepted by the

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 191 of 242

court, the opinion testimony was accepted by the court. Expert opinion testimony was accepted in Baty or Baty, B-A-T-Y, versus the State, 257 Ga., 371. Opinion testimony was accepted in Lecount versus the State, 183 Ga. App., 407. Expert opinion testimony in Lowe versus the State, 179 App., 377. Opinion testimony in Luther versus the State, 255 Ga., 706. Expert opinion testimony in Purvy versus the State and Williams versus the State, co-defendants, reported at 174 Ga. App., 58 and 56. Opinion testimony was accepted in W. G. C. versus the State, 173 Ga. App., 528. Opinion testimony in Hanson versus the State, 251 Ga., 621. Both expert and lay opinion testimony in Rivers versus the State, 250 Ga., 288 and Hall versus the State. Likewise both expert and lay opinion testimony reported at 155 Ga. App., 211. Opinion testimony accepted on this subject matter in Carrol versus the State, 147 Ga. App., 332, and Moore versus the State, 240 Ga., 807. And non-expert opinion testimony was accepted in D'Antignac versus the State, 238 Ga., 437. Opinion testimony was proffered and accepted in Johnson versus the State, 238 Ga., 27 and Johnson versus Jackson, 140 Ga. App., 252.

These cases go back through 1976, over some twenty years. I'm satisfied that there are a number of other cases going much further back than that that deal with this subject matter. And the courts have recognized

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 192 of 242

expert opinion testimony in this particular field.

MR. MEARS: Judge, what was the cite in the Baty case?

THE COURT: It's B-A-T-Y versus the State, 257 Ga., 371.

Based upon that, Dr. Howard's testimony as an expert will be admissible.

MR. MEARS: Your Honor, can I ask the Court to allow me just to have another continuing objection to the use of the shoeprint, based not only on -- Well, based upon the Harper challenge to that without going back into that.

THE COURT: Based upon the Harper challenge; yes, sir.

MR. MEARS: There may be other objections that I need to insert. I just didn't want to waive that by not raising it. There was a really strange case that came out of the Supreme Court this week about one objection is not enough to preserve a particular objection. It wasn't renewed --

THE COURT: Do you have the cite on that case, Mr. Mears?

MR. MEARS: It was in the Fulton Daily Report. I'll bring it in tomorrow. I was somewhat -- It was reversing the Court of Appeals in the case. I just wanted to make sure that with regard to that issue that I could have a continuing objection right on through Dr. Howard's testimony.

THE COURT: Insofar as the issue of the Harper test, either whether or not it is applicable in this particular matter or, if so, whether or not sufficient evidence has been presented to the Court for the Court to make such findings that it will be admissible, that objection to that will be deemed continuing.

MR. MEARS: Thank you, Judge.

THE COURT: Gentlemen, are we ready to proceed? Excuse me. Ladies and gentlemen?

MR. HARDY: Yes, sir.

THE COURT: Do we have all sixteen jurors?

BAILIFF: Yes, sir.

THE COURT: You may bring the jury in.

Who's the next witness, Mr. Hardy?

MR. HARDY: Henry Williams.

(Whereupon the jury returns to the courtroom, after which the following transpired)

MR. HARDY: Henry Williams was called, Your Honor.

BAILIFF: He's either out there or on the second floor.

THE COURT: Henry Williams.

Mr. Williams, have a seat right here, please, sir.

Mr. Williams, raise your right hand.

Do you solemnly swear or affirm that the evidence you will give this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 194 of 242

nothing but the truth, so help you God?

OFF. WILLIAMS: I do, sir.

OFF. HENRY C. WILLIAMS

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for us, please, sir?

A Henry C. Williams.

Q Where are you employed, please, sir?

A Thomasville Police Department.

Q Were you so working back during April the 7th, 8th, 9th, 10th, till the present with the Thomasville Police Department?

A Yes, sir; I was.

Q On April the 7th, were you so working on that evening in the nighttime hours?

A I've got three different incidents here, so I --

Q The Madison Street Deli incident?

A Yes, sir; I was. I was working on that date.

Q And what shift were you working that night?

A I was working the night shift, sir.

Q Did you respond to the Madison Street Deli?

A Yes, sir; I did.

Q And what did you observe when you got there?

A There was some more officers on the scene that arrived

Case 7:14-cv-00089-MTT Document 18-13 Filed 07/24/14 Page 195 of 242

there before I did. I arrived there shortly after they did. The clerk was -- they were loading the clerk, or rendering first aid to the clerk when I arrived. I think EMS was already on the scene. We went in. Myself and Lt. Baker went into the store. Observed what was going on there. Secured the store. And called the criminal investigators. And --

Q Who was called out?

A Det. Chuck Weaver, if I'm not mistaken --

Q Was it turned it over to him?

A Sir?

Q Was the scene turned over to him eventually?

A Yes, sir; it was.

Q Did you see any blood in the store?

A Yes, sir; I did.

Q Where was that?

A On the floor behind the counter over toward the -- if you walk into the store, there's a counter to your right hand side. That counter runs from the start of the door to, back to the little wash area back there where the sink and whatnot was. There was blood from there up to the telephone or up to the register part of the store, which would have been immediately to your right as you walk in the door.

Q Let me show you these photographs, 40 -- 33, 39 and 42, please, sir. If you could look at them?

A All right. Yes, sir.

Q Can you identify them?

A Yes, sir; I can.

Q What are they?

A These are photos that were taken. I did not actually see them taken, but they look like they were taken at the store.

Q Are they fair and accurate representations of what you had just seen?

A Yes, sir; it is.

Q You've testified about?

A Sir? Yes, sir.

Q 46 and 47? Do they appear to just be close-ups of what's in those photographs? More particular, as to 42 here, and 33?

A Yes, sir.

Q Do they likewise appear to be fair and accurate representations?

A Yes, sir.

MR. HARDY: Your Honor, we'd offer 46 and 7 into evidence.

MR. MEARS: Objection on the basis of relevance, based upon the duplicative nature of the photographs, and also upon the fact that the probative value of the photographs is outweighed by the inflammatory nature of the scene depicted therein. I believe Off. Williams has already indicated they're simply closer-up of the photographs already into

evidence. And we would object on that basis.

THE COURT: Mr. Hardy, any response in regards to the objection, specifically as to the duplicative nature of the photographs?

MR. HARDY: Different photographs of the -- different angles and different views of the scene, Your Honor. They're not the same photographs.

THE COURT: Admitted over objection.

BY MR. HARDY:

Q Did you ever go to the hospital, Mr. Williams?

A Sir; I don't remember going to the hospital. I --

Q Did ya'll try to find a suspect that particular night for that particular shooting?

A Excuse me again?

Q Did you try to find a suspect that night?

A Yes, sir. That was what -- They issued a, somewhat of a lookout on him; yes, sir.

Q Nobody was found that evening?

A No, sir.

Q Later on, April the 10th, were you working on that date? Saturday night, Sunday morning, Junior Food Store?

A Yes, sir -- No, sir; I was not working that day.

Q Were you off that day?

A Yes, sir; I was.

Q Did you get called out?

A Yes, sir; I did.
Q Back then did you have a dog?
A Yes, sir; I did.
Q What was the dog's name?
A Pete.
Q And what kind of dog was Pete?
A German Shepherd.
Q Had you trained Pete?
A Yes, sir; I did.
Q All right. Where did you train Pete?
A Leon Sheriff's Department in coordination of, through Lively Law Enforcement Academy.
Q And at that time, April the 10th, how long had you had Pete?
A Since '90. Probably about six, seven years.
Q Had you --
A I got him in August or, say, October of '88.
Q At that time, April the 10th, were you qualified by training and experience to use the dog?
A Yes, sir.
Q I mean, are you re-qualified every year?
A Yes, sir; I do.
Q And you are recertified by Leon County S. O. and Lively Tech?
A Yes, sir.

Q And was the dog trained adequately in tracking humans?
A Yes, sir; he was. Very adequately.
Q Had Pete tracked humans before?
A Several times, sir.
Q Was Pete put on a track that particular night that was indicative of flight?
A Yes, sir; he was.
Q Had, had the trail become so stale and contaminated that the dog wasn't able to track?
A Yes, sir. It had come to a stopping point; yes, sir.
Q Eventually?
A Yes, sir.
Q Was it able to start?
A Yes, sir. Pulled a good start.
MR. HARDY: I'd submit into evidence 167, Your Honor.
Let me show it to him, first, show it to -- We've already given it to Mr. Mears.
Q 167 here, please, sir, can you identify these items, please, sir?
A Yes, sir. These are certificates I received through the Lively Law Enforcement Academy through the Leon Sheriff's County Department where we initially did our training, certifying my dog, sir, recertifying him. I got my initial certification down there too.
Q Is that Pete?

A Yes, sir; it is.

Q Is he certified and you certified back on April the 10th of 1994?

A Yes, sir; we were certified. Yes, sir.

Q Is that the --

A Or recertified.

Q That first document, what's that?

A May 22nd of '92 is this one, this one here. I've got several here. We recertified every year --

MR. MEARS: Your Honor, --

THE COURT: Mr. Williams, excuse me.

MR. MEARS: Your Honor, we're going to object to the line of questioning about the dog. First of all, we would submit it's not relevant to any issues in this particular case. The dog is deceased. There's no basis for putting in the certificates of this officer and the dog. Certainly, the testimony already is the dog was not able to find, track anyone that's related to this particular case. And we would object on the basis of relevancy. It has no relevancy to this particular case at this time, Judge.

MR. HARDY: I don't think that's what the testimony was, what I remember, Your Honor.

Q Were you able to find a track that night?

A Yes, sir; I was.

Q Did you track it?

A Yes, sir; I did.

THE COURT: For the purposes of the record, overruled.

BY MR. HARDY:

Q Do those have to do with Pete and you?

A Yes, sir; they do. Sure do.

Q And ya'll, ya'll have been doing this, you and Pete, since what year?

A '88. I think it was October of '88. October of '88 is when I received the dog.

Q You've been put on track, of tracking humans before?

A Yes, sir. Several times.

Q Is that part of your training?

A Yes, sir; it was. Man tracking; yes, sir.

Q On April the 10th were you given an area to track by other officers?

A Yes, sir; I was.

Q And did you -- did Pete alert on a scent?

A Yes, sir; he did.

Q And did you start tracking?

A Yes, sir; I did.

Q And facing the Junior Food Store, which would have been the Junior Food at that time, which way did you go?

A The southeast corner of the store which would have been directly in front of the store over to the right. There was a breeze walkway in front of the store there. I pulled a track off

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 202 of 242

the southeast corner of the store. That's where the, I was informed by other officers that, through other sources that the subjects went.

Q This area that, 103, is that what you're talking about?

A Yes, sir; it is.

Q Is that the area the tracks led to?

A That's the area that the track started from, sir.

Q And did you follow the track?

A Yes, sir; I did. My dog was harnessed. He was on a lead and I was right behind him.

Q Did you find anything when you were tracking?

A Yes, sir; I did.

Q What'd you see?

A Distinguishable footprints, uh, two Budweiser cans.

Q And where, where'd you see the Budweiser cans?

A Shortly after I started to track, I don't know if there -- I'm almost certain they're the property or part of Junior Food at that particular time, in a mud hole just to the, be just to the south of the store.

Q Excuse me. Let me show you State's Exhibit Number 95, 96, 97. If you could look at them for me, please?

A All right, sir.

Q Are you familiar with that?

A Yes, sir; I am.

Q What's that?

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 203 of 242

A That is a mud hole in which we found some of the distinguishable tracks leading up to and from right near these Budweiser cans here.

Q 98, 99 and 100? Have you seen them?

A Yes, sir.

Q What's that?

A These are the footprints we found, distinguishable footprints that I mentioned earlier, sir.

Q These tracks?

A Yes, sir.

Q And the cans. Did you find anything else in relation to the cans and the tracks?

A No, sir. I recall finding the cans, uh, shouting back at the people at the crime scene to please keep everybody back in particularly this area here, that I had found some distinguishable footprints that I -- my dog had pulled a good track with my dog and my dog was tracking good. And I continued on my track.

Q Who did you tell that to? Ken Collins?

A No, sir. Ken Collins had not arrived on the scene yet, I don't believe.

Q You kept other people --

A Sgt. Mullins and Lt. Ellis Jackson was in charge, if I'm not mistaken, at that scene. I know Sgt. Chris Mullis was there, sir.

Q Where did the tracks lead to? Where did the scent go?
A I tracked from that mud hole there, it would have been directly probably southwest, along the north shoulder of Pinetree Boulevard. I tracked along the north shoulder of that roadway until I reached the property of Providence Plaza, into the parking area and into that first building there. Into that parking lot, little parking area there in front of the building is where I lost the track or where the dog indicated that there was no further scent being available for him to track.
Q Then the tracking stopped at that point?
A He started making circles, sir, as an indication to me that he had run out of scent; yes, sir.
Q Then what'd you do?
A I backtracked in an effort to find whatever other evidence that I could find. More or less doing an article search. I recall going on the other side of the road, tracking back up. And we went back up to the store. I didn't find anything else. To where the footprints were, and those were preserved by the crime scene technician, I think, Agent, Special Agent Ken Collins.
Q You turned the area over to him for investigation?
A No, sir; I did not turn the area over to him. No, sir.
Q Somebody else? Chuck Weaver or somebody else?
A Somebody else did. I don't know who, sir.
Q Did you see the other items, the beer flap?

A Um, I may have, sir. I wouldn't testify to that fact, because I, I don't recall.

Q So then you turned it -- After you did your dog tracks and you turned it back over for the other, Collins and Weaver to do what they --

A Yes, sir.

Q -- they're the crime scene people?

A Yes, sir.

Q Then did you go back off duty then?

A Yes, sir. I went back home and went to bed.

Q And Pete, when did he die?

A July the 5th of this year.

Q What'd he die of? Old age?

A Some type of tumor, sir. I, I never -- They made no autopsy on the dog to find out. That's what Dr. Clinton indicated to me.

MR. MEARS: Could we have just one moment, Your Honor?

THE COURT: Yes, sir.

BY MR. HARDY:

Q Number 163, I show you this. Is this a fingerprint card, please, sir?

A Yes, sir; it was.

Q And did you roll those prints, the known prints there?

A Yes, sir; I did.

Q And are they of Ray Jefferson Cromartie?

A Yes, sir.

Q Is that Ray Jefferson Cromartie in the courtroom?

A That's him right there, sir (indicating the Defendant).

Q And you rolled the known prints of Mr. Cromartie, the man right there, on this card?

A Yes, sir; I rolled these prints right here on that card.

MR. HARDY: We'd offer 163 into evidence, Your Honor.

MR. MEARS: Your Honor, we don't have any objections to the card. I think the Court is going to have to look at the card because it's an official document before it's admitted in its present form. I don't have any objection to the card with certain matters being taken into consideration with the card. It's an official form, document.

THE COURT: I will admit it at this time and take a look at it in regards to what you've brought to the Court's attention to decide whether or not something needs to be done with regards to the card itself.

BY MR. HARDY:

Q You didn't see, pick any evidence or take anything into official custody; did you, Henry?

A No, sir; I didn't. I only located the evidence that I found along the track. You're referring to that? Am I correct?

Q You pointed it out to others?

Case 7:14-cv-00089-MTT Document 18-13 Filed 07/24/14 Page 207 of 242

A Yes, sir; I did.
Q Okay. Then you went back off duty and went to sleep?
A Yes, sir; I did.
MR. HARDY: Thank you.

CROSS EXAMINATION

BY MR. BRYANT:
Q Good afternoon, Off. Williams.
A How are you doing, sir?
Q All right, sir. You have told us today, I believe, that you were involved in two investigations, one at the Madison Deli and one at the Junior Food? Am I correct about that?
A Yes, sir.
Q Okay. And with regard to -- Let's focus first on the Madison Street Deli. At the time that you went there and participated in the investigation there, there was a lookout, I believe you said, that was posted for a suspect. Is that correct, sir?
A Very brief, sir. I --
Q The lookout --
A The gentleman -- it was received through another officer, sir. I did not receive the, the initial identification.
Q Was that a lookout for a black male, stockily built?
A Yes, sir. Very, very, very vague, sir; yes, sir.
Q But it was a black male, stockily built?
A Yes, sir. But I'm not, I'm not even sure about the --

Case 7:14-cv-00039-WTT Document 16-13 Filed 07/14/14 Page 208 of 242

I, I distinctly remember a black male, sir.

Q Okay.

A And the -- That's -- I won't testify to any -- Because I'm not sure about that, sir.

Q Okay. Now, in terms of your dog, did you use your dog for that particular event?

A No, sir; I did not.

Q Okay. Let's move then to the Junior Food Store. You indicated that you and your dog did some tracking down to, I believe you said Providence Property, I believe it was?

A Providence Plaza; yes, sir. That's a retirement home.

Q How far is that from the Junior Food Store?

A A rough estimate, sir, probably four hundred yards, maybe a little further, maybe a little less.

Q Okay. About four football fields?

A Probably three hundred yards since you're getting -- since I'm picturing a football field in my mind. I'd, like I said, give or take, three to five hundred yards.

Q Okay. Now, the tracks that I think you said that you observed on the ground, you didn't see anybody place those tracks there; did you?

A No, sir; I did not.

Q You have no idea of when they came to be put there or how they came to be put there, since you didn't see it done?

A No, sir.

Case 7:14-cv-00089-MTT Document 18-13 Filed 07/14/14 Page 209 of 242

Q Okay. And in terms of the beer tab that was talked about, you didn't see anybody place that down either; did you?
A No, sir; I did not.
Q So you have no idea of when it would have got there or how long it had been there, whether it was put there that night, two weeks before that, or a month before that? You have no idea of your own personal knowledge how it came to be where it was?
A If I recall right, sir, --
Q Well, would you answer my question, sir? First, do you have of your own personal knowledge any idea how those items came to be there?
A No, sir. No, sir; I do not.
Q Thank you, sir. And nor do you have any idea how long they had been there based upon your own personal knowledge?
A Yes, sir; I do.
Q And did you observe them or see them?
A Yes, sir; I did.
Q Did you see them placed there?
A No, sir; I did not see them placed there.
Q All right, sir. Now, in terms of what you did see, you talked about using your dog to track, if I recall correctly?
A Yes, sir.
Q And you indicated that you had -- some place had been pointed out to you at the southeast corner of the store?
A Yes, sir.

Q And you began your search from that point?
A Yes, sir.
Q And that the dog, as you described it, made a hit, I think you said?
A He pulled a track, sir.
Q Pulled a track.
A Picked up on a scent. When I say pulled a track, that's exactly what I mean.
Q All right. Now, do you know from your own knowledge, again based upon the dog, whether or not the track that he pulled had, in fact, anything to do with either of, or anybody who may have been at that store at any particular time? That is, was the track or scent to be picked up, would it have been something that had occurred within the last hour? Could it have been something he picked up, any time frame of what he would have picked up?
A I'm not sure I understand your question.
Q All right, sir. I'm asking in terms of the scent that the dog pulled?
A Yes, sir.
Q Is there any time frame upon which the dog would pull a scent?
A Yes, sir. You're limited on time; yes, sir. The longer you wait, the more diffused the scent becomes, the more contaminated the area becomes; yes, sir.
Q Yes, sir. And so what I'm asking though, sir, is there

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 211 of 242

anyway for you to know as this dog's handler, whether or not that scent had been made within the last, within a half an hour of you making the, picking the scent, or whether it'd been made three to four hours before?

A The way he started to track, sir, that scent had been placed there recently, very recently. A time frame, I could not give you that, sir.

Q You cannot give me -- In answer to my question, you cannot give me any kind of time frame of when that was placed there?

A No, sir. There's been evidence of dogs, not dealing with this particular case, but there's been evidence of dogs immediately tracking a person and up to seventy-two hours. It's been documented.

Q So that anything that might have -- For example, the dog might have been tracing something that could have been placed there as much as seventy-two hours beforehand and as recently as ten minutes before?

A Not the way the dog started on the track, sir; no, sir.

Q It certainly was possible?

A Yes, sir; I guess it is.

Q Yes, sir. And there's no way for you to know which of those it is at this, at that time?

A The way my, the way my dog tracked, sir, those prints, those -- that track I pulled was put there recently.

Case 7:14-cv-00039-WTT Document 18-13 Filed 07/14/14 Page 212 of 242

Q And by recently though, you can't give me a time?
A No, sir; I cannot.
MR. BRYANT: Thank you.
THE COURT: Anything else of this witness, gentlemen?

REDIRECT EXAMINATION

BY MR. HARDY:
Q Was it a real fresh track, Henry?
A Yes, sir; it was.
Q Does it get much fresher, Henry?
A Not very much, sir.
MR. HARDY: Thank you.
THE COURT: You are excused.
OFF. WILLIAMS: Thank you, sir.
THE COURT: Call your next witness, please, sir.
MR. HARDY: Chuck Weaver, please, Your Honor.
THE COURT: Raise your right hand, please, sir.

Do you solemnly swear or affirm that the evidence you shall give this Court and the jury on the matter now pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. WEAVER: I do.
THE COURT: Mr. Hardy?

CHUCK WEAVER

having been duly sworn, testified as follows:

DIRECT EXAMINATION

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 213 of 242

BY MR. HARDY:

Q State your name for us, please?

A Chuck Weaver.

Q Back during the time period of April, May of '94, where were you working, please?

A I was a Detective Sergeant with the Thomasville Police Department.

Q And were you the on-call lieutenant or sergeant, whatever, detective, on April the 7th and April the 10th?

A Yes; I was.

Q Did you get called out on April the 7th to the Madison Street Deli?

A Yes; I did.

Q How did you get called out, Chuck?

A I was called by the dispatcher at the Thomasville Police Department and I responded to that call.

Q Did you go down there?

A Yes; I did.

Q What'd you see when you got there, Chuck?

A I was -- saw a crime scene. I was led to the crime scene by Lt. Jerry Baker. Off. Kathy Murphy was there and some EMT's.

Q Now, who took -- Did you take any photographs down there?

A Yes; I did.

Q Are you the one that did that?
A I took some; yes.
Q Were you able to determine what you thought was the site where the man had been shot?
A Yes. I was walked through the area by Lt. Baker and --
Q Where did it appear he'd been shot? Mr. Wilson?
A Towards the back around the, there's a sink area where you wash dishes and a deli area there. There was blood there, all through the floor area there and up toward the counter area.
Q 42 and 45, can you identify those for me, please, sir?
A Yes. This is the sink area at the Madison Street Deli, the deli part area.
Q Is that the area you're talking about?
A Yes. This is the floor area with the blood on it by the sink.
Q Is that what you saw that night, Chuck?
A Yes; it is.
Q Was there a shell casing found there at the scene?
A Yes; it was.
Q Where was it found?
A It was on the floor behind the counter area close to a standing ashtray.
Q Was anyone called out to assist in the scene evidence-wise?
A Yes. Sgt. Glenn Hutchinson, the crime scene tech, with

the Thomas County Sheriff's Department.

Q 33, does that -- can you identify that one for me, please, sir?

A Yes. This appears to be the shell casing with Sgt. Hutchinson pointing it out with a pen.

Q Is that the shell casing you're talking about?

A Yes; it is.

Q That's in 33?

A Yes.

Q 34, is that just a closeup of the same thing?

A It's a closeup of the shell casing on the floor.

Q Whose seized it that night? You or Hutchinson?

A I believe it's Hutchinson and Kathy Murphy was the one, I think that was also there present when it was found.

Q Did Glenn seize it?

A Yes.

Q Did you look at it?

A Yes; I did.

Q What size is it?

A It appeared to be a .25 semi-automatic shell casing.

Q I'll just let you look at this and let Mr. Hutchinson open it. Have you seen this container before, Number 154?

A Yes. It appears to be --

Q Excuse me. 156?

A It appears to be the cartridge containing the shell

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 216 of 242

casing.

Q Are your initials on there anywhere, Chuck?

A I'm trying to look --

Q Do you see Glenn's on there?

A I do see Glenn's. I don't see C. W. on there.

Q Taking the case you are seizing -- the shell casing. Was anything else retrieved at the scene other than that?

A There was a video that was retrieved from, uh, from the store.

Q Who got that?

A I believe Glenn Hutchinson and Kathy Murphy were involved in that. I did observe it.

Q Did you go to the hospital?

A Yes; I did.

Q Who did you see at the hospital?

A I talked with Dan Wilson. He was there at the hospital.

Q What was his condition?

A He was, appeared to be in bad physical shape. He had multiple bandages and medical paraphernalia around his face. He was bleeding.

Q 37, did you take that picture of him?

A Yes; I did.

Q So at that time that was about the extent of your leads on that case?

A At that point; yes.

Q April the 10th, were you working on call that Saturday night, Sunday morning?

A Yes; I was.

Q Did you go to the hospital there to see Dr. Hall?

A Yes. Early morning hours of the 7th, I did.

Q Did you get anything from Dr. Hall?

A I retrieved a bullet from Dr. Hall, he and his assistant there at the hospital.

Q 29, can you identify that?

A Yes. That is the bullet that I retrieved.

Q Who did you turn it over to?

A At this time it was taken to the Thomasville Police Department and put into evidence.

Q Who was the evidence custodian down there?

A Fran Everett.

Q You turned it over to her for safe keeping?

A Yes.

Q Now, the Junior Food Store. The next day, excuse me, go back to April the 8th, the early morning hours. Did you go down to N. Monroe just south of the store there?

A Yes; I did. Myself and several detectives and a patrol officer went down to Monroe Street.

Q And who did you see down there?

A Uh, I saw the gentleman that lived there, had found

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 218 of 242

something in his yard.

Q Mr. McRae?

A Mr. McRae; yes, sir.

Q Did you retrieve anything from his yard?

A Yes. There was a sweatshirt or a sweat type, jogging type thing, and a hat, was there.

Q Did you take them into custody, Chuck?

A Yes; I did.

Q I show you 30-A first. Can you identify that?

A Can I pull it out?

Q Yes, sir.

A Yes. This is a stocking type cap that was there.

Q 30-B?

A This is the sweat, hooded sweatshirt that was there.

Q Did you recover them there at the yard of Mr. McRae?

A Yes; I did.

Q Did you turn them into Ms. Everett likewise?

A Yes.

Q Would you put them back in the bag, please, sir?

A (Witness complies)

MR. HARDY: Your Honor, we'd offer 30-A and B into evidence.

THE COURT: They've already been admitted.

BY MR. HARDY:

Q Now, let's go back to the April the 10th. Were you

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 219 of 242

called out to the Junior Food Store?

A Yes; I was.

Q And what time did you get there, Chuck?

A It was a few minutes after 4:00 A. M.

Q Where were you when you got the call?

A I was at home.

Q When you got there what did you observe? What'd you do first?

A I talked to the officers, Lt. Ellis Jackson and Chris Mullins --

Q Excuse me. Go ahead.

A They advised me there had been a, a person had been found inside the Junior Food Store apparently dead. And at this time I was waiting for the crime scene tech from the G. B. I.

Q Who was that?

A Kenneth Collins.

Q Okay.

A And I waited there outside the store till Agent Ken Collins arrived.

Q Did you see anyone in the store?

A No one was in the store at this time. We had not been in, but I waited and when he got there then we did go in.

Q When Ken got there did you go in the store?

A Yes; I did.

Q What'd you do when you went in the store?

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 220 of 242

A We went around to the food store and around back behind the counter where a body was located laying on the floor.

Q Did you determine who that was?

A Yes, at some point later in the morning we determined who it was.

Q Who was it?

A A Richard Slysz, Slysz, S-L-Y-S-Z.

Q 55, is that what you're talking about?

A Yes. This is the man that was laying there.

Q Was he dead?

A Yes; he was.

Q So after you and Mr. Collins saw the man, what did ya'll do next?

A At this time Agent Collins started processing the crime scene and I assisted him in processing the crime scene.

Q What did you do first?

A He was taking pictures and we were taking measurements there inside, observing the body, observing the location of the body.

Q Mr. Collins took the measurements?

A Yes; he did.

Q Behind the counter where Mr. Slysz was, what did you observe? Did you observe anything in his hands?

A I believe there was a pencil close by his hand. I don't believe it's in my notes.

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 221 of 242

Q I show you 52 and 60, if you'd look --
A Yeah. I'm at the body now.
Q Do they refresh your memory?
A Yes. There's a pencil here in his hand.
Q Is that the way you found it?
A That's correct. And blood about his head.
Q Is that a fair and accurate representation of that pencil in his left hand?
A Yes; it is.

MR. HARDY: Offer them into evidence, Your Honor, 52 and 60.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

MR. HARDY: Publish them to the jury?

THE COURT: Yes, sir.

(Whereupon Mr. Hardy tenders photographs to the jury)

Q Was Ken the man that was responsible for the seizing of the evidence, or were you? Which?
A Ken was responsible for the, observing the evidence, taking it and, and seizing it; yes.
Q Did you find any shell casings?
A Yes; there was shell casings.
Q Where were they found?
A Next to the body there was a small caliber shell casing, around the butt area and out on the floor.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 222 of 242

Q Were they behind the counter likewise?

A Right.

Q Did you see the man's face? Did you see his glasses?

A Yes; I did.

Q What did you observe about his glasses?

A There was blood and some of the glass appeared to be broken.

Q Did you look under the counter?

A Yes; we did.

Q Did you see any money under the counter?

A There was a bag with money in it.

Q Did the area of the store, did you look at the area of the store, each of the aisles?

A Yes; we did.

Q Was there a disturbance in the store, anything knocked over, turned over?

A Uh, at that time we couldn't make a determination of any disturbance. I think later some of the store personnel came out and assisted us in that.

Q Was there a safe behind the counter?

A Yes; there is.

Q Did you look in the safe? Was it open?

A Yes; it was.

Q Was it locked?

A No.

Case 7:14-cv-00039-MTT Document 1-8 Filed 07/14/14 Page 223 of 242

Q Was there any money in the safe?
A Uh, I believe there was money in the safe.
Q Under the counter?
A Yes.
Q Money under the counter?
A Yes; there was.
Q Where had it appeared that Mr. Slysz had been sitting?
A As you walk into the front of the store there's a, right behind the counter close to the cash register there's a chair there, and it appeared that he was, had been sitting there.
Q I first show you, Mr. Weaver, 61, 62, 63 and 64. If you can identify those for me, please, sir?
A This is a shell casing, small caliber, .25.
Q Was that found at the Junior Food?
A Yes. Also a shell casing with a ruler by it measuring it.
Q Would you refer to the number of the picture, please, sir?
A Okay. The first one by, the shell casing by itself, Number 61, shell casing. Number 62, shell casing with a ruler. 63, shell casing with a ruler. And 64, shell casing by itself.
Q These are all to do with the Junior Food Store?
A Yes; they are.
Q That's to do with the two casings found behind the counter?

Case 7:14-cv-00039-HL Document 18-13 Filed 07/14/14 Page 224 of 242

A Yes.

Q Are each of those fair and accurate representations of what you saw that morning?

A Yes; they are.

MR. HARDY: Offer them into evidence, Your Honor.

THE COURT: Any objections?

MR. MEARS: No, sir.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q Did you say there was a bag, or a safe behind the counter?

A Yes.

Q Would you look at these two photographs, 66 and 67, please, sir?

MR. HARDY: Your Honor, could we have the bailiffs could turn a little air on? It's getting, to me anyway, a little hot in here.

A 66 is a picture of the safe. There appears to be blood at the bottom of the safe.

Q Was that safe open when ya'll got there?

A Uh, I'm looking through my notes. It is in this picture here.

Q Meaning it wasn't locked, is my question?

A No; it was not locked. It was accessible and had several times opened as we looked into it.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 225 of 242

Q The other picture, 67, I think it is?

A Yes. 67 is a picture of the open safe with a bag and coins inside.

Q Does that appear to be fair and accurate representation of the way you saw it?

A Yes.

MR. HARDY: 66 and 67 into evidence, Your Honor.

MR. MEARS: 66 and --

MR. HARDY: 66 and 67.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q How close to the safe was the man's head?

A Real close. It was not far at all.

Q You say there was a bag of money. Where was it?

A Uh, I believe it was under the counter.

Q I show you this photographs here, 81 and 82, please, sir. If you'd look at them.

A 81 is a picture of the, under the counter area and the safe to the left as you're looking at it like this, and the cash register and the phone.

Q Does it show the bag of money?

A There is a blue bag of money there.

Q Is that near where Mr. Slysz was?

A Yes.

Q Are they fair and accurate representations of what you saw?

A Yes. Both. And also 82.

MR. HARDY: Your Honor, we'd offer them into evidence, 81 and 82.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q 69, 70 and 68? 68, 69 and 70, can you identify them?

A 68 is a picture of the blue Commercial Bank bag, Hometown Spirit written on it. 69, the bag is open. You can see bills and other paper products inside the bank bag. 70, the money is spread out, out of the bag on the, what appears to be a chair there, in stacks of twenty-five, fifties, tens and ones.

Q This was in that blue bag?

A Yes.

Q Under the counter?

A Under the counter.

MR. HARDY: Your Honor, we'd offer 68, 69 and 70 into evidence.

THE COURT: Any objection, Mr. Mears?

MR. MEARS: No objections to 68, 69 and 70.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q You went behind the counter area?

A Yes; I did.
Q Did you see the paper, roll of paper towels?
A Yes; there was.
Q What was on that?
A Uh, it appeared to be some pencil markings on that roll of paper towels.
Q Is that in relation to where the man was?
A Yes. Close to the body.
Q 71 and 72?
A 71 shows the paper towels, a roll of paper towels with a, what appears to be a pencil mark and some kind of clipboard with a check-off seat, a check-off sheet. 72 is a closeup of paper, roll of paper towels with a pencil mark and a cash check-off sheet.
Q Number 7 here, is this the roll of paper towels that's in those pictures?
A Yes. It appears to be.
MR. HARDY: Your Honor, we'd offer 7 and 71 and 72 into evidence.
MR. MEARS: No objection, Your Honor.
THE COURT: Admitted without objection.
BY MR. HARDY:
Q You say you were behind the counter, Mr. Weaver?
A Yes; I was.
Q Let me show you these photographs, please, sir. 76, 77

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 228 of 242

and 78, 79, 80, 83, 84 and 85, if you'd look at them for me, please, sir?

A 76 shows behind the counter area and the cash register and an ashtray, checkup sheet, a work area there behind the counter and under the counter.

Q Is this the scene you observed there when you got back there and found the body?

A Yes. 77 shows the same area and a foot of the deceased on the floor by the chair and touching the garbage can. The garbage can in the back there and his foot is right next to the garbage can.

Q Yes, sir. What about the next one?

A The next one, from a different angle, is behind the counter area, the chair and the foot and some magazines to the right of it. And on top of the trash can there's a clipboard with a check-off sheet and appears to be work related to the store and the cash receipts.

Q Next?

THE COURT: What number was that?

A Excuse me. It was 78.

BY MR. HARDY:

Q 79 is the next one?

A And 79 is the cash register, looking from it, behind it and the lottery scratch off type tickets by there, and the counter area with bags and candy and this type of stuff on it,

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 229 of 242

looking towards the store.

Q 80?

A And 80 is the same area, same type things and the, I believe the foot is visible in this too. And some blood, some drops of blood or blood smears there on the counter area in front of the ashtray back this side of the ashtray. That would be 80.

A closer up of that, being 83, and the blood is closer, a picture of the blood. It shows blood on top of the counter and blood at the edge of it, and cash receipts.

Q That was in relation to his seat, just in front of his seat, chair?

A That would be right behind the cash register area where the seat is.

Q Yes, sir.

A Number 84 shows the area, also shows what appears to be blood or as it -- on the edge of the counter as it's coming down, dripping down.

Number 85 is blood drops and what appears to be pieces of glass in this area.

Q Was the glass in his eyes, in his eyeglasses broken?

A Yes. It appeared to be at the time.

Q Next photograph, please, sir?

A The next one is 76. That was the first one and it's --

Q Are each of those photographs fair and accurate representations of the scene as you saw it?

A Yes; they are.
Q That would be 76, 77, 78, 79, 80, 83, 84 and 85?
A That's correct.
MR. HARDY: Offer them into evidence, Your Honor.
MR. MEARS: 81 has been offered, I think.
THE COURT: 81 has already been tendered and admitted.
MR. MEARS: No objection to those, Your Honor.
THE COURT: Admitted without objection.
BY MR. HARDY:
Q Did the coroner show up?
A Yes; he did.
Q Did he pronounce him dead?
A Yes.
Q Was the body moved?
A The body was moved.
Q Did you go to the autopsy?
A No; I did not go to the autopsy.
Q Where was that? Do you know where it was conducted?
A I believe the crime lab in Moultrie or Atlanta. I'm not sure which. But it was not in Thomasville.
Q Did ya'll determine, you and Ken, in viewing the body how many times it had been shot?
A Yes. Twice.
Q Where?
A In the head area, in his glasses area, around the head.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 231 of 242

Q Did you talk to Mr. Williams about what he did? Henry Williams?
A Uh, briefly there. I didn't talk a lot. I think Ken did the bigger time with Henry Williams.
Q And then I think Ken made some measurements and some charts?
A Yes; he did.
Q Did you see the beer cans?
A Yes. I saw them briefly. I was in that area. That was that area --
Q Did Ken conduct that search outside?
A Ken conducted the, most of that search, to do with the beer cans and that area out there.
Q Did you see the beer flap out there as well as the beer cans?
A Yes.
Q Ken is the one that seized that evidence?
A Yes, sir.
Q At that time did you see the shell casing at the store, the two shell casings?
A Yes.
Q Ken, I think, seized them?
A Ken seized them.
Q Were they -- What caliber? Could you tell?
A .25 semiautomatic.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 232 of 242

Q What caliber were they over there at the Madison Street Deli?

A .25.

Q So at that time what did you do with the shell casings?

A They were tendered into evidence and they were later sent to the crime lab for comparison to see if the same type firearm, they came from the same type firearm.

Q So at that time you had no leads as to what, other than talking to Mr. Taylor and Mr. Walsh, who had done this crime either?

A Yes; we didn't have any definite leads at that time.

Q Did you have any leads then until the, I guess the morning of the 13th, any more leads?

A Not until the morning of the 13th.

Q On the morning of the 13th, was, were some individuals arrested?

A There had been some individuals arrested that, yes, were interviewed, that gave us some information?

Q Who, who was interviewed first?

A A Carnell Cooksey.

Q Who interviewed him?

A Myself and Det. Guy Winkelman and also Det. Willie Spencer.

Q As a result of talking to Mr. Cooksey was a gun retrieved?

A Yes. He gave us information concerning the gun and the approximate area where it might be, and we did retrieve it.
Q And where was that?
A That was -- If you go out to the jail justice center, the city side, the chief of police side and look toward apartments, I believe they're referred to as the Cherokee Apartments, it was in an area between them, close to a railroad and a concrete pole.
Q And did you retrieve it?
A Yes; we did.
Q Was Mr. Hutchinson there when that was done?
A Yes; he was.
Q I show you 162, and ask Capt. Hadley to please check it again for us.
Would you just pull the clip out and give it to the Clerk?
162 here, can you identify this?
A Yes. It's a model B25 caliber, .25 automatic.
Q Brand?
A Raven Arms Industry brand.
Q Is that the one you retrieved?
A This is the one we retrieved.
Q Was it taken to the crime lab?
A Yes; it was.
Q Had any shell casings already been up there?
A Yes; they had.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 234 of 242

Q Had the bullets from the Madison Street Deli already been taken up there? This item that you got from Dr. Hall?

A Yes; it had.

Q The shell casings, were they sent to the lab?

A Yes; they were.

Q From both stores?

A From both stores.

Q Did Carnell then make other statements to you other than about where the gun was?

A Yes. He talked about individuals that --

Q As a result of him talking to you, were other people arrested?

A Yes; they were.

Q Who else was arrested then?

A A Corey Clark and a Jeffrey Ray Cromartie and a Gary Young and a Thaddeus Lucas.

Q And is that Ray Jefferson Cromartie in the courtroom this evening?

A Yes; he is.

Q Would you point him out if you see him?

A Sitting at the Defendant's table in a white shirt and tie (indicating the Defendant).

Q Did you talk to other subjects other than those subjects?

A Yes; I did.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 235 of 242

Q Did you talk to some ladies?
A Yes; I did.
Q Tina Washington?
A Yes.
Q Lisa Young Delaney? Lisa Young Delaney? There's also a Tonya Frazier talked to by various people?
A Tonya Frazier was interviewed by detectives. Lisa Young, Jerome Delaney, and a Tina Washington.
Q Did Carnell Cooksey, was he arrested or let go?
A In connection -- He might have been for something else. I did not arrest him in connection with this.
Q So there were various other detectives working on the case besides yourself?
A Yes; there was.
Q And that would have been whom?
A Det. Willie Spencer and Det. Guy Winkelman and Lt. Melvin Johnson, and Mark Scott did assist some.
Q Okay. Did you retrieve the clothes and shoes from the, Mr. Cromartie, Mr. Lucas, Mr. Young and Mr. Clark?
A Yes. There was clothes and shoes retrieved.
Q Did you bag them?
A Yes; they were bagged.
Q Who'd you turn them over to?
A The evidence custodian, Fran Everett.
Q Let me show you -- If we could just keep them in these

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 236 of 2423

boxes, it's easier, Your Honor. Having you stay up here, please. Number 18-B here, these shoes. These seized -- these shoes seized from Mr. Cromartie?

A Yes; they appear to be the ones that were seized.

Q And these are what color?

A White with darker stripes around the edge.

Q 14-A, are these Mr. Clark's shoes?

A They appear to be in that bag; yes.

Q What's the brand of those?

A Force Basketball.

Q 16-A, whose shoes are those?

A Thad Lucas.

Q 27-C?

A Gary Young.

Q Were these all seized from the people at the jail when they were taken into custody?

A Yes.

MR. HARDY: Your Honor, we'd offer each of these into evidence, 14-A, 16-A, 27-C, and 18-B into evidence, Your Honor.

MR. MEARS: Your Honor, we have no objections to 14-A, 16-A, 27-C. We're continuing our objection to 18-B based upon those objections that we made previously.

THE COURT: Yes, sir. Admitted over objection.

BY MR. HARDY:

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 237 of 242

Q Did you see the shoe track out there that morning, Chuck?
A Briefly; yes, sir.
Q And I think you seized all their clothes here?
A At some point their clothes were seized.
Q Were they all turned into evidence likewise?
A Yes.
Q That would be Ms. Everett?
A Yes.
Q Well, after you got the clothes and you talked to some people, what did you do next then, Chuck?
A After interviewing the witnesses and taking statements, warrants were taken for the arrests.
Q Did you take any warrants out on Mr. Cromartie?
A Ray Jefferson Cromartie, Thaddeus Lucas, Corey Clark.
Q Did you have occasion to speak to one Gary Young?
A Yes; I did.
Q And where was that, please, sir?
A It was at the jail justice center, at the investigator's interviewing room.
Q That pencil that we talked about, if we could just go back to that a minute. Was that also seized?
A Yes; it was.
Q 8. Is it likewise what you've already depicted in the pictures?

A Yes.

MR. HARDY: Offer it into evidence, Your Honor.

MR. MEARS: No objection, Your Honor.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q Mr. Young, did you -- Who else talked to you with Mr. Young?

A Lt. Melvin Johnson.

Q Prior to talking to him did you give him his Miranda rights?

A Yes; I did.

Q Did you do that or did Melvin do that?

A We were both present. I can look at the, the rights form.

Q Where, where was it ya'll did that, Chuck?

A At the jail justice center.

Q Did you make a, use a recording device, Chuck?

A Yes; I did.

Q And did you know how to operate that recording device?

A Yes; I did.

Q Did you turn it on?

A Yes.

Q Had you ever operated it before?

A Yes; I had.

Q Was a transcription, I think, made of that, of that

recording?

A Yes; it was.

Q Is this the -- I show you 168 here and ask if you can identify that for me, please?

A It's a Miranda warning with Gary Lamar Young's name at the top. His signature after waiver of his constitutional rights. And myself, Chuck Weaver, signed as a witness.

Q Did you force him to talk to you?

A No; I did not.

Q Did you coerce him?

A No; I did not.

Q Hold out any hope of benefit or reward?

A No, sir.

Q Did you threaten him in any manner?

A No.

Q Did he ever ask to speak to an attorney?

A No.

Q In your opinion, did he freely and voluntarily talk to you?

A Yes; he did.

Q Is it on that tape?

A Yes.

Q What kind of tape?

A A micro mini cassette type tape.

MR. HARDY: Your Honor, we'd offer 168 into evidence.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q And did you, are you the one that operated the machine?

A Yes.

Q I think it may have stops in the middle of the tape somewhere or another?

A Yes. It stops to change or pause. It did stop at one time.

Q Did you say, "Here it is what you supposed to say next"? Did you whisper in his ear what to say?

A No; I didn't.

Q Has it been preserved into evidence since that time?

A Yes; it has.

Q Who's speaking on the tape?

A Gary Young, myself and Lt. Melvin Johnson.

Q And the transcript of the tape, is it a fair and accurate representation of the tape?

A Yes; it is.

MR. HARDY: I think we've already given Mr. Mears one.

Q 169, is this the transcription of the tape you're referring to?

A Yes; it appears to be. 169.

Q 28 here, is the micro cassette that you're talking about?

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 241 of 242

A Yes; it appears to be the micro cassette.

THE COURT: What number is that?

MR. HARDY: 28, Your Honor.

Q 28 goes with 169?

A Yes.

Q Did Mr. Young make statements to you about the Madison Street Deli crime and the Junior Food Store crime?

A Yes; he did.

Q Did you force or coerce him?

A No; I didn't.

Q Hold out any hope of benefit or reward?

A No; I didn't.

Q Did you threaten him in any manner?

A No.

MR. HARDY: Your Honor, we'd like to play the tape at this time?

THE COURT: All right, sir.

MR. HARDY: I think we've already offered them both into evidence. Of course, we know they won't go out with the jury.

THE COURT: Let me see Counsel for just a moment.

MR. MEARS: Your Honor, we had voiced an objection earlier with regard to the playing of the tape based upon the handling of Mr. Young as a witness in a certain particular form. We simply continue that objection.

Case 7:14-cv-00039-MTT Document 18-13 Filed 07/14/14 Page 242 of 242

Subject to that we have no objection to him playing the tape, subject to the objections made at the Bar to Mr. Young's testimony earlier.

THE COURT: All right. Thank you, sir.

Gentlemen, I still need to see you for just a moment, please.

(Whereupon Counsel confer with the Court at the Bench, during which the following transpired)

THE COURT: There was some, some reference earlier and I wanted to make sure we're not going to hear anything about Mr. Reddick.

MR. HARDY: (Inaudible)

(Court reporter advises the Court that he can't hear)

THE COURT: Let me tell you this. We're a week and a half into this thing. I don't want any -- I'm assuming that there's nothing on there about him this and that. Okay?

MR. MEARS: Judge, I've looked at it. I think it only makes reference to the Cherokee incident. I don't believe it makes reference to the Stevens Street incident with Mr. Reddick. I was concerned about that and I looked at the transcript and I don't believe it mentions anything about that.

THE COURT: I just wanted to --

MR. MEARS: Yes. Yes. And I've looked at it. We have

had Mr. Leonard go and look at that. And at this point it doesn't appear that my fears were --

THE COURT: I just wanted to make sure that we don't have any reference --

MR. HARDY: Is he satisfied that (inaudible)?

MR. MEARS: Yeah. Subject to my continuing objection.

THE COURT: All right, sir.

(Conclusion of Bench conference)

THE COURT: Mr. Hardy, you may play the tape.

MR. HARDY: Your Honor, we'd like to pass out transcripts to the jury and the Court for their use if they so desire, with your permission.

MR. MEARS: The Court is probably going to do what I was going to ask, so --

THE COURT: All right, sir.

Ladies and gentlemen, the transcripts are going to be handed out for your use in following the audible statements on the tape recording. However, the transcripts are not to be considered by you as evidence. They are not evidence. They are simply aids to help you in following what is actually on the tape.

Is that satisfactory?

MR. MEARS: (Nods head affirmatively)

MR. HARDY: Have we given Mr. Mears one already? I think this is the one in evidence, Judge, if we could give

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 2 of 93

it to the Court. Give Mr. Court Reporter one. If we could pass these out, please, Your Honor.

(Whereupon transcripts are tendered to the jury)

MR. MEARS: Your Honor, the tape is being played for the jury for a specific purpose based upon our previous, the Court's previous rulings in this matter. It's my understanding that the tape is not being admitted into evidence for any other purpose. Am I correct in that assumption?

MR. HARDY: Under Gibbons, Gibbons, Your Honor.

MR. MEARS: That's what I'm referring to, Judge. It's, it's not being admitted for the purposes of taking it out with the jury and listening to it. It's simply being played to the jury based upon the representations that was made by the Prosecutor earlier, as to the reason for having to play it.

MR. HARDY: Your Honor, it's offered under Gibbons. We know the law is they can't take the tape recorder out and play it in the jury room, nor can they take the transcript out and read it. That's already been held by the courts that we can't do that. But they can look at it at this time and then we'll take them back up and hold them, Your Honor. I think that's the law.

THE COURT: Mr. Mears, that -- I'm not exactly sure what you're, what you're driving at. It's being --

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 3 of 93

MR. MEARS: I'm referring to the tape --

THE COURT: -- offered for --

MR. MEARS: I'm sorry, Judge.

THE COURT: I think we're all, we are aware of the purpose it's being offered for and the Court will give appropriate instructions in regards to that at the appropriate time.

Was your concern in regards --

MR. MEARS: We're contending it's not being offered to go out with the jury --

THE COURT: Oh, no, sir.

MR. MEARS: -- as an item of evidence, --

THE COURT: No, sir.

MR. MEARS: -- is what I'm clarifying.

THE COURT: Yes, sir.

MR. MEARS: Okay.

(Whereupon State's Exhibit Number 28 is played to the jury as follows)

"MR. WEAVER: Today's date is 4-13-94. We're at the jail justice center. Present is myself, Det. Sgt. Chuck Weaver, and Lt. Melvin Johnson, and Gary Lamar Young. The time is 1415 hours. We're talking about the robbery and shooting at the Madison Street Deli and the homicide and robbery at the Junior Food Store.

Speak up real clear and talk in that. I want to show

Case 7:14-cv-00039-MTT Document 18-14 Filed 04/14/14 Page 4 of 93

you this rights form that you signed here, that you're willing to talk with us. Did you, is it your signature?

MR. YOUNG: Yes, sir.

MR. WEAVER: And you're willing to talk to us now about these things?

MR. YOUNG: Yes, sir.

MR. WEAVER: Has anybody threatened you or promised you anything?

MR. YOUNG: No.

MR. WEAVER: And you're willing to talk to us?

MR. YOUNG: Yes, sir.

MR. WEAVER: Without an attorney present?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. Go ahead. And you were telling Lt. Johnson and myself about how you know who, uh, did the robbery and shooting at the Madison Street Deli.

MR. YOUNG: He had told me, Jeff had told me, you know, that they had, they he went and did it. Went in, went in and a tall man, tall man with glasses, I think dropped the dishes and stuff and he shot him in the head.

MR. WEAVER: Okay. You said he was washing the dishes?

MR. YOUNG: That's what somebody said. He was back in the back with a pot, you know.

MR. WEAVER: And he shot him in the head?

MR. YOUNG: Shot him in the head.

MR. WEAVER: Okay. When did he tell you this?

MR. YOUNG: The same night.

MR. WEAVER: Okay. Where were ya'll at when he told you?

MR. YOUNG: I, I was at my girl's house.

MR. WEAVER: Where is that?

MR. YOUNG: Where ya'll got me out of the room.

MR. WEAVER: At Cherokee Projects right over here?

MR. YOUNG: Yeah, Cherokee.

MR. WEAVER: What's the number of that? Do you remember the number of it?

MR. YOUNG: I don't know the number.

MR. WEAVER: What's your girlfriend's name?

MR. YOUNG: Tina.

MR. WEAVER: Okay. When Jeff told you that, who all was there?

MR. YOUNG: Nobody but just me and him.

MR. WEAVER: Where were ya'll at?

MR. YOUNG: Talking at the door.

MR. WEAVER: Were you out, standing outside the apartment?

MR. YOUNG: Yes, sir.

MR. WEAVER: This is Tina's apartment?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 8 of 93

LT. JOHNSON: Let me interrupt you a minute. Uh, Gary, tell me in your words what he said to you about the robbery? Just tell me everything you can remember, what he told you?

MR. YOUNG: He say, he say he had started, you know, to timing the stop lights and stuff, walk around the store, and then he went in. The man was back there washing the dishes or something, a tall man. And he say he walked up to him and bapped him in the head with the gun, shot him in the head. And he went to the cash register and he didn't know how to open it. He said he just had to give up, he had to leave. He just left it, you know what I'm saying?

MR. WEAVER: Did he take anything from the store?

MR. YOUNG: He didn't take nothing from the store, not that I know of. He didn't tell me that. He said he tried but the cash register wouldn't open.

MR. WEAVER: He said it wouldn't open?

MR. YOUNG: It wouldn't open. He didn't know how to open it, you know what I'm saying.

MR. WEAVER: How did he get to the store?

MR. YOUNG: On foot.

MR. WEAVER: Okay. How did he leave the store?

MR. YOUNG: On foot.

MR. WEAVER: Anybody pick him up?

MR. YOUNG: No, sir.

MR. WEAVER: What did he have on when he went to the

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 7 of 93

store? Do you remember?

MR. YOUNG: A hooded, a sock, a black, a black sock, had hooded skull cap.

MR. WEAVER: And what else?

MR. YOUNG: And, uh, green hooded, you know, you know, you know what I'm talking about? A little thing like that.

MR. WEAVER: And that was before he went to the store?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay.

LT. JOHNSON: Now, back up again. Now, describe this, this green thing he had on.

MR. YOUNG: It was one of them jogging, jogging, uh, piece, with a hood on, you know what I'm talking about.

LT. JOHNSON: Uh-hum.

MR. YOUNG: One of them jogging, jogging sweatshirts.

LT. JOHNSON: A jogging sweatshirt with a hood on it?

MR. YOUNG: Yes, sir.

LT. JOHNSON: That's what he had on?

MR. YOUNG: Yes, sir.

LT. JOHNSON: And what color was it?

MR. YOUNG: Green. And a black sock hat.

MR. WEAVER: A black sock hat --

MR. YOUNG: A skull cap.

LT. JOHNSON: Okay. Where did he go when he left, uh, the store?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 8 of 93

MR. YOUNG: I guess he had came back out there. It was late that night. It was late. It was before the store closed.

MR. WEAVER: He came back to where you were?

MR. YOUNG: Yes, sir. He came and -- He was staying with my sister. He stayed with my sister. Where ya'll had got him the first time, where ya'll went the first time.

MR. WEAVER: Over here at Cherokee Park Projects?

MR. YOUNG: Yeah.

MR. WEAVER: Over here behind the jail justice center here?

MR. YOUNG: Yes, sir. Right over there.

MR. WEAVER: And that's where he was staying?

MR. YOUNG: Yes. He was staying with my sister, my sister.

MR. WEAVER: Okay. But when did you see him afterwards?

MR. YOUNG: I seen him when he came back from the thing.

MR. WEAVER: Okay.

MR. YOUNG: He came to my, he came over to my girl's house.

MR. WEAVER: Tina's?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. And what did he have on then?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 9 of 93

MR. YOUNG: He ain't had it on then. He say he had to get rid of it.

LT. JOHNSON: What did he have on when you saw him?

MR. YOUNG: A shirt. I think it was a shirt. You know what I'm saying, it was a shirt. Think it was black. I think it was black. He say he had to get rid of, uh, that, uh, jogging shirt, sweatshirt.

LT. JOHNSON: Did he tell you where he got rid of it at?

MR. YOUNG: No. He say he throwed it out, throwed it somewhere. He didn't tell, he didn't tell me that.

LT. JOHNSON: What did he do with the gun?

MR. YOUNG: Sir?

LT. JOHNSON: Did he have the gun?

MR. YOUNG: Yes, sir. He had the gun.

LT. JOHNSON: Okay. When you talked with him the night right after the robbery, he had the gun with him then?

MR.YOUNG: Yes, sir.

LT. JOHNSON: Did you see it?

MR. YOUNG: Yes, sir.

LT. JOHNSON: Okay. Now, go over it one more time and take your time and explain. Now, don't talk too fast. Tell us what he told you what he did and how he walked in the store. Now, just one more time. Just tell me that one more time.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 10 of 93

MR. YOUNG: He say he wait and he timed the red light, and wait till it go green. Check see how long it wait, you know, be green the last time. Know about how long. Went in and, uh, and he said the man was back there washing dishes, or doing something. It was a tall man. He said when he turned around, when the man turned around he shot him in the head. And he went to the cash register. And I guess that man was crawling or something, trying to get up. He said, get down, like that there and then he come over trying to open up the cash register and he said it would never open. So he say he didn't have time so he had to leave. Then he said he got rid of the, uh, sweatshirt and the, uh, skull cap.

MR. WEAVER: Okay. And so you saw him before it and he told you about it?

MR. YOUNG: Yes, sir.

MR. WEAVER: And you saw the gun before it?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. Describe the gun again?

MR. YOUNG: A .25, silver.

MR. WEAVER: Okay. Do you remember the name of the gun?

MR. YOUNG: A .25.

MR. WEAVE: I know. Do you remember another name, a brand name or anything?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 11 of 93

MR. YOUNG: What you talking about? Like, uh, --

MR. WEAVER: Like, uh, type, Smith, whatever type. Do you know what type it was? Do you know?

MR. YOUNG: I, I don't know what type.

MR. WEAVER: All right. And then you saw him afterwards and he didn't have the sweatshirt on?

MR. YOUNG: Nope.

MR. WEAVER: Okay. All right. Let's go on froward now to, uh, -- Do you know what night this was, about?

MR. YOUNG: No. It was -- I think it was last week or -- No. I don't know. I don't know what day it happened.

MR. WEAVER: All right. Now, about the Junior Food Store. Tell me about that?

MR. YOUNG: You know, he did it again.

MR. WEAVER: Okay. Start from the first. How do you know he did it? Who is he you're talking about?

MR. YOUNG: Jeff.

MR. WEAVER: Okay. What's Jeff's last name?

MR. YOUNG: Cromartie.

MR. WEAVER: Cromartie. Okay. How do you know about the Junior Food Store?

MR. YOUNG: He told me.

MR. WEAVER: All right. Where were you at when he told you?

MR. YOUNG: I was out there in Cherokee.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 12 of 93

MR. WEAVER: (unintelligible)

MR. YOUNG: Yes, sir.

MR. WEAVER: Your girlfriend's?

MR. YOUNG: Yes, sir.

MR. WEAVER: Tina's?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. Who else was there when he told you about it?

MR. YOUNG: Nobody. He didn't tell me (unintelligible). And then he say he was gonna hit the Junior Food Store. So he went out there. Said he was going way on out there like going towards Tallahassee.

MR. WEAVER: Okay. About what time was it?

MR. YOUNG: Well, I'll tell you what (unintelligible) like this right here. I was, I was asleep when they came back.

LT. JOHNSON: When you say, they, who, who --

MR. YOUNG: Him and another dude.

LT. JOHNSON: Who was the other dude?

MR. YOUNG: He say he had another dude with him.

LT. JOHNSON: Who was the dude?

MR. YOUNG: I don't know the other dude.

LT. JOHNSON: Okay.

MR. YOUNG: He didn't told me. I say, you hit it by yourself this time. He say, naw, I had another dude, like

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 13 of 93

that right there. He ain't never tell me who it was.

LT. JOHNSON: What did he tell you happened at the Junior Food Store?

MR. YOUNG: He walked in. He went down the bubble gum aisle. He came back. The man was sitting in a chair with some glasses on. Shot him in the glass. Shot him through the eye, you know, glasses. Shot him through the glasses. And he shot him again. (Unintelligible) and he tried to open up that cash register, but that one wouldn't open. He say he didn't know how to open the cash register. You know, he asked me did I know how to open a cash register. I say, no, I ain't going -- I'm through with all that there. I'm through with all that. I ain't, you know (unintelligible) clean. I ain't with that no more, you know. (Unintelligible) what I'm saying. They be knocking on the door, you know what I'm saying, and she say, who that knocking on that door.

LT. JOHNSON: Okay. Let's back up a little bit. You said, now, that he said he walked in, walked down the bubble gum aisle?

MR. YOUNG: Um-hum.

LT. JOHNSON: Then he walked back over to the counter. The man was sitting in the chair. He shot the man through the eye.

MR. YOUNG: Through the glass.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 14 of 93

LT. JOHNSON: Through the glass.

MR. YOUNG: Um-hum. And then he shot him again.

LT. JOHNSON: And then he shot him again. Then he tried to open the register, you said, and he couldn't get that open?

MR. YOUNG: Couldn't get it open.

LT. JOHNSON: Okay. What did he do next?

MR. YOUNG: He said he left.

LT. JOHNSON: Okay. When he talked to you, did you see -- did he have anything else with him when he told you about this?

MR. YOUNG: No, sir. He didn't tell me -- he didn't have nothing else. He didn't show me nothing else.

LT. JOHNSON: You didn't see no beer?

MR. YOUNG: No, sir.

LT. JOHNSON: He didn't have no beer with him when he told you about this?

MR. YOUNG: No, sir. I don't know who the other dude was he say he was with. I don't know who that one was.

LT. JOHNSON: Did you ever see the other dude?

MR. YOUNG: No, sir. Like I say, I was still up in the bed. He knocked on the door, knocked on the door, 'cause he was staying at my sister's and she put him out. That it right there.

LT. JOHNSON: Okay. What you're saying now is that, he

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 15 of 93

came, after this robbery of Junior Food, he came to your house or to your sister's house --

MR. YOUNG: No. See, he was staying at my sister's for a while, you know, just staying the night, you know what I'm saying, like that right there. I was staying at (unintelligible) house.

LT. JOHNSON: Okay.

MR. YOUNG: And he came knocking on the door. It was late, you know. She say, who that keep knocking on the door. Go on and see who's knocking. Damn. Dog. Damn. I can't get the cash register open, like that right there.

LT. JOHNSON: That's what he told you?

MR. YOUNG: Yes, sir.

LT. JOHNSON: That he couldn't get the cash register open?

MR. YOUNG: Yes, sir. He told me how he shot the man too.

LT. JOHNSON: Um-hum.

MR. YOUNG: Like that right there.

MR. WEAVER: Did you see the gun?

MR. YOUNG: Yes, sir.

MR. WEAVER: What kind of gun was it?

MR. YOUNG: .25.

MR. WEAVER: Was it the same gun that was used, that you saw when you were talking about the Madison Street Deli?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 16 of 93

Same gun?

MR. YOUNG: Yes, sir.

MR. WEAVER: Silver?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. What, what about the handles?

MR. YOUNG: Wooden handle.

MR. WEAVER: Okay. Did you ever see any shells? Did he ever show you any shell casings or bullets?

MR. YOUNG: No. They're .25 bullets.

MR. WEAVER: Okay.

MR. YOUNG: .25 bullets.

LT. JOHNSON: Where did he keep any bullets at?

MR. YOUNG: He get them from people.

LT. JOHNSON: Oh. Just get them from different people?

MR. WEAVER: Do you know who he got them from?

MR. YOUNG: No, sir.

LT. JOHNSON: Do you know -- Go ahead.

MR. YOUNG: He just be getting 'em, you know what I'm saying. (Unintelligible) like that right there, .25 bullet.

MR. WEAVER: Do you know where he get, got the gun from?

MR. YOUNG: No, sir.

LT. JOHNSON: How long has your cousin had that gun?

MR. YOUNG: Had it a long time. Since he's been down here.

LT. JOHNSON: Since he's been down here, you said. Where, where has he been?

MR. YOUNG: Been up north, Pennsylvania, Philadelphia.

LT. JOHNSON: Philadelphia? Philadelphia? How long, how long has he been back here?

MR. YOUNG: Um, three weeks, close to three or four weeks.

LT. JOHNSON: Okay. Let me ask you one more time. When you saw him after the Junior Food Robbery, did he bring some, some beer with him to drink?

MR. YOUNG: No, sir.

LT. JOHNSON: And you're sure he didn't give you no beer?

MR. YOUNG: No.

MR. WEAVER: Okay. What did you do after ya'll got through talking?

MR. YOUNG: I went back upstairs.

MR. WEAVER: And did what?

MR. YOUNG: Got back in the bed.

MR. WEAVER: You went back to sleep?

MR. YOUNG: Yes, sir.

MR. WEAVER: Who all was there when he came back and started talking about shooting the guy at the Junior Store?

MR. YOUNG: Nobody. He just told me 'cause, you know, (unintelligible).

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 18 of 93

MR. WEAVER: Was your girlfriend there?

MR. YOUNG: No. She was up in the bed asleep.

MR. WEAVER: That's what I mean. Who was there in that apartment?

MR. YOUNG: Uh, her and her other two little kids.

MR. WEAVER: Anybody else?

MR. YOUNG: No, sir. Her and the two little kids. That was it.

MR. WEAVER: Did some other people come later?

MR. YOUNG: No; 'cause it was late. It was, like, the morning time, you know.

MR. WEAVER: What time in the morning would you say?

MR. YOUNG: I know it was after, it was after 1:00 in the morning. After 1:00 in the morning.

MR. WEAVER: Could it have even been later?

MR. YOUNG: Some time like that, but I know it was after 1:00. After way, it was after 1:00. After that, you know.

LT. JOHNSON: So, let me ask you this then. After he got through talking with you, do you know where he went?

MR. YOUNG: I guess he went over to my sister's house, my sister's house.

LT. JOHNSON: Is that where he spent the night supposedly? At your sister's house?

MR. YOUNG: Yes, sir. She be in town and come in late,

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 19 of 93

late in the morning.

LT. JOHNSON: Okay. Where's your sister stay at?

MR. YOUNG: In Cherokee. That third house, the house ya'll go.

MR. WEAVER: The first house we went to a while ago?

MR. YOUNG: Same one ya'll came and got me.

MR. WEAVER: Okay.

MR. YOUNG: You know that, over that same, you know.

MR. WEAVER: And what is her name again?

MR. YOUNG: Lisa.

MR. WEAVER: What's her last name?

MR. YOUNG: Young. But she married. I don't know her -- I done forgot his name.

LT. JOHNSON: Okay. Let me ask you this then. You know, uh, Thad Lucas? What did he know about all this?

MR. YOUNG: That's Thad's, uh, brother.

LT. JOHNSON: This is -- Cromartie's Thad's brother?

MR. WEAVER: Jeff Cromartie is Thad's brother?

MR. YOUNG: Yes, sir.

LT. JOHNSON: Okay. What do Thaddeus know about all this?

MR. YOUNG: About, you know, Thad, Thad know -- Thad know but he don't know (unintelligible). Thad (unintelligible). Thad was around here talking about it. Thad didn't know that he did it till he found out -- Thad

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 20 of 93

know he robbed the store but he didn't know that he killed the man, killed the people until, uh, he saw it in the paper and on the news. He did it for real, didn't he? He did it for real, like that.

LT. JOHNSON: What did he say?

MR. YOUNG: He didn't say nothing, you know. He, --

LT. JOHNSON: Do anybody besides Jeff know who this other guy he was with?

MR. YOUNG: The other dude. I don't know. Cause, like I say, he left, he left there by hisself. Then he came back.

LT. JOHNSON: Is there anybody Jeff's been hanging out with that's got a car?

MR. YOUNG: No, sir. He mostly be over -- he be in Cherokee. He walk back here. Well, he know people around here though. He know people around here. But he walked, we walked from here.

MR. WEAVER: All right. Let me ask you this. He came back over there. You were at Tina's asleep. Is that right?

MR. YOUNG: Yes, sir.

MR. WEAVER: And that -- and he came inside and he told you about it?

MR. YOUNG: No. I stepped out.

MR. WEAVER: You stepped outside?

MR. YOUNG: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 21 of 93

MR. WEAVER: Okay. Did he ever come inside?

MR. YOUNG: No, sir. Not that night there.

MR. WEAVER: All right. Then when he stepped outside --

MR. WEAVER: Make a note we stopped the tape at 1435 hours.

Okay. We'll start back again. Uh, and he was outside?

MR. YOUNG: Yes, sir.

MR. WEAVER: Like you said, he was standing outside. All right. Where did he go from there?

MR. YOUNG: The time he left there?

MR. WEAVER: Yeah, yeah. Where did he go?

MR. YOUNG: To my sister's house.

MR. WEAVER: To your sister's, which is right across --

MR. YOUNG: Yeah.

MR. WEAVER: You can see it from --

MR. YOUNG: From out my window -- from out her window. (Unintelligible) my sister's house.

MR. WEAVER: Okay. And where did you go from there?

MR. YOUNG: I went back upstairs.

MR. WEAVER: Okay. Did you see the gun at that time?

MR. YOUNG: Yes, sir.

MR. WEAVER: When, when you went out there and talked to him, he showed you the gun?

MR. YOUNG: Yes, sir.

Case 7:14-cv-00039-HL-TQL Document 18-14 Filed 07/14/14 Page 22 of 93

MR. WEAVER: Okay. Now, I want to move forward just a little bit. That same gun was used in the incident last night. Involved in the incident over at Cherokee projects.

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. Now, that gun was thrown. Are you the one that threw that gun?

MR. YOUNG: Yes, sir. 'Cause I didn't, you know -- I'm gonna tell straight up like this here. He was gonna hit that one up there too, you know what I'm saying, and then --

MR. WEAVER: When you say, he's going to hit that one up there too, what are you talking about?

MR. YOUNG: The Suwannee Swifty store.

MR. WEAVER: The Suwannee Swifty store?

LT. JOHNSON: Up where now? Where? You said up there?

MR. YOUNG: Up there on 84.

MR. WEAVER: On 84?

LT. JOHNSON: Okay.

MR. WEAVER: Okay. Did he talk about that one? When did he talk about that one?

MR. YOUNG: Yesterday. Then, then I had seen the gun and I got it.

MR. WEAVER: All right. How did you end up with the gun last night?

MR. YOUNG: 'Cause he had laid it down on the table. I had threw it. I threw it over yonder.

MR. WEAVER: Okay.

MR. YOUNG: I was looking at ya'll and, man, I was saying, I hope they find that gun, I hope they find that gun, I hope they find it. 'Cause I seen a whole lot of police down there in and around down there. And I say, I hope they find that gun.

MR. WEAVER: Who fired the gun last night?

MR. YOUNG: Me.

MR. WEAVER: You're the one that fired it?

MR. YOUNG: Shot it in the air.

MR. WEAVER: Shot it in the air.

MR. YOUNG: 'Cause he had no more bullets after that. He had no more bullets.

MR. WEAVER: Okay. What did he say about the bullets? Has he said anything about the bullets to you?

MR. YOUNG: Well, he asked me why I shot up, why I shot the bullets.

MR. WEAVER: He asked you that last night?

MR. YOUNG: And why I threw the gun.

LT. JOHNSON: What did you tell him?

MR. YOUNG: I said, man, I throwed the gun, man. You know, you already in trouble, man, you know.

MR. WEAVER: But that is his gun? That's Jeff's gun?

MR. YOUNG: I don't know whose gun it is. I guess it is.

MR. WEAVER: Is that the same gun you seen him, you're talking about these other two?

MR. YOUNG: With the wooden handles on it.

MR. WEAVER: Yeah.

MR. YOUNG: Silver.

MR. WEAVER: Is that the same gun that's over at the --

MR. YOUNG: At the BP store.

MR. WEAVER: Madison Street --

MR. YOUNG: Madison Street or (unintelligible).

MR. WEAVER: -- Deli?

MR. YOUNG: Yes, sir. And Junior Food Store.

MR. WEAVER: Okay. And, let me back up again. This other guy, when he came back, you're saying we. You're talking about we, talking about another guy that was with him.

MR. YOUNG: Yeah.

MR. WEAVER: Okay. And you've never seen this other guy that was with him?

MR. YOUNG: Never seen him with him.

MR. WEAVER: But he told you there was another guy with him?

MR. YOUNG: Yes, sir. Like I say, if I seen him I ain't know he -- I probably ain't know the guy was here. You know what I'm talking about. But he ain't no, 'cause he always be by hisself when he come over there.

 Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 25 of 93

MR. WEAVER: And Jeff is your cousin?

MR. YOUNG: Yes, sir.

MR. WEAVER: And he's been in Thomasville how long?

MR. YOUNG: About three weeks, four weeks, ever since March. Sometime in the end of March, between the second and third week in March.

MR. WEAVER: Does he have a girlfriend?

MR. YOUNG: Not that I know. Well, yeah, (unintelligible).

LT. JOHNSON: Okay. Let me ask you this. What was the shooting about all last night in the incident? What happened last night?

MR. YOUNG: They was talking about West Side stuff.

LT. JOHNSON: Huh?

MR. YOUNG: Them boys talking about West Side.

LT. JOHNSON: Some West Side stuff.

MR. YOUNG: West Side.

LT. JOHNSON: What's that?

MR. YOUNG: They talking gang. West Side, South Side. Some gangs. And one of 'em called the West Side. One over there by the old jailhouse.

LT. JOHNSON: Um-hum.

MR. YOUNG: And this is South Side over here.

LT. JOHNSON: Okay. And what happened?

MR. YOUNG: Dude, dude came and just started shooting,

talking about West Side. I was peeping out the window. I was steady peeping out the window right here. And I heard 'em hollering (unintelligible). (Unintelligible) peeping out the window and I hear West Side, West Side, West Side, mother fucker, West Side. Boom. Boom. Shot all in (unintelligible).

LT. JOHNSON: Shot who in (unintelligible).

MR. YOUNG: (Unintelligible)

LT. JOHNSON: Shot whose window out? (Unintelligible) a window out of an apartment?

MR. YOUNG: Yeah. They shot at, you know, (unintelligible).

LT. JOHNSON: Um-hum.

MR. WEAVER: And this shooting, this was last night? That's what --

MR. YOUNG: Yes, sir.

MR. WEAVER: And that's what, that's what led you to throw this gun out there?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay.

MR. YOUNG: If I didn't did it he'd be gone (unintelligible). He's been left last night. But he ain't go no more bullets.

MR. WEAVER: You're saying if you hadn't done it, he'd have left last night?

MR. YOUNG: Um-hum.

MR. WEAVER: Did he say anything about going looking for that gun today?

MR. YOUNG: I don't hear him say. He just kept saying, why you threw the gun away? Why you shot my bullets? He say, you get the gun from the house, man, like that right there. So I just chunked it (unintelligible). I seen a whole lot of polices (unintelligible).

MR. WEAVER: Did he say, talk about the Madison Street Deli, the first one, on that, where he went in and shot the clerk, the tall clerk that was washing dishes? Did, uh, he say anybody was with him on that one?

MR. YOUNG: No, sir. He say he did that one by hisself. He said he timed the light. You know what I'm saying, he say he timed the light, timed the stop light, and it go green. That keep the cars, you know, from stopping and starting (unintelligible).

MR. WEAVER: But on the Junior Store he said there was somebody with him. All right. Tell me about the Junior Store again one more time? What did he tell you about what happened?

MR. YOUNG: He say he went in, said he went in, like that there. He went down the bubble gum aisle, turned around, turned around and the man was sitting in the chair. He shot the glasses. Shot him somewhere in the head. Say

he shot two times. When he shot him the first time his glasses been going right through here. So he shot him again, like that right there. Then he kept trying to get the cash register open, but it wouldn't never open.

MR. WEAVER: Did he say he went behind the counter?

MR. YOUNG: Behind the counter?

MR. WEAVER: Yeah. Did he say he actually got behind the counter himself?

MR. YOUNG: The other dude.

MR. WEAVER: The other dude. Okay. But --

MR. YOUNG: He, he was in front of the counter and the other dude went to the cash register.

MR. WEAVER: Did they say they took anything at all from the store?

MR. YOUNG: They ain't tell me. He told me -- he came back by hisself over there, you know what I'm saying, and knocked on the door. Came down and she say, who that keep knocking on the door, like that right there.

MR. WEAVER: Lt. Johnson, can you think of anything else at this time?

LT. JOHNSON: Not at this time.

MR. WEAVER: All right. I want to ask you for the record here, did you have anything at all to do with the, either one of these shootings at Madison Street or the Junior Store --

MR. YOUNG: No.

MR. WEAVER: -- other than knowing about it? You weren't at either one?

MR. YOUNG: I wasn't at nary one of them. I wasn't at nary one of them (unintelligible). I was nowhere around. I wasn't on (unintelligible), you know. I was (unintelligible). I was at Cherokee.

MR. WEAVER: Okay. Is everything you've told myself and Lt. Johnson about that Madison Street and about the Junior Store and about the shooting last night, which was -- What time was it when you threw that gun away?

MR. YOUNG: All right. The police (unintelligible) car, before he came around there (unintelligible) I threw it over yonder.

MR. WEAVER: Okay.

MR. YOUNG: I threw it over yonder. Say, why you throw it over there, why you throw it over there?

MR. WEAVER: Is that the only time you've ever fired that gun?

MR. YOUNG: Yes, sir. That's the only time I ever fired it.

MR. WEAVER: Okay.

MR. YOUNG: I ain't had nothing to do with it. I ain't gonna go and get locked up. I don't want to get locked up no time for nothing I didn't do.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 90 of 93

MR. WEAVER: Okay.

MR. YOUNG: And, --

MR. WEAVER: Has he told you not to tell us anything? Has your cousin Jeff told, asked you to say, not say anything to the police? Or have ya'll talked about it or anything this morning?

MR. YOUNG: No; we ain't talk about it. We ain't talk about it this morning.

MR. WEAVER: You didn't?

MR. YOUNG: No. (Unintelligible) I ain't gonna tell you nothing 'cause I done been locked up before. (Unintelligible) you know what I'm saying. I'm through with that there (unintelligible). It's been a long time, '89, and I been in and out of jail, in and out. No more, I don't want no more. I got some (unintelligible). I'm through with that.

MR. WEAVER: So everything you're telling myself and Lt. Johnson is the truth to the best of your -- that you can remember and the best of your knowledge?

MR. YOUNG: Yes, sir. Everything he told me, I'm telling ya'll. Everything.

MR. WEAVER: Okay. The time now is 1445 hours, 4-13-94. At this time this ends the interview.

MR. WEAVER: Today's date is 4-13-94. We've restarted the interview that we were doing just a few minutes ago to

talk about another subject. At this time, the same people present, Lt. Johnson, myself, Chuck Weaver and Gary Lamar Young.

Okay. Gary, I want to ask you about this third person we talked about earlier that was, that you might know something about that was at the Junior Store the night of the shooting and robbery, the night the man was shot twice that you were talking about, the night that man was murdered, and they attempted to get in the cash register. Tell us what you know about this guy Corey?

MR. YOUNG: He was the one trying to open up the cash register.

MR. WEAVER: Corey was trying to open the cash register. Okay. What is Corey's last name?

MR. YOUNG: I don't know his last name.

MR. WEAVER: You don't know his last name?

MR. YOUNG: No, sir.

MR. WEAVER: Where does Corey live?

MR. YOUNG: He be out there in Cherokee, with Tonya (unintelligible) girl's house. That (unintelligible) came here with Thad.

MR. WEAVER: The one that came in with Thad?

MR. YOUNG: Right.

MR. WEAVER: And Corey was the one trying to open the cash register? Who told you this?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 92 of 93

MR. YOUNG: He did.

MR. WEAVER: Corey did. All right. Now, let's back up again. When you were -- When Jeff came, you're talking about Jeff coming to talk to you, was Corey with him then too?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. They were together?

MR. YOUNG: Yes, sir.

MR. WEAVER: Did they ever come in?

MR. YOUNG: No, sir.

MR. WEAVER: Okay. What did they have with them?

MR. YOUNG: They had some beer.

MR. WEAVER: Okay.

LT. JOHNSON: What kind of beer?

MR. YOUNG: Budweiser.

LT. JOHNSON: How much beer?

MR. YOUNG: A case, I think. Two, two twelve packs.

MR. WEAVER: Two twelve packs? Okay. Did you drink any of this beer?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. Did that -- Who else was -- They, they came on in the house, came on in the apartment?

MR. YOUNG: No, sir.

MR. WEAVER: Ya'll went somewhere else?

MR. YOUNG: Over to Tonya's house.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 93 of 93

MR. WEAVER: Ya'll walked over to Tonya's house?

MR. YOUNG: Yes, sir.

MR. WEAVER: Okay. You, you were telling the truth about they came there and then ya'll left Tina's -- You left Tina's; right?

MR. YOUNG: Yes, sir.

MR. WEAVER: Your girlfriend's, and went to Tonya's?

MR. YOUNG: Yes, sir.

MR. WEAVER: Right across the apartments there --

MR. YOUNG: A lot of peoples (unintelligible).

MR. WEAVER: Name everybody over there, who was over there?

MR. YOUNG: Tonya, Tonya, me, Jeff, Corey. I think Thad was over there. Tonya's sister. There was another girl. And then some more dudes had came up.

MR. WEAVER: You're saying Tonya, Corey, Jeff --

MR. YOUNG: I think Thad was over there.

MR. WEAVER: Thad?

MR. YOUNG: Tonya's sister. And another, another girl. And then some more dudes had came up.

MR. WEAVER: Okay. What about, uh, you know the names of anybody else that was there? Do you know anybody by the name of Junior?

MR. YOUNG: Junior? I know, I know a Junior.

MR. WEAVER: What's his name?

MR. YOUNG: Oh, talking about Carnell.

MR. WEAVER: Carnell. Was he there?

MR. YOUNG: No, sir. Carnell wasn't there.

MR. WEAVER: How do you know Carnell?

MR. YOUNG: I know him by -- he stay in Boston.

MR. WEAVER: Okay. Did you see Carnell last night?

MR. YOUNG: Yes, sir.

MR. WEAVER: Was he involved in this shooting thing last night, that gang type thing? You know what I'm talking about?

MR. YOUNG: No, sir.

MR. WEAVER: Okay. But Carnell, you don't think Carnell was there when they, when they came back with this beer?

MR. YOUNG: No. Carnell wasn't there. He wasn't there.

MR. WEAVER: Now, did Corey talk about the robbery to you, separate from with Jeff? What did Corey say about the shooting of this man?

MR. YOUNG: Corey said, the only thing, he turned around, he had turned around, Corey said he was over by the beer thing. He heard the first shot. Then he ran over there. And he shot him again. He went up about, trying to open the cash register.

MR. WEAVER: Okay. Corey was trying to open the cash

register. But when the shots were fired where was Corey?

MR. YOUNG: Back there by the beer thing.

MR. WEAVER: By the beer thing?

MR. YOUNG: And then while Corey was trying to open the cash register, Jeff went and got the beer.

MR. WEAVER: Okay.

MR. YOUNG: And he said he dropped, he said he dropped some out of the door.

MR. WEAVER: He said they dropped some out of the door?

MR. YOUNG: Dropped some cans or something.

LT. JOHNSON: What you mean, they dropped them out the door?

MR. YOUNG: When they were running they dropped, dropped, you know, dropped things. I think some beer had came out. I don't know what they were saying.

LT. JOHNSON: Okay.

MR. WEAVER: Now, did Corey or Jeff tell you how they got over to the Junior Store? Are you sure you don't know how they got there?

MR. YOUNG: I don't know.

MR. WEAVER: Now, you know it's important. That's a long ways from Cherokee projects --

MR. YOUNG: Yes, sir. I know the way out there.

MR. WEAVER: And it's all -- And it's important that you tell us everything you know? I mean the truth.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 36 of 93

MR. YOUNG: Yes, sir. I'm telling you the truth.

MR. WEAVER: You know, now, you've been -- sounds like you're telling the truth, and you know, if you know how they got there you need to tell myself and Lt. Johnson.

MR. YOUNG: I'm telling --

MR. WEAVER: If one of their girlfriends or somebody took them over there, (unintelligible) we need to know how they got there.

MR. YOUNG: I don't know. I don't know how they got there. I'm telling you the truth. I don't know how they got there. 'Cause, you know, they left here walking. I don't know how they got there.

LT. JOHNSON: When you say they left here, what, him and --

MR. YOUNG: Corey.

LT. JOHNSON: -- left together?

MR. WEAVER: Okay. Let me ask you this. Right before, before they went did they talk about doing this to you, about doing it? Did they ask you to go with them?

MR. YOUNG: Yes, sir.

MR. WEAVER: Did they ask you, did they say where they were gonna go?

MR. YOUNG: Yeah.

MR. WEAVER: Did they say the Junior Store?

MR. YOUNG: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 37 of 93

MR. WEAVER: And what did you tell him?

MR. YOUNG: I say I ain't going.

MR. WEAVER: Was there anybody else there with you when they started talking about it?

MR. YOUNG: No, sir.

MR. WEAVER: They ain't --

MR. YOUNG: I told them I wasn't going.

(Conclusion of tape recording)

MR. HARDY: Take up the transcripts.

(Whereupon Mr. Hardy retrieves the transcripts from the jury)

MR. HARDY: We'll give them to the Clerk, Judge.

I think the Clerk doesn't want to -- wants us to keep them, Judge. If there's no objection --

THE COURT: That's fine. I have Exhibit --

MR. HARDY: He's got the one that's into evidence, I think.

THE COURT: Yes, sir. 169.

Do you have any more questions for this witness?

BY MR. HARDY:

Q Why did you stop the tape there, Weaver, toward the end?

A The end of the interview?

Q Yes, sir.

A That was basically it.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 38 of 93

Q No. I said, why did you stop it and then you started talking about Corey Clark? Did you tell him what to say?

A No. No.

Q Well, what'd you do with that break there?

A There was some other detectives working on the case and we received more information, more things to talk about.

Q Did you tell Young what to say?

A No, sir.

Q How to say it?

A No, sir.

Q I think Mr. Collins was the other man out at the Junior Food Store?

A Agent Collins; yes.

Q He secured some of the evidence and I think he's the one that took all the pictures?

A Yes.

Q Did you go back to the beer cooler area?

A Very briefly I did.

Q He would have been the man that made some charts and some other photographs?

A Yes.

Q Both of those stores we were talking about, are they both, the Junior Food Store and the Madison Street Deli, in Thomas County, Georgia?

A They are in Thomas County, Georgia.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 39 of 93

Q And the man deceased, what was his name?
A Richard Slysz.
Q I think he was armed at the time he was killed?
A Yes; he was.
Q And did you see -- He had weapons?
A Yes; he did.
Q And he was the night clerk at the store?
A Yes; he was.
Q I think they're depicted in the photographs. He had a, I think, a derringer on his side?
A Yes.
Q And then he had another one where?
A I believe in his pocket, one of his pockets.
Q Had either one been fired?
A It didn't, they didn't appear to be fired; no, sir.
Q Fully loaded?
A They were loaded.
Q Did you get them out or did Collins do that?
A We were both there. I believe Ken might have taken one out.
Q I think the clothes -- you got clothes from each of the four subjects in addition to the shoes?
A There were some clothes; yes.
Q And they were retrieved incident to arrest at the jail?
A Yes.

Q And you turned all them over to Ms. Everett?
A Yes.

MR. HARDY: He's with the Court.

COURT REPORTER: Your Honor, could we have a recess?

MR. MEARS: Your Honor, I expect my examination of Det. Weaver will be somewhat lengthy.

THE COURT: All right. Why don't we take a recess at this time.

Ladies and gentlemen, why don't we take about a ten to fifteen minute recess before we start the cross examination.

Everyone please remain seated while the jury retires.

(Whereupon the jury retires from the courtroom)

THE COURT: We'll be in recess for about ten minutes.

(Whereupon the Court takes a brief recess, and upon reconvening the following transpired outside the jury's presence)

THE COURT: Mr. Mears, before we bring the jury in, in regards to the Court's ruling yesterday concerning the relevance of anything else on the Deli Street tape --

MR. MEARS: Yes, sir.

THE COURT: -- for that period of time that did not show the actual incident, I just wanted to clarify that you understand the Court's ruling was based upon the information presented at that time. At that time all I felt like there was, and I don't know that I feel like

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 41 of 93

there's anything different at this time, was that at most there was a, be speculation, conjecture as to whether or not someone else was involved in that particular matter, or was, in fact, the perpetrator as opposed to the Defendant.

I'm assuming you understand that if you can at some time present evidence to me otherwise, that I would reconsider it.

MR. MEARS: Yes, Your Honor. And, and I would like to do that either later this afternoon or the first thing -- I've got some evidence that I think is before the Court already that may substantiate the need to show part of, at least part of it, from Gary Young's testimony. But I need, I need just time to put that together in a proper presentation as to why I think it makes at least that portion of the tape relevant.

THE COURT: Well, I don't know if there is or is not. But I just wanted to make sure you understood the ruling was based on what I, I had heard at the time.

MR. MEARS: I, I appreciate you telling me, Judge. I thought you had ruled it all out as to not being relevant after you had reviewed it yesterday.

THE COURT: Well, I had.

MR. MEARS: Then I'm correct then.

THE COURT: Based on, again, anything that we knew of at that time. And I don't know that it's any different at

this time. But it'd be at best speculation or conjecture.

MR. MEARS: You're allowing me to come back to you if I think I've got more --

THE COURT: If you have other evidence, or think, think you have other evidence.

MR. HARDY: Judge, if he takes a long while with Mr. Weaver, will he be the last witness today? I don't know if he's going to take forty-five minutes or not. But --

THE COURT: Mr. Mitchell indicated to me in the hallway that there was a particular witness that they, ya'll had to provide an airline ticket from out of town that he would like to put up today after Mr. Weaver.

MR. HARDY: Well, if we can, Judge. He may need the rest. He has a little medical condition. I haven't seen him today. But he has traveled today to get down from New Jersey. You know, I don't know whether he needs to calm down or not. He's been put through a lot today. He had a heart attack about a week, about ten days ago.

THE COURT: Gentlemen, I'll leave that to ya'll's discretion, whether or not to call him today or not.

MR. HARDY: Yes, sir.

MR. MEARS: Mr. Hardy, we -- I've shown you this map and you've looked at it. Could I get a stipulation as to the authenticity of the map for demonstrative purposes? I'm going to go ahead and mark it and ask that it be used

in --

MR. HARDY: Just number it and introduce it, Judge. It looks like Thomasville.

MR. MEARS: I don't want to get into --

MR. HARDY: It's not drawn to scale but it looks like it's pretty true.

MR. MEARS: It's a photocopy of an official map from the Chamber of Commerce. And I don't want to go any further than that, but I think there's probably some copyright violations going on. But I think we've covered that the way we've made our copies, Your Honor.

THE COURT: All right, sir.

You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Mr. Mears.

CROSS EXAMINATION

BY MR. MEARS:

Q Good afternoon, Mr. Weaver. Mr. Weaver, how long were you with the Thomasville Police Department?

A Approximately thirteen years.

Q And you're now in private business; is that correct?

A Yes.

Q As an officer with the Thomasville Police Department, did you have an opportunity to be a patrol officer as well as a

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 44 of 93

detective?

A No; I didn't. I came here as a detective from another department that I'd been in nine years. So I was never a patrolman here, other than for Rose Show day, I did throw on a uniform. Other than that, I didn't.

Q Mr. Weaver, as a detective and as a thirteen year member of the police department, were you reasonably familiar with the street patterns and locations of certain points within the city of Thomasville as it may relate to this particular case?

A Yes.

MR. MEARS: Okay. Your Honor, with the Court's permission I have marked a city map of Thomasville as Defendant's Exhibit 7.

I'm going to ask if Mr. Weaver could come down and simply make notations on this to outline some of these geographic locations?

THE COURT: Yes, sir.

BY MR. MEARS:

Q Okay. Mr. Weaver, if you'll come down.

A (Witness complies)

MR. MEARS: Your Honor, could I ask if the Court could inquire if the jurors can see this from this location, or do I need to move it?

THE COURT: Ladies and gentlemen, can you see that sufficiently?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 45 of 93

MR. WEAVER: I can't.

MR. MEARS: Mr. Hardy and I can go ahead and put on our glasses.

MR. WEAVER: I need some new ones.

BY MR. MEARS:

Q Mr. Weaver, for the benefit of the jurors, could you please point out where the Cherokee Apartments are located relative to this particular map? And if I could just get it started at the right place here. Here is Smith Street and there's -- Would you just put a circle around what, the general location of the Cherokee Apartments?

A It's going to be in this -- It's in this area here (indicating), I believe.

Q There's Cherokee right there.

A Yeah. I'd say in this area here.

Q Okay. And is the criminal justice center located adjacent to the railroad track that runs in this direction there?

A Yes.

Q Do you see on the map --

A Is this the railroad track?

Q This is the railroad track there.

A Yes. It runs through there, one side on the railroad track. And then you've got a field. And then the apartments is somewhere in here.

Q Okay. So the criminal justice center and then the

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 46 of 93

Cherokee Apartments would be located in this area that you've, you've outlined to the --

A That's approximately correct; yes.

THE COURT: Gentlemen, you may be blocking some of the jurors at the far end over here.

BY MR. MEARS:

Q Mr. Weaver, would you also point out on the map the general location of the Madison Street Deli where Mr. Wilson was the clerk? And I believe you'll find it at the corner of Monroe and Madison. Can you, do you see that?

A Here we go. Madison Street, and let me find Monroe here. In this general area here.

Q Okay. And would you point out the location, general location of the intersection of W. Jackson Street and Pinetree Street as it relates to the location of the then Junior Food Store?

A Let's see. This is Monticello here. Pinetree --

Q Pinetree is right over here. Come around this way.

A Okay. In this area here.

Q You can go back to your seat.

A (Witness returns to the witness stand)

Q Mr. Weaver, could you give an approximate, I realize this would be an estimate only, of the relative distances between the Cherokee Apartments and the Madison Street Deli?

A Mile and a half, two miles max.

Q Okay. And could you give an estimate, again a general estimate, of the relative distance from the Cherokee Apartments to the intersection of W. Jackson and Pinetree?

A Three max, three and a half, three, something like that.

Q All right. Now, your first involvement with the case was when you were on duty and you were called around 10:00 o'clock or 10:15 or some time on April the 7th to come to the scene of the shooting at the Madison Street Deli; is that correct?

A Yes.

Q And when you arrived at the scene, you, were you the investigating officer who took control of the scene at that time?

A Yes. I was the first investigator there and the one in charge of the scene; yes.

Q Had the patrol officers who had first arrived on that scene properly secured the scene in accordance, in accordance with proper investigative techniques, in your opinion?

A I believe so, because when they first arrived there, my understanding was their first responsibility was for the injured. And I believe they did take part, them and the ambulance drivers or the, excuse me, the EMT's took place in that. So they might have had to do certain things to, because of the person there. It did seem to be fairly well secured.

Q That was in accordance with proper training? If you

have an injured person, you take care of them and then you secure the crime scene; is that correct?

A Yes.

Q Now, you've had an opportunity to review the, at least a portion of the videotape that involves the shooting of Mr. Wilson; have you not?

A Yes. It's been a while, but I have.

Q Based upon your recollection, I realize it might have been a while since you reviewed it, did you notice any contamination of the scene from, and I'm talking about contamination by way of disturbance of evidence, disturbance of possible fingerprints, things of that nature, by any of those individuals who had first arrived on the scene?

A I didn't notice any direct contamination, no, from looking at the video. I didn't -- Not to my knowledge.

Q Nothing that just jumped out at you as an experienced investigator?

A There, there was movement. There was people walking about. But I knew -- noticed nothing directly, taken away or added to.

Q To your knowledge, was a crime scene log prepared and maintained by the first arriving or the second arriving officer on the scene?

A By log, they did an incident report and their observations and dealings with the scene were in their incident

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 49 of 93

report.

Q Okay. Would, would you agree, and I'm not being critical of the officers, but would you agree that the proper investigative technique in a crime scene is for either the first or second officer arriving on the scene to immediately begin logging the individuals who come on to that scene or who were there at the time that they arrived?

A Yes. And I believe they did log, name the people that were there at the time. I believe the officers did list them in their incident report. That is proper.

Q And do you recall whether or not there was any attempt to investigate by way of interrogation or interviewing any non police or non emergency personnel who were on the scene or at the scene at the time of their arrival?

A I'm not aware of any.

Q Okay. You are aware that there were residents at that particular location in and around the store by the time the EMS personnel had arrived?

A I couldn't say for sure, because I went straight in. I did not talk to or see the residents myself. So I couldn't testify to the fact whether there was or not --

Q Okay.

A -- anyway.

Q Let me go back just a moment to the log, and please believe me, I'm not criticizing the officers, but I'm asking your

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 80 of 93

opinion as a, as a very experienced investigator, that a log should be kept, shouldn't it, separate and apart from the individual incident reports?

A Sometimes logs are kept.

Q It allows the investigator such as yourself when you arrive on the scene, look at the scene, then it allows you an opportunity to go back and do in depth investigation by interviewing people who might have seen someone, for instance, coming or going from the scene?

A It assists; yes.

Q Okay. In this case that wasn't done; was it?

A In this case they were, they directed me directly. Was there a written log that anybody handed to me? No. But they did direct me. The officers walked me through and told me, you know, everything they'd done or were doing. So I was -- Somebody was with me there at the first the whole time, as soon as I got there.

Q Okay. What about the civilian personnel or those who are non law enforcement or non emergency medical technicians who, who were on the scene or who had been at the scene prior to your arrival? People in addition to those? Residents? Young men who might have been standing by in the parking lot or on the street corner?

A I did not talk to any at that time and no one brought any to my attention.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 31 of 93

Q Okay. Now, and I, I believe you went into the scene, did a, sort of a circular or what the police officer, I think, called it a circular look at the scene, and then came back out and then focused on specific parts of the crime scene; is that correct?

A Yes.

Q And that's a proper technique to be used; isn't it?

A That is.

Q Now, did you direct any of the crime scene technicians to take fingerprints, or attempt to lift fingerprints of any particular location in the Madison Street Deli?

A I believe we were there together. As far as directing, Sgt. Glenn Hutchinson of the Sheriff's Department, the crime scene tech, did take and look for fingerprints in that area.

Q Okay. After you had had an opportunity to go back and review the crime scene, the tape that had been taken on Mr. Griffin's VCR, did you ask Mr. Hutchinson to go back and attempt to lift latent fingerprints from any particular surface in, in the store?

A I don't remember exactly asking him that. I couldn't say whether I did or did not. I do not remember.

Q Okay. Would that have been his responsibility other than your responsibility?

A It would have been his responsibility to do the lifting. Had I seen something or noticed, I guess it would -- we

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 82 of 93

were working it together. You know, it could have been. But it's usually his responsibility.

Q Were attempts made to lift latent prints from any part of the store to your knowledge?

A I'd have to refer to my notes and see.

Q Please do. Please do.

A I believe there was -- Let me check real quick and see. At this time, and we're at 12:15, after midnight, at this time crime scene tech, Sgt. Glenn Hutchinson, is going over the crime scene and dusting the cash register area for possible latent prints. And I believe that he did. It's my recollection that he did do some dusting.

Q Just on the cash register?

A The cash register area, that could be that whole counter top area there. He was in the process of doing that. So that would include more than just a small area.

Q Do you recall, having viewed the videotape of the scene, do you recall that, the image of the person who was in the store at the time Mr. Wilson was shot? Do you recall that particular segment of the film where he went back around from the first cash -- and excuse me for turning my back on you -- but there was a cash register here that sort of faced the front, and then there was a cash register or a machine in the back that dealt with the lottery tickets? Do you recall that scene?

A Vaguely; yes. I mean, I remember it somewhat. It's

been a while. It's been almost three and a half years since I've seen the video.

Q And, and I realize that, and I, I'm --

A But I do remember somewhat.

Q Do you recall the image of that individual going back around the corner, placing his hands on the, what appears to be the metallic or plastic surface of that machine and making a gesture like this (indicating) with his hand on the machine? Do you recall seeing that?

A I don't recall specifically one way or the other. I would just have to simply view the video again to do that, to be sure. I couldn't say for sure.

Q Okay. Would things like that call attention to someone who was processing the scene for fingerprints who had already viewed that particular videotape?

A They could.

Q And, again, you weren't the one doing the videotape, excuse me, doing the fingerprints, but a number of people involved in the investigation looked at that videotape early on, even back in Mr. Griffin's office; didn't they?

A Yes; they did.

Q Okay. Do you recall also the image of the individual who appeared on the videotape as that person left the store, apparently leaving the store with what appeared to be exposed hands with no gloves pushing, at least with one hand and possibly

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 84 of 93

two hands when he went out of the camera range, on what is the glass door there? Do you recall seeing that?

A I remember him going out and pushing. What part of it he touched, I could not say for sure without reviewing the video.

Q Okay. Would that type of, of action on behalf of someone who had been videotaped lend itself to directing a fingerprint processor to taking fingerprints of those areas where it appeared obviously that the person had touched a glass surface?

A It could.

Q Okay. Based upon your experience, is glass surfaces more susceptible to the retraction of latent prints than perhaps other types of surfaces?

A It can be. I don't know whether he took prints there or not, so I -- You'd have to ask Glenn.

Q Would it be a fair statement to say that whatever prints were taken at the Madison Street Deli have been lost?

A I don't know that any were lifted. You would have to -- probably. I could not say. Glenn Hutchinson would be the best one to answer that. I, I just couldn't say if there were any.

Q And, and I understand. Some of these questions go to other people that, that will perhaps testify. You don't have any direct knowledge of the existence of any fingerprints from the Madison Street Deli that relate to Mr. Ray Cromartie as a suspect

in that case; do you?

A No; I don't.

Q Now, I believe you testified that you went to a particular location and retrieved some clothing that someone had called and said they'd found in their yard? Did I hear that correctly?

A Yes.

Q Okay. We talked about the green hood before. I'll ask you this. Is this what you found at --

A Yes, sir; it appears --

Q -- Mr. McRae's yard, or was given to you?

A It appears to be.

Q To your knowledge, were you ever able to find any hairs or anything like that in this particular garment or in the hood?

A I did not find any hairs.

Q Did anyone ever look, to your knowledge?

A I don't know if they did or not. It was sent to, it was sent off to the crime lab. But I don't -- To my knowledge, none were.

Q It was sent to the F. B. I. lab?

A Yes.

Q Okay. Did ya'll take this out and give it to Pete, the tracking dog to see if he could take a trail from Mr. McRae's yard to any place?

A I do not, I don't recall that.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 86 of 93

Q You're aware that -- You know which dog I'm talking about?

A Yes.

Q Okay. And assume for my question that Pete was the type of dog that could follow a trail for, that had been created many hours after, and follow that trail. Do you know if anybody ever attempted to do that?

A I don't know, to my knowledge, whether they did or not.

Q What time of day did you, in the morning, did you find this?

A It was before lunch. It was at 11:00 A. M.

Q Okay. And you were processing the scene between 10:00 and midnight; is that correct? Somewhere in that particular area?

A I believe it was 10:45 and on into the night.

Q Okay. State's Exhibit 30-A, I believe you testified was the cap that was found?

A Yes.

Q Was there any attempt to find any hairs in the cap and match those to anyone? Do you know?

A Not to my knowledge.

Q Did you -- That was sent to Washington too; wasn't it?

A I believe so; yes.

Q There was no ability to identify that one way or the other from the F. B. I. lab; was there?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 97 of 93

A No.

Q You couldn't either say it was the cap that was on the video or it wasn't?

A I couldn't; no.

Q And the laboratory people, you recall on the report you got back?

A To my knowledge; no.

Q They couldn't make it one way or the other; could they?

A Right.

Q Okay. Now, you arrived at the Junior Food Store approximately what time? And I know --

A 10:45.

Q Okay. I mean, the Junior Food Store. I'm sorry. I'm shifting --

A A little after 4:00 in the morning.

Q Okay. I assume you were sort of the detective on call and would handle these type investigations whether you were on the clock or not; is that correct?

A Yes; that's correct. We -- I think we had calls by the weekends and it was just whosever weekend it was. It happened to be my weekend or my day to be on call.

Q Okay. Now, as I understand it, you did a, an investigation within the store, took photographs. You didn't actually do any of the drawings, either the two scale drawings, or any other type of drawings. Those were done by Mr. Collins;

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 98 of 99

is that correct?

A Yes.

Q Okay. Did you -- You did make visual observations though with regard to the location of certain items in the store; is that correct?

A Yes; I did.

Q Now, I know we've got photographs that have been introduced showing the interior of the store. Excuse me one moment.

MR. MEARS: I apologize, Your Honor. I'm looking for one specific interior shot. I'll find it in just a few moments.

If I could ask Mr. Kleinrock to come look for the interior photograph of the store, the interior photograph.

Q I apologize, Mr. Weaver. Mr. Weaver, you've identified, I believe, State's Exhibit 104, 102 and 91, among other photographs, as being the Junior Food Store?

A Yes. This is the Junior Food Store. Yes. Junior Food Store. Right.

Q It's since been changed and there's a new location and a whole new facade out there; is that correct?

A Correct.

Q Now, with regard to this photograph here, and I'm referring to 104, would that be a view of the store from W.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 59 of 93

Jackson Street looking back at the store?

A It appears to be, in a corner there.

Q Okay. And would the gas -- Is there any obstruction or anything between this, the street and the front of the store from that particular view?

A To the front door, nothing blocking it; no.

Q Okay. Where are the gas pumps located in that particular photograph, or can you tell?

A They're in the front of the store, out from the store. By the photo it looks closer to the grass area than it does from the front of the store. Close to the sign, big sign, right straight across.

Q You do a lot of --

MR. MEARS: May I stand here for just one moment, Judge?

Q You do a lot of photography; don't you?

A I do some. I wouldn't say a lot. I do some.

Q Would it be a fair statement to say that even the best photographs sometimes distort distances?

A They can; yes.

Q And simply makes it look either further apart or closer than it really is, simply because of the angle of the camera; is that correct?

A Yes.

Q Is that another view from Jackson Street?

A Yes; it is.

Q Okay. Now, I'm asking if you'll look at 91. Is that the BP Station across the street?

A Yes; it is.

Q That would be the view approximately from the front of the Junior Food Store at the door, looking back across the street into the BP Station; is that correct?

A Yes.

Q Okay. Now, do you see any lights between the BP Station and that particular front of the Junior Food Store? I'm talking about street lights, things of that nature? I'm not talking about redlights, but street lights or lights of illumination?

A There's one. That looks like one there and -- I'm not sure whether this is a light or not. It could be. I see at least two. Two, two lights with poles, or two poles that lights are on is what I see.

Q Okay. The lights that you're referring to, they may be better shown in 102. That's a street light there?

A Yes.

Q Now, let me ask you to look at 104. Do you see any street lights on that side of the store?

A I don't see any in this photo.

Q So, if you were looking at the store here --

MR. MEARS: These are in evidence, Your Honor.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 81 of 93

Q -- you would have a light over on this side of the store, but do, can you see or discern any lighting at all around the left side of the store? If you were coming out of the store and turning to your left, are there any lights that you can determine from this photograph that were there at that end of the store?

A Not from the photo. I don't know -- It's hard to tell the way -- from this photo I don't see any.

Q Okay. Look at 102 and see if you can see any lights in there? And that's just a slightly different angle. But there are no lights on that, in proximity to the store at that end; is that correct? That's the end going up --

A Not in front. I see one in back, but not in front.

Q Okay. And that would be, if you turn left at that corner of the store, that's the way you'd go up to the Providence Apartments; is that correct?

A Yes.

Q And there doesn't appear to be any lights on that end of the store; is there?

A In back, there's one right there in back, if you're going toward Providence.

Q Right. But on --

A In front, I don't see any in this photo.

Q Okay. Thank you.

MR. MEARS: Your Honor, these, these are not in

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 82 of 93

evidence yet. I'd like to go ahead and ask Mr. Weaver some questions. I'm sorry: I got ahead of myself thinking that they'd already been entered. If I could have some leeway and ask him some questions with regard to -- I'm sure Mr. Hardy is going to introduce these at some point.

THE COURT: All right, sir.

BY MR. MEARS:

Q I just want to get some idea, and I know Mr. Collins did the drawings, but for the purposes of your testimony, would you please look at State's Exhibit 132 and sort of orient yourself to the store? What I want to find out if I can, Mr. Weaver, is some relative distances within the store itself between the front door and what has commonly been, what has been referred to as the beer cooler. Looking at that, and based upon your recollection, can you provide an estimate of the distance from the front door over to the beer, where the beer is stored?

A It'd be a hard -- I can look at the measurements that were done by Ken Collins, or he could, would be a more accurate --

Q Okay. I'm sure they would. Just -- Would you defer to Mr. Collins?

A Yes, sir. He did take measurements. I think there were some measurements taken. Probably be --

Q Okay. That's, that's fair. Let me ask you one other

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 83 of 93

question about this one. State's Exhibit 131. We talked about the beer and the cooler. Do you see any beer in that photograph?

A Yes. There's beer stacked behind a Golden Flakes snack center rack.

Q That's right out in the open; isn't it?

A Yes.

Q And is that a stack of cardboard containers of beer in what's usually called twelve packs?

A It appears to be; yes.

Q Does it appear to have been stacked in some type of display with beer on top of each, beer cartons on top of each other?

A Yes; it does.

Q How far is that from the cash register in the store?

A Maybe five yards. I don't know. I, I, you know, I didn't measure it. I don't know if it was measured or not.

Q And --

A Five, five to ten yards maybe.

Q Assume that the cash register is where you are, and I'm just going to sort of back up, and I know I'm asking you to guesstimate here. But assume the cash register is right where your hand is. Let me back up. How far away were the beer cans?

A That's maybe ten, ten yards.

Q Somewhere -- Would this be a fair estimate as to where, how far away from the container --

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 84 of 93

A I guess it's a fair --

Q -- the containers were? Okay. And the beer cooler would be back down the other side, behind, relative to where I'm standing now; wouldn't it?

A From this it'd be straight back in this area here.

Q Okay. Sort of over my right shoulder back this way, if I were standing at the beer containers?

A Right.

Q Thank you, sir. Did you have any involvement in the location of the prints that we've heard some, something about already? The shoeprints outside the store?

A I was aware of it and was there, but I did -- mostly I was inside and I observed Ken. But I didn't have any direct involvement in it.

Q Okay. On April the 12th in the afternoon, were you working, in the early evening hours, were you working at that time? I'm referring to the time that the incident occurred at the Cherokee Apartments?

A I don't think I was on duty. I think that was later at night, late, after dark. I was not on duty that I can remember.

Q Okay. When were you first made aware of the shooting at Cherokee Apartments?

A The next morning, eightish, nineish. Between 7:00 and 9:00 probably when I first came to work.

Q Okay. At that point had you assumed leadership in the

investigation of both the Madison Street Deli and the Junior Food Store?

A Yes.

Q And I understand you were working as a team with --

A Right.

Q -- with Det. Spencer and other people? But usually someone assumes the leadership role and I assume that was your role at that time?

A That's correct.

Q Had you developed any leads of any type at that time? I'm talking about the morning of the 13th, with regard to who had been involved in the Madison Street assault on Mr. Wilson and the, who was involved in the death of Mr. Richard Slysz?

A Not to my knowledge. There hadn't been any definite concrete witnesses.

Q So on the morning of the 13th you were advised in some way or another that there had been a shooting at Cherokee Apartments and some people had been arrested as a result of that particular incident; had they not?

A Yes. I was familiar with it.

Q And at some point in time an individual came to you and, who was, who had been arrested and had been charged, at least at that point, with involvement in the Cherokee Apartment shooting? That individual came and said, "I've got information I can give you"? Isn't that correct?

A He -- I instructed Dets. Guy Winkelman and possibly Mark Scott and some others to interview some people there at the jail in reference to if they knew anything about the Madison Street Deli and the Junior Food Store murder and shooting and robbery. And Det. Winkelman did talk to a subject, Carnell Cooksey, who did come forward, first to Det. Winkelman and then to myself.

Q Okay. And that's in accordance with proper investigative procedures, that if you have an open case and you have individuals who have been arrested for related activity, such as violence and that sort of that thing, that you would ask them if they have, you being the investigator, would ask them if they have any knowledge about these other instances?

A Yes.

Q Isn't that correct?

A Correct.

Q And that's done as a matter of routine; isn't it?

A Yes.

Q And in this particular instance Carnell Cooksey, who was under arrest for other charges involving assault, said, "I've got information I can give you"; is that correct?

A Yes.

Q Okay. And at that point he told you where the gun was that you later found out by the railroad tracks; is that correct?

A That's correct.

Q Did he indicate to you that Gary Young had tried to get him to hold that gun after the police, after the police had arrived at the Cherokee Apartments on the night before?

A I don't remember that in the interview with him. I can go through this thing and see if --

Q Well, that would have been significant enough for you to remember; wouldn't it?

A He mentioned Gary Young; yes. I would have -- He mentioned, he mentioned the gun and Gary Young, so, you know.

Q And, and here again I'm asking you to draw upon your thirteen years of experience. If an individual has a gun and there's been a shooting and the police arrive on the scene, they want to get rid of the gun for two reasons generally; wouldn't you agree? One, they don't want to get caught with the gun in their possession, or the gun is related to some other crime?

A Sure.

Q That's -- Would that be a fair statement?

A Fair statement.

Q And in this instance Gary Young wanted to get rid of the gun and you subsequently found out that he threw it away. Now, you don't have any direct knowledge of whether he offered it to Carnell Cooksey; is that correct?

A That's correct.

Q Okay. Carnell didn't tell you that; did he?

A I don't remember him telling me. I can go back through

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 68 of 93

the interview with him and see. But I don't recall now.

Q Right now it doesn't --

A Right now it doesn't ring a bell; no.

Q And I'm not trying to hold you to what someone else said. But you don't -- that's not something that stuck with you, that Carnell Cooksey had said, "Gary Young tried to get me to hold this gun"?

A I don't remember it like that; no.

Q Okay. But you subsequently found the gun almost exactly where Carnell Cooksey told you it was; didn't you?

A Yes; I did.

Q And it was in the grass, high grass near the railroad tracks outside the justice center; wasn't it?

A Right.

Q Okay. Who was present at the time that you found the gun, besides -- Carnell Cooksey didn't go. He just gave you some general directions and you went out there; is that correct?

A Yes.

Q Who else was there with you?

A Det. Winkelman, Lt. Johnson and at some point Sgt. Glenn Hutchinson.

Q Okay. After you found the gun, did you then obtain arrest warrants for Gary Young and/or anyone else?

A Not right after -- Not right then, right after the gun, no; I didn't.

Q Okay. After you found the gun, what was the next thing that you did after finding the gun?

A We -- I believe we did some more interviewing. But with the information that we had from Carnell Cooksey, police officers, uniform police officers were dispatched or asked to go to, to the Cherokee Apartments and bring in the two possible suspects, three possible suspects.

Q Okay. At that time you were looking for Gary Young?

A Yes. Gary, Gary Young and Jeff Cromartie.

Q And you weren't looking for Corey Clark at that point because no one had given him up at that point; isn't that correct?

A Corey Clark was already --

Q He was in jail already?

A Yes.

Q But you weren't looking for him for the Madison Street Deli or the Junior Food Store; isn't that correct.

A At that time; no.

Q He had been back in the cell with Carnell Cooksey --

A I think from the previous night before; yes.

Q Right. Carnell Cooksey and Corey Clark had been in jail that, all that night together?

A Yes.

Q Okay. Now, when you found the gun, this Raven .25 automatic, did you run it through the thing that you police

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 70 of 93

officers do when you find guns? Did you run it through to see if it had been reported stolen, or whether it was, had been identified as being involved in any other crime?

A I didn't personally. I don't know if it was done or not.

Q Did you ever -- I'm sorry. I didn't mean to cut you off.

A I, I don't know that it was run or not. I, I, I don't know whether it was or not.

Q Were you ever, at any time ever able to determine where this gun came from? I know it was eventually connected to Gary Young, at least at one point. Did you ever find out where the gun came from beyond Gary Young?

A No.

Q After you found the gun and you talked to some uniform police officers, then did you obtain arrest warrants for Gary Young?

A At some point there was arrest warrants for Gary Young.

Q Okay. Let, let me focus on that just a little bit. You went over to the apartment, Cherokee Apartment complex; is that correct?

A Yes.

Q And you went to one of the apartments and there were several individuals in the apartment that you went to; is that correct?

 Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 71 of 93

A Yes.

Q Would it be a fair statement that you had arrest warrants for Gary Young at that time, but you didn't have arrest warrants for Ray Jefferson Cromartie; did you?

A I didn't have arrest warrants for Gary Young either.

Q Okay. You took them in -- Did you -- You were looking for Gary Young though; weren't you?

A And Jeffrey Cromartie.

Q Okay. At that point you were looking -- Did you know who Jeffrey Cromartie was?

A We had a name.

Q Okay. And you had Gary Young connected to the gun?

A (Nods head affirmatively)

Q And Jeff Cromartie was in the room, or in the apartment complex there where Mr. Young was; is that correct?

A He -- I'm not -- I was there. I don't know exactly each particular place. There were several officers that went there. But his name and Gary Young had, had been brought up; yes.

Q Okay. And so, you, you took them into custody without arrest warrants; is that correct?

A Yes.

Q And upon what basis did you arrest them without an arrest warrant? Had a crime been committed in your presence?

A In my presence?

Q Yes, sir.

A No. Just information and probable cause to detain them to investigate further to get an arrest warrant.

Q Okay. Wouldn't the proper procedure have been if you had probable cause, and I know I'm asking you to go back a ways, but wouldn't the proper -- if you had probable cause to arrest Gary Young based upon his connection with the gun would be to present that to a magistrate and get an arrest warrant?

A The time was a factor here because of the type crimes, robbery and homicide. It was the utmost importance that we get them if they were suspects and get them there as soon as we could.

Q And so you, you arrested them, took them to the police station. How long were they in custody, Mr. Cromartie in custody and Mr. Young in custody, before you obtained arrest warrants?

A The arrest warrants were taken the next day.

Q So they were held at least twenty-four hours without arrest warrants; weren't they?

A It was probably more like -- It could have been close, close to twenty-four hours.

Q Somewhere, I bet you it was somewhere close to twenty-four hours. I'm not pinning you down, but somewhere close to a full day they were held in jail without arrest warrants; is that correct?

A That's correct. They were being -- The investigation

was continuing and they were being interviewed.

Q Okay. They were being interviewed. They weren't free to go; were they?

A At that time; no.

Q And did you pull up Gary Young's rap sheet?

A At that time I didn't. I don't --

Q Did someone else do it?

A I did not -- I don't really remember if anybody did or not.

Q Okay. Now, in interviewing Gary Young, and the jury's heard at least one version of his account of what took place. You stopped the tape toward the end. You ended the interview. And it's been -- I mean, I'm not saying you did anything improper. But the tape was stopped and there was a break of several minutes and you went back on and Gary changed his story, at least in part, at that point; didn't he?

A He added to it, yes; and there was some changes.

Q And you determined, based upon what he told you after you restarted the interview, that he had been lying to you about a number of things previously; hadn't he?

A Or he didn't remember. I don't know if he was deliberately lying. There was some things that he added to it.

Q Well, he told you initially he didn't know whose gun it was?

A He did say that; yes.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 74 of 93

Q And that wasn't true; was it?
A That wasn't true.
Q And he told you he didn't know who gave the gun to Ray Cromartie?
A At one point, yes; he did say that.
Q Okay. You -- Later you believed that he gave the gun to Ray Cromartie; didn't you?
A He said -- He later did say that he did; yes.
Q And your pursuing Ray Cromartie at that time was based upon Gary Young's testimony, statements to you; wasn't it?
A And Carnell Cooksey.
Q Yeah. Gary Young also told you that he didn't know who the other dude was that he'd referred to earlier? And I'm using his terms.
A Yeah.
Q You later found out it was Corey Clark; didn't you?
A Yes.
Q Do you really think he forgot who Corey Clark was?
A I think that he added more to it.
Q Corey Clark was his, one of his best friends; wasn't he?
A I, I don't know if he was his best friend or not. I know that they knew each other.
Q Okay. Gary Young also told you that he didn't know how, according to his story, he didn't know how these dudes got

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 75 of 93

out to the Junior Foods and back? He told you he thought they might have walked. Do you remember that? That was on the tape.

A Yes.

Q You later found out that was a lie too; didn't you, at least based upon his subsequent stories? He implicated Thaddeus Lucas; didn't he?

A Yes.

Q And he implicated Thaddeus Lucas because Thaddeus Lucas had a car?

A I, I don't believe he said that in the interview. I don't think he said that they drove his car. But, --

Q Later you found out --

A He did implicate -- I did find out that they were in Thaddeus' car, but, no; I don't think I found out from Gary Young.

Q And, but Gary Young told you he didn't have any idea how they got, how they got out there?

A That's correct.

Q From subsequent statements from other individuals, and I'm not asking you what those statements were, but you did determine that he was present with Thaddeus Lucas that very night that the Junior Food Store was robbed; didn't you? You did determine that; didn't you?

A That Gary Young was with him?

Q With him at the Cherokee Apartments?

A They had -- Yeah, he did see him earlier in the night.

Q Okay. And Gary Young initially told you that he didn't drink any beer that had been brought back to the Cherokee Apartments; didn't he? Or did he?

A There was mention of beer in there. I don't know if I particularly asked him did he drink any beer or not. I don't know.

Q Would it be a fair statement, Mr. Weaver, that Mr. Young's statement to you, both before you cut off the interview the first time and after you started it back, was full of enough holes to drive a truck through as far as the truth?

A He said the truth. There was -- He added to it when questioned further. He, he told more truths.

Q He told more untruths; didn't he?

A The second time?

Q Yes.

A He filled in more, more details.

Q He lied to you about whose gun it was; didn't he?

A At one point; yes.

Q He lied to you about it more than once; didn't he?

A And he --

Q Before you cut off the tape and after?

A He did lie about it, but he did finally admit to it.

Q Well, in the interview he never admitted it was his gun even after you cut the interview back on; did he?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 77 of 93

A He meant that he -- He admitted to having possession of it. He admitted to shooting the gun in the air, as a matter of fact.

Q He never told you this was his gun, that he had traded for it up in Boston and he'd been carrying it around the projects for several weeks prior to this time?

A Not in that interview; no.

Q You later found out that to be the truth though; didn't you?

A Yes.

Q When you arrested -- You did arrest Ray Cromartie and eventually got a warrant for him. You took his clothing from him; did you not?

A At some point his clothes were taken; yes.

Q Okay. And those clothes were turned over to Ms. Fran Everett; is that correct?

A Yes.

Q She'd be the person to identify the clothes that you turned over? She'd be a better person to do that?

A Probably; yes.

Q Okay. Do you recall Ray Cromartie's physical appearance at the time you arrested him in April of 1994?

A Briefly. I didn't talk to him very long at that time. I did see him.

Q I'm going to hand you what's been marked as Defendant's

Case 1:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 78 of 93

Exhibit 6. It's a photograph. Does that refresh your recollection of Ray Cromartie at the time you took him into custody?

A It, it does appear to look like him; yes.

Q Does it appear to resemble him at the time you took him into custody?

A Yes.

MR. MEARS: Your Honor, I'd tender Defendant's -- I'm sorry. Mr. Hardy has seen this, but I forgot to show it to him.

Q Let me -- This is Defendant's Exhibit 6. It's the book-in photograph at the time you arrested him. And it's got the numbers cut off the bottom.

A Okay.

Q Just as a matter of practice, you, you know how that's done, cut off the numbers?

A Sure.

Q And does that resemble him at the time --

A It does. I didn't see him but very briefly.

MR. MEARS: Okay. Your Honor, I'd tender State's, excuse me, Defendant's Exhibit Number 6 into evidence.

THE COURT: Any objections, Mr. Hardy?

MR. MEARS: This is the computer --

THE COURT: It's admitted without objection.

MR. MEARS: And let me correct that. Thank you, Your

Honor. I just want to correct this. I put the wrong date on this. This is the computer photograph from May 25th of 1994. It was a month after he was arrested.

Q I wasn't trying to --

A Sure.

Q I wasn't trying to trick you. I just forgot the date. I thought that was the April, but it's May of the same year, May of 1994.

A Sure.

MR. MEARS: Okay. Number 6, Your Honor.

THE COURT: Yes, sir.

Any objections, Mr. Hardy?

MR. HARDY: No, sir.

MR. MEARS: Your Honor, may I publish this to the jury at this time?

THE COURT: Yes, sir.

(Whereupon Mr. Mears tenders photograph to the jury)

BY MR. MEARS:

Q His hairstyle has changed since then. Would you agree?

A Yes.

Q Okay. After you interviewed Mr. Young, did you then go out and conduct any other investigation at the Cherokee Apartments with regard to Mr. Young's involvement in the Madison Street Deli robbery?

A Yes. I asked people, you know, if he was involved in

it.

Q Were the charges subsequently dropped against Mr. Young for the Madison Street Deli, to your knowledge?

A I don't know for sure. I don't know if they're still standing. I don't know whether they were or not.

Q Okay. You didn't, you didn't withdraw them; did you?

A I did not withdraw any charges; no.

MR. MEARS: I think I'm through, Your Honor. If I could just check with co-counsel one second?

THE COURT: Yes, sir.

BY MR. MEARS:

Q Mr. Weaver, during your interview of Gary Young, do you recall asking him a question with regard to his relationship with Ray Cromartie? Do you recall getting into that line of questioning? Of course, we've heard the tape and you played it.

A I believe I did. I believe I did.

Q Do you recall him saying that Ray Cromartie had only been in town for three or four weeks at that time?

A I believe so.

Q Relative newcomer to the Cherokee Apartments; wasn't he?

A Yes.

MR. MEARS: Okay. Thank you, Mr. Weaver. I appreciate your patience.

THE COURT: Mr. Hardy?

REDIRECT EXAMINATION

BY MR. HARDY:

Q Mr. Weaver, I think you said you saw the shoeprint out there in the mud?

A Yes. I was out there when Ken Collins was observing it.

Q This shoeprint right here, 100, 98 and 99?

A Yes; that appears to be it.

Q Had an occasion to look at Mr. Cromartie's shoes, Number 18-D? B, excuse me? That's the bottom of them?

A I did. I have -- I'm looking at them; yes.

Q Have you come to any opinion as to whether they look alike or not?

MR. MEARS: Your Honor, I'm going to object unless there's been a foundation laid for identification procedures and techniques with regard to these particular shoes. Unless -- The shoes are already in evidence and they've been identified as Mr. Cromartie's. But if any identification is going beyond that, I would respectfully submit there has to be some foundation laid for an expertise in this particular area.

THE COURT: Overruled.

BY MR. HARDY:

Q You can see with your eyes, Chuck?

A Yes.

Q Can you see the bottom of the shoes?
A Yes.
Q And can you look at the picture?
A Yes; I can.
Q Do they look similar to you?
A They look similar.
Q Gary Young, bag, 27-C. Mr. Young's shoes. What kind of shoes did he have on?
A Black tennis type shoes, tennis shoes.
Q Can you see the bottom of them?
A Yes; I can.
Q Do they look anything like that?
A No; they don't.
Q 16-A, Thaddeus Lucas. Would you look at those shoes? What kind are they?
A Nike Air.
Q Look at these shoeprints, look at the pictures?
A Yes.
Q Do they look alike?
A No; they don't.
Q Corey Clark, 14-A. What kind are they?
A They're Nike also.
Q Look at this, look at the picture?
A Yes.
Q Any similarity?

A No similarity.
Q This is the right foot, left foot of Mr. Cromartie?
A Yes.
Q These are what? Do you know the brand of these?
A They're Adidas.
Q The others were not Adidas?
A No.
Q Out of the four pair are any of them Adidas but Mr. Cromartie's?
A They appear to be Adidas. The others are not.
Q Both have the same tread design at the bottom?
A Yes.
Q Mr. Mears asked you a lot about investigative techniques, et cetera. Did you follow to the best of your ability the techniques that you were trained?
A Yes; I did.
Q Did you ask Mr. Hutchinson to do part of the things that you asked, Mr. Mears asked you about?
A Yes; I did.
Q He showed you the picture of Mr. Cromartie, 6-D, I believe it is?
A Yes.
Q 170, 71, 72 and 73, can you look at those for me, please?
CLERK: I think we've already got those numbers.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 84 of 93

MR. HARDY: 170.

CLERK: Oh, 170.

MR. HARDY: Yes, sir. 170, 171, 72, 73.

A Yes, sir.

Q Are those arresting, about this contemporary, with the one Mr. Mears had of Mr. Lucas, Mr. Clark, Mr. Young and, the other name escapes me at this time? Mr. Clark, Mr. Young, Mr. Lucas --

THE COURT: Mr. Hardy, which, which photograph, which number is of which person?

BY MR. HARDY:

Q Could you just read them out to me, please?

A Okay. 172 will be Carnell Cooksey.

Q Okay.

A And 173 will be Thaddeus Lamar Lucas.

Q Yes, sir.

A And 171 is Corey Allen Clark.

Q Yes, sir.

A And 170 is Gary Lamar Young.

Q These were about the time of the arrest, the way they looked?

A They looked -- Yes.

MR. HARDY: We'd offer them into evidence, Your Honor.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 85 of 93

MR. HARDY: He's with the Court.

THE COURT: Mr. Mears --

RECROSS EXAMINATION

BY MR. MEARS:

Q Mr. Weaver, have you had any specialized --

THE COURT: -- excuse me just a minute. We have someone that needs some water.

Ms. Peters, if you could get her a cup of water, please, ma'am.

(Whereupon there is a brief delay)

THE COURT: Mr. Mears.

MR. MEARS: Thank you.

Q Mr. Weaver, have you had any specialized training in the identification of shoeprints?

A No; I haven't.

Q Okay. Have you had any advanced course work or anything of that nature in the technical aspects of identifying shoeprints?

A No; I haven't.

Q Okay. You were asked, based upon your observation of the shoeprints out at Junior Food and looking at these shoes here, whether they were similar?

A Yes.

Q Is that correct?

A Yes.

Q You're not telling this jury that's the same shoe though; are you?

A I'm just saying they were similar.

Q But you don't know whether Ray Cromartie was wearing these on April the 10th; do you? These were the shoes he was wearing when he was arrested on April the 13th?

A Right.

Q So you don't know whether these shoes were the shoes he was wearing on April the 10th, April the 9th, 10th, or any other time; do you?

A I don't know.

Q Do you know the brand of that particular shoe?

A I believe it's Adidas.

Q Do you know the style? Not that I would know, Mr. Weaver.

A I just know it's Adidas high top. I think the style is written on it though. I believe, Pro Model, Adidas Pro Model.

Q It's a Pro Model. Are you aware that between 1989 and 1994 there were one million, three hundred and eighty-seven thousand, four hundred and twenty-four (1,387,424) pairs of Adidas Pro Model shoes made in the United States?

A I was not aware of the number; no.

Q Are you aware that in, between 1989 and 1994 there were eight hundred and twenty thousand, six hundred and fifteen (820,615) pairs of Super Star Adidas made in the United States?

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 87 of 93

Were you aware of that?

A No; I was not.

Q Are you aware that the Pro Model Adidas and the Super Star Model Adidas both have dye cut, even midsole, rubber outsole, with herringbone profiled soles? The soles are the same on both of those shoes. One's a high top and one's a low top. Were you aware of that?

A No; I wasn't.

MR. MEARS: Okay. Nothing further.

Oh, I'm sorry. One more thing.

Q Were you around -- Were you involved in the picking up of Thaddeus Lucas' car in Bainbridge?

A Yes; I was.

Q Did anyone fingerprint that car to determine who had been in it? Let, let me back up. I'm sorry. Let me rephrase the question. When did you pick up Thaddeus Lucas' car in Bainbridge?

A Let me refer to my notes on that. Let's see. Okay. 4-20-94, at Chapman's Garage in Decatur County.

Q Were you able to ascertain how long the car had been impounded in that particular garage by, by April the 20th?

A On 4-24-94 at approximately 10:05 A. M. I received a copy of a bill from a Lenora Chapman from Chapman's Paint and Body Shop where they had towed the car in on 4-13-94 at 2:00 P. M.

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 88 of 93

Q So, from 4-13-94 until the time you picked it up the car had been impounded; is that correct?

A According to these notes; yes.

Q So according to those dates, from the day after the shooting at Junior Food Store the car had been impounded in a known secure location; had it not?

MR. HARDY: That's a misstatement of facts, Your Honor. He's getting his dates mixed up. 10th to the 13th is three days.

MR. MEARS: Well, I'm, I'm -- Thank you.

Q From the 10th through the time on the 13th, it had been impounded in a secure location in Bainbridge, Georgia; had it not?

A It would have been in Bainbridge at the time. I don't know how secure it was.

Q Well, let me ask you this. Were there any attempts at all to make, to lift any fingerprints from the inside of the car?

A I did not. I'm looking to see if it's in my notes. I could not say whether -- I don't know whether Sgt. Hutchinson -- He did go with me there. And I don't remember whether he took any prints or not, or whether it was towed back and he took them later.

Q Would it be a fair statement that he didn't try to lift any prints in your, in your presence?

A I do not remember him -- I took the photos but I don't

remember him taking any prints at that time.

Q Would it have been your procedure at the time to have made a notation of the fact that prints were being attempted to be lifted from a particular location?

A Yes.

Q You, you were keeping notes with a hand held microphone during all this time, I mean, a micro cassette recorder; were you not?

A Yes.

Q And that was your practice; was it not?

A Right.

Q And there's no record in your file that anyone attempted to find or locate fingerprints inside the car after you picked it up at, from Bainbridge, Georgia; is that correct?

A According to my notes, Hutchinson was with me. Whether he did or not, I don't have it in my notes.

MR. MEARS: Okay. Thank you, Mr. Weaver. You've been very patient.

Thank you, Your Honor.

THE COURT: Anything else, gentlemen?

MR. HARDY: I think he's supposed to be on call, Your Honor. We know what his phone number is.

THE COURT: All right, sir. You are excused.

MR. MEARS: Your Honor, I'd tender, excuse me just a moment, Defendant's Exhibit 7, simply the map. I think I

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 90 of 93

failed to tender it into evidence. I don't think there's an objection. Can I go ahead and put that into evidence now?

THE COURT: Any objections?

MR. HARDY: No, sir.

THE COURT: It's admitted without objection.

Gentlemen, was there one more witness that you need to consider whether or not to call today?

MR. HARDY: I think we can go for the day if the Court would like. It's getting later than we have been. And start up tomorrow.

THE COURT: All right, sir.

Ladies and gentlemen, this looks like a good opportunity for us to recess for the evening. So in a moment I am going to excuse you and ask that you return back to the jury room by 9:00 A. M. tomorrow morning and we hope to start the, resume the trial promptly at 9:00 A. M.

I'm going to repeat myself and I'm going to repeat myself each evening. It is very important that your decision be based solely on the evidence presented in this courtroom and the legal instructions given you by the Court. Please do not talk with anyone about this case. That includes spouses, children, others that you see on a regular basis with and very close to. Sometimes it becomes very tempting, either answer a question or to discuss something

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 91 of 93

of this nature. Do not talk with anyone about this case whatsoever. That includes among, discussions among yourselves or before you've heard all the evidence and received the instructions of the law and begun your deliberations. Don't allow anyone to talk with this case, about this case in your presence or within your hearing. Do not read anything about the case. Do not listen to anything about the case. Do not watch anything or read anything that might have a plot or a subject matter or a theme that could be considered violent in nature or content.

Are there any other cautionary instructions requested on behalf of either party?

MR. HARDY: They're just all the same instructions we've already had. The Court has covered them. Thank you.

THE COURT: Thank you, ladies and gentlemen. Everyone remain seated while they retire for the evening.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Anything that needs to be addressed prior to recessing for the evening?

MR. HARDY: Just want to have the witnesses come back at 9:00. And I would like to ask Mr. Seitz if he's feeling fine. He's the man with the heart attack that Mr. Mears had -- I want to make sure he's feeling okay, Judge. I don't want to impair his health.

MR. MEARS: Your Honor, Mr. Seitz apparently has some great concern about his cross examination by us. I'd like an opportunity to talk with Mr. Seitz before he gets on the stand so that he doesn't freeze up on us.

MR. HARDY: I just want him to be comfortable, Your Honor, if I could please --

THE COURT: Is Mr. Seitz outside?

MR. HARDY: We want to talk to him outside the courtroom.

THE COURT: I understand that.

MR. HARDY: Yes, sir. He --

THE COURT: I was just going to suggest an opportunity for Mr. Mears to meet him and if Mr. Seitz wishes to talk to Mr. Mears, he'll be given that opportunity to do so.

MR. MEARS: We could retire and do that now, Your Honor.

THE COURT: Yes, sir.

MR. HARDY: Everybody else at 9:00 in the morning.

THE COURT: 9:00 o'clock.

MR. HARDY: Everybody at 9:00.

THE COURT: Yes, sir.

We'll be in recess until 9:00 A. M.

(Whereupon the Court is recessed for the day, with the proceedings to be resumed the following A. M.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Case 7:14-cv-00039-MTT Document 18-14 Filed 07/14/14 Page 93 of 93

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF LOWNDES

I hereby certify that the foregoing proceedings were taken down by me, as stated in the caption, and that the foregoing pages 1889 through 2221 represent a true, correct, and complete transcript of said proceedings.

I further certify that I am neither of kin nor counsel to the parties in this matter, nor am I financially interested in same.

This the 17th day of November, 1997.

Philip G. Vincent

PHILIP G. VINCENT, C.C.R.
CERTIFICATE NO: A238
OFFICIAL COURT REPORTER
SOUTHERN JUDICIAL CIRCUIT

IN THE SUPERIOR COURT OF THOMAS COUNTY

STATE OF GEORGIA

STATE OF GEORGIA

VS

RAY JEFFERSON CROMARTIE
DEFENDANT

CRIMINAL ACTION NO: 94-CR-328

CHARGE: AGGRAVATED ASSAULT (COUNT 1); POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME (COUNTS 2,4,6,8); AGGRAVATED BATTERY (COUNT 3); MURDER (COUNT 5); ARMED ROBBERY (COUNT 7)

CRIMINAL JURY TRIAL UNDER THE UNIFIED APPEAL PROCEDURE

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The following transpired before the Honorable Frank D. Horkan, Judge, Superior Courts, and a Jury, in the Thomas County Courthouse, Thomasville, Georgia, with voir dire and selection of the Jury commencing at 9:35 A. M. on Monday, September the 15th, 1997, and concluding at 10:20 A. M. on Friday, September the 19th, 1997, and the case-in-chief commencing at 10:50 A. M. on Friday, September the 19th, 1997, and concluding at 10:40 A. M. on Wednesday, October 1st, 1997.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

APPEARANCE OF COUNSEL:

Representing the State: James E. Hardy, Esq.
Mark E. Mitchell, Esq.
Assistant District Attorneys

Representing the Defendant: Michael Mears, Esq.
Carl A. Bryant, Esq.
Gerard Kleinrock, Esq.

VOLUME VII OF TEN VOLUMES
(This volume contains the proceedings commencing at 9:05 A. M. and concluding at 5:45 P. M. on Wednesday, September the 24th, 1997.)

Res. Ex. No. 26
Case No. 7:14-CV-39

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 2 of 269

(The eighth day of proceedings commences at approximately 9:05 A. M. on Wednesday, September the 24th, 1997, outside the Jury's presence)

THE COURT: Gentlemen, are we ready to proceed at this time?

MR. MEARS: Yes, Judge. I apologize for not being here. I was talking to Dr. Parker.

THE COURT: You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Good morning, ladies and gentlemen.

Ladies and gentlemen, at this time, prior to resuming the trial and bringing the first witness in for the day, let me ask whether or not at this time any of you have read anything about this particular case, newspapers or otherwise, headlines or substance of any articles?

Have any of you talked with anyone about this particular case, or had anyone attempt to talk with you about this particular case, or talk about this particular case in your presence or within your hearing?

Have you seen anything about this case or heard anything about this case through any news media, newspaper, radio, television or otherwise?

Thank you, ladies and gentlemen.

Any further questions in regard to that particular

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 3 of 269

subject matter, gentlemen?

MR. HARDY: No, sir.

MR. MEARS: Nothing further.

THE COURT: Mr. Hardy, who is your next witness?

MR. HARDY: Dr. John Parker.

THE COURT: Dr. Parker, if you would have a seat up here, please, sir.

If you would raise your right hand, please, sir?

Do you solemnly swear or affirm that the evidence you'll be giving this Court and this jury in the matter now pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

DR. PARKER: I do.

THE COURT: Mr. Hardy?

JOHN B. PARKER, M. D.

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for us, please, sir?

A Dr. John B. Parker.

Q And what's your profession, please, sir?

A Medical Examiner.

Q And where are you employed, please, sir?

A Full time at Bibb County and surrounding counties. I'm Associate Medical Examiner for Fulton County and also the State

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 4 of 269

of Georgia at Atlanta.

Q How long have you been with the G. B. I.?

A Since October the 1st of 1990.

Q Can you tell us a little bit about your background and training, please, sir?

A My medical education was the Medical College of Virginia and this was followed by internship and this was followed by two years of family practice in medicine. This was followed by a training program in anatomical and clinical pathology, Methodist Hospital of Indiana, which is a portion of the Indiana University at Indianapolis. Fifth year of pathology training was in electron microscopy and surgical pathology at Baylor University Medical Center, Dallas, Texas. This was followed by two years of service pathology and teaching. And this was followed by a training program in medical examiner or forensic medicine at the Southwestern Institute of Forensic Sciences at Dallas, Texas, which is a portion of the University of Texas, Southwestern School of Medicine.

Q And then you came to Georgia and started with the Georgia Crime Lab?

A Yes. Yes. After five years of --

Q Are you licensed to practice medicine in the state of Georgia?

A Yes.

Q Have you testified as an expert in the field of

pathology in the state of Georgia before?

A Yes. This is my thirty-seventh time this year.

Q This year?

A Yes.

Q You've testified in other years, I suppose?

A Usually about fifty-five times, fifty to fifty-five times.

MR. HARDY: Your Honor, we'd submit him as an expert in the field of pathology and autopsy.

THE COURT: Do you wish to inquire?

MR. MEARS: We have no objections to Dr. Parker begin qualified as an expert, Your Honor.

THE COURT: He'll be qualified as an expert in that field and allowed to render his opinions in regards to that subject matter.

BY MR. HARDY:

Q Dr. Parker, on or about April the 10th or thereabouts of 1994, were you called to do an autopsy on a Richard Slysz, please, sir?

A Yes.

Q Was it assigned a crime laboratory number, please, sir?

A The crime lab number is 94 -- I've halfway forgotten it now. 94-1784.

Q And where did you do the autopsy, please, sir?

A This was -- the autopsy was performed at the forensic

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 6 of 269

laboratory on Panthersville Road, the Georgia Bureau of Investigation in Atlanta.

Q Just for us, tell us what an autopsy, what does that word mean? What do you do in an autopsy?

A Well, in the forensic sense an autopsy evaluates the clothes on the body and the external surfaces of the body with photography for documentation, and then internal examination of the body, what we think about the autopsy, examines the abdominal and the chest and the brain with the internal examination.

Q Is that what you did in this case?

A Yes.

Q And you say it was done where again, please, sir? Where was it done?

A Yes. This was at the G. B. I. office in Atlanta on Panthersville Road.

Q 48, can you -- is that the man you did the autopsy on?

A It is.

Q And his name is what?

A Richard Slysz.

Q What do you start in an autopsy by doing?

A If we have a history, we try to review the history if it's available. Then an external examination of the body, of the clothes. If there's injuries, then documentation of the external surfaces of the body.

Q Were you able to determine how tall he was and how much

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 7 of 269

he weighed and how old he was?

A We were told that he was fifty-one years old. He weighed with body bag one hundred and seventy-nine pounds, and he was five, seven inches in height, I believe.

Q Did you take any photographs, Doctor, during the autopsy?

A Yes, sir. At my request.

Q And was the body cleaned?

A No, sir.

Q Was it examined prior to cleaning or what?

A Yes. It was first examined for injuries and then the body is cleaned, unclothed and photographed and then autopsied.

Q Did you notice any injuries to the man?

A Two injuries that are obvious. A gunshot wound in about this area (indicating), number one. And the second gunshot wound, entrance wound in about this area (indicating).

Q Let me show you these two photographs first, please, sir, 143 and 148, and ask if you can identify them, please, sir?

A This is the photograph taken at the time of autopsy at the morgue at the G. B. I. and the body is clothed. And this is a photograph of his head at the time of autopsy. His glasses were still in place and he has not been cleaned.

Q Anything wrong with one of his glass lens?

A His lens is missing on the right side.

Q Are these fair and accurate representations of the way

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 8 of 269

you saw him?

A Yes.

MR. HARDY: Your Honor, we'd offer 143 and 148 into evidence.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q Did you find any other injuries to the body other than the two gunshot wounds?

A No.

Q Can you tell us about the gunshot wounds? I think you, just for your purposes, named them one as one and one as two?

A Yes.

Q That doesn't mean anything one way or the other?

A No; it does not.

Q Start with the one at the eye, please, and if you could describe that for us?

A The entrance wound is very irregular, right, right here at the cheek (indicating), with contusion and, and tearing of the skin around the entrance wound. There was no gunpowder or gunpowder residue or soot around the entrance wound. Wasn't any stippling or scratching of the skin.

Q What does that mean?

A Where the unspent gunpowder strikes the skin and abrades it but doesn't stay stuck to the skin as far as any

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 9 of 269

tattooing. That's the same thing that the gunpowder stays in the skin.

Q Would going through the glass have interfered with that process?

A Yes; it may have.

Q Let me show you these photographs, 144 and 147. If you could look at them for me, please, sir?

A This is a photograph again of the decedent during removal of some of the blood and the clothing and his glasses. In one, the second film here is a closer film taken of the decedent's face at the site of the injury.

Q This is the wound under the eye?

A That's the wound under his eye.

Q Does that depict what you just testified about the injury to the eye?

A Yes; it does.

Q Okay. Can you tell us the flight of the bullet?

A After perforating, going through the skin here, the bullet went acutely upward and to the right. It went from front to back, right to left and upward and it went through the part of the nasal plate on the inside into the base of the skull in an area called the ethmoid plate, through the dura and ended up in this portion of the frontal lobe of the brain, the cerebellum.

MR. HARDY: Your Honor, we'd offer 144 and 147 into evidence.

MR. MEARS: Your Honor, I don't think I have any objection. Let me just make sure and know which ones those are.

Your Honor, we would object on, solely on the basis of the duplication of the two photographs. 144 and 147 are the same gunshot wound, same face. It's simply duplicative and we would object on that basis.

THE COURT: Mr. Hardy, let me see the photographs, please, sir.

State's 144 and 147 are admitted over objection.

MR. HARDY: Publish them to the jury, Your Honor?

THE COURT: Yes, sir.

(Whereupon Mr. Hardy publishes the exhibits to the jury)

BY MR. HARDY:

Q Associated with that wound, did you retrieve a projectile?

A Yes, sir.

Q And what did you retrieve?

A A small caliber jacketed lead bullet.

Q And is that denoted on your records by any way?

A Yes. It was, it was inscribed "P".

Q Would you look at these two and tell me which one you're referring to?

A We're talking about this bullet, small caliber jacketed

lead bullet.

Q That's --

A Number one here and my inscribed number there.

Q That's number 157?

A Yes. Um-hum.

MR. MEARS: One fifty --

MR. HARDY: Seven.

A And I've inscribed the base of the bullet with my initial "P".

Q Okay. Is that what you retrieved from Mr. --

A Yes.

Q -- Slysz?

A From the frontal portion of the left side of his brain.

Q Now, the other injury, where was it, please, sir?

A The other injury was placed on the left temple, approximately here (indicating). The entrance wound, the entrance wound was surrounded by scratching or stippling of the skin, very sparse, which means that the muzzle, the target was closer, in my opinion, at this site where some of the gunpowder struck the skin and scratched it but not, did not imbed in the skin.

Q I show you these photographs, please, sir: 141, 140, 145 and 146, please, sir. If you could look at those.

A It's the photograph of the decedent, left side of his face. About right in here (indicating) there's an entrance

Case 7:14-cv-00089-MTT Document 18-15 Filed 07/14/14 Page 12 of 269

wound. That's approximately here (indicating). There's a little scratching, very vague scratching on his skin, stippling of the skin surrounding the entrance wound.

Q Yes, sir. Next photograph? Are they all --

A They're all the same with different distances.

Q Different views?

A Different views of the same.

Q Are they fair and accurate representations of the stippling as you referred to?

A Yes, sir.

Q And you're saying that that means that the gun barrel would have been within six to eight inches when it was fired?

A Yes.

MR. HARDY: Your Honor, we'd offer 141, 140, 145 and 146 into evidence.

MR. MEARS: Your Honor, we have the same objection with regard to the duplicative nature. I believe 146 and 140 are the same photographs.

THE COURT: Mr. Hardy, if I could see those, please, sir?

MR. MEARS: Other than that, the duplication, I'd ask the Court to look at 146 and 140.

THE COURT: I beg your pardon?

MR. MEARS: Just 146 and 140 I believe are the same photograph. We would object to all of them on the basis

that they're duplicative and do not go to any issue that, any evidence that's at issue in this particular case.

THE COURT: Gentlemen, after reviewing the photographs, I think there may be, there may be some sufficient differences in the photographs themselves, that one may, may possibly depict something that another does not. So I'll allow all of them in over objection.

MR. HARDY: Ask that he be allowed to step down, please, Your Honor?

THE COURT: Yes, sir.

(Witness steps down from witness stand)

BY MR. HARDY:

Q First, referring to 145 and 140, Doctor, if we could start down here. Could you show them what you're talking about in the pictures with the stippling?

A See, the entrance wound is right here (indicating). And there's little small abrasions, little scratching of the skin. They're sparse around the entrance wound. It's the same on this one here (indicating). You can see the little scratches of the skin, little small abrasions of the stippling from the gunpowder hitting the skin but not sticking in the skin, just scratching it. You can see small abrasions, little scratches around the entrance wound where the gunpowder struck but did not stick into it. It abraded the skin. The same way with this one here (indicating). You can see it down below. Again, you can

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 14 of 269

see the small minute abrasion, scratches around the entrance wound here where the gunpowder had struck but did not stick in the skin. And the same way with the other.

Q The same as these other two photographs?

A Yes.

Q Could you come around --

A I think we can see it the best with this one here (indicating). Little scratches around the entrance wound, little small abrasions where the gunpowder sticks into, falls off, but scratches the skin.

Q Thank you, Doctor. Take your seat again, please, sir.

A (Witness returns to the witness stand)

Q 142 here?

A This is again a photograph of the decedent prior to autopsy in the examining room on the examining table still clothed.

Q That just shows how he was received by ya'll?

A Yes. Yes.

Q Weighed, weighed him and took his height?

A Yes, sir.

Q Is it a fair and accurate representation?

A Yes.

MR. HARDY: Offer 142, please, sir.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q Now, this second wound to the side of the head, can you tell us the flight of that one?

A The bullet, of course, perforated the skin in the scalp, skull and went through the brain and ended up going out of the skull on the back side of the head, the occipital region and just ending up in the scalp. In other words, it went from left to right, front to back and a slightly downward trajectory, going through major portions of vital centers in the brain, in the front to back, left to right and downward pattern.

Q Did both bullets perforate the brain?

A Yes.

Q Tear the brain?

A Yes.

Q Were both wounds lethal?

A In my opinion; yes.

Q Did you retrieve a projectile from the --

A Yes; I did.

Q -- that one?

A Yes.

Q I show you Number 140, excuse me, 158 and ask you if you can identify that for me, please, sir?

A This is number two. This bullet is also, on the base of the bullet it has my initials of "P. J." on it for, for my identification purposes. But the container is labeled with the

case number, my writing, and number two, meaning the bullet was taken out of the back of the scalp.

Q Both of those items, 157, I believe, and 158, were turned into the crime lab after you retrieved them --

A Yes.

Q -- from his body?

A Yes. It was turned into the Ballistics Section.

Q For further analysis?

A Yes.

MR. HARDY: Your Honor, we'd offer 157 and 158 into evidence.

THE COURT: What numbers, Mr. Hardy?

MR. HARDY: 157 and 158, the bullets.

THE COURT: Which one is 158?

MR. HARDY: The second one he just testified about.

THE COURT: I'm sorry. I misunderstood. I thought you said 152.

MR. HARDY: No, sir. It's 148. Excuse me. 158. Excuse me. 157 is the first and 158 is the second.

Q Is that correct, Dr. Parker? 157 is the first one?

A Yes.

Q And 158 is the one that went through the side of the head?

A Yes.

MR. HARDY: Excuse me.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 17 of 265

MR. MEARS: No objection, Your Honor.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q What was the cause of death, Doctor?

A Gunshot wounds of head with the resulting injuries.

Q Either one of them, one of them would be death, cause death?

A Yes; in my opinion. Yes.

MR. HARDY: He's with the Court, Your Honor.

CROSS EXAMINATION

BY MR. MEARS:

Q Good morning, Dr. Parker.

A Good morning.

Q Dr. Parker, I just have just a few questions with regard to your finding. The -- Does the caliber of the weapon have any effect on the amount of stippling that you might find at the point of a contact wound?

A Yes.

Q Would it be a fair statement to say that the smaller caliber weapon, the less stippling you would have?

A Yes. They have less gunpowder or less load.

Q And your opinion about the distance in which, at, from which the shot was fired that struck Mr. Slysz in the temple would be at least affected in some manner by the caliber of the weapon; is that correct?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 18 of 265

A Yes.

Q If, if it was a .25 caliber you'd have less stippling even at a closer shot?

A Yes; that's correct. There's less gunpowder in the load.

Q And the stippling differs from tattooing. The stippling is that the black gunpowder doesn't stay in the skin as it did with tattooing; is that correct?

A Tattooing, in my opinion, is a bit closer to a target than a muzzle distance. A bit closer.

Q And in this case you didn't find any tattooing. You found stippling?

A Stippling; yes, sir.

Q And those are technical terms but they have some significance with regard to your profession in making determinations about distances between shots; is that correct?

A That's correct.

Q Okay. Now, with regard to the shot that hit Mr. Slysz in the front of his face, toward the glass --

A Okay.

Q -- is it possible that a smaller caliber weapon, such as a .25 caliber, can be deflected fairly easily by external objects on the face, such as glasses?

A I don't know about fairly, but I do believe it deflected somewhat with the glass and the depth of penetration of

the gunshot wound here was not as much as the second gunshot wound which makes me think it had lost some of its power prior to entering the body.

Q So the fact that the bullet traversed from the front going upward at an angle, that, that angle of entry and flight of the bullet after it entered Mr. Slysz' body would have been affected by having hit his glasses; is that --

A It could -- Yes; it could have been somewhat affected by this.

Q Okay. You have no way of knowing as a forensic pathologist, you have no way of knowing which one of those shots hit him first; do you?

A No. The number one and number two is just for descriptive purposes only.

Q Okay. Would either of the shots have rendered, in your opinion, rendered Mr. Slysz unconscious upon receiving that shot?

A Yes. I think the one going up here (indicating the eye) would be slower losing unconsciousness, but I think he would have lost unconsciousness. This one here (indicating left temple), he would have gone down very, very rapidly.

Q Would it be a fair statement to say that either one of these shots would have almost immediately rendered him unconscious upon being hit by either one of those projectiles?

A Yes. In my opinion. Not dead but unconscious.

Q Absolutely. He would not be pronounced dead until his

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 26 of 269

heart had stopped --

A That's correct.

Q -- is that correct?

A Yes.

Q But as far as rendering him unconscious, not having sensations, observing or feeling sensations, he would have been unconscious upon receipt of either one of those shots; is that correct?

A Yes; in my opinion. Yes.

MR. MEARS: Okay. I don't have any further questions. Thank you, Dr. Parker.

THE COURT: Any further questions of this witness?

REDIRECT EXAMINATION

BY MR. HARDY:

Q He said medically you're dead when your heart stops pumping?

A Yes.

Q So here he would have fallen down and his heart would have still been pumping?

A Yes. It will continue, our heart will continue to be, from head injuries or bullet wounds, for a period of time. It varies where the bullet went through or the injury itself. But we don't die immediately. Very few gunshot wounds to the back of the head, at the base of the brain to the mid brain will render dead at that time. But bullets going through the brain like

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 21 of 265

these, we're still alive in that sense of the word with the heart beating.

Q So he was alive until his heart quit beating?

A Yes.

Q And that accounts for the bleeding?

A Yes.

MR. HARDY: Okay.

RECROSS EXAMINATION

BY MR. MEARS:

Q Along those same lines, Dr. Parker. Do wounds to the head tend to produce more blood than other type of wounds?

A I think that's hard to say, uh, really hard to say. I'll answer it like this. The heart keeps pumping and you'll keep bleeding as long as the heart keeps pumping. You could have a wound in another place and it'd be immense --

Q Depending upon whether it hits an artery or that sort of thing?

A Yes. Yes.

Q The fact that there was a significant amount of blood, you didn't go to the crime scene so --

A No.

Q -- you didn't see that? But assume for my question that there was a significant amount of blood on the floor where Mr. Slysz was lying. That would indicate that his heart had continued to pump even though he was unconscious; is that

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 22 of 269

correct?

A Yes. In my opinion; yes.

MR. MEARS: Thank you, sir.

THE COURT: Gentlemen, may this witness be excused?

MR. HARDY: I think he needs to go on back to Macon and go to work, Judge, if he could, please.

THE COURT: You are excused.

Call your next witness, please.

MR. HARDY: Walter Seitz, please.

Thank you, Doctor.

THE COURT: Good morning. Have a seat right here, please, sir.

If you would raise your right hand?

Do you solemnly swear or affirm that the evidence that you shall give this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. SEITZ: I do.

THE COURT: Mr. Hardy?

WALTER SEITZ

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q What's your name, please, sir?

A Walter Seitz.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 23 of 269

MR. HARDY: Before we even get started, Judge.

Q Mr. Seitz, you've had a medical problem about a, ten days ago?

A I had a heart attack.

Q And are you -- How are you feeling today? We want you to be --

A I'm feeling pretty good.

Q You feel okay to testify?

A Yes; I do.

Q You feel okay --

A Yes; I do.

THE COURT: If at any point in time during your examination that you feel that you need to take a break for any reason or you feel that you're having a problem of some type, please let me know immediately so that we can address that.

BY MR. HARDY:

Q Any time that you feel that we're asking you too much, just tell us to stop. We want -- Your health is the most important thing, Mr. Seitz. Okay?

A Okay.

Q Tell us what your name is, please, sir?

A Walter Seitz.

Q Let's pull the mike up to you a little bit more.

A Walter Seitz.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 24 of 265

Q And, Mr. Seitz, I think you had a heart attack a week ago Sunday?

A Yes, sir.

Q And you were in the hospital until, like, last Wednesday; is that correct?

A Yes, sir.

Q And you're under, still under Dr. Karras' care?

A Yes; I am.

Q And you have been discharged and you're trying to recuperate at the present time; is that correct?

A Yes, sir.

Q But you feel okay today?

A Yes; I do.

Q All right. Good. Back on April the 10th of 1994, Mr. Seitz, where were you working, please, sir?

A At Jack Rabbit Foods on W. Jackson.

Q What did you do for Jack Rabbit Foods?

A I worked on the 11:00 to 7:00 shift as a night clerk.

Q And were you working that particular night?

A Yes, sir; I was.

Q How long did you work for Jack Rabbit?

A Altogether about six years.

Q And were you the only one working that particular night?

A Yes; I was.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 25 of 265

Q And could you describe the area from your store over to the Junior Food Store?

A It's just a clear sight across a five lane highway.

Q Does it have, did it have glass in the Junior Food Store front?

A Yes. There's glass in front of the Junior Food Store and my store is surrounded with glass. And it's like looking at two TV sets in the night.

Q About that time of night, 3:30 or so, is there much traffic out usually?

A No. Very quiet.

Q About 3:30 on that night did anything happen?

A Yeah. I was outside emptying the trash bags and --

Q Where were you outside?

A Outside of my store.

Q Where, where? Which side of your store were you on?

A In the front of the store.

Q That would have been where?

A Right in between me and Junior Foods.

Q Is that near the 319 there, the roadway?

A 319, right. Um-hum. 319 roadway.

Q You're talking about garbage cans, the little ones or the big ones or what?

A Little ones.

Q What? You were just trying to keep awake, I guess, or

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 26 of 269

keep busy?

A No. It's my job to empty the trash bags.

Q All right. So what happened when you were emptying the trash bags?

A I was emptying the trash bag and I heard a sound. It was crack, crack in the night which I identified in my mind as small caliber gunshots.

Q How close where the two crack, cracks together?

A Just bang, bang.

Q Just like that (claps hands together twice)?

A Like that.

Q What'd you do then?

A Then I, I looked up and looked around and I seen someone running around inside of the Junior Food Store.

Q Did you see somebody going from the left side of the store to the right side of the store?

A Yes.

Q Could you describe that individual?

A All I seen was a light skinned black.

Q And what, where'd did he go from the --

A He was running from where the clerk was to the back of the store.

Q What happened then?

A I went inside my store keeping my eye on Junior Foods because I wanted to make sure I could see what was happening.

And my store is all glass so I never lost sight of the store. I went back inside, picked up the phone and dialed 911 and I identified myself to the police and told them that I'd heard some gunshots coming from the Junior Foods and that there were people running around inside the store and that I did not see a clerk or anybody.

Q What'd you observe then?

A I, I observed a, a light skinned male about six foot tall, two hundred and twenty pounds.

Q The same one you had saw him running from the front --

MR. MEARS: Objection --

A I assume that --

MR. MEARS: Objection.

THE COURT: Excuse me.

MR. MEARS: The question is leading, Your Honor.

THE COURT: Sustained.

BY MR. HARDY:

Q Had you seen that one before?

A I -- All I can say is I, I assumed it was the one I'd seen running to the back. But this man came out from the back, out through the store and he was carrying two twelve packs of beer.

Q Where'd he run to?

A And he walked across the front of the store onto the little sidewalk there and around the back of the store.

Case 7:14-cv-00089-MTT Document 18-15 Filed 07/14/14 Page 28 of 269

Q Facing the store, that would have been which way?

A He was going from -- While I was facing the store he was going from my left to my right and around the back of the store on Pinetree.

Q Your right would have been this way (indicating)?

A Yes.

Q Facing the Junior Food Store?

A Yes.

Q What about the other individual? Did you see another individual?

A The other individual, I still hadn't seen.

Q Yes, sir.

A And because the only area in the Junior Foods that I couldn't see is where the clerk was.

Q So, did you ever see a --

A That's a blind spot in the store. That's the only part in the store I couldn't see from my vantage point.

Q Did you see another individual?

A Now, after the first one had come out and gone, a second black male, thinner in stature, about a hundred and eighty-five pounds, about six foot tall, and darker in complexion and thinner, came out and stood in the doorway looking back inside like he was saying goodnight to the clerk.

Q Which way did he go?

A And then he slowly meandered across the sidewalk in the

same direction as the other person, around the back of Junior Foods.

Q So the darker of the two came out second?

A Yes, sir.

Q And was he shorter or taller?

A That I'm not sure of, sir. They were about equal height, again, within inches of each other.

Q Was that here in Thomas County, Mr. Seitz?

A Pardon?

Q Did all that happen here in Thomas County?

A That's all that happened that I know of, sir. There was --

MR. HARDY: Thank you. He may have some questions.

Q One other thing. He's going to ask you, Mr. Mullins, the policeman, were you related to him or just know him well?

A He's, he's the father of my grandchild.

Q Does that have any bearing on your testimony?

A No, sir.

Q You've moved, I think, since this happened, since your heart attack?

A Yes, sir. I live in New Jersey now.

Q That's where you're going to try to recuperate?

A Yes, sir. I'm going to recuperate; yes, sir.

Q You're going back there when this case is over?

A Yes; I am.

MR. HARDY: Thank you.

THE COURT: Mr. Mears? Mr. Bryant?

MR. BRYANT: Yes, sir.

CROSS EXAMINATION

BY MR. BRYANT:

Q Good morning, Mr. Seitz.

A Good morning.

Q How are you?

A Just fine.

Q Okay. We'll try to get you out of here as quick as we can. Okay?

A Okay.

Q We met on yesterday, I believe; is that correct?

A Yes, sir.

Q Okay. I wanted to just make sure I understand a couple of things that you said. One was that you said that there was -- the only area in the store that you could not see from where you were inside your store was the area where the clerk was?

A Yes, sir.

Q There's a blind spot there?

A It was. It's a concrete wall there and I can't see through the concrete.

Q Okay. And the distance from your store over to Junior Foods is, first of all, it's across what you described as a five lane highway, and would that distance be like the length of a

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 31 of 265

football field, something like that?

A I, I described it in my own mind as being about a half a length of a football field, which other people have corrected me. But that's what I assumed it to be.

Q Okay. Some people think it's a football field and some think --

A Right.

Q You think it was about half?

A Right.

Q Okay. But anyway, it's -- they're not next door. They're across the street, across that four lane, five lane roadway --

A Across the street, five lane road.

Q Okay. Now, you indicated that you saw two people from that distance and you've described them. One of whom was a light skinned black person who had the beer?

A Yes, sir.

Q Came out and that person sort of left very quickly. The second person that you say you saw was another black male who came of the store and you said he was a little darker in complexion between the two?

A He was very much darker than, complexion than the other two -- than the other person and thinner.

Q Okay. So that we had one person who was very dark, in your opinion, and another person who was somewhat lighter in

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 32 of 265

complexion?

A Yes, sir.

Q Okay. And that's the only description that you had of either of those individuals? That's exactly what you told the police when they came; is that correct, sir?

A Yes, sir.

Q Okay. And I believe that Mr. Hardy asked you the other question I was going to ask you, so I think that's all I have. Oh, one, just one second.

In your description to the police, do you recall telling them that the person, or one of the persons, I believe it was the one who was somewhat stocky built, had on dark pants and dark shirt?

A That was the second person that came out of the store.

Q Okay. And what about -- You also -- You described two individuals.

A And the person carrying the beer was the khaki pants and a light colored shirt.

Q Okay. In your description to the police, are you certain you didn't tell them it was a light shirt and dark pants and a cap?

A Uh-uh (negative).

Q So if the police officer took that down, he would be in error?

A I, you know, I just think -- All I'm going by is what I

remember I see, is that the man --

Q And I recognize, sir, that this has been more than a few years ago?

A A few years back.

Q But if, in fact, the police report indicated that you had said it was a light shirt, dark pants that these individuals had on, that is both of them had on dark pants, does that jog your memory in any way?

A No.

Q And I believe you indicated that you could not tell anything about the ages of any of these individuals other than they were perhaps somewhere between twenty-five, maybe forty, is what I think you told me yesterday?

A Right.

Q Do you remember saying anything about a cap on anybody?

A I don't remember; no, sir. I'm sorry.

Q Did either of the individuals have on shorts that you can remember?

A Not that I seen; no, sir.

Q Are you sure -- when you spoke to the police officers, I believe you indicated to them that you had -- the person had on dark shorts. Do you recall telling the police that?

A No; I don't.

Q Do you remember which police officer you spoke with?

A Several. I believe it was Lt. Jackson, was one of

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 34 of 269

them, I think. I'm not sure. It's been quite some time now. There was a whole bunch of police officers on the scene.

Q Okay. Did, did any police officer you spoke with, did that include the first officer who arrived and you described to him what had happened?

A Well, he arrived at Junior Foods. My store is across the street. Now, I'm still operating, you know, a business while all this is going on.

Q So you didn't go over there. They came over to you?

A I had to wait until some of my superiors came in, come in the store so I could go talk to them.

Q Okay. And you recall speaking to several police officers that night, you just don't remember which ones?

A Yes, sir.

Q Okay. Did you ever speak with a detective that you can remember?

A I believe so, but I don't remember which one.

Q All right. And are you saying then that you did not tell any of them that the person had on dark shorts?

A I don't remember ever saying that anybody had on any dark shorts. I don't remember ever seeing any dark shorts.

Q Okay. And you don't recall telling them that both of these individuals, that one of the individuals was stocky -- You do recall that you said that one of them was sort of stocky, over two hundred pounds --

A Um-hum (affirmative).
Q -- that you described? And the other individual was a little, was thinner?
A Yes, sir.
Q And that they were both black males?
A Yes, sir.
Q One was a very dark complexioned fellow and the other one was kind of light?
A Yes, sir.

MR. BRYANT: Okay. Thank you, sir.

THE COURT: Anything else of this witness, gentlemen?

MR. HARDY: I ask that he be allowed to go so he can rest, Your Honor.

THE COURT: May this witness be excused?

MR. BRYANT: Yes, sir.

THE COURT: Mr. Seitz, you are excused. You're free to go.

MR. SEITZ: Thank you.

THE COURT: Thank you.

Who's your next witness, Mr. Hardy?

MR. HARDY: Tina Washington.

Take a seat right up there.

THE COURT: Ms. Washington, if you would raise your right hand, please, ma'am?

Do you swear or affirm that the evidence you'll be

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 36 of 269

giving this Court and this jury in the matter now pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MS. WASHINGTON: I do.

THE COURT: Mr. Hardy?

KATINA WASHINGTON

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q Good morning.

A Good morning.

Q What's your name, please?

A Katina Washington.

Q And, Ms. Washington, do you live in Thomas County?

A Yes; I do.

Q How long have you lived here, please, ma'am?

A About eighteen years.

Q Back during the time frame of April, March, April, May of 1994, where were you living, ma'am?

A In Cherokee Projects.

Q Is the mike on good? It's kind of hard to hear back here. Do you want to get a little closer to it? Okay. Where were you living in Cherokee, ma'am?

A In 129-B.

Q And who was living there with you, ma'am?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 37 of 269

A My two kids and Corey was there most of the time and Gary was there a lot.

Q And is this a upstairs-downstairs, or downstairs, or what?

A Upstairs-downstairs.

Q And where, where is your bedroom?

A Upstairs.

Q Where are your kids?

A Upstairs.

Q What's downstairs?

A The living room and the kitchen.

Q And Gary Young, you knew him?

A Yes.

Q How did you know him?

A I knew Gary from way back. His mother and my mother was friends.

Q And Lisa Young?

A I knew her.

Q Where did she live?

A Across from me, like catty cornered from me.

Q In Cherokee?

A Yes.

Q Tonya Frazier?

A She lived behind my apartment.

Q Who is she?

A She, she's a friend.
Q Jeff Cromartie, did you know him?
A I didn't know him.
Q Did you know who he was?
A All I know is he was, uh, Gary and Lisa's cousin.
Q Who did he hang out with?
A Excuse me. Jeff, well, when I seen Jeff, he was with Gary most of the time.
Q That was his friend? Gary?
A And Thad.
Q Is that Jeff in the courtroom this morning?
A Yes.
Q Would you point him out if you see him?
A Right there (indicating the Defendant).
Q Is that what you call him? Jeff?
A That's all I know him by.
Q How long had he been there in Cherokee?
A I'm not sure.
Q Had he been there a long time or a short time?
A A short period of time, I guess.
Q Do you know if he worked anywhere?
A No.
Q Where did he stay?
A With Lisa I think.
Q You know or you just think?

A I think.
Q Was Lisa married?
A At the time she was.
Q Did you ever see a .25 caliber gun, Tina?
A A little small gun?
Q Yes, ma'am.
A Yes.
Q Where'd you see the gun?
A I took it from Gary.
Q And that was at your apartment, 129-B?
A Yes.
Q And did you want the gun in your apartment?
A No; I did not. That's why I took it from him.
Q Now, on Thursday night at the Madison Street Deli, were you there at your apartment?
A Yes; I was.
Q Was Gary there?
A Yes; he was.
Q Were the children there?
A Yes.
Q Anybody else there?
A Corey was there, and I think Thad was outside. I'm not sure where Jeff was.
Q Did he come over there that evening?
A I think he knocked on the door and Gary walked outside.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 40 of 269

Q Did Gary come back in?

A Yeah.

Q Did Gary go back out?

A Yes.

Q Do you know if he gave him anything?

A I gave him -- He asked me for the gun and I gave it back to him.

Q And that's when he went back to Jeff?

A Before he went back outside.

Q Did he come back upstairs?

A No.

Q Did you know anything else happened that night?

A No. I had to go to work the next day so I went to bed.

Q Where were you working?

A At Kenro.

Q Carnell, was he around?

A I'm not sure.

Q Okay. Then the next day is Friday, then Saturday. Did you see Jeff on Friday or Saturday?

A I can't recall. That was too far to remember.

Q All right. The Sunday morning, did you have occasion to see them on Sunday morning?

A I don't know.

Q Over at the other girl's house? At your house?

A I don't recall seeing him at my house.

Q All right. The other girl -- Did you see any beer?

A I seen the beer.

Q Where'd you see beer?

A It was in the kitchen downstairs.

Q Where? Whose house?

A It was at my house in the can on my kitchen table.

Q What kind of beer?

A Budweiser.

Q Who did you see?

A When I got up, uh, Corey and Gary was on the back porch, and Thad, was on the back porch drinking beer.

Q Did you ask them where they got the beer?

A Yes; I did.

Q Did they say anything?

A They asked me why I wanted to know.

Q Did you see Jeff?

A I can't recall seeing Jeff.

Q Did you notice anything about the cans?

A It was dirty.

Q Gary gave the gun to whom that night, that Thursday night?

A I don't know who he gave it to. He walked outside with it.

Q Who was outside?

A Jeff was standing, like, catty cornered down on the

sidewalk.

MR. HARDY: Could I have a second, please, Your Honor?

THE COURT: Yes, sir.

MR. HARDY: She's with the Court, Your Honor.

CROSS EXAMINATION

BY MR. BRYANT:

Q Good morning, ma'am.

A Morning.

Q My name is Carl Bryant. I'm from up in Albany. If I ask you any questions you don't understand, please let me know and I'll try to repeat it or rephrase it so that we do understand each other. Okay?

A (Nods head affirmatively)

Q All right. You need to speak so that the court reporter over here will take down -- I know you were shaking your head but you --

A Okay.

Q -- have to answer out loud. Okay. Ms. Washington, I understand that you have indicated that you knew Gary Young, Corey Clark, I believe it is?

A Yes.

Q And that they were all friends, people that you knew?

A Yes.

Q Is that correct? You knew Thaddeus Lucas?

A Yes.

Case 7:14-cv-00089-MTT Document 18-15 Filed 07/14/14 Page 48 of 269

Q Ms. Frazier?

A Yes.

Q Okay. And you've indicated to the district attorney you didn't know Jeff, you just knew he was the person you called Jeff? You just knew he was Gary's cousin?

A Yes.

Q He wasn't somebody who was a friend of yours?

A No.

Q Okay. And you've also indicated that on the -- that you don't know where he was staying. You thought, and you were thinking he stayed with Lisa, but that's about all. You just think that. You're not sure where he was staying?

A True.

Q Okay. And that the gun that you told us about here, the person who you knew who owned or had that gun was Gary; is that correct?

A Yes.

Q That would be Gary Young?

A Yes.

Q Okay. You never saw him actually give the gun to anybody; did you?

A No; I did not.

Q Okay. And you said that on the night of the Junior Food Store you saw Gary, Corey and Thad drinking beer and there was some beer down on your kitchen table that had mud on it --

A I said there was a can on my kitchen table.

Q A can. Okay. And that you did not see Jeff?

A I don't recall seeing Jeff.

MR. BRYANT: Okay. And I think that's all I have. Thank you, ma'am.

THE COURT: May this witness be excused?

REDIRECT EXAMINATION

BY MR. HARDY:

Q Do you know where Jeff was?

A No, sir.

MR. HARDY: Your Honor, I think she could be excused. We know where she lives, so if she's needed we could find her. If she could just leave her phone number with -- like everybody else.

MR. MEARS: We don't have any objection, Your Honor.

THE COURT: Ms. Washington, you are excused. You'll be, you will be on call insofar as whether or not one of the parties need to call you back as a witness. If you would leave the bailiffs your telephone or some other manner in which they can contact you if necessary. Thank you.

Call your next witness.

MR. HARDY: Lisa Young.

THE COURT: Mr. Hardy, who is your next witness?

MR. HARDY: Lisa Young.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 45 of 269

THE COURT: Ms. Young, if you would have a seat right here, please.

If you would raise your right hand, please, ma'am?

Do you swear or affirm that the evidence you'll be giving this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MS. YOUNG: Yes, sir.

THE COURT: Mr. Hardy?

LISA DENISE DELANEY

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q Good morning.

A Good morning.

Q And tell us your name, please, ma'am?

A My name is Lisa Denise Delaney.

Q And, Ms. Delaney, where do you live now, please, ma'am?

A With my mother at this time.

Q In Boston?

A Yes.

Q And I've spoken to you, I think, on several occasions?

A About one time.

Q All right. And back in April, February, March, April of 1994, where were you living then, please, ma'am?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 46 of 265

A Cherokee.
Q And how long have you lived over there?
A About, not even a year.
Q Who were you living with over there, ma'am?
A I was staying with my husband and my daughter.
Q And ya'll were all living -- Do you remember the apartment ya'll were living in, the number?
A I think it was K -- I don't remember.
Q And was it a one floor or two floor?
A It's a one floor but it's got like upstairs.
Q All right. The bedrooms are where?
A Upstairs.
Q Now, and how long -- When did you get married, ma'am, to Mr. Delaney?
A February the 16th.
Q Of '94?
A Um-hum (affirmative).
Q And do you, do you know Jeff Cromartie?
A Yes. That's my cousin.
Q Okay. When did he show up?
A About a little after I got married.
Q So in February of '94?
A Um-hum (affirmative).
Q Do you know where he came from?
A Uh, I think Philadelphia. I don't know.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 47 of 269

Q Did you know he was coming?
A No.
Q So where was -- He just come and stayed with you?
A Yes. I told him to stay. He didn't come to stay with me, but when he came to visit me I welcomed him into my home because I hadn't seen him in a long time.
Q Did he have another bed -- Did you have another bedroom or where did he stay?
A He slept, he slept in one, my little girl's room upstairs. I was right across the hall.
Q Was he staying with you full time or go somewhere else, or how would he go?
A He stayed there. Since he'd been there he was at my house. He would go visit his daddy and then he'd come back to the house.
Q So would he stay --
A But he barely did go anywhere.
Q Did he stay with his daddy any or did he stay with you?
A He stayed with me most of the time.
Q Okay. When was the last time you'd seen him before in '94, February?
A Before '94, February?
Q When he showed up in February, when's the last time you'd seen him before that?
A When's the last time I'd seen him? I've seen him ever

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 48 of 269

since he's been here.

Q No. I'm talking about prior to him showing up right after you got married. When, when had you seen him before that?

A Oh, before I got married?

Q Yes, ma'am.

A I had seen him -- Well, I hadn't seen him but he called. He used to call me.

Q You hadn't seen him in person for a pretty good while?

A Um-hum (affirmative).

Q Your brother, Gary, where was he living during this time frame?

A Right across the apartments, like the apartment across from where I was.

Q And who was he living with?

A Tina.

Q Tina?

A I don't know her last name.

Q Was Jeff working anywhere?

A No; not at the time.

Q Tonya Frazier, do you know her?

A Yeah.

Q Who is she?

A She stay like a girlfriend, all of our friends stayed around in the neighborhood out there at the projects.

Q Thaddeus Lucas, do you know him?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 49 of 269

A He's like a neighborhood friend.

Q Are you kin to him?

A No; I ain't kin to him.

Q Now, on about the 10th of April or around there, prior to then, had you seen a little gun?

A No. I heard people talking about the gun, but I ain't seen no gun.

Q Seen the gun in your apartment?

A No.

Q Had the gun been in your apartment?

A Not as I know of. I, you know, I, I be focusing on my kids and stuff. I don't be, you know, like -- I used to try to get Jeff to go out because Jeff ain't hardly go nowhere. He ain't go nowhere. Because I had some girlfriends of mine and I used to try to get him to talk to. But he mostly stayed on the phone so much and he had -- I don't think he had time enough to go nowhere. He --

Q Who did he hang out with when he hung out?

A He ain't hang out with -- 'cause all of us just sit outside, you know, barbecued and stuff.

Q Was Gary his best friend?

A My brother?

Q Yes.

A I don't know if they're best friends. They're cousins.

Q Okay. Did you see any beer over there on that early

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 50 of 265

Sunday morning, that Saturday night, April the 10th?

A No; I ain't seen no beer.

Q Did you see any beer over at Tonya Frazier's?

A I don't go to her house.

Q You didn't see any over there?

A No.

Q Do you remember that Saturday night, Jeff talking to Thad?

A No.

Q Do you remember Jeff asking him to take him to the store?

A We was in a conversation, like, it was about 4:00 -- well, my next door neighbor, Kim, and her friend and my husband, we all was in there, we was already in our own conversation. You know, Thad was -- I don't know if Thad came by. He had just got off from work.

Q Did Jeff ask him to take him to the store?

A I don't recall. I was, you know, I was talking -- we was talking about church and stuff, so --

Q You don't remember seeing that beer and asking them where they got the beer, ma'am?

A No. If they had some beer nuts some cans would automatically been there and I ain't see no cans 'cause they checked that. There wasn't no cans or nothing there. So I, well, --

Case 7:14-cv-00039-HL-TQL Document 18-15 Filed 07/14/14 Page 51 of 265

Q Over at Ms. Frazier's house, do you remember seeing the beer over there?

A No.

Q Asked them where they got it from?

A That's -- She say stuff there. 'Cause that's stuff, like, -- they was telling me stuff, you know. That's unusual stuff. They was telling me, like, after they had got locked up and stuff. People running and telling me stuff like that. I ain't know nothing like that, nothing about that.

Q Did you talk to A. J.?

A A. J.? That's probably who you need to talk to 'cause I don't know, you know, --

Q Did you talk to Tonya?

A Yeah. Tonya. Tonya told me about some other stuff.

Q Gary?

A And he ain't too much tell me nothing. Gary, like he's -- me and him wasn't talking on nothing like that.

Q Did you ever talk to Gary a lot?

A Gary's my brother. Since I been over there, you know, I been married and stuff. I just had got in my marriage and stuff, you know. I saw him, you know. He come over about every -- and borrow food, you know, stuff to cook with and stuff. I always cooked and stuff for him.

Q Did Jeff kind of make it a problem when you'd just got married, living there with another man in the house?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 52 of 269

A No; 'cause I invited him in there. If I felt like he -- I didn't want him in there, I wouldn't have never invited him there. And, you know, he, since he's been there he left, he -- he stayed on the phone. And I can vouch for that. He used the phone and --

Q Didn't he put a little stress on your marriage, him being there in the house with another man? Is that what you told him?

A Not really. That was my husband. He ain't put nothing on me. That was my husband. You know, automatically a man gonna say that. But he was just like, you know, automatically a man. I ain't supposed he was worried about. If I had listened to him Jeff wouldn't have been in the first place. That's my blood, you know. I ain't gonna turn him away like that. You know, he hadn't done nothing to me.

MR. HARDY: Thank you, ma'am.

CROSS EXAMINATION

BY MR. MEARS:

Q Good morning, Ms. Young.

A Good morning.

Q Ms. Young, my name is Mike Mears. I'm one of the attorneys representing Ray Cromartie, Jeff Cromartie, Ray Jefferson Cromartie.

A Um-hum (affirmative).

Q When he came to visit with you in February of 1994, you

invited him to stay there?

A Yes; I did.

Q And did he have any relatives up in Boston? Do you know?

A Yes. We have my mama and my nieces and my aunt, my nieces. He had my sister Charlotte. He had a lot; yeah.

Q He didn't have -- Other than you and Gary, was anybody at the Cherokee Apartments that he knew or had, that were relatives that you knew of?

A No.

Q Would it be a fair statement to say that Jeff sort of hung out by himself at the Cherokee Apartments?

A We, -- Yeah. 'Cause I used to, like I said, I used to tell him to get out. I had some girlfriends of mine and my next door neighbor, she was trying to holler at him. And, you know, he mostly didn't go out nowhere. 'Cause I said, "Jeff, why you don't go nowhere"? And he stayed on that phone 'cause I used to get mad at him, 3:00 or 4:00 o'clock in the morning on the telephone.

Q He had a girlfriend in Pittsburgh; didn't he?

A Yes; he did.

Q And Pittsburgh is where he was from?

A Yes.

Q Is that correct?

A And every time he talked to her on the phone, I talked

to her on the telephone and we got to know each other, and I'd never seen her in my life, but when I talked to her on the phone we got to know each other and really it seemed like I talked -- we'd known each other for a long time.

Q So the person, or the reason Jeff was staying on the phone so much is because he had a girlfriend back in Pittsburgh?

A Yes.

Q And you tried to fix him up with some of your girlfriends, but he stayed on --

A They talked to him -- Well, he was talking to 'em, you know, as good friends. Or we'd barbecue, we'd sit around the house. You know, the whole thing was a shock for me 'cause he don't even look like the type of person that would do that, you know --

Q Ms. Young --

A -- all this.

Q Ms. Young, did he ever date any of the friends that you tried to fix him up with?

A Yes.

Q Okay. But he still was interested --

A Talking to his girl.

Q -- on Pittsburgh, talking to Pittsburgh?

A Yes. He was into, more interested in her than he was them others.

MR. MEARS: Okay. I don't have any further questions.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 35 of 269

Thank you, Ms. Young.

THE COURT: Mr. Hardy?

MR. HARDY: Tonya Frazier.

Thank you.

THE COURT: Thank you, ma'am.

May this witness be excused?

MR. MEARS: Yes, Your Honor.

MR. HARDY: Just put her on call like everybody else.

THE COURT: Gentlemen, let me, let me see Counsel for just a moment.

Ms. Frazier, if you'd have a seat right here, please, ma'am.

(Whereupon Counsel confer with the Court at the Bench, during which the following transpired)

THE COURT: Capt. Hadley, Capt. Hadley came in a few minutes ago and I think what he said was that he could bring Thaddeus Lucas up this back stairway and have him -- I don't know if they're intending on bringing him in through this door when he's called as a witness. There'd been some prior discussion about him being in his jailhouse attire and there were no objections from either party in regards to that.

MR. MEARS: That's correct, Your Honor.

MR. HARDY: I don't know what he's wearing this morning.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 36 of 269

THE COURT: Now, I don't know, you know, whether or not they've got him in shackles or handcuffs. I assume not.

MR. HARDY: Can we, you know, can I just go to the door and look and see?

THE COURT: Before you call him as a witness, let's address anything like that we need to.

MR. MEARS: My objection goes, my non objection goes to the jailhouse attire.

THE COURT: I beg your pardon?

MR. MEARS: I'm not objecting to him being in jailhouse attire. I just -- I don't think it'd be appropriate for him to be in chains or handcuffs.

THE COURT: Unless we have some information otherwise.

MR. MEARS: Yes.

MR. HARDY: Just call this witness in and --

THE COURT: Is he after -- Is he next?

MR. HARDY: Well, he's outside. I haven't seen him today. I don't --

THE COURT: Thank you.

(Conclusion of Bench conference)

THE COURT: Ms. Frazier, if you could raise your right hand, please, ma'am?

Do you solemnly swear and affirm, solemnly swear or affirm that the evidence you'll be giving this Court and this jury in the matter now pending before this Court shall

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 37 of 269

be the truth, the whole truth and nothing but the truth, so help you God?

MS. FRAZIER: Yes.

THE COURT: Mr. Hardy?

TONYA FRAZIER

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your -- Pull the mike up to you a little bit. It's away from you.

What's your name, please, ma'am?

A Tonya Frazier.

Q Ms. Frazier, back during the time period of April of 1994, where were you living, please, ma'am?

A 445 Cherokee Street.

Q And how long did you live over at Cherokee, ma'am?

A Four years.

Q And who were you living there with?

A Me and my son.

Q Sir -- Ma'am?

A Me and my son.

Q Okay. And how old is the child?

A Seven.

Q Seven. Was he seven back then or seven now?

A He's seven now. He was, uh, he was four back then. Four.

Q Back then did you know who Jeff Cromartie was? Had you seen him around?

A Yes.

Q And where had you seen him, ma'am?

A Uh, just walking around the projects.

Q Do you know where he was staying?

A With Lisa Young.

Q Ma'am?

A He was staying with Lisa Young that I know of.

Q Where did Lisa live in relation to your house?

A Uh, she stayed kind of in the back. She stayed in the back.

Q And did Lisa have any children too?

A Did she have any what?

Q Have any children?

A Yes.

Q Were they living with her too?

A Yes.

Q And did you know Thaddeus Lucas?

A Yes.

Q How did you know him?

A He was going with my sister Tameka.

Q And did you know Corey Clark?

A Yes.

Q How did you know him?

A He was a friend of mine.
Q Did all these people that we've named, were they in and around the Cherokee Projects?
A Yes.
Q Gary Young, did you know him?
A Yes.
Q And how did you know Gary?
A From Boston. He used to stay in Boston.
Q Is he kin to Lisa?
A Yes. They're sister and brother.
Q And are you kin to them?
A No.
Q Where do you live now? Do you live in Thomasville or Boston?
A Boston.
Q Carnell Cooksey, did you know him?
A Yes.
Q How'd you know him?
A From Boston. He was staying in Boston. I just grew up with him and Gary. I grew up with them.
Q Okay. The night of April the 7th, Madison Street Deli, do you know anything about that?
A No.
Q Okay. April, it'd be the 8th, the 9th, the 10th, be Saturday, on Saturday night did you see Corey and Gary, Jeff or

Thad?

A Yeah. They was around in the projects and stuff and they came to my house later that, that night.

Q Before they came to your house later that night, what were they doing?

A Just standing around the projects, just standing around.

Q Talking?

A Yes. Just standing out there. They was talking, I guess.

Q Where were they talking? What do you mean? Out on the street?

A They was just out there laughing and just out there, standing out there talking.

Q And that would have been Corey, Jeff. Who else?

A And Thad.

Q Do you know where Thad was working?

A Domino's.

Q This was after he'd got off work?

A I don't know if he had worked that day or what, but I had, I had -- I hadn't seen him that day, but I seen him later on that night though.

Q All right. So before you saw him later on that night, did you see the other people together?

MR. MEARS: Your Honor, I'm going to object to the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 81 of 269

form of the question. Identify the other people. We've gotten several names, and I think it's misleading to --

THE COURT: Rephrase your question, please, sir.

BY MR. HARDY:

Q Before Thad got off work did you see Mr. Cromartie, Mr. Clark, Mr. Young?

A Um-hum (affirmative).

Q Where were they?

A They was all standing outside.

Q What were they doing?

A They was just talking like they usually be out there talking and joking around.

Q Carnell Cooksey, did you see him?

A No; I didn't see him.

Q All right. When Thad got off work, did you see all of them together? Gary, Thad, Corey?

A Uh-uh (negative).

Q Where were you then?

A I was, I was in the house.

Q Okay. Later on did you see them again?

A Um-hum. Thad -- Yeah, later on I did.

Q Where'd you see them?

A Later on they had came to my house.

Q Who came to your house?

A It was Jeff, Corey and, uh, Gary.

Q What did they have?
A They had some beer.
Q The Jeff you're talking about, is he in the courtroom this evening -- this morning?
A Yes.
Q Would you point him out if you see him?
A Right there (indicating the Defendant).
Q Where did they come?
A They come to my house.
Q And what'd they have?
A Some beer.
Q What kind of beer?
A Budweiser in the can.
Q Did you see anything else?
A (Shakes head negatively)
Q How many were there?
A It was a twelve pack.
Q What were they doing?
A They was just sitting in the kitchen. I had, I had, uh, went back to bed.
Q Did you ask them about the beer?
A Yeah. I just, like, where did ya'll get the beer from this time of night, and they didn't say nothing so I just went back to bed.
Q Who did you ask that to?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 83 of 269

A All of them.
Q Did anybody say where they got it?
A No.
Q Did you notice anything about the beer?
A No. It just had dirt on it.
Q Do you know if they had any beer anywhere else?
A No.
Q Did you get any of the beer to drink yourself?
A Yes. One.
Q Where'd you go?
A Back in the room.
Q Were you in there where they were?
A (Shakes head negatively)
Q Did they stay or did they leave?
A They left.
Q Do you know where they went?
A No.
Q Do you know where -- Did you see Carnell Cooksey?
A He was asleep. He was drunk. He was in my house asleep drunk.
Q Did he ever leave your house that Saturday night?
A He left. Somebody took him out the house.
Q Did Carnell wake up when they brought the beer there?
A No.
Q Why was he at your house?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/24/14 Page 84 of 265

A Who? Carnell? He just come over there like that. He used to come over there.

Q So you know him too?

A Um-hum. I grew up with Carnell.

MR. HARDY: She's with the Court.

CROSS EXAMINATION

BY MR. MEARS:

Q Good morning, Ms. Frazier.

A Morning.

Q Ms. Frazier, my name is Mike Mears. I'm one of the attorneys representing Ray Jefferson Cromartie. If you don't understand any of my questions, please ask me to repeat them. Okay?

A Um-hum (affirmative).

Q Now, would you please pull the microphone over just a little bit because I'm having trouble hearing you. We'd like everyone to hear your responses. Okay?

A Um-hum (affirmative).

Q And if you will, if you don't mind saying yes or no so that this gentleman here can record what you say.

A Okay.

Q Thank you. What is your sister's name?

A Tameka Frazier.

Q Tameka Frazier?

A Um-hum (affirmative).

Q And she was Thaddeus Lucas' girlfriend; is that correct?

A Yes.

Q Are, are they still together? Do you know? Is she still his girlfriend?

A No.

Q Okay. But in April of 1994 Thaddeus and your sister were boyfriend and girlfriend; is that correct?

A Yes.

Q About how much time did you -- how often did you see Thaddeus and your sister Tameka together?

A She was, uh, she was working. She was mostly working. But Thad was always traveling with her. But they was, like, sometime, not all the time.

Q Where did Tameka live at that time?

A She was staying with me at that time.

Q She was living with you at Cherokee Apartments?

A Yes.

Q So Thaddeus would be in and out of your apartment to see your sister; is that correct?

A Yes.

Q Now, at that time Corey Clark was your boyfriend; is that correct?

A Yes.

Q How long had you and Corey been boyfriend and

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 66 of 265

girlfriend?

A Um, about, about a year. Yeah; about a year.

Q Ya'll had been going together for a pretty good period of time in April of 1994; is that correct?

A Yes.

Q How often would you be with, with Corey? Did he come by your apartment a lot?

A Yes.

Q Where did he live? Do you, do you remember?

A With his mother.

Q And where did she live?

A She was staying on Fletcher Street.

Q Okay. But Corey spent a lot of time at Cherokee Apartments visiting with you; is that correct?

A He visited me and Tina Washington.

Q Okay. He was friends with Tina Washington too; wasn't he?

A Yes.

Q Did he, did he call Tina sister? Did you ever hear him calling her his sister?

A Yes. Sometimes he did; yes.

Q Sort of pretend sister?

A Um-hum (affirmative).

Q Do you know why he called her his, his sister?

A No.

Case 7:14-cv-00089-MTT Document 18-15 Filed 07/21/14 Page 67 of 269

Q Okay. Now, you said you grew up with Gary Young; is that correct?

A Yes.

Q Did ya'll go to school together, you and Gary? Were ya'll in school at the same time?

A No.

Q Gary is a little bit older than you?

A Yes.

Q Did you know Gary's family?

A His sister, Lisa.

Q Lisa?

A Um-hum (affirmative).

Q Anyone else in his family, did you know them?

A No.

Q Okay. Now, Ms. Frazier, were you present in the Cherokee Apartments on April the 12th, the night that the shooting took place out there?

A Yes.

Q Where were you at, during that night?

A I was in the house. Talking about the shooting that happened in Cherokee?

Q Yes, ma'am.

A First, I was outside; then I went in the house.

Q Did you see any of the people that were involved in that shooting?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 68 of 269

A I just seen some boys shooting but it was, it was dark. I just went in the house when they started shooting.

Q Did any of those boys from west side come to your apartment looking for Corey?

A No. They ain't say who they was looking for. They just came to my house.

Q They came to your apartment?

A Um-hum (affirmative).

Q Did they put a gun in Corey's face?

A No.

Q You didn't see that?

A No; because he, Corey was sitting there in the chair. They just had (unintelligible).

Q Okay. But you were there the night that the people came over?

A I was there.

Q Did you hear who they were looking for?

A No.

Q Do you recall what time of the night you saw Gary Young, and you said, I think you said Gary and Jeff and Thad and Corey, with the beer?

A That night? It was late. About, like, about like 3:00, about 3:00 something.

Q Earlier that night had you seen anyone -- did you know of anyone leaving Cherokee Apartments, I'm talking about before

Case 7:14-cv-00089-MTT Document 18-15 Filed 07/14/14 Page 69 of 269

3:00, to go off to the store to get some beer and then come back?

A No.

Q Had Carnell Cooksey been drinking beer around you, around your apartment that night?

A When he came he was already like drunk and so he just went to sleep.

Q Okay. And you didn't hear about anyone going to get beer before, say, 3:00 or, 3:00 o'clock?

A No.

Q Okay. Are you still friends with Corey?

A I haven't talked to him since, you know, they locked him up.

Q At the time in April of 1994, were ya'll planning to make your relationship permanent?

A No.

Q But you were close to him; is that correct?

A Yes.

Q Ya'll had all grown up together; hadn't you?

A Me and Corey?

Q I mean, all of the friends that you had at that time. Ya'll had been together for a while; hadn't you?

A Oh, yes.

Q You didn't know Jeff; did you, other than just to see him around the projects?

A No.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 70 of 269

MR. MEARS: Okay. Thank you. Nothing further.

THE COURT: Any further questions of this witness?

MR. HARDY: If she could just leave her number too, please, Your Honor.

THE COURT: You are excused.

Ladies and gentlemen, prior to our next witness I've got a very short matter to address. This looks like a good opportunity for us to take our mid morning recess.

We're going to recess for about fifteen minutes.

Everyone remain seated while this jury retires.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Mr. Hardy, I believe that you -- gentlemen, if you could just step up to the bench for a moment? Well, I believe you needed to inquire as to whether or not Mr. Lucas is appropriately suited to come inside.

MR. HARDY: He's got on civvies, Judge.

THE COURT: All right, sir. That's fine.

Gentlemen, we're going to take about a ten or fifteen minute recess and then Mr. Lucas will be the next witness.

Mr. Hardy, can you refresh my recollection now in regards to Mr. Lucas and Mr. Clark, the co-defendants. Their cases have already been disposed of; is that correct?

MR. HARDY: They've both pled on accusations to

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 71 of 269

Robbery, Hindering the Apprehension. Mr. Clark was sentenced by you to twenty-five years. And Mr. Lucas was given twenty, serve ten and maybe five concurrent on the Hindering. I think that's the way it was.

THE COURT: Did I sentence Mr. Lucas?

MR. HARDY: Yes, sir.

THE COURT: Why the differences in the sentences?

MR. HARDY: He was under a sentence already. You gave him concurrent time. He was just the driver. He never went in the store or anything. I don't know why you sentenced him -- you got a PSI and --

THE COURT: I recall a PSI on Mr. Clark --

MR. HARDY: You did a PSI on both of them.

MR. MEARS: Could we have the PSI as far as --

THE COURT: Excuse me. Sir?

MR. MEARS: Could we have the PSI?

THE COURT: I don't have the PSI.

MR. HARDY: They don't give them to us.

MR. MEARS: Could I ask that the PSI be made a part of this record and that the Court -- I know you reviewed it at one time, Judge, but I ask that to be made a part of Brady review and make it a part of the record so that later on we don't have to go looking for the PSI. When you're on the Supreme Court and I'm retired that --

THE COURT: No, sir; I won't -- For several reasons

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 72 of 265

I'll never be there, some of which I'm sure have become obvious.

MR. MEARS: But if I could, I think it'd be appropriate for the PSI to be a part of this record as a part of the Brady material since he was a co-defendant in the case.

THE COURT: I'll think about that.

MR. MEARS: Okay.

THE COURT: Do you recall the other, what other sentence he was under at that time?

MR. MEARS: Was Lucas under any other -- I don't think Lucas was under any other sentence.

MR. HARDY: Yeah; he was under a sentence.

THE COURT: For some reason I think I've gotten Lucas mixed up in my mind with somebody I had had in Brooks County at one time.

MR. MEARS: Lucas committed aggravated battery on his girlfriend, girlfriend. He battered her pretty badly.

THE COURT: Well, we tried that case.

MR. MEARS: It went to the jury. I think he sort of acted out in front of the jury. He had some words for the jury in front of the jury. I can share my transcript with you.

THE COURT: We'll be in recess for about ten minutes.

(Whereupon the Court takes a brief recess, and upon reconvening the following transpired outside the

jury's presence)

THE COURT: Mr. Hardy, we've previously addressed these matters, but I just want to be absolutely sure that in regards to the co-defendant's testimony, that being Mr. Lucas or Mr. Clark, as I recall insofar as Mr. Clark's sentencing, there were no recommendations made to the Court by the district attorney's office. A pre-sentencing investigation report was provided to the Court prior to the sentence being imposed in that particular case --

MR. HARDY: That's correct on him. But I think on Mr. Lucas we made a recommendation about concurrent time, but not on Clark, the man in the store. I think the Court got a PSI and we had a sentencing hearing before the Court and he had his lawyer, Ms. Lane, there present.

THE COURT: In regards to Mr. Lucas, was the recommendation, sentence recommendation made to the Court, was that recommendation made in writing to the Court, or was it made orally? Do you recall?

MR. HARDY: It wasn't in writing, but I remember, Your Honor, I think it was the Court -- recommendation to the Court and the Court could follow it or not follow it, I think is the way it was couched. Mr. Andrews was his lawyer and he's in the back in the courtroom.

THE COURT: All right. Mr. Mears, have you had an opportunity to look at the transcript of the sentencing

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 74 of 265

hearing in Mr. Lucas' case?

MR. MEARS: Yes, Your Honor. I, I intend to go into certain aspects of his sentencing within the bounds as the Court set with regard to the understanding about whatever plea agreement was there. And I don't think that'll be a problem, Judge. I was going to tender the certified copy of the indictment and a copy of the sentencing report into evidence. And that simply spells out the years that the Court sentenced him to.

The other matter that we addressed briefly was the second offense that Mr. Lucas was sentenced for, unrelated to this particular case. In December of '96 Mr. Lucas was sentenced for Aggravated Assault and Aggravated Battery after a jury trial and the victim in that case was his girlfriend. He was on bond at the time, on bond from this case. And he was indicted. And according to the court records he was found guilty by the jury and the Court sentenced him to terms of years on both the Aggravated Battery and the Aggravated Assault charges. That, that took place in, on December the 16th of 1996. That was the other matter that was not related to this, for which he has been convicted of a felony. I intend to introduce that indictment, that is, when and where appropriate.

THE COURT: Now, what I understand you're intending to do in regards to that, use that for impeachment purposes,

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 75 of 265

simply introduce the certified copy of the indictment and conviction?

MR. MEARS: That's correct, Your Honor.

THE COURT: All right, sir. You had made some reference earlier about the PSI in Mr. Clark's case being made a part of this record. What is the purpose of that?

MR. MEARS: No. Your Honor, I was just made aware by Mr. Hardy in our conversation with the Court at the Bench that there had been a pre-sentence investigation report completed. And I believe it --

MR. HARDY: I think there has. I don't never see them, Mr. Mears. The Judges don't let me have them or see them or have anything to do with them. So that'd just be an assumption on my part. He'd have to tell you whether he did it. But I don't never get to see them.

MR. MEARS: I will make the appropriate inquiries with the probation office as to whether or not the PSI report exists on either Mr. Lucas or Mr. Clark.

THE COURT: You understand those reports are by law confidential. Now, insofar as the request to make a part of that report or make that report a, a part of the record in this case, what would be the relevancy or the purpose?

MR. MEARS: If the pre-sentence investigation report contained any Brady type of material or it contained any information that might relate to the Defendant's

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 76 of 265

understanding of a possible plea or leniency or hope or expectation of benefit in regard for the plea, then I think it'd be appropriate for us to be given that. What I'm asking -- First of all, I'll find out if there is a PSI report. If there is, then I will ask the Court to review that in camera. If the Court then feels that it's still something that should be remain, should remain under seal and not be divulged to us, that it be sealed, made a part of the record for whatever review needs to be made of it at some later time. I think that would be the appropriate thing for me to request and for the Court to simply review it in camera. And if there is anything on Brady, I certainly assume that the Court would provide that to us, since he is now testifying in this case. If there's any information in there that would be of an impeaching or of the nature that would lend the Court in its review of that to suspect that there's a hope of leniency in exchange for his testimony, that the Court would provide that to us. Even if the Court determines that it's not, I think it would be appropriate to have it placed under seal and made a part of this record. And I would formally request the Court to do that.

THE COURT: Mr. Mears, the only thing, from my experience with the pre-sentence investigation report -- I'll certainly review it to see whether or not it reflects

 Case 7:14-cv-00089-MTT Document 18-15 Filed 07/24/14 Page 77 of 265

any, any deal or anything of that nature, purported deal. I do not, do not believe it did. But I'll review it for that particular purpose.

Insofar as the other information contained therein, background information, education, employment history, things of that nature, and also any criminal record which, of course, you would have an opportunity to get from other sources. But I'll review it and make a determination at that time.

MR. MEARS: And does the Court, does the Court think it would be appropriate if you do have an opportunity to conduct such a review, assuming that there is a PSI report, would the Court then put it under seal and make it a part of the record of this, this trial?

THE COURT: I'll consider that.

MR. MEARS: Thank you.

THE COURT: Your next witness is Mr. Lucas?

MR. HARDY: Yes, sir. He's back there.

THE COURT: If you'll bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Mr. Hardy, you may call your next witness.

MR. HARDY: Thaddeus Lucas.

THE COURT: Mr. Lucas, if you would have a seat right here, please.

If you would raise your right hand, please, sir?

Do you solemnly swear or affirm that the evidence you shall give to the Court and the jury in the matter now pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. LUCAS: Yes, sir.

MR. HARDY: Lower your hand, please, sir.

THADDEUS LUCAS

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q What's your name, please?

A Thaddeus Lucas.

Q And, Mr. Lucas, were you originally charged in this case?

A Yes, sir.

Q And have you entered a plea in this case?

A Yes, sir.

Q Pull the mike up to you a little bit, if you would? Maybe raise it a little bit, please, sir. Thank you, sir. Have you been sentenced to prison in this case?

A Yes, sir.

Q Are you currently in prison?

A Yes, sir.

Q Where are you in prison?

Case 7:14-cv-00059-HL-TQL Document 18-15 Filed 07/14/14 Page 79 of 269

A Leesburg.

Q And what was your sentence in this case? Do you know what your sentence was and what you pled to?

A Robbery and Hindering the Apprehension.

Q How many years did you get?

A Twenty years, ten to serve.

Q And were you already -- Were you under another sentence at the time for fighting with your girlfriend?

A Yes, sir.

Q And what sentence did you have in that case?

A Twenty years, ten to serve.

Q Did that happen a year or so after the Junior Food Store?

A Yes, sir.

Q So you're currently in Leesburg, the state prison there?

A Yes, sir.

Q And how long have you been in prison?

A About six months.

Q Do you know -- Where did you grow up, Mr. Lucas?

A Thomas County.

Q Did you go to school here?

A Yes, sir.

Q What school did you go to?

A Thomasville.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 80 of 265

Q And how far did you go in school?
A Tenth.
Q And who is your father?
A Joseph Lundy.
Q Where did you grow up? Where did, where did you live?
A 208 W. Jerger.
Q 20 what?
A 208 W. Jerger Street.
Q Just about four or five blocks from here, down from the courthouse?
A Yes, sir.
Q And where were you working back during the time period of February of 1994, Mr. Lucas?
A Domino's Pizza.
Q And were you working anywhere else?
A Shoney's.
Q And what were you doing for Shoney's?
A Cook.
Q And what were you doing for Domino's Pizza?
A Delivery driver.
Q And what kind of car did you have?
A A Honda.
Q Do you remember what color it was?
A Brown.
Q And do you remember how many doors it had?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 81 of 265

A Two door.

Q What kind of car was it? A --

A Five speed. Honda Civic.

Q Honda Civic?

A Yes, sir.

Q Okay. Was that your car?

A Yes, sir.

Q So how long had you been working for Domino's Pizza?

A Two years.

Q And how long had you been working for Shoney's?

A About a year.

Q So you was holding down two jobs?

A Yes, sir.

Q Where were you living then? You said with your father?

A Yes, sir.

Q And did you have a girlfriend at that time?

A Associate; yes, sir.

Q And who was that?

A Tameka Frazier.

Q Where did she live?

A She lived in Boston but she stayed with her sister, off and on with her sister.

Q Do know Jeff Cromartie?

A Yes, sir.

Q And is he here in the courtroom this morning?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 82 of 269

A Yes, sir.

Q Now, are you kin to him?

A I assume.

Q And what do you assume?

A Stepbrothers.

Q So you have the same father?

A Yes, sir.

Q Did you ever know him until you were eighteen? Never heard of him?

A No, sir.

Q Is that the first time you ever met him, when you were eighteen?

A Yes, sir.

Q Did you have anything to do with him -- Did he live in Thomasville?

A About six months then after I knew him; yes.

Q Did he come to live with your dad?

A Yes, sir.

Q That would be over there on Jerger?

A Yes, sir.

Q Now, was he living here prior to February of 1994?

A He was just coming through.

Q Did you know that he was coming?

A No, sir.

Q And where is the first time you saw him back in

February, March, April of '94? Do you remember?
A At my father's house.
Q At your father's house?
A Yes.
Q Did you know he was coming to your father's house?
A No, sir.
Q Did he just show up?
A Yes. To me he did.
Q Was he living with your father some?
A Off and on; yes.
Q Where else would he be living?
A I assume he was over there at his cousin's house.
Q Who was that?
A Lisa.
Q Is she kin to you too?
A No, sir.
Q What about Gary Young?
A No, sir.
Q Do you know Gary Young?
A Yes, sir.
Q Do you know Corey Clark?
A Yes, sir.
Q How do you know them?
A I just know them from, from Jeff and all. I don't know them personally.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 84 of 269

Q Did you see Jeff over at Cherokee?

A Yes, sir.

Q Where would he be --

MR. MEARS: Your Honor, I'm going to object to the form of the question unless there's some time limit put on it. Did he just see him there, I think would --

THE COURT: Rephrase your question, please, sir.

BY MR. HARDY:

Q Around April the 7th, before then? April the 10th? Did you see Jeff over at Cherokee?

A Yes, sir.

Q Where would, where would you see Mr. Cromartie?

A At his cousin, Lisa Young.

Q Who did he hang out with over there?

A I really, I really can't recall.

Q Did any of the other people, Jeff, Corey, Gary, any of them have a car?

A No, sir; not to my knowledge.

Q You're the only one that had a car?

A Yes, sir; I had a car.

Q Do you know where he came from when he came down to Thomasville there in February?

A No, sir.

Q Do you know anything about the Madison Street Deli robbery, Mr. Cromartie, I mean, Mr. Lucas?

A No, sir.

Q After -- the Friday after it happened, did you hear anybody talking about it on the newspaper or TV?

A Gary and Carnell Cooksey.

Q What were they saying?

MR. MEARS: Your Honor, I'm going to object. That would call for a hearsay response from this witness about what some other witness said.

THE COURT: Any response, Mr. Hardy?

MR. HARDY: Leave it with the Court.

THE COURT: Sustained.

BY MR. HARDY:

Q Did you ever see the .25 caliber gun, Thad?

A No, sir.

Q Did you hang out with those people that much?

A Just off and on. Just, I would, like, after work, I would --

Q How late did you work?

A About 2:30 A. M.

Q What time did you go to work in the daytime at Shoney's?

A 6:00 in the morning.

Q So you basically worked from 6:00 in the morning till 2:30 in the morning?

A 6:00 till 2:00. 6:00 in the morning until 2:00 P. M.

Case 7:14-cv-00039-WTT Document 18-15 Filed 07/14/14 Page 86 of 265

and then I worked at Domino's from 4:30, week nights till about 12:00 to 12:30. Weekends, I worked from 6:00 to 2:30 or 3:00 o'clock A. M.

Q So you worked twelve hours or so a day?

A Yes, sir.

Q Saturday night, Sunday morning, April the, excuse me, April the 10th, when you got off work did you go over to Cherokee?

A Yes, sir.

Q And when you got over there who did you see?

A Jeff, Jeff Cromartie and Lisa Young and Gary Young.

Q Where'd you see them?

A At Lisa's apartment.

Q And did Jeff talk to you?

A Yes, sir.

Q What did he say to you?

A He asked me to take him to the store.

Q Did you want to do that?

A It was late. I didn't want to, I didn't want to go to the store.

Q Did you refuse the first time he asked?

A Yes, sir.

Q Did he ask any more?

A Yes, sir.

Q Who asked you?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 87 of 265

A Jeff.

Q Did you refuse again?

A Yes, sir.

Q Did he ask you any more?

A Yes, sir.

Q How many times did he ask you before you agreed to take him?

A It was about three times.

Q Why did you agree to take him?

A He kept -- I got aggravated. I just, you know, if he wanted to go to the store that bad, I said, well, I'd go on and take him.

Q Do you know why he wanted to go to the store?

A No, sir.

Q He's the one that asked to go to the store?

A Yes, sir.

Q Did anybody go with you -- with him to the store?

A Corey.

Q Corey who?

A Corey Clark.

Q What seat were you in?

A I was the driver.

Q Who was in the front seat?

A Jeff.

Q Who was in the back seat?

A Corey Clark.

Q Do you know where, why they wanted to go to the store?

A No, sir.

Q Which store did you start to go to?

A It's where Food Max was. I think it's probably now Piggly-Wiggly.

Q Did you go, try to go there?

A Yes, sir.

Q Did anybody tell you not to go there?

A Yes, sir. Jeff said he didn't want to go to that store.

Q Did he tell you where to go?

A Yes. The store on U. S. A. 19.

Q Did you know what store he was talking about?

A Not till we got there.

Q Did he -- Who told you where to go?

A Jeff.

Q Did he direct you where to go?

A Yes, sir.

Q And where did you go?

A Well, we was, I was driving to the Junior Food Store and he told me not to drive up in there, so we drove on the side of Pinetree Boulevard.

Q Who told you to do that?

A Jeff.

Q Who told you where to stop?
A Jeff.
Q And did you stop?
A Yes, sir.
Q Did anybody get out?
A Corey and Jeff.
Q Did you know what they were going to do in the store?
A They told me they was going to steal some beer.
Q Did you ever see a gun?
A No, sir.
Q Did you stay right there or what'd you do?
A They told me to park down there in Providence Plaza.
Q Who told you that?
A Jeff.
Q Did you do that?
A Yes, sir.
Q Did Corey ever tell you what to do?
A No, sir.
Q Where was he?
A In the back seat.
Q Did you go to Providence Plaza?
A Yes, sir.
Q Did you park there?
A Yes, sir.
Q Did they come back?

A Yes, sir.
Q Who came back?
A Jeff and Corey.
Q Did they walk back or run back or what?
A When I looked up they was just already getting in the car. I don't know if they ran or walked.
Q When they got back did they have anything with them?
A Beer.
Q Who had the beer?
A Jeff had a case and Corey had a case.
Q What kind of beer?
A Budweiser.
Q Did anything happen to the beer? Was the cartons whole or broken or do you know?
A It was in a box.
Q It was Budweiser beer?
A Yes, sir.
Q Did they say anything to you when they got in the car?
MR. MEARS: Objection, Your Honor. Unless it's a response from Mr. Cromartie, it would be hearsay.
BY MR. HARDY:
Q Did Mr. Cromartie say anything to you when he got in the car?
A Said, "Let's go".
Q And did anybody -- Did Mr. Cromartie tell you where to

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 91 of 269

go?

A I knew where to go.

Q Which way did you go?

A Pinetree Boulevard, all the way down to Smith Avenue and turn left, by Cherokee Apartments.

Q Where'd you go in Cherokee?

A Tonya Frazier's house.

Q Why'd you go to her house?

A That's where they, you know, that's where they were staying at. I mean, that wasn't where they was staying, where they were hanging out.

Q And did they get out?

A Yes, sir.

Q Who got out?

A We all got out.

Q Who's all of us?

A Me, myself, and Corey and Jeff.

Q Do you know where Gary Young was?

A Uh, Tina's house. Tina Washington.

Q How do you know that?

A Because when I was outside he still at the apartment and came over to, to --

Q After ya'll got back?

A Yes, sir.

Q Do you know where Carnell Cooksey was?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 92 of 269

A They say he was asleep at Tonya's house, asleep on the couch.

Q Where did ya'll go? Did you go inside or outside?

A Inside.

Q What happened when you got inside?

A Well, there was numerous of people there and they, you know --

Q Who all was there?

A There was quite a few people there.

Q What happened when you got inside?

A They put the beer on the table, one on the counter and one on the table and they started drinking and, you know, listening to music, whatever.

Q Who was drinking the beer?

A Basically who all was there.

Q Did you drink any?

A No, sir.

Q Do you drink beer?

A No, sir.

Q Who was drinking the beer?

A Corey, Gary, Carnell. And like I say, there was numerous people there.

Q Was Mr. Cromartie drinking?

A I didn't see him drink.

Q Did he come in with a beer?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 93 of 265

A Yes, sir.
Q Did you notice anything about the beer?
A It had dirt on it.
Q What kind of beer was it?
A Budweiser.
Q Did you ever see the gun, Mr. Lucas?
A No, sir.
Q Did anybody ever tell you what happened at the store?
A Yes, sir.
Q Who told you what happened at the store?
A Corey.
Q Did Mr. Lucas ever tell you what happened at the store?
A Excuse me?
Q This man over here, Mr., Jeff, did he ever tell you, Mr. Lucas, what happened at the store?
A No, sir.
Q The next day did you go to work?
A Yes, sir.
Q Was that at Shoney's?
A Domino's. I was off at Shoney's.
Q And then did you go to Bainbridge?
A Yes, sir.
Q When did you go to Bainbridge?
A Tuesday, Tuesday evening.
Q Why'd you go to Bainbridge?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 94 of 265

A I have some relatives, I have some relatives over there. So I go to see them.

Q Did anything happen to the car?

A Busted the head on it.

Q What'd you do with the car?

A Parked it at a convenience store.

Q Did you leave it?

A Well, I leave it just to come back over here and try to get some excess cash to go back and get it and get it fixed.

Q Did you say what was wrong with your car?

A It had a busted radiator and warped the head.

Q It was overheating?

A Yes, sir.

Q Do you know what happened to your car at the convenience store?

A The man told me I could leave it there. But when I got back I was arrested.

Q Did you talk to the police? Did you talk to the police when you were arrested? Give them a statement?

A Yes, sir.

Q Who'd you talk to? Do you know?

A Lt. Melvin, Lt. Melvin Clark. Whatever, lieutenant or something.

Q Did you talk to one of the detectives?

A Yes, sir.

Q Who told you which store to go to? Who told you to go to the Junior Food Store?

A Jeff.

Q Who told you where to park?

A Jeff.

Q Who told you where to go to Providence Plaza?

A Jeff.

Q Who told you, let's go, when you got back to the car?

A Jeff.

Q Who had the beer?

A Jeff and, uh, Corey.

Q Are you telling us what you remember and what you saw?

A That's it.

Q All that's happened here in Thomas County, Georgia?

A Yes, sir.

MR. HARDY: He's with the Court.

MR. MEARS: One moment, Your Honor.

CROSS EXAMINATION

BY MR. MEARS:

Q Good morning, Mr. Lucas.

A Good morning.

Q Mr. Lucas, my name is Mike Mears. I'm one of the attorneys representing Ray Jefferson Cromartie. If I ask you any question that you don't understand, please ask me to repeat the question. Okay?

A Yes, sir.

Q If you will, speak loudly enough so that the last person in the jury down here can hear you and so that the court reporter can take down what you say.

A Yes, sir.

Q Okay? Please try to speak into the microphone if you can.

Mr. Lucas, are you the same Thaddeus Lamar Lucas that was indicted by a Thomas County Grand Jury in October of 1994 for the offense of being a party to the murder of Mr. Richard Slysz?

A Yes, sir.

Q Are you the same Thaddeus Lamar Lucas that was indicted in October of 1920 (1994, sic.) for being a party to the armed robbery of Mr. Richard Slysz?

A Yes, sir.

Q I ask you to look at what's been marked as Defendant's Exhibit Number 9 and just verify that that is the indictment returned against you.

A Yes, sir.

Q You're the same person?

A Yes, sir.

Q Mr. Lucas, were you represented by an attorney at the time you were indicted?

A Yes, sir.

MR. MEARS: Your Honor, I would tender Defendant's

Exhibit 9. I've shown these to Mr. Hardy.

THE COURT: Any objections?

MR. HARDY: It seems to be in the proper form, Your Honor.

THE COURT: It's admitted without objection.

BY MR. MEARS:

Q Mr. Lucas, you were allowed to plead guilty to the offense of Robbery to an accusation rather than an indictment; were you not?

A Yes, sir.

Q In other words, you didn't have to go to trial for the offense of Murder, being a party to Murder or to being a party to Armed Robbery; did you?

A No, sir.

Q The district attorney allowed you to plead guilty to a lesser offense, to an accusation; didn't he?

A Yes, sir.

Q That was in exchange for your testimony here today; wasn't it?

A Yes, sir.

Q They just let you do that out of the goodness of their heart?

A No, sir. I was found guilty on October 28th, '96 on Aggravated Battery and Aggravated Assault and I was sentenced on December 12th to twenty years, twenty, ten to serve on Aggravated

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 98 of 269

Battery, and twenty years on Aggravated Assault. I was already heading to the system and my lawyer came to, you know, came to a conclusion, you know, to get my time ran concurrent for a lesser, lesser offense.

Q Let me, let me ask you some questions about that, and I'll come back. You were originally arrested and charged with the murder of Mr. Richard Slysz and the armed robbery of Mr. Slysz at the Junior Food; were you not?

A Yes, sir.

Q And then you were indicted by a Thomas County Grand Jury; were you not?

A Yes, sir.

Q And you made a statement to the police; did you not?

A Yes, sir.

Q And you were given bond; weren't you?

A Yes, sir.

Q In other words, you were let out of jail after you gave your statement; didn't you?

A Yes, sir.

Q And you posted a bond?

A Correct.

Q Until you were, those charges were to be disposed of; isn't that correct?

A Yes, sir.

Q And while you were on bond were you arrested and

charged with any other crimes?

A Yes, sir.

Q Are you the same Thaddeus Lucas that was indicted by a Thomas County Grand Jury in October of 1996 for the offense of Aggravated Assault?

A Yes, sir.

Q You were indicted for the Aggravated Assault on Marquita Higgins; were you not?

A Yes, sir.

Q You were indicted for assaulting her with your fists; were you not?

A Yes, sir.

Q Are you the same Thaddeus Lucas that was indicted in October of 1996 for the Aggravated Battery of Marquita Higgins?

A Yes, sir.

Q And you were charged with intentionally, maliciously causing bodily harm to the person of Marquita Higgins by seriously disfiguring her body by causing a mandible fracture and by causing a blowout fracture to the right medial orbital wall?

A Yes, sir.

Q Are you the same Thaddeus Lucas that was indicted for those offenses?

A Yes, sir.

Q I ask you to look at what's been marked as Defendant's Exhibit 8. Is that your indictment, Mr. Lucas?

 Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 100 of 209

A Yes, sir.

MR. MEARS: Your Honor, I would tender Defendant's Exhibit 8. It's a certified copy of the indictment.

THE COURT: Any objection?

MR. HARDY: Not to the form he's got, Your Honor. Not -- He's got a certified copy. They'd speak for themselves.

THE COURT: It's admitted without objection.

BY MR. MEARS:

Q Mr. Lucas, as a result of being charged with the offense of Aggravated Assault and Aggravated Battery of Marquita Higgins, you went to trial; did you not?

A Yes, sir.

Q And you were tried by a jury here in Thomas County; did you not?

A Yes, sir.

Q And you were convicted of the offense of Aggravated Assault; were you not?

A Yes, sir.

Q You were convicted of the offense of Aggravated Battery; were you not?

A Yes, sir.

Q And that took place in December of 1996? Is that correct?

A For the trial?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 101 of 269

Q Your conviction and your sentence was in December of 1996; is that correct?

A Yes, sir.

Q The trial, the actual trial was in October of '96; is that correct?

A Yes, sir.

Q And then you were later brought back to court in December and actually sentenced; is that correct?

A Correct.

Q And you were given, for the offense of Aggravated Assault, you were sentenced to ten years in prison; were you not?

A Yes, sir.

Q And for the offense of Aggravated Battery you were sentenced to a period of twenty years; were you not?

A That's correct.

Q Is it your understanding that those two sentences to run concurrent or at the same time?

A Yes, sir.

Q Did you understand that?

A Yes, sir.

Q That took place in December, that sentence took place in December of 1996; did it not?

A Yes, sir.

Q I show you what's been marked as Defendant's Exhibit 12. Are you the same Thaddeus Lamar Lucas that was tried and

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/24/14 Page 102 of 259

sentenced for those offenses?

A Yes, sir.

MR. MEARS: Your Honor, I would tender Defendant's Exhibit 12.

THE COURT: Any objections?

MR. HARDY: It's the correct form, Your Honor.

THE COURT: It's admitted without objection.

BY MR. MEARS:

Q Mr. Lucas, after you had been sentenced to twenty years with the ten year concurrent sentence on the Aggravated Battery, you then agreed to plead guilty to lesser included offenses in the crimes for which you were indicted involving the Junior Food Store; is that correct?

A Yes, sir.

Q And you were represented by an attorney in that plea agreement; were you not?

A Yes, sir.

Q And your attorney is here in court today; is she not?

A He is.

Q Is he not? I'm sorry. Is he not? Now, that plea was not to the indictment for which you were charged; was it? In other words, you were indicted for Murder; were you not?

A Yes, sir.

Q And you understand that if the State had sought the death penalty against you for Murder you could have received the

death penalty if the jury had handed it back? Do you understand that?

A Yes, sir.

Q You understand that you could have been sentenced to life without parole if the jury had determined that was the appropriate sentence for the offense of Murder --

MR. HARDY: Judge, I'm going to object. Side bar. He's misstating the law, Your Honor. I think he was indicted as parties to the crime.

MR. MEARS: Your Honor, we might want to talk about that outside the presence of the jury.

THE COURT: Ladies and gentlemen, let me ask that you step to the jury room for a moment.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Mr. Hardy, as soon as the door is closed, if you'd be a little bit more specific in regards to your objection, please.

MR. HARDY: I think he and Mr. Clark were charged with felony Murder and being parties thereto. They weren't charged with malice Murder, I believe.

MR. MEARS: Your Honor, I --

THE COURT: Anything further?

MR. HARDY: He was saying, I think, he can get the death penalty for felony Murder. Is that -- I was trying to

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 104 of 269

hear and go through my papers.

MR. MEARS: Yes. I said for the offense for which he was charged he could have received the penalty of death if he had been found guilty of the offense of Murder for which he was charged. And the objection arose at that point.

If the State is going to take the position that you cannot receive the death penalty for the offense of felony Murder, I'll withdraw the question and go on to something else.

MR. HARDY: Judge, I was just trying to listen, Judge, and I kept hearing him with my papers and it came to my mind that this man and the other man were charged with felony Murder and being parties thereto. They were not charged, excuse me, Your Honor, with malice Murder as Mr. Cromartie is. Mr. Cromartie was not charged as a party thereto. He was charged with the offense of malice Murder. Mr. Clark and Mr. Lucas were charged as parties, felony Murder, count one, and count two, Armed Robbery, parties thereto. So I think that's the wording of the indictment as to those, original indictments as to those two individuals.

And we would leave that with the Court. I didn't clarify -- He didn't -- wasn't clear as to what he was saying was what they were charged with and what they, what really happened, in my mind.

MR. MEARS: The charge for the offense of Murder under

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 109 of 289

Official Code of Georgia 16-5-1. It's charged, the indictment reads that Mr. Lucas was charged with the offense of Murder in that, in the county aforesaid, did unlawfully, knowingly, willfully and intentionally being a party thereto while in the commission of a felony, to wit: Armed Robbery, cause the death of Richard A. Slysz, a human being. If Mr. Hardy is going to state in his place that you cannot receive the death penalty for felony Murder, I'll withdraw the question and go on to another line of questioning.

THE COURT: Gentlemen, I don't think that's the question. I think the question is, regardless of whether he states it in his place or not, Mr. Mears, the question is, my understanding of the law, insofar as when the death penalty can be imposed. I don't know, I don't -- I'm really not sure of the basis of the State's objection yet. I don't know if the State is saying, you know, under Eckland versus Florida --

MR. MEARS: Inmans versus Florida.

THE COURT: Inmans versus Florida, that since, since neither one of these were the trigger men and the death penalty couldn't be imposed. Of course, that's been carried a little bit further. If there are sufficient findings of wanton and reckless disregard for the possible consequences of a possible or purported victim in a crime, then the death penalty can be, in fact, be imposed even if you are not the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 106 of 289

trigger person.

MR. MEARS: Your Honor, I, I agree. And I'm not sure -- I'm arguing as to what I understand the objection to be. And if I'm incorrect in the objection, I will certainly withdraw it. But I certainly take the position, just like Mr. Hardy does, that you can't receive the death penalty, or shouldn't receive the death penalty for felony Murder. He's not indicted under those terms. He's indicted, he's indicted for unlawfully, knowingly, willfully and intentionally --

THE COURT: That's obviously not the law. You cannot receive the death penalty for felony Murder, Mr. Mears.

MR. MEARS: Well, Your Honor, I didn't make the objection. Mr. Hardy did.

MR. HARDY: I don't think he said what they were were charged -- He said, "You were charged with Murder" and he didn't say, "You're charged with felony Murder and parties thereto, not being the trigger man". He's trying to leave the impression these people pulled the trigger somehow or another. And that's not the way they were indicted nor what the indictment shows, Your Honor.

THE COURT: Gentlemen, I'll --

MR. HARDY: Or what they pled to.

THE COURT: I'll overrule the objection.

Anything further?

MR. MEARS: Nothing further, Your Honor. Thank you.

THE COURT: Mr. Mears, are you aware of any, any law at this time in regards to whether or not the indictment has to, has to track the language of particular holdings and, in fact, allege that although a party to the crime, it was, you know, --

MR. MEARS: No; Your Honor.

THE COURT: -- willful, wanton, reckless disregard --

MR. MEARS: I specifically requested charges on that, that if you have an interrogatory type of charge to outline the jury's specific findings of fact and the individual's involvement with regard to felony Murder. Judges, and probably rightly so, applying the law as it is have refused to give such a charge and refused to provide such a verdict, a jury verdict form. If a person, unfortunately, the law is in Georgia, not the federal part of Georgia but the State part of Georgia, the law is that if a person's convicted of felony Murder, there's no way to delineate whether or not the jury found that they, other than going on to a sentencing hearing, as to whether or not the person is to be subjected to the death penalty offense.

There was a young man just sentenced in Cobb County day before yesterday for a death in a convenience store where his co-defendant was the trigger person. Everyone agreed. And his co-defendant, Vance Soloman, was executed about

 Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 108 of 289

seven or eight years ago. Brandon Jones was just convicted and sentenced to death in Cobb County when the district attorney argued that Vance Soloman was the trigger person. I wish it weren't so. I don't believe that when the Supreme Court finally resolves this issue, that they'll allow jurors to sentence someone to death for the involvement that perhaps Mr. Lucas had. But --

THE COURT: My question is, and it really goes back to whether or not the State's objection, maybe not on the basis stated, is good or not, but, but that simply being the indictment against Mr. Lucas as formed, would the indictment have to put him on notice of the State's contention that they felt like the, the Defendant's acts were wilful, wanton, reckless disregard of the circumstances and possible injuries to the victim for the State to seek the death penalty. If, if you see my point? My point is, you know, if that's the case, then your question is inappropriate because he could not have been tried for, in a sentencing phase --

MR. MEARS: Absolutely, Your Honor --

THE COURT: -- imposition of death or life imprisonment without parole.

MR. MEARS: There's no law in Georgia that requires the indictment to be in a form such as to put on notice. That's why the 17-10-30 -- 130 requires that there be a notice of

Case 7:14-cv-00039-MTT Document 18-8 Filed 07/14/14 Page 109 of 269

intent to seek the death penalty and now it's prior to arraignment and that there be a proceeding under the Unified Appeal. That's strictly up to the district attorney. He's indicted for Murder, whether it's malice Murder or felony Murder. And if -- district attorneys do it all the time. They'll have double counts. They'll have a malice Murder and a felony Murder and seek the death penalty on both of them. I'm sure Your Honor has seen cases like that. And so I think my question is appropriate. I wish it weren't appropriate. I wish I were not allowed to ask that question because I think it would cut down significantly on the number of death sentences.

THE COURT: Well, at this point in time, unless I can be shown that the indictment as phrased or otherwise would make the question improper, I overrule the objection.

You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Mr. Mears, you may proceed.

MR. MEARS: Thank you, Your Honor.

Q Mr. Lucas, before we took the break I asked you the question whether or not you understood that as you were indicted for the offense of being a party to the crime of Murder, felony Murder, as written in the indictment, do you understand that should the district -- had the district attorney decided to seek

the death penalty against you and the jury determined it was an appropriate sentence, you could have received death under that indictment? Do you understand that?

A Yes, sir.

Q And you understand that if the district attorney had pursued the death penalty as an appropriate punishment and a jury determined that it was appropriate, you could have received life without parole? Do you understand that?

A Yes, sir.

Q And you understand that if the district attorney had sought your prosection for this offense of felony Murder, the jury could have returned a sentence and sentenced you to life imprisonment for the rest of your natural life? You understand that?

A Yes, sir.

Q You were allowed to plead guilty to an accusation and not plead to anything under this indictment; weren't you?

A Correct.

Q In fact, the indictment was dismissed; wasn't it?

A Correct.

Q And it was dismissed after you had agreed to testify; wasn't it?

A Repeat that.

Q It was dismissed on February the 20th, 1997; is that correct? I'll show you. Excuse me. I'm showing you a document

that's been marked Defendant's Exhibit Number 10, Mr. Lucas. Are you the same Thaddeus Lamar Lucas?

A Yes, sir.

Q And that's your case and it shows that it was dismissed on February the 20th, 1997; wasn't it?

A That's what it says.

Q Did you know it had been dismissed? Did you know your indictment against you for felony Murder had been dismissed? Did you know that?

A Well, not until I pleaded and I got a copy of it.

Q I'm sorry?

A I got a copy, the same copy you have.

Q Okay.

MR. MEARS: I tender Defendant's Exhibit Number 10.

THE COURT: Any objections?

MR. HARDY: No, sir.

THE COURT: It's admitted without objection.

BY MR. MEARS:

Q In exchange for your cooperation you avoided being put on trial for the death penalty; didn't you? You avoided being put on trial for the offense of Murder; didn't you?

A You talking about the plea?

Q Um-hum. Yes, sir.

A Yes, sir.

Q And you were allowed to plead guilty to the offense of

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 112 of 269

Robbery; didn't you?

A Sir?

Q You pled guilty to the offense of Robbery?

A Yes, sir.

Q Not even Armed Robbery?

A No, sir.

Q Just plain Robbery. And you also pled guilty to the offense of Hindering the Apprehension of a Criminal; didn't you?

A Correct.

Q And for the offense of Robbery you were given, sentenced to twenty years but you only have to serve ten years of that; isn't that correct?

A That's correct.

Q And for the offense of Hindering the Apprehension of a Criminal you were sentenced to five years?

A Yes, sir.

Q All of that runs concurrent to that twenty year sentence you're serving for beating up Marquita Higgins; doesn't it?

A Yes, sir.

Q So the only sentence you're serving, as far as the length is concerned, is your aggravated battery sentence and your aggravated assault sentence against Marquita Higgins; isn't it?

A That's --

Q It's all running at the same time; isn't it?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 119 of 269

A I don't know --

Q You've only got one twenty year period of your life; haven't you? That's all they're asking for.

A I guess.

MR. MEARS: Your Honor, I would tender Defendant's Exhibit 11, which is the sentencing sheet.

THE COURT: Admitted without objection.

BY MR. MEARS:

Q Now, Mr. Lucas, you were arrested by the Thomasville Police Department on April the 13th, 1994; is that correct?

A I don't recall the date, but it was in April; yes, sir.

Q Let me put it in maybe a time frame. Were you around the Cherokee Apartments on April the 12th when the shooting took place?

A Yes.

Q You remember -- You know which shooting I'm talking about, when the West Side guys came over there?

A Yes, sir.

Q And Gary Young shot it out with them. You, you're aware of that; aren't you?

A Yes.

Q Okay. You were arrested right after that; weren't you?

A A day later. The next day.

Q The next day. April the 13th. And you were placed in the cell with Corey Clark, excuse me, you were placed in a cell

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 114 of 289

next to Corey Clark at the justice center; were you not?

A Yes, sir.

Q And Gary Young was in that cell too?

A No. All, all of us was in individual cells.

Q Okay. But you were in the same pod?

A Yes.

Q And so the ladies and gentlemen understand, the pod means you were all together in one area and then you had individual cells that you go into at night; is that correct?

A No, sir. It was a holding cell.

Q Holding cell. You were all together; would that be a fair statement, back at the jail?

A Yes. In holding cells, separate cells.

Q You, Carnell Cooksey --

A Me, Corey, Gary --

Q -- Corey and Gary?

A And Jeff.

Q Jeff wasn't back there with ya'll; was he? Not in that same area; was he?

A He was in intake.

Q He was in intake, but he wasn't there back there with ya'll; was he?

A What? In the pod?

Q Yeah.

A Yes; he was.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 119 of 269

Q Was he with you and Gary in the same pod, in the same cell location?

A He was --

Q Think about it now.

A If I'm not mistaken, Gary was in B-4. Corey was in B-5. I was in B-6. And Cromartie was in B-3.

Q You and Gary and Corey were all together? Ya'll could talk together; couldn't you? Would you at least agree with that? That you were all together where you could talk?

A We was in the same B pod; yes, sir.

Q Okay. And you talked about your case; didn't you? You talked about why you'd been arrested?

A I did; yes.

Q Now, let me take you back a little bit after -- a little bit before your arrest. You testified that on the morning of April the 10th you had finished working at Domino's and you went over to the Cherokee Apartments. And I assume you went over there to see your girlfriend, Tameka?

A Yes, sir.

Q And you had been over to the Cherokee Apartments quite a bit since you and Tameka had started having a relationship; is that correct?

A Yes, sir.

Q So it wasn't unusual for you to go to Cherokee Apartments?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 116 of 269

A No; it wasn't unusual.

Q Okay. Now, what was your last delivery for Domino's Pizza that night? Do you recall?

A I don't recall.

Q You delivered all over Thomasville; didn't you?

A Yes, sir.

Q And you'd made deliveries out on Pinetree; hadn't you?

A Yes, sir.

Q And you knew the Pinetree area; didn't you?

A Yes, sir.

Q And you knew the intersection of W. Jackson and Pinetree; didn't you?

A Yes, sir.

Q And you knew -- I mean, you'd been all over town delivering pizzas; hadn't you?

A Yes, sir.

Q And you testified that no one else in that group of people that you were talking about earlier, you were the only one that had a car; weren't you?

A Well, I guess, you know.

Q Jeff Cromartie didn't have a car; did he?

A No, sir.

Q Do you know whether Jeff Cromartie even knows how to drive or not?

A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 117 of 269

Q Has he ever driven your car?
A No, sir. He's driven my father's car.
Q Do you know whether or not he's got a Georgia driver's license or anything?
A I don't know.
Q Okay. You've never seen him drive your car; have you?
A No, sir.
Q Since he came down here and was staying at Cherokee Apartments, had he ever gone with you to deliver pizzas?
A No, sir.
Q Had Corey Clark?
A No, sir.
Q Had you ever been riding around with Corey Clark?
A No, sir.
Q You've never had Corey Clark in your car riding around before April the 10th?
A The only night he was in my car was that night of the incident.
Q Okay. That's the first time Corey Clark, your friend, had ever been in that car?
A That's the only time he's been in my car.
Q Okay. Would you agree with me that you knew that area of the city pretty well?
A Yes, sir.
Q Okay.

A That was my job.
Q You knew Gary Young too; didn't you?
A Yes, sir.
Q How close were you with Gary Young?
A We was all right. I mean, we wasn't the best of friends, but we were --
Q You were friends?
A We were friends all right.
Q You were good friends; weren't you?
A We was -- I mean, --
Q Mr. Lucas, you're serving your time now.
A Yeah; I understand.
Q You understand that you've sworn to tell the truth to these ladies and gentlemen?
A Yes, sir.
Q How close of friends were you with Gary Young?
A I mean, if he did something outrageous, I mean, I don't be taking up for what he, taking up for what he had. I ain't, I ain't that kind of friends.
Q But before April the 13th ya'll were good friends; weren't you?
A Yeah, sort of.
Q Okay. Now, you were interviewed twice on April the 13th by Det. Guy Winkelman and the other police officer. Do you recall that?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 119 of 209

A Yes, sir.

Q There were two different interviews. Do you recall that?

A Yes.

Q And on, during the first interview you told Det. Winkelman that you got off work at 2:30; didn't you?

A Yes, sir.

Q Have you had an opportunity to review your statement?

A No, sir.

Q Have you had an opportunity to review any of your statements?

A No, sir.

Q Several statements you made?

A No, sir.

Q Okay. Now, you told Det. Winkelman that you were with Tameka, Tonya Frazier, Erica Bell, Corey Clark and Carnell Cooksey on the night that you got off work on the 10th day of April, 1994. That's Sunday morning. Didn't you?

A Yeah.

Q That was your first statement. That's what you told him. You told him you were with Tameka, Tonya, Erica, Corey and Carnell. You told him that. Then you said that Gary Young and Jeff Cromartie came into the apartment around 3:30 or 4:00 o'clock; didn't you?

A I don't know.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 120 of 269

Q Do you recall making that statement?
A Sir?
Q Do you recall making that statement, that you were with Corey Clark, Carnell Cooksey, Erica, Tonya and Tameka when Gary Young and Jeff Cromartie came in to the apartment?
A Yes, sir.
Q That's what you told him?
A Yes, sir.
Q And that was a lie; wasn't it?
A Yes, sir.
Q You lied to them at that time; didn't you?
A Yes, sir.
Q You denied having been with Gary Young or Jeff Cromartie earlier that evening; didn't you?
A Yes, sir.
Q And that was a lie; wasn't it?
A Yes, sir.
Q And you told Det. Winkelman that Jeff and Gary came into Tonya Frazier's apartment with the beer in your first statement; didn't you?
A Yes, sir.
Q And that was a lie; wasn't it?
A Yes, sir.
Q You were trying to protect yourself; weren't you?
A Basically; yes, sir.

Q But you knew if you told the truth, you were going to be arrested; didn't you?

A Correct.

Q And you knew that you were involved; didn't you?

A After the fact; yes, sir.

Q And you were, you were telling lies to the investigators to protect yourself; weren't you?

A I don't know.

Q Now, during this second interview that you gave to Det. Winkelman, you told him that when you got there at 2:30 A. M., got there being the apartment, that Jeff and Corey were already at Tonya's house; didn't you? That was part of your second statement. Do you recall making that statement?

A I didn't have two statements. I mean, there was no other statement.

Q You don't recall making that statement at all?

A No, sir.

Q We'll come back to that. You told Det. Winkelman that you didn't know what Gary Young was doing that night; didn't you? You didn't know -- You told him you didn't know what he was doing that night? You didn't know who he was with or where he'd been in your first statement to Det. Winkelman; did you?

A Yes, sir.

Q And that was a lie; wasn't it?

A I didn't know what he was doing.

Q You knew he was there drinking beer with you; didn't you?
A I don't drink.
Q Excuse me. You knew he was there drinking beer in your presence?
A Yeah; at that time he was. I thought you was saying before.
Q And when you were first asked about Gary Young, you lied about it; didn't you? You lied about knowing where Gary Young was; didn't you?
A Yes, sir.
Q You did. And you did it to protect yourself; didn't you?
A Yes, sir.
Q Because you knew if you were associated with Gary Young that night you was gonna be in trouble; didn't you?
A Yes, sir.
Q And so you lied to protect yourself; didn't you?
A Yes, sir.
Q And it worked; didn't it? It worked; didn't it?
A What you mean?
Q The lies worked. You weren't ever prosecuted for Murder; were you?
A No.
Q You weren't ever prosecuted for Armed Robbery; were

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 123 of 209

you?

A No, sir.

Q You did a good job of protecting yourself.

MR. MEARS: Nothing further.

MR. HARDY: Is that a question or a statement, Your Honor?

THE COURT: Mr. Mears, is that a question or a statement?

MR. MEARS: I'll withdraw it, Your Honor.

REDIRECT EXAMINATION

BY MR. HARDY:

Q Mr. Mears just asked you about, at first you were trying to protect yourself?

A Yes, sir.

Q Did you know what Jeff had done in that store?

A No, sir.

Q At the time they interviewed you, did you know what Jeff had done in that store?

A (Shakes head negatively)

Q Did you -- What did you think they were gonna do when you went to the Junior Food Store?

A Thought they was gonna snatch some beer and that was it.

Q Snatch some beer?

A And that was it.

Q Did you know they were going in there to kill somebody?
A No, sir.
Q Did you know Jeff was gonna shoot somebody?
A No, sir.
Q Are you lying now to protect yourself?
A I don't have no reason to lie.
Q What'd you think Corey was gonna do in the store?
MR. MEARS: Your Honor, I'm going to object. It calls for supposition, unless he's going to base it upon some factual piece of evidence that's already in evidence. It calls for supposition unless he can get in Corey Clark's mind.
THE COURT: Would you repeat that question?
BY MR. HARDY:
Q What did they tell you you were gonna do at the store when you left Cherokee? What'd Jeff tell you?
MR. MEARS: Again, it's hearsay unless it goes to Mr. Cromartie --
BY MR. HARDY:
Q What'd Jeff say?
A Sir?
Q What'd Jeff say he wanted to go to the store for?
A Get some beer.
Q Why did you want to go to the Food Max?
A Because it was the nearest store, close to the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 129 of 265

projects.

Q It was open; wasn't it?

A Yes, sir.

Q How many stores are open at 3:30 in the morning?

A That one and, uh, Swing's -- Sing's over there by, uh, Pizza Hut, off of Remington.

Q Who told you to go to Junior Foods?

A Jeff.

Q You wanted to go to Food Max?

A Yes, sir.

Q Was that closer?

A Yes, sir.

Q Are you lying to protect Gary?

A No, sir.

Q Are you lying to protect Corey?

A No, sir.

Q Are you telling us what happened?

A What I know; yes, sir.

Q Are you going to be in prison for a long time?

A I don't know.

Q Did you even know they were gonna kill the man? Mr. Jeff Cromartie was gonna kill the man when he went in the store?

A Nobody -- I mean, I was surprised.

Q Would you have took -- taken him to the store if he was gonna kill somebody?

A I wasn't, I wasn't -- No, sir; I didn't even want to go to the store that night.

Q Did you -- Did ya'll concoct a story in these cells, as he's trying to imply, when ya'll were all in holding cells with concrete walls between you?

A Sir?

Q When ya'll were down there and he said ya'll were all in B-3, 4, 5, 6.

A Yes, sir.

Q Did you talk to the other people and try to change -- say everybody get their story straight, or did they have you separated?

A They had us separated.

Q With concrete walls between you?

A Yes, sir.

Q And iron doors?

A Yes, sir.

Q Mr. Cromartie was there too?

A Yes, sir.

Q Did they talk to you individually?

A The detectives?

Q Yes, sir.

A Yes, sir.

Q So the detective would talk to you and then somebody else would talk to somebody else?

A Yes, sir. All of us didn't talk to the same detective as far as I know.

Q You even talked to a different detective?

A Yes, sir.

Q Who had the beer?

A Corey and Jeff.

Q Before you went to the store, where was Jeff and Corey?

A I was at Lisa's house. I was at Lisa's house just sitting around. And I got up to use the rest -- use the bathroom. That's when Jeff came to the -- well, somebody knocked on the back door and I opened the back door and it was Jeff. He said, "Will you take me to the store"? I said, "Yeah; I'll go on and take you to the store". When I went to get my keys off, off the table, I go outside and Corey, I seen Corey sitting on top, on the hood of my car.

Q That's the first time you saw him?

A That's the first time I seen him.

MR. HARDY: Thank you.

RECROSS EXAMINATION

BY MR. MEARS:

Q You'd delivered pizzas on Pinetree before; hadn't you?

A Yes, sir.

Q You knew where the Providence Apartments were on Pinetree; didn't you?

A Yes, sir.

Q You'd been up and down that road many times; hadn't you?
A Yes, sir.
Q Yet your testimony is that Jeff had to tell you how to get to the Providence Apartment?
A No. He told me to park down there.
Q To drive up that way and park there?
A He told me to wait there.
Q Okay. How were you dressed that night?
A Just my, my Domino's uniform on.
Q Will you describe that for me, please?
A Blue shorts, white tennises, and Domino's blue and orange shirt.
Q Light colored shorts?
A Well, they're navy blue.
Q Dark colored shorts?
A The same as that coat there (indicating).
Q As dark as that navy blue coat that the court reporter has got on?
A Yes, sir.
Q You had on dark shorts like that?
A Yes, sir.
Q Were you wearing a cap?
A Yes, sir.
Q What kind of cap did you have on?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 129 of 209

A A Domino's neon strip cap on.

Q One of those bright blue Domino's cap?

A No. The neon-like; yes, sir.

Q Real bright blue cap?

A Yes, sir.

Q And dark blue shorts?

A Domino shorts.

MR. MEARS: Thank you.

THE COURT: Gentlemen, may this witness be excused?

MR. HARDY: Yes, sir.

MR. MEARS: We have no objection.

THE COURT: You are excused.

Call your next witness.

MR. HARDY: Clark.

THE COURT: Raise your right hand, please, sir.

Do you solemnly swear or affirm that the evidence you shall give this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

MR. CLARK: I do.

THE COURT: Mr. Hardy?

COREY ALLEN CLARK

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/24/14 Page 130 of 269

Q State your name for us, please?
A Corey Allen Clark.
Q Where do you live now, Corey?
A River State Prison in Hartwell, Georgia.
Q And are you the same man that had originally been charged with parties to the crime in this, the murder and armed robbery? Had you originally been charged with that?
A Yes, sir.
Q Not being the shooter, just parties to the crime; is that true?
A Yes, sir.
Q You pled on an accusation to Robbery and Hindering the Apprehension of a Criminal?
A Yes, sir.
Q And you were given twenty-five years in prison?
A Yes, sir.
Q Is that what you're doing right now?
A Yes, sir.
Q And you're gonna be in prison for a long, long time?
A Yes, sir.
Q Who was your lawyer in the case?
A Ms. Gail Lane.
Q That lady right back there?
A Yes, sir.
Q Who's your mama?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 131 of 269

A Ms. Emily Clark.

Q Is she in the courtroom?

A Yes, sir.

Q Where is she?

A She's back there behind Ms. Lane.

Q Is the other lady kin to you too?

A That's my godmother.

Q What's her name?

A Ms. Alberta Hayes.

Q How old are you now, Corey?

A Twenty-four, sir.

Q And how old were you when this happened?

A Twenty-one.

Q Let me show you documents. Mr. Mears will show them to you. But is this the accusation that you pled to? That's what you'd been originally charged with in the indictment?

A Yes, sir.

Q That shows the sentence you got, twenty-five years in prison?

A Yes, sir.

Q Did you know the Judge was gonna give you twenty-five years when he gave you twenty-five years?

A No, sir.

Q That's what you got, twenty-five years in prison?

A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 132 of 269

Q To serve?
A Yes, sir.
Q Do you even know when you're gonna get out or do you have any idea when you're gonna get out?
A I've got a TPM date.
Q A what?
A I've got a TPM date.
Q What's that?
A April of 2009.
Q So at least twelve more years you're gonna be in prison?
A Yes, sir.
Q How long have you already been in prison?
A In all I've been in there about three and a half years.
Q How long did you live in Thomasville?
A Basically, all my life.
Q Did you grow up here?
A Yes, sir.
Q Where'd you go to school?
A Thomasville High School.
Q Did you graduate?
A Yes, sir.
Q What year?
A 1991.
Q Did you play sports?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 133 of 289

A Yes, sir.

Q What'd you play?

A Played football.

Q What team were you on?

A I was on the '88 State Championship team.

Q Did you finish high school?

A Yes, sir.

Q Do you work?

A I don't work now.

Q When you worked, when you were out?

A Yes, sir; I was working.

Q Where were you working?

A Thomasville Home Furnishings.

Q How long did you work for them?

A About nine months.

Q Where'd you work before that?

A I think Habersham out of Camilla, Georgia.

Q And what'd you do for them?

A Putting up steel doors in prisons.

Q All right. How long did you work for them?

A About six months.

Q Did you work anywhere else?

A I worked at Shoney's before a few months and Cedar River Seafood for a few months.

Q Have you always had a job?

A Yes, sir.
Q At the time you were arrested where were you working?
A I had just got fired from Thomasville Home Furnishings.
Q And what'd you do for Thomasville Home Furnishings?
A I was a material cutter.
Q Do you have a problem drinking?
A Yes, sir.
Q What do you drink?
A Just about everything. Beer, liquor.
Q You like alcohol?
A Yes, sir.
Q Back on April the 7th, did you know anything about -- 1994, did you know anything about the Madison Street Deli being robbed?
A No, sir.
Q How tall are you?
A Six two.
Q How much do you weigh?
A About one eighty-nine.
Q Is that about the same size you were back in '94?
A Probably so.
Q Are you still about the same skin color back then?
A Yes, sir.
Q April the 7th, did you know anything about the Madison Street Deli getting robbed?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 155 of 269

A No, sir.
Q Did you ever hear about it getting robbed?
A Only on the news.
Q Did anybody tell you to watch the news?
A No, sir.
Q Which news is that? TV, radio or what?
A TV, the 12:00 news. Midday.
Q April the 9th, which would have been Saturday, did you have occasion to see a Jeff Cromartie?
A Saturday? Yes, sir.
Q Do you know Jeff Cromartie?
A Yes, sir.
Q How do you know him?
A Through his cousin Gary.
Q Do you know Gary?
A Yes, sir.
Q And you know Thaddeus Lucas?
A Yes, sir.
Q How do you know him?
A Know all of them through Gary. Thad, I was going with Thad -- I was going with this girl in the projects and Thad was going with her sister.
Q Who was that? Who were you going with?
A Tonya Frazier.
Q Do you know Lisa Frazier -- Lisa Young?

A Yes.
Q How long -- Who is she?
A That's Gary's sister.
Q Tina Washington?
A Yes, sir.
Q How'd you know her?
A She has, she has two kids by one of my brothers.
Q So all you people knew each other?
A Basically; yes, sir.
Q How long has Jeff been down here?
A I don't know. Probably -- I don't really know.
Q Do you know where he was staying?
A With Lisa, Gary's sister.
Q Who all was staying with Lisa?
A Lisa, her kids, her husband.
Q Do you know if Jeff had a job?
A No, sir.
Q You don't know or he didn't have a job?
A I don't know.
Q What kind of shoes did you wear back then?
A Like Reeboks. They was white Nikes.
Q Is that what you wearing, the Nikes, when this happened?
A White, white Nikes.
Q Do you know what the other folks were wearing?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 197 of 209

A No, sir.

Q Excuse me. Would these be the shoes you were wearing that night?

A Yes, sir.

Q Number 14-A. What time did you get up with Jeff on that Saturday night before the robbery?

A I, I don't really know.

Q Where was -- You and Jeff, did ya'll talk about going out there?

A (Nods head affirmatively)

Q What'd you talk about?

A We talked about going to the store when Thad got off.

Q Why were you going to the store when Thad got off?

A I was gonna get some beer.

Q What -- Did you have a car?

A No, sir.

Q Did Jeff have a car?

A No, sir.

Q Who had a car?

A Thad.

Q Where'd Thad work?

A At Domino's.

Q What kind of car did he have?

A A brown type hatchback car.

Q So you and Jeff talked about what?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 198 of 269

A Just going to the store.
Q And doing what?
A Getting some beer.
Q Why'd you want beer?
A Because we -- I'm a alcoholic.
Q You needed some beer?
A I needed me a drink; yes, sir.
Q When Thad came home, what'd you do?
A Waited till we got consent from him that he was gonna take us.
Q Who asked him to take you to the store?
A Jeff.
Q Did Thad take you to the store?
A Yes, sir. About fifteen minutes later when he got, after he got there.
Q Who was driving the car?
A Thad.
Q Who was sitting in the front seat?
A Jeff.
Q Who was sitting in the back seat?
A I was.
Q Where'd you go?
A We went to the Junior Food Store out on 319.
Q Did you know where that was?
A Yes, sir.

Q Who told Thad where to go?
A Jeff.
Q Where did ya'll go? Did you go, like, to the front of the store, or where'd you go?
A We pulled around to the side. Jeff and I got out.
Q Who got out first?
A Jeff got out first.
Q Who told Thad where to park?
A Jeff told him where to park.
Q When you got out of the car, what'd you do?
A It was a air conditioner vent right behind the store. We hid behind that because there was a man in a white truck still in the store.
Q Why'd you hide behind the vent?
A Wait until the man in the truck leave.
Q Where'd Thad go?
A He went down the street to the Providence Plaza Apartment.
Q Why'd he go down there?
A Park and wait for us.
Q Did anybody tell him to go down there?
A I don't think so.
Q What'd you do after you were hiding behind the air conditioning vent?
A After the man in the truck left we went to, we went in

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 140 of 289

the store, Jeff and me. He went in first and I went behind him.

Q Where'd you go?

A I went straight for the beer cooler.

Q And where was that?

A In the back of the store.

Q What'd Jeff do?

A He went down the first aisle as soon as you get in the store.

Q What'd you do then?

A Well, I was reaching to open the door. I heard two gunshots. I saw the flash of the first shot in the glass, you know. So I ducked. I dropped down, you know, 'cause I hadn't expected that. Then --

Q Who shot the gun?

A Jeff shot the gun.

Q Had you seen the gun before then?

A Not on his person.

Q So when you heard the two shots, what'd you do?

A I dropped down to the floor because, you know, it shocked me. It was unexpected. So then --

Q Had you seen the man in the store?

A Yes, sir.

Q Where was he?

A He was sitting in a, on a stool behind the counter.

Q Did you see him when you came in?

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 141 of 209

A Yes, sir.
Q Did you say anything to him?
A No, sir.
Q Did Jeff say anything to him?
A No, sir.
Q Did he say anything to ya'll?
A No, sir.
Q What was he doing? Do you know?
A He was looking through some papers.
Q So you went back to the beer cooler?
A Yes, sir.
Q What were you doing at the beer cooler?
A I was open, getting ready to open the door.
Q What were you gonna get?
A I was gonna get some beer.
Q And after you heard the shots, what'd you do?
A I dropped down to the floor.
Q Were you scared?
A Yes, sir.
Q What'd you do then?
A I got up off the floor. He told me to get the money.
Q Sir?
A When I got up off the floor he told me to get the money. I looked up. He was reaching across the counter trying to open the register.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 142 of 269

Q Who?

A Jeff was.

Q What'd you do then?

A So I ran behind the counter, you know. I pressed the one key that I thought was gonna open it, but --

Q Did you see the man?

A Yes, sir. I looked down and saw the man. He wasn't moving. So I --

Q Did you get any money?

A No, sir.

Q What'd you do then?

A While I was behind the counter I was looking down and he had left and went back to the cooler and grabbed two twelve packs, twelve, Budweiser, in the can. After he got the beer he left out of the store and I left behind him.

Q Who's taller? You or Jeff?

A I am.

Q Who's the darkest back then? You or Jeff?

A I was.

Q Number 171. Who's that?

A That's me.

Q Is that the way you looked?

A Yes, sir.

Q 6 here, who's that?

A Jeff.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 143 of 269

Q Is that the way he looked?
A Yes, sir.
Q Who ran out of the store with the beer?
A Jeff ran out of the store with the beer. I was following behind him.
Q Where'd you go?
A I was right behind him.
Q Where'd you go?
A We went around back to the same side that we came on in.
Q Did anything happen around there?
A While we was running one of the beer, one of the twelve packs busted open and --
Q Who had it?
A Jeff had both of them.
Q When they broke --
A It busted open and some of the beer wasted out. So I scooped it up and scooped them back in there except for two beers. And then we ran on and got in the car that was waiting.
Q Where was the car waiting?
A At the Providence Plaza.
Q When you got in the car did you tell Lucas anything?
A No, sir.
Q Did you ever tell him anything?
A No, sir.

Q Where'd you go?
A Back to the Cherokee Projects.
Q Which way did you go? Do you know?
A Down Pinetree Boulevard.
Q Whose house did you go to in Cherokee?
A We went to Tina's house.
Q Did you go to another house?
A I went to Tonya's house after I got through drinking.
Q Who drank some beer?
A Tina, Jeff, Gary, me, Thad.
Q Is that the beer that'd been stolen?
A Yes, sir.
Q Who shot the man in the store?
A Jeff.
Q Did you shoot him?
A No, sir.
Q Did you have that gun?
A No, sir.
Q When's the first time you told anybody about what happened?
A After I got arrested.
Q Who'd you talk to?
A Det. Johnson and Weaver.
Q Did you tell them what you've told us today?
A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 149 of 269

Q Did you know Jeff was gonna shoot that man?
A No, sir.
Q Did he say anything to that man that you heard before he shot him?
A No, sir.
Q Did the man say anything to him before he shot him?
A No, sir.
Q Did you say anything to the man before Jeff shot him?
A No, sir.
Q Was that here in Thomas County, Georgia, Corey?
A Yes, sir.
Q Did you have anything to do with the Madison Street Deli?
A No, sir.
Q Did you ever see the gun that night except when you saw the flash?
A No, sir.
Q How many shots did you hear?
A Two shots.
Q How soon were they?
A Right behind one another.
Q (Claps hands twice)
A Yes, sir.
Q Where was the man when you saw him?
A Sitting behind the counter on a stool.

Q When you went behind the counter, where was he?
A Laying on the floor.
Q Was he bleeding?
A I didn't see any blood.
Q Was he dead? Do you know?
A I didn't see him breathing either.
Q Did you care about seeing him?
A Sir?
Q Did you care even about seeing him?
A I was scared.
Q Why were you scared?
A Because he, the man, the man ain't do nothing, you know.
Q Are you scared of Mr. Cromartie?
A I was then.
Q Who had the gun?
A Cromartie did.
Q Did you know what he was gonna do then?
A No, sir.
MR. HARDY: Thank you.

CROSS EXAMINATION

BY MR. MEARS:
Q Good afternoon.
A Good afternoon.
Q Mr. Clark, my name is Mike Mears. I'm one of the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 147 of 269

attorneys representing Ray Jefferson Cromartie. If I ask you any question that you don't understand, please ask me to repeat it. All right? And could I ask you to please say yes or no or make a verbal response so that the court reporter can take it down?

A Yes, sir.

Q Will you do that for me?

A Yes, sir.

Q Okay. Mr. Clark, you were indicted originally by a Thomas County Grand Jury for the offense of Murder on the accusation that you unlawfully, knowingly, willfully, intentionally being a party thereto while in the commission of a felony, to wit: the Armed Robbery, cause the death of Richard A. Slysz, a human being; weren't you?

A Yes, sir.

Q You were also in that same indictment indicted and charged with the offense of Armed Robbery; were you not?

A Yes, sir.

Q Being a party to the armed robbery; were you not?

A Yes, sir.

Q I'm going to hand you what's been marked as Defendant's Exhibit 13, and ask you to verify that indictment to make sure that that is the indictment that a Grand Jury returned against you?

A Yes, sir.

MR. MEARS: Your Honor, I would tender Defendant's

Exhibit 13 into evidence.

THE COURT: Any objection?

MR. HARDY: It's proper, Your Honor. All the documents relating to the same thing should be in one package. Normally, it's the indictment, plea, sentence or whatever as one exhibit.

MR. MEARS: Your Honor, -- I'm sorry.

MR. HARDY: He can do it however he wants, but normally the way it's done would be like that, Your Honor. Show it to the witness.

THE COURT: It's admitted without objection.

MR. MEARS: Your Honor, could I ask that, for some instruction. There is no normal way. There is a way that each attorney does it. I'm sort of -- I realize I'm not from Thomas County, but I sort of resent the implication that I'm doing something wrong or out of the normal. I can tell Mr. Hardy that it's never done the other way in most of the courts of this state.

THE COURT: Gentlemen, let's move along.

MR. MEARS: Thank you, Your Honor.

Q Mr. Clark, you, when you were indicted you were represented by an attorney; is that correct?

A Yes, sir.

Q You had indicated on direct examination that you were represented by Ms. Gail Lane; is that correct?

A Yes, sir.

Q She was not your first attorney; was she?

A No, sir.

Q Judge Altman was your first attorney before he went on the Bench; wasn't he?

A Yes, sir.

Q And so the attorney that first represented you is now a Judge here in Thomas County; is that correct?

A Yes, sir.

Q Okay. And do you know whether Ms. Lane is related to Mr., to Judge Altman or not?

A That's her husband.

Q Okay. Now, you were originally indicted for the offense of Murder; weren't you?

A Yes, sir.

Q And you understand that if the district attorney had sought the death penalty, made this -- made your case a death penalty case, and you had been convicted of the offense of felony Murder as set forth in this indictment, and the jury decided to give you the death penalty, you could have gotten the death penalty; couldn't you?

A Yes, sir.

Q And you were advised that by your attorneys; weren't you?

A Yes, sir.

Q And you understand that had the district attorney decided to seek the death penalty against you and the jury decided that you were guilty of the offense of felony Murder, that jury could have sentenced you to life without parole; couldn't they?

A Yes, sir.

Q Assuming they heard enough fact and they applied the law?

A Yes, sir.

Q And you were advised of that; weren't you?

A Yes, sir.

Q And that jury could have sentenced you to life imprisonment for the offense of Murder?

A Yes, sir.

Q You were also indicted for the offense of Armed Robbery; weren't you?

A Yes, sir.

Q And you were told what, what the penalty for Armed Robbery was; wasn't you?

A Yes, sir.

Q And what was that?

A Life.

Q Life. Now, you didn't have to go to trial or even plead to this indictment that's been marked as Defendant's Exhibit 13; did you?

A No, sir.

Q You were allowed to plead to an accusation, something that didn't go to the Grand Jury, but was drawn up by the district attorney; weren't you?

A Yes, sir.

Q And you were allowed -- Well, excuse me. Are you the same Corey Allen Clark that's set forth in this plea, Defendant's 14? Is that you, Mr. Clark?

A Yes, sir.

Q You were allowed to plead guilty, not to Murder. That was dismissed; wasn't it?

A Yes.

Q You were allowed to plead guilty, not -- you didn't have to plead guilty to Armed Robbery. You were allowed to plead guilty to just plain Robbery?

A Yes.

Q Now, Mr. Hardy asked you when you -- Well, you were also charged with Hindering the Apprehension of a Criminal also?

A Yes.

Q And for the Hindering the Apprehension of a Criminal you received five years; did you not?

A Yes.

Q Mr. Hardy asked you that when you pled guilty and received the twenty-five year sentence that you're now serving, you didn't know what you were going to get; did you?

A No, sir.
Q Do you know what the maximum penalty for robbery is?
A No.
Q It's twenty years; isn't it?
A Yes.
Q Twenty. And then five for the hindering. So you avoided a murder trial; didn't you?
A Yes.
Q And you avoided an armed robbery trial?
A Yes.
Q You avoided the possible death sentence?
A Yes.
Q And you avoided the possible life without parole?
A Yes.
Q And you have a parole date now of the year 2009; is that correct?
A Yes.
Q Excuse me. Do you recall the date that you pled to the accusation? I should have asked you this earlier, Mr. Clark. What is that date?
A December the 20th, 1995.
Q And in exchange for your testimony here today you were given those sentences, allowed to plead to Robbery and Hindering the Apprehension of a Criminal, and the prosecutors dismissed the Murder charge and the Armed Robbery charge against you; didn't

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 155 of 269

they?

A Yes.

Q I'm showing you what's been marked as Defendant's Exhibit 15. Have you ever seen that document before? Are you the same Corey Allen Clark whose case, in criminal case 94-CR-327, charged with Murder and Armed Robbery, are you the same one whose case was dismissed on the 8th day of January 1996?

A Yes.

Q I'm, I'm sorry. I misspoke. A Motion to Dismiss was on December the 20th of 1995. The order entered by the Court was actually entered on the 8th day of January of 1996. Is that correct?

A Yes.

Q And that was your case?

A Yes.

Q Okay. So on the same day that the prosecutors asked the Court to dismiss the Murder charges you pled to Robbery?

A Yes.

Q And the same day that the prosecutors dismissed the Armed Robbery charge you pled to Hindering the Apprehension of a Criminal?

A Yes.

Q Okay. And that was all in exchange for your testimony; wasn't it?

A Yes.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 154 of 269

Q Okay. Now, Mr. Clark, you were originally arrested on the 13th of April, 1994; weren't you?

A Yes.

Q At some time after April of 1994, you came to the realization that you were in a lot of trouble; didn't you?

A Yes.

Q And you talked with your attorneys about it; didn't you?

A Yes.

Q And your attorneys told you you were in a lot of trouble; didn't they?

A Yes.

Q And some time after you had talked to your attorneys you wrote a letter to the prosecutor offering your assistance in this case; didn't you?

A Yes.

Q In exchange for some, cutting you some slack; didn't you?

A Yes.

Q Those are my terms, not yours?

A Yes.

Q You wrote a letter August the 24th of 1994 offering your assistance; didn't you?

A Yes.

Q Did you write the letter or did someone write it for

you?

A I wrote it.

Q Did anyone give you any advice as to what to put in the letter?

A No, sir.

Q Did anyone give you any assistance or any guidance? And I'm not talking about what your attorneys might have told you. That's privileged. I'm asking you did anybody else give you any help?

A No, sir.

Q Had you had any conversations with any prosecutor or any detective about helping out with this case in exchange for some help with your sentence?

A No, sir.

Q When you wrote Mr. Hardy back in August of 1994, you were expecting him to respond to that letter; didn't you?

A Yes, sir.

Q You were expecting him to take you up on your offer; didn't you?

A I didn't know if he was gonna do that or not.

Q You were represented by attorneys at that time; weren't you?

A Yes.

Q And you knew you were in trouble; didn't you?

A Yes.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 156 of 269

Q And you knew you had to do something to protect yourself; didn't you?

A Yes.

Q Do you remember telling Mr. Hardy, "I'm writing because I'm willing to turn State's evidence against the other co-defendants in this case"?

A Yes.

Q Do you recall telling him that?

A Yes.

Q Now, what other co-defendants were you referring to at that time? And this is August of '94. Do you remember who your co-defendants were at that time?

A Mr. Cromartie and Mr. Lucas.

Q And you did that to protect yourself; didn't you?

A Yes.

Q Okay. Had you had any discussions with Mr. Young about your case after you were arrested? Mr. Gary Young?

A No, sir.

Q And Mr. Gary Young was a friend of yours; wasn't he?

A Yes.

Q A good friend of yours; wasn't he?

A Yes.

Q Had ya'll been in jail together by August of '94? Ya'll had spent some time in jail at that time; had you not?

A Yes.

Q Okay. Now, how good of friends were you with Thaddeus Lucas?

A I, I didn't really know him too well.

Q Did you consider him a friend?

A Yes.

Q You didn't know Jeff Cromartie very well at that time; did you?

A No, sir.

Q He'd only arrived in town just a few weeks before all this happened; didn't he?

A Yes, sir.

Q And you hadn't had any, really any conversations or anything with him; had you?

A No, sir.

Q Now, you're related to Tina Washington; aren't you, in some way?

A No, sir.

Q Do you recall ever referring to her as your sister?

A Yes.

Q What is the nature of the relationship with Tina Washington?

A She has two kids by one of my brothers.

Q Which brother is that, Mr. Clark?

A My brother named Chester.

Q Is he your younger brother or older brother?

A Older brother.
Q Okay. And you were friends with Tina Washington?
A Yes.
Q Close friends; weren't you?
A Yes.
Q And even though there was no official relationship between your brother and Tina, you considered her your sister; didn't you?
A Yes.
Q Or some people might say sister-in-law?
A Yes.
Q You were that close; weren't you?
A Yes.
Q How long had you know Mr. Gary Young in April of 1994?
A I had, I had known him, like, since, like the seventh grade.
Q Ya'll grew up together; didn't you?
A Yes.
Q Did ya'll play football together?
A Not together.
Q He played football too though; didn't he?
A Yes, sir.
Q You were good friends with Gary Young; weren't you?
A Yes.
Q Okay. Before April the 10th of 1994, the time of the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 159 of 269

Junior Food Store incident, you had seen that gun before, the one we've all been talking about? You had seen it before; hadn't you?

A Yes.

Q It's been marked State's Exhibit 62. You had seen that gun before; hadn't you?

A Yes.

Q You'd seen that gun in Tina Washington's apartment; hadn't you?

A Yes.

Q You'd seen that gun on the dresser in Tina Washington's apartment; hadn't you?

A Yes.

Q And you knew whose gun it was; didn't you?

A Yes.

Q And you knew it was Gary Young's gun; didn't you?

A Yes.

Q And you knew he carried that gun around with him; didn't he?

A I didn't know if he carried it on him.

Q Well, you knew he had it close by; didn't you?

A Yes.

Q Did he ever tell you why he carried a gun or why he had a gun close by?

A No, sir.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 160 of 269

Q Now, on the night of April the 9th, that's a Saturday night, and then that Sunday morning, the 10th, going into the early morning hours, you were at Tina's apartment; weren't you?

A Yes.

Q You were drinking beer there with Gary Young; weren't you?

A Yes.

Q How many beers had you and Gary consumed on Saturday night? I'm not talking about Sunday morning. Now, I'm talking about Saturday night.

A I don't remember.

Q But you've admitted that you had a drinking problem in those days; didn't you?

A Yes.

Q And it was a rather severe drinking problem; wasn't it?

A Yes.

Q It had cost you your job at Thomasville Home Furnishings; hadn't it?

A Yes.

Q You'd been fired just, just about that time, about the time all this happened because you just couldn't stay away from the alcohol; could you?

A Yes.

Q Now, on that Saturday night you and Gary Young had been drinking a lot of beer together; hadn't you?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/24/14 Page 161 of 269

A Yes.

Q And at some point that night had you and Gary gone out to one of the stores and gotten some beer, got some beer and brought it back to Tina's apartment?

A I, I don't remember.

Q Is it possible that you and Gary had gone out and, or somebody had gone out and got beer and brought it back?

A Yes, sir.

Q Would it be a fair statement to say, Mr. Clark, that during Saturday night there were a lot of people coming and going from Tina's apartment and the other apartments right around Tina's apartment?

A Yes, sir.

Q It was sort of like a family unit type of thing there; wouldn't you agree?

A Yes, sir.

Q And some time during that night somebody went out and got some beer? I'm talking about Saturday night now. Went out and got some beer and brought it back; didn't they?

A Yes, sir.

Q What kind of beer did they bring back?

A Budweiser.

Q Twelve packs of Budweiser; wasn't it?

A Yes, sir.

Q And that was done on Saturday night before Sunday

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 162 of 259

morning ever came around; didn't it?

A Yes.

Q Okay. I hate to bring up that problem, but I'm going to ask you some questions. You were drunk most of that day; weren't you?

A Yes.

Q And please don't take offense at what I'm saying, but you were pretty well drunk that whole day; weren't you?

A Yes.

Q And I'm talking about Saturday?

A Yes, sir.

Q You'd just lost your job, just recently before that, and you were sort of drinking to get rid of it; wasn't you?

A Yes.

Q Can you estimate how many beers you had consumed during Saturday afternoon up to midnight Saturday night?

A About ten.

Q Ten twelve ounces?

A Yes.

Q Now, you know Carnell Cooksey; don't you?

A Yes.

Q And he was there drinking that night too; wasn't he?

A I don't remember.

Q Let me ask it this way. Could he have been there and you just don't remember him being there?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 169 of 269

A Yes.

Q Mr. Clark, you don't remember a lot of things about that night because you were drunk; isn't that true?

A Yes.

Q And you'd been drinking several days leading up to Saturday; hadn't you?

A Yes, sir.

Q So would, would it be fair of me to say that you just didn't start drinking Saturday afternoon, you had been binging or drinking on sort of a binge up through that Saturday night?

A Yes.

Q Okay. And a lot of things -- Am I safe in assuming that a lot of things are sort of blurry because of the alcohol that you had consumed that whole period of time?

A Say it again?

Q That you have some trouble remembering some of the things because when they were going on you were drunk?

A Yes, sir.

Q And I don't mean to use that word -- It didn't come across the way I meant it. You were just really intoxicated?

A Yes.

Q And so your inability to remember things today, not because you're not trying sometimes, it's just because you didn't remember when they were going on; did you?

A Yes.

Q Because you were drunk. Now, according to your version of what you remember on the night at the Junior Food, or the morning of the Junior Food robbery and the death of Mr. Slysz, you first told Mr. Chuck Weaver and Lt. Johnson that you never went behind the counter while you were in that store; isn't that correct?

A Say it again?

Q In your first interview that you gave with Chuck Weaver, didn't you tell him that you never went behind the store, that neither, no one in that store went behind the counter?

A I don't think I did.

Q Okay. Do you recall the interview that you gave with, or gave to Chuck Weaver and Lt. Melvin Johnson?

A Yes.

Q Okay. And it's your testimony that you never told them that you didn't go behind the counter that night?

A No.

Q Okay. Is it because you don't remember or you didn't go behind the counter that night?

A I did go behind it.

Q Did you tell them that you didn't go behind the counter?

A I think I told them I did.

Q Okay. Now, according to your version of what happened that night, it was Mr. Cromartie who ran out of the store with

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 169 of 269

two twelve packs of twelve ounce cans of beer in his arms; is that correct?

A Yes, sir.

Q When you came around and went in, you went in first; didn't you?

A No, sir.

Q Oh, you didn't?

A No, sir.

Q Did you ever tell anybody you went in first?

A No, sir.

Q Okay. You went in second?

A Yes.

Q Or third?

A Second.

Q Okay. What were you wearing that night?

A Some brown shorts and my white Nikes and a flowered looking shirt.

Q Did you have a cap on?

A No, sir.

Q And I believe that your testimony was that you came in and went straight to the beer aisle?

A Yes.

Q That's against -- As you go in the store that was over against the wall on the other side?

A In the back.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/24/14 Page 186 of 269

Q You went immediately to the beer?
A Yes.
Q When you heard the shots that you've described in your direct testimony, had you already taken the beer out of the cooler?
A No, sir.
Q Was it that quick?
A Yes.
Q Now, that cooler had a rod between the handles on it so that nobody could accidentally take beer out on a Sunday; didn't it?
A Yes.
Q I assume that's what it was for.
A Yes.
Q There was a wooden pole or a wooden rod there. Had you got to the point where you were taking that rod out?
A No, sir. I was reaching.
Q Had you touched it?
A No, sir.
Q Okay. And you heard two shots. I believe Mr. Hardy said (claps hands twice) just like that?
A (Nods head affirmatively)
Q Now, you said you saw the flash from the first shot?
A (Nods head affirmatively)
Q How quickly did you turn your head?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 167 of 269

A I didn't turn my head.

Q You didn't see either shot; did you?

A No, sir.

Q Your testimony was you hit the floor; didn't you?

A Yes.

Q Did you ever tell anybody that you saw the second shot?

A No.

Q When you hit the floor, did you stay down? Did you get up? What did you do then?

A I stayed down like three seconds and then I got up.

Q Then what'd you do?

A That's when he told me to get the money, get the register.

Q Now, where was he at that time?

A Reaching over the counter.

Q And you were way back by the beer?

A Yes.

Q And he's standing at the cash register, according to your story, and he tells you to, come on up here and you get the money out?

A Yes.

Q Is that, is that how you recall it? And did you know how to operate that cash register?

A No, sir.

Q So the person that had the gun asked you to come up

from where the beer is, and ya'll had gone to get the beer? That's your story; wasn't it?

A Yes.

Q So asked you then to leave the beer alone and come on up and get in the cash register, and your story is you did that?

A Yes.

Q And the person that's standing at the cash register then goes back, according to your story, and gets the beer?

A Yes.

Q Did you see that big display of beer right in front of the cash register?

A No, sir.

Q Big stack of beer right there?

A No, sir.

Q Okay. So your recollection is that the person you've identified as Ray Jefferson Cromartie left the cash register -- had that person, you've identified him as Jeff, had that person ever gone behind the counter?

A No, sir.

Q In your presence?

A No, sir.

Q The person then goes back, all the way back to the beer cooler, gets two twelve packs and runs out the door; is that correct?

A Yes.

Q How much beer did you ever see Jeff Cromartie drink?
A Not much.
Q He wasn't a beer drinker; was he?
A Not much; he wasn't.
Q Isn't it a fact, you hardly ever saw him drink any beer? Isn't that true?
A Yes.
Q You, you -- the times that you were around him, those few times, you didn't see him drink beer; did you?
A Not much.
Q But your recollection is that he shoots the store clerk, then tells you to come up and get the money, and then he goes back and rushes back there and grabs two twelve packs of twelve ounce cans in his hands and runs out the door? Is that correct?
A Yes.
Q Did he put the gun in his pocket or where did the gun go while he was grabbing up these two twelve packs of beer?
A I don't know. He must have put it in his pocket.
Q Now, two twelve packs of twelve ounce cans of beer is a fair load; isn't it?
A Yes.
Q So the gun is somewhere, wherever the gun was, it wasn't in his hands when he had these two twelve packs of beer going out the front door?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 170 of 269

A No, sir.

Q Now, did you ever see that gun in that store that night?

A No.

Q Okay. You certainly didn't have it in your possession; did you?

A No, sir.

Q This person that's standing up there that's (claps hands twice) shot somebody just like that, then he yells for you back by the beer on the floor, come on up here and get the money out, and then that person rushes back and gets the beer and rushes out the door and you're still behind the counter trying to get the money out; aren't you?

A Yes.

Q Because you were behind the counter; weren't you?

A Yes.

Q You walked around that counter, walked down there right where Mr. Slysz was lying. He was right here and the cash register was right there; wasn't he?

A I don't recall where he was.

Q Pretty close by?

A Yes.

Q Would you agree with that?

A Yes.

Q And you tried to get the money out, out of the cash

register?

A (Nods head affirmatively)

Q But you'd only gone there to get beer; hadn't you?

A Yes.

Q Now, Mr. Hardy asked you whether or not you were afraid of Jeff Cromartie, and your testimony was, at that time. Were you afraid of Gary Young?

A No, sir.

Q You, you were afraid of Jeff Cromartie but not afraid of Gary Young. You went around the counter where Mr. Slysz was lying dead, tried to get the money out of the cash register. The person with you had gone out with the beer, but that's why you went there, to get the beer. That's your testimony; isn't it?

A Say it again?

Q You went there to get the beer but you ended up trying to get money out of the cash register and the other person got the beer?

A Yes.

Q So you decided not -- You decided you didn't want the beer; you wanted the money?

A He grabbed the beer so I, I didn't think I needed to grab none.

Q You were gonna grab the money?

A I couldn't open the register. I tried the one key, the one key that I thought would open it. It didn't open it. So I

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 172 of 269

left it at that.

Q Had you ever tried to open a cash register before and it didn't open?

A No, sir.

MR. MEARS: One moment, Mr. Clark. I'll be right back.

Excuse me, Your Honor.

Q When you came out the door after you came back around from trying to get into the cash register, did you stop at the door, look back over your shoulder, check out the store, and say goodbye to anybody?

A No, sir.

Q Did you stop at the door and look back to see what else you could get that you hadn't already got?

A No, sir.

Q Did you stop at the door and look around to see if there was any beer that you needed that you hadn't got?

A No, sir.

Q Did you go back over and see if you could get the cash register open again?

A No, sir.

Q When you walked out the door, did you slowly walk around the corner?

A No, sir.

Q Were you going fast?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 173 of 289

A Yes, sir.
Q I believe you said you were wearing shorts?
A Yes.
Q Okay. You walked around the corner and somehow the beer containers had been dropped, according to you, there in the muddy area; is that right?
A Yes.
Q And you stopped to pick them up?
A Yes.
Q Where was the other person?
A He was ahead of me.
Q Okay. On down the road?
A Yes.
Q Now, had you ever been in that store before?
A Yes, sir.
Q Bought beer there on Saturday?
A No, sir.
Q Ever bought lottery tickets there?
A No, sir.
Q You'd been in that store before; hadn't you?
A Yes, sir.
Q You'd been in that store after you got off work at night; hadn't you?
A No, sir.
Q Did you ever stop there on any of your pizza delivery

runs?

A I didn't deliver pizza.

Q I, I'm sorry. Did you ever stop there when Thaddeus Clark was delivering pizzas?

A No, sir.

Q Excuse me. I got the name -- Thaddeus Lucas. Excuse me.

A No, sir.

Q Your testimony is you never rode around with Thaddeus?

A No, sir.

Q Okay. But you knew where this store was before that night; didn't you?

A Yes, sir.

Q And you'd been in there before; hadn't you?

A Yes, sir.

Q You'd bought beer in there before; hadn't you?

A No.

Q What did you buy?

A Food, potato chips, soda, things like that.

Q Now, where were you living at that time, Mr. Clark? Where were you living at that -- in April? I'm sorry. In April?

A 230 Bartow Street.

Q Where is that in, where is that located in Thomasville? I'm, I'm not from Thomasville. So when you say Bartow Street, I don't immediately know where that is. Is it on the west side?

A On the south side.

Q South side. Near the Tallahassee Road, near W. Jackson Street?

A It's near -- Yeah; near Jackson Street.

Q Out near Jackson Street?

A Like two blocks from Jackson Street.

Q Mr. Clark, I want to ask you, if you don't mind, would you mind just stepping right down here and showing the ladies and gentlemen of the jury, since I don't know where Bartow Street is, would you -- Here is W. Jackson. I think we've already had another witness identify the corner of Pinetree and W. Jackson. W. Jackson Street here, and this is Pinetree. Could you locate Bartow? Are you familiar enough with this?

A (Witness steps down from witness stand) Right here.

Q Okay. Bartow is right here?

A Right.

Q And which block did you live on?

A Right here on this corner.

Q Do you mind just putting a little circle right there?

A (Witness complies)

Q And would you just put your initial right there so I'll know who it is.

A (Witness complies)

Q Thank you. You may take your seat now.

A (Witness returns to the witness stand)

Q So the W. Jackson Street and the Junior Food Store, how far is that from Bartow Street? Bartow sort of comes out into W. Jackson right there; doesn't it?

A Yes.

Q How far is that from where you lived? I, I know I'm asking you to just sort of guess. But would you give us just your own estimate?

A Half a mile.

Q Two minutes by car?

A Two minutes.

Q Now, Mr. Clark, when you were sentenced for the offense of Robbery and the offense of Hindering the Apprehension of a Criminal, you told Judge Horkan, the Judge that sentenced you, you told Judge Horkan that you had not had any contact with Ray Jefferson Cromartie prior to the day of the Junior Food Store shooting; didn't you?

A I don't remember.

Q On the day that you entered your sentence, do you recall being asked questions about how well you knew Jeff Cromartie?

A Yes.

Q Okay. Do you recall being asked questions about how close or how well you knew him?

A No.

Q You don't recall those?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 177 of 289

A No.

Q Okay. I'm going to ask whether Mr. Bryant can find that in the transcript and I'll be back to it in just a second. I'm going to ask you some more questions. You knew that Gary Young owned and had possession of a .25 caliber pistol. You knew he had it in his possession after the Junior Food Store incident; didn't you?

A Say again?

Q You knew that after the Junior Food Store incident, the death of Mr. Slysz, after you came back from there, you knew that Gary Young had that pistol in his possession after that time; didn't you?

A I didn't see it.

Q Well, you knew he had it before --

A Before; yes.

Q -- before April the 10th, before the Junior Food Store incident; didn't you?

A Yes.

Q And you knew he had it in his possession after the Junior Food Store incident; didn't you?

A Yes.

Q Because you gave a statement to that effect; didn't you?

A Yes.

Q So you knew that, that Gary Young had the pistol before

the Junior Food Store and you knew he had it after the Junior Food Store; didn't you?

A Yes.

Q Had you talked to him about that pistol?

A No, sir.

Q Had you borrowed that pistol from him?

A No, sir.

Q Had he loaned that pistol to you to hold or keep for any reason?

A No, sir.

Q Okay. Mr. Clark, were you present in the Cherokee Apartments the afternoon that, or, excuse me, the evening that the West Side guys came over there and there was a shootout?

A Yes.

Q Were you in Mr. Lucas' presence when he had the gun during that shooting?

A Say again?

Q Were you in his presence when he had the gun during that shooting?

A Mr. Lucas?

Q I, I'm sorry. I apologize. Mr. Young. You knew that Mr. Young had the pistol in his hands, in his possession that afternoon, on the 12th, that evening when the guys from West Side came over there; didn't you?

A Yes.

Q And the guys from West Side had originally come to see you; hadn't they?
A I don't know.
Q Did one of them stop you and ask you any questions or flash a gun in your face in any way?
A No, sir.
Q So if anybody said that they put a gun in your face they were incorrect; is that correct?
A Yes, sir.
Q Okay. So nobody put a gun in your face?
A No, sir.
Q But you were there and you saw those guys; didn't you?
A Yes, sir.
Q And then you saw Gary Young shooting at them; didn't you?
A I didn't see it.
Q Did you hear the gunshots?
A Yes.
Q Okay. And the gunshots that you heard Gary Young fire that evening were just like this (claps hands twice), just like you heard in that store; wasn't it? Same gun, same bullets, same person?
A Say again?
Q Or was it? Who fired the gun on April the 12th, 1994 in the Cherokee Apartments? Who fired it?

A I didn't see who was shooting. I was inside the apartment.

Q Okay. You knew Gary Young had the gun; didn't you?

A Yes.

Q You knew he had used it; didn't you?

A I don't know if he used it or not.

Q You never had any conversations with him about it?

A No, sir.

Q Now, I'm, I'm still a little confused about what you knew concerning Gary Young and the beer that night. And, please forgive me. You said that you were drinking beer with Gary Young on Saturday afternoon?

A Yes.

Q You were drinking beer with Gary Young on Saturday night?

A Yes.

Q And then you were drinking beer with Gary Young Sunday morning?

A Yes.

Q At some point during that time, your memory is that you and Gary Young never went to get beer --

A No.

Q -- together? Who was, who was supplying you with all this beer?

A I don't know.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 181 of 269

Q It just kept coming; didn't it?
A Yes.
Q Until it ran out?
A Yes.
Q And you and Gary had been drinking Saturday afternoon and Saturday night, early into Sunday morning and the beer gave out; didn't it?
A Yes.
Q And then you went to get some more beer; didn't you?
A Yes.
Q Okay. Just one moment, please. I'd asked you a question earlier, Mr. Clark, and I'm almost through. I had asked you a question earlier as to whether or not at the time of the sentencing, the question I asked you was, "Mr. Clark, during your sentencing hearing you told Judge Horkan that you were, had not had any contact with Mr. Cromartie prior to the day of the Junior Food Store shooting". And you said you didn't recall having made that statement. I want to show you a -- I'm going to show you just a couple of points to sort of refresh your memory. I'm showing you what is a transcript of the hearing where you entered your sentence.
MR. MEARS: Judge, may I stand here for just a moment?
THE COURT: Yes, sir.
BY MR. MEARS:
Q I call your attention to this part right here where

you're being asked questions by Mr. Hardy. And he says -- Just read there, read on and see if that refreshes your recollection.

A (Witness complies)

Q Mr. Clark, have you had a chance to review that portion of the transcript?

A (Nods head affirmatively)

Q Does that refresh your recollection about the questions and answers you were giving at the time of your sentencing?

A Yes, sir.

Q Do you recall being asked this question by Mr. Hardy, "Why did he shoot the man?" Do you recall your response, "I don't know."?

A Yes.

Q Then do you recall Mr. Hardy asking, "Had you ever seen the man before?" And Mr. -- And you said, "No, sir." Okay?

A Yes.

Q Then, talking about Mr. Slysz at that point?

A Yes.

Q Okay. This is Mr. Hardy, "Mr. Cromartie, from your knowledge what, what -- had he ever seen the man before?" And you said, "Not to my knowledge."?

A Yes, sir.

Q And you'd been in the store before; is that correct?

A Yes.

Q Had, had you ever seen Mr. Slysz before?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 183 of 285

A No, sir.

Q Now, do you recall being asked by Mr. Hardy, "Have you, have you had any contact with Mr. Cromartie in Thomasville or this area prior to this day the shooting occurred?" Do you recall being asked that question?

A I don't recall.

Q Do you recall giving this answer, "No, sir."?

A (Shakes head negatively) I seen it on there.

Q Did I read it correctly?

A Yes.

Q And did I read your response correctly?

A Yes.

Q If this transcript is correct and if it accurately reflects the question and if it accurately reflects your answer, that would have been a lie; wouldn't it?

A Yes.

Q In that sentencing hearing you stood before this Court, you raised your hand and you swore to God to tell the truth; didn't you?

A Yes.

Q You were asked under oath whether you had had any dealings or any contact with Mr. Cromartie prior to the day of this shooting and you said no; didn't you?

A What do you mean by any dealings?

Q Well, let me read the question again. You were asked,

"Had you any contact with Mr. Cromartie in Thomasville or this area prior to this day the shooting occurred?" You answered, "No, sir." That was a lie; wasn't it?

A Yes.

Q Mr. Clark, you didn't want to have any contact with Jeff Cromartie; did you?

A Before the accident?

Q The reason you answered that question, you were trying to distance yourself from Ray Cromartie; weren't you?

A Yes.

Q To protect yourself; weren't you?

A Yes.

Q And you didn't have to stand trial for murder; did you?

A No, sir.

Q You didn't have to stand trial for armed robbery?

A No, sir.

Q And you did protect yourself; didn't you?

A Yes.

MR. MEARS: Thank you. Nothing further.

REDIRECT EXAMINATION

BY MR. HARDY:

Q Who shot the man in the head twice, Corey?

A Mr. Cromartie.

Q This apprehension of this criminal that you pled guilty to was who?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 189 of 265

A Sir?

Q The criminal you pled to was Mr. Cromartie's killing --

MR. MEARS: Your Honor, I'm going to object --

A Yes, sir --

MR. MEARS: -- and I have a motion to make outside the presence of the jury.

THE COURT: All right, sir.

Ladies and gentlemen, let me ask that you step to your jury room for just a moment.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: If you'd wait until the door is shut.

All right, sir.

MR. MEARS: Your Honor, at this time I would ask the Court to declare a mistrial. Mr. Hardy has accused Mr. Cromartie of being a criminal, not once, but twice in the presence of the jury. He's placed his character into evidence by accusing him of being a criminal. He has not been convicted in this case. He's not been convicted yet. He's not designated as a criminal. To so designate him and to so call him a criminal is to place his character into evidence. And I would ask the Court to declare a mistrial. It's very clear, Judge. You can't do that. And to, to accuse someone of being a criminal -- he could stand here all day and argue to the jury that he committed an act,

that's what he's on trial for. But he can't characterize him as a criminal because that has specific legal implications. And I would ask the Court to declare a mistrial.

THE COURT: Mr. Hardy?

MR. HARDY: I was referring to what he had already said this man had done, pled to in court. I was asking him if the count that he had pled to was in reference to this particular man, referring to exactly what Mr., Mr. Mears had already asked him on direct examination. He said, did you plead guilty to count two, Hindering the Apprehension of a Criminal. He never said the criminal he pled to hindering the apprehension was Mr. Cromartie. I was filling in what he had left out on his, his cross examination. He asked him, I think, must have been five times. He introduced certified copy after certified copy. He said, you pled guilty to Hindering the Apprehension of a Criminal. He didn't read the rest of the sentence, said, to wit: Ray Jefferson Cromartie, charged with the offense of Murder. And that's what I was asking him. And that's what he had already asked him on cross examination three or four times, Your Honor. Not referring to in the literal sense of having been convicted, but what was in the paper that he had already asked him about. And that's exactly what he's introduced into evidence, exactly what's written on the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 187 of 269

piece of paper, Your Honor.

MR. MEARS: Your Honor, that's about as different as night and day, legally and factually. What Mr. Clark pled guilty to and why he pled guilty to it is between Mr. Clark, Mr. Hardy and God. This man cannot be characterized as a criminal in a court of law before a jury by a prosecutor until he, himself, has placed his character into evidence. That's what Mr. Hardy did, for whatever reason he did it. It can't be done. And I would ask the Court to declare a mistrial. This is one of the most egregious offenses that a prosecutor can commit, particularly in a case that's still at the stage where the jury hasn't even begun to deliberate. This is not argument. This is evidence being presented to the jury through a witness. There's the distinction. He asked him the question about this individual and categorized him as a criminal. Judge, he crossed the line. He put his character into evidence. And I would ask the Court to take the appropriate act and declare a mistrial.

THE COURT: All right. Thank you, sir.

Gentlemen, at this time I don't believe that the characterization was an intentional crossing of the line on behalf of the Prosecution. I think that it may have been in error. At this time I think curative instructions will satisfy the matter.

Mr. Mears, if you would like to proffer some curative

instructions, I'll be happy to consider them. Otherwise, I will structure them myself.

MR. MEARS: Your Honor, I'll leave that with the Court. I think the Court is much more adapted to providing curative instructions. I would like to, after you've given the curative instructions, to renew my Motion for a Mistrial. Would the Court allow me to do that some time later without waiving it?

THE COURT: Yes, sir.

MR. MEARS: I don't want to just stand up in front of the jury and do it again just after you've just given them curative instructions. I think that's somewhat disrespectful. It appears to be disrespectful to the Court and I don't want to appear to be disrespectful, because I'm not. But I don't want to waive it, so I want to make sure that I renewed my Motion for a Mistrial as soon as you've given the curative instructions, if the Court will allow me to do that?

THE COURT: Yes, sir.

MR. MEARS: Thank you.

THE COURT: You may bring the jury in.

THE COURT: Mr. Sheriff, could I see you for just a moment?

SHERIFF: Yes, sir.

(Whereupon the jury returns to the courtroom,

after which the following transpired)

THE COURT: Ladies and gentlemen, I believe at this time that we are ready to proceed with the cross examination of this particular witness.

However, prior to doing so, let me simply ask you to disregard the last remark or characterization in the question as phrased by the district attorney insofar as it referenced or may have characterized or otherwise presumed that the Defendant on trial was a criminal, or characterized as a criminal. The statements in the context and under the circumstances which they were made were improper and you should not infer or assume anything from that statement. And you are instructed to completely disregard that particular characterization.

Mr. Mears, you may proceed.

MR. MEARS: I defer to Mr. Hardy at this point, Your Honor.

THE COURT: All right.

BY MR. HARDY:

Q I asked you earlier, he was talking about -- did you have any day to day contact with Mr. Cromartie before the shooting?

A No.

Q Did you pal around with him?

A No, sir.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 190 of 269

Q Was he your best buddy?

A No, sir.

Q Did you socialize with him?

A On and off.

Q He wasn't your bosom buddy; was he?

A No, sir.

Q And he referred to this letter you wrote. Did you just write that on your own?

A Yes, sir.

Q Did your lawyer know you were gonna write it?

A No, sir.

MR. HARDY: 174. We've already -- They already have a copy of it, Your Honor.

Q Can you identify this for me?

A Yes, sir.

Q What's that? Is that the letter we're talking about?

A Yes, sir.

Q How about reading it?

A It says, "Dear Mr. Hardy. My name is Corey A. Clark, Sr. I have been charged with armed robbery and murder in connection with the incident at the Junior Food Store on U. S. 319 back in April. The incident happened as follows: After receiving a ride with Thaddeus Lucas, Jeff Cromartie and I entered the store. All intents and purposes was to grab some beer and flee the premises. Jeff entered first and ventured down

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/24/14 Page 191 of 265

the aisle closest to the door. This was done in order to make sure that the coast was clear outside the store. I proceeded after him going down the aisle where the beer was located. During all of this time the clerk was situated on a stool behind the counter. As I approached the cooler I heard two shots fired. I immediately turned and saw that the clerk was no longer atop the stool. Cromartie was now positioned directly in front of the counter. He yelled for me to get the money. All I thought was it was only supposed to be a beer heist. As he reached across the counter fumbling at the cash register I was still behind the counter looking down at, at the victim. He was not moving so I assumed that he was already dead. As I stood there standing in a daze Cromartie sauntered up to the cooler removing two twelve pack Budweiser boxes. We both, we both left the store, me trailing behind Cromartie. As I reflect on the moments preceding the incident I never knew that he possessed a gun. I'm writing because I want to turn State's evidence against the other co-defendants in this case. I've never done anything vaguely resembling this in my life. I don't feel that my family and I should suffer as much as the main perpetrators in this matter. I have a loving family and I have -- I want to be a father to my kids. My father, the late Mr. Roscoe Clark, Jr., taught me to be truthful and honest with myself. That way I could be truthful and honest to others. So please consider one thing. Without my cooperation a murderer will still be on the loose. I, myself,

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 192 of 269

may be lucky to still be alive. I don't really know this guy Cromartie or what would have happened if he would have had more bullets in that gun. I might not have lived to turn him in. So I'm asking you to please think this over and send me your response."

Q Were you scared of him that night?

A Yes, sir.

Q Had you ever been remotely close to anybody getting killed like that?

A No, sir.

Q Did you even know what to think or do?

A No, sir.

Q And I think he's already characterized you as been drinking a lot?

A Yes, sir.

Q He doesn't drink a lot?

A No, sir.

Q And Gary Clark had drunk a lot?

A Not as much as I did.

Q Who was more sober? You or Jeff?

A Jeff.

Q Who was telling everybody what to do?

A Jeff.

MR. HARDY: We'd offer 174, I think the number was, Judge, the letter.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 193 of 269

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q You told the police what happened out there?

A Sir?

Q Did you tell the police what happened out there?

A The police?

Q Yes, sir. When they talked to you?

A Detectives Johnson and Weaver.

Q Did you tell your lawyer what happened?

A Yes, sir.

Q Ms. Lane and Mr. Altman?

A Yes, sir.

Q Did you shoot anybody?

A No, sir.

Q Who shot the man in the head twice?

A Jeff.

MR. HARDY: Thank you.

RECROSS EXAMINATION

BY MR. MEARS:

Q Mr. Clark, State's Exhibit 174, your letter was written in August. When did you give your attorney a copy of that? When did you give your attorney a copy of that letter?

A I didn't make a copy for my attorney.

Q So your attorney got that from the district attorney

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 194 of 269

after you had written it?

A Yes, sir.

Q Okay. Now, in the letter you indicated that you wanted to turn State's evidence against your co-defendants. And in the letter you said that you had been taught to always be truthful to yourself and to others; is that correct?

A Yes, sir.

Q And you invoked the name of your late father --

A Yes, sir.

Q -- when you wrote that letter? "My father, the late Mr. Roscoe Clark, Jr., taught me to be truthful and honest with myself. That way I can be truthful and honest to others." And your father taught you that; didn't he?

A Yes.

Q And that was in August of 1984. Mr. Clark, do you recall me asking you the question -- Well, let me just ask it again. I asked you whether or not you had ever told anyone that you had, you didn't go behind the counter to the store. Do you recall me asking you that question?

A Yes.

Q Right here, less than twenty minutes ago?

A Yes.

Q Do you recall your response then, that you had never told anybody that?

A Yes.

Q And you told these ladies and gentlemen of the jury that you had gone behind the counter of that store?

A Yes.

Q And you told these ladies and gentlemen of the jury you had never told anybody that you hadn't gone behind the counter of the store?

A Yes.

Q Now, I asked you that question about three times and you told these ladies and gentlemen of the jury after having raised your hand and swore to God Almighty that you were going to tell them the truth, you told them you never said to anyone that you had never been behind the counter of that store. Do you recall that?

A Yes.

Q Do you recall being asked during your sentencing hearing, Mr. Hardy asked you, "You didn't go around the counter where the man was?" Defendant Clark: "No, sir". Do you recall telling that lie to Judge Horkan under oath at the time of your sentencing?

A No.

Q Do you want to look at it?

A I've seen it.

Q You rolled -- Mr. Clark, you took an oath when you got this deal to tell the truth, when you got this deal to testify against Jeff Cromartie, when you got this deal to save yourself

from the possible electric chair, when you got this deal to get a parole in the year 2009, you swore to tell the truth in order to get the deal. You lied when you were getting the deal; didn't you?

A No, sir.

Q You told Judge Horkan that you'd never been around behind that counter? It's in the transcript. That was a lie; wasn't it?

A Yes. If that's what I said it was a lie.

Q And it was just as big a lie as when you invoked the name of your poor dead father in that letter; wasn't it? Wasn't it, Mr. Clark?

A No.

Q You lied then, you invoked the name of your father and you lied and you invoked the name here in the courtroom and you lied again because you did it to protect yourself; didn't you?

A I didn't lie.

Q But you sure protected yourself; didn't you? Didn't you, Mr. Clark?

A Yes.

MR. MEARS: Nothing further.

THE COURT: Anything further of this witness?

MR. HARDY: I think that's all we can -- that's allowed, Your Honor. There's no more allowed. Back and forth, back and forth is all you have.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 197 of 269

THE COURT: You may step down.

Ladies and gentlemen, it's 1:00 P. M. It looks like a good opportunity -- we're going to have a lunch recess and take our lunch recess at this time. We'll -- Will approximately an hour be enough time? All right. Start back at 2:00 o'clock.

Please recall the cautionary instructions that I've given you earlier and adhere to those instructions.

We'll be in recess until 2:00 P. M.

Everyone remain seated while the jury retires.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Mr. Mears, unless the question is in regard to some, something relevant in this case, and if you can show me that a detective in questioning someone threatened someone with the electric chair or electrocution, fine. That would be admissible and relevant. But we've already been over the fact of whether or not electrocution, the fact that the State carries out the death penalty by electrocution or some other means is relevant, I think; is that correct?

MR. MEARS: Judge, if I use the word "Electrocution" it was --

THE COURT: You used the word "Electric chair" which is implying the same thing and it's not going to be strung out

before this jury.

MR. MEARS: Judge, I understand the Court's ruling. We've, we've hashed that out. I've made my argument. And I understand the Court's ruling. I did not use the term "Electric chair" purposefully. It was something that -- I don't even consciously remember having used it during that questioning. I'll apologize to the Court because I understand what the Court's ruling was. I did not transgress and I was not trying to circumvent. You had told me I couldn't use the word "Electrocution". I assumed that that meant electric chair also. My use of the word was inadvertent and it was not meant to skirt or to flaunt the Court's previous ruling. It's simply a -- The best I can do is an apology to the court. It's a matter of habit from having done it in other cases. And I apologize to the Court for having used the word "Electric chair". It was not intentional.

THE COURT: I'm not going to admonish you again in this fashion. Do you understand that?

MR. MEARS: I understand that.

THE COURT: All right, sir.

MR. MEARS: And, and I appreciate the Court's not admonishing me for violating your rule in front of the jury. I understand that you had that right to do that. Quite frankly, Judge, I don't recall having used the words. I'm

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 199 of 269

sure I did if you said I did, but it was not done intentionally.

THE COURT: All right, sir.

We'll be in recess until 2:00 P. M.

THE COURT: Mr. Mears, it was not a mistake. What I mean by, "in this fashion", is that the next time it is used, if it's not in an appropriate situation as I have described earlier, then you understand the powers of the Court, contempt powers of the Court.

MR. MEARS: Absolutely. I, I certainly don't take the Court's previous ruling lightly. And I certainly understand that if I transgress that the Court can and will take appropriate action.

THE COURT: Thank you, sir.

MR. MEARS: And my only response is, Judge, I didn't mean to do it.

THE COURT: I understand.

MR. MEARS: I understand that may not be enough, but I did not consciously --

THE COURT: Well, I, I recall there was somewhat an emotional string of questions. But you are a professional. You understand the Court's ruling, so abide by the Court's ruling.

MR. MEARS: Absolutely.

THE COURT: We'll be in recess until 2:00 P. M.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 260 of 269

(Whereupon the Court is recessed for lunch, and upon reconvening at approximately 2:05 P. M. the following transpired outside the jury's presence)

THE COURT: Ladies and gentlemen, are we ready to proceed?

MR. HARDY: Yes, sir.

THE COURT: You may bring the jury in.

Mr. Hardy, who is your next witness?

MR. HARDY: Ken Collins.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Would you raise your right hand, please, sir?

Do you swear or affirm that the evidence you will give this Court and this jury in the matter now pending before the Court will be the truth, the whole truth and nothing but the truth, so help you God?

AGENT COLLINS: I do.

THE COURT: Mr. Hardy?

AGENT KENNETH R. COLLINS

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for us, please?

A Kenneth R. Collins.

Q Where are you employed?

A I'm employed with the Georgia Bureau of Investigation.

Q How long have you been with them, please, sir?

A I've been with them approximately eleven years.

Q Where'd you work before that?

A At Georgia State Patrol for thirteen years.

Q And what do you do for the G. B. I., please, sir?

A I'm a field agent with Region 9, Thomasville, and I also serve as a crime scene specialist for this region.

Q And are you a licensed law enforcement officer in the state of Georgia?

A Yes, sir; I am.

Q Are you certified?

A I am certified; yes, sir.

Q Tell us a little bit about your, your job, what you do as a crime scene technician?

A As a crime scene specialist with the State of Georgia it's, it's my duty to, to maintain the vehicle that carries all the specialized crime scene equipment for working crime scenes and we respond to an eleven county area to assist in processing crime scenes within the area.

Q How long have you been doing that, Ken?

A Approximately seven years.

Q And tell us a little about, about your training and the schools you've been to and that kind of thing?

A In addition to the normal training for an investigator or a G. B. I. agent, which is a, about a three month school, we have gone back to numerous and various one week courses that involve various aspects of crime scenes and crime scene processing on how to collect and preserve evidence.

Q Did you attend classes on footprints?

A Yes, sir.

Q Fingerprints?

A Yes, sir.

Q How to take them?

A Yes, sir.

Q About the plaster casts?

A Plaster casts, blood, pattern analysis, photography. We've had some in alternate light source uses, referred to as a forensic light also known, sometimes they call it the laser light, but it's not a true laser. Just, just various aspects of the --

Q You've had training and experience on all those things?

A Yes, sir.

Q And even, I think, ballistics?

A Ballistics?

Q About guns, you know about guns a little bit?

A Nothing other than, than just using it as a weapon; no, sir.

Q Go to a school up in Albany, New York for about a year

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 203 of 265

ago?

A Yes, sir. I went to the, the, a homicide course up there that's put on by the State of New York Police Academy. And it's a week long; yes, sir.

Q And you've been a crime scene man for how many years?

A Approximately seven years.

MR. HARDY: Your Honor, we'd offer him as an expert in the field of crime scene specialty with the G. B. I.

THE COURT: Do you wish to inquire, Mr. Mears?

MR. MEARS: I don't have any objection and I have no desire to voir dire as long as I understand that the scope of the qualification is crime scene technicians. There were several sub-categories with regard to footprint, things like that. I would like to voir dire if he's being offered for that expansive role.

MR. HARDY: Footprints, Your Honor, I think fingerprint collection, photography, as he did in this particular case of seizing, collecting of evidence which he's done in this particular case.

MR. MEARS: Then I need to ask just a couple of questions.

THE COURT: All right.

CROSS EXAMINATION

BY MR. MEARS:

Q Good afternoon, Mr. Collins.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 204 of 265

A How are you, sir?

Q Mr. Collins, I want to ask you just a few questions about your training and background within a couple of those sub-specialty areas of crime scene investigation.

A Yes, sir.

Q With regard to the training that you've had with regard to footprint evidence, what type of courses have you taken where that the subject, the sole subject was footprint evidence, either identification or the taking and/or preserving of footprints?

A I haven't had a specific course in, in, in footwear or footwear impressions.

Q Right. And I'm referring to shoes rather than feet.

A Right. I understand what you're saying. I have had no courses in analyzing or preparing these, these areas. It is a part of evidence collection. And we've had several forty hour courses in which we've had people come down from either the lab or from other areas that have had extensive training in the casting and collecting of this evidence. And we have been shown how to mix, pour and collect these shoe track impressions.

Q Okay. Would it be a fair statement that your area of expertise with regard to that particular subject is, is directed only at the collection and preservation of footprints?

A That is correct.

Q Rather than --

MR. HARDY: That's what we're offering. It is not

as an expert to give the analysis. I think that's the next witness. He's just the collection person.

MR. MEARS: All right. I have no objections to Agent Collins being qualified as an expert in that particular area.

Q The other area I would like to ask you about, Mr. Collins, is the area of fingerprint.

A Yes, sir.

Q Is your -- Just tell me a little bit about the courses you've taken with regard to fingerprint evidence as it relates to crime scene evidence?

A We've had several courses on how to develop the fingerprints, how to lift the fingerprints. And I've also had one forty hour course through the F. B. I. in which we, it's an advanced latent print examining course, where I did have some, some exposure to identifying fingerprints.

Q Would you consider it an area of scientific expertise in your part as to the identification and comparison of fingerprints?

A No, sir; I don't consider myself an expert in that area. The school is primarily designed to help us determine if what we had developed and lifted was a identifiable or usable print.

Q Would it be a fair statement to say that your area of expertise in that area is the finding, locating and preserving

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 206 of 289

and lifting of latent prints?

A Yes, sir; that's correct.

MR. MEARS: I have no objections to Agent Collins' expertise, Your Honor.

THE COURT: All right, sir. Mr. Hardy, the Court will recognize Agent collins as an expert in the field of crime scene technology, as a crime scene technician, collection of evidence regarding footprint evidence and impressions, comparison, et cetera, and also as an expert in the collection of fingerprint evidence.

REDIRECT EXAMINATION

BY MR. HARDY:

Q Mr. Collins, in reference to the case of the State of Georgia involving the Madison Street Deli, were you called out to that one?

A No, sir; I was not.

Q And were you called out to the one involving the Junior Food Store on April the 10th of 1994?

A Yes, sir; I was.

Q And how did you get called out?

A I received a call from the Thomasville Police Department requesting that I meet their investigators at the, at that location on W. Jackson Street. I proceeded there and arrived at approximately 4:30 A. M.

Q Who'd you meet there?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 207 of 209

A I met with Inv. Chuck Weaver of the Thomasville Police Department.

Q Was the scene already roped off when you arrived?

A Yes, sir; it had been secured.

Q And that's the proper procedure?

A Yes, sir.

Q And when you arrived, what'd you first do, Ken?

A The first thing I did was I talked with Inv. Weaver, or Det. Weaver, and he basically explained to me what was going on, what they had found out and, and what the crime scene consisted of.

Q Okay. And then is that -- your training is to get an overlay or overview of what's happening?

A Yes, sir.

Q Then at that time did you start your collection process or analysis process?

A Yes, sir; I did.

Q What did you first do, Ken?

A The first area that I worked in on this particular scene was the exterior portion of the parking lot area in which we collected or identified and collected shoe track evidence.

Q And where was that? If you face the store, Ken, where would that have been?

A If you're facing the store it'd be on the right hand side or on the S. Pinetree Boulevard side in the side parking

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 208 of 289

lot.

Q And what is the area like back there?

A It's semi-lit. You have light coming from the front parking lot area where the exterior lights are. Going back towards the back side it grows progressively darker. And I think there was a street light a little further down the road that gives you some lighting. It was partially in grass; it was partially in gravel and partially in sand. Where the cars or vehicles park it had eventually killed the grass and it's a, basically rocky-sandy type surface that we were working in.

Q Was the area able to leave any shoeprints in that particular area you saw?

A Yes, sir.

Q Did you observe any?

A Yes, sir; we did.

Q Did you observe anything else?

A Yes, sir. We also found some other items there. We found two full twelve ounce cans of Budweiser beer and a portion of a cardboard or pasteboard top from a Budweiser carton.

Q Let me show you first State's Exhibit Number 103, please, sir. Is that what you've just described, the area, part of the area?

A Yes, sir; it is.

Q And 95?

A Yes, sir; it is.

Q Is that showing the area where you're talking about you saw the --

A Yes, sir.

Q -- the beer cans and such? Let me show you these photographs, 96 and 97. Can you identify those for me, please, sir?

A Photographs 96 and 97 are photographs of a mud puddle area just on the right side toward the back of the store. And it just, these two photographs display two of the twelve ounce Budweiser beers that were found in the mud. These photographs are photographs of the same two cans of beer, just taken from different angles.

Q Let me show you State's Exhibit Number 2 and 3, and ask if you can identify them for me, please, sir? First, if you'd start with 2?

A State's Exhibit Number 2 is a Budweiser can that I labeled as Budweiser can number one that was lifted from that scene on that date.

Q Number 3?

A Number 3 is the second twelve ounce Budweiser can that came from that particular location.

Q Did you mark them?

A Yes, sir; I did.

Q Are those the same cans that are depicted in 96 and 97?

A Yes, sir; they are.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 210 of 269

MR. HARDY: Your Honor, we'd offer 2 and 3 into evidence.

MR. MEARS: No objection.

THE COURT: They're admitted without objection.

BY MR. HARDY:

Q You referred to a part of a beer carton?

A Yes, sir.

Q Let me show you these photographs, 94, 92 and 93, please. If you'd look at them?

A These are photographs from varying distances showing the, the portion of the Budweiser carton that was recovered in the same general area as the, as the two cans of beer were found.

Q Are they fair and accurate representations of what you saw, Ken?

A Yes, sir; they are.

MR. HARDY: I think they've already been offered and admitted, Your Honor.

Q I show you what's been marked as State's Exhibit Number 4, and ask if you can identify this for me, please, sir?

A Yes, sir. This appears to be the portion of the Budweiser carton that I obtained from the scene.

Q Is that what's depicted in these photographs you've identified in 92, 93 and 94?

A Yes, sir.

Q And did you turn that into Evidence?

A Yes, sir; I did.

Q Did you process it?

A No, sir; I did not.

Q Who did that?

A It was processed by Sgt. Glenn Hutchinson of the Thomas County Sheriff's Department.

MR. HARDY: Offer Number 4 into evidence, Your Honor.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

MR. MEARS: Your Honor, subject to the next witnesses we may have some objections as to how it was used, but not insofar as this particular witness is concerned.

THE COURT: All right.

MR. MEARS: I believe this is the, relates to the fingerprint; is that correct?

THE COURT: Yes, sir.

MR. HARDY: I couldn't hear what he said, Judge. I'm sorry. Is it admitted or not admitted?

THE COURT: It's admitted.

MR. HARDY: Thank you.

MR. MEARS: Reserve the right to object later.

BY MR. HARDY:

Q Did you see any shoeprints out in this area?

A Yes, sir; we did.

Q Where was that?

A They were in the same parking lot area on the, on that particular side of the building.

Q Near where the beer and the flap were?

A Yes, sir. There, there was a series of footprints that led from the front area of the store back in that general direction.

Q How many shoes did you see? Right foot, left foot, only the right foot, only the left foot, or what?

A Right foot, left foot. There were several of the same particular pattern or what appeared to be the same pattern. We eliminated down and photographed a left and right of each one that seemed to have the most available detail in it.

Q How many legible type shoes did you see?

A There were a number of different legible shoe tracks. These particular shoe tracks were selected because Henry Williams was there with his canine and they identified these as the most probable tracks belonging to whoever had been in the store. And that, uh, they had more experience in tracking and we selected those prints to photograph and cast.

Q 98, 99 and 100, can you identify them for me, please, sir?

A Yes, sir. These are shoe impressions that were, were at the scene in the, in the sandy soil area that we worked in.

Q Did you take the pictures?

A Yes, sir; I did.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 213 of 269

Q Are they fair and accurate representations of what you saw?

A Yes, sir; they are.

Q Are they right foot, left foot?

A Yes, sir; they are.

MR. HARDY: Your Honor, I think they've already been admitted into evidence.

THE COURT: What numbers are those, Mr. Hardy?

MR. HARDY: 90, excuse me, 98, 99 and 100.

THE COURT: Yes, sir.

BY MR. HARDY:

Q Then you said you made a plaster cast after that?

A Yes, sir. It's a, it's a casting material. We no longer use plaster. We use a substance known as, they describe as hydrocal, which is a, a substance that has more durability than plaster.

Q How do you do it?

A Basically, you mix it with a -- it's a powder com -- compound and it comes very similar to cement in an eighty pound bag and we, we dip some into a plastic bag. We add water until we get a consistency of somewhere around like pancake batter. Then just prior to pouring it we add a catalyst to, to make it harden quicker. And while it's still in the liquid state we pour it into the shoe, shoe pattern to try to capture the actual pattern. Depending on the surface, if it's a sandy surface that

may be destroyed by, by the weight of the particular casting material, sometimes we'll use something like hair spray to help stabilize the shoe impression prior to pouring.

Q Have you ever done that before?

A Yes, sir; I have.

Q Did you take any pictures of it while it was drying?

A Yes, sir.

Q 87 and 88, can you identify them?

A These are the photographs of the, of the shoe impressions with the casting material, after I have poured the casting materials.

Q Are they fair and accurate representations of what you were doing?

A Yes, sir; it is.

MR. HARDY: Your Honor, I would offer them into evidence.

THE COURT: Any objections?

MR. MEARS: No objection to the photographs.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q Now, the plaster cast, would it be a reverse of the shoeprint? How would that come out? Explain that to us?

A When you pour it, when you lift the image you get a, a reversal. The left shoe would look like a right shoe. The right shoe would look like a left shoe. Simply because you're turning

the footprint over when you, when you made the cast impressions.

Q Let me show you what's been marked as Number 13. I hand you this box, please, sir.

A These are the two cast impressions that I made at the scene that night.

Q What did you do with them after you made them?

A They were released to Det. Weaver of the Thomasville Police Department for evidence.

Q For transfer on up?

A Yes, sir.

MR. HARDY: Your Honor, we'd offer them into evidence.

MR. MEARS: Your Honor, could I ask -- could I ask the Court before the Court rules on their admissibility, if I could have a chance to cross examine Agent Collins about the methods used in collecting those?

BY MR. HARDY:

Q Just tell us the method you used?

A Well, basically I used the same methods that I described to you earlier. This comes in a powder form. I put powder in a plastic bag, mixed it in water. Just prior to pouring it I added a hardener to it. I poured it in the track. Created an impression. The hardener makes it stiffen up and, and solidify much, much faster than normal.

Q Did you make a chart showing the relative positions of the beer flap and the cans?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 216 of 269

A Yes, sir; I did.

Q I show you this State's Exhibit Number 139, and ask if you can identify that for me, please, sir?

A This is a rough drawing I did demonstrating the locations of the evidence I collected in relationship with the Junior Food Store, W. Jackson Street, and S. Pinetree Boulevard.

Q Is it drawn to scale?

A No, sir; it is not.

Q But did you get the distances from various, of identifiable points?

A Yes, sir; I did.

MR. HARDY: Your Honor, we'd offer it into evidence.

Q Is it a fair and accurate representation of what you saw?

A Yes, sir; it is.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

MR. HARDY: Your Honor, we'd like to pass these copies out to the jurors.

THE COURT: All right, sir.

MR. HARDY: Give the original to the Court. Give Mr. Mears one.

(Whereupon Mr. Hardy tenders documents to the jury)

BY MR. HARDY:

Q Mr. Collins, would you just -- do you have a copy there

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 217 of 265

with you? Let me give you one. Excuse me. Tell the jury what you've drawn on here, please, sir?

A Basically, what you see with the sign Junior Food Store written inside the block, is a representation of the building with its orientation to W. Jackson Street. Down at the bottom edge of the page is the orientation of S. Pinetree Boulevard. The small block with two squares inside it in the lower left hand corner of the page is where the gas island was located at that time.

Q Mr. Collins, would, if you looked at it in this way, that would orient you looking directly at the front of the store, if you looked at it like that?

A That is correct. If you were standing on W. Jackson Street you would be looking at the front of the store.

Q So then where are you finding the cans and the beer flap?

A The area that I was working in, if you're looking at the front of the store, would be to your right to where the arrows are drawn on the end of the page.

Q Toward what street would that be?

A Towards S. Pinetree Boulevard.

Q Okay.

A The arrows are indicating where the shoe tracks led from the roadway in towards the building, and then there's another set of arrows leading back to where the buildings went

towards, I believe the name of the complex is Providence Plaza. It's located behind the Junior Food Store.

Q Now, you indicated where the beer flap, the cans were?

A Yes, sir; I do. The beer carton or the portion of the beer carton is item one and the two Budweiser cans are labeled two and three.

Q Which does it appear, did you find first? The cans or the beer flap?

A They were, they were all seen about the same time.

Q I'm talking about from the ground?

A The number one appears first, which is the beer carton, which is closer to the store. And then the two cans, two and three, are further away from the store, which are the two beer cans in this, the mud puddle are. Measuring from the corner of the building and to a utility pole, if you look right under where it says Exhibit A there's a small circle drawn there and that was a utility pole that I used for reference. The Budweiser carton, or a portion of it, was approximately fifteen feet and two inches from the pole and fifty-four feet and nine inches from that corner of the store. The beer can that's labeled as number two was approximately twenty-one feet and nine inches from the utility pole and approximately sixty feet and three inches from the, from the corner of the store. And the second beer can was twenty-one feet ten inches from the utility pole and it's sixty-two feet ten inches from that corner of the store.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 219 of 269

Q So you found the beer flap and then can number one and then can number two?

A Yes, sir.

MR. HARDY: I'll take them up, please, Your Honor.

(Whereupon Mr. Hardy retrieves documents)

Q Did that conclude your analysis on the outside, Ken?

A Yes, sir; pretty much.

Q Then where did you go?

A Went inside the building.

Q And where did you go first inside the building?

A When I went in the building I went to the area behind the station where the clerk, store clerk would be stationed.

Q Yes, sir.

A And I observed the victim where he was found and the evidence around him.

Q Was he, excuse me, still there?

A Yes, sir; he was.

Q State's Exhibit Number 51 and 53, can you identify those for me?

A Yes, sir. These are photographs of the victim as he was found, or as he was when I arrived at the crime scene on that, on that particular morning.

Q Who went behind the counter with you?

A Inv., Det. Weaver was behind the counter with me.

Q You and he were working together on the scene?

A Yes, sir.

Q What's the first thing you do once you see the scene? What's the next thing you did?

A I photographed it.

Q Did you look around?

A Yes, sir; I looked around and photographed it.

Q What did you observe on the counter area?

A On the counter directly in front of a, or right close in front of the chair, a wooden chair that was sitting behind the counter was some, some paperwork as if somebody had been writing on this particular type of reports or forms that were there. And also on the counter was a lottery ticket that apparently had been cashed in. There were some sales receipts. There was a small spatter, what -- a reddish type substance that appeared to be blood on the edge of the counter. Some small fragments of glass that appeared to have come from a pair of glasses. Looking down under the counter there were the normal items that you would find behind a, a checkout counter at the store. A small safe, bank bags, paper towels.

Q Let me show you these photographs if you would and look at them, please. 73, 74, 65, 75, 86, 105, 58 and 59. If you could take time to look at those, please, sir.

A (Witness complies)

Q Have you had a chance to look at those?

A Yes, sir.

Q Can you identify them?

A Yes, sir. These are photographs I took in the area behind the checkout counter, in the same area in which the victim was found, and they are photographs of the various items that we've discussed, including some possible blood spatters.

Q For the record, if we could, please, 73 shows?

A Some broken glass that appears to be a portion of a, what appears to be a portion of a eyeglass lens.

Q 75, 65 and 74?

A These are of the, of the blood spatter, blood stain that I observed on the edge of the counter in front of the chair.

Q 86?

A This is a photograph of the cash register with a receipt that's still within the cash register that was rang up, rang up at a specified time. It is dated 4-10-94.

Q 105?

A This is just an overall view looking from the end of the counter towards the checkout area where the, where the clerk was.

Q 58 and 59?

A These two particular photographs are a closeup of the victim's, I believe it's the left arm, with, with some reddish-brown material that appears to be a blood stain, blood spatter.

MR. HARDY: Your Honor, we'd offer each of these photographs into evidence, please. 73, 75, 65, 74, 86,

105, 58, 59.

MR. MEARS: Just one moment.

We don't have any objection, Your Honor.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q Did you -- Was your first priority to check the man behind the counter?

A That had already been down and I believe the EMT's had already been to the scene to, to check that and there was not a necessity for me to check him personally.

Q I mean, but to check the body?

A Do I check the body? Yes, sir; I do check the body, and I did check the body.

Q All right. What did you observe about him injury-wise?

A He appeared to have two wounds of, I guess, the easiest way to describe it, is puncture looking wounds. One on the face and one on the side of his head.

Q Did you determine who he was?

A Yes, sir; we did.

Q Who was he?

A The man's name was Richard Slysz. I believe that's correct, the way you pronounce that name.

Q Identification was on his person?

A Yes, sir; it was.

Q Matched up with his driver's license?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 223 of 269

A Yes, sir; it did.

Q Now, was he armed?

A Yes, sir; he was.

Q How was he armed?

A The first thing that I observed on him was on the, on his belt. On the right hand side he had a small two shot derringer, .38 type derringer in a small holster. This was worn on the right side and it was with the, with the grip of the handle facing forward or what is referred to most of the time as a cross draw type holster.

Q Was that still on his side?

A Yes, sir; it was.

Q Still there?

A Still there. The second thing I found, in one of his right front pockets was a second two barrel, double barrel derringer type weapon. It was just inside the pocket.

Q Did you even know it was there by vision?

A Not by vision; no, sir. I had to -- I was looking in his pockets for identification factors and other items when we determined what was on his person at the time we found the second weapon.

Q Did you take those off of him?

A Yes, sir; we did.

Q Turned them over to Evidence?

A Yes, sir; I did.

Q Were they both loaded?
A Yes, sir; they were.
Q Either one been fired?
A No, sir.
MR. HARDY: The Number 6, 5 and 6, Your Honor.
Q If you'd look at them? Can you identify those items for me, please?
A Yes, sir. This was the, one of the derringer pistols that was taken from Mr. Slysz.
Q Which number are you looking at?
A This is Item Number 5. This is the second derringer pistol that was taken from Mr. Slysz.
Q The silver colored one was on his side or in his pocket?
A I believe the silver one was on his side.
MR. HARDY: Your Honor, we'd offer, they're denominated on the bags they're in as 6-A and 5-A, Your Honor, and on the outside bag it's got 5 and 6 on it.
MR. MEARS: Your Honor, the only objection we'd have would be as to the relevancy.
THE COURT: They're admitted without objection, or over the objection as to relevancy.
BY MR. HARDY:
Q Did you seize any of the glass fragments that were in those pictures?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 229 of 269

A Yes, sir; we did.

Q They were on the counter or on the floor?

A They was on the counter.

Q 10 and 11 here, please, could you look at them?

A Item Number 11 are the glass fragments from the counter, which was on top of the counter. The evidence seal, or the seal on the evidence is still intact. And Item Number 10 is glass that was from the floor, next to the victim on the floor and the pool of blood.

Q The glass that was on the counter was in one of the photographs you've already examined and --

A Yes, sir.

Q -- identified earlier today?

MR. HARDY: Your Honor, we'd offer both of these into evidence.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

MR. HARDY: They'll be 10 and 11, Your Honor.

Q Mr. Collins, did you find any shell casings?

A Yes, sir. There were two expended shell casings or cartridge casings down behind the counter behind the area where the wooden chair was sitting.

Q Did you seize them?

A Yes, sir; we did.

Q Did you turn them over to Evidence?

A Yes, sir; we did.
Q Ms. Everett?
A I turned them over to Det. Weaver and he returned, he turned them over to the evidence clerk.
Q Do you seal them when you received them?
A Yes, sir.
Q 159 and 160, if you could identify them for me, please, sir?
A These are evidence casings that were seized at the scene. They're .25 caliber cartridge casings. They have been resealed at the crime lab after, apparently after examination. There is no identifying markers on the actual bullet itself because we -- in comparison purposes, I did not want to mark anything that might obstruct the analyst from determining if the bullets had any evidentiary value.
Q Are they what's appearing in these photographs of 63, 62, 61 and 64?
A Yes, sir.

MR. HARDY: Your Honor, we'd offer the casings, Your Honor, 160 and 159, into evidence.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q Did the man have anything in his hands when you found him?

A Yes, sir. He had a wooden lead pencil in his, I believe it was his left hand.

Q Is that what's in Number 60 here?

A Yes, sir.

Q Did you make a diagram showing where the casings were, Mr. Collins?

A Yes, sir; I did.

Q How'd you do that?

A I basically drew a diagram of the inside portion of the store focusing on the cash register counter or checkout counter area, in that region of the counter, or the space behind the checkout counter where the clerk would have been stationed.

Q Number 138 here, can you identify this?

A Yes, sir. This is a, this is the drawing that I made of that cash register area on the inside of the store and items one and two that are marked are the .25 caliber shell casings that were recovered from the store.

Q Is it to scale or --

A It's not to scale.

MR. HARDY: Your Honor, we'd offer 138, I believe it is, into evidence.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

MR. HARDY: Pass them to the jury as a reference, Your Honor.

THE COURT: All right, sir.

(Whereupon Mr. Hardy tenders documents to the jury)

BY MR. HARDY:

Q Mr. Collins, again, as we look at it like that, we'd be looking at -- the store would be, facing the front of the store?

A That is correct.

Q And then you turn it around ninety degrees, you'd be looking from the inside of the store?

A Yes, sir.

Q Okay. Could you just tell us, the back part is not drawn to scale, where the victim is, the chair, et cetera; is it?

A No, sir.

Q You're just trying to show where the shell casings were in reference to the counter?

A Fundamental relationships; yes, sir.

Q Show -- Tell us what you, where you found the casings, please?

A Shell casing number one was approximately five foot six inches from the corner of the uppermost left portion of the photograph, or the drawing and the edge of the cash register, the corner of the cash register is five foot six inches. Shell number two was approximately five feet ten inches from the corner and seven foot three inches from the corner of the cash register. And those were used for reference points.

Q I think there's at least one photograph, 105 here, does

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 229 of 269

it show the back part of the counter?

A Yes, sir.

Q Kind of more visually show what your chart shows?

A Yes, sir.

Q And where was -- In relation to the body now, where were the shall casings?

A The shell casings were between the wall on the right hand side of the back wall of the store and the back of the victim, somewhere in the area of these shelves that are on the right hand side.

Q Could you just take my pen and just draw on there and show me?

A Somewhere in these areas right in here (indicating).

Q Did you have a, was it a trash can or something back there? What was back there?

A There were boxes. There were many articles of various types of material sitting on the floor and on the shelves. And the chair itself, there's a trash can and the, they may be obscured behind some of those photographs.

MR. HARDY: Let me take these up, please.

(Whereupon Mr. Hardy retrieves documents from jurors)

Q Do you know this gun, is it a -- ejects side, top, left, right? Do you know?

A No, sir; I do not know.

Q You seized the casings now. Did you seize anything

else behind the counter?

A Yes, sir. I seized a package of Basic Light 100 cigarettes. I also took a portion of the victim's shirt and removed it. I actually cut the piece of the shirt out because it had a blood pattern on it that may have been useful at a later date. A roll of paper towels. And I took the yellow wooden pencil that was in his left hand.

Q Number 1 here, can you identify that for me, please, sir?

A This is a cutout portion of the victim's shirt, of the left sleeve, with a, with an apparent blood pattern that I collected for possible, possible further evaluations of blood stains, if necessary.

Q You just did that as a precaution?

A Yes, sir.

Q Number 8 here? Is that the pencil you have been talking about?

A Yes, sir.

Q Ken, you seized, collected the shoeprint, turned it over to the crime lab, Jim Howard?

A No, sir. After I seized it, I turned it all over to Det. Chuck Weaver and through his chain of evidence it ended up in the crime lab.

Q I realize that, but you did it for further investigation for the lab?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 231 of 289

A Yes, sir.
Q As well as the shell casings?
A Yes, sir.
Q And you took the photographs that we've seen so far?
A Yes, sir.
Q And did you take a number of other photographs inside the store?
A Yes, sir.
Q Did the store to be, appear to be ransacked or messed up or in disarray?
A No, sir. The store was uniquely neat.
Q I think you took a number of pictures of, down the various aisles and the counter?
A Yes, sir; I did.
Q Did you go back to the beer cooler area?
A Yes, sir; I did.
Q I'm going to hand you a number of pictures that show the store, that Mr. Mears has seen them. If we could just look at them. Let me call the numbers out for the record, please. 127, 120, 119, 130, 129, 128, 126, 125, 122, 123, 124, 113, 110, 112, 108, 115, 114, 109, 111, 116, 117, 131, 132, 135, 134, 133, 118 and 121. Ask if you could look at all of those, please, sir?
A (Witness complies)
Q Have you had a chance to look at all of them?
A Yes, sir; I have.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 232 of 269

Q Do you know what they are?

A These are basically overall photographs showing the inside of the store and the relationship of materials within the store.

Q Are they fair and accurate representations of the store that morning?

A Yes, sir; they are.

MR. HARDY: Your Honor, we'd like to offer each of them into evidence.

THE COURT: Any objection?

MR. MEARS: Those are the ones that were previously called out by number?

MR. HARDY: Yes, sir.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q Now, let's look at these photographs again. 127, 120, 119, 121 and 118. What area of the store are they?

A This is in the cooler area of the store, on the far wall as you walk through the door, to the right hand side.

Q What kind of beer is on the bottom shelf?

A The bottom shelf contains Budweiser beer.

Q What size cartons?

A Pardon me?

Q What sizes are they?

A They appear to be, on the bottom shelf it appears to be cartons of twelve packs which would usually contain twelve beers within each of those cartons.

Q Does it appear that any of them are missing in the picture?

A Yes, sir.

Q Does it appear how many are missing?

A There appears to be two missing from, from these photographs.

MR. HARDY: Publish them to the jury, Your Honor?

THE COURT: Yes, sir.

(Whereupon Mr. Hardy tenders documents to the jury)

BY MR. HARDY:

Q Was the weather clear that day?

A Yes, sir.

Q It wasn't raining out there like it is right now; was it?

A No, sir.

Q Had it rained earlier, I guess? The day before or a couple of days before?

A Within, within the recent past; yes, sir.

Q But that night and that morning it wasn't raining?

A No, sir; it was not at the time I was there.

Q Did you lift any fingerprints, Ken?

A Yes, sir; I did.

Q How did you do that?

A I developed fingerprints inside the store. I utilized two methods. Number one, I used a fluorescent powder known as Redwak (ph.) powder and the alternate light source or forensic light, a known term that you like to use. And I also developed some using black powder.

Q You don't get into whether they're identifiable; you just try to lift them?

A That's correct.

Q Did -- What areas did you try to get fingerprints?

A I primarily worked the area around the checkout counter, where the cash register was, the counter itself, those items that were right around the center of activity, around the body, the entry door on the inside and outside of the building. And also I tried the, the area of the handles where the, the cooler, where the Budweiser beer was missing. I, I put black powder on those areas attempting to lift prints from that area.

Q Do you always get prints?

A No, sir; you don't.

Q More than not you don't?

A More likely not than, than so.

Q Just because you get them doesn't mean they're of any--

A Not necessarily. It doesn't mean that they're either identifiable and it does not necessarily mean that if you can

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 255 of 269

develop them that they are particularly, that they apply particularly to this situation.

Q You just try?

A Yes, sir. We just attempt to lift all that we find that appear to be usable.

Q 165, can you identify that?

A These are latent lift cards where the developed fingerprints were lifted and placed on these cards for further evaluation.

Q You left that for someone else to do?

A Yes, sir.

Q And that would have been whom?

A Sgt. Glenn Hutchinson with the Thomasville Sheriff's office compared the prints in this case.

Q The beer flap, did you lift the print from the beer flap, or did he do that?

A He did that also.

Q You didn't even lift that one?

A No, sir.

MR. HARDY: Offer 165 into evidence.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q Now, one side is the print and the other side is showing where it came from or what is it?

A Basically, they're a short brief note indicating where it came from and then my signature on the back.

MR. HARDY: I'm going to ask the Clerk if he, may has an envelope that we can maybe put these in later so they won't -- clip it somehow or another.

Q So you then gave all that to Hutchinson?

A No, sir. I gave it to Chuck Weaver, Det. Weaver.

Q For Hutchinson to then analyze?

A That's correct.

Q And you just find them; you don't analyze them?

A That is correct.

Q And he would have done the beer flap, done the lift off of it?

A That is correct, sir.

Q Number 9, I think you've already testified about it. I think, this being the cigarette pack.

A Yes, sir; this is the cigarette pack.

Q That's what you've already testified to earlier?

A Yes, sir.

MR. HARDY: Offer it into evidence, Your Honor.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q So, does that complete your examination of the crime scene inside and outside, Mr. Collins?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 237 of 269

A Pretty much; yes, sir.

Q Did you draw just a basic chart of the inside of the store?

A Yes, sir. I drew an overall, just features showing the general layout.

Q Not to scale but just a drawing?

A Just as a -- There's nothing that I draw as to scale. It's just an overall view of the store.

Q Is that 164? Can you identify it?

A Yes, sir. This is a, just a general overall sketch of the store, giving a general idea of where items are located within the store.

Q Is it a fair and accurate representation?

A Yes, sir.

MR. HARDY: We'll offer 164 into evidence. Excuse me. 176, Your Honor, into evidence. 176.

MR. MEARS: No objection.

THE COURT: It's admitted without objection.

BY MR. HARDY:

Q You never went to the other store; did you?

A No, sir.

Q And you weren't called to go to Bainbridge when they found the car of Mr. Lucas?

A No, sir.

Q Did you try -- Did Mr. Hutchinson try to take some

prints from the beer cans, or did you do that?

A Mr. Hutchinson did.

Q You turned those two over to him for that purpose?

A Yes, sir.

Q You collected the beer flap and turned that over through Weaver to Hutchinson likewise?

A Yes, sir; that's correct.

Q So you were basically the accumulator and then you disseminated it to other people for further testing?

A Yes, sir.

Q Did all that happen in Thomas County, Georgia, that you just testified about?

A Yes, sir; it did.

MR. HARDY: He's with the Court.

THE COURT: Mr. Mears?

MR. MEARS: Your Honor, may I have just one moment to get some things together?

THE COURT: Yes, sir.

RECROSS EXAMINATION

BY MR. MEARS:

Q Good afternoon, Mr. Collins.

A Good afternoon, sir.

Q I'm sorry to keep you waiting.

A No problem.

Q Mr. Collins, I want to ask you some questions and I'm

going to try to follow in this direction. I preface it so you can you see, you know, where I'm going with the questions. I'm going to ask you a series of questions about your observations concerning the outside of the store, some distances, lighting, things of that nature, work to the inside of the store, and then back out of the store to the tracks.

A Yes, sir.

Q So I'm going to try to follow that so you'll, at least, get some idea of where I'm going or why some question might be asked. Okay?

You've identified the outside of the store, and I believe these photographs are in evidence. I'm just going to ask you to look at 102 to make sure that you recognize that.

A Yes, sir; I do.

Q And what is that? I'm sorry.

A That is a view of the front of the store.

Q From what direction?

A From, from standing at W. Jackson Street looking at it.

Q I'm now handing you 106, I believe, 104. Could you look at, could you identify that, please, sir?

A This is a, also a view of the front of the store and the gas pump area and this is standing approximately in the, in the corner of the intersection of Pinetree Boulevard and W. Jackson Street.

Q And 101?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 240 of 269

A It's a, almost a direct on, front on view of the store.

Q Okay. And 90?

A This one is a view of Pinetree Boulevard, Boulevard, looking from the store standing at W. Jackson Street.

Q Okay. And 91?

A This is a view of the BP Food Store which is directly across the street, across W. Jackson from, on the opposite corner from the Junior Food Store.

Q Okay. If I could ask you to just hold those. I'm going to ask you a few questions about those, and if you would use those as reference. And then at some point I may ask, with the Court's permission, to display those to the jurors.

A Sure.

Q Now, when you did your measurements on the outside of the store, I assume some of them were more detailed than others. Some were, I assume, would be approximations. Some would be actual --

A Well, I used a steel tape and they -- but because of the undulations of the ground sometimes they are -- they are still approximate based on the fact that you can't get a direct straight line.

Q Now, the first measurement, I'd ask you at least to make an approximate estimate on, based upon your experience and your having been at the scene, could you give an estimate of the distance from the BP station across the street, and I'm asking

you to use the front of the window where if an individual were standing inside the BP station looking across W. Jackson, across the parking lot of Junior Foods, to the windows of the Junior Food? Do you have any idea as to the approximate distance?

A I didn't measure it, but I would guess it's somewhere in the range of four to five hundred feet.

Q Okay. A little bit over three hundred yards, or, I mean, excuse me, a hundred yards?

A Yes, sir.

Q Okay. If I, if I stated to you it was approximately a hundred and two paces of a five foot, eight inch person pacing, would that fit into your estimation?

A That would not be unreasonable, no, sir; I don't think.

Q A little over a hundred yards?

A Yes, sir.

Q From the front of one store to the front of the other store?

A Yes, sir. That's, that's a fair estimate.

Q Okay. Now, looking at the photographs, the photographs were made during daylight hours obviously.

A Yes, sir.

Q Can you look at the BP, the station in the, the station depicting the BP station --

A Yes, sir.

Q A lot of stations in that question. Are -- Do there

appear to be obstructions of any type in the windows? Posters, for sale signs, things like that, that you can discern from looking at that and based upon your recollection of the store?

A There appear to be some, some poster type material on some of the windows; yes, sir.

Q Okay. Now, would you look at the front of the Junior Food Store and see if you see anything that could possibly be categorized as visual obstructions in the window of the Junior Food Store?

A Yes, sir. There are posters and signs also in the windows of the Junior Food Store.

MR. MEARS: Okay. With the Court's permission could I ask the, Mr. Collins simply to point to those two stores and what you're referring to to them, please.

Q Mr. Collins, I believe if you can step down here you could show them?

A (Witness steps down from witness stand) I've got the wrong photograph on that one.

Q First of all, if you'll just show, show the jurors the BP station and what you're referring to?

A This was taken from, standing in front of the Junior Food Store looking across the street at, at the Jack Rabbit BP Food Store.

Q Mr. Collins, as you go back by the jurors, could you show them the Junior Food Store and the windows and what could

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/24/14 Page 243 of 269

possibly be visual obstructions in the Junior Food Store?

A This is a photograph looking almost straight at the Junior Food Store, and you can see that there are price stickers and signs in the actual windows of the store and about halfway up the store there are some type of posters and stickers on the actual entry door. There are some papers or posters on the area where the clerk was standing. I'm not sure if that green area right there is a reflection, but you'll see as I come back, or if there's another stripe across the window. I can't be sure on that, but you can see it. This area is where I'm talking about. I'm not sure whether that's something that you -- is a reflection or if it's something on the window. I don't remember.

Q Thank you, Mr. Collins.

A (Witness returns to the witness stand)

Q Mr. Collins, using those same photographs, just in general, could you once again, with a little bit more detail, tell the jurors where the lights, the outside lights were placed around the Junior Food Store as you saw them when you did your investigation?

A The, the gasoline island is lighted. There are also as you can see in this particular photograph, in the corner of it there is a, there is a light that appears to be a regular street lamp type light. And going down Pinetree Boulevard, I don't remember if there is a street light on that particular pole that we used for measuring or not. But it has some sort of lighting,

 carry over from the front of the store and other street lights in the general area.

Q Do the photographs that you've, you've used and you took when you were out there show the side area of the store where the beer cans and the shoeprints that you've testified about are located?

A These photographs have a brief glimpse of it but not a real good overall view of it. This photograph is on the side and this, this area here where it is dirt is on that side. This photograph of it shows the same general side, some of the paved parking area plus the, the dirt area. You can't see in this one. You can see a little bit of it again from the frontal view of the store, but it's difficult to tell about that area.

Q Now, as you turn the corner of the store and head east on -- let me get my directions so I don't get turned around. If I were coming out the front door of the store and I turned and went around this corner and went down Pinetree, what direction would I be going in? Do you recall?

A Well, you'd be, I guess, headed in a -- you could either consider it south or east depending on exactly where you were standing, because this, this is an area where perhaps local knowledge creates a problem for you in your mind, when you start doing directions on this road. W. Jackson Street, they label W. Jackson Street as U. S. 319, which is a north-south highway, which creates some confusion when you get trying to think that

way. So the first, your first instinct is to list north going up 319. However, true north is somewhere in between. So that would be depending on how you looked at it. Either west -- You're either east or, or south.

Q Okay. And when -- On your legend, you put north, it's somewhat opposed to what the street directions are? Is that --

A Somewhat opposed and that in itself has created somewhat of a problem with the description, because I was trying to keep it where it would relate to east-west Jackson Street as being north and south, and then, then when you sit down and draw it, it's, it's almost instinct to put north up 319. So I have a north arrow on this particular, particular portion of it, but in some of my verbal descriptions I use north based on W. Jackson Street, which creates a little confusion. But, yes, that's -- if you go by this arrow, then we're talking about going in an easterly direction.

Q And, and lawyers are notorious for losing directions. So that, that explains why I was having trouble with it just a few minutes ago.

A Well, I apologize for that. It is, it's a very confusing area simply because true north lies somewhere in between and you've got a U. S. Highway that's a north-south highway and then a city street that's labeled east to west. And it can create some confusion in your mind when you're trying to, to word it out.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 246 of 289

Q I appreciate that. That may help the jurors when they look at the individual drawing, not to get as lost as I did when I first looked at it. And that's not a criticism of your drawing. I just didn't know the directions you were going with that.

A It's very difficult and, and it's easily confused.

Q Okay. Now, with regard to your drawing, you've made some, within the limitations of a steel ruler, you've made some specific distance measurements; is that correct?

A That is correct, sir.

Q Okay. Now, using your drawing, looking at, first of all, the beer cans that were found, the two beer cans that have been introduced into evidence here, when were your, when was your attention first called to those beer cans?

A I don't remember the exact point in the investigation when it was first, first drawn to me. We were looking at the shoe impressions and they probably told me about the, the beer cans and the, the beer top being there some time during that conversation. I probably even walked over and looked at it to note it in my mind that it needed further processing.

Q Okay. Now, there's been testimony, assume that there's been testimony with regard to a tracking dog named Pete --

A Yes, sir.

Q -- who turned the corner. Have you ever used a tracking dog?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 247 of 289

A No, sir; I have not.

Q Okay. Would it be a fair statement to say that when you arrived on the scene, everyone's attention had been focused in that particular area? Not because of the tracking dog but because of the witness across the street and the witness of Mr. Taylor? You reviewed their statements and -- did you not?

A I didn't review their statements. I'm familiar with --

Q You're familiar with what reports they gave to the officers arriving on the scene?

A That is correct, sir.

Q Okay. So, regardless of Pete's abilities, everyone's attention was already headed in that direction anyway; wasn't it?

A Yes, sir.

Q And it was -- In your presence was there ever any attempt to take Pete anywhere else other than around the side of that store?

A Not to my knowledge. I was not there when Pete worked out.

Q Be that as it may. I'm going to ask you look at State's Exhibit 97 and State's Exhibit 96. And are those the beer cans and the general location that you found them in?

A Yes, sir; they are.

Q Had they been moved or touched at that time, to your knowledge?

A To the best I can tell they're approximately where they

fell. I don't see anything that would indicate to me that they, that they had been moved. There are some indentions in the mud and that may have been where they fell and bounced. I can't tell. I can't determine if they were -- if that's where they fell and made the, made the indention in the mud upon their initial fall, or what.

Q Okay. Using your diagram, and you've put the number two as a Budweiser can and number three as Budweiser can; is that correct?

A Yes, sir; that's correct.

MR. MEARS: Your Honor, may I ask permission from the Court and the State to redistribute those diagrams that they used? It just occurred to me it might make more sense if the jurors could see them. Could we have the State's permission to do that?

THE COURT: Yes, sir.

MR. MEARS: Your Honor, may I do that or get Mr. Hardy to do it?

THE COURT: Yes, sir; you can do it.

(Whereupon Mr. Mears tenders documents to the jury)

BY MR. MEARS:

Q Mr. Collins, if, if you would orient your drawing, which the jurors now have in front of them, to the outside of the store? Orient that to the photograph that you've just identified with the beer cans?

A If you're looking with the, with the photograph in the upright position so that you can read Junior Food Store, the cans that are on the ledger are items two and three. You'll note them on the right, lower right hand corner of the drawing.

Q Now, if I read your, your numbers correctly, the beer cans if, if a person were moving down Pinetree, and I won't give the direction, just moving away from the store toward Pinetree --

A Yes, sir.

Q -- would the beer cans be behind the footprint that, that you've identified here as number one, I mean, excuse me, the beer carton?

A The number one item, the beer carton, would be closest to the store. Items two and three would be furthest from the store, going in the direction that you're talking about.

Q I had it just backwards. The beer carton, the piece of cardboard from the beer carton is before you get to the mud puddle?

A That's correct.

Q Would that be a fair statement?

A Yes, sir.

Q And then you find the two beer cans?

A That is correct.

Q Okay. Now, in relation to those three items, the, the two beer cans and the beer carton, where was the footprint that you lifted located?

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 250 of 269

A Well, the, the shoe tracks gave a general direction coming around the corner of the store, in the bottom left hand corner as you look at the store, as going towards Providence Plaza or by these three articles. There were a series of footprints. The photographs, the ones that I photographed and collected as evidence were the ones -- we chose one left and one right that appeared to give us the, the greatest detail. But they were headed in the same general direction toward this particular --

Q Okay. Could you be just a little bit more specific and just clarify it for me? Would you talk about the several footprints and then the one that you actually lifted?

A Yes, sir.

Q Or two prints. You thought you had a left and a right; is that correct?

A Yes, sir.

Q That one footprint, left and right, where was that footprint in relationship to number one on the chart?

A The shoe tracks that I actually photographed and lifted were back closer to the store, between one and the carton, in the dirt area of that parking area.

Q Okay. Now, just to visualize the distance, would you look at your map, and I'm going to start walking away, and assume that that is the footprint that you located.

A Yes, sir.

Q Okay. Right here at this corner. And when I get as far away from the footprint as the corner of the store, please tell me to stop.

A Well, to say --

Q Can you do that?

A It'd probably be easier just to relate it. It'd been at least as far as the back door of the courtroom, simply because we're going to run out, we're going to run out of space. But it'd been probably that distance or in that general area. It was, it was thirty or forty feet from the actual shoeprint I actually lifted.

Q It's hard to tell from the diagram and the photograph where the footprint was. But is it a fair statement to say that it's almost back to where, maybe even beyond where the bailiff is sitting?

A It could be to that distance; yes, sir.

Q So the footprint that you lifted would have been that far away, and I'm not going to try to guess the distance, but --

A I'm, I'm saying it could, it could have been as much as that distance. It's thirty to forty feet probably from where I actually lifted it and photographed it to where the carton was.

Q Now, you saw other footprints in the area; is that correct?

A Yes, sir.

Q And did you see other footprint, footprints that had

the same degree of impressionability on the sole? And do you understand my question? I may not have framed it right.

A Well, this, this is a, is a store where a lot of people park. Yes, sir; there were other shoe tracks, there were other impressions. Some of them probably as, as notable as the ones that I lifted.

Q So, if this is the corner of the store (walks toward back of courtroom), at least it may be even -- but at least this distance?

A Yes, sir.

Q From the beer carton; is that correct?

A That's correct.

Q Between that particular distance and the distance where you found the portion of the beer carton, approximately how many footprints did you find?

A I don't know. I didn't count them.

Q Was there any -- Did anyone in your presence or at your direction make an attempt to photograph those footprints?

A Uh, no, sir.

Q Were those footprints discernable? And I'm not saying identifiable. Were they discernable as footprints?

A Some of them were and some of them were not. Once again, we, as you go past this area you go into a grassy area. When I was observing these shoe tracks it was in a darkened condition and I, I don't remember how far I could observe them,

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 253 of 289

but they went in that general direction.

Q Okay. Would it be a fair statement to say that you only attempted to make impressions of one set of shoes?

A As far as plaster casting purposes?

Q Yes, sir.

A Yes, sir; that is correct.

Q The decision by a crime scene technician who's trained in preserving and collecting evidence is somewhat subjective, is it not, in the types of evidence that you deem necessary or proper to preserve and collect? Is that correct?

A That is correct, sir.

Q And you, you base that upon your experience and your training; is that correct?

A Yes, sir; that is correct.

Q Now, this was early morning hours, early in the day when you were called out to the scene to help process this crime scene; is that correct?

A Yes, sir; that is correct.

Q And your attention had already been called to a particular area with regard to the beer can, or the beer and the carton; is that correct?

A Yes, sir; that is correct.

Q By other officers already on the scene?

A Yes, sir; that is correct.

Q The footprint that you collected, excuse me, the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 254 of 289

footprint that you poured the hydrocal and made the impression of, who called that to your attention?

A Henry Williams that was the dog handler.

Q Okay. Now, when you collected -- I'm sorry. When you processed that footprint, you used a standard liquid portion of hydrocal which is a powder that you've added water to; is that correct?

A Yes, sir; that is correct.

Q Now, you can lay those down to the side where it's more convenient. As Mr. Hardy asked you, and I believe you responded, that's an inverse or reverse image of the track that's on the scene; is that correct?

A Yes, sir; that is correct.

Q Now, with regard to the decision to collect that particular print, was it, was it based upon the accessibility of the print, the visibility of the print? How did you make a distinction between collecting that print and any of the other prints that were out there?

A Of the prints that I observed, this one probably had the most complete print. Some of them were partial prints; had the most detail that I could observe at that time. The same with both prints. I chose the, tried to choose a left and tried to choose a right that gave us the most quantity of detail and probably the most usable track.

Q Okay. Your decision to collect, or to, -- I keep using

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 259 of 265

the wrong word -- your decision to pour and make impressions of these particular shoeprints was not based upon any evidentiary basis other than it was the easiest and most accessible print to make an impression from. Is that correct?

A No, sir. There were other shoe tracks there that were just as accessible from a standpoint of pouring the track. These were the ones that were identified to me as leading in the direction from which the officer and his dog had tracked a suspect and they identified these as being the most likely shoeprints to be made. Therefore, we selected, of those that we saw, we tried to select the ones that were most likely to be casted.

Q So as I understand your, your decision was based upon perhaps Mr. Williams saying, here's a footprint that Pete smelled on, or tracked on?

A This was the track the dog took him in. And I don't, I can't describe tracking dogs for you. But this is what he indicated to me that the dog had indicated would be the most likely set of prints to photograph and to cast.

Q And it was about that far, and I'm pointing back to the door or back up here, to where the beer cans and the beer carton was found; is that right?

A It could have been that great a distance; yes, sir.

Q Now, the photograph that you have that shows the location of the beer -- Oh, here's one. I'm sorry. I knew there

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 286 of 289

was another one. I just -- Let me ask you to identify 95?

A This is a photograph looking from the mud puddle back towards the store.

Q Okay. That's perhaps a more expansive view of the mud puddle with the beer carton; is that correct?

A Yes, sir.

Q Okay. Now, did you see any footprints around the mud puddle where the beer cartons were located?

A No, sir; I did not.

Q Would that be unusual?

A Not really. My, my first thought would be if I were going that way I'd go around the mud puddle.

Q You don't step in the water; you'd step around it?

A I'd go around it; yes, sir.

Q Okay. Anywhere around that mud puddle in a direction that would have been usual for someone to avoid the mud puddle, was that checked for footprints?

A We're in a, in a grassy area and footprints, you get more grass than you do dirt here and they get extremely difficult to see. I didn't see any more. Were they possibly there, possibly I missed them if they were. I didn't see them.

Q I'm asking you to look at State's 103?

A This is a photograph standing back towards the front of the store looking in the direction towards the mud puddle or towards Providence Plaza.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 287 of 289

Q Okay. Would it be a fair statement to say that the beer can and the, and the carton, where the carton was found, based upon your drawing and these photographs and the footprint, and I'll, I'll leave this alone now, but it's a pretty good distance away; isn't it?

A It's a fair distance; yes, sir.

Q Okay. And would it be a fair statement to say that even though there's a grassy area around here, there was not any great effort to try to locate footprints around the beer carton or that particular location?

A Well, I certainly looked in the mud puddle area, in the edge of the mud, did not see any. As far as, as looking, getting on my hands and knees and really searching this particular area, no, sir; I did not.

Q Okay. Did you have a chance to review Mr. Williams' report or Mr. Mullins' report with regard to Mr. Williams tracking with ole Pete, I mean Pete?

A No, sir; I did not.

Q Are you aware that the report indicates that --

MR. HARDY: Your Honor, can he ask questions for him to comment upon somebody's testimony or report? They've already testified and he's got cross examination of Mr. Williams and Mr. Mullins, I believe.

THE COURT: Mr. Mears?

MR. MEARS: Your Honor, I think it would be

appropriate if there was an area that was not pointed out to the crime scene technician at the time he was attempting to do his work. I think it would be appropriate for me to ask questions, not about the contents of the report, but whether or not he was told about that particular report.

THE COURT: Well, you can ask this witness if he was told a particular fact by someone.

MR. MEARS: I'm sorry. That, that's what the limit of my question was going to be.

Q Were you told that Off. Williams --

THE COURT: So far, insofar as it's not hearsay.

BY MR. MEARS:

Q And I'm not asking you what he told you, if he told you anything or anything else. Were you, were you directed -- Let me do it that way. Were you directed to the Providence Apartments and directed to any footprints at that location?

A No, sir. I was -- It was indicated to me that the tracking had gone as far as Providence Plaza. I did not go to the Providence Plaza area.

Q Now, I'm going to ask just a few questions, very few, about the process you used in, in pouring the hydrocal and that sort of thing. Did you use a mold to outline the shoeprint that you were going to make an impression of?

A No, sir; I did not.

Q And the reason for that would be that because of the

type of soil you weren't --

A The slope --

Q -- the elevation and slope, you weren't worried about the hydrocal running on you; is that correct?

A That is correct.

Q Now, did you make sufficient pouring the first time that you poured the hydrocal to complete the, the lifting of the print?

A Let me, let me again tell you, say that when I pour a hydrocal plaster or any other substance in the process of developing or trying to collect a shoe impression, it is my general principle and general policy to mix sufficient quantity to, to complete each track with one pouring. That is a general rule of thumb. As specifically how much did I pour that night, I don't, I don't have any recollection of that other than the fact that it is my normal procedure.

Q Okay. And you have no present recollection of having done a second pouring or an additional pouring with regard to these particular prints?

A There were two individual tracks.

Q I'm talking about a second pouring on each individual print?

A I do not have a recollection of doing that. And, and, like I say, my general practice is to mix enough to pour one complete track at a time.

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 260 of 269

Q Okay. You pour the hydrocal, and my hand I'm indicating the top of the impression; is that correct?

A Yes, sir.

Q And this is what is on the surface and it dries here and then when it's sufficiently dry, then you lift the print up; is that correct?

A Yes, sir; that is correct.

Q Now, with regard to the pouring and the lifting, there appears to be a line or delineation of some type on the outer edge. Is that just a natural curvature or was that done as a part of the drying process, or was that done as a part of the lifting process?

A These are -- In fact, around the edges of the, of the pattern, and particularly the shoe track, they are possibly pouring patterns. And, and those, the thickness of it, I can probably explain to you what I did.

Q Okay. It just caught my attention, and would you, please, just try to help me out with that?

A Fundamentally hydrocal is a, is a, is a cement. I don't know what its commercial use is but it's basically a cement. And as we pour this particular substance, or just prior to pouring it, I add a catalyst to it to create, it, it makes it harden quicker. And noting the thickness of it, it looks like I come up a little short on the mixture. I didn't have quite as much as I wanted. And when I poured it in there, because I used

the same quantity of catalyst I normally use, it started hardening rapidly. And as it hit the ground it did not flow as I would have desired to have it flow, and while it was still damp I basically reached down here, and you can still see the finger marks as I took it and I spread it out so that it will completely cover the shoe track.

Q Okay. That's fine. Thank you. On the diagram that you've drawn --

A Yes, sir.

Q -- you indicate through drawings what appear to be footprints moving away from the corner of the store toward --

A Providence Plaza.

Q -- Providence Plaza. You also seem to indicate that there are shoe tracks coming in.

A Yes, sir.

Q Now, could you tell me what would those notations, in relation to and were there ever any attempt to identify or make hydrocal casts of those shoeprints?

A These shoe tracks indicated that somebody or some person walked in a general direction from S. Pinetree Boulevard across this portion of the parking lot back towards the front door of the, or towards the front of the store. The shoe tracks, if I remember correctly, had some characteristics similar to some of the shoe tracks that we were looking at in the parking lot. They were not of sufficient character to, to cast or to make an

impression of, simply because this is the area where all the cars parked and the soil was much looser. It's a dry, sandy soil and it did not retain the characteristics that were, were of any benefit, in my opinion, to pour.

Q Okay. I'm trying to make sure I've asked all the questions about the outside of the store. If you'll just give me one moment, please.

Did you notice any area around the store that might appear to be an air conditioning compressor unit or storage shed or something of that nature on the outside toward the rear of the store?

A I don't remember it right off hand; no, sir.

Q Do you recall anyone drawing your attention to that particular area to look for footprints or fingerprints?

A No, sir; I don't recall right off hand.

Q Did anyone involved in the investigation tell you that one of the -- Well, were you ever asked to go back out to do fingerprints after that particular morning you were there?

A Not to my recollection; no, sir.

Q So, your, your attention was never called to a housing unit for the, an air conditioning unit or air conditioning compressor; is that correct?

A Not to my recollection; no, sir.

Q Okay. Now, going into the store itself.

A Yes, sir.

Q I assume you made a visual observation before you started taking any measurements or drawing any diagrams of that, that sort; is that correct?

A Yes, sir.

Q And you -- Did you use a circular pattern or back and forth? How, just how did you make your observation --

A Fundamentally, when I went through the front door, I went to the area where the victim was. I did an overall evaluation in my mind of what I needed to do and what I felt like I needed to do. And then the first sequence then, of course, is to make notes and photograph. In the process of photographing I generally go to all four corners and photograph back in each direction of the store, getting overall shots of the interior portion of the store.

Q And that would be a standard crime scene technique as far as capturing the crime scene on film; is that correct?

A At some point in time during the process I would take overalls of the store; yes, sir.

Q Now, Mr. Collins, I want to ask you some questions about that overall view of the store. And I assume from the looks of photographs 133, 134, 135, 132, 131, 117 and 116, those are photographs that depict the entire scene of the store from various directions; is that correct?

A Yes, sir; that is correct.

Q Okay. Now, first of all, I call your attention to the

Case 7:14-cv-00039-MTT Document 18-15 Filed 07/14/14 Page 264 of 269

windows, those portions of the front windows of the store that can be seen from the, from the photographs. Do there appear to be visual obstructions of any type on the windows inside the store?

A Yes, sir; there are some obstructions with some areas being visible, having visibility out of them.

Q Okay. And do you have a specific photograph that you feel best shows those, that particular part of the store?

A Well, I have a couple. These, this photograph of the front of the store is the windows that are furthest away from the clerk's area. And they have large posters high up in the window. This particular one shows the front entryway door. It doesn't show the door directly adjacent to the, to the location of the cash register, but it's showing some obstruction approximately waist high or a little better on the, on the door area. This one is probably the best overall photograph showing the windows by the, by the clerk's area. And although there is some obstruction, it's hard to tell exactly how much of the window is obstructed from, from that particular photograph.

MR. MEARS: Okay. Your Honor, may I publish these briefly to the jury? I'm referring to State's Exhibits 116 and 131 and 132.

THE COURT: Yes, sir.

BY MR. MEARS:

Q Would you help me with this, Mr. Collins?

A Sure (witness steps down from the witness stand).

Q Again, we're just going to walk down the jury, and if you would look at these as we walk down, please (Displays exhibits to the Jury and then the witness returns to the witness stand).

Mr. Collins, did you do any measurement of height distances in the store, and, or did you, did you make any mental notes, or did you obtain any mental impressions as to the height measurements within the store? As, referring primarily to the counter top and the merchandise aisles as shown in these photographs?

A No, sir; I did not.

Q Looking at the photograph here, particularly photograph 116 and 131, could you make a reasoned estimate of approximately the height of the aisles, of the merchandise aisles?

A A reasonable guess would be four, four and a half feet tall. It should be pretty much standard for the shelving. Usually, these shelves are not much more than chest high.

Q Okay. Now, with relationship to the BP station that's across the street, what's the elevation of the topography in that area from the BP station?

A It's fairly level. I've never really looked at it. I, I could tell you one is slightly higher by a few feet than the other, but it appears to be somewhat -- it's, it's not a real hilly area, but there's not a tremendous amount of it -- well,

there may be five or six feet difference in elevation. I'm not sure. I'm not --

Q Is there any way to tell from these photographs, particularly photograph 104, as to whether or not the store itself is of a higher elevation than the BP store?

A No, sir; I can't tell you by looking at the photograph. I, I really don't know.

Q Okay. Based upon your recollection from the BP station coming across W. Jackson up to the Junior Food Store, is there any increase in the elevation, no matter how slight?

A I would think, and this is based strictly on, on personal recollection of going through the parking lots of both stores, that the BP station would be slightly higher.

Q The -- Looking across -- Your, your testimony is that the BP station would be higher than the Junior Food Store?

A If, if I were to guess, yes, sir; I would say yes. And, there again, I don't have any way to verify that or to, to make anything more than a guess at it.

Q Okay. Is that based upon your recollection of BP stations or this particular scene?

A It's, it's based on the fact that I drive by that particular intersection on a daily basis. And if my memory serves me correct, I remember going up in the driveway at the BP station, and it seems like there's more elevation going up in the driveway than there is at the Junior Food Store.

Q Now, the BP station, it sits back off of W. Jackson?
A Yes, sir.
Q And the Junior Food Store sits up off of W. Jackson and Pinetree; is that correct?
A That is correct.
Q Okay. Now, if, and only if, you were looking through the store of the BP station, over a hundred yards, into the windows of the Junior Food Store, would you have an opinion as to the absolute height that a person might be visible, if they were visible at all, from that distance considering the visual obstructions in both stores?
A I have absolutely no idea. I, I don't -- I wouldn't even venture a guess as to such a situation, because I don't know.
Q Did you go across and look out of the BP station toward the, or did anyone to your knowledge do that?
A I did not. And to my knowledge, I don't know if anyone else did or not.
Q But your recollection is that the shelving heights in the Junior Food Store are somewhere around four, four and a half feet?
A I'd estimate in that general area there. They're pretty basic, standard shelving that you find in a store. Most of them are chest high with the products on them.
Q Okay. Now, after you had made your visual inspection

of the store, did you then decide what areas you were going to attempt to lift latent fingerprints from?

A No, sir. The first thing that I did was, was to go to the area of the victim and process the area in which the victim was found so that we could remove the victim from the scene.

Q Okay. After that event had taken place, did you then made a determination as to what areas you would attempt to lift latent prints from?

A Yes, sir; I did.

Q Okay. What criterion did you use to make the determination as to where to dust using whatever form of -- First of all, there are different substances that are used; are there not?

A Yes, sir; there are a multitude of different things you can use.

Q Is there any one particular type of fingerprint identifying, that would identify the print so that you could make the lift? Is there any one particular type that you feel is better than the other?

A I, I don't have any real preference. I think the most common and most frequently used substance for developing prints overall is the standard black powder. And that's pretty much a, a standard within the industry.

Q Okay. Do you know -- Are you familiar with the other types of substances or chemicals that are used by other people in

lifting prints?

A There, there are many chemicals and many other substances used to develop prints; yes, sir. We do use some at different times on different occasions and different circumstances.

Q So you used fluorescent powder?

A And I also use black powder.

Q And you use black powder?

A Yes, sir.

Q Do you know on any particular print which one you used? Did you make a determination, and I'm referring now to 165, did you make a determination as to which of those particular prints you used one or the other substances?

A Well, on any real smooth surface I probably went straight to the black powder. If I had a surface where I might have a contrast problem so that black powder would not be as easily seen, I would have probably gone to the fluorescent powder. However, if I had developed a print with fluorescent powder, I've found over a period of time that you cannot lift fluorescent powder and be analyzed by the, by the identification technician. So what I do, if I do develop a print using a fluorescent powder, I go back over the same print with a black powder, once I have identified it, and lift the black powder portion of it. And then you have a, a usable print.

Q Mr. Collins, so the jurors will perhaps have a more

Case 7:14-cv-00089-MTT Document 18-16 Filed 07/14/14 Page 1 of 60

clearer understanding of the process that you used, what is, what is it on the surface that becomes discernable once you have dusted it, so to speak, with a particular substance: fluorescent powder, black powder, or whatever?

A I'm not --

Q Is it oil? Is it the actual impression?

A What does it adhere to?

Q Yes, sir.

A Yes, sir. The powders all adhere to the oils or the, the fl -- the sweat that's exuded through the skin, any contamination that's picked up or exuded through the pores as sweat is left, the basis of it being water or sweat, and it eventually evaporates leaving oils, amino acids and other small particles that are included in your sweat pores.

Q Okay. Now, in this particular crime scene, you made a determination, and I think I was headed down this road and I sidetracked myself, you were making -- you were telling us what criterion you used to dust a particular surface or a particular article or a particular area --

A Yes.

Q -- for possible prints. Would you tell us what criteria you used?

A Basically, the criteria I used was as you come through the front door, realizing that someone had come in and out the front door, obviously that becomes an area that you would want to

Case 7:14-cv-00089-MTT Document 18-16 Filed 07/14/14 Page 2 of 60

look at. The second thing would be the location of the victim. The probability that this person either approached the checkout counter, may or may not have touched things in it. The fact that the cash register was, I guess the word would be locked or, or the lights were flashing but it was not functioning. There was a chance that somebody had touched the cash register. As I walked through the store and looked at the, the cooler area, the rod that is used after midnight in a lot of these stores to, to prevent somebody from opening the beer cooler doors where they can sell beer after midnight, or so they can't sell beer after midnight, had been moved down away from the beer section, so I obviously wanted to process the area of the doors, the cooler doors that may or may not have been touched by, by the perpetrator.

MR. MEARS: Your Honor, may I ask the Court if we could turn the air conditioning down a little bit. I'm quite warm and I apologize. I'm just somewhat uncomfortable with heat.

THE COURT: Is anyone else warm or cold at this time?

JUROR: Cold.

THE COURT: Ma'am?

JUROR: I'm cold.

MR. MEARS: Never mind, Judge. I feel fine. I'll go forward, Judge. I don't want to inconvenience the jurors.

THE COURT: Mr. Mears, can you give me an approximation at this time about, of about how much longer you'll be with this witness?

MR. MEARS: I'm about halfway through, Judge.

THE COURT: All right, sir. Why don't we take about a ten minute recess at this time.

MR. MEARS: Judge, could we -- I'll get these back from the jurors.

THE COURT: Yes, sir.

(Whereupon the documents are retrieved from jurors)

THE COURT: Ladies and gentlemen, you may go to your jury room.

We'll be in recess for about ten minutes.

(Whereupon the Court takes a brief recess, and upon reconvening the following transpired in the jury's presence)

THE COURT: Ladies and gentlemen, let me just remind you that at any time during the trial any of you need to take a break for any reason, let me know and we'll try to accommodate you.

In addition, if at any time any of you get too hot or too cold, let us know that and we'll try to accommodate you also.

Mr. Mears, you may proceed.

BY MR. MEARS:

Q Mr. Collins, I'll try to make sure that my questions are more directed and I'll try to be as, a little bit quicker with it. I just want to make sure that I've asked all the questions I need to ask of you with regard to your work in the store. And I apologize for the tedium that I'm sure my questions must be provoking, so --

A No problem.

Q -- please, please forgive me. When you decided to attempt to lift the fingerprints from those various areas of the store, as you've already indicated, you did, in fact, make attempts to lift latent fingerprints from various areas, inside the front door, around the cash register, places like that; is that correct?

A That is correct.

Q How many usable prints did you obtain?

A I did not evaluate them. I don't know how many of those prints are usable or identifiable.

Q Okay. So you don't know how many of the prints that you took were of value as far as identification purposes; is that correct?

A No, sir; I do not.

MR. MEARS: Your Honor, I've already shown this to Mr. Hardy, and it's been marked as Defendant's Exhibit 17. It is a, an enlargement of Mr. Collins' drawing of the inside of the store.

Q Mr. Collins, is it okay if I ask you some questions with regard to this particular, your drawing as it's blown up?

A Certainly.

Q Does it appear to be a fair and accurate representation of your smaller copy?

A Yes, sir; it does.

Q Okay. Now, with regard to the points in the store that you attempted to lift latent prints, could I ask you just very quickly to come down and make sort of a general circle in that area where you attempted to lift latent prints? And if I could borrow the court reporter's red pen? And I realize this does not have the other areas, but just so that the jurors could see where you made attempts to lift prints.

A (Witness steps down from witness stand and refers to drawing) Certainly, I worked the area of the entry and exit point which is the door in front of the store. I worked the area in and around the cash register where that it, understanding that from the position of the victim that he was in this area at the time the perpetrator entered. I worked this area of the counter. There is some, some items here. This is the general area where you slide your different items that you're going to purchase across, across the counter and in most areas are likely that you would lean up on the counter. This area was processed. I processed the keys and the, the reachable areas of the cash register. I processed in the corner areas along in these areas

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 6 of 60

of the counter under the assumption that it was possible that someone came around and attempted to enter the cash register. Whether they did or not, I don't know. But that's just, just a likely area that, that logically tells me that these areas need to be processed for prints. Also I went from this area to the area, in this area of the store where the coolers would be located. And since this particular rod had been moved, I processed those handles for the door and the outside portion of the glass. The inside portion of the glass in the cooler area was not possible to print it simply because of the, of the condensation that occurs on the inside of these glass windows and, and I don't have anything on glass that would develop it. Powder would just make a mess on, on the wet area. So that area was not processed. Those are essentially the areas that I felt like the person may have been, moved about the store or been in during their periods of time within the store. And those are the areas that I processed for, for the possibility of latent prints.

Q Mr. Collins, while you're still down here, I want to ask you to look at State's Exhibit 105, and orient that, if you will, to your drawing with regard to the location of Mr. Slysz when you saw him?

A This, this stick figure that I have drawn here behind the counter, and let me get to where maybe -- Is that better? Okay. Great. This stick figure that I have drawn represents the figure of Mr. Slysz. And obviously, it's a little more curvature

Case 7:14-cv-00089-MTT Document 18-16 Filed 07/14/14 Page 7 of 60

in shape with the feet being pointed a little bit more forward this way and with the head being up against the counter in the area of, right up under the, under the counter area. He's in a almost, kind of on his back face up. This chair probably is a little closer to the, to the counter than it indicates in the drawing, but it's the general area it was located in. And this whole area, from here to here, is five, maybe six feet in width.

Q You've made a drawing -- you've made a notation here, what appears to be a seven feet, three inches and an arrow there to the back of the chair. What does that indicate?

A This, this arrow goes on past the chair and it actually indicates number two, the one and two, which are your .25 caliber shell casings that were recovered from this area of the, of the store.

Q Okay. So from the front of the cash register to where the shell casings were located is approximately -- your measurement was seven feet, three inches; is that correct?

A That is correct.

Q And the other shell casing was five, six inches; is that correct?

A That is correct.

Q From looking at the photograph and the position of Mr. Slysz's body as you found it, were you able to make, based upon your experience, a determination as to his location, out where he was standing or seated at the time he was shot?

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 8 of 60

A His most likely location, based on, on the scene and what I saw, is he would most likely have been probably sitting in this chair and the chair may have been somewhat closer to this particular counter.

Q What was in the front of this counter? Do you recall?

A Uh, seems like there was a money order machine. There was some, some paper boxes, adding machine, the shelf. It's, it's cut off from, from the, from the customer side of the shelf by, by things that are stacked up, as in most any particular store that you walk in.

Q Based upon this, did you see an area where it appeared that groceries would be bagged and sacked? Was it to the left of the counter?

A No, sir. The, the area that the customer would pass items back across for, for checkout would be on this side of the cash register and it's an area that's, that's comfortable to work in. It's, what, two or three feet?

Q About right here?

A That's correct.

Q Okay. Thank you.

A Thank you (witness returns to the witness stand).

Q Mr. Collins, when you processed the scene, did you have available to you any information, and I think I know the answer to this question, but did you have any information about any individuals who might have been in the store at the time Mr.

Slysz was, was shot?

A As far as identity goes?

Q Yes, sir. Identity, size, weight, anything at all?

A Nothing other than the fact that they stated that there might have been two black males in the store.

Q And that was the extent of, of the knowledge you had about who might have been in the store at the time that Mr. Slysz was shot?

A Yes, sir; that's correct.

Q Okay. Other than the items that you have found -- you've already testified you found the guns that Mr. Slysz had on his, the cigarette packages and things of that nature. Were three any other items of evidentiary value that you found or located in, in the store that morning?

A I did collect a roll of paper towels that was under the shelf directly in front of the area that he was sitting in. The reason I collected that particular roll of paper towels as, as the -- it appears that as he fell from the chair to the floor, that pencil struck the paper towels and left a pencil mark on it. So that was photographed and collected.

Q Excuse me. Mr. Collins, with regard to that, as, as an interpretation of that particular bit of evidence that you collected, did that indicate to you, or would it indicate to you that Mr. Slysz was shot rather unexpectedly?

A Yes, sir; I would think so. It would appear to me,

and, and there again I don't -- this is just totally an assumption on my part. It appears that he was doing some type of paperwork and probably was unaware that it was fixing to happen.

Q Any other item of evidentiary value?

A Nothing that we collected at that time; no, sir. There, there were some other items there but we did not collect them.

Q Did anyone, to your knowledge, make an attempt to run the cash register tape to determine what the last item was sold and when it was sold?

A It was photographed. It was still in the cash register. If I'm not mistaken, that was collected. That would have probably been collected by Det. Weaver. I did not personally collect it. I don't think there was a time displayed on there. The date was there but I'm not -- I don't think there was a time on it.

MR. MEARS: I believe I'm through, but let me make sure. One moment, Your Honor.

Q Mr. Collins, one area that I'm still confused about. The fingerprint that was lifted, the latent that was lifted from the portion of the carton, beer carton --

A Yes, sir.

Q -- did you do that or did Det. Hutchinson do that?

A Sgt. Hutchinson developed and lifted that print.

Q Okay. You didn't have anything to do with the

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 11 of 60

identifying of it as a print or dusting it or lifting it; is that correct?

A No, sir. That's correct.

MR. MEARS: Okay. I have nothing further, Mr. Collins. Thank you for your patience.

FURTHER REDIRECT EXAMINATION

BY MR. HARDY:

Q I think we've talked about facing the store on the right hand side. The other store -- other side of the store, was any scent gathered on the other side of the store, to your knowledge?

A No, sir; not that I'm aware of.

Q The other side of the store, you're familiar with what it looks like?

A I probably looked around there. I don't remember any details on that side of the store. I -- There was nothing around there that appeared to, to require that I work in that area.

Q 177 and 175?

A These are photographs, once again, it's taken from the W. Jackson side of the Junior Food Store. 175 shows a trash dumpster that is located just to the left of the store. And the other photograph is closer and it basically takes a photograph of the left side area of the store.

Q Are they both fair and accurate representations?

A Yes, sir; they are.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 12 of 60

MR. HARDY: Offer them into evidence, Your Honor.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

MR. HARDY: That's all I have, Your Honor.

THE COURT: Gentlemen, may this witness be excused?

MR. HARDY: We can put him on call. I think we've got his beeper number or how to get him at the G. B. I. if we need him.

THE COURT: Thank you, sir.

AGENT COLLINS: Thank you, sir.

MR. HARDY: Jim Howard.

THE COURT: Dr. Howard, if you would raise your right hand?

Do you solemnly swear or affirm that the evidence you'll give this Court and this jury concerning the matter now pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

DR. HOWARD: Yes, sir.

THE COURT: Mr. Hardy?

DR. JAMES W. HOWARD

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q What's your name, please, sir?

A James W. Howard.

Q Where are you employed, please, sir?

A I'm employed with the Georgia Bureau of Investigation Crime Lab in Moultrie, Georgia.

Q And how long have you been with them, Jim?

A I've been with the crime lab system for twenty-three years.

Q And what do you do for them?

A I am a microanalyst and criminalist.

Q Can you tell us a little bit about your background and training, please, sir, your educational experience?

A Yes, sir. Uh, I have a Bachelor's Degree in Chemistry from Georgia State College in Atlanta. And a Ph.D. in Inorganic Chemistry from the University of Virginia. And after three years of post graduate research, I taught at Ford International University for a year. And then in September of 1974 started as a crime lab scientist with the Atlanta laboratory where I received my initial training. And in November of 1978 moved to Moultrie and became a scientist in the Moultrie laboratory where I've been since, for a little over nineteen years.

Q You're a microanalyst, I think?

A Yes, sir.

Q And what does that mean?

A As a microanalyst, uh, the, the main duties include the receiving and processing of evidence in criminal cases and the use of the microscope being one of my principal tools for

analysis.

Q Is another one of your fields ballistics?

A Yes, sir. I am a firearms examiner, which includes the test firing of weapons and the retrieval of test bullets and cartridge cases and the comparison of these items to evidence bullets and cartridge cases.

Q How many years you been doing that, Jim?

A For twenty-two of my twenty-three years.

Q And you've had many hours of training in that particular field?

A Yes, sir. Uh, as -- For a total of two years in Atlanta while there for my little over four years.

Q You've been doing it twenty-two years?

A Yes, sir.

Q Have you ever testified in a court of law and I guess basically all of south Georgia as an expert in this field?

A Yes; I have.

Q And is another field of yours shoe impressions?

A Yes, sir. As a, as a criminalist I've also trained for a short period of time in Atlanta and have done case work in the area for about twenty-one years.

Q You've testified as an expert in that field likewise?

A Yes; I have.

MR. HARDY: Your Honor, we'd submit him in the field of expertise criminalist and ballistics, firearms as well

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 18 of 60

as shoe impressions.

THE COURT: Mr. Mears?

MR. MEARS: Your Honor, we have no objections to Dr. Howard being qualified as an expert in the area of ballistics. We don't have any objection to him being qualified in any of the other areas other than shoeprint identification. And we would continue in our objection to that, if I could simply have a continuing objection based upon our other objections made in this area.

THE COURT: All right, sir. Considering all the matters that I have heard in this area, I'll qualify him as an expert in all fields tendered at this time.

MR. MEARS: And I can have a continuing objection with regard to shoeprints?

THE COURT: Yes, sir.

BY MR. HARDY:

Q Dr. Howard, the State of Georgia versus Ray Jefferson Cromartie, were you asked to do some ballistics work, firearms work?

A Yes, sir. There were some items tendered to the laboratory for initially comparison purposes and then shortly thereafter a weapon was tendered for comparison identification purposes.

Q I show you some items and ask if you can identify them for me, please, sir. First, I'll show you what's been marked as

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 16 of 60

State's Exhibit Number 29, and ask if you can identify that for me, please, sir?

A Yes, sir; I can.

Q What is it?

A State's Exhibit 29 is a, a metal jacketed bullet that was delivered to the laboratory on our case number M94-1810, and involved a case identified as, the victim being Dan Wilson, and the evidence was brought, brought to the lab by Glenn Hutchinson.

Q What caliber is that projectile?

A That is a .25 caliber metal jacketed bullet.

Q You can tell that from looking at it?

A Yes, sir. Yes, sir; I can.

Q I show you Number 156, and ask if you can identify that for me, please, sir?

A Yes, sir. State's Exhibit 156 is identified by our crime lab case number and item number and as with State's Exhibit 29 was delivered by Glenn Hutchinson to the lab. And State's Exhibit 156 contains a .25 caliber cartridge casing which is further identified as the part of the bullet that, that, of the total bullet that holds the projectile that is fired through the barrel of the weapon.

Q I show you 162, and ask if you can identify this for me, please, sir?

DR. HOWARD: Your Honor, the weapon is clear.

THE COURT: Thank you, sir.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 17 of 60

A I do recognize State's Exhibit 162 by the serial number and my initials. It was submitted on the Dan Wilson case and a second case involving a Mr. Slysz as the victim. State's Exhibit 162 was also delivered by Glenn Hutchinson to the laboratory.

BY MR. HARDY:

Q What caliber and what type gun, brand name?

A State's Exhibit 162 is a Raven Arms, .25 caliber semi-automatic pistol.

Q I show you items Number 159 and 160, and ask if you can identify them for me, please, sir?

MR. HARDY: I don't think 156 has been offered. We'll offer that at this time.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

A State's Exhibits 159 and 160 are identified by our crime lab case number and item number and each of, 159 and 160, contain one .25 caliber cartridge casing.

BY MR. HARDY:

Q And they are associated with which case?

A These were associated with the Slysz case and both of these were delivered to the laboratory by Chuck Weaver, April the 11th of 1994.

Q 158 and 157, if you could -- they're in this bag. If you could look at them for me, please, sir?

A Yes, sir. State's Exhibits 157 and 158 are both

identified as .25 caliber metal jacketed bullets. And these were transferred to the Moultrie lab by Dr. Parker after the autopsy.

Q They were down in your custody until you brought them down, I think, Monday?

A Yes, sir. Yes, sir.

Q And those are both .25 full?

A These are both .25 full metal jacketed bullets and, and are identified by our crime lab case number and item number.

Q Your initials are on those too?

A And my initials are on the, on the base of the bullets.

Q Now, tell us how you make comparisons of projectiles with guns and shell casings with guns? Can you do that?

A Yes. Yes; I can. If I can just, just by holding 162 --

Q Yes, sir.

A -- just for exhibit. The, the testing procedure in a firearms identification case begins with a, of course, an examination of the cartridge cases recovered from a, a scene and, of course, any projectiles or, or bullets that may have been recovered for comparison to ascertain their caliber and microscopic characteristics, if they are suitable for comparison purposes and, and the like. And if a weapon is submitted --

Q First, did you examine the casings in this case in that manner?

A Yes; I did.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 19 of 60

Q All right. Go ahead.

A The, uh, the initial examination was made to determine, first of all, what caliber they are, and are they suitable for comparison, and then if a weapon is submitted, the weapon is examined, function for operability and then test fired using ammunition like the ammunition or the evidence submitted with the case.

Q Is that what you did in this case?

A Yes. Yes; I did.

Q I show you this little box containing 161, and ask if you can identify this?

A Yes, sir.

Q What's that?

A State's Exhibit 161 are three test firings including a bullet and a casing which were recovered from a water tank that I, I discharged the, the weapon into. Uh, the water enables the examiner to recover the bullets without any extraneous damage to them other than what the barrel of the weapon has placed on the, on the bullets, on the test bullets.

Q Is that what you did in this case?

A That's what I did in this case.

Q Are those the test firings, 161, which were fired from 162?

A From 162; yes, sir.

Q Into the water tank?

A Yes, sir. And, of course, these are identified by our case number, the make and serial number of the weapon and my initials.

MR. HARDY: Your Honor, we'd offer 161 into evidence, test firings.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q So what's the next thing you do? You examine the shell casings. You make the test firings. What do you do next?

A After obtaining the test firings, both the bullet and the casings, these are examined to determine the best of the tests, so to speak, and then those, those tests are compared microscopically on a ballistics comparison microscope, which is equipped with two stages to accept the test bullet or casing on one side and the evidence bullet or casing on the, on the second side. And these are, these are microscopically compared together to determine the, uh, the presence of suitable markings, which are called tool markings, on both the evidence and the test to see if they will match microscopically for a determination of whether or not that bullet or that casing was fired in or from the, uh, the weapon submitted.

Q Is that what you --

A And if the test rounds match microscopically, of course, the evidence, then we can conclude that the evidence was

also fired from that weapon that was submitted.

Q Is that what you did in this case?

A Yes; I did.

Q Is that the procedure you used?

A Yes, sir.

Q Is that the standard procedure in your lab, the F. B. I. lab, the Alabama lab --

A Yes. Yes, sir; it is.

Q And you've been doing that for how many years?

A For twenty-two years.

Q You've done that, I guess, thousands of times?

A Over the years in, in terms of, of exhibits and so forth; yes, sir.

Q The bullet from Mr. Wilson, the two from Mr. Slysz, do you have an opinion as to what fired them?

A Yes, sir; I do.

Q What is that opinion?

A My opinion is that the, uh, the bullets in State's Exhibit 29 and in Exhibits 157 and 158 were fired from Exhibit 162.

Q As to the casings, 160, 159 and 156, do you have an opinion as to which weapon they were fired from?

A Yes; I do.

Q And what's that opinion?

A Likewise, the, State's Exhibits 156, 159 and 160 were

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 22 of 60

fired in State's Exhibit 162.

Q Any doubt in your mind?

A No doubt.

Q This weapon, how does it extract the, the casings?

A As with a, a weapon of this type, it's got an extraction mechanism that, if I could illustrate, when a test round is fired, or a round is fired, the slide is pushed to the back, to the rear of the gun, and as it, as it proceeds to the rear of the gun it extracts the fired casing and ejects it backward and --

Q Up in the air?

A -- and, and somewhat to the right of -- if the shooter were right handed it would eject it back over his right shoulder. And in, in the process of returning forward it loads in a new round in, in the chamber for the next firing.

Q So it throws it out and then it --

A And then it reloads a, a new round into the --

Q It goes out and it hits or whatever it may do? The shell goes up in the air and it's --

A And it comes down. But usually in, in this type extraction it will come out over the right shoulder of a right handed shooter.

Q Now, did you do some shoeprint work?

A Yes. There was also a set of plaster casts and photographs submitted for comparison to four separate pairs of

shoes.

Q First let me show you this 13 if I could, please.

THE COURT: Gentlemen, I don't think we addressed at the end of, I believe it was Mr. Collins' testimony, whether or not 13 would be admitted. Do you have any objections?

MR. MEARS: I don't have any objection at this point, Your Honor, subject to everything else that's been objected to.

THE COURT: Yes, sir. 13 is admitted without objection.

A State's exhibit 13 are, excuse me, two plaster casts that were submitted for comparison purposes. And each of the casts has been identified with a, a black marking pen with our crime lab case number, item number and my initials and these were brought to the laboratory by Fran Everett.

BY MR. HARDY:

Q Are they delineated as to which is right foot and which is left foot?

A In, in my examination procedure I, I placed on the bottom of each of the casts the, uh, indication of which shoe type impression it was, either a left shoe or a right shoe. Yes, sir; that is my writing.

Q Do you have one for each foot?

A Yes; I do. Yes, sir. There is a left shoe impression

and a right shoe impression.

Q I show you these photographs which are 98, 99 and 100. Can you identify them for me, please, sir? Have you seen them before?

A These are State's 98, 99 and 100. I have seen photographs similar to these. These are not the ones I examined though earlier.

Q Your bag was right there the last time I saw it. Were your pictures in it? It's been misplaced somewhere.

Let me just show you the bag, if I could. And is that what -- This, I think, was in your box that you brought down with the shoes Monday, if I'm not mistaken. If you could just look at all of those, please?

A Yes, sir. May I return those to you, please?

Q Yes, sir.

A I don't believe this has been marked with an exhibit number yet.

Q We really don't -- Just look at them first, please.

A Okay.

MR. HARDY: We'll put 179 on it, please, Your Honor.

Q I think you brought these to court; didn't you, Mr. Howard?

A Yes; I did. State's Exhibit 179 will be identified as a manila envelope containing a total of twenty photographs, eighteen of which depict shoe impressions.

Q I think we've already given those to Mr. Mears.

A I believe he does have a copy of these, if, if I, I do recall. And ten of these photographs were examined as comparison to a set of four submitted shoes. Actually, the remaining eight were also compared, but were not inclusive.

Q If we could just put these over here for now.

MR. HARDY: Your Honor, we'd offer this brown bag which contains the photographs 179 into evidence.

MR. MEARS: I don't think we have any objection, Your Honor. Just let me make sure.

MR. HARDY: We've already given a copy, I think, to Ms. Leonard.

A Each of the photographs has been marked with our case number and, and initials.

MR. MEARS: We have no objection, Your Honor, to the remaining photographs.

THE COURT: They're admitted without objection.

BY MR. HARDY:

Q I think you received some shoes into the lab to make a comparison with?

A Yes, sir. Yes, sir. There were four pairs of shoes submitted on two separate submissions.

Q First, Number 18-B here. I think those were submitted first? Mr. Cromartie's shoes?

A State's Exhibit 18-B is identified by our crime lab

case number and item number eight, and, uh, have been further identified on each of the two shoes involved. These were identified as Adidas' belonging to Mr. Cromartie. These were submitted along with the, uh, the two casts by Fran Everett.

Q The bag is about to tear up. I'm trying to find another bag for you, Mr. Howard. We'll just put them back in the box. I think you brought these down to Court Monday?

A Yes; I did.

Q Did you receive three other pair of shoes into the evi -- to your lab?

A Yes, sir. Yes, sir. Those three were delivered along with the photographs in State's Exhibit 179.

Q 16-A, whose shoes are they?

A 16-A is identified by our crime lab case number and item number and my initials and these were in a bag labeled "Thad Lucas".

Q Number 14-A?

A State's Exhibit Number 14-A, again, is identified by our crime lab case number and item number and is a pair of basketball shoes in a bag labeled "Corey Clark".

Q What type of shoes were Lucas' shoes and Corey Clark's shoes?

A The, uh, the shoes identified as belonging to Mr. Lucas, a pair of Nike basketball shoes.

Q Mr. Clark?

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 27 of 60

A Mr. Clark's, contained a pair of Nike basketball shoes.

Q Number 27-C, whose shoes are they?

A 27-C, the, uh, State's Exhibit 27-C is, again, identified by our crime lab case number and item number, my initials and contained a pair of Converse All Star canvas shoes in a bag marked "Gary Young".

MR. HARDY: I ask that he step down here, please?

THE COURT: Yes, sir.

A (Witness steps down from witness stand)

BY MR. HARDY:

Q Would you get the plaster cast out for me, please, sir?

A Yes, sir.

Q Would you --

MR. HARDY: Your Honor, with the Court's permission, if he could be allowed to hold them up so the jury can see them and where we could lay them on the rail, or I could hold one and he could hold one, if we could, please?

THE COURT: Yes, sir.

BY MR. HARDY:

Q Could you tell me, the one I'm holding, which shoe is this?

A This is the right shoe impression.

Q The one you're holding?

A Is the left shoe impression.

MR. HARDY: If we could display them to the jury,

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 28 of 60

please?

THE COURT: Yes, sir.

A If one were to view the shoe impressions, you would need to imagine this as a reverse image of the shoe itself in that you are looking at the, the impression as cast this way so that if you were to look at it, it would look like a left shoe when it's actually a right shoe. And, of course, the same for this cast of a left shoe impression. This, this being the right shoe impression and this being the left shoe impression.

BY MR. HARDY:

Q If we could just place them in the box so we won't break these things.

A If I can, I'll place the left one --

Q Put the other one here. Photographs, did you look at -- you say you used ten of these photographs?

A Yes. Ten of the photographs were --

Q Do you know which ten you used?

A Yes, sir. Were used in the comparison against the shoes belonging to Mr. Cromartie.

Q Did you compare all four pair of shoes to the plaster casts and the print?

A Yes; I did. Yes; I did.

Q Can you show me which pictures you used?

A Yes, sir.

Q Are they noted on the back or what?

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 29 of 60

A They are. Each one is noted. Those being the set depicting a, a right shoe impression, these depicting a left shoe impression.

Q So then it would be these pictures? Which is which?

A All right. These which are --

Q Right and left?

A -- right and left. These are the same impression under different lighting and photographic conditions, but they do show the, the same, uh, the same impressions, being a left shoe.

Q If we could just put a paper clip on them?

A Yes, sir.

Q Maybe put "L" on -- Do you have a pen that you could put "L" maybe for left foot?

A Yes; I do. Yes, sir.

Q Just write on the back, "Left".

A Of each?

Q If you would, please.

A Okay.

Q And you have pictures you say would be the right foot?

A And these other five show the same impression which is a right shoe impression under different lighting and photographic conditions, but, again, are of the, the same shoe impression. All right.

Q So you took then the pictures. How did you make your comparison? Take your seat again, please.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 30 of 60

A (Witness returns to the witness stand) The, both the comparisons with the plaster casts and the photographs were done on a side by side comparison, of course, with measurements being taken of the casts themselves and of Mr. Cromartie's shoes and of the --

MR. MEARS: Your Honor, excuse me. I'm going to object to the characterization of anyone's shoes. They were introduced as a particular exhibit number. Whose shoes they are is a matter that's going to have to be determined as a fact. And I think it's inappropriate to have the characterization placed on the shoes for comparisons. So I would object on that basis, most respectfully.

THE COURT: All right, sir. Any response?

MR. HARDY: They've already been admitted into evidence as to whose shoes they were, Your Honor.

MR. MEARS: They were admitted into evidence as an exhibit number having been allegedly taken from a particular person. I think it's inappropriate to continue by saying that these are somebody's shoes. That's something the jury is going to have to determine.

THE COURT: Sustained.

BY MR. HARDY:

Q Did you compare the four pairs of shoes you had?

A Yes; I did.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 31 of 60

Q Against the pictures and as well as the impressions you had?

A The two casts of the impressions, yes; I did.

Q Okay. Did you come to some conclusion?

A Yes; I did.

Q And what all -- How all did you do this now?

A This was on a side by side comparison.

Q Okay.

A Also including the use of a ruler for measuring length and width of the impressions and the submitted shoes.

Q You used your procedure you used in other cases?

A Yes, sir.

Q Was this based upon the scientific procedures that you've used in the past?

A Yes.

Q Based upon -- Did you come to some scientific certainty as to an opinion?

A I do have an opinion; yes.

Q Okay. Now, --

MR. MEARS: Your Honor, I'm going to object to the form of the last question unless there's going to be a response given. There was no response to that particular question. So I'm going to object to the form of the question, that part about scientific certainty.

THE COURT: Overruled.

BY MR. HARDY:

Q Did you come a scientific opinion?

A Yes; I did.

Q That's based upon your training and experience?

A Yes, sir.

Q And what was that opinion?

A That the, both of the casts, which are included in State's Exhibit 13, and the ten photographs as submitted in State's Exhibit 179, were similar to the, to the, uh, the pair of shoes in State's Exhibit 18-B, which were identified as the shoes of Mr. Cromartie.

Q Did you look at the other three pairs of shoes that were submitted to you?

A Yes; I did.

Q Are they similar?

A They, they are not similar, and in the comparison were eliminated as having possibly made the impressions in the photographs and the, the plaster casts.

Q Did you make some xerox copies of the bottom of the shoes?

A Yes; I did.

Q Do you have those with you?

A Yes; I do.

MR. HARDY: I think we've given those to Mr. Mears.

A Each of the xerox copies has been labeled with our

crime lab case number and item number and which of the shoes was photocopied.

Q Are they all of the same shoe, meaning right or left, or how did you do it?

A The -- In, in the, uh, in the case of the item submitted with the photographs, the right shoe was photocopied and in the case of the, uh, the shoes identified as being Mr. Cromartie's, the right and the left shoe were photocopied.

MR. HARDY: Show those to Mr. Mears, please.

Q I think you said you xeroxed these?

A Yes; I did.

Q I think you used your item number?

A Yes, sir. Yes, sir.

MR. HARDY: I think we might -- we may have a different number. If we could correlate the two, please.

A Would you like a correspondence to the, to the exhibit number of each?

Q Yes. To our exhibit numbers if we could, please.

A We could do that.

Q Now, you said that you had two of the Adidas?

A Correct. Correct.

MR. HARDY: If I could borrow the Clerk's stapler, please?

Q If you could write on the back which to --

A Which State Exhibit Number?

Q Be 180.
A Is that 180 or 18?
Q No. I'm, I'm going to number your xeroxes there 180. It correlates. What does 180 then correlate to?
A To State's Exhibit 18-B.
Q If you could write that on the back of that, please?
A All right.
Q Get the next one, please. Be 181.
A Yes, sir.
Q Which bag does that correspond to?
A State's Exhibit 181 would correspond to State's Exhibit Number 16-A.
Q If you'd write that on there for me, please. Your number was 11?
A Yes, sir. Yes, sir. Our item number on, on case M94-1784.
Q Is that what you've written on the back?
A Yes, sir. I made two photocopies of State's Exhibit 16-A depicting the heel area in one and the sole or the ball of the outsole on the other.
Q If we could just staple them together and get the next one, please. Put 182 on it, please.
A State's Exhibit 182 is identified with State's Exhibit 14-A.
Q Do you have one more?

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 35 of 60

A And we have one more which is associated with State's Exhibit 27-C.

Q Are each of these xerox copies fair and accurate representations of the bottom of the soles of these four pairs of shoes?

A Yes; they are.

MR. HARDY: I'd like to exhibit them to the jury, Your Honor?

THE COURT: Yes, sir.

MR. MEARS: Your Honor, I'm going to object to --

THE COURT: Yes, sir.

MR. MEARS: -- first of all, they haven't been introduced yet. Secondly, I'm going to object -- the highest and best evidence of what the soles look like are the soles themselves --

MR. HARDY: We can do that. We'll do both.

MR. MEARS: May I finish my objection?

THE COURT: Yes, sir.

MR. HARDY: Excuse me. Excuse me. Excuse me.

MR. MEARS: To make a xerox copy of a physical item, of physical items of evidence that's already before the Court and then use a xerox of that particular item is not appropriate. The highest and best evidence of what the soles look like in the eyes of Mr., Dr. Howard and these jurors is, in fact, the soles themselves. And I

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 36 of 60

certainly understand the reason, that the shoes are messy and they're probably not the nicest things to handle. But these xerox copies aren't the shoes and they're not the best evidence of what the soles look like. And I would object to it.

THE COURT: All right, sir. Mr. Mears, the jurors will have an opportunity to examine the shoes at the appropriate time. I see no problem in admitting these photographic copies. The objection is overruled.

MR. MEARS: May I ask for instructions to the jurors that they're not to consider the xerox copies as evidence of what the shoes look like?

THE COURT: Yes, sir.

Ladies and gentlemen of the jury, the xerox copies are going to be passed around for your convenience at this time in looking at whatever these xerox copies do depict, tread designs, et cetera. They are not to be considered as substitutes for the shoes that have, in fact, been admitted into evidence.

MR. HARDY: Could he be allowed to step down, please, Your Honor?

THE COURT: Yes, sir.

A (Witness steps down from witness stand)

BY MR. HARDY:

Q If you could hold those two for me, please, Mr. Howard?

A Yes, sir.

(Whereupon exhibits are shown to the jury)

MR. HARDY: I thought I'd introduced them, Your Honor. Maybe Mr. Mears -- If I hadn't, I will. 180, 181, 182 and 183, Your Honor. These are for demonstrative purposes. Introduce them, Your Honor.

THE COURT: Any objections?

MR. MEARS: If they're being introduced for demonstrative purposes in lieu of passing the photographs out, if they're not going to go out with the jurors as part of the evidence that's been admitted, I don't have any objections, Your Honor. If they're being offered as substantive evidence for the jurors to make comparisons based upon these, then I do object on the basis that the highest and best evidence of what the soles look like are the shoes themselves.

THE COURT: Any response?

MR. HARDY: We're going to show them the shoes too, Judge. I want them to look at the shoes. The Clerk can keep these. We'll have the real shoes out.

MR. MEARS: If it's only demonstrative, then I don't have any --

THE COURT: Mr. Hardy, if you're going to stipulate at this time that only the shoes will go out as opposed to this, then so be it --

MR. HARDY: The Clerk can keep these --

THE COURT: So be it. They're admitted --

MR. MEARS: I have no objection.

THE COURT: -- under those reasons.

BY MR. HARDY:

Q Step on down here, Mr. Howard. The ones that have been -- 16-A. What does it say on the bottom?

A In the case of 16-A, these are Nike Air basketball shoes.

Q Step down that way so they can all see.

A (Witness complies)

Q 14-A, what kind of shoes are these?

A These are also Nike shoes.

Q 27-C?

A These are Converse All Star canvas shoes.

Q 18-B?

A This, this pair is a pair of Adidas.

Q Go ahead and take your seat again, please, sir.

A (Witness returns to the witness stand)

Q You made your ballistics comparisons and the shoe comparisons?

A Yes; I did.

Q Is that the extent of your work there, Dr. Howard, on this particular case?

A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 39 of 60

MR. HARDY: I think it's all been introduced into evidence, if I'm not mistaken.

THE COURT: Yes, sir.

MR. HARDY: The bullets and everything, I believe. I think everything up here has been offered and admitted. If I'm not correct. Is that correct --

THE COURT: Mr. Hardy, I don't know if I know off the top of my head everything is up there. I know quite a bit has been admitted. At the appropriate time we can go back through the list and make sure.

MR. HARDY: Thank you. Yes, sir.

CROSS EXAMINATION

BY MR. MEARS:

Q Good afternoon, Dr. Howard.

A Good afternoon, sir.

Q Dr. Howard, I apologize for having to ask you a series of questions after 5:00 o'clock in the afternoon before this jury. I will do my best to be short and brief and ask you the questions that I need to ask you. But even at this late hour in the afternoon I have to go over a few things with you. Okay?

A Very well.

Q Now, first of all, you were only given one set of plaster, excuse me, hydrocal prints to compare; weren't you?

A Hydrocal casts or casts, casts of shoe impressions? Yes, sir. Just one set.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 40 of 60

Q So when Mr. Hardy shows you five or six different pairs of shoes, he didn't show you, and no one showed you five or six different shoeprints to make comparisons of; did they?

A No. No.

Q So -- I'm sorry. Go ahead and --

A No. Go ahead.

Q So you didn't, you weren't on the scene at the location where these hydrocal prints were taken; were you?

A No; I was not.

Q Okay. You did not direct or give instructions to or prepare these particular prints for comparison purposes; did you?

A No, sir; I did not.

Q So you were limited, were you not, in the comparisons to be made because you only had one set of prints to make comparisons of? Would that be a fair statement?

A I, I only compared what was submitted to the laboratory; correct.

Q And that's common sense. You had one set of prints to compare and that was all? No one brought you any other prints to compare?

A Not casts.

Q Not casts. Now, you -- and, and I objected and you were using the terms that, so and so's shoes, so and so's shoes. Do you have any direct personal knowledge as to who owned any of these shoes?

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 41 of 60

A No.

Q That was identified to you by the people who brought it to you and by the names written --

A By the submitters and investigators; yes, sir.

Q And you don't know when the individuals were wearing those particular shoes even if they were correctly identified; do you?

A That's correct.

Q And you don't know whether or not anyone was wearing a particular pair of shoes on April the 10th; do you?

A No; I don't.

Q You're limited, as a forensic scientist, you're limited by the facts as they're presented to you for examination; are you not?

A That's correct.

Q And it doesn't take scientific knowledge, does it, to exclude some shoeprints from the impressions you were given to review; does it?

A No; it doesn't.

Q Okay. It doesn't take --

A It, it takes, I think, observation powers and logic; yes, sir.

Q And I'm certainly not taking away from your expertise. Please don't misunderstand me. But when any individual is asked to look at a shoeprint, particularly of an athletic sole

shoeprint from Adidas, from Nike or some other brand name, then obviously not the same shoe, not the same shoe designed sole, it's not a scientifically required process, is it, to make --

A We're, we're using scientific processes whether we realize it or not.

Q All of us?

A All of us are. But a lay person or a so-called shoeprint expert could and should arrive at the same conclusion in those cases.

Q Should agree with the lay person?

A Should agree with the lay person.

Q Okay. My point is that with regard to the comparisons of the shoeprint and the casts and these shoes, you were limited by the shoes you were given to compare to?

A Again, I only could, could operate with what I was given; correct.

Q And were you also limited by the quality of the cast print that was brought to you for use?

A Yes; partly. Yes; I was. Yes; I was.

Q You can only make comparisons of the print that was given to you, and I'm referring to the hydrocal --

A Castings.

Q -- casts. You are limited somewhat by the quality of that cast; are you not?

A Yes. Yes; I was.

Q No matter how much scientific observation you provide to that process, there are some limitations that come with the process because --

A With, with the evidence; yes, sir.

Q Okay. Now, you were asked to look at State's Exhibit 27-C, which is Gary Young, has his name on it.

A As identified by the package.

Q That's what it says. And you looked at this and you make -- it's not the same shoe?

A In elimination; yes, sir.

Q And you did the same thing with Thad Lucas and with Corey Clark? Those shoes that were identified to you as coming from them?

A Yes.

Q Okay. Now, I want to just set all of those aside because those are not something that you had to apply a scientific -- I know what --

A A, a further examination procedure to?

Q Yes, sir. Okay. Now, you've identified photographs, and we've looked at this, we've looked at these photographs before.

A Yes; we have.

Q Now, these photographs were brought to you to make observations, to assist you in applying your scientific principles to identifying and perhaps making comparisons to these

cast prints and other shoes; is that correct?

A That's correct; yes, sir.

Q Were you given any other shoeprints to look at?

A Photographs of shoeprints; yes.

Q Okay.

A There were an additional eight photographs of shoeprints in State's Exhibit, I, I believe it's 180.

Q 179.

A 179.

Q These are the ones that we've looked at.

A Yes, sir. Yes, sir. These, these were examined and were -- In these eight photographs are depicted two separate shoe impressions.

Q So, the separate shoe impressions, the two separate ones that are depicted in the remaining photographs, were you given hydrocal casts along with these photographs?

A No; I was not.

Q Would that have assisted you in making comparisons?

A Against the submitted shoes?

Q Yes, sir.

A No, sir; I don't believe it would have assisted.

Q Would it have assisted you in identifying the type of shoes?

A Possibly, yes, sir; it would have.

Q Looking at the prints that you were given --

A Yes, sir.

Q -- that relate to the casts, can you tell from looking at those prints, and I believe these are in evidence -- these are the same --

A State's Exhibit 98 would correspond to the State's Exhibit -- to State's Exhibit 179.

Q At least a portion --

A To a portion of these, in this case State's Exhibit 98 would correspond as a right shoe impression to the five identified in State's Exhibit 179. And there are two left shoe impressions, State's Exhibits 99 and 100, that would correspond to left shoe impressions identified in 179.

Q Now, looking at those photographs, can you make a determination as to whether or not the person wearing those shoes at the time the impression was made was running or walking?

A I, I'm not a, an expert in that particular endeavor. But these appear to be walking prints.

Q They're fairly flat?

A They are very flat. They're full impressions. Do not seem to be distorted in any obvious manner.

Q Isn't it -- Well, would it be a fair assumption, Dr. Howard, that an individual running in a pair of athletic shoes with distinctive treads in, on them, if that person was running, the manner in which their feet made contact with the ground would be different than the manner in which their feet made the contact

if they were walking?

A I guess it would be; yes, sir.

Q And, again, applying observation methods to that particular subjective determination, it appears, does it not, that whoever was wearing those particular shoes at that particular time was not running but was walking?

A I, I would agree with that; yes, sir.

Q Now, with regard to the particular design tread in the hydrocal cast, Dr. Howard, --

A Yes, sir.

Q -- were you able to determine from looking at the cast the design tread? Does it have a particular name, a particular identifying sole type of configuration in the commercial market?

A You mean to be able to put a, a brand name on that?

Q Or a design name? For instance, if it's, I show my lack of knowledge of patterns here, but if it's like a quilted design or if it's a herringbone design --

A I believe -- I think we've talked about this previously. That, yes, it, it's consistent with what we would consider a herringbone pattern; yes, sir.

Q And have you had an opportunity to determine, just from in your research and looking at this case or other cases, how many different types of shoes have herringbone type of sole patterns on them?

A Numerous.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 47 of 60

Q Numerous types of --

A I, I personally cannot give you a number, but, yes, there are numerous shoes manufactured, athletic shoes that do have the herringbone pattern.

Q Okay. I'm going to show you a book, and I think you've looked at this before. Just for illustrative purposes only, and not for evidentiary purposes, Dr. Howard, I'm calling your attention to a catalog of footwear for Adidas shoes.

A Yes, sir.

Q And I'd ask -- I'd call your attention to page 61. And could you look at this particular page and determine how many types of shoes are depicted here that have herringbone configurated sole patterns?

A There are three separate models of shoes shown and each one has a, a herringbone pattern.

Q Would that herringbone pattern be similar in design to the hydrocal cast that was given to you for comparison?

A Yes. Yes; they would be.

Q Okay. Are you familiar, Dr. Howard, with the practice of athletic shoe makers to use the same sole on different types of shoes, interchange the shoes with the uppers, the soles with the uppers?

A Yes, sir. I think we've discussed this and, yes; it is a practice. I'm not familiar with how prevalent it is in the industry but it does occur and I believe with each of the

manufacturers.

Q Adidas, Nike, all of them?

A Yes, sir.

Q Okay. The three different -- I'm sorry. The three different models you here, that you've talked to here that have the similar herringbone, are those different upper sole type of shoes?

A Yes; they are. If you were to actually hold those shoes you would realize that they're each designed for a different purpose and some have more ankle support than the others. Yes; they're each three different in, in their upper design. Yes; they are.

Q You had indicated during your direct examination, I believe, that you made some measurements with regard to these shoes; is that correct?

A Yes. Both with the castings, the photographs and the, specifically the, the Exhibit 18-B, which is a pair of Adidas.

Q Would it be possible for using the, the practice of interchanging soles with uppers, would it be possible to have a different sole size and different upper size within a half, half a shoe size?

A Possibly; yes, sir.

Q You could have a ten on a -- a ten and a half sole and a ten upper?

A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 49 of 60

Q Okay.

A Yes, sir.

Q Okay. Isn't it, would it be correct, Dr. Howard, to say that applying your scientific process that you've talked about of visualization and measurement and making comparisons, it's still a subjective exercise on your part to make a determination that the cast and any particular shoe is similar?

A That, that's correct.

Q And that's really -- Isn't that the best you can do given the casts you have and the comparisons you were asked to make?

A Yes.

Q You can only say it's similar?

A That's all I can say.

Q Now, unlike the ballistics examinations that you did, you were able to make a determination that the bullets were fired from the same gun? I believe that was your testimony; correct?

A On the weapon that was submitted; yes, sir.

Q Because you were able to make a determination that looking at the striations and things of that nature, based upon your opinion, they were all fired from the same gun? Is that correct?

A Correct.

Q Okay. You cannot do that with the shoes; can you?

A I cannot do that in this particular case with the

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 56 of 60

submitted castings and then the photographs of that impression that those were cast from.

Q Were you made aware by anyone that there were other shoeprints at the scene at the Junior Food Store that had not been photographed?

A Uh, not at the time of the submission of these.

Q Have you subsequently been made aware?

A I have been; yes.

Q Okay. So you have not been offered an opportunity to make comparisons even using photographs with any other shoe; have you? In other words, you weren't given photograph --

A That, that was submitted or not submitted?

Q That were not submitted.

A That is correct.

Q Obviously, if they were -- You've been made aware there were other shoeprints out there. They were not photographed, therefore you could not have made any comparison?

A I, I'm not sure that I was aware they were not photographed, but I, I was made aware that they were not cast.

Q Okay. Were you given anything else with regard to this case to make comparisons of other than the ballistics and the shoeprints?

A No, sir.

Q I want to ask just a couple of questions about verifiability and verifiable certainty and I'll leave, leave it

alone. You've made an observation based upon your experience that these shoes are similar; is that correct?

A Correct.

Q And would you agree that that, given the limitations and given the process, that's a subjective determination?

A It is; yes, sir.

Q You're not telling the jurors these shoes are the same?

A No.

Q Or that these prints were made by the same shoes; are you?

A No.

Q You're simply saying that the best you can say is that they're similar in tread design?

A Similar in tread design and appears to be the same in, in shoe length and outsole length and as such the, the shoes, uh, in 18-B could have made the impressions that we see in the castings in both prints.

Q And even the photographs that have been identified to you as being the shoeprints that made the, or from which the plaster casts were made, they don't appear to be running; do they?

A No.

Q You can't tell this jury who was wearing those shoes, 18-B, on April the 10th; can you?

A No.

Q Looking at the impression, you can't tell the jury when the prints or the impressions were made in the soil; can you?

A No; I can't.

Q You can't tell the jurors, can you, that the other shoes that you were given to, at least compare, were worn by the individuals that were identified to you as belonging to those shoes; can you?

A Not of my own knowledge; no.

Q You're, you're limited in what you're told; is that correct?

A That's correct.

Q And you're limited in what you're given to compare; isn't that correct?

A That is correct.

Q In this case you were given one set of prints to compare; weren't you? Let me rephrase that.

A Well, actually, there were two sets of two different types of shoes and only one set of castings.

Q Castings. All right. I, I was going to come back. You were only given one set of casts to make comparisons of?

A That's correct.

MR. MEARS: One moment, Dr. Howard.

I don't have any further questions, Dr. Howard. Thank you very much.

THE COURT: Mr. Hardy?

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 53 of 60

MR. HARDY: I'd ask that he be excused. I think he probably needs to go to another court tomorrow maybe or go back to work.

DR. HOWARD: Back to work.

THE COURT: Dr. Howard, you are excused. Thank you, sir.

DR. HOWARD: Thank you.

THE COURT: Ladies and gentlemen, it looks like a good time for us to recess for the evening. At this time, I again apologize for the redundancy of my cautionary instructions to you, but my apology in no way is meant to minimize the seriousness of you following these instructions throughout this trial.

Again, please do not talk with anyone about this case. Don't allow anyone to talk with you about the case or talk about the case in your presence or within your hearing. Do not read anything about the case nor listen to anything or watch anything about the case. Do not read any books, magazines or other reading material or watch any movie or program with a violent theme plot or subject matter.

In addition, if you go by the Madison Street Deli or go by the location of where the Junior Food Store was on Jackson Street, please do not give your attention or give any attention to the grounds surrounding those areas.

Any further cautionary instructions requested on behalf

of the State?

MR. HARDY: Thank you, Your Honor; no.

THE COURT: Or the Defense?

MR. MEARS: None, Your Honor.

THE COURT: Thank you, ladies and gentlemen. 9:00 o'clock tomorrow morning.

Everyone please remain seated while the jury retires.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Mr. Hadley, the witnesses may be excused until 9:00 o'clock tomorrow morning unless Counsel needs to speak with any of them before they leave.

Gentlemen, in regards -- Well, I don't think the best evidence rule applies to tennis shoes or shoes. In regards to, to an objection insofar as whether or not -- for instance, the objection dealing with the photostatic copies of the bottom of the shoes, I think you stated you had no objection if they weren't going to go out as demonstrative evidence. I think that's normally something that I take up at the appropriate time, that is, after the jury has been sent to their room to select a foreperson and begin their deliberations. They're asked to wait to begin their deliberations until we get all of the exhibits together and send them out. You know, at that time we will address the fact as to whether or not anything admitted into evidence

should or should not go out with the jury for their consideration.

And I think even though it may be, you know, a broad label or characterization put on it as demonstrative, my understanding as to what the real test is, is whether or not it would constitute continuing testimony in some form or fashion. If it's continuing testimony it doesn't go out. If it's not continuing testimony, and has been admitted, I'm not aware of anything to prevent it from going to the jury for their consideration, at this point. I don't know if you gentlemen are aware of something else.

MR. MEARS: I don't know. That's, that's the best I could do with objecting to it. I just didn't think it should be done and that was the best objection I could come up with at the moment. I think it's still improper to take -- It's like taking a pistol and taking photographs of it and having the pistol and the photograph. Maybe my objection wasn't well taken. It's the best I could do at the time. It just didn't seem to be fair.

THE COURT: All right. Gentlemen, are ya'll in a position -- it's my understanding that -- how many more witnesses do you anticipate, Mr. Hardy?

MR. HARDY: Be two or three or so. Four maybe.

THE COURT: Do you anticipate resting tomorrow?

MR. HARDY: Hope so. It depends on Mr. Mears.

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 56 of 60

MR. MEARS: Don't blame me. Judge, Mr. Hardy has asked me and I told him I anticipate probably three to five witnesses depending upon how he finishes out, what they may do. That's the best estimate I can give the Court at this time as far as scheduling. They'd be relative short witnesses, duration. Three to five at the most, as far as what I can guess.

THE COURT: And, of course, that duration may depend on Mr. Hardy to some extent.

MR. MEARS: I'm sure Mr. Hardy will be thorough in his cross examination, Your Honor.

THE COURT: Gentlemen, what I -- the only reason I'm asking is, are ya'll in a position to -- of course, I'll give you an opportunity. We'll have a brief charge conference tomorrow before you present your closing arguments, if we, in fact, do that tomorrow. It appears that may be possible. My question is, are ya'll in a position at this time to briefly go over requests to charge that have been submitted by each other?

MR. MEARS: Now?

THE COURT: Yes, sir.

MR. MEARS: I'm really, I'm really not, Judge. I would like a little bit of time to process the requests. I think we've got them all submitted, but I really would like -- I'll think about it tonight and be prepared to do it

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 57 of 60

tomorrow. I'm really just not prepared to do it this afternoon.

THE COURT: All right. Gentlemen, have ya'll had an opportunity to look over the requests to charge that have been submitted by the Defense?

MR. HARDY: I think we got one stack and then we got a supplemental stack.

MR. MEARS: I've got sixty-one charges. Most of them are fairly standard.

MR. HARDY: Judge, could we just follow up on what he said. We present our witnesses, they present their witnesses, and we have our charge conference. Do we anticipate we're going to get to the closing arguments tomorrow or would it be the next day?

THE COURT: It's going to depend on what time we get through. If we have time tomorrow we will proceed into it tomorrow. I would think -- I mean, if we finish -- I don't anticipate the charge conference taking more than thirty minutes. I may be wrong. There are some -- I've reviewed the requests to charge. I have some specific questions about some. Some of them, of course, will depend on what the evidence is. Others I have questions about regardless of what the evidence, remaining evidence is. But I, I really don't anticipate it taking more than about thirty minutes. If we finish, you know, the evidence at, at 2:00

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 58 of 60

P. M. tomorrow, then we're going to keep working the rest of the afternoon.

MR. MEARS: Your Honor, would the Court -- if we finish that early and then have a charge conference, I really would like at least an hour to prepare for closing. We've got numerous amounts of items of evidence and witnesses. I'd like to have at least an hour to prepare for closing before we do it. I think it'd be very unfair to ask us to do a closing in a case like this on the spur of the moment.

THE COURT: Mr. Mears, I, I don't think -- Mr. Cromartie was indicted October of '94. I realize you didn't come in until some time later. But you've been in this case for a year and a half, two years. We've known this case was coming to trial at this time. You have yourself, Mr. Bryant, a very capable attorney, another attorney, support, and other support personnel, and you have this evening. I feel like that you'll have an opportunity to put a closing argument together. All right, sir?

MR. MEARS: I appreciate the Court's assessment of my abilities. I think they're highly -- the assessment is highly overrated.

THE COURT: We'll be in recess until 9:00 A. M. tomorrow morning.

Gentlemen, the Clerk simply wants ya'll to be aware of something. I think that's what he testified to, but just so

ya'll are --

MR. MEARS: They were all put --

THE COURT: And there are eighteen photographs. Isn't there eighteen as opposed to twenty?

MR. HARDY: We took out two that had blood on them.

CLERK: That's what I want ya'll to know.

MR. HARDY: We took out two bloody ones that had already been --

THE COURT: Mr. Hutchings just wanted to make sure that ya'll were aware of that.

MR. HARDY: Yes, sir. Thank you, David.

(Whereupon the Court is recessed for the day, with the proceedings to be resumed the following A. M.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Case 7:14-cv-00039-MTT Document 18-16 Filed 07/14/14 Page 60 of 60

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF LOWNDES

I hereby certify that the foregoing proceedings were taken down by me, as stated in the caption, and that the foregoing pages 2222 through 2548 represent a true, correct, and complete transcript of said proceedings.

I further certify that I am neither of kin nor counsel to the parties in this matter, nor am I financially interested in same.

This the 17th day of November, 1997.

[signature]

PHILIP G. VINCENT, C.C.R.
CERTIFICATE NO: A238
OFFICIAL COURT REPORTER
SOUTHERN JUDICIAL CIRCUIT

IN THE SUPERIOR COURT OF THOMAS COUNTY

STATE OF GEORGIA

STATE OF GEORGIA

VS

RAY JEFFERSON CROMARTIE
DEFENDANT

CRIMINAL ACTION NO: 94-CR-328

CHARGE: AGGRAVATED ASSAULT (COUNT 1); POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME (COUNTS 2,4,6,8); AGGRAVATED BATTERY (COUNT 3); MURDER (COUNT 5); ARMED ROBBERY (COUNT 7)

CRIMINAL JURY TRIAL UNDER THE UNIFIED APPEAL PROCEDURE

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The following transpired before the Honorable Frank D. Horkan, Judge, Superior Courts, and a Jury, in the Thomas County Courthouse, Thomasville, Georgia, with voir dire and selection of the Jury commencing at 9:35 A. M. on Monday, September the 15th, 1997, and concluding at 10:20 A. M. on Friday, September the 19th, 1997, and the case-in-chief commencing at 10:50 A. M. on Friday, September the 19th, 1997, and concluding at 10:40 A. M. on Wednesday, October 1st, 1997.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

APPEARANCE OF COUNSEL:

Representing the State: James E. Hardy, Esq.
Mark E. Mitchell, Esq.
Assistant District Attorneys

Representing the Defendant: Michael Mears, Esq.
Carl A. Bryant, Esq.
Gerard Kleinrock, Esq.

VOLUME VIII OF TEN VOLUMES

(This volume contains the proceedings commencing at 9:00 A. M. and concluding at 5:05 P. M. on Thursday, September the 25th, 1997.)

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 2 of 239

(The ninth day of proceedings commences at approximately 9:00 A. M. on Thursday, September the 25th, 1997, with the following transpiring outside of the jury's presence)

THE COURT: Good morning, ladies and gentlemen. Are we ready to proceed at this time?

MR. HARDY: Yes, sir.

MR. MEARS: Yes, Your Honor.

THE COURT: Gentlemen, I've got a note from a juror. I don't know which juror. It states, "Being a teacher, I need to make lesson plans and get a substitute for next week. Any guesstimation of the number of days I will need to notify my school system? Thank you."

I know we've already previously had a, an estimate as to the guilt-innocence phase and that seems to be running pretty close to the estimate. The sentencing phase, if it reaches that point, was estimated to take two to three days.

MR. MEARS: Looking at where we've come to this point and the schedule we've been keeping, I think we've probably overestimated the amount of time that will be needed for the sentencing phase, depending upon what Mr. Hardy does with regard to, assuming, assuming that we get to that stage, how much Mr. Hardy is going to put into the record, go back over the matter, that estimate of two to three days may be substantially too long. That's just my guess at this point

looking at how things have moved up to this point. I think we have been pretty much on what we told you the schedule was going to be.

THE COURT: Gentlemen, do you have an estimate of the amount of time to actually present the evidence during the sentencing phase if we reach that point?

MR. MEARS: The State has to go first. If they put the world during the sentencing, obviously, I've got to be prepared to either rebut or address it. If they don't put up a substantial amount of witnesses, a substantial number of new bits and pieces of evidence, then obviously, my part, or our part is going to diminish considerably depending on what they put up.

MR. HARDY: We've already given the Court our notices and we've already heard all the evidence. So I don't think ours will be that long.

MR. MEARS: Okay. Probably, probably a day will be the outside estimate then.

THE COURT: All right, sir. Thank you.

You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Good morning, ladies and gentlemen.

Ladies and gentlemen, prior to bringing in our first witness for the day, let me inquire whether or not any of

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 4 of 239

you over the recess have read anything about this particular matter, heard anything about this particular matter, talked with anyone about this particular matter, or seen any specifics at either of the locations in regards to this particular matter? Read any novels, magazines or otherwise, or watched any movies, television programs or otherwise that involve any violent themes, plots, subject matter, things of that nature?

Thank you ladies and gentlemen.

Ladies and gentlemen, I told you at some point in time during these last two weeks of an estimate of the amount of time that this case would take to try. We told you that the guilt-innocence phase, we anticipated would take about five days, and the case appears to be progressing pretty much along that estimate. I told you if, in fact, the case enters into the second stage, that is the sentencing phase, we would estimate at that time based upon the information we had, that that particular phase would take two to three days. At this point in time we have a little bit of a better estimate in regards to the length of time in the sentencing phase, if, in fact, this case reaches that phase. And at this point in time we anticipate that the evidence for the sentencing phase, again if we reach that point, would take approximately one day. Again, that is an estimate. Of course, the total length of time that the case

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 5 of 239

takes, both the guilt-innocence phase, an estimate -- the sentencing phase will be based to some extent on the amount of time that the jury needs to properly deliberate on the matter and reach a verdict in the matter.

So I'm giving you this additional information simply to help you, you plan next week. Again, we anticipate the evidence in the sentencing phase, if we reach that, will take about one day. The total length of time for the sentencing phase, again, will depend on the amount of additional time for the jury to properly deliberate and make up their verdict in that particular matter.

I hope that will help you plan next week somewhat.

Mr. Hutchings, put that in the file, please, sir.

Mr. Hardy?

MR. HARDY: Fran Everett.

THE COURT: Good morning, Ms. Everett. Have a seat right here, please, ma'am.

Would you please raise your right hand?

Do you solemnly swear or affirm that the evidence you'll be giving the Court and this jury in the matter now pending before the Court will be the truth, the whole truth and nothing but the truth, so help you God?

MS. EVERETT: I do.

THE COURT: Thank you, ma'am.

Mr. Hardy?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 6 of 239

FRAN EVERETT

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for us, please, ma'am?

A Fran Everett.

Q Where are you employed?

A Thomasville Police Department.

Q And what do you do for them, please, ma'am?

A I'm the Evidence Clerk for the Thomasville Police and Thomas County Sheriff.

Q And how long have you been doing that, Fran?

A About four years.

MR. HARDY: Your Honor, we ask that she be allowed to step down, please?

THE COURT: Yes, sir.

BY MR. HARDY:

Q Step down for me, Ms. Everett.

A (Witness steps down from witness stand)

Q Just look at all this evidence up here, and can you identify, or are you familiar with the items you see up here? The brown bags?

MR. HARDY: Give her a second to look at it, please, Your Honor?

A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 7 of 239

Q Are you familiar with all those items?

A Yes, sir.

Q How are you familiar with them, Fran?

A The majority of them --

Q You need to go back to the stand so the court reporter can hear you, please.

A (Witness returns to witness stand) The majority of them that I could see had my initials on them.

Q And when something is turned over to you, are you responsible for it then until it's turned over to somebody else?

A Yes, sir.

Q Do you keep it in a locked place?

A Yes, sir.

Q And where is that?

A Well, my offices are locked, secured area, and I have a secured area with, inside of my office as well.

Q And how do you get items from -- Say, the policeman at 11:00 o'clock last night found something. What does he get -- Where -- What does he do with it or she do with it?

A We have a locker inside of their office area, which I have the key to. And they put it in there and leave the key in the lock box for me.

Q So then you have a key to the lock box?

A Yes, sir.

Q So that's how you keep it under safe and secure

conditions?

A Yes, sir.

Q And that's how you would have gotten a lot of this, some of this evidence?

A Some of it; yes, sir.

Q Some of it would be given directly to you?

A Yes, if I'm -- if it happens during the day or they collect it during the day, they bring it directly to me.

Q And then how do you -- What's the procedure?

A They come to my office and we sign off on it.

Q It's signed in to you?

A Signed in.

Q And then you've kept a log of it there, I think?

A Yes, sir.

Q I think you have a, you have a typed log in this case?

A Most of it is.

Q Then do you have sheets that the policemen repair -- prepare when they sie -- get something?

A I have the originals from what they itemized their stuff, what they was turning in.

Q I think that you had brought all of the evidence in this case up to court for Spencer?

A Yes, sir.

Q I think the two big bags is what you brought it up to court in?

A Yes, sir.

Q I think there were some clothing items that were retrieved through investigation in this case? Were some clothing items received by you?

A Yes, sir.

Q And who did you receive them from, please, ma'am?

A Chuck Weaver.

Q And who is he?

A He was an investigator.

Q And were the items already denoted as to who they belonged to and then turned into you?

A The bags were labeled; yes, sir.

Q Yes, ma'am. As to whose clothes were what?

A Yes, sir.

Q And you've had that stuff in your possession?

A Yes, sir.

Q Did you get clothes for -- This was on the 13th, I think, of April?

A I'm not familiar. Just a minute. The 14th of April.

Q You received the items from Weaver?

A Yes, sir.

Q That would have been what the individuals would have been wearing at the time of their arrest, to the best of your knowledge?

A Yes, sir.

Q Is that the procedure that's in the jail, is when someone is arrested the clothes are taken and if need be given to you?
A Yes, sir.
Q It's what they were wearing at the time of their arrest?
A I don't always get what they were wearing at the time of the arrest.
Q Sometimes you do and sometimes you don't?
A Yes, sir.
Q Did you get items, clothing items in reference to a Mr. Lucas and Mr. Clark, Mr. Cromartie and Mr. Young?
A Yes, sir.
Q This first item would be number 14 on your list? Number 14 here, can you identify this for me, please, ma'am?
A Yes, sir.
Q What's that?
A The clothes of Corey Clark.
Q And have you -- Did you originally have this bag closed and initialed?
A Yes, sir.
Q Mr. Clark's clothes are 14?
A Yes, sir.
Q I think 16 is your next number. What's 16?
A The clothes of Thad Lucas.

Q Were these likewise sealed and marked by you?
A Yes, sir.
Q Are those your initials down here?
A Yes, sir.
Q And 17, excuse me, 15, have you got that on your list?
A Yes, sir.
Q What did you write on 15?
A A bag containing white and blue boxers.
Q Shirt?
A Yes. A T-shirt.
Q Was that turned in by Weaver?
A Yes, sir.
Q I think Number 19, I think, and 20. Would you refer to those numbers, please, ma'am? 17? Let me bring these items. Please look at these items. 19 and 17 and 20 and 18. 17, 18, 19, 20, 22.

Have you had a chance to look at those items?
A Yes, sir.
Q Do you know what they are?
A Yes, sir.
Q What are they?
A The clothing that was turned in.
Q Whose clothing?
A Jeff Cromartie's.
Q Each of those bags belonged to Cromartie?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 12 of 235

A Yes, sir.

Q That would have been 17, 18, 19, 20 and -- Is that the last number?

A 21 and 22.

Q 27 here?

A 27?

Q Yes, ma'am. 27. Do you know what that is?

A Yes, sir.

Q What's that?

A Clothes of Gary Young.

Q Did you also, with each of these sets of clothing, receive shoes?

A Yes, sir.

Q Look at these bags for me. 18-B. You already have an 18 here. That's 18-B. Is that how you numbered the shoes, with the letter versus the number, to go with the number?

A Yes, sir.

Q Can you identify these bags, 18, 14, 27 and 16?

A Yes, sir.

Q What are they?

A 14, shoes belonging to Corey Clark.

Q And what size are they?

A Eleven.

Q Did you initial each of these shoes?

A I believe I did.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 13 of 239

Q Okay. 14? 16? 14-A, Your Honor. Excuse me. 16-A?
A 16-A is the Nikes, is Lucas.
Q Do you have a size on them?
A Ten and a half.
Q 18-B?
A 18-B is Jeff Cromartie, Adidas.
Q What size?
A I'm not familiar.
Q 27-C?
A 27-C is the black Converse, Gary Young.
Q Converse All Stars?
A Is that Converse?
Q Do you have a size on them?
A Size ten.
Q I think the shoes were taken from you to the lab, or by you or someone had came and got them from you at the police department?
A The first pair that was on Jeff Cromartie, I took to the lab. And the last three pair was taken by Det. Stevens.
Q I think you let Mr. Mears see the evidence and I've seen the evidence in times past?
A Yes, sir.

MR. HARDY: She's with the Court.

CROSS EXAMINATION

BY MR. MEARS:

Q Good morning, Ms. Everett.
A Good morning.
Q How are you doing?
A Fine.
Q Ms. Everett, I want to just make sure that I understand and that we've got the correct chain of custody of this evidence from the officers who collected it, wherever they collected it, to you so that we can have an idea, when you say 14-A came from here, that we've got the right information for each one.
A Okay.
Q Now, would you please look at your chain of custody sheet for Number 14? That would be, I believe you've identified that as Corey Clark's clothing; is that correct?
A Yes, sir.
Q Okay. Now, who did you receive 14 from?
A Chuck Weaver.
Q Excuse me?
A Chuck Weaver.
Q Is there anything on your chain of custody receipt to show where Mr. Weaver got this clothing?
A He listed his location as jail justice center.
Q And so based upon the records that you have, it would indicate that the clothing that was collected and attributed to Corey Clark would have been the clothing he was wearing at the day of his arrest. Would that be a fair statement?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 15 of 235

A Yes, sir.

Q Okay. Now, and that would be the only clothing that you had given to you that was attributed to Corey Clark, other than the tennis shoes?

A Yes, sir.

Q Would that be a correct statement?

A Yes, sir.

Q Okay. And please check your documents as much as you need. I just want to make sure that's all of the clothing that was tendered into evidence to the evidence custodian that related to Corey Clark.

A As best I can remember.

Q Okay. Now, when you receive clothing like this in a bag or however it's delivered to you, do you go through the clothing to look for any items of evidence, money, change, anything like that in these bags?

A I usually look at the evidence sheet that they turn in, and I don't barely look all the time. If it comes sealed I try not to bother it.

Q And it's not, that's not your responsibility; is that correct?

A I check to see what they had listed and kind of look at the bag, but I don't search the evidence.

Q If they say they were giving you a shirt, you'd look in to make sure it was a shirt?

A Right.

Q And if they say they've given you a pair of trousers, you just make sure it's a pair of trousers?

A Right.

Q So you don't go through the pockets or things like that; is that correct?

A Right.

Q Now, with Corey, Corey Clark's clothing there was this multi colored shirt and a pair of green trousers. Is there anything else at all that you see indicated, that was turned over to you, other than the shoes, that the police officers collected as it relates to Corey Clark? Any other clothing or anything else?

A No, sir.

Q And it would only have been the clothing he was wearing on the day of his arrest; is that correct?

A (Nods head affirmatively)

Q And what does your records reflect the date that Mr. Weaver collected the clothing?

A 4-14.

Q 4-14?

A Um-hum (affirmative).

Q Okay. Now, I'm going to ask you, if you will, to do the same -- if you'll look at your record with regard to the clothing that was collected from Thaddeus Lucas, Number 16?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 17 of 239

Could you please look at your chain of custody sheet on that? Do you have that, Ms. Everett?

A Yes, sir.

Q Ms. Everett, would you tell the ladies and gentlemen of the jury where this particular bag of evidence, Number 16, came from first of all? Who gave it to you?

A Chuck Weaver.

Q Does it indicate where Mr. Weaver got this particular, these particular items of clothing?

A Jail justice center.

Q On what date?

A 4-14.

Q And would that indicate that this would have been the clothing that Mr. Lucas was wearing on the day of his arrest? Is that correct?

A Yes, sir.

Q And do you have any notations there as to what he collected?

A Nike tennis shoes, multi-colored shirt, brown jeans, corrugated jeans.

Q Did Mr. Weaver make a notation if they were shorts?

A No, sir.

Q Would, would you have pulled these out? Do those appear to be, at least not full length trousers?

A Right.

Q Okay. Did the notation from Mr. Weaver show that he collected shorts?
A No, sir. He didn't indicate that; but I did.
Q You did it when you got it and looked at it? Your sheet says shorts on it?
A Right. Jean shorts.
Q And a multi-colored shirt; is that correct?
A Yes, sir.
Q Okay. Is there anything else that was turned into you by the investigating detectives, other than the clothing, that Mr. Lucas was wearing the day of his arrest?
A No, sir.
Q Now, do you have any clothing -- The clothing that was related to Gary Young, what's your number on that? Is it Number 27?
A Yes, sir.
Q Okay. And does that evidence sheet indicate where items, the items in bag 27 came from?
A No, sir.
Q Does it show the date that they were taken from Mr. Young?
A Yes, sir. 6-14.
Q 14th. The evidence -- Would that indicate to you looking at the sheet that this was the clothing that Mr. Young had on at the time of his arrest?

A Yes, sir.

Q And does it show anything other than a pair of short pants and a white T-shirt? Well, there's some socks in here also. Does it show anything else?

A No, sir.

Q And with regard to the clothing of Mr. Cromartie, does your record show what clothing was turned in to you by Det. Weaver? Do you have a sheet and number relating to Mr. Cromartie's clothing? Do you understand which bag -- we've talked about Thaddeus Lucas, Corey Clark and Gary Young. Which one's related to Mr. Cromartie?

A When he turned it in, he just turned in, listed as ten bags containing clothing.

Q As how many bags?

A Ten. And each bag with the suspect's -- some of the bags have suspects' names and clothing and shoes in it.

Q All right. On Number 27, there's no name on the bag; is there?

A This outside bag will be my bag. The shoes were in another bag.

Q On the inside of the bag it says Gary -- I won't put it all in there. Just look -- so the ladies and gentlemen of the jury can see. His name appears inside?

A Right. This is the bag he turned in.

Q Right. And so each one of the bags, the bag inside of

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 20 of 239

the bag would have the name relating to the individual that was arrested; is that correct?

A Yes, sir.

Q Okay. Now, with regard to the clothing that was attributed to Ray Cromartie, bag 18. Was that one of the bags of clothing?

A Yes, sir.

Q Does it indicate where bag 18 came from? I know you got it from Det. Weaver. Does it show where he picked it up?

A No. On his property form, it has location of property obtained, he just put jail.

Q And he -- Would that indicate to you that item 17 came from the clothing that he was wearing when he was arrested?

A 18; yes.

Q It says he got it from the jail; is that right?

A Right.

Q Okay. Now, again, did you go through the clothing to determine what kind of clothing Mr. Cromartie was -- I mean, what was in it? A shirt, excuse me, a pair of trousers, a shirt and some underwear; is that correct?

A Yes, sir.

Q Did you go through the bags to determine, excuse me, through the clothing to determine whether there was any items in this bag or in --

A In the pockets?

Q In the pockets.
A No, sir.
Q Would you look through there and see if you see any items in the pockets?
A (Witness complies) A lottery ticket.
Q What's the date on the lottery ticket?
A March the 26th.
Q March 26th. Does it show what -- any identifying, where the store was or anything like that?
A No; I don't think so.
Q It's not a winning ticket, I suppose?
A I don't guess so.
Q Okay. Would you put that back in where you found it, please, if you don't mind. And are there any other items? Look if you would. Are there any other items in that, in the trousers?
A No, sir.
Q Now, you also have a bag that's marked bag 17. Where did that bag, according to your record, where did that bag come from?
A That was one of the ten he turned in.
Q Excuse me?
A That was one of the bags he originally turned in.
Q Does it say on your sheet whose clothing it was?
A No, sir.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/24/14 Page 22 of 239

Q Is there any, anything in your records to show that this clothing was Mr. Cromartie's clothing?

A No, sir.

Q Is there anything in your records to show where this clothing came from?

A He's got it listed as jail.

Q Got it listed as jail. Does he attribute it any particular individual?

A No, sir.

Q Did you go through this bag and determine who this belonged to? I mean, did you go through any of the pockets or anything?

A No, sir.

Q Did, did you have any discussions with anyone or was this attributed to being Ray Cromartie's clothing?

A You mean, did I ask if they were?

Q Yes, ma'am.

A No, sir.

Q Would you just look through the pockets and see if you can see anything that would identify this clothing? This -- What is that object there?

A This is a picture of some children.

Q Children?

A Um-hum (affirmative).

Q Is there any names or anything on that?

A No, sir.

Q Okay.

A A penney.

Q A penney. Okay. And is there any record that you've got to show who these pants belong to, or where they came from?

A No, sir.

Q So, as far as your records indicate, Number 17, there's no determination as to where those clothes came from or who they belonged to; is that correct?

A No, sir.

Q Now, with regard to Number 20, did your records reflect where Number 20 came from and whose clothing, there appears to be a shirt in here, whose clothing this was?

A Jeff.

Q Okay. Does it say where it came from?

A That was one of the bags.

Q One of the bags that says jail?

A Right.

Q And it appears to be a flannel type of shirt; is that, that correct?

A Well, I had it listed as a flannel jacket.

Q Flannel jacket. Number 19, whose, whose clothing is this attributed to be according to your records?

A Jeff.

Q Jeff. And, again, it appears to be a flannel jacket

type shirt; is that correct?

A Yes, sir.

Q And Number 22. I'm sorry. Who does this belong to according to your records? From the jail?

A It came from there.

Q Okay. Does it attribute it to any particular individual?

A No, sir.

Q Okay. This has been sealed. It doesn't appear to have been broken but one time; is that -- It appears not to have been broken when we looked at it before. What, what does it show on your records that this is?

A A white T-shirt, extra large --

Q Huh?

A White T-shirt, extra large, with a phrase on one side of it.

Q What does it say?

A "Get my knowledge at a white college? I don't think so."

Q Okay. And what does that say?

A "Education is an important element in the struggle for human rights".

Q Okay. And that was attributed to whom?

A I don't have a name on it.

Q Do you know who -- Is there anything in your records to

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 25 of 235

indicate who that belonged to?

A No. No, sir.

Q Ms. Everett, based upon your experience as evidence technician, excuse me, as someone who collects and keeps it, would it be unusual for someone to arrive at jail under arrest wearing this many articles of clothing?

A I don't know.

Q Well, just, just apply your, your experience, would it be unusual for someone to arrive at jail under arrest wearing two flannel jackets, a T-shirt, three pairs of pants --

A No, sir.

Q It would be somewhat unusual; wouldn't it?

A Yes, sir.

Q So, would it be a fair assumption that they didn't arrive at jail wearing all these clothing; the clothing was picked up from somewhere else and brought to the jail? Would that be a fair assumption?

A Yes, sir.

Q You've identified the tennis shoes of, those tennis shoes that were in bags with the name Corey Clark, Gary Young and Thaddeus Lucas. Did they arrive in separate bags like this?

A No, sir.

Q How did they arrive?

A They was in the bags with the clothing.

Q Okay. So, the bag that you've identified as having

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 28 of 235

Corey Clark's clothing in it had the tennis shoes; is that correct?

A Yes, sir.

Q And the bag that had Gary Young's name on it, the tennis shoes would have been in that bag?

A Yes, sir.

Q And the bag that had Thaddeus Lucas' tennis shoes, are attributed to Thaddeus Lucas, was in the bag with Thaddeus Lucas' clothes; is that correct?

A Yes, sir.

Q Would that indicate, based upon your records, that those were the shoes that they were wearing on the 14th of April?

A Yes, sir.

Q Is that correct? Now, the shoes that you've identified as having been turned in to you that belonged, that were attributed at least by the bag as belonging to Ray Cromartie, were they in the bag with his clothes?

A Yes, sir.

Q Which bag did the tennis shoes come out of?

A The one that had the white T-shirt, purple pants and underwear.

Q Okay. So that would have been the bag that these shoes would have been, come from?

A Yes, sir.

Q Is that correct?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 27 of 235

A Yes.

Q Is there anything in your records to indicate where or when that bag or those -- these tennis shoes came to be in the jail?

A Came to be in the jail?

Q Yes, ma'am.

A No.

Q The item, or bag that's been marked State's Exhibit 30-B and 30-A, would you look at your, your custodian log for that?

A Um-hum. Yes, sir.

Q Okay. And where did these come from, according to your log?

A I received them from Chuck Weaver.

Q Did you ever release it to anyone after it was turned in to you?

A Yes, sir.

Q And to whom did you release it to?

A My supervisor, Glenn Hutchinson.

Q Okay. Did Mr. Hutchinson eventually return it to you?

A Someone else did.

Q Okay. So Mr. Hutchinson picked it up from you?

A Yes, sir.

Q And who does your record -- What, what does your record -- Who returned it to you?

A Jim Grady with the F. B. I.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 28 of 239

Q With the F. B. I. Did anyone else ever take it out of your possession after Mr. Grady returned it?

A No, sir.

Q Okay. Several people have looked at it since then but always in your presence; is that correct?

A Yes, sir.

Q I've looked at it, Ms. Leonard has looked at it but it was always in your presence; is that correct?

A Yes, sir.

Q Ms. Everett, I'm going to hand you -- I'm not going to mark this, but I think you've got the original. But I want to hand you a document that appears to show one item with a quantity of three. It's a shoe, shirt and pants. Would you look at that and see which one of those -- Can you -- Do you have the original there in front of you?

A Um-hum. That's the one I associated with Gary Young.

Q And that shows your initial receipt of the shoes, Gary Young's shoes, his shirt and pants, at least, what was attributed to him; is that correct?

A Yes, sir.

Q Does your evidence show when and who picked that up and took it out of your possession?

A Bob Stevens came and got the shoes.

Q And when was that?

A 10-17 of '96.

Q 10-17 of '96?
A Yes, sir.
Q Do your records show it ever having been taken out before 10-19 of '96?
A No, sir.
Q Who brought it back according to your records?
A The shoes?
Q Yes, ma'am.
A I haven't received them back.
Q And so they were taken out 10-17 of '96?
A Yes, sir.
Q And they have not been put back in your possession since then; is that correct?
A Yes, sir.
Q Okay. Would you look at the same record as it relates to Corey Clark's shoes? As I understand it, you, you created a separate sheet for the shoes for Mr. Young since they were taken out and nothing else was taken out; is that correct?
A Say that again.
Q Okay. Did you -- Does your record show that any other article of Mr. Young's clothing was ever taken out from you by Mr. Stevens, by Mr. Grady, or anyone from the F. B. I. or anywhere else?
A No, sir.
Q There was no tests or anything done on any of Mr.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 30 of 235

Lucas' clothes, as far as you know?

A No, --

Q I'm sorry. Mr. Young. I didn't mean to confuse you.

A No, sir.

Q Would you look at your same type of evidence sheet as it relates to Mr. Corey Clark's shoes?

A Okay.

Q When -- Does it show that the shoes were taken out of your possession at some time?

A Yes, sir.

Q And when were those shoes taken out?

A 10-17-96.

Q 10-17-96. Does it ever show the shoes coming back to you?

A No, sir.

Q And who took them out?

A Bobby Stevens.

Q Okay. And would you do the same thing for Mr. Lucas' shoes.

A 10-17.

Q Did the shoes ever come back to you?

A No, sir.

Q Okay. And the same thing for Mr. Cromartie's shoes?

A Cromartie's shoes was taken before. His was taken on 5-27.

Q Of what?
A Of '94.
Q Of '94. So Mr. Cromartie's shoes were taken out in May of 1994?
A Yes, sir.
Q When were they returned to you?
A They wasn't.
Q And the other shoes were taken out two years later?
A Approximately.
MR. MEARS: Okay. Thank you, Ms. Everett.

REDIRECT EXAMINATION

BY MR. HARDY:
Q Just to correct something on the Gary Young sheet. It shows when Mr. Weaver got his clothes, it was on what date? You may refer to mine, please.
A The ten bags?
Q No. This sheet that Mr. Mears had you look at.
A On 6-14.
Q And then they were turned in to you? All this stuff was turned in to you? All these clothing items were turned in to you?
A Yes, sir.
Q And you said that Mr. Lucas' shoes, 18-B, were associated with the bag 18, this bag?
A Yes, sir.

MR. HARDY: She's with the Court.

THE COURT: Anything further of this witness, gentlemen?

You are excused. Thank you.

MR. HARDY: Glenn Hutchinson.

Good morning. Would you raise your right hand?

Do you solemnly swear or affirm that the evidence you'll be giving this Court and this jury in the matter now pending before the Court shall be the truth, the whole truth and nothing but the truth, so help you God?

SGT. HUTCHINSON: I do.

THE COURT: Mr. Hardy?

SGT. GLENN HUTCHINSON

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for us, please, sir?

A Glenn Hutchinson.

Q Where are you employed?

A Thomas County Sheriff's office.

Q How long have you been with them, please, sir?

A Five and a half years.

Q Where'd you work before that?

A I worked for the Albany Police Department for twenty-one years.

Q And what'd you do with Albany Police Department?

A I was a supervisor for the identification and laboratory section.

Q And tell us a little bit about your training and experience in Albany and Thomasville for twenty-six years?

A I attended the F. B. I. Fingerprint Classification school, F. B. I. Advanced Latent Fingerprint school, Advanced Palmprint school. I am certified by the Peace Officers Standards and Training Council of Georgia as a crime scene technician. I have processed evidence for fingerprints and made fingerprint comparisons for the G. B. I., F. B. I., Secret Service, the Naval Investigative Service and various other law enforcement agencies within the nineteen county area of southwest Georgia.

Q Have you ever testified in a court of law as an expert?

A Yes; I have.

Q Are you familiar with the new A. P. system?

A Yes; I am.

Q What is that?

A It's the State's automated fingerprint identification system.

Q Do you continually go to educational classes in reference to fingerprinting?

A Yes; I do. I normally have twenty hours of in-service training in fingerprint comparison each year. I also am a member of the International Association of Identification. I attend a

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 34 of 239

training seminar once a year, a week long training seminar, sponsored by the International Association of Identification.

Q Are you a member of any Georgia organizations?

A I am a member of the Georgia Division of I. A. I.

Q The what?

A I. A. I., International Association of Identification.

Q Have you testified in state courts and federal courts?

A Yes; I have. I've testified in federal courts in Thomasville, Tallahassee, Albany. State and Superior Courts in Thomas County, Colquitt County, Grady County and Decatur County, Dougherty County, Seminole County.

Q Do you routinely now do fingerprint examinations for other agencies in southwest Georgia?

A Yes; I do. Various agencies from around this area bring their fingerprints to me. I occasionally do fingerprint processing of evidence for the State Crime Lab in Moultrie. I'm occasionally called there to make positive identifications of deceased persons.

Q And did you do that up there at the floods in Albany a couple of years ago?

A Yes; I did. I was asked to participate with the G. B. I. Morgue Identification Team in the fingerprint section identifying the remains of some four hundred and twenty-three caskets that were disinterred during the flood.

Q Do you do this daily, fingerprinting, fingerprint work?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 35 of 235

A Yes, sir; it's a daily thing for me.

Q For the last twenty-six years?

A I have done it since 1978.

MR. HARDY: Your Honor, we'd submit him as an expert in the field of fingerprint analysis.

THE COURT: Mr. Mears?

MR. MEARS: Your Honor, could I just ask him a couple of questions?

THE COURT: Yes, sir.

MR. MEARS: Is he being submitted --

MR. HARDY: Yes. Submit him as an expert; yes, sir.

MR. MEARS: As a crime scene technician expert also. I didn't hear that request. I just want to make sure --

MR. HARDY: Crime scene, lifting of the prints, analysis of the prints, giving his opinion as to a print; the whole gamut, his expertise.

THE COURT: Gentlemen, my understanding is, is the tender as an expert relates to fingerprints, processing, comparison, identification. Is that correct?

MR. MEARS: Not as a crime scene technician.

MR. HARDY: That too, Your Honor. He does that too.

THE COURT: All right, sir.

MR. MEARS: Is that --

MR. HARDY: That's -- Excuse me.

Q You also, as to the crime scene work too?

A Yes; I do, occasionally; yes.

Q And do you have training and experience in that?

A I am certified by the Peace Officers Standards and Training Council.

MR. HARDY: Thank you.

MR. MEARS: I just wanted to make sure he didn't leave anything out, Judge.

Your Honor, may I have just a few questions on voir dire with regard to qualifications in both of those areas?

THE COURT: Yes, sir.

CROSS EXAMINATION

BY MR. MEARS:

Q Mr. Hutchinson, just very briefly. You've outlined your training and background with regard to fingerprint identification and the schools you've gone to. With regard to crime scene, being an expert in crime scene technician, what does that mean insofar as police terminology is concerned?

A A crime scene technician goes to the scene. He processes, collects evidence. He processes for fingerprints, photography. Transports evidence to the state crime lab.

Q So, as a crime scene technician you would not -- you would not solely be looking for fingerprints; you'd be looking at everything that would be of evidentiary value in a particular crime scene; would you not?

A That's correct.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 37 of 239

Q And your training has been related, not only to fingerprints, but also to the overall general collection of evidence at the crime scene; is that correct?

A That is correct.

Q Okay. Now, with regard to your training, very briefly, what has been your technical training with regard to crime scene evidence collection? Not, not specifically referring to fingerprints, but in general?

A The crime scene technician certification entails fingerprint classification, development of fingerprints, advance latent fingerprint comparison, photography for investigation, evidence collection, evidence presentation. Those are the courses it entails.

Q And you're also given training in how to present that evidence in court; are you not?

A That's correct.

Q And you're given courses in how to testify in court; are you not?

A That's correct.

Q Okay. Now, with regard to the fingerprint area of your expertise, I'd like to ask you some questions in two particular areas. One would be the gathering and collecting of suspected latent fingerprints. And then the second area that I'll ask you some questions about is the identification. I'd like to separate those two out. Is that okay?

A Okay.
Q It's easier for me to keep up with. Now, with regard to the gathering and collecting of fingerprint evidence, what specialized training have you had in the use of chemicals as they relate to the extraction and preservation of fingerprints at crime scenes?
A A forty hour course in fingerprint -- evidence processing for fingerprints through the use of chemicals or powders. The lifting of those latent prints.
Q How many of those -- Is that one forty hour course?
A I've attended -- that's in the basic crime scene technician course. I've attended numerous over the years, over the nineteen years that I've been doing it, courses in developing fingerprints and lifting fingerprints. New techniques, new chemicals.
Q Okay. With regard to the use of chemicals, whatever those chemicals may be, outside of the basic forty hour course, what formal training have you had in the use of chemicals to identify, preserve and extract fingerprints from surfaces?
A That is part of our week, week long training seminar every years sponsored by the International Association of Identification. It deals -- there are classes within that week long seminar that deal with the use of chemicals, what chemicals to use on certain surfaces, what chemicals react to certain secretions from the human body. And, as I say, I've been doing,

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 39 of 239

attending those seminars since 1978. I don't know the exact number of classes that we've gone to.

Q On the average -- I know these are week long seminars that cover all of crime scene processing. Is that correct?

A That's correct.

Q And, and a portion of each week's seminar would relate to the subject matter of the use of chemicals to locate, preserve and extract fingerprints; is that correct?

A That's correct.

Q Approximately what percentage of each of those seminars, and I'm not, I'm not asking you tell me how many seminars, but approximately how much time is devoted to the use of chemicals?

A Probably, it would be an estimate, about fifty percent.

Q Fifty percent of the entire crime scene technician seminar is related to the use of chemicals and fingerprints?

A That's correct.

Q And so, two and a half days out of a week long seminar is related to the use of chemicals in extracting, locating and processing fingerprints?

A That's correct.

Q It's an extremely important part of your job as a fingerprint technician; would you agree?

A Yes; it is.

Q Okay. Now, with regard to the identification, what

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 40 of 239

formal training have you had outside of the basic courses and the week -- the yearly seminar, yearly one week seminar that you go to, what formal training courses have you had in the identification procedures used to identify known and unknown fingerprints?

A Those are also -- comparison classes are also given during the week long seminar. I do it on a daily basis, compared them on the job since 1978, so there is no other formal training. The State does not offer any more training than the basic fingerprint classes.

Q So the basic fingerprint classes contained within that original forty hour course that you get to get your crime scene certification, outside of that there are no formal classes relating to identifying fingerprints; is that correct?

A The only formal classes the State offers are the forty hour basic classification and the forty hour fingerprint comparison or advanced latent fingerprints, and then there are some private agencies who do classes or present seminars. There is one on the advanced palmprints which I've attended.

Q What about the F. B. I. course? How much of that particular -- You said you'd been to an F. B. I. course. How much of that was devoted to the identification of fingerprints?

A The forty hour advanced latent fingerprint course is devoted to the comparison and charting of latent fingerprints.

Q Now, in the week, the one week long yearly seminar that

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 41 of 239

you say you've attended for the past nineteen years, we know half of that is spent on the use of chemicals in preserving, locating and extracting fingerprints. How much of that, of the other two and a half days is spent on identification of fingerprints?

A Probably ten percent.

Q Half a day?

A Half a day; yes, sir.

Q So that the other two days are devoted to all of the other areas of crime scene technicians' work; is that correct?

A That's correct.

Q Shoeprints, footprints, photography, measurements, that's all done in two days?

A That's correct.

Q Videotape reproduction?

A I don't remember any videotape reproduction that I've had in any seminars.

Q How about the use of videotape surveillance cameras in the use of those tapes as part of an evidence crime scene? Have you ever had any training in that?

A No, sir; I have not.

MR. MEARS: Your Honor, I have, at this time I have no objections to Mr. Hutchinson being classified as an expert in those two areas for which he's been submitted.

THE COURT: All right, sir. He will be recognized as an expert in those two areas.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 42 of 239

Mr. Hardy?

REDIRECT EXAMINATION

BY MR. HARDY:

Q Do you consult with the regional lab up in the Albany P. D. or the Dougherty County S. O., Boots Windham, up there on a weekly basis, daily basis, with them too?

A Yes, sir.

Q Do you talk to other people all the time about your life in fingerprint work?

A Yes; I do.

Q Is that all you do, is basically fingerprint and fingerprint and fingerprint?

A Yes, sir; that's correct.

Q The Madison Street Deli, did you go out there on April the 7th?

A Yes; I did.

Q And did you look at the crime scene there?

A Yes, sir; I did.

Q Was you the one that retrieved the shell casings?

A Yes, sir; I did.

Q Did you look at the scene?

A Yes, sir.

Q Were you able to gather anything at the scene?

A I recovered one spent .25 caliber shell casing.

Q Any fingerprints legible there?

A I processed the scene for fingerprints. I developed no identifiable fingerprints. I did develop some fingerprints but they were not identifiable.

Q What do you mean by identifiable?

A Fingerprints lack sufficient ridge detail, characteristics to be identifiable.

Q Do you have to have -- If you find something, then you have to have something to compare to it?

A That's correct.

Q Can you just automatically say, "Hey, that's Bill's"?

A No, sir; I cannot.

Q If you don't have something to compare it to, getting a fingerprint doesn't mean anything?

A That's correct.

Q Did you go out to the Junior Food Store?

A No, sir; I did not.

Q Did you receive some evidence from the Junior Food Store to process?

A Yes, sir.

Q Who'd you --

A I received two full cans of Budweiser beer, twelve ounce cans, one piece of torn cardboard with white letters B-U-D-W on one side, and twelve latent fingerprint backing cards, three by five backing cards.

Q Items Number 2 and 3, can you identify them for me,

please, sir?

A Yes, sir. These are the two Budweiser beer cans that I received with my initials, G. P. H., on the bottom of the can and --

Q Why are they black colored?

A I'm sorry?

Q Why do they just got that color to them?

A I have processed them with fingerprint powder. That's fingerprint powder on them.

Q Were you able to get any legible prints off of the two beer cans?

A No, sir; I was not. I initialed off on them and outside of both of the bags.

Q Did you process both of these?

A Yes; I did.

Q When did, when did you get the beer flat and the cans from Ken Collins?

A I received them from Fran Everett on April the 14th of 1994.

Q Do you have access to the evidence room?

A Yes. I oversee the operations of the Evidence and Property Management Section.

Q Excuse me. Let me move this out of the way. Number 4 here, can you identify that for me, please, sir?

A Yes, sir. It's the torn piece of cardboard that I

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 45 of 239

received also on the --

Q Did you process that?

A Yes, sir. I did process this.

Q Has it got any water damage to it?

A I'm sorry?

Q Does it have any water damage to it?

A It does not appear to have any to me.

Q Is that the way you received it?

A Yes, sir; it is.

Q You've initialed it, I think?

A My initials are on the bottom, I think.

Q Did you process that one?

A Yes, sir; I processed this using the super glue fuming method.

Q What's that?

A It entails placing this piece of cardboard in a tank. I use a glass tank, very much like a fish aquarium with a top on it. I use a small cotton fiber filter to place in the tank. The filter is impregnated with sodium hydroxide. And super glue, a few drops of super glue are squirted on the cotton fiber filter. The sodium hydroxide, it acts as a catalyst to make the super glue fume and it looks very much like a cigarette smoking in an ashtray. The fumes adhere to any fingerprint that might be on the object. It appears as a whitish deposit. You then have to process it with black fingerprint powder to enhance the ridge

characteristics in the fingerprints that you've developed.

Q Is that some of that chemical technique that Mr. Mears was just asking you about?

A Yes, sir; it is.

Q How long has super glue -- is that a common acceptable procedure in the scientific, or in the fingerprint folks -- do fingerprint folks do that all the time?

A Yes, sir. That's one of the most common methods of developing fingerprints.

Q And was a print developed on that?

A Yes, sir. One fingerprint.

Q Then what do you do?

A I compare the -- I photograph the fingerprint once I develop it on this piece of cardboard. It was photographed with a fingerprint evidence camera, which photographs one to one image. I then lift this fingerprint from the cardboard with fingerprint lifting tape, which looks very much like scotch tape. The fingerprint is lifted and placed on a white three by five backing card, being a white background and the ridges being black when you place it on that card, you can see the print much better than a white photograph.

Q I show you Number 23, I believe it is, here first, please, sir.

A These are thirty-five millimeter photographs of the fingerprint developed on the piece of cardboard.

Q Number 4 there?
A I'm sorry?
Q Item Number 4. 23 are photographs of the print developed on item Number 4?
A Right. Correct. A piece of cardboard.
Q You took them?
A No, sir. These were taken by Agent Ken Collins of the G. B. I. who was present with me when we developed this fingerprint.
Q If you could put them back in there. This was done over where?
A It was done at the jail justice center, Sheriff's Department, here in Thomasville.
Q Are those fair and accurate representations of the print that was developed by the super glue?
A Yes, sir; it is.
Q 164 here, can you identify that for me, please, sir?
A This is a three by five latent print backing card. This is the card I placed the latent fingerprint from the piece of cardboard onto once I lifted it with the tape.
Q Is that what you just testified about?
A Yes; it is. My initials are on the back.
Q And the other side, what's on the other side?
A This is a diagram of the piece of cardboard. The little "X" represents the approximate area of where I lifted the

 fingerprint from on the piece of cardboard. Details of the incident here are incident dates and times, the location and my initials here.

Q Now, did you get other cards from Ken that he had lifted at the store?

A Yes; I did. I received twelve other latent print backing cards.

Q Number 165, if you could look at that for me, please, sir?

A These are the twelve latent print backing cards that I received from Fran Everett in the evidence room. The backs of the cards indicate they were lifted by Agent Ken Collins of the G. B. I. I've initialed the back of each of the cards, and dated, my initials are on the back and the date in blue ink. These cards display both partial latent fingerprints and latent palmprints.

Q Now, you have these prints. Did you need to something to compare them with?

A Yes.

Q And did you have prints obtained from various people to make comparisons to these?

A Yes; I did. They were prints in my file.

Q Which prints did you compare to these?

A I compared --

Q The tab, Number 4, and then these twelve other cards?

A I compared the known fingerprints of Ray Cromartie, Corey Clark, Thaddeus Lucas and Gary Young.
Q Did you also have the deceased?
A Yes. I had the postmortem prints of the deceased.
Q Put those back. Paper clips?
A I'm sorry.
Q Is that the procedure you used? You have something you want to compare and then you have something to compare it to?
A That's correct.
Q Did you compare these twelve -- Were you able to get any positive identification on these twelve?
A No; I was not.
Q What are you looking for when you make a fingerprint comparison?
A Each fingerprint -- there are three basic types of, pattern types of fingerprints. There are loops, arches and whirls.
Q Loops?
A Arches and whirls.
Q Okay.
A Within the fingerprint pattern there are -- in the identifying characteristics, the ridges form identifying characteristics within the fingerprint pattern such as bifurcations, a forking of one ridge into two, ridge endings, a ridge ends abruptly between two ridges. There are dots. Just

what the word implies, a dot. An island or an enclosure where one ridge splits into two, travels for a short distance, comes back together to form an island or an enclosure. Those are identifying characteristics within the fingerprint pattern and they are unique to that person.

Q Are fingerprints unique to each individual?

A Yes; they are.

Q Does anybody have the same fingerprints?

A No one -- No two people can have the same identifying characteristics within a fingerprint pattern. They can have the same pattern type. We may all have a loop on our left thumb, but the characteristics that the ridges form within that loop pattern are not the same on anyone, not even identical twins or siamese twins.

Q Everybody's fingerprints are different?

A Yes, sir.

Q Now, you say you looked at the fingerprints of each of the people involved insofar as Mr. Lucas, Mr. Young, Mr. Cromartie and even the deceased, Mr. Slysz?

A That's correct.

Q Now, I think you have the print cards, which is 163. Is this the print card that you used in reference to Mr. Cromartie?

A Yes, sir; it is.

Q That was rolled by which officer?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 51 of 239

MR. MEARS: Your Honor, may we approach the Bench?

A The signature says Henry Williams --

THE COURT: Yes, sir.

(Whereupon Counsel confer at the Bench, during which the following transpired)

MR. MEARS: The witness has introduced --

THE COURT: I know.

MR. MEARS: This guy he had --

THE COURT: I've got a note right here. There's something on one side --

MR. MEARS: -- a previous D. U. I. conviction. My objection is that it's being flashed around in front of the Jury. The Jurors sitting right there can see it. There's two Jurors right there within two feet of it. It's not necessary to flash it in front of them.

THE COURT: Cover it up.

MR. MEARS: I'm afraid covering it up in front of the Jury or making any alterations now is going to -- I don't see any reason why they have to be shown that right now.

(Conclusion of Bench conference)

BY MR. HARDY:

Q This is the print card you used of the known prints of Mr. Cromartie?

A That's correct.

Q You had print cards of the other individuals likewise?

A Yes, sir.

Q And you then would look at, say, this particular card of Mr. Cromartie and look at it and find those swirls and islands and grooves and dots and things like that?

A That's correct.

Q And you did that for each of the individuals?

A Yes; I did.

Q This other bag, which is 184, does it include palmprints and fingerprints of the subjects you were just talking about?

A Yes, sir; it does.

Q Are these what you used in these comparisons?

A That's correct.

Q Looking at the swirls and the islands and the dots and the other identifying characteristics?

A That's correct.

Q And where on the beer tab did you get this print?

A On the top portion of it, what appears to be the top portion of it. The painted side of it.

Q Okay. Were you able to identify that particular print from the top of the beer carton?

A Yes; I was.

Q And how did you do that?

A I compared the identifying characteristics within that fingerprint pattern to the known fingerprint on the fingerprint

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 53 of 239

card.

Q And were you able to come to a determination as to whose fingerprint, which finger it was on the beer carton?

A Yes; I was.

Q Whose finger was it on the beer carton?

A The Defendant's, Ray Cromartie, left thumb.

Q Left thumb. Did you make a chart, diagram showing that?

A Yes; I did.

MR. HARDY: Your Honor, we'd offer, I think we've not done that, 23 and 184 into evidence. I think they have not been offered. 23 are the photographs and 184 are the fingerprint cards.

THE COURT: 184, Mr. Hardy?

MR. HARDY: Yes, sir. 184. The bag with the fingerprint cards he just looked at.

MR. MEARS: Your Honor, we don't have any objections to either 23 or 84 --

MR. HARDY: 184.

MR. MEARS: Excuse me. 184.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q You made that chart. Let me show you Number 166, and ask if you could look at this for me, please?

A This is a chart enlargement that I made of the known

fingerprint of Ray Cromartie and an enlargement of the print lifted from the top of the piece of cardboard.

Q Now, you look for points of comparison between the prints?

A That's correct.

Q And you look for a minimum number of points of comparison?

A There is no set number. Each fingerprint is unique. The characteristics within that pattern are unique to that fingerprint. But I do use a standard of nine. Most courts accept eight to twelve points of identification.

Q You won't call one until you at least see nine?

A That's correct.

MR. HARDY: If you could -- Ask him to step down, please, Your Honor?

THE COURT: Yes, sir.

A (Witness steps down from witness stand)

BY MR. HARDY:

Q Now, the side over here you're talking about the -- which is which?

A The ink fingerprint is the fingerprint, the known fingerprint of the, from the fingerprint card. This is the latent fingerprint that was lifted from the piece of cardboard, the latent fingerprint.

Q So the one over here on this side is the one from the

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 55 of 239

beer carton?

A That's correct.

Q That would be the right hand side. It says latent fingerprint.

A Um-hum (affirmative).

Q And this would be from the --

A Fingerprint card, the known fingerprint.

Q Now, how do you go about comparing the fingerprints? Start down here and show these ladies first, please?

A Okay. Characteristic number one, identifying characteristic number one in the known fingerprint is a ridge ending. And in the latent fingerprint an identical ridge ending. Identifying characteristic number two is also a ridge ending. It appears in the known fingerprint flowing up from the bottom, end abruptly between two ridges. An identical ridge ending appears here in the latent fingerprint in the same location and ends abruptly between two ridges. Number three is also a ridge ending that flows up from the bottom of the print and ends abruptly between two ridges. The same identical ridge ending is present in the latent fingerprint. Number four is a ridge ending flowing down from the top of the print in the known fingerprint. An identical ridge ending flows down from the top in the latent and ends abruptly between two ridges. Number five is a ridge ending flowing in from the right side of the known print. An identical ridge ending flowing in from the right side of the latent in an

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 56 of 239

identical location. Number six is a ridge ending flowing in from the left side of the known print. It's in the same furrow that characteristic number five, they're both in the same ridge furrow but do not meet each other. That same identical ridge flows in from the left side of the latent and ends abruptly in the same spot here in the latent print. Number seven is also a ridge ending. It flows down from the top of the known print and ends abruptly between two ridges. In the latent print it flows down from the top and ends abruptly between two ridges in the same identical place. Number eight is also a ridge ending. It flows up from the bottom of the prints and ends abruptly between two ridges. It does the same thing in the latent print, flows up from the bottom and ends abruptly at the same location in the latent fingerprint. Number nine is also a ridge ending that flows up from the bottom and ends abruptly between two ridges. It flows up from the bottom in the latent print and ends abruptly between two ridges in the same identical place. And number ten is a ridge ending that's here in the core, the center of this fingerprint, and ends abruptly here at the top of the recurve of the ridge above it. It also is the exact same location here in the latent finger print. This is a whirl pattern. This is the second most common fingerprint pattern of the three basic fingerprint patterns.

Q Step down here and show these ladies and gentlemen?

A Number one, again, is a ridge ending that flows in from

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 57 of 239

the top of the known latent and ends abruptly between two ridges. That same identifying ridge ends here abruptly between two ridges in the latent fingerprint, same identical spot. Number two is a ridge ending flowing up from the bottom. It ends abruptly here between two ridges. The same identical point here on the latent fingerprint and ends in the same identical place. Number three is a ridge ending that flows up from the bottom and ends abruptly between two ridges in the known. Flows up from the bottom in the latent and ends at the identical location between two ridges abruptly. Number four is a ridge ending flowing down from the top of the known print. Also down from the top of the latent fingerprint and it ends in the identical same location. Number five is the ridge ending coming from the right side of the known, ending abruptly between two ridges. It enters from the right side of the latent and ends abruptly between two ridges at the same location. Number six flows in from the left side within the same furrow and ends abruptly between two ridges. In the latent print it does the exact same. It flows in from the left side and ends abruptly between two ridges in the same furrow as number five. Number seven is a ridge ending flowing down from the top of the latent fingerprint, ending abruptly. It flows down from the top in the latent and ends abruptly between two ridges. Number eight is a ridge ending which flows up from the bottom, ends abruptly. In the latent print, exact same location, flows up from the bottom and ends between two ridges abruptly. Number

Case 7:14-cv-00039-HL Document 18-17 Filed 07/14/14 Page 58 of 239

nine is a ridge ending flowing up again from the bottom of the known fingerprint, ending abruptly. Same location on the latent fingerprint. It flows up, ends abruptly between two ridges. And number ten is a ridge ending, a ridge within the core of the fingerprint that flows up from the bottom and ends abruptly. It does the exact same thing in the latent fingerprint, flows up from the bottom and ends abruptly in the same location.

MR. HARDY: Your Honor, we'd offer this chart, 166, into evidence.

MR. MEARS: No objection.

THE COURT: Admitted without objection.

BY MR. HARDY:

Q Did you just stop at ten? Are there more points of comparison?

A There are fifteen that I counted in that latent fingerprint. I only charted ten to keep the chart uniform and not have to cross any of those red lines, identifying lines there.

Q You found fifteen?

A Fifteen.

Q That's from this beer tab right here?

A That's correct.

Q And whose fingerprints are on this beer tab?

A Ray Jefferson Cromartie.

Q Did you go over to Bainbridge and, with Chuck about the

brown car?

A Yes; I did.

Q Did you fingerprint the car?

A No, sir; I did not.

Q Why not?

A I was not asked to fingerprint it. I only went with Inv. Weaver. He had asked me to go with him that day. He was not familiar with the location of the wrecker service that had this vehicle. I had some other evidence to take to Decatur County in another case and I rode over with him.

Q So that car wasn't processed?

A Not by me; no, sir.

Q Is there any doubt in your mind whatsoever that that's Ray Cromartie, Ray Jefferson Cromartie's fingerprint on that beer tab?

A No, sir; none at all.

Q Any two people in the world have the same fingerprint?

A Not the same identifying characteristics; no, sir.

MR. HARDY: If I could have a second, please, Your Honor?

THE COURT: Yes, sir.

BY MR. HARDY:

Q The shell casing, I think, you found at Madison Street, you turned in to the evidence locker, or you -- you took it up to Moultrie?

A Yes, sir. Turned it over to Jim Howard at the crime lab.

Q Can you identify that for me?

A Yes, sir. That is the shell casing. It has my initials on it and the date, 4-9-94.

Q And that was all that you were able to retrieve at that particular location?

A That's correct.

Q Is that Ray Jefferson Cromartie that you found his fingerprint on the beer tab in the courtroom this morning?

A Yes, sir; he is.

Q Would you identify him if you see him?

A Yes, sir. He's seated at the Defense table with the blue shirt on (indicating the Defendant).

MR. HARDY: Thank you.

RECROSS EXAMINATION

BY MR. MEARS:

Q Mr. Hutchinson, I want to go back and ask you some questions about the Madison Street Deli crime scene, and then we'll talk about fingerprints and your work at the Junior Food. But first, I want to concentrate on your work at the Madison Street Deli. Is that okay?

A Yes, sir.

Q Okay. Now, with regard to the Madison Street Deli, were you the primary crime scene technician at that particular

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 61 of 239

location?

A Off. Weaver was actually doing the scene. I was only asked to process for fingerprints, and that's the only thing that I did, and collect that one shell casing. Those are the only things that Off. Weaver asked me to do.

Q You also observed a videotape; did you not?

A Yes; I did.

Q And that videotape was back in Mr. Griffin's office; was it not?

A Yes; it was.

Q I'm handing you what's been shown as State's Exhibit 32. It's already in evidence. But would you just look at that just to make sure that you recognize that as being the videotape that you looked at in Mr. Griffin's office on April the 7th of 1994?

A My initials are on the bottom of the package. I don't have any initials on the tape, so I, I don't know if this is the exact tape.

Q Assume for my question that the item has been identified by other individuals who said that that's the one they took out of Mr. Griffin. Now, how long did you spend viewing that particular videotape on April the 7th of 1994?

A I viewed the -- probably no longer than two or three minutes or so. I viewed the entry of the person into the store, his route around the counter to the cash register, and then back

out the front door. That's the only portions of it that I viewed.

Q Were you ever asked to view the videotape at any other time for the purpose of determining whether latent prints should be looked for at other locations in the store?

A No, sir. That was the only time that I viewed it as far as looking, looking to where to process the likely surfaces that might be processed is at the store.

Q Okay. Are you -- You are aware that that's an approximately two hour videotape totally? Are you aware of that?

A I, I -- No, sir; I don't really know how long it is.

MR. MEARS: Your Honor, at this time we would request the Court to allow us to play the entire video to the jury? It's in evidence. We feel that it's relevant and, the arguments we've made already, I would ask for this to be our opportunity to play the video to the jury while I have Mr. Hutchinson on the stand to ask him questions with regard to crime scene processing. He's been qualified as an expert, not only as a fingerprint expert, but also as a crime scene technician. I want to ask him questions about the videotape as it relates to the processing of the crime scene and identification.

THE COURT: Are you speaking of the entire two hours, Mr. Mears?

MR. MEARS: Yes, sir. Yes, sir.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 63 of 235

THE COURT: Overruled.

MR. MEARS: Okay. Then subject to my exception to the Court's ruling, Your Honor, could I be allowed to play certain --

THE COURT: Excuse me just a moment.

Ladies and gentlemen, let me ask you to step to your jury room for just a moment.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Why don't you tell them this looks like a good opportunity to go ahead and take our mid-morning recess (indicating to Bailiff). Why don't we take about a fifteen minute recess at this time.

Mr. Mears?

MR. MEARS: Yes, Your Honor.

THE COURT: We have previously covered this matter and I, I think my ruling on it was clear, but maybe it was not. Now, on Monday, I believe, or one day this week, we spent lunch at the deli, so to speak. We watched this entire tape. And my indication to you at that time was if you can show me something specific on the tape which satisfies me that it is relevant to the issues for this jury to decide, then we will address that issue and, if I'm satisfied it's relevant, allow the jury to watch that portion of the tape.

Now, I think during the time period the tape was being

viewed Counsel had an opportunity to, to watch the numerical, for lack of a better terminology, or not knowing the technical terminology, there are numbers shown on the screen which Counsel can identify, did identify as to specific portions of the tape where specific matters might be that Counsel thinks is relevant so that we could show those pertinent portions, if there are, in fact, pertinent portions. I, at this time, still am not satisfied that the entire two hours of other customers coming and going is relevant.

MR. MEARS: I understand it, Your Honor. And what I started to say and perhaps I should have asked the jury to leave before I started the request, but I wasn't arguing with your ruling. My offer, my request is to play the entire tape. If the Court is, and which you have, denied that request, then I was going to ask the Court subject to my exception to not play the whole tape, to play specific portions. There are several portions that I think that should be played. Several portions toward the end of the tape where there appear to be several black males entering the store, not purchasing anything, looking out the door --

THE COURT: Can, can you secure your notes and, and tell me what specific portions and what those portions depict?

MR. MEARS: One moment, Your Honor. While Mr.

Kleinrock is looking for that, we made notations as to time from the beginning and the notations I would display on the screen, the time on the tape. I will show you the specific times when I can find my note pad. There is several instances about at -- we started playing the tape at 11:20. Eight minutes into the tape, eight minutes into the tape there appears to be an individual wearing a bandanna on his head with a jacket covering a sweatshirt with a hood on it come into the store and is never seen leaving the store. I assume he left but apparently went under the camera. The person had what they say on the street is a do rag, a gang rag. That's the way gang members identify themselves in some particular locations, by wearing a bandanna tied around their head. According to my observations the person looked very much like Gary Young. Now, the Court may take a different opinion of that. But I think that's up to twelve members of this community to determine whether or not Gary Young was in that store or not that night.

THE COURT: Mr. Mears, there's no evidence at this time that anybody else besides Mr. Wilson was in the deli when the individual came in and shot him. There's no evidence whatsoever that anyone else was in there.

MR. MEARS: Surely if Mr. Young came in, checked the store out, saw how many clerks were in there. At that time I think there were two clerks in there. He went back

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 66 of 239

outside and waited until the other clerk left with his girlfriend or lady friend and then came back in the store. That's certainly a, not an implausible assumption for jurors to make considering it was Mr. Young's gun that shot Mr. Wilson. I can't think of anything more relevant than the jury being asked -- The State has played that --

THE COURT: Do you have someone that is going to identify this individual as Mr. Young?

MR. MEARS: No more than the State --

THE COURT: Or, or identify this individual as, as being -- have somebody that's going to testify that in their opinion this individual could be Mr. Young?

MR. MEARS: No more than the State has anyone who's testified --

THE COURT: But the State has --

MR. MEARS: May I finish, Your Honor?

THE COURT: -- put somebody on the witness stand that has said that. Now, if you, if you have a witness that is going to say that, who is going to view that portion of the tape and say that, then, yes, sir; you may play that portion. But, otherwise, --

MR. MEARS: The State, the State hasn't put anyone up that's identified that shooter as Mr. Cromartie.

THE COURT: What are the other portions of the tape?

MR. MEARS: There's no portion of that tape, Your

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 67 of 239

Honor, that identifies Mr. Cromartie. The F. B. I. couldn't even do it.

THE COURT: My question is, what other portions of the tape do you purport to play?

MR. MEARS: I want the whole tape played, Your Honor. I'll rest on that. If the Court's going to rule that irrelevant, that's all I'm going to offer, because, Your Honor, the State can put the tape in; they cannot identify Mr. Cromartie as being the shooter. The F. B. I. with all of its sophistication couldn't identify it, then I've got a right to put up the tape to show that Mr. Young was the person who came into that store. The jurors can look -- they looked at Mr. Young then. They can look at the tape and make a determination of whether the person who did the shooting was Mr. Young. It was his gun. He's admitted he was wearing -- that he's worn gang colored scarfs on his head before. Your Honor, this is a gang related incident. The Court can, can assume that my argument is implausible, but I assure the Court, this is not an implausible argument. This matter involved a gang from West Side and a gang from Cherokee Apartments. It was an invasion of one gang's territory. Mr. Young was the head of the gang. And I've got a right to have the jury look at that tape. Mr. Cromartie's got a right to have the jury look at that entire tape, Judge. The State put it up there with the assumption

that the shooter was Mr. Cromartie. Why can't we put the tape up with the assumption that the shooter was Mr. Lucas? Nobody has identified Mr. Cromartie. No one has identified him other than the real shooter as having ever worn this particular jacket. There's certainly no evidence to link him to that jacket or that hat. I would submit there's more evidence linking Mr. Young to the Madison Street shooting than there is linking Mr. Cromartie. No one has said that that was Mr. Cromartie's pistol. Everyone has said it's Mr. Young's pistol.

THE COURT: What other parts of the tape, Mr. Mears?

MR. MEARS: I want the whole tape played, Your Honor. I, I think we're entitled to have the tape played, specifically that portion dealing with individuals coming -- As a matter of fact, Keith Redding is shown on that tape at least three different times. Now, I know he's been out of this, this tape, out of this case because the State backed out. But Mr. Redding was in the tape. There was obviously a lookout coming and going during that tape. The jurors have a right to look at that.

THE COURT: There's no evidence in the record that Mr. Redding or Reddick is in the tape.

MR. MEARS: Your Honor, I have made my offer to play the tape. If the Court is going to disallow me to play the evidence, then I understand the Court's ruling. I can't

Case 7:14-cv-00039-WTT Document 18-17 Filed 07/14/14 Page 69 of 239

argue anything else other than I argued. The tape speaks for itself. The evidence speaks for itself. And I ask the Court to allow me to play the entire tape.

THE COURT: Mr. Mears, I'm not going to allow you to play the entire tape. Now, I will consider specific portions of it if you can satisfy me that they are relevant.

MR. MEARS: I want to play that portion of the tape beginning with the time that Mr. Gary Young came into the store, or the person that I am supposing the jurors might consider as being Mr. Young, until the end, because they've got to make a comparison of the individuals coming into the store, making visual comparisons of their body types, their heights, their skin color, the complexion of their skin, color of their skin, the depth of the color of their skin, and make a comparison to the person who went in and did the shooting.

THE COURT: I don't agree.

MR. MEARS: I understand, Your Honor.

THE COURT: What is the -- Does the State have a position?

MR. HARDY: I don't see the relevance of the whole tape. As to what instances he wants to play, I think he looked at it Monday at lunch. I'd certainly object to him saying that's Gary Young or that's Thad or that's that. I don't think -- if he gets up and says, well, that's Gary

Young or that's Mr. Reddick on the tape or that's Glenn Hutchinson on the tape or that's Mike Mears on the tape, that would certainly be improper, Judge. If he's talking about with the Judge, the Court's direction that he can play 11:28 for fifteen seconds or whatever and not make any comment or blurt out, hey, that's Gary or that's the way Gary's clothes were, that would totally be improper. I don't know whether he's trying to say he's just going to play it, leave no comment, or what's he's saying he's doing --

THE COURT: He could ask a witness, you know, whether or not they think that particular individual depicted is some specific person. Now, he can't testify himself.

MR. MEARS: And certainly that's -- Mr. Hardy knows that that would be improper for anyone --

THE COURT: Gentlemen, let's quit, I almost say bickering, but -- All right, sir.

Assuming for a moment that we allow you to play that portion, again, are there any others? I'm not going -- Mr. Mears, we're not just going to play the whole tape from start to finish because --

MR. MEARS: Why not, Judge?

THE COURT: -- there may be something on there --

MR. MEARS: I know you've ruled, Judge, and I'm not arguing. But I, for the life of me, I can't understand why?

THE COURT: I don't see the relevance.

MR. MEARS: Is it a time factor?

THE COURT: I don't see the relevance of it.

MR. MEARS: Judge, I, I can't articulate any other stronger reason for playing it other than the fact that the juror has a right -- You're going to charge them that they have the right to look and make identification on some of these matters. They have the right to use their common sense. They have a right to look at this tape.

THE COURT: Without any other specifics being offered, we'll allow you to play that portion which you have specifically indicated to the Court that you would like to play, that is eight minutes into the tape where an individual comes in with a blue bandanna on. You can play that portion of the tape.

MR. MEARS: That's not sufficient to just play that one portion, Your Honor. It's less than ten seconds, that particular part, because the individual is coming into the store --

THE COURT: Mr. Mears, I have asked you to be specific. Your only response is you want to play the entire tape.

MR. MEARS: My, my specific --

THE COURT: Now, if you will tell me another specific segment and what it shows, we will consider it. Otherwise, my ruling is going to stand. We're not going to play the

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 72 of 239

entire tape.

MR. MEARS: Will you allow me to play the part of the tape from, from eight minutes into the tape to the end of the tape?

THE COURT: No, sir.

MR. MEARS: Will the Court allow me to play the last ten minutes of the tape? There were other individuals coming into the store in the last ten minutes of the tape that the jurors can make comparisons of.

THE COURT: Specifically, what do the individuals depict that you wish to show the jury and you think is relevant?

MR. MEARS: There were several individuals who come into the store who appear to not make any purchases, go to the door and look out, come back in. There are also in -- at one point, Your Honor, I believe there's --

THE COURT: All right. The fact that another individual comes into the store, does not make a purchase, what does that, you know, what does that prove or, or what is that going to help this jury decide?

MR. MEARS: Your Honor, it shows individuals coming in to determine when the clerk was going to be alone. It shows individuals coming in, scouting the store on behalf of the shooter who comes in later. Your Honor, there was one point at 57.4, one of the -- I'm sorry. I'm using the numbers

that appeared on the screen at that point. Individuals, two black males entered the store, one wearing a Nike T-shirt, another wearing a Tasheki (ph.) type of shirt. They went to the back of the store and were never seen leaving. I'd like to show that part of the tape because that, the configuration of that store, I'm going to ask Mr. Hutchinson, the configuration of the store, it does have places where you can be out of the area of the camera and be out of the area of the clerk's view.

THE COURT: Mr. Mears, but there is no evidence that anyone else, other than the one individual that came into the store that is depicted on the video was involved in the matter.

MR. MEARS: Judge, you, you let -- you, you made a decision about not severing out the Madison Street Deli based upon a similar transaction analysis between Madison Street and Junior Food. Now, Junior Food has at least two, maybe three individuals in the store, but we know that there were two individuals in the store at the Junior Food Store. The State's case puts two individuals in the store. One going down one aisle and one going down the other aisle. You let the Madison Street Deli into this case and not severed it on the basis of the similarities between the two. Now, the Court's saying because they're not similar, I can't show the tape.

THE COURT: No, sir, that's not --

MR. MEARS: That doesn't make any sense, Judge.

THE COURT: That's not what I'm saying. Do you have any other specifics?

MR. MEARS: No, Judge; I don't.

THE COURT: All right, sir. You can show that, that one portion. Without any other proffers, you can show that one portion eight minutes into the tape.

MR. MEARS: Your Honor, I, I don't want to show the one portion and waive --

THE COURT: We're in recess.

MR. MEARS: -- I'm not arguing with you, Judge. I don't want my showing of one portion to be considered a waiver of my objections. Would the Court allow my objection to stand and not having waived it by playing that one ten second --

THE COURT: No, sir. No, sir. I've asked you for specifics. You've not proffered any others.

MR. MEARS: Judge, all I'm asking you is if I play the ten second portion, is that going to be a waiver of my objection to not being allowed to show the whole tape? Because I, I don't think --

THE COURT: Mr. Mears, I --

MR. MEARS: -- that one second is sufficient, or the ten second portion --

THE COURT: That's been noted. We're in recess.

(Whereupon the Court takes a brief recess, and upon reconvening the following transpired outside the jury's presence)

MR. MEARS: Your Honor, where can Mr. Hutchinson be? He can't see it from the witness stand. Could I ask him if he could stand back over here with me while we --

THE COURT: Yes, sir.

MR. MEARS: Go ahead up there.

THE COURT: You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Mr. Mears, you may proceed.

MR. MEARS: Thank you, Your Honor.

Q Mr. Hutchinson, before we took the break, before we took the break I had asked you whether or not you had had an opportunity to view the surveillance tape in Mr. Griffin's office and you said you had; is that correct?

A That's correct.

Q For the purpose of my next series of questions, I'm going to ask if you will, to come down to this end of the jury box with me while we play that portion of the tape that has been designated here to be a very short portion. But if you will look at that with me. Then I'll stop it and then I'll ask you to return to the stand. Is that okay?

A (Witness steps down from witness stand)

MR. MEARS: Is that appropriate, Your Honor?

THE COURT: Yes, sir.

JUROR: Can I ask that this be moved over here?

THE COURT: Yes, sir.

Ladies and gentlemen, before we start it, we'll -- let us know if some, if any of you can't see it sufficiently.

MR. MEARS: If we do it this way it may not be necessary for Mr. Hutchinson --

JUROR: That's better. Thank you.

THE COURT: Can everyone see?

MR. MEARS: Mr. Hutchinson, can you see? Okay. Mr. Hutchinson, if you could just stay there.

(Whereupon a portion of State's Exhibit 32 is played)

MR. MEARS: Your Honor, may I go ahead and move this out of the way?

THE COURT: Yes, sir.

BY MR. MEARS:

Q Mr. Hutchinson, you had an opportunity to view that at the crime scene at the Madison Street Deli on April the 7th; is that correct?

A That's correct.

Q You have seen that part. When you began to process that particular crime scene for fingerprints, did you use the videotape as a means of identifying certain areas within the

store to attempt to collect prints?

A That's correct. I did.

Q Okay. Now, at that time you had been informed, had you not, by the first officers that arrived on the scene and the EMS people, as to who had been in the store subsequent to the time that Mr. Wilson was shot? Had you not?

A I didn't understand your question.

Q Had you been told by the officers on the scene that a type of crime scene log had been kept? You know what that is?

A Yes.

Q A crime scene log is a record of who has come onto the scene, where they've been, and the times that they've been there. In this case a crime scene log was not taken. But did you receive information from the officers as to the names of the individuals who had come into the store after the shooting took place?

A Yes; I did.

Q Okay. So you knew who those people were including the two lay people, the two ladies who had come, encountered -- at least one came into the store and was talking to the other at the door after Mr. Wilson had tried to call 911? You had those names too; didn't you?

A I don't remember those names; no, sir.

Q You weren't given those names?

A No, sir.

Q Okay. So absent those -- Did you know anything about that?

A No, sir.

Q You weren't asked to check their prints, like on the door or anything else?

A No, sir.

Q Okay. Absent those people, you were told who else had been in the store after Mr. Wilson had been shot?

A The officers. I don't know the names of the EMT's who had been there, but that EMT's had been there. I don't know their names.

Q And you processed the scene for latent prints; is that correct?

A That's correct.

Q Now, we use the term "Latent Print". Would you just tell the ladies and gentlemen of the jury what that means? What, what's the difference between a latent print and a known print?

A A latent print is the reproduction of the ridge detail, the little lines in your fingers, palms and soles of your feet, that are left on an object when it's touched by someone.

Q And as a crime scene technician and as a collector of fingerprints, that's what you actually collect when you go to a crime scene and try to locate identifiable prints; is that correct?

A That is correct.

Q Now, in this particular instance, the one at the Madison Street Deli, you looked at the crime scene. Could you make a determination as to those possible areas within the store that the, Mr. Wilson's assailant had touched while he was in the store, assuming it was a he?

A I could see some of the areas, yes, on the tape.

Q Okay. Would it be a fair statement to say that it appeared that he touched the door on his way out?

A I really can't see it going out. I see him coming in, opening the door, touched the door obviously coming in.

Q Did you see in the film as he was going out, his left hand extend toward the door?

A I did not notice that in the film; no, sir.

Q You didn't see that in that film?

A No, sir.

Q How many times did you watch the film?

A I think I viewed it twice.

Q Okay. And as you watched it just then did you see the gentleman, or am I just missing that completely, where he was going out the door like this?

A I missed -- I obviously missed that. I didn't see that.

Q And, and I'm not saying that he did it. I'm just saying that there was -- I'm asking the question, did you see him do that?

A No, sir.
Q What I say is not evidence. Okay? Did you see him as he, or she, came back around the corner and started touching the cash register?
A Yes; I did.
Q Okay. Did you stop the videotape at any time as you were watching it in Mr. Griffin's office so that you could better, get a better or clearer picture of those parts of the cash register that he touched?
A I don't recall us stopping the tape at the store. I don't recall us doing that.
Q Okay. Do you recall that portion of the tape where it appears that the individual went, left the tape, and I'll turn my back on you, like this is the cash register, left the cash register, went back around and either said or yelled something over toward where Mr. Wilson apparently was? Did you see that portion?
A Yes, sir.
Q Did you see his left hand on the other machine, the cash register or the lottery machine there?
A It appears it's at the end of the counter. I don't know if it's one --
Q Did you see the machine sitting there?
A Yes. There is a machine there on the end of the counter.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 81 of 239

Q When you attempted to locate latent prints at the Madison Street Deli, what areas did you first secure and then attempt to locate prints by the application of proper chemicals or dust?

A The store was secured already when I got there. There was -- they had up barrier tape. I started processing with the cash register that you see the individual appears to be punching the keys of. I started with that cash register and worked myself back around to the front door.

Q What -- You started with that. Did you ascertain, or did you ask any questions as to whether or not anyone on the scene before you had touched the cash register?

A Yes; I did.

Q And what were you told?

A I was told by the officers that no one had.

Q Okay. You were told that no one had touched the cash register?

A The cash register itself; yes, sir.

Q Okay. Now, when I asked the question, did you secure it, I guess my question is, the crime scene had been secured. Did you do any internal securing method, or use any internal securing methods over those areas that you had decided you were going to take latent, or attempt to find latent prints from?

A I did. I advised the officers that, not to touch anything until I had processed it for fingerprints.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 82 of 239

Q And that's good crime scene detective --

A Normal procedure.

Q Normal procedure. Now, when you finished processing the cash register, what was the next thing that you processed, or attempted to process?

A The counter next to the cash register. And I processed the end of the counter where the lotto machine appears to be, or there's some type -- may be another cash register there, some type of machine on that end of the counter. I processed the entrance to the back of these counters. There's a two, two and a half foot little entrance between the counter and the wall of the store. I processed the area in, along the front of that counter which faces out into the store. And then I was at the front door and processed both the inside and the outside of the front doors, both doors.

Q Okay. Now, did you ever process the machine, the lotto machine, or what we're calling the lotto machine at the end of the counter?

A I don't recall processing the whole, the whole machine. Just the end of the counter where it was sitting.

Q Okay. But you did attempt to retrieve prints from the inside of the door; is that correct?

A That's correct.

Q At what height level were you attempting to retrieve those?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 83 of 239

A I processed it as high as I could reach. I'm five nine. Probably six three, something like that, that height, as far as I could reach, or where a person would normally handle the door when they come in.

Q That, that was my question. You processed that area where someone would normally push against the door?

A Yes, sir.

Q Okay. Now, did you obtain any usable latent prints? And you know what I mean by the term "usable", within the context of your profession?

A I did not lift any identifiable or usable prints.

Q How many lifts did you take at the Madison Street Deli?

A I don't remember the exact number. About seven or eight to the best of my knowledge.

Q Seven or eight. Would that be the most that you would have lifted?

A Yes, sir.

Q Now, when I use the term "Lifted", let me explain it. I'm assuming by using that term that these are prints that you had dusted or surfaces that you had dusted with some form of chemical, that you had then placed some type of tape, fingerprint tape of some type on and lifted after you had photographed it?

A That's correct.

Q Did you photograph any of these before you lifted them?

A No; I did not.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 84 of 235

Q Okay. So you put tape on and lifted seven or eight prints?

A Yes. Partial fingerprints.

Q Partial prints. Now, and your testimony is, none of those were usable; is that correct?

A That's correct.

Q Did you ever attempt to, to compare any of those partial prints to any known prints?

A No, sir; I did not. There was not enough ridge detail to compare. They were not of any evidentiary value to me.

Q To you. Did you make any attempt at all to obtain the prints of the other individuals who had been in the store to see if you could make even partial identifications?

A No, sir; I did not. There's, there's not enough ridge detail. There was no need for me to compare them. There was nothing to compare to.

Q Okay. And you've testified that you use anywhere from eight to twelve, eight to twelve points of identification in order to make an assessment as to whether or not there's a comparison; is that correct?

A That's correct.

Q Have you ever made any points of comparison using less than eight individual points of identification?

A No, sir; I have not.

Q Have you ever attempted to make identification

comparisons using less than eight points?

A No, sir.

Q Okay. Are you aware that such identifications can be attempted? In other words, you, you've identified the bifurcated, the islands, the ridges, those type of things, and you've indicated at least in one print that you, that you did make a comparison of, that you found -- you, you charted ten and you said you found fifteen?

A That's correct.

Q Now, you didn't even attempt to make any comparisons at the Madison Street Deli; did you?

A No, sir.

Q Okay. What did you do with those partial prints after you finished with them?

A I just, I threw them away. They were of no value to me. No evidence.

Q When did you throw them away?

A That night.

Q So, without saving those prints or even those partial prints or having the F. B. I. or anyone else look at them, you threw them away?

A Yes, sir.

Q Is that a standard practice, to throw away even partial prints?

A Yes, sir. If they're not of any value to us, then we,

we don't keep it. It's like any other item. If we can't use it, it's not of any value to us. I'm not going to use it.

Q Did you ask for a second opinion on any of those partial prints?

A No, sir; not that night. There was nobody to ask.

Q Did you -- Did it occur to you to -- and I'm not questioning your decision to throw them away except that I need to know did you even consider having someone else look at the prints to see if you might have been mistaken?

A No, sir; I did not. I, I knew that they were not identifiable.

Q Have you ever made a mistake?

A In some things; yes, sir.

Q But we do know that there's no way to check your work with regard to the prints at the Madison Street Deli because you threw it away that night; didn't you?

A That's correct.

Q Seven or eight lifts you threw away?

A Yes, sir.

Q Is it the procedure of -- Is it your procedure to discard prints before there are even suspects available to attempt partial identification from?

A If the print does not contain enough identifying characteristics, there's no -- I do not keep it. It's not identifiable.

Q Mr. Hutchinson, do you understand the term "Minutia" with regard to partial prints?

A Yes.

Q Minutia are those things that include scars, marks, things of that nature that are not part of those fingerprint classifications, but they can be used to make identifications; is that correct?

A My understanding of minutia is that it is the identifying characteristics.

Q But there are external identifying characteristics that can be used such as scars, such as abnormalities of skin, things of that nature; are there not?

A Scars do help you know maybe what finger to go to, to look at on a fingerprint card. But a scar is -- there are no identifying characteristics actually in the scar to use. But, yes, a scar will help you determine where on the fingerprint card you need to start looking at.

Q And it would also identify particular fingerprint cards to look at; wouldn't it?

A That's true.

Q Under the, under the A.F.I.S. system. You've mentioned the automatic fingerprint identification system, which is this new super computer system they've got. You didn't use that that night; did you?

A No; I did not.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 88 of 239

Q Did you make any attempt to use that that night?

A No, sir. The prints are not, were not identifiable. There was no need to enter them in the A.F.I.S. Some of them were partial palmprints. And A.F.I.S. does not search palmprints. It has no data base for that.

Q In fact, A.F.I.S. is very particular about the type of prints that they use; isn't that correct?

A It has to be a very good print most of the time for A.F.I.S. to --

Q You have to roll it just the right way, you have to hold it down in front just the right way, and all of that; don't you?

A Well, it has to have good identifying characteristics within the pattern.

Q Now, what number do you use as a guideline to determine when you've lifted enough prints or partial prints from a scene that you decide your work is done at that particular location?

A What -- I, I didn't understand the question.

Q Is there a number? You've indicated that there, obviously there's numbers that you use as a, as a reference point for identifying characteristics and making comparisons. Is there a number that's used by members of your profession to determine when you've adequately covered a crime scene area to make sure that you've made all the good faith efforts necessary to locate identifiable prints?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 89 of 239

A There's no certain number. I would normally lift all the prints that I developed in the likely areas that the perpetrator may have handled. There is no certain number though.

Q It's a subjective decision on your part?

A Yes.

Q Is it unusual to have a videotape to get, guide you to particular locations within a store, or a location to take a, take fingerprints?

A It is. I don't have that very often.

Q It's very helpful; isn't it?

A It is.

Q Because it allows you to not waste your time on other areas of the location in sort of a fishing expedition for fingerprints; doesn't it?

A In some ways; yes, sir.

Q And in this particular case you had some specific points of reference that you could focus on in attempting to lift latent, or to identify latent fingerprints; is that correct?

A That's correct. And a specific time or a pretty close time that the perpetrator was in the store.

Q How, how long were you in the store that night attempting to lift prints?

A I was there probably about an hour and a half to the best of my recollection.

Q How much of that time was spent trying to identify and

lift fingerprints?

A Oh, probably half of it.

Q Forty-five minutes?

A That's right.

Q Okay. Now, during the forty-five minutes that you were in the store, how much time did you spend trying to lift prints from the cash register?

A I don't know really how long it took me.

Q And, Mr. Hutchinson, I'm not asking you for specifics. Just estimates. I know I'm asking you to go back several years.

A Probably no more than five minutes or so. It doesn't take very long to, to apply fingerprint powder to an object and to see a developed fingerprint.

Q So, you spent five minutes on the cash register. And you did a portion of the counter around where the lottery, for sake of our discussion, a lottery machine was located?

A Right.

Q But you didn't do the lottery machine itself?

A No.

Q Did you do anything back around the kitchen, around the sink area, the poles around the sink area, or the dish rack itself?

A I didn't do the sink or the, that area immediately around it. It was wet with water. There was no way I could apply fingerprint powder to the moisture.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 91 of 239

Q Okay. How much time did you spend on the inside of the door?

A Probably took me about ten, twelve minutes.

Q Inside, inside of glass doors is good territory for fingerprints; would you agree?

A Most of the time; yes.

Q You've got a smooth surface. It's usually non porous. Usually the oil secretions from hands and other chemicals from hands that hit that are going to be preserved or are going to remain there for a long time. Is that a fair statement?

A They can if you touch that glass. And on those doors there was a handle in front of them. So a lot of times you didn't touch the glass. You touched the handle before you got to the glass. They were exceptionally clean doors. You don't normally have one that clean. I don't know if it had been cleaned or which -- when the last time it was cleaned, but it was exceptionally clean.

Q So you spent five or ten minutes on the inside of the door; is that correct?

A About ten minutes; yes.

Q Ten minutes. Did you do the, the handle at all?

A Yes; I did.

Q Okay. And you did the glass portion above the handle?

A Right.

Q Okay. And then the outside of the door, did you

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 92 of 239

attempt to lift any prints from the outside of the door?

A Yes; I did.

Q Okay. How many partials did you recover from the -- I'll walk back in now. How many partials did you recover from the outside of the door?

A I believe I only recovered three from the, from the outside of the door.

Q How many from the inside of the door?

A There was just a couple from the inside of the door to the best of my recollection.

Q Only a couple of prints from the inside. Were they on the handle or the glass?

A They were on the glass.

Q Okay. How many did you recover from the counter around the lottery machine?

A I didn't recover any.

Q How many did you recover from the cash register?

A I recovered one from the keys of the cash register.

Q Just one?

A Just one.

Q And that's your total of seven or eight?

A Approximately seven or eight to the best of my recollection. I can't -- Like I say, I can't remember the exact number that I lifted.

Q Do you have any records in your file to show the

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 95 of 239

location of these partial prints that you've just talked about? Do you keep a record of them?

A No, sir.

Q Did you throw that away with the prints themselves?

A I, I didn't put down anything as to where I lifted them. I don't, I don't recall that.

Q Well, just look, briefly if you'll just look through your file and see if you even kept that record?

A Yes, sir. From the cash register and the front door.

Q Okay. So, I believe you said five minutes at the cash register; is that correct?

A Approximately five minutes. Could have been less than that. It doesn't take very long.

Q Ten minutes at the door. And the outside how long?

A Probably another ten, twelve minutes out there.

Q So we're talking about twenty, twenty-five minutes. Would that be a fair statement? Well, wait. I forgot about the lottery machine. How much, how much time there?

A A couple of minutes. And there's the counter along the front of the deli, the deli counter itself, another ten minutes or so.

Q Okay. Now, you had viewed the, at least you'd viewed part of that videotape and did you see any time the person who is alleged to have shot Mr., or the person who shot Mr. Wilson in that video, did you ever see him or her touch the counter top?

A I don't recall seeing them touch the counter top.

Q Then what would have been the purpose of spending time taking prints from the counter top?

A Well, I'm not -- you're not really able to see the whole length of the counter in front of the deli. Knowing that you have to run along in front of that counter, or walk along in front of that counter, there may, there may be a chance that a person handled that counter, specifically the end of it where you turn to go behind the counter. As I say, the opening is about two and a half feet, about the width of this petition here. And you may have had to put your hand out. That's the reason I processed those areas.

Q Okay. Now, you indicated that there was a .25 caliber cartridge casing that was turned over to you, or at least you had come into contact with at the scene; is that correct?

A That's correct.

Q Now, in your experience, have you ever been able to lift latent prints from cartridge casings?

A In my experience it's very seldom that you ever lift a latent print from a cartridge. Some of the bigger cartridge cases, some of the large ones, there have been instances where I have lifted a partial latent fingerprint. I don't remember ever lifting an identifiable one.

Q The number of points of comparisons that you are able to make on any particular latent print is not dependent upon the

size of the print though; is it, entirely?

A Not entirely; no.

Q You have have fifteen prints within a very small portion of a fingerprint; can't you?

A That's possible; yes.

Q I mean, you can find sufficient ridges. You found at least, as you talked about, you found at least ten ridge points of comparison. You didn't find any other, the bifurcated or trifurcated or islands or any of those. You only found ridges; is that correct?

A There's ridge endings. There are, there is a -- Yeah. All -- I'm sorry. All ridge endings; yes.

Q Right. And that's all you talked about here. But that's not depending upon -- the number that you find is not dependent upon the size of the print; is it?

A Not always; no.

Q So it is possible to recover, and technicians do recover prints even from small .25 caliber shell casings; don't they?

A I'm sure they do. I, I don't know of any instances where there have been some developed from a .25.

Q Because whoever puts the shell casing in the chamber or in the magazine generally uses their fingers to do that. Would that be a fair assessment?

A Most of the time; yes.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 56 of 239

Q Okay. Do you know whether or not there were any procedures in place to safeguard the prints that might have been on the .25 caliber shell found at the Madison Street Deli or not?

A It was placed in that container, metal container by me. I handled it end to end as I picked it up and transported it to the crime lab to Jim Howard at the crime lab. I don't normally process an item that's going to the crime lab to be checked for some other firearms verification or whatever. But I did not check it.

Q Okay. Let me move on to the Junior Food Store. You had indicated that you processed some fingerprints -- You, you didn't go to the Junior Food Store; is that correct?

A No, sir; I was not at the scene.

Q So you did not actually locate, identify and lift latent prints at the Junior Food Store; is that correct?

A That's correct.

Q How many finger, latent fingerprints were you given to observe and to attempt to make comparisons from, from the Junior Food Store?

A There were twelve latent fingerprint cards, backing cards.

Q Okay. How many of those latent prints were lifts of value?

A There were, I believe, about five that are identifiable.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 57 of 239

Q You didn't find nine prints of value?

A No, sir. There were five latent lifts that are of value. Five cards is what I'm saying that are of value.

Q But I'm saying, you didn't find nine lifts of value?

A In those, yes; there are nine points of identification in those --

Q I'm sorry. I'm talking about the print itself now, not the individual comparisons within the ones that you made comparisons of. How many prints were given to you from the Junior Food Store that had value for identification purposes?

A I'd have to look at the cards to see.

Q Mr. Hutchinson, I'm handing you what's been marked as State's Exhibit 165. Are those the twelve prints of value that, or the twelve prints that you had?

A Those are the twelve latent three by five backing cards.

Q Out of those twelve, how many had value for identification purposes according to your estimation?

A There were five cards that -- one card contained two fingerprints. And both of those were identifiable. So there was actually six fingerprints or palm, partial palmprints that were identifiable.

Q Now, where were those -- I, I know you didn't do it. But the card identifies the location where the lifts were made; does it not?

A Yes; it does. On the back there's a diagram.

Q Okay. Just, just to those six that you determined were of value, where were they located?

A One was located on the front door frame, left side, outside, approximately four foot from ground level, from the floor.

Q Okay.

A One was located from the cash register, upper right corner. One was located from the inside front door frame. Two were located from the front door, outside door glass. And one from the front door, inside door glass.

Q Now, of those six prints that you determined were usable, or had value for identification purposes, from within the store, what comparisons did you make, or to what did you make comparisons of those six?

A I compared those partial prints to Ray Cromartie's known fingerprints, Corey Clark's, Thaddeus Lucas and Gary Young. Also the victim --

Q Mr. Slysz?

A -- post mortem -- Right.

Q Now, did you make any comparisons at all of those six prints with any known prints? I mean, excuse me. Did, did you identify any of those six as having characteristics of those known prints?

A No, sir; I did not.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 59 of 239

Q You did not find sufficient points of similarity in which for you to make a decision that they were the prints of those four people you identified; is that correct?

A That's correct.

Q Would it be a fair statement that you found no fingerprint, latent print that matched Ray Jefferson Cromartie's inside the store?

A That's correct.

Q Okay. Now, were there any prints, latent prints given to you from the beer section of the, of the store?

A No, sir. I don't see any here that indicate that.

Q What about the partial, or those six that you said did not have value for identification purposes, where were they from?

A Inside the front door glass, front door glass inside. Cash register, right side. Front door glass, outside. Outside glass of the front door. Front door glass, outside, on the frame of the door. And the last one is from the keys of the cash register.

Q What about the .25 caliber cartridge case or shell casings that were found inside the store? Is there any cards indicating that attempts were made to lift prints from those two .25 caliber cartridge casings?

A No, sir.

Q Now, as I understand your testimony, then you made, even with those prints that had value that you could use for

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 100 of 239

identification, you weren't able to make any, any matches? You weren't able to identify them as belonging to anyone; is that correct?

A That's correct.

Q Or at least anyone that you had prints to compare to?

A That's correct.

Q Okay. Now, you were given a portion of a cardboard beer container to make a comparison with; is that correct?

A That's correct.

Q Now, again, you did not identify or lift that particular print from the Budweiser beer carton; is that correct?

A I did lift that print.

Q You did that one?

A I developed it and lifted it; yes.

Q In other words, there was nothing done at the scene to indicate, or to attempt to lift prints from this?

A None whatsoever that I know of.

Q Okay. Were you given any indication, either in writing or orally, as to the manner of preservation of this particular item before it was given to you?

A No, sir; only that it was collected from the scene.

Q Okay. And you lifted the print, I believe you said, from the outside?

A Yes, sir. From the shiny -- the red side there.

Q What type of chemical did you use?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 101 of 259

A I used super glue.

Q I'm sorry. I think you said that. Is that a cyclanitrate (ph.) or something like that?

A Crynolacrylic (ph.).

Q That's right. And is there a better way to do it, using cardboard?

A No, sir. That's, to me that's the best way. That is one of the most common ways used to lift from a, what's called a wax surface or shiny surface, a non porous surface. The outside of that, the red side of that carton is a non porous wax surface and that's the procedure that we're taught to process it with.

Q Did you find any partials in addition to the one that you used for a comparison?

A There is a partial just above the original lift. It appears to be where the finger has moved.

Q In what proximity was that partial to the one that you found?

A Very close. Just -- they're almost together.

Q Almost overlaid?

A Well, not overlaid, but very close.

Q Very closely?

A But above. Not side by side.

Q Okay. Is there any way to determine when a print is placed on a particular surface?

A You're asking for a specific time or date, no, sir; I

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 102 of 259

cannot do that.

Q Obviously, I'm asking as someone who does this, done it for nineteen years now, have you ever been able to pinpoint the time using just the fingerprint on a surface?

A No, sir.

Q Depending upon where the surface has been, how long it's been there, its exposure to elements, things of that nature, all of those factors may make it come or go, but you can't tell how long it's been there; can you?

A That's correct.

Q Okay. Once a print is put on a surface like that, and there's no other exposure of that surface to elements, water, dust, other prints, how long can it last?

A There's no, no way I can tell you a specific length of time. It all depends, as you said, on the conditions that it's exposed to. I can't tell you that it'll be there a week, two weeks or -- there's no way for me to know how long that it will be there.

Q There's just no way of knowing whether it's been there two days, three days or a week; is there?

A That's correct.

Q Okay. Now, when you make fingerprint comparisons and you were asked, and you've been doing this a long time, and I believe you said that you are absolutely sure; is that right?

A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 103 of 299

Q Were you absolutely sure, absolutely sure that none of the prints you found at the Madison Street Deli could have been used for identification purposes by a, a fingerprint examiner?

A Yes, sir.

Q You're absolutely sure?

A Yes, sir.

Q You never make a mistake about that?

A No, sir; never have.

Q And you've never made a mistake in your life as a fingerprint examiner?

A I've never made a mistake; no, sir.

Q In nineteen years?

A Not in an identification; no, sir.

Q Okay. Mr. Hutchinson, in nineteen years, how many times have you had other fingerprint examiners come to court and challenge your work?

A I can only recall two times.

Q And those two times you were right; weren't you?

A Yes, sir; I was.

Q And all of the other times no one's challenged you; have they?

A No, sir.

Q Because you've never been wrong?

A I've never been wrong in an identification.

Q Because, isn't it true, Mr. Hutchinson, that when you

look at a fingerprint, you go through whatever the fingerprint is, you determine whether or not number nine is the same as number nine here; don't you?

A Yes, sir.

Q You use a micro -- Do you use a microscope to do that?

A I use a magnifying glass; yes, sir.

Q And when you look down here at number four, excuse me, when you look down here at number four, you determine whether or not number four matches number four over here; don't you?

A Yes, sir.

Q You look at that with your eyesight?

A Yes, sir.

Q And you've never made a mistake?

A Never on identification; no, sir.

MR. MEARS: Okay. Nothing further.

FURTHER REDIRECT EXAMINATION

BY MR. HARDY:

Q Do you check with other people on occasions, get other advice?

A Yes; I do.

Q Do you do that all the time?

A Not all the time, but frequently; yes.

Q You've made other mistakes, I think?

A Yes, sir; I have.

Q As to the -- When it gets down to the good, clear

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 108 of 255

print --

MR. MEARS: Objection. Leading question. He still has him on direct, Judge.

THE COURT: I'm not sure that I've heard enough to make a ruling on that. What is -- State your question. Let him state it before --

BY MR. HARDY:

Q When you have an identifiable print and something to compare it with, do you take your instruments and then make a comparison?

A Yes, sir.

Q Then do you consult with other people if need be?

A Right.

Q That's when you're saying when you have the identifiable prints, something to work with, you've not made a mistake in that area?

A I've never made a misidentification.

Q You're real cautious about getting those at least --

MR. MEARS: Objection, Your Honor. That calls for bolstering the witness and it's also leading.

THE COURT: Sustained as to leading.

BY MR. HARDY:

Q You need how many points of comparison before you'll say one way or the other?

A Nine.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 106 of 253

Q That's more than other people?

MR. MEARS: Objection --

A It all depends on --

MR. MEARS: Objection. Objection, Your Honor. There's been no foundation laid as to his comparative values with other fingerprint identifiers. If they're going to put in what other fingerprint identifiers use, that'd be one thing. But to just ask it like that without a foundation, I would object.

THE COURT: Mr. Hardy?

MR. HARDY: I'll rephrase it.

Q You will not make a call until you have how many points?

A Nine points.

Q This one right here, Number 166, how many points of comparison between the two did you find?

A There were fifteen. I charted ten.

FURTHER RECROSS EXAMINATION

BY MR. MEARS:

Q Mr. Hardy asked you if you ever called for help, or asked for help. Did you ask for any help on those prints at the Madison Street Deli before you threw them away?

A No, sir; I did not.

Q And that wasn't a mistake; was it?

A I don't think so.

Case 7:14-cv-00039-HTT Document 18-17 Filed 07/14/14 Page 107 of 259

MR. MEARS: Nothing further.

THE COURT: May this witness be excused?

MR. HARDY: Yes, sir. We know where he can be on call, Your Honor.

THE COURT: You are excused.

Let me see Counsel for just a moment.

(Whereupon Counsel confer with the Court at the Bench, during which the following transpired)

THE COURT: How long is the next witness going to be?

MR. HARDY: I think I might rest, Judge.

THE COURT: We need to go over your exhibits, I guess, before you do. You had asked me yesterday about whether or not everything that had been on the table was in.

MR. HARDY: I think we have. Just to make sure.

THE COURT: All right.

MR. MEARS: I think we might ought to go back and frisk some of the witnesses to make sure.

THE COURT: But you're going to rest. You're going to have a motion?

MR. MEARS: Yes, Your Honor. Can we do that after lunch if he's going to go through his stuff before he rests?

THE COURT: I'm going to send the jury out for a longer lunch hour today and we'll go ahead over his list. I would think you're prepared to make the motion at this time.

MR. MEARS: We're prepared; yes, sir. I mean, you've

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 198 of 259

heard the evidence. I'll make the motion and not prolong it. I'm sure it's going to be granted so I'll just go ahead and make it.

THE COURT: Yes, sir. That's why I'm letting the jury go to lunch at this time till 1:15.

(Conclusion of Bench conference)

THE COURT: Ladies and gentlemen, it appears that I have a couple of matters to take up outside of your presence. I anticipate those matters taking fifteen, twenty or thirty minutes. So at this time we're going to recess for lunch.

Let me ask that you return to your jury room by 1:15. I'll give you a little longer lunch period today. And hopefully we can resume this matter promptly at 1:15. Thank you.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: All right, gentlemen, it's my understanding that the State wants to inquire as to what exhibits have, in fact, been admitted at this time. Is that correct?

MR. HARDY: Yes, sir.

THE COURT: Mr. Hardy, do you have a, a chronological list? When I say chronological, I don't mean numerically, but --

MR. HARDY: I've got one numbered 1 through -- Yes,

sir.

THE COURT: Yours is numbered 1 through 176 or 180 something?

MR. HARDY: Yes, sir.

MR. MEARS: Your Honor, while he's doing that can we go ahead and separate out those that have been identified as Defense exhibits so that it might help speed it along. Can we go ahead and be doing that while he's doing --

THE COURT: That's fine.

MR. MEARS: I just didn't want to get in Mr. Hardy's way.

MR. HARDY: Number 1 -- Excuse me. How would the Court like to do it?

THE COURT: Whichever way is going to be the most expedient.

MR. HARDY: Do you want me to xerox this for the Court right quick?

THE COURT: No, sir; I don't think that's going to be necessary. I think we can just run down the list real quickly.

MR. HARDY: Number 1 is --

THE COURT: I'm sorry.

MR. HARDY: Excuse me. Do you want me to say it or you to say it, however the Court wants to do it?

THE COURT: You're going to do them in the order that

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 116 of 255

you have them listed as opposed to the order they were tendered?

MR. HARDY: That's, that's the way I have it, Judge. I'm sorry. I think we've already offered everything that's up here. But if you want us to go 1, start with the Number 1 and run through it, however the Court would like to do it.

THE COURT: Well, I just want to be satisfied that nothing, nothing goes out with the jury that either has not been admitted or would not otherwise go out. Of course, we're to the second point of that at this time. You simply want to make sure that everything is in evidence prior to resting.

MR. HARDY: I think there was a question about the fingerprint card, Your Honor. We need to get the Clerk to redact that.

THE COURT: It was 15 -- Yes, sir.

MR. HARDY: Which is 163, Your Honor.

MR. MEARS: Your Honor, could I ask -- I know that the jury will probably attempt to make their own fingerprint comparisons using it. There -- I'm not sure it can be redacted in its present form without perhaps making a copy. This is, so the record will reflect, Your Honor, State's Exhibit 163 is a fingerprint card that was fingerprints taken of Mr. Cromartie when he was arrested in 1990 for a DUI. And there are -- it's dated 1990, but it doesn't show

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 111 of 259

any disposition of the case that I can tell or anything like that. But I think it would be inappropriate for the card to go out in its present form. Redacting it is going to be difficult because of the dates on the back. I think by redacting it, whiting it out or anything like that is certainly going to call attention to it.

THE COURT: Let's see the card again, Mr. Mears. I only recall one specific portion that appeared to need to me --

MR. MEARS: DUI here.

THE COURT: Yes, sir.

MR. MEARS: And the fact that it's dated in the back, 11-20-90.

THE COURT: Well, there's also on the front, it's also dated.

Any response, Mr. Hardy?

MR. HARDY: I think he'd have a right to get the dates and the DUI off of it, Judge.

THE COURT: Well, yes, sir; I agree with that. Any response in regards to how you would propose to do that?

MR. HARDY: Take some white and white it out if you want to.

MR. MEARS: You've got this one. Why don't you just use that?

THE COURT: All right, sir.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 112 of 259

MR. HARDY: If the Court doesn't mind, they can take a copy, white it, xerox it, and the Clerk can have it and you can just white it out.

THE COURT: Well, my question is whether or not you'll be satisfied putting in a xerox copy, or whether or not you wish to otherwise cover up this material and actually send this out.

MR. HARDY: However the Court thinks it'd be best, Your Honor. I don't --

THE COURT: All right, sir. If we can find some type of satisfactory tape -- white out -- well, I could charge the jury not to scratch the white out off, but I'd really be concerned if they did that. I think it might be better just to make a, make a xerox copy of it and white out or cover up these two, three portions on the xerox copy and --

CLERK: Do you want front and back?

THE COURT: -- then copy it again.

Do you want it front and back, Mr. Hardy?

MR. HARDY: If he can just do the front for us, Judge.

THE COURT: All right. Just the front in the two spots, or three spots, gentlemen. We've got this date here. Okay? 11-21-90, or, yeah, 11-21-90. This information here. This date right here.

CLERK: What about that last number right there? What does that number indicate?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 113 of 259

THE COURT: I don't have the foggiest idea of that number. I don't see anything else on there. Do you gentlemen?

MR. MEARS: It almost -- they'll never know it was a DUI, because they're going to think it was murder now.

THE COURT: All right. Mr. Hardy, why don't we just use your list? If you'll run down the list, please, sir?

MR. HARDY: If we could first just get to the rights since the Clerk may have to redact, so he can do that, Judge. We've got the pictures. These pictures, Mr. Mears.

MR. MEARS: Yes, sir. I'm sorry.

MR. HARDY: You had cut off the bottom part of Mr. Cromartie's picture.

MR. MEARS: Cut off the bottom --

MR. HARDY: Cut off the bottom of each of these other ones.

MR. MEARS: I have, I have no objection to that, Your Honor. It's the book-in information. And I did it to Mr. Cromartie. I certainly don't have any objection to the State doing it for the other witnesses.

THE COURT: All right, sir. What numbers are those so that we can --

MR. HARDY: Your Honor, those are --

THE COURT: -- satisfy ourselves they're already in.

MR. HARDY: -- 170, 171, 172 and 173.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 114 of 259

THE COURT: All right, sir.

CLERK: Cut off the bottom of them?

MR. HARDY: Just the part that has the writing on it, yes.

There was a letter that Mr. Clark wrote. Any objection to that going out? I'm just trying to get the written documents.

THE COURT: What number is that, Mr. Mitchell?

MR. MITCHELL: It's Defendant's 16.

MR. MEARS: It's Defendant's 16. You introduced the --

MR. HARDY: The original one.

MR. MEARS: -- the original, I believe.

CLERK: You've got a 16-A too. 16 and 16-A.

MR. MITCHELL: The original is 174, State's Exhibit Number 174 is the original.

MR. HARDY: Mr. Mears, these appear to be copies of --

MR. MEARS: Those are the ones that were being handed out and I think they got back up here instead of back --

THE COURT: I do show 174 as having been admitted.

MR. HARDY: We'd offer it, Judge.

THE COURT: I do show it as having been admitted.

MR. HARDY: Oh, excuse me. Here's the original of the charges.

CLERK: You mentioned a 16 a while ago or --

MR. MEARS: 16 was the Defendant's.

THE COURT: Mr. Mitchell?

MR. MITCHELL: Yes, sir.

THE COURT: Let's go over your list, please, sir. If you'd start with --

MR. MITCHELL: Yes, sir.

THE COURT: -- what you have listed first.

MR. MITCHELL: Number 1 was the shirt sleeve of the victim collected by Ken Collins. That's Number 1.

Did you offer that, Mr. Hardy?

MR. HARDY: Yes, sir; I believe so.

THE COURT: Gentlemen, do you show that as being tendered?

CLERK: I don't.

THE COURT: Sir?

CLERK: I don't. I had a question mark by 1. I, I put a question mark by that as it was not tendered.

THE COURT: Mr. Hardy, do you wish to tender Number 1?

MR. HARDY: Yes, sir; we would if they don't have an objection. If they have an objection, we won't tender it.

MR. MEARS: We don't have an objection. I believe there was no testimony concerning any use of that, but we wouldn't have any objection.

MR. MITCHELL: I believe it was identified by Mr. Collins. He said he cut it off the man.

MR. MEARS: We don't have any objection.

THE COURT: It's admitted without objection.

MR. MITCHELL: Exhibit Number 2 is a can of Budweiser.

THE COURT: I show that as being in.

MR. MITCHELL: Exhibit Number 3 is a can of Budweiser.

THE COURT: In.

MR. MITCHELL: Exhibit Number 4 is a piece of beer carton.

THE COURT: Gentlemen, if your notes are different than mine, please bring that to my attention.

3 and 4, I show in.

MR. MITCHELL: Exhibit 5 was a .38 derringer from the victim. I don't believe that was offered. Mr. Hardy?

THE COURT: I show, I show 5 and 6, both of them as being tendered and admitted.

MR. MITCHELL: Okay. All right.

CLERK: Judge, I've got a 5-A and a 6-A. I don't have a 5 or a 6 entered.

MR. HARDY: 5-A and 6-A were in bags which are 5 and 6, I think, Judge, is the way it went.

MR. MITCHELL: Were those the bullets, the pellets?

MR. HARDY: Right here, Judge. 5-A and 6-B are within the bags which are labeled 5 and 6, and they were all offered.

THE COURT: All right, sir.

MR. HARDY: 5-A and 6-A are in 5, the bag labeled 5 and

6.

MR. MEARS: We don't have, we don't have any objection at this time. I don't, I don't think we had any objections, Your Honor, and don't have any objection.

THE COURT: I show the pistols as being in, not necessarily the bags. But they're all in now.

MR. HARDY: Yes, sir.

THE COURT: Yes, sir.

MR. MITCHELL: Exhibit Number 7 is a roll of paper towels.

COURT REPORTER: I don't believe anyone ever identified that.

THE COURT: Yeah; Mr. Weaver did.

MR. MITCHELL: I believe it was talked about by Mr. Weaver.

THE COURT: Mr. Weaver identified it. It's already been admitted.

MR. MITCHELL: Exhibit Number 8 is the pencil. I believe that was discussed by Mr. Collins and Mr. Weaver.

THE COURT: I knew there was something I forgot to ask both sides to do, and that's provide me with an exhibit list so I wouldn't have to do this.

MR. MITCHELL: I believe we can -- I can make a xerox copy of this, Judge, if the Court would like.

THE COURT: What I'm doing is comparing it to my notes,

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 118 of 299

whether or not it's been admitted.

MR. MITCHELL: Exhibit 8 is the pencil.

THE COURT: And, of course, mine, mine are in the order that they were tendered.

MR. MITCHELL: Yes, sir.

MR. HARDY: Here's Number 7, the paper towels.

THE COURT: 8, the pencil, I show as being admitted.

MR. MITCHELL: Exhibit 9 is a pack of cigarettes.

THE COURT: That was later on.

MR. MITCHELL: Yes, sir. I believe that was Mr. Collins talking about that.

THE COURT: Yes, sir. 9 has been admitted.

MR. MITCHELL: Exhibit 10 is glass fragments from the floor at the Junior Food Store.

THE COURT: I show 10 and 11 being admitted.

MR. MITCHELL: 11 was also glass fragments.

THE COURT: Yes, sir.

MR. MITCHELL: Exhibit 12 are latent print cards. Exhibit 12 are latent fingerprint cards.

MR. HARDY: I think it was given that other number 23 that --

MR. MITCHELL: No. 23 is a picture.

MR. HARDY: The bag we just had that had the fingerprints in it, Mr. Mears. 184, Judge, I think is the latent there. It wasn't 12. It wasn't offered as 12.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 219 of 299

MR. MITCHELL: Okay. 12 wasn't offered. It was relabeled.

THE COURT: Number 184 I show as being in.

MR. MITCHELL: Exhibit 13 are these plaster casts.

THE COURT: Those are in. 14, 15, 16, 17, 18, 19, 20, 22, and I have -- it was called out as 27. I don't know if somebody -- if it was actually supposed to be 21 or not.

MR. MITCHELL: 14, I have is clothing of Corey Clark. 14-A is shoes.

THE COURT: That's not been tendered.

MR. MITCHELL: Sir?

THE COURT: It's not been -- 14, 15, 16, 17, 18, 19, 20, 22 and what I have written down as 27 have not been tendered.

MR. HARDY: We'd offer them all, Judge.

THE COURT: Now, is it, in fact, 27 or is it 21?

MR. HARDY: Yes, sir. 27 is --

MR. MITCHELL: 27 is Gary Young.

THE COURT: Any objections?

MR. MEARS: We have no objection, Your Honor.

THE COURT: Admitted without objection.

MR. MITCHELL: Judge, there was a 14-A, shoes of Corey Clark.

THE COURT: Those have been admitted.

MR. MITCHELL: 16-A, also a pair of shoes.

THE COURT: All of the shoes have been admitted.

MR. MITCHELL: 18-B and 27-C, I think.

THE COURT: 27-C.

MR. MITCHELL: Yes, sir.

CLERK: Judge, I don't have a 21, 24, 25 and 26.

MR. MITCHELL: Okay. All right. 21 was three pairs of white socks.

MR. HARDY: 15, 24, and 21 were not offered, Your Honor.

THE COURT: Well, 15, 15 was just offered a few minutes ago and admitted.

MR. HARDY: Excuse me. I mean, 21, you just asked about that?

THE COURT: Yes, sir.

MR. MITCHELL: All right. Mr. Hardy, have we got, have we got 19, 20 and 22? We never discussed those. That's items of clothing. A green plaid flannel jacket --

THE COURT: Those, those were just --

MR. MITCHELL: -- a white T-shirt --

THE COURT: -- just tendered and admitted. 23, fingerprint card has been admitted --

MR. MITCHELL: Those are photos.

THE COURT: Sir?

MR. MITCHELL: I'm sorry, Judge.

THE COURT: You show 23 as a --

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 121 of 299

MR. MITCHELL: Photos of fingerprints on beer carton.

THE COURT: What is the number of that bag that you told me a little while ago, Mr. Hardy?

MR. HARDY: 184, Your Honor, the -- this is, with the fingerprint cards is 184. The pictures of the fingerprint lifted from the beer carton is 23.

THE COURT: All right. 23 had been tendered and admitted.

MR. MITCHELL: I don't believe that we offered 24; is that correct, Mr. Hardy?

MR. HARDY: No, sir.

MR. MITCHELL: Okay. I don't believe we offered 25 either; did we? That was two packs of negatives.

MR. HARDY: No, sir. Those were just negatives of pictures.

MR. MITCHELL: 26 was --

THE COURT: Gentlemen, let's back up. I think it's going to be easier -- We're going to go with my list.

MR. MITCHELL: Yes, sir.

MR. HARDY: Yes, sir.

THE COURT: Yours are in order. It's going to be a lot quicker for you to find yours when I call it out than it is for me to find it on my list when you call it out.

MR. MITCHELL: Yes, sir. If I could explain to the Court what we did was to go down the evidence custodian's

 list. It was less confusing that way.

THE COURT: Oh, that's fine. What I should have done is had you type your list up, provide a copy to the Clerk, to the court reporter, to the Defense, to myself before we got started. I didn't -- I failed to do that.

All right. 150.

MR. MITCHELL: 150 is an evidence, F. B. I. evidence --

THE COURT: Custody letter.

MR. MITCHELL: Sir?

THE COURT: Custody letter in regards to the videotape.

MR. MITCHELL: Yes, sir. Federal form number 192.

THE COURT: That's in. 32, original videotape is in. 31, box with pictures and tapes, is in. 149, pictures of still photographs, is in. 152, five by seven pictures, still photographs, in. 151 is in. 154 and 155 were tendered and admitted during the motion, during the hearing on whether or not to admit the videotape but otherwise were never tendered. Those are the empty bags that had tapes in them.

MR. HARDY: Mr. Mears, these bags that were referred to, these bags were never used.

MR. MEARS: I don't see any reason for them to go in, Judge, unless the State wants them in. It's been my experience if you've got an empty bag out there, that just causes questions. And while sometimes I think questions are

good, in this case I don't see any benefit to my client to having the jurors asking what is being kept from them.

MR. HARDY: We'll put them in the other bags, Judge. I didn't offer them. Mr. Mears talked about it.

THE COURT: All right, sir. 153.

MR. MITCHELL: I have that as an empty paper bag as well.

THE COURT: What do you show it as, Mr. Hutchings?

CLERK: Judge, I show it as the submission sheet that the F. B. I. agent testified about, the evidence submission sheet that was wrapped around the tape.

THE COURT: Right. It's a white piece of paper, more or less -- I wouldn't call it a chain of custody letter, but it's a white sheet of paper. I show it as being in.

MR. HARDY: It's the evidence sheet that was around the tape.

THE COURT: 33 through 36 are photos, which are in. 38, 39 and 40 are photos, which are in. These are of the deli scene. 41 and 42, deli scene, are in. 44 -- 43, 44 and 45, photos deli, are in. 37, photo of Dan Wilson, in. 29 of Mr. Wilson, in. 32-A is in, slowed down version of the videotape. 162 is the actual firearm, which is in. 101, 102, 103, 104, photos of Jackson Street, which are in. 89 is a photo of Jackson Street, which is in. 90, photo Jackson Street, in. As is 91. 53 is a photo of Mr. Slysz

behind the counter, is in. The following photographs also relate to the Jackson Street incident: 100, 99, 98 are shoeprints, they are in. 95, 96, 97 of beer, are in. 92, 93, 94, part of beer container, are in. 30-A and 30-B, black sock hat and green sweat jacket, are in.

CLERK: Judge, could I ask about Court's 1, which is a summary of statements, Gary Young, that was --

THE COURT: About what?

CLERK: There's a Court 1 exhibit that's a summary of the statements of Gary Young. That doesn't go out?

THE COURT: No, sir.

MR. MEARS: That was used initially to try to refresh Mr. Young's recollection, I believe.

THE COURT: Yes, sir. 106. And the following are photographs of Jackson Street area and the clerk. 106, Jackson Street, 107. 54, 55, 56, 57, clerk. 48, 49, 50, likewise Jackson Street incident. Those are all in. 46 and 47 are photographs of the deli incident. 167 are the certificates in regards to the, Off. Williams' training and certification as a tracking dog handler. 163 --

CLERK: I don't show it.

THE COURT: Sir?

CLERK: 167, I don't show as being admitted.

MR. HARDY: We'd offer it, Your Honor, if it hasn't been offered.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 128 of 239

THE COURT: I think it was already -- Well, --

MR. MEARS: I think it was offered. I think I objected to it on the basis of relevancy and I think the Court let it in over objection.

THE COURT: That's what I recall. Yes, sir; it is in.

MR. MEARS: I'm going to ask the Court to reconsider that ruling though.

THE COURT: It's in. 163 is the Defendant's fingerprint card which we've discussed editing to some extent. 156, shell casing from the deli. 52, photographs of Mr. Slysz with pencil in hand, as is 60. 61, photograph shell casing. And this is at Jackson Street, I believe. No. This may be the deli, or Jackson Street. My notes don't indicate that.

MR. MITCHELL: Which number?

THE COURT: 61.

MR. MITCHELL: 61 is Junior, Junior Foods.

THE COURT: Right. Went in through Mr. Weaver's testimony. 62, 63, 64, 65 are likewise photographs of shell casings, are in. 66, 67, photographs of the safe, safe area. 81, bag of money, as is 82. Those are in. The following are in: 68, 69, 70, which are again photographs under the counter area. 71, photograph of roll of paper towels, which is in, as is 72. 7 is the actual roll of paper towels, which is in. 76, photographs behind the

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 126 of 259

counter at Jackson Street -- Junior Food Store. 76 is in. 77 is in. 78 is in. Those, again, being photographs. 79 is in. 80 is in. 83 and 84 are in. 168 is the Miranda waiver of Gary Young. That is it. As is 169, the transcript of interview with Gary Young. And 28, the actual micro cassette tape.

MR. MEANS: Judge, the transcript doesn't go out with the jury as I understand it, Your Honor.

THE COURT: No, sir.

MR. HARDY: Does the Clerk of the Court have that one? It's not up on the table up here.

CLERK: I hope I do because I think I put that one up.

THE COURT: What is that? The transcript or the tape?

MR. HARDY: The transcript, Your Honor. I think the Clerk must have it.

THE COURT: Have you got the tape up there?

MR. HARDY: The tape's in the envelope.

THE COURT: All right.

MR. HARDY: Do you want me to give it to the Clerk too?

CLERK: Does the tape go out?

THE COURT: The tape doesn't go out but it stays in evidence. 171. Well, we've already discussed these. Photographs of Young, Clark, Cooksey and Lucas, booking photographs.

MR. HARDY: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 127 of 299

THE COURT: The following are photographs which are in: 143, 148, 144, 147. All right. Do you gentlemen show 157 as being admitted?

MR. MITCHELL: 157 is -- Yes, sir.

THE COURT: That's the bullet testified to by Dr. Parker. 141, 145, 146, 140 and 142 are photographs in regards to skin stippling of Mr. Slysz, which are in. 158, the second bullet, which is in, that Dr. Parker took from Mr. Slysz. We're already addressed 174, 2, 3 and 4. 87 and 88, photos of plaster casts, which are in. 139 is in. The following are photos, again of Jackson Street incidents, which are in: 73, 75, 65, 74, 86, 105, 58 and 59. 159 is the shell casing, Jackson Street, which is in. As is 160. 138 is the drawing of the cash register area as testified to by Ken Collins, is in. 8 is, in fact, the pencil, which is in. 127 -- Well, the following are photos of the crime scene which are in: 127, 120, 119, 130, 129, 128, 126, 125, 122, 123, 124, 113, 110, 112, 108, 115, 109, 111, 116, 117, 131, 132, 135, 134, 133, 121. 165 is the latent, the fingerprint, latent lift cards, are in. Is that what you gentlemen show?

MR. MITCHELL: Yes, sir. Yes, sir.

THE COURT: Okay. 176, Mr. Collins' sketch of the overall store, is in. 156, pill box, is in. 161, in, bullet and shell casing. 179, that's the envelope

containing eighteen photographs, is in. 180, 181, 182, 183, photostatic copies of the shoe soles, are in, although the State, the State stipulated they wouldn't go out with the jury.

CLERK: Which ones are those, Judge?

THE COURT: 180, 181, 182 and 183, the photostatic copies of the shoe treads. All right. 18, Mr. Cromartie's clothes, are in, or what's purported to be Mr. Cromartie's clothes, are in. 22, the same, in. 27. What do you gentlemen show 27 as being?

MR. MITCHELL: Clothing from Gary Young. Clothing identified as from Gary Young.

THE COURT: Which is in. Do you show it as being -- Mr. Vincent, do you show that as being offered?

COURT REPORTER: Judge, you included that with the others, I think, before you started with your list.

THE COURT: Oh, that's correct. That's correct. It is in. All right. 164 is the latent fingerprint card in regards to the beer flap. 165, the twelve latent fingerprint cards from the Jackson Street area. Do you gentlemen show those as being in?

COURT REPORTER: I didn't show 164 as being in. I showed 165 as being in.

CLERK: I did too. I've got 165. I don't show a 164.

COURT REPORTER: I've got 164 as a fingerprint card.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 129 of 299

MR. HARDY: A card like this?

THE COURT: No, sir. That's 163.

MR. HARDY: 165, Your Honor, is the packet.

THE COURT: 164.

MR. HARDY: Is the card from the beer carton, Your Honor. I think we have not offered -- If we have not, we'll offer 164 and 165.

THE COURT: Any objections?

MR. MEARS: I thought they'd already been offered. I don't, I didn't have any objection to them.

THE COURT: Admitted without objection.

166 is a chart in regards to a footprint. I show that as being in. Do you gentlemen show any others? Sir?

MR. HARDY: 166 was a fingerprint --

THE COURT: What number do you show that as being?

MR. HARDY: 166, Your Honor. The big chart.

THE COURT: The chart of known Defendant's print and the latent print?

MR. HARDY: Yes, sir.

THE COURT: And it's in. I show it as being tendered and admitted. Is that what you gentlemen show?

CLERK: Yes, sir.

THE COURT: Any others?

COURT REPORTER: What about 131 and 134? I'm showing photographs.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 136 of 259

THE COURT: What are those?

CLERK: I've got, I've got a question mark by that 131 as well.

MR. MITCHELL: All right. 131, I show is a photograph, view of, view of the inside of the Junior Food Store.

THE COURT: I show that as being admitted. As do I 134.

MR. MEARS: Judge, what about this box right here? This is Number 13, with shoe impressions?

THE COURT: It's been admitted.

COURT REPORTER: What about Number 106, which I show as a photograph?

THE COURT: Number what?

COURT REPORTER: Number 106.

MR. MITCHELL: It's a view of the victim behind the counter at Junior Food Store, 106.

MR. HARDY: It's 106 right here. 131.

MR. MEARS: Judge, with regard to 142 and 143, the photographs.

THE COURT: Wait just a minute.

MR. MEARS: Oh, I'm sorry. I thought --

THE COURT: Which one are you asking about? 106?

COURT REPORTER: Yes, sir. I was asking about 106. I show it as being identified but not admitted.

CLERK: 106. I've got it marked off as being admitted.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 131 of 259

MR. HARDY: 106, 131 and 132, if we've not offered them, we'll offer them, but I thought we'd offered them.

THE COURT: 131 and 132 are already in.

MR. MITCHELL: What about 106?

THE COURT: I don't have an indication --

CLERK: I've just got a photo of the deceased, is what I've got. 106.

MR. MEARS: We'd object as duplicative, Your Honor, of those that are already in. There's about ten photographs of Mr. Slysz behind the counter.

THE COURT: Sustained.

CLERK: So 106 is out?

THE COURT: Yes, sir.

MR. MEARS: Mr. Hardy and I discussed State's Exhibit 142 and 143, and I believe he's agreeable to them being admitted but not going out to the jury. These are photographs of Mr. Slysz at the morgue on the autopsy table. It's questionable as to whether or not it fits in the category of those photographs that relate to autopsies.

THE COURT: Gentlemen, why don't we -- I'm going to withhold a ruling on that.

MR. MEARS: I believe he had agreed to --

THE COURT: Let's wait and see what the Defense has to show and then -- I don't know that there's going to be anything relevant but --

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 182 of 259

MR. MEARS: I, I don't intend to get into that area.

MR. HARDY: I don't have any problem with the Clerk keeping them, Judge.

THE COURT: All right, sir.

MR. HARDY: Those two right there, the man laying on the gurney before the autopsy.

THE COURT: Are there any other exhibits which we have not addressed, as to whether or not they've been admitted?

MR. MITCHELL: Were 118 and 119 admitted, Judge? I show those as pictures of the beer cooler in the Junior Food Store.

MR. MEARS: One of those was a bar across the window, I believe.

MR. MITCHELL: I think it has but I didn't check it off.

THE COURT: 119, I show as being admitted. Gentlemen, do you have 118?

CLERK: I've got a 118 but I don't have a 119.

COURT REPORTER: I don't have either one.

THE COURT: Do you wish to proffer them, Mr. Mitchell?

MR. MITCHELL: Picture of the beer cooler in the Junior Food Store. Yes, sir. If we haven't offered it.

MR. MEARS: We don't have any objection to 118 and 119. I remember seeing those.

THE COURT: All right. It's admitted without

objection.

All right, Mr. Mears, I understand you have a motion.

MR. MEARS: Are you ready for me to make that?

THE COURT: Yes, sir. Does the State rest?

MR. HARDY: Yes, sir, with the introduction of all the evidence; we rest.

THE COURT: All right, sir.

MR. MEARS: Just one moment, Your Honor.

Your Honor, on behalf of the Defendant at this time I would move for a Directed Verdict of Acquittal as to count one of the indictment. Count one alleges the Aggravated Assault of Mr. Dan Wilson on the 7th day of April of 1994. We'd submit there's been insufficient evidence upon which a jury can make a decision with regard to that particular offense. We feel that the State has failed to meet its burden of proof beyond a reasonable doubt. And that there is a lack of evidence sufficient upon which, the absence of which the Court can make a determination and that a Directed Verdict of Acquittal should be granted as to count one, the aggravated assault on Mr. Dan Wilson.

THE COURT: All right, sir.

MR. MEARS: We would move, we would ask the Court to grant a Directed Verdict of Acquittal as to count two, which is the charge that Ray Jefferson Cromartie committed the offense of Possession of a Firearm During the Commission of

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 184 of 259

a Crime in that the crime was the aggravated assault of Mr. Dan Wilson. We would ask the Court to grant a Directed Verdict of Acquittal as to count two of the indictment.

We would ask the Court to grant a Directed Verdict of Acquittal as to count three of the indictment, which alleges that Ray Jefferson Cromartie committed the offense of Aggravated Battery on the person of Mr. Dan Wilson in that he severed, by shooting him he severed his carotid artery. We would move for a Directed Verdict of Acquittal based upon the lack of evidence and insufficiency of evidence upon which a jury could make a decision with regard to that particular count.

We would ask the Court to grant a Directed Verdict of Acquittal as to count four in that Ray Jefferson Cromartie was accused of the offense of Possession of a Firearm During the Commission of a Crime, to wit: the Aggravated Battery.

Your Honor, also with regard to counts four and two, we feel that those counts would also merge if the Court is not going to grant a directed verdict as to those. Only one of those counts should be submitted to the jury for determination because all of the facts that are used to show count two are the same facts which are used to show count four. And we'd ask the Court not to submit one of those counts, because you can only use -- now, I know that usually goes to a merger of the offenses for sentencing. However,

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 193 of 295

I'm making a motion with regard to even submitting it to the jury base upon the same principle.

We would ask the Court to grant a Directed Verdict of Acquittal as to count five in that there's been insufficient showing of evidence that Ray Jefferson, Ray Jefferson Cromartie on the 10th day of April, 1994 did willfully and intentionally with malice aforethought cause the death of Richard A. Slysz. We would move for a directed verdict on that particular count on the basis there's been an insufficient showing of evidence upon which a jury could make a determination that Mr. Cromartie was the person who caused the death of Mr. Slysz.

We would move for a Directed Verdict of Acquittal as to count six, to wit: Mr. Ray Jefferson Cromartie committed the offense of Possession of a Firearm During the Commission of a Crime, to wit: murder. We would move for a Directed Verdict of Acquittal in that count, that count.

We would move a Directed Verdict of Acquittal on count seven charging Mr. Cromartie with the offense of Armed Robbery in that he did take two twelve packs of beer from the immediate presence of Mr. Richard A. Slysz. We'd move for a Directed Verdict of Acquittal as to that count.

As to count eight we would move for a Directed Verdict of Acquittal with regard to the allegation that Mr. Ray Jefferson Cromartie possessed a firearm during the

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 136 of 259

commission of a crime, to wit: the armed robbery of Mr. Richard A. Slysz.

Again, I would also ask the Court to consider if you do not, if you do not grant a Directed Verdict of Acquittal as to count eight and count six, that the Court only submit one of those counts to the jury for consideration because the same set of facts as are alleged in count six and count eight, they're -- they've used those, they used the evidence up. You can only use it one time to show the commission of possession of a firearm during the commission of a felony, because the way the count eight is drawn, excuse me, because the way count five is drawn there's been no indictment, there's been no count set forth in the indictment for the offense of Felony Murder. So there's no underlying felony that would support the Possession of a Firearm During the Commission of a Felony of Armed Robbery. Obviously, that may come up during the requests for charge at the appropriate time.

But at this time, based upon the totality of the evidence presented by the State, we would ask the Court to grant a verdict, Directed Verdict of Acquittal on all counts.

THE COURT: Thank you, sir.

Any response?

MR. MITCHELL: Your Honor, based on the standard of

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 137 of 259

Jackson versus Virginia, taking all of the evidence in the light most favorable to the State, we would submit that there was ample evidence to prove all the counts, with respect to counts one and two, three and four, involving the Madison Street Deli. There was testimony from Mr. Cooksey, I believe, that the evidence of Mr. Young's statements were admitted as substantive evidence pursuant to the Gibbons case. With respect to counts five, six, seven and eight, there has been direct testimony from witnesses to the event with the addition of the fingerprint, shoeprint and other physical evidence. Taking all of the evidence in the light most favorable to the State, we'd submit that a reasonable trier of fact could find the Defendant guilty of all the offenses charged.

With respect to any potential murder issue, it's my understanding of the law that a Defendant may be charged with and prosecuted from all the offenses which might arise out of that person's conduct. And the issue of, the issue of merger would only arise, assuming that there were to have been a conviction of all the charges, and it'd be premature at this time to discuss the issue of merger.

THE COURT: All right. Thank you, sir.

Gentlemen, based upon the evidence we've heard today, I do think there's sufficient evidence in the record for the jurors to find beyond a reasonable doubt the Defendant's

guilt of each offense alleged in the indictment. And, therefore, the Motion for a Directed Verdict is overruled and denied.

Insofar as the motions concerning the merger of offenses and ask the Court, asking the Court at this time not to submit those to the jury, I think that is not appropriate at this time simply, for instance, you know, the jury -- if I -- as to the Aggravated Battery and Aggravated Assault charge, I guess what you're asking me to do is simply not submit one of those and the jury could find either one of those without having to find both of them or without finding that there was evidence to support one of them anyway.

So, in regards to that, that motion, or those motions are also overruled and denied.

We'll be in recess until 1:15.

(Whereupon the Court is recessed for lunch, and upon reconvening at approximately 1:20 P. M. the following transpired outside the jury's presence)

THE COURT: Gentlemen, are we ready to proceed at this time?

MR. MEARS: We're ready, Your Honor.

THE COURT: Mr. Hardy, do you wish to rest in the presence of the jury?

THE COURT: Yes, sir.

THE COURT: All right, sir. If you --

MR. MEARS: Your Honor, do you want me to go ahead and put -- Excuse me. Do you want me to go ahead and put on the record with regard to -- or do you want me to wait and do that later?

THE COURT: We'll go ahead and do that.

Hold them up just a moment.

Are they out there?

BAILIFF: No, sir.

THE COURT: Okay.

MR. MEARS: Your Honor, I anticipate that the State is going to rest at this point in front of the jury. At that point I'm sure the Court would ask for the Defendant to go forward with his case.

With regard to the question of whether or not Mr. Cromartie will testify in his own behalf at this phase of the case, whether he's going to testify or not, Mr. Bryant and I have discussed this matter with Mr. Cromartie. We've advised Mr. Cromartie that he has the right to testify in his own behalf. We've also advised him that he has a right not to testify in his own behalf. And if he chooses not to testify that the Court would issue appropriate instructions to the jury not to consider his exercising his right not to testify against him. And I anticipate asking the Court to do that because based upon our advice and based upon our

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 140 of 299

discussions with Mr. Cromartie, Mr. Cromartie is not going to testify in this particular case.

THE COURT: All right, sir. Mr. Mears, have you informed Mr. Cromartie that it's, that it's his decision. It's not, it's not his attorney's decision. It's his decision to make with the counsel of his attorneys as to whether or not to testify?

MR. MEARS: Yes, sir. I specifically told Mr. Cromartie that I could not tell him to testify nor could I tell him not to testify. I could advise him as to his rights, I could advise him as to different matters, but the decision to testify or not to testify is a personal right that the Constitution gives to him and to him alone. And I have so advised him of that.

THE COURT: All right, sir.

Mr. Cromartie, do you understand all of the statements made by Mr. Mears on your behalf?

MR. CROMARTIE: Yes, sir.

THE COURT: And do you concur in all of those statements?

MR. CROMARTIE: Yes, sir.

THE COURT: All right, sir.

You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Mr. Hardy, do you have an announcement at this time?

MR. HARDY: Your Honor, the State would rest with the introduction of all the testimony and all the evidence.

THE COURT: All right, sir.

Mr. Mears, you may call your first witness.

MR. MEARS: Your Honor, we would call one witness. It will be Patrolman, former Patrolman David Allen.

THE COURT: David Allen.

I believe Mr. Allen has previously been sworn.

DAVID KEITH ALLEN

having previously been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MEARS:

Q Good afternoon, Mr. Allen.

A Good afternoon.

Q Mr. Allen, I'm going to ask you some questions with regard to the incident on April the 10th at the Junior Food Store. I believe you had testified previously before the ladies and gentlemen, ladies and gentlemen of this jury that you were one, if not the first, uniformed officer to respond to that scene; is that correct?

A Yes, sir.

Q And when you arrived, what was the first thing that you did when you arrived on the scene?

A The first thing I did when I arrived was I had noticed the vehicles that were there, the people, the two men that were there at the store. I then spoke with the two men that were there.

Q Mr. Allen, at that time how long had you been a law enforcement officer?

A Uh, two and a half, three years.

Q You were not a detective or an investigative officer at that time; is that correct?

A No, sir.

Q You were a uniformed officer; is that correct?

A Yes, sir.

Q But you had gone, had you not, to -- Did you go to police academy training?

A Yes, sir; I did.

Q And where did you go?

A ABAC in Tifton.

Q And you had been certified as, as a police officer; is that correct?

A Yes, sir.

Q And as a police officer you were trained in how to respond to various crime scenes; is that correct?

A Yes, sir.

Q And would it be a fair statement to say that one of the first things you do upon arriving is look for possible witnesses

to the incident for which you are called?

A Yes, sir.

Q And did you prepare a written report after this incident on April the 10th?

A Yes, sir; I did.

Q Have you had a chance to review that report?

A Yes, sir.

Q Does that report reflect your actions in interviewing any of the potential or possible witnesses to the incident at the Junior Food Store?

A Yes, sir; I believe it does.

Q You had talked to Bruce Taylor, Joseph Walsh and Mr. Walter Seitz; is that correct?

A Yes, sir.

Q And did you record in any form or fashion their comments or the information that they related to you?

A I wrote down the descriptions and what -- of the suspects and, you know, from what they saw when they, you know, were there at the store.

Q Okay. You went -- After you had talked to Mr. Taylor and Mr. Walsh, did you walk across the street to the BP station and talk to Mr. Seitz?

A Yes, sir.

Q Okay. How soon after you had arrived on the scene? And I know you -- I'm asking you to go back a ways. But how soon

after you arrived on the scene did you talk to Mr. Walsh and Mr. Taylor?

A As far as getting the descriptions?

Q Yes, sir.

A Maybe between five and ten minutes after I arrived.

Q Okay. A very short period of time? Is that -- Would that be a fair statement?

A Yes, sir.

Q Less than fifteen minutes after you arrived you were taking down descriptions from them; is that correct?

A Yes, sir.

Q And these were descriptions based upon what they saw that night about fifteen minutes before you arrived?

A Yes, sir.

Q Would that be a fair statement?

A Yes, sir.

Q Looking at page five of your report -- First of all, what is the purpose of obtaining descriptions from possible witnesses? I know that sounds like a simple question, but from a police standpoint, what is the purpose of obtaining accurate descriptions as soon as you can when you arrive on the scene?

A It's to put out a bolo or a lookout for the suspects, to try and apprehend the suspects as quickly as possible before they get too far away from the scene or before they were gone completely.

Q We've used the term, I think the term "Bolo" has been used in some of the questioning. Would you just tell the ladies and gentlemen of the jury what that term means?

A Bolo is just -- it's a shortened version of be on the lookout. It's the first letters of each of that. It means, you know, it's just a shorter way of saying be on the lookout for someone or something.

Q Based upon the information you received within fifteen minutes of the time you arrived at the Junior Food Store, what was the description of the individual that you designated in your report as number one? And I assume that's just to keep them separate; is that correct?

A Yes, sir; that's correct.

Q What was the description, physical description given to you by the witnesses within fifteen minutes of your arrival?

A A black male, five ten to six feet tall, hundred and eighty pounds, light colored shirt, dark pants, early twenties, and wearing a cap.

Q Okay. Would you look and see -- it says dark pants. Would you just look at that, please?

A Excuse me. Dark shorts.

Q Dark shorts?

A Excuse me. Yes, sir.

Q Okay. So, black male five ten, a hundred and eighty pounds, early twenties, light shirt, dark shorts, and cap?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 146 of 259

A Yes, sir.

Q What was the description given to you by these witnesses of the other individual, the one that you've designated as number two?

A Black male, five ten to six feet, hundred and eighty pounds, dark shirt, dark pants, early twenties.

Q Were there any other descriptions given to you that night by any of these, these individuals who were there?

A We had them fill out a, a description sheet which is the back sheets on my report of, you know, just giving them several different things to look over and then asking them to mark the ones that, that they remembered.

Q Was that inconsistent with the report that they gave you?

A No, sir; I don't believe so. I haven't looked over them that closely to tell.

Q If it had, it'd have been something that would have caught your attention. You would have -- Because this is the first identification that you received after arriving on the scene; wasn't it?

A Yes, sir; it was.

Q Did anyone ever mention to you that they'd seen an individual wearing glasses?

A No, sir; not that I remember.

MR. MEARS: Thank you. Nothing further.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 147 of 299

Thank you, Judge.

CROSS EXAMINATION

BY MR. HARDY:

Q I think, David, you also wrote down another description that was given to you also, also a description of a black shirt, black pants, page number three? First -- about line number ten.

A Yes, sir.

Q Light colored T-shirt and dark pants?

A Yes, sir.

Q And then the other suspect, black shirt and black pants?

A Yes, sir.

Q There you're talking about pants, and the other one you talk about shorts?

A Yes, sir.

Q You didn't get an in depth statement from Mr. Taylor; did you?

A No, sir.

Q Have you seen that?

A Mr. Taylor's statement?

Q Yes, sir.

A No, sir; I have not.

Q Where -- When you were at the scene?

A No, sir; I have not.

Q This one right here, the statement he wrote for chuck

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 148 of 239

Weaver?

A No, sir.

Q You didn't get into any depth with him; did you, Mr. Allen?

A No, sir. Just got a very brief description so we could get some information out as soon as we could.

Q So later on the detectives go into more depth and try to pick the man's mind, so to speak?

A Yes, sir.

Q Get all the details?

A Yes, sir.

Q They allow them to write the report sometimes like that?

A Yes, sir.

Q You didn't see that though; did you?

A No, sir. This is the first time I've seen it.

Q You just want to get something as quick as you can and get it out on the bolo?

A Yes, sir.

Q Excuse me. Of course, you were across the street at the BP. It was nighttime when you were out there; wasn't it, David?

A Yes, sir; it was.

Q Can you see the BP across over there from the Junior Food Store?

A Yes, sir.
Q It was lit up, fluorescent type lights?
A Yes, sir. The outside of the store was.
Q I think somebody said it's like, kind of like looking at a TV?
A It's lit up very well.
Q There are street lights out there and, I think gas pump lights were out there?
A Yes, sir.
Q I think you also saw the footprint around there; didn't you, David?
A Yes, sir; I did.
Q And you described it in your report as those wavy lines?
A Yes, sir.
Q I think I showed you the picture of it the other day?
A Yes, sir; you did.
Q Did you look at the shoes the other day, Mr. Allen?
A The shoes themselves?
Q Yes, sir.
A No, sir; I did not.
Q Number 18-B here, is that what you observed?
A Yes, sir.
Q Is that consistent with what you saw?
A That's consistent with what I saw.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 190 of 259

Q And where did you see those?
A The west side of the store over next to Pinetree Boulevard, right there in the kind of muddy area.
Q Sir?
A Right there in the kind of, in the mud area where it was real wet, side of the store.
Q Sometimes the policemen on the scene make, peripherally get the information and the detectives may get a little deeper into it and ask more questions?
A Yes, sir.
Q And as to nuances between lighter, darker, longer, or shorter, that kind of thing?
A Yes, sir.
Q I think one of the descriptions is, one was a taller, slender man? That's on these sheets that were filled out? A darker, taller, thinner man?
A Yes, sir; I believe so.
Q And the other one was more stocky than the taller, thinner man?
A Yes, sir.
Q And he was lighter colored, the shorter one?
A Yes, sir. That's what was marked on the description.
Q 6, Defendant's 6 and 171, Mr. Allen, which is the darker of the two?
A The darker of the two is this one, 171.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 191 of 295

Q What's the name of that person?

A Corey -- Corey Allen Clark is his name.

Q And the other fellow? He's the lighter of the two, Number 6?

A Yes, sir; he's the lighter of the two.

MR. HARDY: He's with the Court, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. MEARS:

Q Mr. Allen, you were asked to identify by skin tone an individual. Do you know what circumstances of lighting in these particular photographs?

A No, sir.

Q Have you had any training in the ethnicity of identification according to ethnic groups and ethnic sub-groups within ethnic groups?

A No, sir.

Q Have you had any particularized training in the identification of African-Americans?

A No, sir; I have not.

Q Have you had any specialized training in the ability to make skin tone comparisons?

A No, sir; I have not.

Q You were asked whether or not you had been made aware of the statements, more detailed statements, according to Mr.

Hardy, of Mr. Taylor; is that true?

A Yes, sir.

Q Let me ask you to look at this to refresh your recollection about what was said to you. And I call your attention to the first three lines on page two. In fact, in further reflection, Mr. Taylor said they were both were wearing shorts; didn't he?

A Now, he's making reference to one wearing shorts, without reading the entire thing --

Q Well, why don't you read the entire thing?

A (Witness complies) Okay.

Q Is there anything, now that you've read that, is there anything that contradicts the initial report that was given to you by the collective report given to you by Mr. Walsh, Mr. Taylor and Mr. Seitz?

A The original description that was given to me didn't say anything about any kind of white design on the front of the shirt. I'm not -- His next statement about, the next statement about, you know, the shorts, he said that he believed that they both possibly could be wearing shorts whereas before I was told one was, one was shorts and one was pants.

Q What about caps? Did he make reference to either one of them or both of them wearing caps?

A In this statement it refers to both wearing caps, and I only have one.

Q Did it make any reference to whether or not they discussed their identification and they discussed their observations and came to a decision after talking to each other, about the beer?

A Yes, sir; it does.

Q What does it say?

A It says, "I couldn't really discern what they were carrying but after some speculation between Joe and myself we decided that it was beer. And that is something I can't be sure of, but it's important to note because that's why we turned around. Joe thought he'd seen two twelve packs. The men seemed too young to buy beer and it was after midnight Saturday."

Q Said they seemed too young to buy beer?

A Yes, sir.

Q And that they -- that was speculation that they had the beer?

A Yes, sir.

MR. MEARS: Okay. Thank you, Mr. Allen.

RECROSS EXAMINATION

BY MR. HARDY:

Q Also your report said that they were running from the store?

A Yes, sir.

Q What does it say? If you would read, right in there, if you'd read that, please, sir?

A It said, "I decided to ride down Jackson Street and turn off on Pinetree Boulevard. When we reached the intersection of Jackson and Pinetree looking to our left we noticed two black men leaving the front of the Junior Food Store. I turned left onto Pinetree and then we noticed the first, the men first walking to the side of the store and then breaking into a run. Shortly afterward the guy in front dropped something."

Q All right. Keep reading at the bottom down there, what Mr. Mears -- the lines he indicated.

A "Both men stopped to pick whatever it was and then kept running. In the time that they were beside the store I noticed, as best I can recollect, that they were both wearing caps. The one in front was slightly shorter than the other. He was wearing white shoes and" --

Q Do what?

A "He was wearing white shoes and a black or dark shirt with some sort of white design on the front."

MR. HARDY: Thank you.

MR. MEARS: I have no further questions, Your Honor.

THE COURT: Thank you, sir.

Mr. Mears?

MR. MEARS: Your Honor, at this time we would like an opportunity to make sure that we've properly marked and tendered all of the exhibits that we intend to. And then at that point, upon a completion of that task, we would

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 199 of 259

announce that the Defense would rest.

THE COURT: All right, sir.

MR. MEARS: We can do that -- Perhaps, it might be better to do it -- I'll go ahead -- Would the Court give me permission to tender the exhibits, if we haven't already done so, outside the presence of the jury, I will go ahead and announce that we'll rest at this point so as not to inconvenience the jury while we're doing that.

THE COURT: Is there any anticipated rebuttal by the State?

MR. HARDY: No, Your Honor. Thank you.

THE COURT: All right, gentlemen, with the condition that we'll address the exhibits for the Defense, subject to that condition, does the State close?

MR. HARDY: Yes, sir.

THE COURT: Defense close?

MR. MEARS: Yes, Your Honor.

THE COURT: All the evidence is in. The case is closed.

Gentlemen, in a moment, after I excuse the jury for a little while, we'll take up the question of what witnesses may be excused and some other matters.

Ladies and gentlemen, insofar as the guilt-innocence phase of this trial, all of the evidence is in for your consideration. The law requires that I have a conference

with Counsel for the parties to address certain matters that we need to address prior to their interposing or giving their summation or closing arguments to the jury.

So, at this time I'm going to excuse you for a certain period of time and then ask that you come back today. And we anticipate resuming the closing arguments at that time. Now, based upon the information I have and the matters that I'm familiar that we need to address, I'm going to excuse you until -- I believe we'd better take an hour. Forty-five minutes, I'm afraid I may have you sitting in the jury room and I don't want to waste any of your time. If you would report back to the jury room by a quarter till 3:00. We should be in a position at that time to begin the summations. Thank you.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Mr. Mears?

MR. MEARS: Your Honor, I just wanted to make sure that we had tendered in together with all of our objections. Defendant's Exhibit 1 was tendered. I think it was introduced.

THE COURT: I show Defendant's Exhibits, the following being tendered and admitted. Defendant's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13.

CLERK: That's what I've got. 14 is the sentences on

Corey Clark.

MR. MEARS: At this time then we would tender Defendant's Exhibit 14.

THE COURT: Any objections?

MR. HARDY: Leave it with the Court. It seems to be in the proper form.

THE COURT: It's admitted without objection.

MR. MEARS: We would tender Defendant's Exhibit 15.

THE COURT: It's admitted without objection.

MR. MEARS: It appears that State's Exhibit 174 is the original of Defendant's 16. I believe that has already been admitted. Based upon that I will withdraw Defendant's Exhibit 16.

THE COURT: All right, sir.

MR. MEARS: I believe, Your Honor, the map we had tendered --

THE COURT: What number is that? 7?

MR. MEARS: That's 7. That's in, I believe; is it not?

THE COURT: Yes, sir.

MR. MEARS: We had the drawing, Number 17 was the drawing which was a blowup of, I believe, Mr. Collins' sketch. Although the smaller one is in evidence, I'll go ahead and tender 17 because it's got some writings and circles and drawings on it that were put there during his testimony that the small one would not have. So I would

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 158 of 299

tender 17 at this time.

THE COURT: Any objections?

MR. HARDY: Aside, Your Honor, should they go out to the jury with all those markings on them?

THE COURT: We'll admit it into evidence for purposes of the record. Of course, there may be a number of matters we need to address whether or not they constitute continuing testimony and should go out with the jury.

MR. MEARS: Well, at least we tender those at this time whether they go out --

CAPT. HADLEY: Your Honor, may I approach?

THE COURT: Sir?

CAPT. HADLEY: Excuse the witnesses?

THE COURT: Well, that's one of the questions I've got at this time, Mr. Hadley.

Gentlemen, let me -- I know there's some witnesses that should this case enter into a second phase, witnesses that need to remain subject to their subpoena and subject to the rule of sequestration. Otherwise, I think the State had a list of some eighty-three witnesses. Are there any witnesses that can be excused at this time by either party?

MR. HARDY: We could basically put them on call, Your Honor. I mean, I think that's what we've been doing. There shouldn't be that many here left. Most of them have been put on call, if we're going to call any.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 159 of 295

MR. MEARS: I know that Lt. Johnson was here earlier and Lt. --

MR. HARDY: If we could just put them on call and let them go, Your Honor.

THE COURT: All right, sir.

MR. HARDY: They need to get back to work.

THE COURT: The State's putting all of its witnesses on call?

MR. HARDY: Yes, sir; if we could, please.

THE COURT: All right, sir.

MR. HARDY: Except Spencer here.

MR. MEARS: Any, any witnesses that have been subpoenaed by the Defense, we would ask that they be excused until tomorrow morning at 10:00 o'clock. I don't anticipate them having to be here before then at the very earliest.

THE COURT: All right. Any witnesses who have been subpoenaed by the Defense are excused -- The State's witnesses are excused with the exception they're to remain on call. The Defense witnesses, or the ones that have been subpoenaed by the Defense are excused until 10:00 A. M. tomorrow morning.

MR. MEARS: Your Honor, would it be the appropriate time to take up a couple of other matters that we need to address the Court about with regard to -- now that we've closed the evidence. We had requested --

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 160 of 299

THE COURT: How long, how long are those matters going to take?

MR. MEARS: Very short, Judge.

THE COURT: All right, sir.

MR. MEARS: We had requested under the Open Records Act all jail records of co-defendants and the other witnesses the State had put on their list who were residents of the jail. We only received records from February, 1995 to the present because all other records apparently had been put in archives. We never received any of the records prior to 1995, particularly those in 1994. I would like for those records to be produced, if for no other reason, for us to provide them as part of the record. We might also need them in the event there's a sentencing hearing in this particular case. But we have not been provided with any records under the Open Records Act of jail records. And the Court will recall we had a discussion of that at some, a couple of months ago anyway. Which we're continuing in that request.

THE COURT: All right, sir. I think we've addressed it at least a couple, if not maybe three times. It's my understanding that the parties were going to get together, or the Defense was going to get together with the Sheriff's office and address those matters and bring it to the Court's attention if they could not be satisfied. To my knowledge, this is the first time it's been brought to my attention

Case 7:14-cv-00039-MTT Document 18 Filed 07/24/14 Page 162 of 295

that it has not been satisfied in some extent.

MR. MEARS: That's correct, Your Honor. This is the -- We weren't sure whether they would be produced during the trial. If they -- All I'm saying is we're continuing in that request. I know that Sheriff Powell has made a good faith effort to locate these records. I simply don't want to have, to rest and let that be the end of our request. I still think we're entitled to those. If they can't find them, they can't produce them, then we just need to be told that so we can make it a part of the record.

THE COURT: All right, sir. I think if there was anything that would rise to the level of what could be considered as mitigation evidence that you would be entitled to it, at this point in time.

MR. MEARS: I understand, Judge. We also had filed a subpoena for the production of documentary evidence upon the district attorney and his staff, the assistant district attorney and his staff with regard to any documents which relate to agreements, deals, plea offers, things of that nature relating to any of the co-defendants including Gary Young, Corey Clark, Thaddeus Lucas. We have not had a response to that subpoena.

THE COURT: Gentlemen, I believe that prior to Corey Clark and Thaddeus Lucas taking the stand that we, on the record, addressed whether or not every, everything within

the State's knowledge that would be applicable under the law that should be divulged to the Defense had been and that has, in fact, been addressed on the record.

MR. MEARS: And I understand it, Judge. I just wanted to make sure that there's no way that we're waiving that in the event that somewhere down the road someone finds a document that was overlooked or not produced, and I'm certainly not implying that they haven't, but sometimes things get intentionally mislaid or lost. I think they're required to make a good faith effort to look for those. And I'm certainly not waiving that particular subpoena for the production of documents.

THE COURT: All right. I think it's been satisfied at this time.

MR. MEARS: I just wanted to make sure that that was a continuing request. And we have not received anything with regard to any of the co-defendants.

The exception was the letter which we obtained, a copy of which we obtained from Ms. Lane and the original was produced while Mr. Clark was on the stand. I acknowledge that that was produced. I'm considering that a part of the type of documentary evidence that we were subpoenaing. Other than that we have received nothing.

With regard -- And I assume this is what you're, one of the things you're going to take up with what would go out

Case 7:14-cv-00039-HL Document 18-17 Filed 07/14/14 Page 163 of 299

with, with the jury, as concerning the documentary evidence and photographs and things of that nature.

THE COURT: Isn't that something we can take up -- I'm more concerned at this time in completing our charge conference prior to the jury getting back at a quarter till 3:00.

MR. MEARS: That's fine, Your Honor. I just wanted to make sure that -- There are some questions that I have with regard to what should or should not go out.

THE COURT: Yes, sir.

MR. MEARS: Even though it might have been admitted subject to objection, it still -- I think there has to be a determination of whether it goes out with the jury.

THE COURT: Yes, sir.

MR. MEARS: Okay.

THE COURT: All right, gentlemen, are you ready to address the requests to charge?

MR. HARDY: Yes, sir.

THE COURT: Now, gentlemen, let's start with -- I believe the State has submitted one proposed request to charge; is that correct?

MR. MITCHELL: May we have a moment, please, Your Honor?

THE COURT: Yes, sir.

MR. MITCHELL: We'll submit it without argument.

THE COURT: All right, sir.

MR. MEARS: Which one are you submitting?

THE COURT: Parties to the crime.

MR. MITCHELL: Parties to the crime.

MR. BRYANT: Did we get a copy of that? I don't think that we got a -- Did we get a copy?

MR. MITCHELL: I thought we served it on them.

MR. MEARS: Is it just a standard parties to a crime --

MR. MITCHELL: It came right out of the pattern jury --

THE COURT: There is a certificate of service.

MR. MEARS: We probably, probably did. If we didn't, I think we're all aware of what that charge is.

THE COURT: There's a certificate of service attached dated September the 2nd of this year.

No objections?

MR. MEARS: I want to reserve all of my objections to the charges until such a time as there is a motion for a new trial or an appellate review of the decision, Your Honor, if I may do that.

THE COURT: All right, sir. Gentlemen, I think the charge would be applicable, at least insofar as counts five through eight in this particular matter.

MR. MEARS: Your Honor, my, my wish to reserve charges, excuse me, as the Court knows it, it -- I probably don't have the charge -- but I want to reserve objections to the

Judge's, to Your Honor's charges, all of them, until such time as there's a motion for a new trial or an appeal in this case. May I do that?

THE COURT: Yes; you may. And I'll give you an opportunity after, in fact, the jury is charged to interpose any objections or, you know, reserve your right to state any objections, motion for a new trial, or appeal of the matter. I'm simply at this time looking for some direction from Counsel as to what they think, based upon their professional experience and training, is or is not appropriate under the law and the evidence in this case at this date and time.

MR. MEARS: I would like to do that, Your Honor, and I certainly will with the understanding that I'm not waiving my right to reserve objections at some later time.

THE COURT: Yes, sir.

All right. The Court would intend to give party to a crime.

All right. Defendant's requests to charge. Number one, Mr. Mears, that's a general charge on indictment and plea, not being evidence. I would intend to give that. Number two, any objection? Let me ask this. Does the State have any particular ones -- you've had an opportunity to review all of the requests to charge submitted. And, gentlemen, at this time we're speaking of requests to charge in regards to the guilt-innocence phase. Have you had time

to review all of them that were submitted?

MR. MITCHELL: Judge, I've read all of them and made some notes on them, Judge.

THE COURT: Let me know which specific ones you have an objection to.

MR. MITCHELL: A lot of it looks like it's the pattern's instructions. I do have some questions with respect to, on number two, with respect to what's under moral certainty.

THE COURT: Gentlemen, I don't know that --

MR. MITCHELL: I thought the Supreme Court says we're not supposed to talk about that any more.

THE COURT: I, I'm assuming that I'm not being requested to charge that language in those two paragraphs.

MR. MEARS: I put the -- That is directly from the, I believe, from the Superior Court Judges' Requests to Charge. That's what we -- I just took the whole charge as it was presently published in the Judges' Charge Book.

THE COURT: All right. Gentlemen, I'll -- as to number two, I'm going to give the general charge on presumption of innocence, burden of proof, reasonable doubt. I do not intend to give the language contained in these two paragraphs on the second page of that following the, the two words which are in bold "Moral Certainty".

Mr. Mitchell, any other specific ones that you -- Or

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 167 of 299

what are the others that you specifically have a question about?

MR. MITCHELL: Judge, now just because I put a question mark on it doesn't necessarily mean anything except that I just wasn't sure. I put a question mark on number twelve, but I think that may be right out of the pattern jury book.

THE COURT: All right. Are we going numerically?

MR. MITCHELL: Number three, I think is a pattern charge.

THE COURT: Yes, sir. I would intend to give a general charge in regards to the subject matter of number three.

MR. MITCHELL: I believe that number four is right out of the pattern charge book.

THE COURT: The same as to number four.

MR. MITCHELL: I believe number five is.

THE COURT: The same as to number five.

MR. MITCHELL: Number six is.

THE COURT: The same as to number six. I think five and six overlap a bit, but I'll give the general charge that'll cover all of that subject matter.

MR. MITCHELL: Number seven is.

THE COURT: Yes, sir.

MR. MITCHELL: Number eight is standard. Number nine is standard with regard to expert witnesses.

THE COURT: I'll give the general charge as to seven,

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 168 of 259

eight and nine.

MR. MITCHELL: Number ten is a standard pattern charge. And number eleven is just a definition of direct and circumstantial evidence.

THE COURT: I'll give general charges in regards to the subject matter contained in both ten and eleven.

MR. MITCHELL: I think twelve is too, but I put a question mark by it.

THE COURT: Number twelve, the two equal theories rule has been found to be an improper statement of the law, so the Court will not give that charge.

MR. MITCHELL: I guess that's why I put a question mark by it.

THE COURT: It may be.

MR. MEARS: Your Honor, there still needs to be some situations where the two equal theories would apply. That's the reason I've submitted it. It's been held that it's not error for the Court not to give it. There's been some condemnation of the charge. I simply think that there still may be some case out there where the two equal theories would be appropriate and that's why I've submitted it.

THE COURT: I think that will be sufficiently covered in the circumstantial evidence charge.

MR. MITCHELL: Thirteen, I think, is a correct statement.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 169 of 299

THE COURT: Gentlemen, I would intend, insofar as thirteen, that is a portion of the general charge as regarding impeachment of witnesses. Of course, I would intend to give the entire general charge in regards to impeachment of witnesses. I don't mean -- When I say the entire general charge, there are, you know, "A", "B", "C", "D", whichever ones are appropriate under the evidence in this case insofar as --

MR. MEARS: Your Honor, will we be denied -- Can we argue this portion of it separately as it's given?

THE COURT: Certainly.

MR. MITCHELL: And I believe they requested the entire charge on impeachment as part of thirteen because the entire charge --

THE COURT: Well, proof of general bad character, I don't know that that's applicable in this particular matter. There's been no, no testimony presented, someone's character evidence so to speak, you know, I know his reputation, wouldn't believe him or her. I think "A" is applicable, disproving the facts which have been testified to. "C" is. And "D" is, I believe.

MR. MITCHELL: Fourteen is also part of that.

THE COURT: General charge on fourteen likewise.

MR. MITCHELL: Fifteen, I don't think we've given anybody immunity. I'd submit that to the Court's

discretion, but I don't think we've given anybody a grant of immunity in the technical sense of that.

THE COURT: Well, I agree that you haven't in the technical sense. But, you know, part of the language of this charge states, or as a result of a negotiated plea in which leniency may be inferred. I will give that charge.

MR. MITCHELL: I'm not sure if there's any evidence to support sixteen, but it's a package statement of the law. I mean, with regard to --

THE COURT: There's no evidence to --

MR. MITCHELL: I don't think there's any evidence to support it, but I just mean, it's a correct statement of the law.

THE COURT: It's a correct statement of the law. There is no evidence to support that in my opinion at this time.

Do you disagree? Are you going to reserve any disagreement?

MR. MEARS: Your Honor, I don't think I will.

THE COURT: I think it's also incomplete.

MR. MEARS: I would disagree but I'm still going to submit it for consideration of the Court, Your Honor.

THE COURT: I will not give number sixteen. It's an incomplete statement of the law and it's also not supported by the evidence.

Seventeen, will give, certainly give the general

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 171 of 299

charge, accomplice testimony.

MR. MITCHELL: As to eighteen, I don't think there's any evidence to support -- I don't know that there's really any evidence to support a criminal negligence charge, of criminal negligence.

THE COURT: No, sir; I don't believe there is. I would not intend to give that charge.

Number nineteen, does the Defendant still --

MR. MITCHELL: We have no objection to that.

THE COURT: -- the Defendant still wish for the Court to give number nineteen?

MR. MEARS: Yes; I do, Judge.

THE COURT: The Court will do so. Twenty?

MR. MITCHELL: I believe that's, I believe that's a pattern charge. I'm not sure if it's complete but I believe that's a pattern charge on identification.

MR. MEARS: It came off the disk. I think it came off the disk pattern charge. I think it's at least substantially the pattern charge. It may well be --

THE COURT: I'm not questioning whether it's the pattern charge or not. I'm just running through my mind -- We've got no, no testimony from any witness insofar as, with the exception of co-defendants saying, you know, "Mr. Cromartie was there". He was with", I mean, "We know him. He was there. He was with us". It's not like you've got

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 172 of 293

Mr. Seitz across the street saying, "I saw him run out of the store and, yes", you know, "in my opinion, this was the man". Or Mr. Watson or Mr. Whomever, or Mr. Taylor or whomever was with him, and "We saw them run out and", and, you know, "I think this is the man". I don't know that identification, the charge on identification is appropriate or, or required in this particular case.

MR. MEARS: Well, Judge, normally this charge is given when you have a Jackson-Denno situation where there's been a determination -- not Jackson-Denno. I'm sorry. When you've had an out of court identification, either a photographic lineup or a show, showup of some type. I acknowledge that's normally when you would request this particular type of charge. However, in this particular instance we've got at least three witnesses, two of whom have testified, and one has testified by proxy, as to identifying individuals coming from the store. We also have this videotape --

THE COURT: We've got descriptions. We've got no identification.

MR. MEARS: I acknowledge that, Judge. But the inference that the State is asking the jurors to draw, since Mr. Cromartie is the only person on trial, is that he was one of those individuals. They also, at the Madison Street Deli, they put up the videotape that only had one perpetrator there, the obvious inference being that the

State wouldn't have put it up if they hadn't been asking the jurors to make the identification. And I would ask the Court to give this charge.

THE COURT: All right, sir. There being no objection, I'll give the charge. It'll be the general charge on identification, Mr. Mears. And this may be it.

MR. MEARS: Yes. Thank you.

THE COURT: Twenty-one, attempt, attempted armed robbery.

MR. MITCHELL: I'm not really sure that's authorized by the evidence. You know, I think what we've got here is going to be the completed offense or no offense.

THE COURT: I don't see that it's adjusted to the evidence. If, if in counts one through four or the deli incident, you know, that, that could arise to an attempted armed robbery, but I just don't see it in this case.

MR. MITCHELL: Well, he's charged with aggravated assault with intent to rob.

THE COURT: That's what I'm saying. He's not charged with, with armed robbery insofar as the deli incident. I just don't think it's applicable in this case. He's charged, insofar as the deli incident, Aggravated Assault, Aggravated Battery, two counts of Possession of a Firearm During the Commission of a Crime. He's not charged with Armed Robbery, Robbery, Attempted Robbery.

MR. MEARS: I'm sure I had a good reason for asking that. If the Court will give me just one minute I'll try to come up with it.

The best I can do, Judge, is that the jurors might be able to determine that it was an attempted armed robbery at the Junior Food Store.

THE COURT: All right, sir. The Court will not give number twenty-one. Number twenty-two, again --

MR. MITCHELL: Judge, once again, I, I think that the evidence we have will show either the completed, the completed offense or no offense on behalf of the Defendant, so I'm not sure that the abandonment of the criminal enterprise would be appropriate under the evidence.

THE COURT: All right, sir.

MR. MEARS: I don't disagree, Judge. I'm still reserving --

THE COURT: I understand. I do not think that it's appropriate under the evidence in the case at this time and will not give twenty-two.

Twenty-three, I'll give that general charge.

Twenty-four, give that general charge.

Twenty-five.

MR. MEARS: I'd like for that one to be given, Judge.

THE COURT: All right, sir. Twenty-six.

MR. MITCHELL: Judge, I've got some question about some

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/11/14 Page 179 of 299

of the language in twenty-six, more especially the last couple of paragraphs. Those concern -- I'll submit it to the Court's discretion. I'm not sure if that's -- I didn't compare these against the pattern charge book, but --

MR. MEARS: I think it's from the charge book.

MR. MITCHELL: It probably is. I don't know. I'll submit it.

THE COURT: Gentlemen, in looking at this particular charge, it may, in fact, be out of the pattern charge book. However, I know there's case law that states, you know, there's some, been some charges in the past in regards to fingerprints, states, it's kind of like the circumstantial evidence charge or two theories charge, that if it's, if the fingerprint evidence is the sole evidence in the case, and if there's another reasonable theory as to how the fingerprint got there at some time other than the time the crime was perpetrated, then it's not sufficient to convict.

MR. MEARS: Your Honor, I think there's certainly testimony that would support paragraph two. Not -- I understand what the Court's saying. But with regard to paragraph --

THE COURT: I intend to give a portion of the charge. I think a portion of it is certainly justifiable.

MR. MEARS: What about the second paragraph from the bottom of the first page, Judge?

THE COURT: Second from the bottom?

MR. MEARS: Yes, sir. Are you going to give that?

THE COURT: I don't know that there's been any evidence introduced that they could have been left at a different time.

MR. MEARS: Yes, Your Honor. I asked -- When I asked Mr. Hutchinson did he have any way of determining the time when the fingerprint would have been on the beer carton and we went through, I guess, three or four series of questions about there's no way to determine the time, assuming that it was Mr. Cromartie's fingerprint on the beer carton, there's no way to determine when it was placed there. He tested -- and that's --

THE COURT: Well, I understand the fact that, you know, -- it could have been left at some other time doesn't mean that there's evidence that it was left at some other time.

MR. MEARS: I don't think the Defendant has to show, you know, in requesting that particular application of law. I think that that's an inference that jurors can draw from the testimony, that it's a public place. It's not like a private place where he would not have been expected to be there. There are any number of factors that an individual could come and go in a public place. And the jurors, I would submit, Your Honor, may infer from the fact that it was a public place he could have been there before.

THE COURT: All right, sir.

MR. MEARS: Will you give that, at least that portion of it in addition to the other parts?

THE COURT: In addition to which other parts? What's above that?

MR. MEARS: Yes, sir.

THE COURT: Yes, sir.

MR. MEARS: Can I argue that fingerprints are a type of circumstantial evidence? I understand you're not going to give the last paragraph, if I understood it correctly. However, can I argue that the fingerprints are, that fingerprint is a type of circumstantial evidence and in -- because you're going to charge them on how to handle circumstantial evidence.

THE COURT: Any response, gentlemen?

MR. MITCHELL: Well, Judge, I think a lot of this goes to where it's a one hundred percent circumstantial evidence case. That circumstantial evidence alone must exclude every other reasonable hypothesis except the, save the guilt of the accused. I mean, that's a correct statement in a one hundred percent circumstantial evidence case. But that's not what we've got. We have direct evidence and circumstantial evidence.

THE COURT: I'm speaking of his last statement, where he wants to argue to the jury that it's circumstantial

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 178 of 299

evidence. That's all I'm addressing.

MR. MITCHELL: Judge, I mean, I guess he can argue any theory in closing argument --

MR. MEARS: Well, I, I acknowledge the Court was not going to give the second part. I mean, I understood that's where you were going. What I wanted is not to be precluded or at least not to have an objection made when I'm arguing. Not that I'm going to read this or argue this paragraph, but they can consider fingerprints as a form of circumstantial evidence. I wasn't going to argue this portion of it that says you have to exclude every other reasonable hypothesis. You're right, that is in only circumstantial cases. And all I'm asking is, can I simply make reference to fingerprints as an item of circumstantial evidence. It's not direct evidence in other words.

MR. MITCHELL: I don't know of any reason why that'd be an improper argument, Judge.

THE COURT: Yes, sir. All right, gentlemen, the next proposed request to charge, robbery by intimidation. Now, I understand the statute which says that robbery by intimidation is a lesser included offense of armed robbery. But, in this particular case, based upon the evidence in the case, there, there is no evidence whatsoever from which the jury could infer that anything was done by any individual at the Junior Food Store to intimidate, frighten or scare Mr.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 179 of 299

Slysz insofar as taking of the property. I don't know if the State has any -- I should have asked the State first whether or not they have any particular position on it. But I just --

MR. MITCHELL: Judge, that'd be the State's position, what the Court just stated. We don't think there's any evidence to support the charge of a lesser included offense.

THE COURT: I just don't -- Any response?

MR. MEARS: Your Honor, I don't have any, I don't have anything to add other than we would like, we would ask the Court to consider giving robbery by intimidation as a lesser included offense considering the totality of the evidence that's been presented in this case.

THE COURT: All right. Thank you. Gentlemen, I think, again, based on the totality of the evidence, I think it's inappropriate. It's simply not adjusted to the evidence.

Theft by shoplifting.

MR. MEARS: Well, as -- this may seem like a stretch at first blush, Your Honor, but it's not, because if, if the jurors were to apply the theory of mere presence at the scene of a felony doesn't automatically make you guilty of that felony. If they were to infer that, for instance, Mr. Cromartie was there and was shoplifting the beer and someone else did a felony which he was not a party to but a mere presence there, then they could be authorized to find him

guilty only of shoplifting.

THE COURT: I don't think that's a logical and reasonable inference under the evidence. I think -- it's either there and did it or there and a party to the crime or was not there.

MR. MEARS: I acknowledge that, that factually -- and I'm not meaning to diminish by asking for a shoplifting charge. I'm not meaning to diminish the seriousness of the crime in any way. I'm simply trying -- I was trying to put myself in the minds of the juror who might be looking for some areas that they could, and felt the evidence warranted it, find him guilty of a particular crime but not guilty of armed robbery or murder.

THE COURT: Yes, sir. Are those the same arguments in regards to the request for charge on simple assault, theft by taking?

What is the State's position?

MR. MITCHELL: Your Honor, our position would be that the evidence as framed shows the completed offenses or no offense, would be our position, and that the charges on lesser included offenses would therefore be inappropriate.

THE COURT: Okay. I think the law is now that even if all of the evidence presented by the State shows, or would be sufficient for the jury to find a completed offense, say armed robbery, if the evidence also authorized the jury to

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 181 of 299

find a lesser included -- the evidence authorized the jury to find a lesser included offense, then it's error for the Court not to charge that. Alvarado versus the State, et cetera. But in looking at Alvarado and some subsequent cases, I'm satisfied there's got to be, to be evidence presented for the jury to, to find the lesser offense. And at this time I don't think there's been sufficient evidence, I don't think there's been any evidence presented for the jury, so that the jury could find, or support a finding of theft by shoplifting, theft by taking, simple assault.

MR. MEARS: Your Honor, could I address that just briefly. I think that one of the reasons that I would ask the Court to consider this, as I know you are very carefully, because there's a certain burden shifting element in not giving some lesser included offenses on the basis that there's been no showing of theft by taking, there's been no showing of simple assault. I think that there is an element that would, where that could be construed as shifting the burden to the Defendant to show evidence of a lesser included offense. And I think that was the dilemma that, at least, I interpreted from some of the cases leading up to the most recent case that said it's error if there's any evidence at all of a lesser included offense, the charge should be given. I interpret it, and I'm certainly no scholar in this area, but I think I interpreted that as the

 Court being very concerned about the shifting of the burden to the Defendant to show that he's not guilty of armed robbery but guilty of, of something else. It's almost like making it an affirmative defense where, you know, the Defendant says, I'm not there, and you raise the alibi defense, then it's considered an affirmative venture. In order to sustain an alibi you've got to go forward, I believe. It's been so long since I've had an alibi defense, I'm not sure. But I believe you've got to show at that point as an affirmative defense some evidence to support that affirmative defense. Lesser included offenses, Your Honor, I think, fall into a different category and set a really fine line between shifting the burden to the Defendant to show that he, he or she did a lesser included offense rather than one for which they were indicted. And I would ask the Court to consider that argument when making its decision as to whether or not to submit the lesser included offense charges to the jury.

THE COURT: All right, sir. Mr. Mears, I, I will consider the argument, considered it while you've argued it. I still think, you know, to charge on affirmative defense there has to be the evidence in the case as to the affirmative defense, whether, whether put in by the State or the Defendant or otherwise. This case, in my opinion, there's no evidence at this time supporting a charge on

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 183 of 299

theft by shoplifting or theft by taking or simple assault.

MR. MEARS: I, I understand the Court's ruling. I simply want to -- I'm urging the Court to consider that because I think to do otherwise shifts the burden to him. And I realize that it's a very fine line, but I think it's a very important line because affirmative defenses have been legislatively recognized, I think, and judicially recognized whereas lesser included offenses are a judicial process has been made primarily by, by decisions of the Court.

THE COURT: Yes, sir.

MR. MEARS: I think there's a distinction there and that's what I'm asking the Court, and I know you're considering that right now.

THE COURT: All right, sir. Twenty-eight will not be given. Twenty-nine will not be given. Thirty.

MR. MITCHELL: Judge, I don't think that felony murder is a lesser included offense of malice murder, and I don't know -- because he hasn't been indicted for that particular -- I mean, it seems to me like that's a collateral offense. I don't know how you can find somebody guilty of felony murder when they're only indicted for malice murder. And I don't think it's a lesser included offense. I think they're, they're collateral, if the Court understands my theory. I don't think the jury can, can find him guilty of something that he wasn't indicted for that's not a lesser

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 184 of 299

included offense of what he's charged with.

THE COURT: Anything else?

MR. MITCHELL: No, sir.

THE COURT: All right. I don't know that felony murder is a lesser included offense if you look solely to the possible punishment. The possible punishment is the same. Some of the appellate court decisions talk about, well, a lesser, culpable mind or something of that nature. I don't really necessarily understand all of that. I do believe that based upon the case of Henry versus State, 265 Ga., 732 that this indictment as drawn and the evidence as presented does not warrant a charge on felony murder. I'll be happy to, to entertain argument otherwise and to look at any, any other authority the Defense may have in regards to that particular request.

MR. MEARS: Your Honor, I think that Georgia is somewhat unique in that the statute combines felony murder with malice murder and makes it very difficult for both prosecutors, Defense attorneys and Judges, to ferret out the distinction between the two, because malice -- it's labeled homicide. Then within that homicide statute there's two different forms of homicide which aren't really divided by, by code sections. That's what makes it extremely difficult for me to argue that it's not a lesser included offense because of the, the intentionality that's required in malice

murder. And, here again, Georgia is very strange in this particular regard because intention and malice are equated as being the same thing, according to the case law. Malice equals intention and intention equals malice. You can be convicted of felony murder without the element required to prove malice murder. That's where I believe, Your Honor, that it's a lesser included offense. You can be convicted of felony murder, in other words homicide, without having intended to cause the death of another human being if you intended any one of the number of specified felonies that would fall in that category. There have been very few that have been excluded from that category. So I think -- just to say the armed robbery -- the reason robbery is a lesser included offense of -- robbery is a lesser included offense of armed robbery is because one of the elements of armed robbery is not present in robbery. That is, the possession of an offensive weapon or threatening weapon. So that's why, as I understand it, that's why robbery is a lesser included offense of armed robbery. And on down the line the other lesser included offenses. There's always some one or two elements of the more severe crime not present in the less severe crime. That's what makes it lesser included, because all of the elements aren't there.

The same principle should apply to the murder statute. One of the elements that's not present in felony murder,

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 180 of 293

that is intention, is present in malice murder. So if you have malice murder but, or at least a murder that doesn't have intention, the next, the next level of offense involving a homicide would be felony murder. So I think it would be appropriate to charge, I think it would be required to charge upon request that felony murder -- See, for instance, if the jury decides that Mr. Cromartie was present at the scene and if the jury decides his mere presence is not sufficient to absolve him of any guilt, but they decide that Corey Clark did the shooting, and that's certainly something that this jury could infer from the facts in this case, Mr. Cromartie could still be convicted of the offense of felony murder should the jury find that that was the appropriate sentence, even though Mr. Corey Clark pulled the trigger, or Mr. Thaddeus Lucas or Mr. Gary Young, whoever they decide might have been there. Therefore, the facts in the case and the law certainly would be appropriate, would be appropriate in this particular instance for a charge of felony murder. And I think it would be very important for the Court to give this particular charge considering the jury could find that someone else pulled the trigger, even if they find that Mr. Cromartie was there. And I would, I would urge the Court to, to give the charge on felony murder as a lesser included offense. And we, we've talked about the effect of punishment. I think that's a different

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 187 of 299

argument. But as far as the finding of this jury, I would urge the Court to consider giving the charge of felony murder based upon the fairly inarticulate argument that I've tried to give the Court. Thank you.

THE COURT: All right. Thank you, sir.

All right. Ladies and gentlemen, again, for the reasons stated, I don't feel like that that charge is appropriate in this particular matter.

I believe we've already addressed thirty-one. Is that correct?

Thirty-two.

MR. MITCHELL: Judge, I believe the undisputed evidence was the man was, the man was shot while he was holding a pencil in his hand doing his books. There's absolutely no evidence of any provocation.

MR. MEARS: I really don't dispute that, Your Honor. However, there is an element here where the victim, and I'm certainly not questioning the fact that he was -- it was a terrible crime. He was wearing a weapon. There's a possibility that the jury could infer that the presence of that weapon that he was wearing, that there was provocation of some type to cause whoever shot him to do it. I'm asking that the Court consider voluntary manslaughter on that basis and that basis alone.

THE COURT: Okay. Mr. Mears, I don't believe there's

any evidence to make that inference. From the simple fact that the victim may have had, may have been armed does not in and of itself raise the inference that, that he may have done something to provoke the attack upon him. I will not give thirty-two.

MR. MEARS: I believe we've already dealt with thirty-three.

THE COURT: Yes, sir.

MR. MEARS: Probably a double, double charge on that.

THE COURT: Thirty-four.

MR. MITCHELL: I think we've kind of already dealt with that too.

MR. MEARS: It was robbery by intimidation.

THE COURT: Sir? We've not dealt with robbery yet.

MR. MEARS: I thought we dealt with robbery by intimidation.

THE COURT: We did.

MR. MITCHELL: This is robbery by force. I think the undisputed evidence would be, and I think it's going, once again, Judge, that the evidence shows it's a completed offense or no offense and there was a firearm used in the -- which would be clear to be an offensive weapon. I think it's either all or nothing.

MR. MEARS: Well, except in this case, Your Honor, the, the State is taking the position that the other two people

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 189 of 299

involved in this crime were guilty of the offense of robbery. They were allowed to plead guilty to robbery. They certainly felt that it was the appropriate sentence for them. Now, they made the determination as to the role of Mr. Clark and the role of Mr. Lucas in this case. The jury is going to have to take, make a determination of what Mr. Cromartie's role was, if any, in this. They could very well determine that his role was the same as theirs, or they could say that one of the other individuals did something else. I think it's very appropriate in this case considering the pleas that the district attorney -- it wasn't a jury determination for something else. It was a determination by the district attorney to allow them to plead guilty to robbery, an accusation of robbery. So I think it would be appropriate to charge this one, Your Honor.

THE COURT: All right, sir. Gentlemen, again in this particular matter, the only evidence in regards to the commission of a robbery is that it was done by an offensive weapon. There is no evidence that robbery was accomplished in some other manner, i. e. without an offensive weapon. So in this particular case, again, I don't think that there's evidence to support that lesser included offense.

MR. MEARS: Can I make one more argument, Judge?

THE COURT: Yes, sir.

Case 7:14-cv-00039-WTT Document 18-17 Filed 07/14/14 Page 196 of 259

MR. MEARS: In taking a plea, I, I believe the standard is that the Court has to make a determination that there's sufficient evidence to support the plea. And I believe Your Honor did this with regard to Mr. Clark. And I'm not sure about Mr. Lucas, but I think with Mr. Clark, and I may have them backward, Judge, I, I -- if I do, I'm sorry. There was a sufficient basis in fact based upon their statements. And I know Mr. Clark gave a statement. Mr. Hardy asked him, you know, tell us what happened out there. And, and the Court made a determination that based upon their version of what took place, there was a sufficient basis to support the plea of robbery. And I would ask the Court to make that consideration in determining whether or not Mr. Cromartie should be given the same consideration of the evidence.

THE COURT: Thank you, sir. Number thirty-four will not be given.

Thirty-five, I believe we've already covered.

MR. MEARS: Thirty-six, I believe we've covered.

THE COURT: Yes, sir; we have. Will not be given.

Simple battery. I believe --

MR. MEARS: This has to do with the Madison Street robbery, Your Honor. A lesser included offense of aggravated battery. I'm asking the Court to consider giving that one.

THE COURT: All right, sir. Any response?

MR. MITCHELL: Judge, once again I -- Judge, once again I think that the evidence would show the completed offense or no offense. I mean, the undisputed evidence is the man was, the man was shot with a firearm in his, and did damage to, his artery was severed. I, I don't think that -- and to tie it off, I don't think that would support contact in an insulting and provoking nature with the person of another. I mean, like, usually it's like, when a man's permanently lost his artery, I, I think the evidence would show the completed offense or no offense.

MR. MEARS: The State overlooks subsection B of that particular -- it says, intentionally causes physical harm to another. The jury might consider it. I think they will. It's up to them, not the prosecutors. The jury might consider it. And I'm certainly not taking away the seriousness of Mr. Wilson's injury. But the jury might consider that the elements of aggravated battery had not been proven beyond a reasonable doubt. I remember Dr. Hall's testimony. And, excuse me. Dr. -- yes, Dr. Hall. Dr. Hall's testimony about the ligature involving the carotid artery. I'm not throwing that aside. I'm simply saying that the jurors have a right to choose which witnesses they want to and to add credibility or whatever they want to add to it. And the jurors could well find that all of the elements of aggravated battery had not been

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 192 of 299

proven beyond a reasonable doubt and then subsequently find the individual on trial guilty of the offense of battery rather than aggravated battery. And I would ask the Court to give the charge.

THE COURT: All right, sir. Ladies and gentlemen, thirty-seven will not be given.

Thirty-eight, I believe we have covered.

Thirty-nine is not applicable. Is that correct?

MR. MEARS: We get into a real, an issue here, Your Honor, with the handling of the Madison Street Deli robbery and assault, excuse me, the Madison Street Deli assault and at the same time that the, in the same indictment with Junior Food. Granted, the State has withdrawn similar transactions that they provided by notice. My concern is how the Court is going to instruct the jurors with regard to the Madison Street Deli and the Junior Food and not to use the evidence from the Madison Street Deli incident to convict Mr. Cromartie of the Junior Foods. I think that's going to be a real problem in this case. Because if the jurors aren't without some limiting instructions, they can't find Mr. Cromartie guilty of the offense of murder at Junior Foods based upon what happened at the Madison Street Deli. Granted, that's probably what they're going to do but the Court at least has to give them some instructions as to how to separate out each individual element of each and every

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 193 of 299

charge. Each and every count of the indictment has to be determined separately. And I believe that's the law, is that they can't use the Madison Street Deli incident to convict Mr. Cromartie of the murder at Junior Foods. They can use it, if it's a similar transaction, if the Court gives limiting instructions to say, you can use the evidence from the Madison Street Deli if you find it shows motive, you know, modus operandi, opportunity, knowledge, all of those things that are traditionally given in a similar transaction charge. So I think that similar transaction, a similar transaction charge should be given with regard to the Madison Street Deli incident as it relates to the Junior Food incident, because the jurors are going to come back with a verdict form saying guilty, guilty, guilty, not guilty, not guilty, not guilty, or they're not going to be able to find, you know, come to a verdict one way or the other because there's not going to be any way for them to break it down as to what evidence do they use to find Mr. Cromartie guilty of the murder at Junior Foods should they find him guilty.

And so the question is, what instructions were created by the Court to guide the jurors' discretion, which is not unfettered, in using the evidence that's been presented to them. So I think the similar transaction charge would be appropriate as it relates to the Junior Food Store, I'm

sorry, to the Madison Street Deli as an element of the proof of the commission of a crime at the Junior Food Store.

THE COURT: Thank you, sir. Ladies and gentlemen, thirty-nine will not be given.

Forty will not be given as requested. There'll be a general charge covering some of that particular matter.

Ladies and gentlemen, is that, does that cover all of the requests from the Defense in regards to the guilt-innocence phase?

MR. MEARS: Yes, Judge. I believe all the rest of ours had to do, that we submitted, had to do with the possibility of there being a sentencing phase. There may be others depending upon what happens during, what happens during the deliberations here if we get to that point, that I would want the Court to consider at some other time.

THE COURT: All right, sir.

MR. MEARS: Your Honor, I did submit a request to charge number seventy. It was submitted --

THE COURT: Seventy?

MR. MEARS: Number, number seventy. Did Your Honor get that? I thought I'd faxed it to Your Honor. We filed it.

THE COURT: I got one package of supplemental requests, sixty-one through sixty-nine, is what I have.

MR. MEARS: Right. And I believe there was one other one, a number seventy. Did ya'll get that?

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 198 of 295

MR. MITCHELL: We don't have it up here with us.

MR. MEARS: I apologize to the Court and the State if they didn't get number seventy, because I --

MR. MITCHELL: I think it's the same thing we've already talked about.

MR. MEARS: It's impeachment of witnesses. I don't -- Could I have just one moment to make sure, Your Honor?

THE COURT: Yes, sir. I believe number -- Well, it's an unnumbered -- I've got an impeachment request but it's actually unnumbered. It's between thirteen and fourteen in my package.

MR. MEARS: Fourteen, Your Honor, was a short version of impeachment. You got this. It just wasn't numbered; is that correct?

Your Honor, may I hand up to the Court a copy of -- it's number seventy by number.

THE COURT: I believe I've got that. I've got an unnumbered request in my package.

MR. MEARS: That should be number seventy, Your Honor. Is that the one?

THE COURT: Looks like it.

MR. MEARS: That should be number seventy, a copy we got --

THE COURT: That's the one we felt like everything -- the Court felt like everything was appropriate with the

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 190 of 239

exception of B, proof of general bad character.

MR. MEARS: Could I just have that -- I mean, could you just -- I'd referenced it seventy, and I think it's probably in the original file as seventy.

THE COURT: All right, sir.

MR. MEARS: You did mention bad character and I simply overlooked that when I was going through this. Everything but bad character on what we, what I've marked as number, what I've submitted as number seventy will be given; is that my understanding?

THE COURT: I'm going to give the general charge on, on impeachment with the exception of bad character.

Any other Defense requests to charge that I have not addressed, guilt-innocence phase?

All right. I believe our jury is to be back at a quarter till 3:00. Why don't we -- Would you gentlemen like about ten minutes or so before we get started?

MR. MITCHELL: Yes, please, Your Honor.

MR. MEARS: Your Honor, we, we still haven't addressed the issue of what can go out with the jury. Are we going to do that after arguments?

THE COURT: That's what I had thought I would do. Now, since you're raised the question, if there is something that you specifically need to address so that you can, can say something in argument about, you know, while you have this

out -- the reason I brought it up earlier is so we could get through our conference on requests to charge.

MR. MEARS: I don't, I don't know of anything that I'm going to make that type of reference to. May I inquire if the State is going to do that?

MR. HARDY: Do what now?

MR. MEARS: Say, while you have this out you can look at it and --

MR. HARDY: I probably will, Judge.

THE COURT: That's fine. But, gentlemen, and I'll simply tell you, I do intend to give Counsel an opportunity to raise any objection as to the particular piece of evidence going out, as to whether or not it's continuing testimony, before we send all the exhibits out to the jury.

MR. MEARS: One thing that I think that I do want to address then before it's discussed are the still photographs that were made from the videotape. The videotape, as I understand, will not go out to the jury. The jurors can request the replaying of the videotape, if I'm correct. I think that's the law. That they can request it upon notice. The parties would come back in and they can watch the videotape again. I would object to the still photographs of the videotape going out. If the videotape can't go out with the jurors, and I believe that's a correct statement of law, then the frame, individual frames from that videotape should

not go out either.

THE COURT: Do you have any authority?

MR. MEARS: My only authority -- Well, no; I don't, Judge, other than the fact that I think it's inappropriate. Otherwise, you circumvent the rules of evidence. Every videotape you have, you just have a frame of, still photograph made of each frame and send it out. And, as a matter of fact, that might be a good idea, may be a way to get around it. But I don't think that's the law now and I think it, it circumvents the, the law against letting the videotape go out.

THE COURT: All right, sir. If you would tell the jurors that we're going to probably be about another fifteen minutes, another fifteen minutes apparently.

MR. MEARS: Has the Court ruled on that?

THE COURT: I was waiting to see if the State had any response.

MR. HARDY: Your Honor, we think the still photographs are just like any other photographs. And that's the rule unless there's been a case over the last year or so saying that still photographs made from videotapes are just like any other picture, whether or not they're fair and accurate representations.

THE COURT: Well, I know there's been, there has been a case in regards to enlargements of still photographs made

from videotape, et cetera, et cetera. Insofar as its admissibility, do you know -- either one of you gentlemen have any authority on whether or not those particular photographs would fall under the category of continuing testimony?

MR. MEARS: I don't know, Judge. I'm not -- I'm certainly not going to represent to the Court that it, that it falls under the rubric of continuing testimony. I don't know of any case. There may well be but I just don't know it and I can't cite it to the Court. My, my argument in, in addition to the general principles of fairness is that the, allowing the videotape to be reproduced in the form of still photographs, certainly you can use them for demonstrative purposes and you can use them to call the jurors' attention to particular frames of the videotape, but to reproduce it frame by frame, then send it out, and this is basically three different forms of the same frames, so you're getting, the jurors have got three different versions of each frame in that twenty-two minute segment -- the twenty-two second segment. And that's all it is, is twenty-two seconds and they've got every frame photographed. And I think it, it simply circumvents the rules against letting the videotape go out, and I would object to it.

THE COURT: All right, sir. Gentlemen, at this time I, I feel like the rule in regards to the videotape going out,

generally is directed at audio portions of the tape. It's like we don't send out the micro cassette tape for them to play and listen to, et cetera, because it'd be continuing testimony, kind of like a transcript or something of that nature. I don't think that, that the videotape portion and especially the still photographs produced from the video portion fall into that particular prohibition. So that objection is overruled. They do go out.

Anything else, gentlemen?

MR. MEARS: Does that mean Mr. Hardy wins?

THE COURT: It's yet to be seen, yet to be seen.

MR. MEARS: I understand, Judge. I, I think I may -- I've clearly made my objection to that. If possible, I'm going to continue to do some real quick research and see if I can come up with anything. Would you allow me, if I do find something, to bring it to the Court's attention?

THE COURT: Yes, sir.

All right. Gentlemen, let's --

MR. MEARS: The indictment -- Is the Court going to send this indictment out with the jury?

THE COURT: Are you talking about the original indictment?

MR. MEARS: Yes, Your Honor.

THE COURT: Yes, sir. I had -- Unless there is something on it --

MR. MEARS: It has the punishment on the, under the charges, Your Honor. Quite frankly, I've never seen indictments drawn where the minimum and maximum punishment for offenses is included on the indictment. Since this jury is not to concern itself with punishment, I think it would be inappropriate for that to go out. I would ask the Court to just let us submit a jury form and not send the indictment out. The indictment is not evidence. The Court will charge them it's not evidence. As a matter of fact, North Carolina, not that it's binding on this Court, has a statute that says you can't send it out.

THE COURT: I'm aware of it. Mr. Mears, I'll be happy to -- I would intend to send the indictment out. I'll be happy to, insofar as that front page, to have the Clerk make a copy of the front page, white out where the State has, or where the possible punishments have been typed in, and then, you know, copy it one more time and substitute that copy for this face of it.

MR. HARDY: Will there be a verdict form?

THE COURT: I've got one right here for you gentlemen to look at.

MR. MEARS: Your Honor, subject to my overall objection, I appreciate you doing that.

THE COURT: Yes, sir. I've also got some -- it would be premature to look at at this time. What I, you know, in

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 202 of 299

my charge, Mr. Mears, I charge them et cetera, et cetera, et cetera, and I basically charge them that if they find that the Defendant's guilty, they write in guilty. If they find him not guilty, they write in not guilty, as to the specific counts.

MR. MEARS: Your Honor, with regards to the possession of a firearm, I -- they have to find a predicate offense first before they can find the possession of a firearm during the commission. Now, do you give instructions as to use --

THE COURT: I believe that I will.

MR. MEARS: Okay. If you could, I think that would, may help them. They have to find that an armed robbery occurred before they could find the possession of a firearm.

THE COURT: And if they find him guilty of --

MR. MEARS: Aggravated, I think it's aggravated assault and aggravated battery at the Madison Street Deli.

THE COURT: If they find him not guilty of count one and find him guilty of count two, then count two isn't going to stand up anyway.

MR. MEARS: That's right. You've got an inconsistent verdict. Okay. Thank you.

THE COURT: Otherwise, is this, is this verdict form satisfactory, gentlemen?

MR. HARDY: Yes, sir.

Case 7:14-cv-00039-MTT Document 18 Filed 07/24/14 Page 263 of 295

MR. MEARS: It is, Judge.

THE COURT: Let me address one other thing real quick. Gentlemen, insofar as the Unified Appeal Procedure, Section 3-A-2, we've already addressed 2-A, written requests to charge. We've already -- Are there any other matters that need to be ruled on at this particular time insofar as matters that arose during the trial, evidentiary or otherwise?

MR. MEARS: I think we've got -- Nothing other than, Your Honor, we would renew all objections to the evidence previously made hereto on the grounds that were stated contemporaneous with the raising of the objections. We would raise those objections again with regard to the Motion for a Mistrial and the renewal of the Motion for mistrial after curative instructions. We would renew that at this time. Given that I have, I don't know of anything else we need to raise pursuant to the Unified Appeal or pursuant to the Rules of Procedure. And I simply restate, renew all of those at this point.

THE COURT: All right, sir. Mr. Mears, I will renew my previous rulings on all objections and all motions of the Defense in those regards.

Gentlemen, are you aware of any other motions or objections that need to be presented? I think you have just covered that.

MR. MEARS: Judge, would you look at subsection D? Mr. Bryant has made a good point. It's under Rule III of the Unified Appeal, under D.

THE COURT: Are you speaking of after charge of the Court?

MR. MEARS: After the -- That's just before that. It's Rule D, under 2, D, I'm sorry.

THE COURT: 2, D?

MR. MEARS: Rule III, 2, D.

THE COURT: Yes, sir.

MR. MEARS: Could we have explicit permission to reserve objections to the State's closing argument until after the closing argument is made? In other words, if we -- and I, I, very rarely do I ever object during the closing argument at the guilt-innocence phase of a trial like this.

THE COURT: Mr. Mears, I don't have any, any problem with that off the top of my head with the exception -- I'm not going to put this case in a position of, if there's an objection and, and the Court were to sustain the objection, and the Court by admonishing the attorney or otherwise instructing the jury could satisfy any prejudicial effect to the Defendant or otherwise, what otherwise might be considered some, some error on the part of the State in making such an argument, I don't want to put the Court in

this case in a position of, of not being able to cure whatever you might consider to be improper argument. So, insofar, if you're willing to -- it's almost to the extent of asking you to, to waive -- I don't want to -- I guess -- I hope I'm making myself clear. I don't want to be in a position of waiting until after the State presents its argument and then you state an objection that I otherwise could have cured during the argument. Do you understand?

MR. MEARS: Yes, sir; I, I understand. And the reason I'm, I'm making the request under Rule II, I mean, I'm sorry, under Rule III, 2, D, there is --

THE COURT: I understand.

MR. MEARS: -- a procedure for that. And I understand the Court's reason for not wanting to do that. I just simply wanted to make sure that I had asked for that.

THE COURT: I think it would be better that if you do have an objection during the State's argument, let's raise it at that time so that I can address it at the proper time.

MR. MEARS: That's fine. I just wanted to make sure I, I had asked because I think it's incumbent upon me to follow the Unified Appeal as best I can. I think also, since the Court had asked, E probably has to be done at this time also.

THE COURT: Yes, sir.

Mr. Cromartie. Mr. Cromartie, I need to ask you at

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/24/14 Page 206 of 295

this time, as I have in the past, whether or not at this time you have any objections to your Defense Counsel?

MR. CROMARTIE: No, sir.

THE COURT: Either Mr. Mears or Mr. Bryant?

MR. CROMARTIE: No, sir.

THE COURT: Do you have any objections as to the manner in which they are defending you in this matter?

MR. CROMARTIE: No, sir.

THE COURT: All right. Thank you, gentlemen.

Gentlemen, why don't we take about a five minute break. Is that going to be sufficient?

MR. MEARS: Can we have ten?

THE COURT: Ten minute recess and then we'll begin with the summations.

(Whereupon the Court takes a brief recess, and upon reconvening the following transpired outside the jury's presence)

THE COURT: Mr. Hardy, do you need a moment?

MR. HARDY: Might as well start, Judge.

THE COURT: All right. I believe the State has the opening and concluding.

MR. HARDY: Mr. Mitchell will address the jury first, Your Honor, and I'll address them, of course, second.

THE COURT: You may bring the jury in.

(Whereupon the jury returns to the courtroom,

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 207 of 299

after which the following transpired)

THE COURT: Ladies and gentlemen, I believe that we're ready to begin our summations or closing argument. Let me remind you that the summation or closing argument is not evidence in the case and is not to be considered by you as evidence. It's simply the attorneys' opportunity to tell you what they think the evidence has, in fact, proved during the case or has not proved during the case. And it's their opportunity to try to persuade you to decide the case in a particular way.

The State has the opening and concluding argument.

Mr. Mitchell?

MR. MITCHELL: May it please the Court.

Good afternoon, ladies and gentlemen. After all the lawyers complete their final summations or closing arguments, which may be, which hopefully will be concluded this afternoon, Judge Horkan will instruct you all in the law that you'll use to apply to the facts of this case as you find them to be. And I want to take just a few minutes and talk with you about some of the principles of law that I expect that Judge Horkan will tell you.

Now, instruction in the law will come from the Court and not from me. But I am allowed to talk with you about some of the things that I expect that Judge Horkan will tell you.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 268 of 295

Now, I'd like to go over the particular charges contained in the bill of indictment that you'll be considering. The first charge in this bill of indictment is the charge of Aggravated Assault against Mr. Dan Wilson on April the 7th, 1997 (1994, sic.). It's alleged in this particular count that the Defendant committed an assault upon Mr. Wilson with the intent to rob. Now, aggravated assault -- an assault is defined as an intent, an intent to commit, an attempt, excuse me, to commit a violent injury on the person of another. An assault, an aggravated assault is either an assault with a deadly weapon or an assault with intent, with intent, in this case, to rob. And so a, an assault being an attempt, it would not be necessary for there to be totally a completed act. In this case there was.

The second charge that we're -- that you'll be considering is Possession of a Firearm During the Commission of a Crime. And I think that's fairly self-explanatory. The bill of indictment says, alleges that on April 7th, 1994 that the Defendant committed the offense of Possession of a Firearm During the Commission of a Crime, when he had on his person a certain firearm during the commission of a crime, that being aggravated assault, said crime being against the person of another, and that being Dan Wilson, and which crime was a felony. And basically that's self-explanatory.

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 269 of 295

During the commission of a felony a person possesses a firearm during the commission, during the commission of a certain felony. And that'll be the same for count two.

For count four which alleges the Possession of a Firearm During the Commission of Aggravated Battery, which I'll discuss with you in a moment.

With respect to count six, which alleges the Possession of a Firearm During the Commission of the Crime of Murder against Mr. Richard Slysz on April 10th, 1994, and with respect to count eight which alleges Possession of a Firearm During the Commission of a Crime with respect to the armed robbery of Mr. Richard Slysz on April 10th, 1994.

The next charge contained in count three of the bill of indictment is the offense of Aggravated Battery. And this count alleges that on, on or about April the 7th, 1994 that the Defendant caused bodily harm to the person of Dan Wilson by depriving that person, maliciously depriving that person of a member of his body, that being by severing his carotid artery.

Basically, what the law says is a person commits the offense of Aggravated Battery when a person, when a person maliciously deprives another person of a member of his body. And that could be anything. It could be your eye's put out, you lose hearing in your ear, you lose your finger. In this case what we're talking about is the carotid artery in Mr.

Wilson's neck. And I think that Dr. Hall told you that he had to tie this artery off and that because of this Mr. Wilson is more susceptible to strokes and so forth. So he's been deprived of the use of a part of his body which before he was shot he had. And that's what we're talking about when we talk about the offense of Aggravated Battery, maliciously depriving another person of a member of their body. And, of course, the malice, which I'll talk some more about that in a minute. You walk up to somebody and shoot them, malice.

With respect to count five, Murder. Our law says that a person commits the offense of Murder when a person unlawfully and with malice aforethought takes the life of another human being. All right. Malice is defined as the deliberate intention to take the life of another human being. I expect that Judge Horkan will tell you that malice may be, may be either express or implied. I expect that he'll tell you that, I expect that he will tell you that express malice is the deliberate intention to take the life of another which is shown by external circumstances capable of proof. I expect that he'll tell you that malice may be implied where no considerable provocation appears and the killing shows evidence of an abandoned and malignant heart.

And I'll give you some examples of some of the things that I'm talking about. Carnell Cooksey told you all that

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 211 of 299

the Defendant had made some statements to the effect of, well, there's just an old man down there at that store. It's a formulation of malice. That's something -- That's external circumstance capable of proof, which you could use to find express malice. I'm thinking about what I'm going to do before I go down and do it. Now, it's a different idea from what's called premeditation. It's a little bit different. Premeditation is, I'm definitely planning to go kill somebody. I think that you do have that, but in this particular cir --

MR. MEARS: Your Honor, I'm going to object. Personal opinion evidence is not appropriate. I would object.

MR. MITCHELL: I apologize to the Court, Your Honor.

THE COURT: Sustained.

MR. MITCHELL: With respect to, with respect to implied malice, I expect that Judge Horkan will tell you that malice may be implied where no considerable provocation appears and the circumstances of the killing show an abandoned and malignant heart. And that's the language of, that's the language of our statute.

What we're talking about there, is you just walk up to somebody, for no reason, bam, bam. There's no considerable provocation. Evidence of an abandoned and malignant heart. That's an example of what we're talking about there.

With respect to count seven of the bill of indictment,

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 212 of 289

Armed Robbery. I expect that His Honor will tell you that a person commits the offense of Armed Robbery when with intent to commit a theft, that means that I'm intending in my mind to go steal something, that you take the property of another, something that doesn't belong to you, from the person or immediate presence of another. Okay. And my immediate presence is, that's not necessarily something, that's something that's right on me. My, my immediate, my immediate presence is, say if a, say if I'm, if I'm standing right here, something -- Det. Spencer over there may be in my immediate presence. From the immediate presence of another by use of an offensive weapon. An offensive weapon is anything capable of inflicting bodily injury or grave serious injury or death. Guns, knives, so forth.

So, what we're talking about here is with the intent to commit a theft, I'm going to steal some beer, or, I'm going to try to get some money. There's been some evidence about cash registers being tapped on and so forth. I'm going to steal something, with intent to commit a theft, by use of an offensive weapon I take the property of another from the person or immediate presence of another. And in this particular case I think the evidence would show that Mr. Slysz was in this store, down at the Junior Food Store on Jackson Street. He was behind the counter. He was the person in charge of the store. Individuals -- Beer was

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/24/14 Page 213 of 299

removed from there, his immediate presence.

I expect that His Honor will tell you that, will charge you with the principle of law called parties to a crime. And what that means is, is any person who aids or abets another or participates in assisting another in the commission of a crime is a party thereto and may be charged with and convicted of the offense the same as, the same as the person that directly, directly committed the offense.

I expect that His Honor will tell you that you all are made by law the sole and exclusive judges of the credibility and believability of the witnesses. And it's up to you to decide which witnesses to believe and which witnesses to disbelieve, if there are any that you disbelieve.

I expect that Judge Horkan will tell you that all of the witnesses are presumed to honor their oath to tell the truth, but if at some time there is such a conflict in the testimony that you must believe one witness or disbelieve another witness, that you all alone are the sole and exclusive judges of which witnesses to believe and which witnesses not to believe, or which portions of a witness' testimony to believe.

I expect that he'll also tell you that where a witness has given statements which are inconsistent with what he testified to, and those statements are introduced into evidence, and we've had that here with respect to the

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 214 of 299

statements of Mr. Young, that those prior inconsistent statements, which are inconsistent with what he testified to, may be considered by you as substantive evidence in the case. In other words, you may consider his prior statements in this case to Det. Weaver and Det. Johnson as substantive evidence in the case. In other words, in other words, you may use that for the, for the substance of what, of what was said. Now, how much of that that you choose to believe or not to believe is solely, I expect Judge Horkan will tell you, is solely an issue for you, the jury, to resolve.

I expect that Judge Horkan will tell you that there are two kinds of evidence: direct and circumstantial. Direct evidence is evidence which points directly to a fact in question. In other words, I see it happen. In this case we have both. Direct evidence we have here. Mr. Clark told you all that he was in the store. Mr. Cromartie shot the man. Direct evidence.

Circumstantial evidence is the facts and circumstances which point indirectly to a fact at issue. And I'll give you an example of what that is. It's just common sense. In other words, you come out on that rainy morning and you see there's cat paw tracks across the top of your car. You didn't see the cat, but you know the cat with muddy paws walked across the top of your car. That's what we're talking about with circumstantial evidence.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 215 of 253

Now, another principle of law that I expect that Judge Horkan will charge you with, is that normally the testimony of one witness is sufficient to prove the facts to which that witness testified to. In the case where there are individuals who are co-defendants or accomplices there must be, there must be some corroboration of that person's testimony. And that corroboration may be slight. And whether or not there's been sufficient corroboration is an issue for you, the jury, to decide. In other words, in this case, slight corroboration is all that's required. Mr. Clark told you what happened. You've got the fingerprint outside the store. You've got that shoeprint. You've got the testimony of Mr. Cooksey. You've got the testimony of, statements of Mr. Young. You've got the testimony of Mr. Lucas. All of that evidence together is corroboration.

Another principle of law that I expect that His Honor will instruct you with is reasonable doubt. And I expect that Mr. Mears will talk, talk with you about reasonable doubt to some great degree. I expect that he will, that Judge Horkan will tell you that the State has the burden of proving every essential element of the offenses charged, which I've just briefly glossed over with you, beyond a reasonable doubt. I expect that Judge Horkan will tell you that a reasonable doubt is not a vague, far flung, arbitrary, or capricious doubt. I think that he'll tell you

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 216 of 299

that it's the doubt of a reasonable, fair-minded juror diligently seeking the truth.

And, as I say, I expect when Mr. Mears comes up here in a minute that he will talk with you at some length about the concept of reasonable doubt. And before I sit down I'd like just to briefly touch on that with you. I submit to you that a reasonable doubt is just what it says. It's a doubt that's reasonable. The State's not required to prove the guilt of the accused beyond all doubt or to a mathematical certainty. Moral and reasonable certainty is all that we can expect in a legal investigation. And I expect that probably when they talk about the term, reasonable doubt, when Mr. Mears comes up here in a minute, he's an excellent attorney, I expect that he'll emphasize that word, beyond a reasonable doubt, as if the State had to go beyond the horizon and to the ends of the earth to prove the Defendant guilty. I'd submit to you that that term, beyond, is really a little bit misleading, because what we're talking about here is, all the State really has to prove is that there is not a reasonable doubt in the case. Reasonable doubt is not a mere possible doubt, because everything which relates to human affairs and depends upon moral evidence is open to some possible or imaginary doubt. And that's not what we're talking about. What is a reasonable doubt? It's a sound, sensible, logical doubt based on evidence.

We would submit to you that based on the evidence that's been presented in this case, there's no reasonable doubt of the guilt of this Defendant. Now, I'm going to sit down here and Mr. Mears will have the opportunity to address you. After Mr. Mears addresses you, Mr. Hardy will have the opportunity to come before you and talk with you about the specific facts of this specific case, which I've only, which I've only glossed over and superficially alluded to. And I expect that after Mr. Hardy had his opportunity to come back and talk with you, that you'll be satisfied that there is no doubt, reasonable or otherwise, as to the guilt of this Defendant.

THE COURT: Mr. Mears?

MR. MEARS: Good afternoon, ladies and gentlemen. This is one of the scariest moments of any attorney's life, is standing before the jurors at the conclusion of a trial, a trial in which that attorney's charged, that attorney's client, that attorney's reason for being here is being submitted to the jury as a human being. I introduced Ray Jefferson Cromartie to each one of you at the beginning of jury selection. I want to do it again as we finish.

Ray, stand up (Mr. Cromartie complies). Ray Jefferson Cromartie.

Thank you, Ray (Mr. Cromartie sits down).

And I don't want us to forget the other people that

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 218 of 299

have caused us to be here, have reason. Mr. Richard Slysz, the gentleman who was killed at the Junior Food Store. Mr. Dan Wilson, the gentleman who suffered a gunshot wound in his face at the Madison Street Deli. You have to consider those individuals as well as Ray Jefferson Cromartie.

Another thing that scares attorneys at this point is that perhaps the attorney has done something to make the jurors mad, some phrase, keeping the courtroom too cold or too hot. You don't know. You're just terrified that you've done something that will make the jurors decide the case on something other than what they heard from the witness stand. If that has happened, hold it against the attorney, not against Ray Jefferson Cromartie.

The role of a criminal trial in our society is one of the most sacred roles in this system that we have. You as twelve strangers to Ray Jefferson Cromartie and twelve strangers to Richard Slysz and Dan Wilson are going to write chapters in the books of their lives. Whatever you do here today or tomorrow will be a chapter in the lives of those three human beings. One way or the other, good, bad, whatever. The enormity that our society has put on your shoulders surpasses any fear that I have.

As I argue the case to you, please understand my job is not to convince you one way or the other of one fact or another. My job is to make sure that the evidence is

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 219 of 299

presented. Mr. Bryant's job likewise, make sure the evidence is presented fairly within the rules of evidence. Make sure that we do our job on behalf of Ray Jefferson Cromartie. I'm not up here to convince you one way or the other. I don't have that ability. The evidence must convince you. We live in a day when television and movies just have blown courtroom proceedings out of proportion. Every juror sometimes, I'm afraid, thinks that defense attorneys and prosecutors are supposed to argue to you according to some script that's been written and rewritten and rewritten by screen writers so that we come in here and just wow you right into one decision or another. It doesn't work that way.

What I am going to do, just like Mr. Mitchell and Mr. Hardy will do, Mr. Mitchell has done and what Mr. Hardy will do, is to try to focus your attention on those portions of the evidence that we feel should be considered by you in making your decision as to whether or not Ray Jefferson Cromartie is guilty beyond a reasonable doubt of the offense of Aggravated Assault and Aggravated Battery on Mr. Dan Wilson, Possession of a Firearm During the Commission of those two felonies, whether he's guilty beyond a reasonable doubt of the offense of Murder of Mr. Richard Slysz, whether or not he's guilty beyond a reasonable doubt of the Armed Robbery and Possession of a Firearm During the Commission of

the Crimes at the Junior Food Store.

Mr. Mitchell, I'm afraid, gives me too much credit with regard to arguing reasonable doubt. I'm not going to spend a great deal of time talking to you about reasonable doubt. You'll be charged as to what reasonable doubt is by the Judge. But I would suggest to you that reasonable doubt is the doubt that you individually have about the elements of this case. It's doubt for which you, as individual jurors, can assign to each individual item of evidence that was not proven to you beyond a reason, a reason which you individually, not collectively, subscribe to the value of each item of evidence, including the testimony. That's all it is. There's nothing magical to it. You are not asked to leave your common sense outside the courtroom. No one has asked you to do that. What you're asked to do is to keep an open mind and not automatically assume that Ray Jefferson Cromartie is guilty of anything until the State has proven to you as an individual each and every element of each and every offense beyond a doubt, a doubt which has reason which you subscribe to it. If you are left unsettled or troubled by a piece or a bit of evidence or testimony, that's reasonable doubt. If you feel that the evidence or the testimony on any particular issue leaves you unsettled, if you're saying to yourself when you go back in the jury room, if you say, I'm not sure that that happened that way, that's

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 221 of 299

reasonable doubt. And if you are unsettled and if you're not sure, that will be your decision. It will also be a part of the chapter you're going to write in Ray Cromartie's life.

Now, I would like to go over some of the evidence with you. Please understand that when I am talking about the evidence and pointing out certain things that have occurred here in the courtroom, I am not attempting to supplant your memory of what took place. Some of you have been very diligent. Most of you, I think, have been very diligent in taking notes. And I believe Judge Horkan has told you and will tell you that you're entitled to use those notes to refresh your own memory, but you're not to use other people's notes in place of what your memory is, because, you see, even though you are twelve, you will be twelve people making this decision, you are each individually charged with a responsibility.

Now, let me talk about the classifications of witnesses we had. We had police witnesses. You heard those police witnesses. And let me suggest to you that every police officer who testified, including the crime scene technicians, the officers from Patrolman Allen on to Mr. Collins with the G. B. I. were doing their jobs the best they could under the circumstances, but they were limited in what they could do because they were not at the scenes of

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/24/14 Page 222 of 299

either one of those crimes when they occurred. So what they were dealing with were bits and pieces of evidence that was either collected or pointed out to them or that they developed. You have to keep that in mind.

Just because a police officer comes in and testifies as to a particular fact, you don't have to believe them. You don't have to disbelieve them. They're like any other witness. What I would suggest that you might want to do is to listen to, in your mind, their testimony as it relates to the testimony of those witnesses who claim to have been present or to have been associated with the particular incidents about which they were testifying.

Now, how do you do that? How do you take the testimony from one witness to the other witness and apply it? One way is that you take the law that Judge Horkan will give you. You see, this case is like a puzzle to a certain extent. The prosecutor starts out, hopefully, with pieces of the puzzle. They bring them into court through the individual witnesses and they present them. And they put the pieces out here. They don't have to put the puzzle together unless they want you to believe the whole picture. The individual pieces of the puzzle, and if there's a piece missing, then that gives you an incomplete picture of what happened. Some of the pieces are false pieces. Some of the pieces were brought in here by people who lied to you. They had lied to

Judge Horkan before they came into this courtroom. They lied to the police officers before they were ever charged. They lied after they were charged. And I would submit to you, ladies and gentlemen, they, some of those individuals lied to you here in this courtroom. That's for you to determine. But I would suggest to you that the evidence is very clear based upon their inconsistent statements, the evasive statements that they made, and the disproved statements that they made, that they lied to you.

You'll be charged that if you find that a witness' credibility has been impeached by either making a prior inconsistent statement or by lying to you in some form, you can, if you choose, disregard everything that particular witness said. That's up to you. That's part of putting together the pieces of the puzzle that have to be put, put before you in order to create a picture.

What is the picture supposed to be? It's supposed to be the truth. That's what verdict means. You're going to go back and be asked to render a verdict. Verdict, I was told one time, is simply part of a Latin phrase meaning vitae dicta (ph.), the truth, to speak the truth. And I would suggest to you, ladies and gentlemen, that some people that came before you in this courtroom did not speak the truth.

Now, should you on that basis alone find Ray Jefferson Cromartie not guilty of the offense? Yes. Because the

people that lied to you were the only people that claimed to have any knowledge of what happened at the Junior Food Store.

Now, the Madison Street Deli. I know it's late in the afternoon and I'm going to try to be quicker with this than I was with Mr. Collins because I know I lost a lot of you by going through Mr. Collins point by point, and I apologize for that. It was just something that came over me, I felt I had to do. And I'll try not to do that here this afternoon with you. But it's important. This young man is on trial for the crime of Murder.

Now, let's look at Madison Street Deli. First of all, the Madison Street Deli, the assault on Mr. Wilson, is not related to the Junior Food Store, according to the State's own evidence, except by this little pistol that they, that was used, this instrumentality here. The thing connecting the Madison Street Deli and the Junior Food Store was this pistol.

Now, the State would have you believe that the pistol, and I, I'm not really asking you to dispute the ballistic tests in this case. You notice, I didn't ask Mr. Howard any questions about his ballistic comparisons. I tried not to ask questions about things that we weren't disputing. This pistol was in the possession of Gary Young on April the 6th, 1994. I submit from the evidence you can find that this

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 229 of 299

pistol was in the possession of Gary Young on April the 7th of 1994. I would submit to you that Gary Young was in that store. I would submit to you that Gary Young had been in that store. I would submit to you that this was his pistol. What other evidence do you have that Ray Cromartie was ever in the Madison Street Deli on April the 7th of 1994? Stop and think about it. Stop and think about what other evidence did you have, what evidence at all did you have that he was in that store other than the he shay, he say, she say testimony of some people that came in here and lied to you? Now, a lot of people may cringe when lawyers, and we're supposed to be real polite when we use the word "Lie". And people sort of say, "Well, he shouldn't be saying that. He could just say untruth. Just say they're mistaken." Ladies and gentlemen, there's no other way to cut it. Those people lied to you about what they had heard at the Madison Street Deli.

This green coat that you heard here, that you had here, and the black stocking cap. Nothing to connect Ray Cromartie to that hat and that green coat except the testimony of Gary Young. They sent it off to the F. B. I. lab. You heard that. And they didn't check it for hairs. They didn't check it for fiber. They didn't do anything with it. It came back. Did you hear any testimony at all about that coat, that hat belonging to Ray Cromartie or

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 226 of 299

being on Ray Cromartie on April the 7th? Who told you it did? Gary Young.

Gary Young's gun, Gary Young's coat, Gary Young's hat, ladies and gentlemen. Now, I probably spent too much time with Mr. Young asking him about his do-rag and some of my associates laughed at me about using the term do-rag or bandanna.

There's more to going on, going on with the Madison Street Deli than a purported robbery. Mr. Young is staying at the Cherokee Apartments. Madison Street Deli is over by the west side. Ladies and gentlemen of the jury, I would submit to you that the only evidence you have before you at all that has any credibility at all is the physical items, because the gun belonged to Gary Young. Everybody, even his friends, said it was his gun. Remember? Did you see that gun in his hand on Wednesday, Tuesday, Thursday, Friday? Yes. Yes. Yes. Yes. Yes.

Ladies and gentlemen, what other evidence was there given to you that Ray Cromartie committed the offense of the Aggravated Battery, Aggravated Assault on Mr. Dan Wilson? You see, what has happened here is just that, oh, we've got this evidence about the Junior Food Store and I want to talk to you about that. They said, well, we've got this evidence about the Junior Food Store; oh, and we've got this other robbery over here at the Madison Street Deli and we'd better

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 227 of 299

get rid of them at the same time because the same person must have done them both. Well, Junior Food Store, the State's case said it was, it was three people driving a car over to W. Jackson Street, two of them going in, one shooting Mr. Slysz, the other stealing some beer and running out. The Madison Street Deli, supposedly, according to the State's version, one lone person comes in real quickly, shots Mr. Wilson, plays with the cash register for a second and runs back out.

Ask yourself the question, why didn't the State play the rest of the tape for you? Why didn't they show you who had been in and out of that store before that gunman came in there? You didn't see the rest of that tape. Well, let me ask you this. If the State's version about Junior Food was even anywhere near close, why did Ray Cromartie walk all the way from Cherokee Apartments all the way over to Madison Street and then walk all the way back over there on the 7th? That's, that's their story. That's Gary Young's story. And then turn around and get Thad to drive them down to W. Jackson Street, just a few blocks south of where Mr. Clark lived.

You see, ladies and gentlemen, the Madison Street Deli and all of the horror that Mr. Dan Wilson had to suffer, and probably still suffers, is not the result of anything that Mr. Cromartie did on April the 7th.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 228 of 299

Mr. Hutchinson told you that they came in and they took seven or eight latent prints and then threw them away that night. Now, you've got to consider -- I'm not saying Mr. Hutchinson purposely threw those away. Please don't misunderstand that. But why would they throw away prints without asking somebody to check them out? Why not get some help? We, we'll never know. We'll never know whose prints might have been on that cash register.

Now, you heard Mr. Hutchinson say in nineteen years he's never made a mistake. Nineteen years of countless hours of testing and coming into court and testifying, never made a mistake. I've been trying cases for twenty years and I've made a lot of mistakes. I don't know there's a human being alive that doesn't make mistakes at times. What happened to those prints? Whose prints were they? Why didn't you see the rest of the videotape?

I'll tell you this, ladies and gentlemen, the evidence that was presented to you is not credible as it relates to the accusations against Ray Cromartie and the Madison Street Deli. It's just not credible. If you convict Ray Cromartie of the offense of aggravated assault and aggravated battery and possession of a firearm during the commission of those two offenses, you will do it on the testimony of Gary Young. And God help us if we put young men in prison on that kind of evidence.

Case 7:14-cv-00039-MTT Document 1-8 Filed 03/14/14 Page 229 of 299

Let's talk about the Junior Food Store, April the 10th. Now, Corey Clark and Thaddeus Lucas cut deals. People do it all the time. There's an old adage among criminal defense lawyers that's kind of crass, I guess, but it says, the first to squeal gets the deal. That's, that's what people say. Whoever gets to the prosecutor first with the best story gets the deal. In this case, Gary Young got the best deal of all. Gary Young had originally been charged with the Madison Street Deli. He was originally charged in, I can't even say the word, because it was so -- they, they charged him. So, you see, if they use the story of Corey Clark and Thaddeus Lucas against Mr. Cromartie, then they couldn't prosecute Gary Young for the Madison Street Deli. You see the dilemma they found themselves in. Because Gary Young said, "No; I didn't do that". That's my gun but I didn't do it. I've been over there. I've been wearing my gang rags but I haven't been over there". You see, they couldn't pursue the case logically against Mr. Young and pursue the case at the Junior Foods, even though it was his gun. He got the best deal of all. He didn't get charged with murder at Junior Food and he had his case dismissed. You'll see the documents out with you. Not just not prosecuted, but dismissed. Gary Young is walking the streets of Thomas County and Thomasville, Georgia and it was his gun in both robberies.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 290 of 299

Just as an aside, not that it's really that important, but they didn't even try to find out who that belonged to, ladies and gentlemen. Had the dog Pete that says he can pick up scents up to seventy hours later. They never once tried to track that scent from that particular sweatshirt. Now, ladies and gentlemen, I would submit to you that sweatshirts, I don't know, but I'm assuming, that sweatswir -- set -- sweatshirts give off a better tracking scent than shoes on a concrete floor in a convenience store.

You see, the reason they didn't pursue it is because it didn't fit what they had already made up their mind by April the 13th the story had to be, because the first to squeal got the deal. Carnell Cooksey overheard -- Ladies and gentlemen, Carnell Cooksey never heard anything from Ray Jefferson Cromartie. Carnell Cooksey heard the talk out at Cherokee Plaza. That's what I would suggest that you consider. Carnell Cooksey got arrested. First one in there, said, I can tell you something, where that gun is. And they went and found the gun right where Carnell Cooksey said that Gary Young had thrown in. The first to squeal got the deal.

Corey Clark and Thaddeus Lucas and Gary Young were friends. They were very thick. They were very tight. Jeff Cromartie came down here from Pittsburgh. Some people say Philadelphia, Pittsburgh. His family lived out near Boston.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 281 of 2959

He had lived here as a young person. His grandmother lives down near Beachton. He was spending some time with Mr. Joe Lundy, who was sort of his, his pretend father, someone who had given him love and care as he was growing up for periods of time. He was an outsider at Cherokee Plaza. You heard Lisa Young testify that he didn't do a whole lot over there, stayed on the phone. He was homesick for his girlfriend in Pittsburgh.

Judge Horkan will charge you in so many -- he will charge you to the extent that you can't convict Ray Cromartie for hanging out with the wrong people. You can't convict Ray Cromartie for his being present around other people. Ray Cromartie, ladies and gentlemen, got smack dab in the middle of something that he didn't know he was getting in the middle of. Because on April the 12th, now I'm skipping around a little bit, but I hopefully will tie it all together for you. On April the 12th there was a shooting at the Cherokee Plaza Apartments. You recall that some guys from West Side came over looking for somebody. The only person we have evidence that they shot at was Gary Young. Ask yourself, why would some young men from West Side come looking for Gary Young at Cherokee Apartments, looking for him to the extent that he -- that they would fire at him through the apartment window, his girlfriend? What did Gary Young do? He took this gun, it was in his

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 292 of 299

possession, went out there and tried to kill them. That was his testimony. In his statement to the police, he said, "Oh, I fired it in the air". Then in here he told you he tried to kill them. Then he tried to get somebody to hold the gun for him. You remember, I asked one of the police officers, why would anyone not want to be arrested with a pistol on him. Two reasons. One, it's a hot gun where the gun's been involved in a crime. And that's exactly what happened.

Gary Young knew on, on April the 12th that he had to get rid of that gun. Stop and think about it. If he had been attacked, why would he throw the gun away? If the gun wasn't hot and he was being attacked by some people, why didn't he throw the gun away? I'll tell you why. Because on April the 12th Gary Young knew how that gun had been used twice. He knew he had to get rid of the gun or he'd be smack dab in the middle of the Madison Street Deli assault on Dan Wilson and smack dab in the middle of the charges of murder involving Mr. Slysz.

Gary Young is in the middle of this pot of mess we've got here. How he dealt with this situation on April the 12th out at the Cherokee Apartments should give you some concern about the evidence that the State presented to you. Are you going to believe Gary Young? Are you going to believe him when it was his gun, him shooting, him trying to

kill someone?

During the jury selection I think everybody on this panel was asked by Mr. Hardy, do you believe what you read in the Thomasville Times newspaper. And I'm not from around here. And I was rather surprised by all the responses. And I found, subsequently found out that a lot of people don't believe what they read in the newspaper. If you don't believe what you read in the newspaper, are you going to believe what Gary Young said? A newspaper that doesn't have any interest, supposedly, to go do it one way or the other. And you're going to believe what Gary Young says when it involves convicting a, the young man of murder?

Well, Carnell Cooksey started the process of telling, the story got started, and I want ya'll to just think about it when you go back and start deliberating, how consistent that story was. I guess you could say, well, it happened exactly that way, A, B, C, D, right down the line. Ladies and gentlemen, the story was told and told and rehearsed and rehearsed to get it right.

Now, I know that is going to be difficult for some of you to understand or even believe, because you're going to say to yourself, well, Mr. Mears, Ray Cromartie is on trial. He must have done something wrong. He did. He hung out with Gary Young. He was staying in the Cherokee Apartments. He was quiet. He wouldn't date the girls that Lisa Young

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 284 of 299

was fixing him up with. He was on the phone all the time.

Ray Cromartie's involvement in the Junior Food Store is something that you're going to have to wrestle with, starting with Gary Young's story, because, ladies and gentlemen, that's the story that started the stories that you heard from Corey Clark and Thaddeus Lucas. And whatever involvement Ray Cromartie might have had in that particular incident, if any at all, is something you're going to have to decide. You're going to have to decide it based upon the evidence that was presented, not what you supposed, not what you think, not what you may believe.

But let me suggest to you what happened in the Junior Foods Store, inside that store that night. And I suggest that you can listen, think about the physical evidence and think back to some very critical testimony, because, you see, as good as their story was, as well rehearsed as those young men got the story, they slipped up and made a bad, bad mistake in their story because they didn't know how it was going to look when they started telling that story because they didn't know what the evidence technicians were going to find or had already found and what the photographs were going to show.

You see, first of all, Gary Young, Corey Clark, Thaddeus Lucas and perhaps Carnell Cooksey, if he actually heard anything, they didn't know what the initial witnesses'

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/24/14 Page 288 of 299

statements were about the people who came out of the Junior Food around 3:00 to 4:00 o'clock that morning on April the 10th. They didn't know that the witnesses would testify that the first person running out of the store had on a cap, had on a light colored shirt, and dark blue pants. Do you recall Thaddeus Lucas' testimony about what he was wearing that night when he said he was out there on W. Jackson Street? If I recall correctly, Thaddeus Lucas said he was wearing his Domino's Pizza cap, bright blue I believe he said, or some type of blue, and his dark blue shorts. You see, whatever Mr. Seitz and Bruce Taylor and Mr. Walsh saw, the testimony that was given to Off. Allen fifteen minutes after they saw it, not after they thought about it, not after they discussed it, not after it'd been in the paper, not after all of that. When they first heard the police come up and they first told the story, they said the person coming out of there had a ball cap, light shirt, dark shorts, and they said they were running. Now, I know there's some other testimony about whether they walked, stopped. They said they were running, running with two twelve packs of beer under, or two twelve, twelve ounce cartons of beer under their arm. You see, when they started telling their stories, they didn't know that somebody had seen them there, running out of the store. They didn't know that.

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 236 of 299

Also, when Corey Clark, after he finally got it right, and he lied to Judge Horkan during his sentencing hearing about whether he'd ever gone behind the counter or not, I questioned him, had him read his transcript, you'll remember that. Even Corey Clark never put in his story Ray Cromartie behind that counter. Even Corey Clark's story told and retold, even the he say-she say story that was going around in the Cherokee Apartments never put Ray Cromartie behind that counter.

This gun was fired, according to the estimates of the State's witnesses, six inches from the left temple of Mr. Slysz. You have the photograph. I'm not going to wave the photographs around. I'm not going to do that. You'll see those. You'll have them out there with you. Mr. Slysz was seated at a small bar type of chair doing his paperwork. In fact, he was tallying up perhaps the night's receipts. And Corey Clark said that, according to his version, that Ray came in and went down the candy aisle, right here (indicating). And that he proceeded on to the beer coolers over here. It appears from the photographs and from the testimony that I asked the witnesses whether or not he, Mr. Slysz was sitting in the chair and he said he thought he was.

Now, ladies and gentlemen, stop and think for a moment. Stop and think about Corey Clark's version of what happened.

The person who went down this aisle, came back up. You remember I asked, is this an open space here? Yes; it's an open space. Is this unobstructed? Yes; it's unobstructed. The person walks up over this counter and fires directly into the face of Mr. Slysz. Is Mr. Slysz still going to have the pencil in his hand and not even know what hit him? No, ladies and gentlemen. The person that shot Mr. Slysz went through the store, instead of going down the beer aisle, he turned and walked back around the aisle, directly there, shot Mr. Slysz right there, excuse me, in his left temple just like that, sitting here like that. Mr. Slysz is falling out of the chair and the second shot hits him right there and he falls in the position you see him in. Why do we know that? The casings. The casings of the shells that sent projectiles into the head of Mr. Slysz. They're not over here. They're not over there. They're right here.

Look at your notes when you get back and start deliberating. Think back to what Dr. Howard said about the ejector pattern of this gun. Ejection pattern of this gun and the casing that come out. Remember what he said? They go up and out, up and out, like this. Where was he standing to shoot Mr. Slysz? Both of those shell casings were over in this corner.

I'm sure the State will ask you to consider other alternatives, and you should. You should consider all of

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 238 of 259

the evidence in this case, but you don't leave common sense behind that door when you come in here, and you're not asked to leave common sense in here when you go behind that door to do your deliberations. You take the evidence, you apply the law, you apply logic to it. That's the beauty of the jury system.

Ladies and gentlemen, you look at the photographs. Some of them are rather gruesome. They show Mr. Slysz on the, on the floor with a lot of blood around him. Ladies and gentlemen, logically, logically, Corey's Clark's story doesn't add up to the facts. Another thing, Corey Clark says that Ray shot Mr. Slysz when he was standing at the cash register reaching over this way and then he yells for him to come up from where he said he was on the floor back here by the beer cooler, come up here and get the cash, get the money. I -- That just doesn't calculate. Why would he ask Corey to come up if Corey never knew they were going there to get money, if Corey's only thought, well, I'm just going there to pick up some beer. If Corey was only there to get beer, why would he go running to the front of the store, as he said, follow the directions of Ray Cromartie, try to open the cash register from back around here? For one reason, Corey's story doesn't pan out and he forgot this part of it. He was already behind the counter. He was already behind the counter. He was already back there to

Case 7:14-cv-00039-MTT Document 18-17 Filed 07/14/14 Page 239 of 299

get into the money.

Ladies and gentlemen, when they made up their story, they didn't know what the physical evidence was going to show. That's why the stories they told, when you look at them, don't hold water with regard to how Mr. Slysz was shot.

I'm sure Mr. Hardy will ask you to examine other possibilities. He's going to ask you to believe Corey Clark. He's going to ask you to believe Gary Young. He's going to ask you to believe Thaddeus Lucas. I'm going to ask you to believe what the evidence shows, not what the lies from the witness stand wanted you to believe. You see, once the story was told, once it was put into place, once the deals were cut, they had to stick with them, even when they became inconsistent with each other. Corey Clark had a deal to get out of prison in the year 2009, if not sooner. They didn't even try him for armed robbery. They didn't try him for aggravated assault. They tried him, or let him plead guilty to the offense of robbery. They want you to sentence, they want you to convict Ray Cromartie for the offense of murder based upon a story that was a result of that kind of deal. Thaddeus Lucas -- You'll have all of these documents out with you, and I, I urge you to look at them as part of your evaluation of the evidence in this case. You'll see Thaddeus Lucas got, got a deal. You'll

also see that while Thaddeus Lucas was out on bond as part of his deal, he beat up his other girlfriend and put her eye out, aggravated battery, and broke her orbital, knocked it out. Aggravated battery, as you will hear the charge involving Mr. Dan Wilson, means depriving someone of a member of their body. You'll read it in the indictment that's out with the evidence. Broke her jaw, broke her orbital, this bone in here. A person that can do that to a defenseless woman can lie to you if it protects them. A person that can do that to any other human being is not going to be afraid to cut a deal with somebody that they hardly know in prison if it protects them.

You see, I asked each one of those individuals, you were protecting yourself; weren't you? And they did. Gary Young made out like a champ. He's walking the street. It was his gun. He was the one that shot Mr. Wilson at the Madison Street Deli, ladies and gentlemen. He's walking the streets of Thomasville, Georgia as I'm talking to you right now.

Corey Clark and Thaddeus Lucas are in prison. They'll get out. They got a great deal. They don't even have an armed robbery conviction on their record. Just plain simple robbery. They got a great deal. And they did it because they agreed, they agreed to let Ray Cromartie come to trial than them. They agreed it was better for them for Ray

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 2 of 32

Cromartie to take the fall.

Now, I know you're asking yourself, wait a minute, Mr. Mears, didn't I hear something about a footprint out by the Junior Food Store? Wait a minute, Mr. Mears, didn't I hear something about a fingerprint? Ladies and gentlemen, the footprint -- First of all, you've got to decide whether it was his shoe or not. Based upon that print, boy, it sure seems like it. Dr. Howard is a very fine man. He brought in this herringbone pattern shoeprint. Sure looks like it fits Ray's shoes. He couldn't say that. He said it was similar. Stop and ask yourself the question, if Ray were wearing those shoes that night, if, if Ray was wearing the shoes that morning, excuse me, why didn't that print -- why weren't the prints that were taken, why weren't they running away from that store? That's what the witnesses said, the person coming out of the store carrying the beer was doing, was running. It certainly wasn't a running print. You look at the photographs and apply some common sense. As Dr., as Dr. Howard said, we use scientific methods. Look at it. That was a scientific method he used. Look at it. That, is that tennis shoe running through that sand that night? You might decide that that is Ray Cromartie's shoe. It was as far as beyond that door to that chair from where the beer cartons were. Is that enough evidence, even if you decide it's similar to his shoe, and that's all you can decide,

Case 7:14-cv-00089-MTT Document 18-18 Filed 07/14/14 Page 5 of 32

that's all that the expert said it was, are you going to find him guilty of murder based upon that, because there's nothing in the store, nothing in the store to connect him to this crime except Corey Clark.

But, you're saying, wait a minute, Mr. Mears, what about the fingerprint taken by Mr. Hutchinson? You've seen the swirls and I'm sure you'll take them back out and look at them and see it again. Quite frankly, ladies and gentlemen, I don't know whether that's his print or not. I don't know. Mr. Hutchinson said he had never made a mistake in nineteen years of testifying. And he had not made a mistake this time. I can look at these prints, and I have till I've almost gone blind, and, you see, this is the known print. This is the one where you start from. You see, fingerprint identification is good in a lot of cases if you keep the prints and don't throw them away. Fingerprint identification is good if you use the right chemicals. But this is the known print. This is the one that was on the beer carton. And what, what the fingerprint examiner does is that they look at this with a magnifying glass and they look at this one with a magnifying glass and they try to find the number of ridges that corresponds. Okay, there's a ridge here, and there's a ridge there. That's one point. And they go down -- And Mr. Hutchinson said he found ten ridges. He didn't find any islands. He didn't find any

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 7 of 32

bifurcated lines or he didn't find any trifurcated lines. You heard him make the explanation. He only found ridges.

I would submit to you, ladies and gentlemen, that's all he found. You have to take his testimony at the Junior Food Store as a professional in light of his conduct at the Madison Street Deli. You can consider that in determining whether or not that is a sufficient identification for you to find a young man guilty of murder.

Now, I can argue to you, well, we don't know when that print was put on there. That's something, I mean, that's -- you can decide that. That might be a stretch for you. What I'm suggesting to you, ladies and gentlemen, that after nineteen years of not having made a mistake, are you willing to convict someone of murder? There were twelve other prints in that store. According to the State's own witnesses, Mr. Corey Clark, he touched the cash register. They had his prints. And he couldn't match up the prints on someone who had tried to get into the cash register. If you haven't made a mistake in nineteen years, and you've got someone telling you, I touched this cash register, I tried to get money out of this cash register, and you can't find their prints on it? You can't identify their prints on it? Come on, what's going on here? I tell you what's going on here. It's the same reason Ray Cromartie's shoes were sent to the crime lab for identification two years before anyone

Case 7:14-cv-00089-MTT Document 18-18 Filed 07/14/14 Page 3 of 32

else's shoes were ever sent up there. I think it's the old ones. These didn't even come close to matching it.

Ladies and gentlemen, every document you're going to see from April the 13th on has got Ray Cromartie's name on it. He was accused, singled out, picked out, he was the person, according to the police, from day one, April the 13th. Why? Because Gary Young said so. He was the person from day one. Why? Corey Clark said so. Thaddeus Lucas said so. He may be his friend. I don't know. But after nineteen years of not making a mistake, are you willing to risk that young man's life on that kind of infallibility?

You know, they give us pencils to write with, and I borrowed this one. It's got an eraser on it. You know why we have erasers on pencils? Because some of us make mistakes sometimes. You very rarely see a pencil without an eraser on it these days. Why? Because people make mistakes. If you make a mistake with this pencil, you write something out and you miscalculate, if I figure my income tax wrong, I can get it straightened out, can erase it and start it over again. That's what erasers are for, ladies and gentlemen. You make a mistake, you don't have an eraser on that verdict form. You make a mistake, that young man right there is going to be found guilty of murder, the most heinous offense we have in our society. Are you going to do it on this kind of evidence? Are you going to do it on the

Case 7:14-cv-00039-MTT Document 18-18 Filed 04/14/14 Page 6 of 32

testimony of these people that came in here and testified to you and admitted they lied, not only to the Judge, my God, if a person will lie to the Judge, you think they're going to hesitate to lie to a police officer? Do you think they're going to bat an eye about lying to you? No, ladies and gentlemen.

Please, please consider this evidence carefully. Please apply reasons to any doubt you might have. Ray Cromartie, you may write the last chapter in his book. Are you going to do it on the words of these people? I ask you not to. I ask you to find him not guilty of all these offenses, ladies and gentlemen. Thank you.

THE COURT: Mr. Hardy?

MR. HARDY: Please, Your Honor. Mr. Mears. Mr. Bryant.

I don't have somebody to stand up and introduce, because you know why? Mr. Slysz is dead. Richard Slysz is gone. He doesn't have any more chapters in his life to write. He's dead. And his life is taken away from him for nothing. His life was taken away from him for twenty-two beers, twenty-two Budweiser, twelve ounce beers, two hundred and forty ounces of beer. His life was lost for that.

I'm going to show you his picture. I don't want you to forget him. Let me make one point. I'll refute some of the points he made earlier. But do you remember Mr. Taylor said

the man who was riding in his car was Mr. Walsh? And where did Mr. Walsh work? Mr. Walsh was the manager of the Domino's Pizza place in Thomasville where Mr. Lucas worked. Rhetorical question. The man, he had a hat on wearing a Domino's Pizza uniform and he worked for him, do you think he'd said, that's Thaddeus Lucas? Certainly he would have. It wasn't Thaddeus Lucas. That's a red herring he's trying to throw out at you.

Right from the road to where he saw him, he'd have said, that's Thaddeus Lucas. It wasn't Thaddeus Lucas because Thaddeus Lucas wasn't there. That's a red herring he just threw out at you. You heard Mr. Walsh, where he worked. And he was the manager of that place; wasn't he? That's just a red herring.

Excuse me a minute. I agree with another thing. When Mr. Mears said when he started, he said, lawyers get kind of scared. Lawyers are paranoid, Mr. Mears. All lawyers are paranoid and they're scared. I'll admit that. I'm paranoid a lot. He is too. Probably Mark and maybe Carl is sometimes. We get kind of scared sometimes.

I want you to look at the totality of the evidence. I don't just want you to look at one point. Look at the whole evidence. The State wants you to look at all of the evidence. Look at everything.

Shot in the head, cleaned up version. Shot in the side

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 8 of 32

of the head, cleaned up version. See the little marks around the head. Shot in the head, uncleaned up version. Dan Wilson, shot in the head, uncleaned up version. You saw the cleaned up version in court.

How do we know they took the twelve -- two twelve packs of beer? Look at these pictures. Look at the beer cooler back there and you can see where two twelve cartons of beer were, and you can see where the bar has been slid across. Proves two twelve packs of beer, look at the picture, are missing, gone from the store.

Look at the beer flap again outside. Hutchinson -- had been raining; hadn't it? The beer flap had no rain on it, had no condensation. He said, "It was dry when I got it", clean. Hadn't been out there that long. Out there -- it had rained earlier, but that beer flap got there when these cans were dropped, I submit to you.

Mark mentioned to you earlier about reasonable doubt. A reasonable doubt is not a vague, far flung, fanciful or imaginary or capricious doubt. It's a doubt you can put common sense to. Each of you, ladies and gentlemen, bring common sense into the courtroom. You use it every day of your life, every day, everything you do. Some of you have children; some of you don't. You have to judge life by common sense. There's the old story I like to say about giving an example of circumstantial evidence. You have a

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 9 of 32

child and your wife cooks cookies and she puts the cookies up there. They might be Oreos. She might buy Oreos or something. And say, don't bother the cookies, boy, girl. Yes, ma'am; I won't bother those cookies. I'm not going to bother them. And then you leave the room and lo and behold you come back in and that lid is tilted a little a bit. And, well, the kid must have bothered those cookies. Well, you go over there and look and there's a chocolate line around the mouth. You go up to little Johnny, and say, "Johnny, did you eat the cookie"? "No, ma'am, I didn't eat the cookie". "Well, Johnny, where'd you get that little mark around" -- "Mama, I didn't eat the cookies". Well, he has to get confronted a couple of times and he says, "Yes, mama; I ate the cookies". Now, that's human nature. People fudge a little bit to start with and then they say, "Well, you've got me. Let's go over it".

Mark told you a reasonable doubt, you know, it's not -- you know, I may -- somebody in the world may say, hey, the sun's not going to shine tomorrow. That may be a doubt but it's not reasonable. The moon's not going to rise tonight. That's a doubt but it's not reasonable.

There are two kinds of evidence. Direct evidence is what you see. You see the flag. You see the wall. You see it with your own eyes. Circumstantial evidence is putting two and two together. The old story that Mark gave you that

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 10 of 32

it snowed last night, you have a cat, you go outside and you see cat prints going over the roof. Last night after it snowed the cat walked over the car. Simple. Common sense is all that is. Putting two and two together.

Reasonable means sensible, intelligent, wise, equitable. You may hear lightning. You didn't see the tree get struck, but you ride by a little later and all the leaves are dead and there's a big line down the tree. The tree got struck by lightning. That's putting two and two together. That's common sense. That's all that is. It's reasoning. It's putting circumstantial evidence together with direct evidence. You may have heard it a mile away and you see it. That's all that is.

Reasonable doubt is a sound, sensible, logical doubt based on evidence in the case. It's not some far flung, fanciful thing.

Some of the points Mr. Mears -- About, about the pizza man. You know, you used to watch TV a long time ago and Dandy Don Meredith used to say, if, if, and, and were canned as nuts, oh what a happy Christmas we would have. If all the ifs and all the ands and all the buts that we want to be true were true, then we'd have a happy time. But that's not the way life is.

Look at the evidence. Look at -- We want you to look at the evidence. The State wants you to look at the

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 11 of 32

evidence and look at the facts.

He's assuming where the man was shot in the head with the gun. I think his assumption is he came right up here (indicating) and shot like that. You've seen people where they shoot guns and they shoot them like that, where they shoot them like that, shoot them like that. Those shell casings are going to go out that way. When you lean way over the counter shooting within six inches, those shell casings are going to go that way. And they're just not going to stop. They're made out of metal. You've got linoleum floors in a store, you've got concrete in a store. What are they going to do? They're going to bounce around. They're going to bounce around. They're not just going to stop stationary right where they hit. They're going to bounce. You go up within six to nine inches of that man's head where he was shot, I think the evidence is going to show he was shot through the glasses first, not through the side of the head. Shot through the glasses, bam, bam. The man's head turns, reflex, gets shot in the side of the head. Those shell casings are going to go, bounce over there. They're going to ping around and then finally stop.

What was on that counter that Ken Collins found? He found the glasses fragments in these photographs. Take the time to find them. You'll be given a chance to see. You'll see the counter and on the counter there was glass

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 12 of 32

fragments. And on the counter right in front of him where he shot him is the blood. You have other pictures showing the glasses, glasses, from his glasses where he was shot through the glasses on the counter. If it'd been as he's trying to say, the glasses, the glasses wouldn't have been on the counter. The glass would have been on the floor somewhere.

The man had a pencil in his hand. More than likely left handed because the pencil was in his left hand. That pencil did not move out of his left hand. He was shot so quick by that man coming up on him. He wasn't scared. I submit to you he wasn't frightened. He was there doing his paperwork on that seat behind that counter. Wasn't frightened by the men coming in the store. He had a gun on his side. He didn't even have a chance to go for his gun, nor this gun. He was protecting himself because he was working the graveyard shift. What had happened three days earlier in Thomasville? He wasn't scared. He was caught totally unaware as to what was going on. He was shot in the head twice before he could do anything. The pencil was still in his hand there doing his work. And you'll see the papers over here where he was sitting in that chair. Where the man just reached across and popped him and popped him and ran back to the beer. Because what did Mr. Seitz say? Mr. Seitz said he saw the light colored man running right

after he heard the two cracks; didn't he? Running back to the back of the store. Very consistent. Is that consistent to Corey Clark's story? I submit to you it is.

Right after Mr. Seitz said he saw the light colored man running to the back of the store, he went and called 911, and then he saw the darker man stand up, the taller man. And he saw -- then he -- Mr. Seitz said the light skin colored man of the two came out of the store with the beer. And Mr. Clark said he went back there to get the beer.

You'll have the photographs of Mr. Cromartie and Mr. Clark to look for yourselves as to which is the lighter of the two. We've already had witnesses testify. Mr. Cromartie, shorter of the two and lighter of the two. This is the way they look. Corroborates Mr. Clark's story. Corroborates what Mr. Seitz said.

Mr. Taylor. Mr. Taylor said -- We called Mr. Allen back and we hashed back and forth with the testimony. The testimony was that he saw the man walking out of the store first and then start running. The footprints that Mr. Collins said were some distance back there from where the beer cans were? Look at the pictures of the store. Walking first, find the prints. Then they start running, drop the beer, find the tab, find the beer. Consistent with what Taylor said. You'll have a chance to look at the plaster casts if you so desire. Look at the pictures. You've seen

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 14 of 32

the pictures earlier and you've seen the shoeprint earlier. You'll have an opportunity to view the herringbone outline for yourself. You can look at the other three pair of shoes if you so desire. Two pair of Nike, Nike, one pair of Converse All Stars, totally different. Totally different.

Jim Howard gave his expert opinion about it, but any lay person can look at them too. Any person can look at them if they want to.

Play the whole tape, people coming and going out of the store buying stuff, buying stuff. To get to the point where the man comes in through the door. Dan Wilson had turned a little key, you saw on the video where he turned a little key half a little bit. He was back there washing pots and pans. On the video you can hear the pans, cling, clang, clang, clang, clang, clang. And he's back there washing pots and pans in the video. Bam. The man comes back around and hits some of the keys, hits some of the keys trying to money out of the cash register. He comes back around and says, get down, something to that effect, and runs out of the store. You saw the video. You saw the still photos. Did you look at the man on the video? Did you notice the size of his nose? Did you notice the part of the face you could see? Did you notice the size of his nose?

Mr. Cromartie -- Do you see the nose? Is it a large nose? Do you remember looking at the video, seeing the man

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 15 of 32

in the slowed down version, where you could see the man up there, you could see his light complexion, you could see the nose? These still pictures that the F. B. I. man came, seems like it's been an eternity since he testified, just Monday. These pictures, you can see the man's nose in the video. Prominent feature in the photograph, the nose. You'll have a chance to look at it.

Couldn't get in that cash register. Came out to the second store, robbed it, couldn't get in that cash register. But he was going to get something. That's why he stole beer. He wasn't successful. The register wasn't -- the first time. Wasn't successful with the first pop. Let's get something. Let's get some beer. That's why ole Clark, the drunk, thought they were going out there, was stealing beer. First they had him under cross examination. He was too drunk to know what he was doing. Now, he's so smart he kills people. They can't have it both ways. He's a drunk going to get beer, Clark. Yep, let's go get some beer. Riding with Mr. Cromartie. Mr. Cromartie, they didn't know had the gun. Mr. Cromartie shot. Doesn't ask any questions. Did he ever say, give me your money, give me some beer or I'll shoot you? Did he ever give any warning to the man, either one? Shot him in cold blood, both of them. So he ran to get the beer. And the other man, he said he heard the shots. Clark said, "The man had a gun. I

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 18 of 32

saw the flash. I'm not going to disagree with a man who's got a gun. The man told me to jump, I jumped. The man tells me to get to the cash register, I get to the cash register. I wasn't going to argue with the man with the gun".

I submit to you he must have made a feeble attempt because there were bags of money laying in eyesight if he'd looked. He was just wanting to get out of that store, I submit to you.

They've got a conspiracy theory. That's what you go to defense lawyers' school. They teach you. It's called the red herring theory. And the red herring theory is, let's get them to chase those red herrings over there, or let's take the shotgun theory, shoot the shotgun in the wall and see which one of the pellets they'll run for, or the seal-octopus theory. You know, an octopus is an animal in the ocean that doesn't have any teeth and it doesn't have any hands, but it's got a big bag and when it wants to get away it shoots out all this dye into the ocean so it just scoots away so nobody will bother it. So let's shoot the red dye out there, or purple dye.

They've got a conspiracy theory and want to say all these people -- and I submit -- I'm not talking bad about them, but a lot of them are not too smart. Don't have enough sense to get together and get a big conspiracy theory

to blame poor ole Ray Jefferson Cromartie. Or they want the theory to be that they're so drunk that they don't know what they're doing one time but they know what they're doing the next time, or they're so smart they get together and concoct stories, or what else can we think of next.

And he's talking, well, why didn't they take the dog when they found the shirt. Henry Williams testified to you unless the area is contaminated, if it's contaminated there's no use running the dog. If this shirt was found, what did the man say, 10:00, 11:00 o'clock the next morning on a busy street in front of my house. I submit to you, would that have been contaminated? Would it have been worth Henry Williams' time? For an area not roped off, not put any tape, many hours after the crime.

Carnell Cooksey. He didn't say anything about Friday night, Mr. Mears. Do you remember the testimony, Friday night, what Carnell Cooksey said happened Friday night? Do you have your notes? Do you remember the words, one eighty seven? That this man over here is saying, let's go do a one eighty seven, an armed robbery, trying to get Carnell out there to commit a crime on Friday, talking it up, talking about it.

Tina Washington. Let's talk about April the 7th. Tina Washington, just a mother of two, trying to make for herself. She does know Gary Young. If she was going to

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 18 of 32

lie, she'd have lied a lot better than she lied. All she said was, "I was up asleep and had to go work at Kenro the next day and there was a knock on the door and Gary goes down and gets the gun and gives it to Jeff". And Carnell Cooksey says the same thing. The man came over, Mr. Cromartie, to borrow the gun. They let him borrow the gun and we leave. That's all she said. She didn't come up here to you, well, this and that, this and that and the other. She knew a limited portion. All she knew about was the borrowing of the gun.

Tonya Frazier. Her limited purpose was the next morning, on Sunday morning, she saw the beer. She saw the beer was dirty and she thought it was kind of unusual. She asked where they got the beer. Gary. Mr. Cromartie. The other people. They said something, laughed or whatever, didn't tell her. If it was such a big conspiracy theory, she'd come up and said all these things to implicate poor Jeff. But, no, all she had to say was about the beer.

And Gary throwing the gun. Gosh, he was trying to hide all those other crimes. Well, he sure is a stupid criminal if he throws the gun right in front of the Thomasville Police Department. The testimony, I think, was that the police were coming up in their cars and he threw the gun away. He didn't have time to think about anything else. He was just throwing the gun away because he'd just shot the

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 19 of 32

gun in the air and that's why the cops were coming. He wasn't thinking about anything else. If he was a cold, calculated person like Mr. Mears wants him to be, he could have throw it in Cherokee Lake or ten thousand other places the two or three days that he had to throw it.

Mr. Clark and Mr. Lucas were given a deal. They've been punished by the Court. They're under the sentence of the Court. They testified about their involvement in this particular case. Mr. Lucas happened to own the car. Mr. Clark didn't have a car. Mr. Cromartie didn't have a car. Other people didn't have a car. Mr. Lucas was the man working the two jobs, Shoney's and Domino's Pizza. I think from Mr. Mears' testimony these people had been sitting around drinking beer that Saturday, talking, talking, didn't have a ride. Then Lucas comes home well after midnight. And what does Mr. Lucas say? It's that man's brother right there. He says, "He asked me once to take him. I told him no. He asked me twice to take him. I told him no. He asked me again. He kept asking and finally I just said I'll do it". What does he say? He starts to drive toward the place that's open after midnight the closest, Food Max, because he thinks he's taking them to get some beer. But, no, don't go to Food Max because Jeff's sitting in the front seat, says, go out Jackson Street to the Junior Food Store. I think the testimony was Jeff told him where to go. Jeff

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 20 of 32

told him on what side of the store to stop. And Jeff told him to go where to park, where we'll meet you when we come back. Who's directing traffic? Jeff Cromartie.

If Thaddeus was going to tell a big lie, he'd have said, "Yeah, I saw him with the gun. He told me he was gonna rob the place". No. Mr. Lucas says, "I didn't never see the gun. I didn't know they were gonna rob the place". He lets them out. Drives over there to Providence Plaza and parks. I think Mr. Clark's story was, his testimony was, that we went to the back of the store area, walked over there to try to see if there was anybody around. He said, I think his testimony was there was a car out front and we waited till the car left and then we went around front, he thinking they were going to steal beer. He's a drunk. The testimony is he likes to drink and he wanted to steal some more beer, to drink some beer because he's an alcoholic.

And when he went in the store, where was the man he wants to steal the beer to drink it go? To the beer cooler. So he goes back to the beer cooler to get the beer so he can steal it so he can leave. That's what the testimony is. And the other man, Mr. Cromartie, the man who had already shot one man in the head, the man who didn't die. And I think the testimony from Mr. Cooksey was, what did this man ask the day, day or so after the tele, did you watch the news, did you see the news, did you see what was on the

news?

And I submit to you why did he shoot him twice in the head? The first man didn't die from just one shot to the head. Let's make sure this one dies, shoot him twice. Don't shoot him in the arm and wound him, shoot him somewhere in the chest. Shoot him in the head and kill him. Without asking him one question, saying one thing to him. Just killed him. And then he can't get in the register because he couldn't get in the other register. Maybe he's paranoid about can't get in cash registers. Said the other dude come up and see if he can get in the cash -- the drunk one. And the drunk one who's heard the shots testified he's scared. So the other man, the short man, gets the dude, the lighter skin man gets the dude, gets the beer, goes out of the store first. That's what the testimony was. That's what Mr. Taylor saw and Mr. Seitz saw. The taller man then comes out. Mr. Taylor said it. Mr. Seitz says he heard the bam, bam shots and the lighter skin man goes back to the, to the left -- to the right, to the right of the store from over here where the counter is, where the man was shot. It's consistent with what he saw and what he observed, and the walking and then the running.

Henry, Henry Williams comes out. Henry Williams is called out with the dog. And Henry Williams says it was a fresh track. It was a real fresh track. I think Henry said

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 22 of 32

something about, real fresh track. His dog, Pete, follows that track, saw those shoeprints, saw that beer, saw the prints coming and going, he said. He tracked it all the way over there to Providence Plaza, down Pinetree Boulevard, the paved road. You can see that in the pictures too. And the dog starts going around in circles, where he thinks the dog has lost his track, where they got in the car, where they left. And he comes back, shows it to Ken Collins, and the beer flap is -- the beer flap is with, what, five or ten feet to the beer cans. Which is first? The cans or the beer? Like the chicken and the egg. The beer flap is first. The beer flap is first because the carton broke. When the carton broke, you keep running, you've got the beer. Common sense.

I submit to you they didn't pick the beer up in the mud because they didn't want to get their feet muddy. Just like Tayler said he didn't want to get his feet muddy. They picked all the other beer up that fell out, whatever fell out. That beer flap there wasn't rained on. You can look at it and see the condition of it. The man's left, excuse me, left thumbprint's on it. That man right there. A matter of feet where the beer cans were. Not that far from where the foot, foot tracks were. Not that far from where the store is.

The same gun, that 162, Number 162, that .25 caliber

Raven .25 caliber pistol shot both men. Dr. Howard testified about it. He went through all those bullets and where they came from. Dr. Hall got that one bullet out of Mr. Wilson's head, went through his head, his right carotid artery. Dr. Hall, I think testified that that right carotid artery, "I just tied it off". He'll never have use of that carotid artery again. He's only got three sources of blood to his brain now. One, two, three. Two other major veins and one artery. He's subject to having a stroke any ole time. I submit to you that's aggravated battery. Aggravated battery. He's lost the use of his carotid artery for the rest of his life. He didn't die.

And this gun, Dr. Parker came down and testified about the taking -- that man was shot twice in the head, .25 caliber bullets was taken. Jim Howard took the casings and the bullets, concluded they, all of them were fired from the same gun, 162, that .25 Raven caliber pistol. Both guns shot both people. Killed one. Severely wounded another.

When it happened on the 7th, the cops didn't know who did it. But they found that shirt, they found that hat. 8th, 9th, 10th, early morning of the 10th they were called again. I submit to you they realized that two clerks had been shot in a matter of days. 11th, 12th, and then they have this shooting over at Cherokee. And as Mr. Mears brought out on cross, the police started investigating it

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 24 of 32

and start talking to everybody they think may give them some leads. Any kind of case that's brought in, they start talking to folks. Talking to people around the community. They talked -- Carnell Cooksey happened to be in jail, and Winkelman, he was a detective at that time, talked to Carnell Cooksey. And Carnell Cooksey then started telling them about things. Carnell Cooksey, names and dates and players. Carnell Cooksey told them where the gun was and they went outside and found it out at Cherokee, just a matter of feet from the police department. I think the testimony was it was just a matter of feet from the chief's office, across the railroad track. It was immediately sent off to the crime lab and tested with the casings and the bullets that had already been sent off to find out if that was the gun and it was.

And the police then start trying to put two and two together. They had some facts from Cooksey. They talked to Clark who had already been taken into custody to find out what he had to say. And then from those people, it leads to other people. Then they go out the next day and arrest Mr. Cromartie, Mr. Lucas and Mr. Young. They keep them separated. I think the testimony was they're all separated and every one of them were talked to by different detectives so there wouldn't be any contamination of what they said and who they said it to. Each person was talked to by a

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 25 of 32

different detective and each person was kept separated so they couldn't talk to each other. So the detectives then talked to each of the people getting their bits and pieces from each person, because everybody doesn't see the same thing the same way. I may look at that lady and say she's got red on her shirt. Somebody else may say it looks orange. General stories, the general view may be the same but some of the variances may be a little different.

So the police then talked to everybody involved to get their side or their facts about the story to use in their investigative techniques. That led to the various charges.

Mr. Slysz was doing his paperwork, sitting in his chair, 3:30 in the morning with a pencil in his hand when he was shot in the head for no reason. The glass is on the counter. You can see it in the pictures. The blood is on the counter. You can see it in the pictures. He was shot so quick, the two bullets, fell over dead. I think the doctor said he was brain dead essentially but his heart was still pumping. When he was laying there on the floor his heart kept pumping. The pictures, you'll see the chair, the counter. He was laying right over here.

I want you to look at the totality of the evidence. It's just not this or not that or not that. It's all the evidence the jury is asked to look at. The fingerprint, the shoeprint, the testimony of Dr. Hall, Dr. Parker. Tina

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 28 of 32

Washington, the young mother of two, said Jeff came over to borrow the gun. Cooksey who said, yes, Jeff came over to borrow the gun. Yes, "Jeff asked me to do a one eighty-seven on Friday", an armed robbery. I think he also said Jeff told him about shooting the man. Then on Saturday night he saw them with the beer, saw them with the beer. He was a drunk. He didn't go out to the Junior Food Store -- I think the testimony was he was drunk on the sofa at the time that they left.

There are four distinct different pairs of shoes these people seized when they were arrested. And Mr. Taylor's testimony this morning that Mr. Allen read said that the man that came out of the store first was wearing white high top shoes. White high top shoes with the herringbone.

It was Gary Young's gun all right. But the person who borrowed and shot people with it was Ray Jefferson Cromartie. Corey Clark talked about stealing beer. That's all he thought they were doing. That's why he went. That's what got him in trouble. Wanting beer. I think the lighting out there from Mr. Taylor and Mr. Seitz, the lights out there on the gasoline aisle, the lights in the street, the lights in the store, plenty of light for them to see whatever it is they saw. Seeing the two men running away from the store.

Mr. Fingerprint Man. I can't even think of his name

right now. I apologize to you. The fingerprint man. He made a big -- said he'd never made a mistake. What his testimony -- you remember what his testimony was, that he's not made a mistake as to identification. "Yes, I've made other mistakes in life". But he's careful about his identification. I think his testimony was he wants nine points minimum before he'll say somebody is that person's fingerprint. It's not a flippant thing to do. If it's seven, there are six, not going to do it. Five, not going to do it. Must be at least nine. Makes mistakes about other things, but his testimony was he's going to have at least nine points. He charted for you ten points on State's Exhibit Number 166. But he said to you that he found fifteen points of comparison between the beer flap print, left thumb of Mr. Cromartie and the known print. Not nine, not ten, not eleven, not twelve, not thirteen, not fourteen, but fifteen points. Fifteen points. Going to have his minimum and then more than the minimum to make sure of what we say.

Both crimes, both crimes were committed at night. Both crimes were committed with the clerk alone in the store. Both clerks were shot in the head. One once and one twice. I think it's a logical deduction for you -- you can use whatever deduction you want. The first man was shot twice and the second man was shot two times. Both of them were

 fairly quick. Both of them, the registers were pecked on to try to get money but no money was gotten. The second one, two twelve packs of beer were taken. Twenty-two beers eventually were gotten away with. Two left in the mud. Two people almost lost their lives. One did, Mr. Slysz.

You have a fingerprint. This jury will say, hey, you don't have fingerprints. Oh, you don't have eyewitnesses. Oh, you don't have shoeprints. Oh, you don't have eyewitnesses. Oh, you don't have other witnesses. Oh, you don't have this. Oh, you don't have that.

Ladies and gentlemen, in this case you've heard a fingerprint expert, a shoeprint person. You've heard from Mr. Seitz. You've heard from Mr. Taylor. You've heard from the ballistics from Mr. Howard. You've heard from Mr. Clark. You've heard from Mr. Lucas. You've heard from Mr. Young, whether you want to believe him or not, I submit to you, told you details about the crime told to him by Mr. Cromartie. You've heard from Tina Washington. You've heard from Tonya Frazier. All their testimony leads to the conclusion that this man right here is the one who shot Dan Wilson in the head, who shot Mr. Slysz in the head and ran out of the store with beer.

Sometimes a little bit of evidence may point to somebody, this piece or that piece. But in this case all of the evidence points towards Ray Jefferson Cromartie as being

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 29 of 32

the one who did both shootings. You can guess and surmise and say, oh, it must have been this or it must have been that, or I wish it were that way or I wish it were that way. Mr. Mears can wish and wish and wish.

He said that that shirt belonged to Gary Young. There wasn't any evidence that that shirt belonged to Gary Young. The testimony was that Gary Young said -- Mr. Mitchell impeached him. That Mr. Cromartie told him that that's what he was wearing and that's what he'd thrown down there after he ran away from the crime. And you can look in the video and see whether or not that's consistent with this shirt right here and the black toboggan hat. Look at the pictures. You won't get a chance to look at the video outside. Look at the pictures and see whether it's consistent in your minds.

Their theory is, let's blame Gary Young for everything. He's not a very nice person. He's not a very nice person. I submit to you he's not very smart either. Gary Young told you what his cousin told him, his best friend, the man he palled around with and associated with, the man that he let borrow the gun.

If it's human nature for people to be totally quiet about what they do, it goes back to the story about the kid. Some people go through life and never tell anybody about anything. I submit to you Mr. Cromartie needed to tell

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 30 of 32

somebody about what he had done after he did it, and the man he borrowed the gun from is the one he told. Just have to tell somebody, watch the news, watch the news. Callous, cold, indifferent. Shoot two people in the head for virtually nothing, twenty-two beers.

The State of Georgia wants to thank you for your time and your patience. Listen to the charge that Judge Horkan will give you, whether it be today or tomorrow, and base your verdict upon the law that the Judge will give you and the facts and the evidence which you've heard from the witness stand. This man right here, that man right there in the blue shirt shot the two people, the State submits to you, in the head. Thank you.

Excuse me, Your Honor.

THE COURT: Yes, sir.

Ladies and gentlemen, based upon the time of day and the length of time I anticipate that the legal instructions are going to take, I feel like it's a good idea for us to recess for the evening and come back tomorrow morning at 9:00 o'clock. You'll be alert. Not that you're not alert at this time. But you'll be alert and we can give you the legal instructions at that time.

Let me remind you that although the evidence has been concluded insofar as this particular stage of the proceedings, that you are still not to have any outside

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 31 of 32

influence whatsoever in regards to this particular matter.

Again, do not talk with anyone about this case. Don't let anyone talk with you about the case or in your presence or hearing. Don't listen to anything about the case, radio, TV or otherwise. Don't read anything about the case, newspaper or otherwise.

In addition, please recall the instructions I gave you concerning, if you go down Madison Street, do not look at the deli. If you go down Pinetree Boulevard or Jackson Street, do not look at the area or where the Junior Food Store was at that time. I believe it's a Petro store at this time.

Any further cautionary instructions requested on behalf of the State?

MR. HARDY: No, Your Honor. Thank you.

THE COURT: Or the Defense?

MR. MEARS: Nothing further.

THE COURT: Everyone please remain seated while the jury retires.

See you at 9:00 o'clock tomorrow morning.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: We'll be in recess until 9:00 A. M.

(Whereupon the Court is recessed for the day, with the proceedings to be resumed the following A. M.)

Case 7:14-cv-00039-MTT Document 18-18 Filed 07/14/14 Page 32 of 32

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF LOWNDES

I hereby certify that the foregoing proceedings were taken down by me, as stated in the caption, and that the foregoing pages 2549 through 2817 represent a true, correct, and complete transcript of said proceedings.

I further certify that I am neither of kin nor counsel to the parties in this matter, nor am I financially interested in same.

This the 17th day of November, 1997.

Philip G. Vincent

PHILIP G. VINCENT, C.C.R.
CERTIFICATE NO: A238
OFFICIAL COURT REPORTER
SOUTHERN JUDICIAL CIRCUIT

IN THE SUPERIOR COURT OF THOMAS COUNTY

STATE OF GEORGIA

STATE OF GEORGIA

VS

RAY JEFFERSON CROMARTIE
DEFENDANT

CRIMINAL ACTION NO: 94-CR-328

CHARGE: AGGRAVATED ASSAULT (COUNT 1); POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME (COUNTS 2,4,6,8); AGGRAVATED BATTERY (COUNT 3); MURDER (COUNT 5); ARMED ROBBERY (COUNT 7)

CRIMINAL JURY TRIAL UNDER THE UNIFIED APPEAL PROCEDURE

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The following transpired before the Honorable Frank D. Horkan, Judge, Superior Courts, and a Jury, in the Thomas County Courthouse, Thomasville, Georgia, with voir dire and selection of the Jury commencing at 9:35 A. M. on Monday, September the 15th, 1997, and concluding at 10:20 A. M. on Friday, September the 19th, 1997, and the case-in-chief commencing at 10:50 A. M. on Friday, September the 19th, 1997, and concluding at 10:40 A. M. on Wednesday, October 1st, 1997.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

APPEARANCE OF COUNSEL:

Representing the State: James E. Hardy, Esq.
Mark E. Mitchell, Esq.
Assistant District Attorneys

Representing the Defendant: Michael Mears, Esq.
Carl A. Bryant, Esq.
Gerard Kleinrock, Esq.

VOLUME IX OF TEN VOLUMES

(This volume contains the proceedings of Friday, September the 26th, 1997, from 9:05 A. M. to 3:10 P. M.; Monday, September the 29th, 1997, from 9:05 A. M. to 5:00 P. M.; Tuesday, September the 30th, 1997, from 9:00 A. M. to 5:00 P. M.; and Wednesday, October the 1st, 1997, from 9:00 A. M. to 10:40 A. M.

Res. Ex. No. 28
Case No. 7:14-CV-39

(The tenth day of proceedings commences at approximately 9:05 A. M. on Friday, September the 26th, 1997, outside of the jury's presence)

THE COURT: All right. You may bring the jury -- Anything to address before we bring the jury in, ladies and gentlemen?

MR. HARDY: No, sir.

MR. MEARS: No, sir.

THE COURT: You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Good morning, ladies and gentlemen.

Ladies and gentlemen, those of you in the audience and otherwise, let me inform you at this time that once we begin the instructions of the law to the jury, no one will be allowed to either enter or leave the courtroom. The purpose of that is so that the jury is not distracted during these legal instructions. So if anyone does not wish to remain during the entire instructions, has some other matters which need your attention, I'll give you an opportunity at this time to excuse yourself prior to my beginning the legal instructions.

Ladies and gentlemen, the first thing that I need to do is inquire as to whether or not over the evening recess any of you have read anything, or seen anything in print about

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 3 of 228

this particular case, whether or not you have heard anything about it, whether or not you have talked with anyone about this case, or anyone has attempted to talk with you about it?

Thank you, ladies and gentlemen.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CHARGE OF THE COURT

THE COURT: Ladies and gentlemen, you have been considering the case of the State of Georgia versus Ray Jefferson Cromartie.

Now, the Defendant in this case has been indicted by the Grand Jury of Thomas County, count one, for the offense of Aggravated Assault; count two, four, six and eight, for the offenses of Possession of a Firearm During the Commission of a Crime; count three, the offense of Aggravated Battery; count five, the offense of Murder; count seven, for the offense of Armed Robbery.

This indictment was returned in open court on October the 20th, 1994 and is as follows: "The Grand Jurors selected, chosen and sworn for the County of Thomas, whose names appear in this bill of indictment, in the name and behalf of the citizens of Georgia, charge and accuse Ray Jefferson Cromartie with the offense of Aggravated Assault, for that the said accused on or about the 7th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally make an assault upon the person of Dan Wilson with intent to rob, contrary to the laws of said state, the good order, peace and dignity thereof."

Count two: "And the Grand Jurors aforesaid on their oaths aforesaid in the name and behalf of the citizens of

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 8 of 228

Georgia charge and accuse Ray Jefferson Cromartie with the offense of Possession of a Firearm During the Commission of a Crime, for that the said accused on or about the 7th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally have on his person a certain firearm during the commission of a crime, to wit: Aggravated Assault, said crime being against the person of another, to wit: Dan Wilson, and which crime was a felony, contrary to the laws of said state, the good order, peace and dignity thereof.".

Count three: "And the Grand Jurors aforesaid on their oaths aforesaid in the name and behalf of the citizens of Georgia charge and accuse Ray Jefferson Cromartie with the offense of Aggravated Battery, for that the said accused on or about the 7th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally, maliciously cause bodily harm to the person of Dan Wilson by depriving said person of a member of his body, to wit: by severing his carotid artery, contrary to the laws of said state, the good order, peace and dignity thereof."

Count four: "And the Grand Jurors aforesaid on their oaths aforesaid in the name and behalf of the citizens of Georgia charge and accuse Ray Jefferson Cromartie with the offense of Possession of a Firearm During the Commission of

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 6 of 228

a Crime, for that the said accused on or about the 7th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally have on his person a certain firearm during the commission of a crime, to wit: Aggravated Battery, said crime being against the person of another, to wit: Dan Wilson, which crime was a felony, contrary to the laws of said state, the good order, peace and dignity thereof."

Count five: "And the Grand Jurors aforesaid on their oaths aforesaid in the name and behalf of the citizens of Georgia charge and accuse Ray Jefferson Cromartie with the offense of Murder, for that the said accused on or about the 10th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally with malice aforethought cause the death of Richard A. Slysz, a human being, by shooting said victim in the head, contrary to the laws of said state, the good order, peace and dignity thereof."

Count six: "And the Grand Jurors aforesaid on their oaths aforesaid in the name and behalf of the citizens of Georgia charge and accuse Ray Jefferson Cromartie with the offense of Possession of a Firearm During the Commission of a Crime, for that the said accused on or about the 10th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally have on

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 7 of 228

his person a certain firearm during the commission of a crime, to wit: Murder, said crime being against the person of another, to wit: Richard A. Slysz, and which crime was a felony, contrary to the laws of said state, the good order, peace and dignity thereof."

Count seven: "And the Grand Jurors aforesaid on their oaths aforesaid in the name and behalf of the citizens of Georgia charge and accuse Ray Jefferson Cromartie with the offense of Armed Robbery, for that the said accused on or about the 10th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally, with intent to commit theft, take property, to wit: two twelve packs of beer, from the immediate presence of Richard A. Slysz by use of a certain handgun, the same being an offensive weapon, contrary to the laws of said state, the good order, peace and dignity thereof."

And the Grand -- Count eight: "And the Grand Jurors aforesaid on their oaths aforesaid in the name and behalf of the citizens of Georgia charge and accuse Ray Jefferson Cromartie with the offense of Possession of a Firearm During the Commission of a Crime, for that the said accused on or about the 10th day of April, 1994, in the county aforesaid, did then and there unlawfully, knowingly, willfully and intentionally have on his person a certain firearm during the commission of a crime, to wit: Armed Robbery, said

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 8 of 228

crime being against the person of another, to wit: Richard A. Slysz, and which crime was a felony, contrary to the laws of said state, the good order, peace and dignity thereof."

Now, ladies and gentlemen, to this indictment the Defendant has entered his plea of not guilty and this makes the issue which you have been selected, impaneled and sworn to try.

Now, I caution you that the fact that an accused has been indicted by the Grand Jury is no evidence of his guilt and you are not to consider this indictment as evidence or implication of guilt. Neither is the plea of not guilty to be considered by you as evidence in the case.

Now, ladies and gentlemen, this Defendant is to be presumed innocent until proven guilty. A Defendant enters upon the trial of the case with a presumption of innocence in his favor and this presumption remains with the Defendant until it is overcome by the State with evidence which is sufficient to convince you beyond a reasonable doubt that the Defendant is guilty of the offense charged.

Now, no person shall be convicted of any crime unless and until each element of the crime charged is proven to the satisfaction of the jury beyond a reasonable doubt.

Now, the burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of each crime charged beyond a reasonable

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 9 of 228

doubt. There is no burden of proof upon the Defendant whatever, and the burden never shifts to the Defendant to prove his innocence. However, the State is not required to prove the guilt of the accused beyond all doubt.

And a reasonable doubt means just what it says. It's a doubt of a fair-minded, impartial juror honestly seeking the truth. It's a doubt based upon common sense and reason. It does not mean a vague or an arbitrary doubt, but is a doubt for which a reason can be given arising from the evidence, a lack of evidence, a conflict in the evidence, or any combination of these.

Now, ladies and gentlemen, if after giving consideration to all the facts and circumstances of the case your minds are wavering, unsettled, unsatisfied, then that is a doubt of the law and you should find the Defendant not guilty. But, if that doubt does not exist in your minds as to the guilt of the Defendant, then you would be authorized to find the Defendant guilty. If the State fails to prove the Defendant's guilt beyond a reasonable doubt, then it would be your duty to find the Defendant not guilty.

Now, ladies and gentlemen, you must determine the credibility or believability of the witnesses who have appeared before you and testified in this case. It's for you to determine what witness or witnesses you will believe and what witness or witnesses you will not believe if there

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 10 of 228

are any that you do not believe.

Now, in deciding or passing upon their credibility, you may consider all of the facts and circumstances of this case, the witnesses' manner of testifying, their intelligence, their interest or lack of interest in the case, their means and opportunity for knowing the facts to which they testify, the nature of the facts to which they testify, the probability or improbability of their testimony and of the occurrences about which they testify. And you may also consider their personal credibility insofar as that may legitimately appear from the trial of the case.

Now, when you consider the evidence in this case, if you find a conflict in the evidence you should settle this conflict, if you can, without believing that any witness has made a false statement. However, if you cannot do this, then it is your duty to believe that witness or those witnesses you think best entitled to belief. You must determine what testimony you will believe and what testimony you will not believe in this case.

Now, ladies and gentlemen, it's my duty and responsibility to determine the law applicable to this case and to instruct you on that law by which you are bound. It's your responsibility to determine the facts of the case from all of the evidence presented. It then becomes your duty and responsibility to apply the law that I give you in

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 11 of 228

this charge to those facts as you find them to be and make up your verdict in this case.

Now, this Defendant is charged with certain crimes under the laws of our state.

A crime is a violation of a statute of this state in which there is a joint operation of act and intention.

Now, intent is an essential element of any crime and must be proved by the State beyond a reasonable doubt.

Now, intent may be shown in many ways provided that you believe that it existed from the proven facts before you. It may be inferred from the proven circumstances, or by acts or conduct, or it may, in your discretion, be inferred when it is the natural and necessary consequence of an act.

Now, whether or not you draw such an inference is a matter solely for your determination.

Now, a Defendant will not be presumed to have acted with criminal intent. But you may find such intention, or the absence thereof, upon a consideration of words, conduct, demeanor, motive and other circumstances connected with the acts for which the accused is being prosecuted.

Now, ladies and gentlemen, evidence is the means by which any fact is put in issue, or is established, or disproved. Now, evidence includes all of the testimony of the witnesses and the exhibits admitted during the trial. It does not include the indictment, the plea of not guilty,

the opening statements or the closing arguments of the attorneys.

Now, evidence may be either direct or circumstantial or both. Direct evidence is evidence which points immediately to the question at issue. Evidence may also be used to prove a fact by inference and this is referred to as circumstantial evidence. Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may infer other related or connected facts which are reasonable and justified in light of your experience.

Now, to warrant a conviction on circumstance evidence, the proven facts must not only be consistent with the theory of guilt but must exclude every other reasonable theory other than the guilt of the accused.

Now, the comparative weight of circumstantial evidence and direct evidence on any given issue is a question of fact for the jury to decide.

Now, ladies and gentlemen, testimony has been given by certain witnesses who in law are termed experts. The law permits persons expert in certain areas to give their opinions derived from their knowledge of that area.

Now, the weight which is given to the testimony of expert witnesses is a question to be determined by the jury. The testimony of an expert, like that of any other witness, is to be received by you and given only such weight as you

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 13 of 228

think it is properly entitled to receive. You are not required to accept the opinion testimony of any witness, expert or otherwise.

Ladies and gentlemen, facts and circumstances which merely place upon a Defendant a grave suspicion of the crime charged, or which merely raise a speculation or conjecture as to the Defendant's guilt are not sufficient to authorize a conviction of the Defendant.

The mere association of a person with other persons involved in the commission of a crime, without more, will not authorize a jury to find such person guilty of consent in or concurrence in the commission of the crime unless the evidence shows beyond a reasonable doubt that such person helped in the actual perpetration of the crime or participated in the criminal endeavor.

Now, ladies and gentlemen, one who testifies under a grant of immunity from prosecution or a promise of no prosecution by the State or who testifies pursuant to a promise of leniency or as a result of a negotiated plea in which lenience may be inferred is a competent witness. And you may consider whether or not the testimony from such a witness might be slanted in such a way as to further the witness' own interest. You alone shall decide the credibility or believability of the witnesses.

Ladies and gentlemen, the Defendant in a criminal case

is under no duty to present any evidence tending to prove innocence and is not required to take the stand and testify in the case.

If a Defendant elects not to testify, then no inference hurtful, harmful or adverse to the Defendant shall be drawn by the jury nor shall such fact be held against the Defendant in any way.

Now, ladies and gentlemen, to impeach a witness means to prove that the witness is unworthy of belief. A witness may be impeached by disproving the facts to which the witness has testified, or by proof that the witness has been convicted of a crime involving moral turpitude.

I charge you that the offenses of Burglary, Aggravated Assault, Aggravated Battery, Robbery, and Hindering the Apprehension of a Criminal are crimes involving moral turpitude.

And third, a witness may be impeached by proof of contradictory statements previously made by the witness as to matters which are relevant to the witness' testimony and to the case.

Now, if any attempt has been made in this case to impeach any witness by proof of contradictory statements previously made by that witness, then you must determine from the evidence, first, whether any such statements were, in fact, made. Second, whether they were contradictory to

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 15 of 228

any statements that the witness made while on the witness stand. And, third, whether it was material to the witness' testimony and to the case.

Now, if you find that a witness has been successfully impeached by proof of previous contradictory statements, then you may disregard that testimony unless and until it is corroborated by other creditable testimony. And the credit to be given to the balance of the testimony of that witness will be for you to determine.

Now, it is for you to determine whether or not a witness has been impeached and to determine the credibility of such witness and the weight the witness' testimony shall receive in consideration of this case.

Now, should you find that any witness, prior to the witness' testimony in this case from the witness stand, has made any statement inconsistent with that witness' testimony from the witness stand, and that such prior inconsistent statement is material to the case and the witness' testimony, then you are authorized to consider that prior statement not only for purposes of impeachment but also as substantive evidence in this case.

Ladies and gentlemen, every party to a crime may be charged with and convicted of commission of the crime. A person is a party to a crime only if that person directly commits the crime, or intentionally helps in the commission

of the crime, or intentionally advises, encourages, hires, counsels or procures another to commit the crime.

Now, any party to a crime who did not directly commit the crime may be indicted, tried, convicted and punished for the crime upon proof that the crime was committed and that the person was a party to it even though the person claimed to have directly committed the crime has not been prosecuted or convicted, or has been convicted of a different crime or degree of crime, or is not amenable to justice, or has been found not guilty.

Do you need some water?

JUROR: No. I'm just taking a cold, I think.

THE COURT: Ladies and gentlemen, identity is a question of fact for determination by the jury. It is dependent upon the credibility of the witness or witnesses offered for this purpose. And you have the right to consider all of the factors charged you in this charge regarding the credibility of witnesses.

Now, some, but not all, of the factors you may consider in assessing reliability of identification are: The opportunity of the witness to view the alleged perpetrator at the time of the alleged incident. The witness' degree of attention toward the alleged perpetrator at the time of the alleged incident. The level of certainty shown by the witness about his or her identification. The possibility of

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 17 of 228

mistaken identity. Whether the witness' identification may have been influenced by factors other than the view that the witness claimed to have had. Whether the witness on any prior occasion did not identify the Defendant in this case as the alleged perpetrator.

Now, it's for you to say whether under the evidence in this case, the testimony of witnesses, and the facts and circumstances of the case sufficiently identify this Defendant beyond a reasonable doubt as the perpetrator of the alleged crime or that he was a party to it. It is not necessary that the Defendant show that another person committed the alleged offense. It is sufficient if there are facts and circumstances in this case which would raise a reasonable doubt whether this Defendant is, in fact, the person who committed the crime or was a party to it.

If you do not believe that the Defendant has been sufficiently identified as the person who committed the alleged crime or crimes, or was a party to it or to them, or if you have any reasonable doubt about such, then it would be your duty to find the Defendant not guilty.

The burden of proof rests upon the State to prove beyond a reasonable doubt the identity of this Defendant as the person committed the crime or crimes alleged in this bill of indictment.

Now, ladies and gentlemen, all of the charges contained

in this bill of indictment are what, under our law, are defined as felonies.

Now, the testimony of a single witness, if believed, is generally sufficient to establish a fact. An exception to this rule is made in the case of a felony where the witness is an accomplice.

The testimony of the accomplice alone is not sufficient to warrant a conviction. The accomplice's testimony must be supported by other evidence of some type. And that evidence must be such as, independently of the testimony of the accomplice, would lead to the inference of the guilt of the Defendant. It is not required that supporting evidence be sufficient to warrant a conviction, or that the testimony of the accomplice be supported in every material particular, but must be more than to the effect that a crime was actually committed by someone. It must be sufficient to connect the accused with the criminal act, and must be more than sufficient to merely cast upon the Defendant a grave suspicion of guilt. Now, slight evidence from another source connecting the Defendant with the commission of the alleged crime intending to show participation in it may be sufficient supporting evidence of the testimony of an accomplice.

In order to convict, that evidence must be sufficient when considered with all other evidence in the case to

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 19 of 228

satisfy the jury beyond a reasonable doubt as to the guilt of the Defendant. The sufficiency of the supporting evidence of the testimony of an accomplice to produce the conviction of the Defendant's guilt is a matter for you to determine.

Now, the testimony of one accomplice may be supported by the testimony of another accomplice. Whether or not the testimony of one accomplice does, in fact, support the testimony of another accomplice is a matter for you to decide.

Now, whether or not any witness in this case was an accomplice is a question of fact for you to decide.

Now, ladies and gentlemen, certain evidence of fingerprint comparison has been admitted for your consideration.

Now, identification by fingerprint comparison is opinion evidence and is dependent upon the credibility and accuracy of the expert witness or witnesses called for that purpose as well as the following factors: The validity of the theory of identification by a fingerprint comparison. The credibility of the witness who performs other necessary functions in making the comparison, such as inked finger impressions and latent lifts, and the accuracy of procedures in identifying, preserving, recording and maintaining the integrity of the physical evidence, all of which are

questions for the jury to decide.

Now, fingerprint evidence is also governed by the rules on circumstantial evidence. If you believe that fingerprints corresponding to those of the Defendant were found and identified, their evidentiary value, if any, would be diminished to the extent that they could have reasonably been left at a time or under circumstances which would be consistent with innocence.

A verdict of guilty may not rest upon fingerprint identification alone unless you are satisfied beyond a reasonable doubt that fingerprints left by the accused were, in fact, found and they could only have been impressed by the accused at the time of the commission of the crime and that such identification under all of the facts and circumstances of the case is sufficient to satisfy your mind of the guilt of the accused to the exclusion of any other reasonable hypothesis and beyond a reasonable doubt.

Now, ladies and gentlemen, this Defendant is charged in count one with the offense of Aggravated Assault With Intent to Rob.

I charge you that an assault is an attempt to commit a violent injury to the person of another with intent to rob.

Now, Aggravated Assault is an attempt to commit a violent injury to the person of another with intent to rob.

Now, in regards to that I need to give you the

definition of Robbery.

A person commits Robbery when with intent to commit theft the person takes property of another from the person or immediate presence of another by use of force.

Now, force means personal violence or that degree of force necessary to remove articles from the person or from the clothing of the person so as to create resistance, however slight.

Now, ladies and gentlemen, this Defendant is charged in count three of this bill of indictment with the offense of Aggravated Battery.

I charge you that a person commits the offense of Aggravated Battery when he maliciously causes bodily harm to another by depriving him of a member of his body.

Ladies and gentlemen, count five of this bill of indictment charges this Defendant with the offense of Malice Murder.

A person commits Murder when that person unlawfully and with malice aforethought, either express or implied, causes the death of another human being.

Express malice is that deliberate intention unlawfully to take away the life of another human being which is shown by external circumstances capable of proof. Malice may, but need not, be implied where no considerable provocation appears and where all the circumstances of the killing show

an abandoned and malignant heart.

It's for the jury to decide whether or not the facts and circumstances of this case show malice.

Now, to constitute Murder, the homicide must have been committed with malice. Legal malice is not necessarily ill will or hatred, but it is the unlawful intention to kill without justification, excuse or mitigation.

If a killing is done with malice, no matter how short a time the malicious intent may have existed, such killing constitutes Murder.

Now, Georgia law does not require premeditation and no particular length of time is required for malice to be generated in the mind of a person. It may be formed in a moment and instantly a mortal wound may be inflicted, yet if malice is in the mind of the accused at the time of the doing of the act or the killing and moves the accused to do it, then such is sufficient to constitute homicide as Murder.

Now, proof of particular motive is not essential to constitute the crime of Murder. Evidence of motive, if any, is admitted for your determination as to whether or not it establishes the state of the Defendant's mind at the time of the alleged homicide.

Now, ladies and gentlemen, you may infer that a person of sound mind and discretion intends to accomplish the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 23 of 228

natural and probable consequences of that person's intentional acts. And if a person of sound mind, excuse me, if a person of sound mind and discretion intentionally and without justification uses a deadly weapon or instrumentality in the manner in which the weapon or instrumentality is ordinarily used and thereby causes the death of a human being, you may infer the intent to kill.

Whether or not you make any such inference is a matter solely within the discretion of the jury.

Ladies and gentlemen, this Defendant is charged in count seven with the offense of Armed Robbery.

Under Georgia law a person commits Armed Robbery when with intent to commit theft that person takes property of another from the person or immediate presence of another by use of an offensive weapon. An offensive weapon is any object, device or instrument which when used offensively against a person is likely to or actually does result in death or serious injury.

Now, ladies and gentlemen, this Defendant is charged in counts two, four, six and eight with the offenses of Possession of a Firearm During the Commission of a Crime.

A person commits the offense of Possession of a Firearm During the Commission of a Crime when the person has on or within arm's reach of his person a firearm during the commission of or any attempt to commit any crime against or

involving the person of another.

Now, the offenses of Aggravated Assault, Aggravated Battery, Murder and Armed Robbery are felonies under the laws of this state.

Now, ladies and gentlemen, you have been trying all eight of these charges at the same time. However, you must return a separate and distinct verdict as to each of these eight charges.

A verdict form has been prepared for your use in doing so. The form is here in my hand. We have the style of the case. It's printed here: We, the Jury, find the Defendant, Ray Jefferson Cromartie, as to count, and we list counts one through eight.

Now, ladies and gentlemen, if you find and believe beyond a reasonable doubt that the Defendant is guilty of the offense set forth in any one or more of the particular counts of this indictment as, when, where and in the manner set forth in that particular count or counts, then you would be authorized to find the Defendant guilty, and the form of your verdict in that event would be: We, the Jury, find the Defendant as to count blank guilty. And where I have used the word "Blank" you would insert the word "Guilty" next to the count number upon which you find the Defendant guilty beyond a reasonable doubt.

Now, on the other hand, if you do not believe the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 25 of 228

Defendant is guilty, or if you have any reasonable doubt as to his guilt as to the offense charged in any one or more particular counts of this indictment as, when, where and in the manner alleged in that particular count of the indictment you are considering, then it would be your duty to find the Defendant not guilty as to any such count or counts of the indictment. And the form of your verdict in that event would be: We, the Jury, find the Defendant as to count blank not guilty. And where I have used the word "Blank" you would write in the words "Not guilty" next to that particular count number upon which you find the Defendant not guilty.

Now, ladies and gentlemen, in this, in these deliberations you are to concern yourselves only with the guilt or innocence of the Defendant as to these specific charges. In these deliberations you are not to concern yourselves with anything regarding any possible punishment.

Now, ladies and gentlemen, by ruling or commenting, by no ruling or comment which I have made during this trial have I intended to express any opinion upon the facts of this case, upon the credibility or lack thereof of any witness, upon the evidence or upon the guilt or innocence of the Defendant. Whatever your decision is in this case is yours to decide.

Now, ladies and gentlemen, one of your first duties

when you retire to the jury room will be to select one of your members to act as foreperson who will preside over your deliberations and who will sign the verdict to which all twelve of you freely and voluntarily agree.

Now, Ms. Clark, Mr. Henry, Ms. Sims, Mr. Piland, at this time, in a moment when the jury retires to begin their deliberations, you will be separated from these twelve. Now, during that time the additional instructions -- the instructions still apply to you. You don't need to talk with anyone about the case or deliberate on the case among your own group. Now, if at such time that it becomes necessary for the Court to excuse one of these twelve jurors, then you would be asked to take that juror's place in the order that you were selected as alternates.

Now, ladies and gentlemen, at this time you may retire to your jury room to select one of your members as foreperson. Now, please do not begin your deliberations until we gather all of the evidence together and the indictment and the verdict form and those are sent into the jury room for your consideration during your deliberations. As soon as you have received those, then you may begin your deliberations in this case.

(At approximately 9:50 A. M. the jury retires to the jury room, after which the following transpired)

THE COURT: Ms. Peters, Mr. Stratford, we need to find

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 27 of 228

a separate room for the alternates to be in. Do we have a witness room or some other room that they can be segregated in?

Gentlemen, are there any objections or exceptions to the charge?

MR. HARDY: Not from the State, Your Honor.

MR. MEARS: Your Honor, I believe we'd respectfully reserve all objections and exceptions to the charges until such time as a Motion for a New Trial is filed, if necessary, or there is an appellate, a notice of appeal or an appellate brief filed in this particular case. We would reserve all objections and all exceptions.

THE COURT: All right, sir. You do have that right.

Mr. Mears, at this time, with the exception of what we did cover during the charge conference yesterday, are you aware of any particular charge that the Court would need to give, or any particular charge that the Court did give that it should not give, or any slip of the tongue that needs to be corrected or anything of that nature?

MR. MEARS: Your Honor, I do not have any objections or exceptions to any manner in which the Court gave these particular charges. I did not note any slip of the tongue or any inadvertent deviation from the charges that you said you were going to give. Other than that, I have nothing further to add other than my continuing reservation of my

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 28 of 228

right, of Mr. Cromartie's right to except or object at the time of a Motion for a New Trial or notice of appeal.

THE COURT: Yes, sir. You have that right.

MR. MEARS: Thank you.

THE COURT: All right, gentlemen, if you could -- I believe you have previously approved the verdict form. You have previously approved the editing, so to speak, of the indictment. I have both of those here. These need to go out with the jury.

My request at this time is that you make sure that all the proper exhibits are together that the bailiffs are taking out to the jury. That you also bring to the Court's attention any specific exhibit that you feel like should not go out to the jury so that we can address that.

MR. MEARS: Judge, if I could address that specifically now with regard to the enhanced and enlarged photographs from the videotape. They have been designated, I believe, as, collectively as State's Exhibit 152 and State's Exhibit 151.

THE COURT: Gentlemen, while you're doing that, I, I recall at this time one specific very brief instruction that I, I don't believe I gave the jury. And I don't believe I have forgotten in the past to give it to a jury, and that is that whatever their verdict is has to be a unanimous verdict. I don't recall telling them that.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 29 of 228

If you would ask them to come back in, please.

MR. HARDY: I thought they understood that.

MR. MEARS: I want to thank you for remembering it, Judge.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Ladies and gentlemen, I apologize for ushering you out and back in like this. I inadvertently forgot to give you one very, very important charge which I've never forgotten to give a jury before. But I just flat forgot it in this particular instance and I apologize for that.

Whatever your verdict is, it must be a unanimous verdict. That is, it must be agreed upon by all twelve of your members and dated by your foreperson, signed by your foreperson, returned and published in open court.

Thank you.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Gentlemen, I believe Mr. Hutchings has gone to get some boxes to help transfer these exhibits to the jury room.

MR. MEARS: Judge, I would just renew my reservation of objections and exceptions.

THE COURT: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 30 of 228

MR. MEARS: Judge, while we're waiting on Mr. Hutchings to get that, can I briefly clarify my objections with regard to State's Exhibit 149, 151 and 152. The Court will recall these were identified as being photographs made from, at various times from the freeze frame portions of the videotape which is State's Exhibit Number 32. The Court will recall, 31, I believe, was the slow motion portion of the videotape. 32 is the complete tape. State's Exhibit 149, I believe the testimony was, was a type of mavigraph, was made from a mavigraph processing of the crime scene at the Madison Street Deli. 51 and -- 151 and 152 are the same photographs of 149 with varied lighting. As the Court can see, these -- they've altered the lighting in 152 from 151. And they are basically, all three exhibits are the same frames from the videotape.

My objection is and was and it still is that, one, the three exhibits are duplicative. There are three different images of the same frames. Therefore, the jurors are seeing three different exhibits of the very same photograph which I think falls, clearly falls within the prohibition against duplicating evidence because it unduly accentuates and focuses the juror's attention on items of evidence rather than having the jurors concentrate on the quality and credibility of the evidence. Here you have -- by sheer numbers the jurors are going to think, I would submit, that

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 31 of 228

this evidence is more important than any other evidence. That's for them to determine. And I would object on that basis.

The introduction of all of these collectively or individually constitutes a continuing witness from the videotape. The Court, I believe, has acknowledged that the videotape itself does not go out. The jurors cannot see and resee and view and review the videotape itself. This is -- These photographs are simply nothing more than a continuation of the videotape in freeze frames. This is not an enlargement for the purpose of showing a particular item or a particular part of the surveil -- of the video. This is the video itself in freeze frame portions. We would object on that basis.

The enlarged frames and the light altered frames are gross alterations of the frames of the videotape and are therefore manufactured evidence, not original evidence as required by law.

At least 151 and 152 are also gross alterations of the frames in that there's been a manipulation of the light in order to unduly and unfairly focus the juror's attention on particular parts rather than the photograph as a whole.

The use of freeze frame photographs such as these is a subterfuge and circumvents the prohibition against the videotape itself going out. It's not as if -- in those

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 82 of 228

cases where the courts have in some instances allowed an enlargement of a single frame of a surveillance tape to go out, this, these frames that have been reproduced here, these photographs, is, in fact, the twenty-two second portion of the videotape that the State is prohibited from sending out to the jury. Therefore, the introduction of 149, 152 and 151 is an attempt to circumvent the rules of evidence with regard to that particular matter.

And I know that Your Honor had already ruled. I simply wanted to make sure that I had articulated those objections in the proper form.

THE COURT: All right. Thank you, sir.

Any response by the State?

MR. HARDY: Leave it with the Court, Your Honor, on that issue, whatever the Court wants to do.

THE COURT: Gentlemen, at this time I'll readopt my former ruling.

All right. Gentlemen, at this time let me address whether or not there are any issues as to arguments of Counsel or as to the charge of the Court?

MR. HARDY: No, sir.

THE COURT: What I'm doing is going over the section of the Unified Appeal Procedure that we need to go through at this time.

MR. MEARS: Judge, the only issue with regard to

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 83 of 228

argument of Counsel, I think I made one objection during yesterday's argument. Mr. Mitchell, I believe, had inadvertently interjected, and I'm sure it was inadvertent, simply that, "I believe we've got that". I think that was an improper assessment of opinion. I objected. I believe the Court gave curative instructions. I have no exceptions to those.

THE COURT: I sustained the objection and Mr. Mitchell apologized.

MR. MEARS: Mr. Mitchell -- I won't characterize what Mr. Mitchell acknowledged. But that would have not been proper and he acknowledged that in front of the jury. I have no exceptions to anything the Court did with regard to that objection.

THE COURT: All right, sir.

MR. MEARS: I think it was handled properly by Mr. Mitchell and I appreciated him making that statement.

MR. HARDY: 174 is the letter and a copy of the letter.

MR. MEARS: I withdrew 16 because I think it'd be confusing to them too.

MR. HARDY: This goes out or doesn't go out, 174?

MR. MEARS: 174 goes out. I've withdrawn Defendant's Exhibit 16 because it's duplicative of that.

THE COURT: Gentlemen, are there any other motions or objections for the Court to consider at this time on behalf

of the Defense?

MR. MEARS: I don't have anything, Your Honor.

THE COURT: Mr. Cromartie, --

MR. HARDY: Mr. Kleinrock, Your Honor, on the fingerprint card, there was the date, 1990, was still on the copy, and he's trying to white it out and make another copy.

THE COURT: Mr. Cromartie, I need to address at this time again, sir, whether or not you have any objections to Mr. Mears or Mr. Bryant as your Counsel in this particular matter?

MR. CROMARTIE: No, sir.

THE COURT: Or any objections as to the manner in which they are handling your defense?

MR. CROMARTIE: No, sir.

THE COURT: All right. Thank you, sir.

MR. MEARS: Your Honor, I don't believe we've made a determination as to -- we have a map, I believe, that was used by a couple of the witnesses. It's an enlargement. I don't think there was any objection to the use of the map of Thomasville. I would ask that that go out with the jury. Unlike the other diagram of the crime scene done by Mr. Collins, they've got the smaller versions, and I'm not sure it's necessary that the, the enlargement of Mr. Collins' drawing to go out. I would like for the map --

THE COURT: That's fine if the State has no objection.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 55 of 228

MR. HARDY: Not to the map, Your Honor.

THE COURT: That's fine.

MR. MEARS: It's Defendant's Exhibit 7, Judge.

THE COURT: Gentlemen, while ya'll are doing that, I'm going to look at one matter. I'll be right back.

(Whereupon there is a brief delay, after which the following transpired)

THE COURT: Gentlemen, have ya'll had an opportunity to review the exhibits to go out? Are each of you satisfied with the exceptions, any objections made in regards to the enhancements or photographs taken from the video? Are there any objections to any matters that are being taken out with the jury?

MR. HARDY: I think the Clerk has those that had been objected to.

MR. MEARS: I think so. I think that everything, subject to all our objections, everything that's been allowed to go out has now gone out.

THE COURT: We'll be in recess while the jury is deliberating.

MR. MEARS: Your Honor, could I ask for, perhaps it might be appropriate, if Mr. Cromartie could stay in the courtroom with us rather than back next to the jury room?

THE COURT: Mr. Mears, I'm going to leave that to the discretion of the Sheriff's office.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 36 of 228

MR. MEARS: We're going to sit here, I just wondered if he could sit with us rather than sit back there while we --

THE COURT: Well, again, I'm going to leave that to the discretion of the Sheriff's office since they're responsible for security and also responsible for keeping him.

MR. MEARS: I understand.

THE COURT: So I'll leave that to their discretion, whether or not they have enough personnel, et cetera to do that.

(Whereupon the Court is recessed to await the verdict of the jury.

At approximately 11:40 A. M. the jury returns to the courtroom, after which the following transpired)

THE COURT: All right. Ladies and gentlemen, we have a written question from the jury. "May we view the video concerning the Madison Street Deli incident, only portion relating in the actual shooting that we were shown as evidence? Thanks."

Any response from the State?

MR. HARDY: I don't care if they see it.

THE COURT: From the Defense?

MR. MEARS: Your Honor, I think they're probably entitled to see it. I would object to showing the videotape again on the basis that it unduly accentuates that particular piece of evidence as opposed to others. Subject

to that objection, I acknowledge that they probably have a right if they request to see it.

THE COURT: All right, sir.

MR. MEARS: Could I ask -- Are you going to bring them back in and show it to them in here, Judge?

THE COURT: Yes, sir.

MR. MEARS: Okay.

THE COURT: Yes, sir.

All right, ladies and gentlemen, I, I'm going to overrule the objection and allow the jury to watch that portion of the video.

Gentlemen, we need to, if we can, go ahead and move it around. And I think a better location is where we had it set up later in the day, so that all the jury can see it from that one spot.

MR. MEARS: As I understood it, this is only the small twenty-two second portion?

THE COURT: That's correct.

Gentlemen, let me inquire of one question. It's a good question that's been raised by the bailiff. That is whether or not the alternates should come in and view this also. Now, I understand that if, and recognize that if we need to replace one of the original twelve jurors with an alternate, that the Court instructs the jury to begin their deliberations over again. In the event that were to occur,

it appears to me that the alternate that takes the place of one of the twelve is not going to have had the opportunity of viewing this with the other eleven that had seen it again, and we would need to show it to the alternate at that time and ask them to resume their deliberations.

With that in mind, I think I would have the original twelve and the alternates view this at this time. Is there any --

MR. MEARS: I, I think that would be appropriate, Your Honor. We certainly don't have any objection to them being brought in.

THE COURT: All right.

MR. MEARS: Is the Court going to, is the Court going to give any instructions to the jurors, recharge them with regard to any particular matter such as identification or anything like that before or after they've seen the videotape?

THE COURT: I have not intended to; no, sir.

MR. MEARS: Just as a matter of record, I want to make sure that I renew my request for charge on similar transaction as it relates to the Madison Street Deli, Judge.

THE COURT: All right, sir.

Gentlemen, if we could go ahead and get this -- Is it -- Let's go ahead and get the tape at the appropriate point before we bring the jury in.

(Whereupon there is a brief delay)

MR. MEARS: If I recall correctly, Your Honor, there was a sound that appeared in the washing of the dishes. There was a sound, I believe, just after that is when the person came on and when he leaves is when it should be cut off.

THE COURT: Yes, sir.

MR. MEARS: That's my understanding.

THE COURT: Gentlemen, do you recall if you put -- if you pause this particular video does it distort the picture?

MR. MEARS: Yes, sir. It, it gives it a --

THE COURT: Fuzzy.

MR. MEARS: -- we tried that when we were doing the individual watching.

THE COURT: Well, I was just wondering in anticipation if the jury did ask for it to be paused at some point in time, what, what directions we would give that. And, in fact, if it distorts the picture, then that's certainly not going to be of any benefit.

MR. MEARS: I would ask that it not be paused, Your Honor. That it simply be played as it was during the trial straight through, and I don't think there was any pauses then. I think -- I would ask the Court not to pause it.

THE COURT: Mr. Hardy, Mr. Mitchell, is that your recollection of what it does when you pause it?

MR. HARDY: I think there's just some lines across it. It doesn't distort the picture.

THE COURT: All right.

MR. MEARS: Well, I, I think it does. I don't want to argue about it. But when you stop it, it's, it's got some distortion to it. We could see it and see, Your Honor. But I -- It wasn't stopped during the presentation at trial and I would ask that it not be stopped now.

THE COURT: All right.

All right, gentlemen, are you ready to bring the jury in?

Let's bring the jury in.

MR. HARDY: Your Honor, is Mr. Mitchell going to start it and stop it? How are we going to do this?

MR. MEARS: That's fine with us.

THE COURT: Mr. Mitchell, if you would.

MR. MITCHELL: Maybe put him a chair up here and let him sit down.

MR. MITCHELL: It might be better if we let Mr. Mears start it and stop it, Judge, in case --

MR. HARDY: Let the Judge -- Somebody -- Maybe the Clerk there or somebody.

THE COURT: Gentlemen, ya'll have been working this particular TV throughout the trial. Ya'll are familiar with it --

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 41 of 228

MR. HARDY: We'll get Mark a chair and let him --

MR. MEARS: If Mr. Mitchell and I could stand behind the alternates --

THE COURT: That's fine.

MR. MEARS: -- I think between the two of us we might be --

THE COURT: Mr. Hutchings, put this note in the file, please, sir.

CLERK: All right.

BAILIFF: Are you ready now for the jury?

THE COURT: Yes, ma'am.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Ladies and gentlemen, we've received a note requesting that the portion of the video dealing with the Madison Street incident be reviewed by the jury at this time. Is that correct?

Ladies and gentlemen, have you selected a foreperson? Ms. Blaha?

MS. BLAHA: Yes, sir.

THE COURT: Okay. All right.

(Whereupon a portion of State's Exhibit 32 is played for the jury, after which the following transpired)

THE COURT: Ladies and gentlemen, you may now retire to your jury room.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 42 of 228

(Whereupon the jury retires to the jury room, after which the following transpired)

THE COURT: We'll be in recess while the jury continues to deliberate.

Gentlemen, do you have any objection -- Mr. Bailiff, simply inform the jury when they, if and when they get ready to break for lunch, just let us know.

MR. MEARS: That's fine with us, Judge.

THE COURT: I'll bring them back in and recaution them and then I'll send them to lunch.

MR. MEARS: Are they going to be sequestered during the lunch recess insofar as going to lunch together and coming back? Are you going to allow them to disperse and go to lunch?

THE COURT: I had not anticipated sequestering them. I think --

MR. MEARS: I'm not requesting it.

THE COURT: Yes, sir. With appropriate instructions we can allow them to disperse.

(Whereupon the Court is recessed in the case to await the verdict of the jury.

At approximately 12:00 P. M. the jury returns to the courtroom, after which the following transpired)

THE COURT: Gentlemen, we have another request from the jury. The request is, "May we please see the slowed down

version of the video?"

MR. MEARS: Your Honor, we're going to object to the slowed down version. I think that while the, another foundation would have to be laid. The Court would certainly have to give instructions as to the, how they handled the slowed down version of the tape. I would strenuously object to showing anything other than the tape in the form in which it was recorded. It's already been altered. And I would object to them being shown the slowed down version.

THE COURT: All right. Any response?

MR. HARDY: We'll submit it.

THE COURT: Gentlemen, from my recollection of the evidence, they have seen State's Exhibit Number 32, the original version of the tape. They were also, I believe while Mr. King, Mr. King, while he was on the stand, they viewed the slowed down version. Is that correct?

MR. MITCHELL: Yes, sir.

THE COURT: Gentlemen, I believe that I will allow them to view that once more.

Mr. Mears, do you have any specific instructions that you would wish to request be given to the jury in regards to their reviewing that slowed down version?

MR. MEARS: Judge, I believe -- isn't there a standard charge with regard to the jurors are to consider all of the evidence and not -- and I may be sort of searching here.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 44 of 228

But there's something that comes to my mind that there's a standard charge that the Court gives the jurors about, it goes into the not singling out and excluding bits of pieces, to cover it in its totality, something of that nature in the standard charge.

THE COURT: Not that I recall off the top of my head, Mr. Mears. You know, I -- there -- they certainly should consider all of the evidence, and I'll be happy to charge them that they need to consider all of the evidence in reaching a verdict in this case.

MR. MEARS: At, at least that, I would ask. There may not be, and it may just be Defense attorney's wishful thinking that there should be such a charge. But if the Court could give what you've proposed, I would appreciate it very much, at the beginning of playing the slowed down version.

THE COURT: All right, sir.

All right, gentlemen, let's get the equipment set up again.

(Whereupon there is a brief delay)

MR. MEARS: Your Honor, Mr. Bryant has made a very excellent point. I don't want to, by requesting this additional charge, I don't want to be considered as having waived my previous objections and reservation of objections and exceptions to the other charges the Court has given.

Case 7:14-cv-00039-HL-TQL Document 18-19 Filed 07/14/14 Page 45 of 228

THE COURT: All right, sir.

MR. MEARS: If the Court is going to consider my request as a waiver of the reservation of charges, then I'll withdraw the charge.

THE COURT: All right, sir.

MR. MEARS: And is the Court ruling one way or the other?

THE COURT: Mr. Mears, if it would, in fact, be a waiver, I would consider it as a waiver.

MR. MEARS: Excuse me?

THE COURT: If it would, in fact, be a waiver, I would consider it as a waiver.

MR. MEARS: Okay. Then in that -- absent direction from the Court I, I --

THE COURT: I don't know that it is, in fact, a waiver. Insofar as waiving the objection as a whole, I don't think that is the case. But I'm not going to say, you know, you can --

MR. MEARS: Out of an abundance of caution, Your Honor, I'm withdrawing that particular request. It's not in writing at this time. I will withdraw it and reassert my reservation of all objections and exceptions to the Court's charge until such time as a Motion for New Trial or notice of appeal has been filed in this case.

THE COURT: All right, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 46 of 228

MR. HARDY: Mr. Mitchell -- the slow down had started off with the twenty-two seconds and then it goes to the slow down. Does the Court wants us to do both, or one or the other?

MR. MEARS: I would like to go straight to the slow down. I don't --

THE COURT: Yes, sir.

(Whereupon there is a brief delay)

THE COURT: All right, gentlemen, are you satisfied that you have it at the appropriate place, have the tape at the appropriate place?

MR. MEARS: We can just do it the same way we did it before.

MR. BRYANT: One of the jurors was complaining about the overhead lights earlier.

THE COURT: Let's leave them, let's leave them on until they get in the box and then you can cut them off.

You may bring the jury in.

(At approximately 12:00 P. M the jury returns to the courtroom, after which the following transpired)

THE COURT: All right. Ladies and gentlemen, we have a request to see the slowed down version of the video. And we'll play that for you at this time.

Before we start it, let me remind you that you do need to consider all of the evidence presented during the trial

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 47 of 228

in your deliberations and in reaching a verdict in your case.

All right. We're ready to start.

(Whereupon a portion of State's Exhibit 32 is played for the jury)

THE COURT: All right. Ladies and gentlemen, what I do with the notes that you send me, I initial them and put them in the Clerk's file so that there is a permanent record. And I think this last note was written in pencil. If ya'll could write them in ink for the record, I would appreciate it.

At this time we will ask that you step back to your jury room to resume your deliberations. Let me -- I think you've already been sent the message, but let me just reaffirm it. When ya'll get ready to break for lunch, let us know and we'll simply bring you back in and reaffirm the cautionary instructions that we have given you and take a lunch recess.

Thank you.

Mr. Hutchings.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: We'll be in recess while the jury is deliberating.

(Whereupon the Court is recessed in the case to

await the verdict of the jury.

At approximately 12:25 P. M. the jury returns to the courtroom, after which the following transpired)

THE COURT: Ladies and gentlemen, you've requested a lunch recess. Would an hour be long enough? Would you prefer to come back at 1:20 or 1:30? 1:30.

Let me simply ask that you please recall -- I think by this time you will recall the cautionary instructions that I've already given you, and please abide by those.

And in addition, there may have been some articles in the paper in regards to the fact that this case has gone to the jury at this time. There may be persons over lunch or things of that nature discussing it, giving opinions, rendering opinions based upon what they've read or heard as opposed to what's actually been presented in the courtroom. So just be extra cautious not to let anyone talk about this case in your presence or within your hearing.

In addition, when you come back from lunch and return to the jury room, the bailiff will let me know when all twelve of you are back and present in the jury room. And at that time I will send instructions for you to resume your deliberations. You don't need to deliberate, talk about the case unless all twelve of you are present. This includes restroom breaks, lunch breaks and otherwise. You all twelve need to be present and be a part of the discussions and the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 49 of 228

deliberations.

Anything further requested by the State?

MR. HARDY: No, sir.

THE COURT: Or the Defense?

MR. MEARS: Nothing further.

THE COURT: Thank you, ladies and gentlemen.

Yes, ma'am?

MS. BLAHA: Do we wear the sticker out or take it off --

THE COURT: Well, it may be helpful -- that could work both ways. It may helpful if someone sees you wearing the sticker, depending on that person, that they would take precautions not to talk about the case in your presence. On the other hand, there may be those that would do just the opposite and see it as fate, so to speak. I think I would prefer for you to remove the stickers and use your own judgment insofar as making sure that no one discusses this matter in your presence or in your hearing.

Thank ya'll.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: We'll be in recess until 1:30.

(Whereupon the Court is recessed for lunch after which the Jury resumes deliberations.

At approximately 2:30 P. M. Court is resumed with the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 50 of 228

following transpiring outside of the jury's presence)

THE COURT: Now, ladies and gentlemen, it's the Court's understanding that the jury has reached a verdict in this case.

Let me first caution anyone that if you feel like, regardless of what the verdict is, if you feel like that you may have some difficulty in maintaining your emotions, composure, demeanor, then I suggest that you excuse yourself from the courtroom at this time. Any outbursts, things of that nature will not be tolerated.

You may bring the jury in.

BAILIFF: And the alternates?

THE COURT: Yes, ma'am.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Madam Foreperson, has the jury reached a unanimous verdict on all eight counts?

MS. BLAHA: Yes, sir; we have.

THE COURT: If you would hand the verdict form to the bailiff, please, ma'am?

Ladies and gentlemen, the verdict of the Jury is: We, the Jury, find the Defendant, Ray Jefferson Cromartie guilty as to all counts. This 26th day of September, 1997. Patricia S. Blaha, Foreperson.

All right, ladies and gentlemen, at this time I am

going to conduct what is referred to as a poll of the jury.

In doing so what I will ask -- I'll call on each of you individually. I will ask, "Was this your verdict in the jury room? Was it reached by you freely and voluntarily? Is it still your verdict? And was it based solely on the evidence presented here in court and the instructions on the law given you by the Court"?

Ms. Rhonda Smith. Ms. Smith, was this your verdict in the jury room?

MS. SMITH: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. SMITH: Yes, sir.

THE COURT: Is it still your verdict?

MS. SMITH: Yes, sir.

THE COURT: Was it based solely on the evidence presented here in the courtroom?

MS. SMITH: Yes, sir.

THE COURT: Ms. Marsha Conradi.

MS. CONRADI: Yes, sir.

THE COURT: Ms. Conradi, was this your verdict in the jury room?

MS. CONRADI: Yes; it was.

THE COURT: Was it reached by you freely and voluntarily?

MS. CONRADI: Yes; it was.

THE COURT: Is it still your verdict?

MS. CONRADI: Yes, sir.

THE COURT: And was it based solely on the evidence presented here in this courtroom?

MS. CONRADI: Yes, sir.

THE COURT: Ms. Theresa Fletcher. Ms. Fletcher, was this your verdict in the jury room?

MS. FLETCHER: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. FLETCHER: Yes, sir.

THE COURT: Is it still your verdict?

MS. FLETCHER: Yes, sir.

THE COURT: And was it based solely on the evidence presented in this courtroom?

MS. FLETCHER: Yes, sir.

THE COURT: Corine Monroe.

MS. MONROE: Yes, sir.

THE COURT: Ms. Monroe, was this your verdict in the jury room?

MR. MONROE: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. MONROE: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 53 of 228

THE COURT: Is it still your verdict?

MS. MONROE: Yes, sir.

THE COURT: And was it based solely on the evidence presented here in this courtroom?

MS. MONROE: Yes, sir.

THE COURT: Ms. Darla Glass.

MS. GLASS: Yes, sir.

THE COURT: Ms. Glass, was this your verdict in the jury room?

MS. GLASS: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. GLASS: Yes, sir.

THE COURT: Is it still your verdict?

MS. GLASS: Yes, sir.

THE COURT: And is it based solely on the evidence presented here in this courtroom?

MS. GLASS: Yes, sir.

THE COURT: Ms. Jewell McMickle.

MS. MCMICKLE: Here.

THE COURT: Ms. McMickle, was this your verdict in the jury room?

MS. MCMICKLE: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 54 of 228

MS. MCMICKLE: Yes.

THE COURT: Is it still your verdict?

MS. MCMICKLE: Yes.

THE COURT: And was it based solely on the evidence presented here in this courtroom?

MS. MCMICKLE: Yes.

THE COURT: Ms. Patricia Blaha. Ms. Blaha, was this your verdict in the jury room?

MS. BLAHA: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. BLAHA: Yes, sir.

THE COURT: Is it still your verdict?

MS. BLAHA: Yes, sir.

THE COURT: Was it based solely on the evidence presented here in this courtroom?

MS. BLAHA: Yes, sir.

THE COURT: Ms. Charlotte Parker.

MS. PARKER: Yes, sir.

THE COURT: Ms. Parker, was this your verdict in the jury room?

MS. PARKER: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. PARKER: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 35 of 228

THE COURT: Is it still your verdict?

MS. PARKER: Yes.

THE COURT: And was it based solely on the evidence presented here in this courtroom?

MS. PARKER: Yes, sir.

THE COURT: Ms. Amy Alderson.

MS. ALDERSON: Yes.

THE COURT: Ms. Alderson, was this your verdict in the jury room?

MS. ALDERSON: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. ALDERSON: Yes, sir.

THE COURT: Is it still your verdict?

MS. ALDERSON: Yes, sir.

THE COURT: Was it based solely on the evidence presented here in this courtroom?

MS. ALDERSON: Yes, sir.

THE COURT: Ms. Natasha Hill. Ms. Hill, was this your verdict in the jury room?

MS. HILL: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. HILL: Yes, sir.

THE COURT: Is it still your verdict?

MS. HILL: Yes, sir.

THE COURT: Was it based solely on the evidence presented here in this courtroom?

MS. HILL: Yes, sir.

THE COURT: Ms. Gladys Leaks.

MR. LEAKS: Yes.

THE COURT: Ms. Leaks, was this your verdict in the jury room?

MS. LEAKS: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. LEAKS: Yes, sir.

THE COURT: Is it still your verdict?

MS. LEAKS: Yes, sir.

THE COURT: And was it based solely on the evidence presented here in this courtroom?

MS. LEAKS: Yes, sir.

THE COURT: Ms. Annette Connelly. Ms. Connelly, was this your verdict in the jury room?

MS. CONNELLY: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. CONNELLY: Yes, sir.

THE COURT: Is it still your verdict?

MS. CONNELLY: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 37 of 228

THE COURT: Was it based solely on the evidence presented here in this courtroom?

MS. CONNELLY: Yes, sir.

THE COURT: Gentlemen, does either party wish to examine the form of the verdict at this time?

MR. MEARS: I do, Your Honor.

THE COURT: All right, sir.

MR. MEARS: We have no objection to the form of the verdict, Your Honor.

THE COURT: All right. Thank you, sir.

Ladies and gentlemen, at this time I have a matter that I need to take up with Counsel prior to proceeding into the second stage of this trial.

So at this time I'm going to ask that you step to your jury room. Let me ask, while you are in your jury room if you would discuss this for me. That is, as I see it we basically have three options insofar as proceeding. If you would like to proceed this afternoon with the sentencing phase, the second part of this trial, then we will proceed this afternoon, shortly. In addition to that, if you wish to come back tomorrow and work on, on this case. As I told you before, we anticipate that the evidence would take approximately one day in the sentencing phase. If you wish to come back tomorrow and work on that, let me know. Or if you wish to come back -- to recess for the day and come back

Monday. We can either work the rest of this day and come back tomorrow, or we can work the rest of this day and come back Monday, or we can recess and come back Monday.

If ya'll would discuss that among yourselves and if you can reach some consensus, we will do our best to follow that consensus. If any of you have any, any very unusual and important matters scheduled for tomorrow, let the rest of the jurors know that so that can be considered in, in your request to the Court insofar as how you would like to proceed in this matter.

You may retire to your jury room at this time.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: All right. Gentlemen, at this time are there, prior to proceeding with the sentencing phase of this case, are there any motions that need to be addressed to the Court?

MR. MITCHELL: Nothing from the State, Your Honor.

THE COURT: Mr. Mears?

MR. MEARS: Your Honor, we have no motions to present at this time. However, we would formally ask for a continuance until at least tomorrow morning in order to adequately prepare for the presentation of witnesses for the sentencing phase of this trial. We need time to, first of all, talk to our client with regard to this matter. He's

Case 7:14-cv-00089-MTT Document 18-19 Filed 07/14/14 Page 39 of 228

just now been convicted of six felonies, one of which may subject him to the death penalty. I need an opportunity to sit and talk with him in a reasoned manner about the fact of his being convicted. And I would ask the Court for a reasonable period of time in which to consult with my client at this time. And I would ask the Court to grant us at least until tomorrow morning at 9:00 o'clock to begin presenting evidence with regard to the mitigation phase, assuming the State is going to present any case in aggravation. I assume that they would at least make an offer of that. That is the only motion that I would have at this time, Your Honor, is for -- and I know you've asked the jurors to consider that. But I would also ask the Court to consider our need to consult with our client, to make sure that our client understands the need to continue in a manner in which he has done so far during this trial and has conducted himself appropriately at all times. I need an opportunity to talk with him, to just go over the process, which I've done in the past, but I think given the enormity of the verdict that's just been handed down against him, it would not be inappropriate. And I understand the Court has considerable discretion with regard to the timing of the sentencing phase of the trial. And under the circumstance, Your Honor, I would ask the Court to consider granting Mr. Cromartie and his attorneys a reasonable period of time to

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 80 of 228

get all of our witnesses together. Some of them are here. Some of them are available by call. But I really need just some time to put it all together, all in line and put them on the stand so that the jurors can hear what they need to hear with regard to mitigation. And I would ask the Court for that consideration.

THE COURT: All right, sir. Mr. Mears, I'm going to take that request under consideration at this time and not make a decision right at this moment in regards to that particular request.

Gentlemen, do you have your Unified Appeal Checklist with you?

Gentlemen, let me refer your attention to Section 3, the trial --

MR. MEARS: I, I'm sorry, Your Honor. May I have just one moment with my client before we start?

THE COURT: Yes, sir.

(Whereupon there is a brief delay)

THE COURT: Let me refer your attention to Section 3, Trial Proceedings, Sentencing Phase.

Are there any issues which may arise regarding the admissibility of evidence in the sentencing phase that Counsel for either party is aware of?

MR. MEARS: Your Honor, I would ask the Court, and I have not had an opportunity to reduce this to writing at

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 81 of 228

this time, but I would ask the Court to issue an order in limine, I suppose, to any reference to the Madison Street Deli convictions or any of the facts relating to the Madison Street Deli until and unless the State has put up aggravating circumstances as they relate to the Junior Food Store. We had alluded to this in argument previously, Your Honor, about the concern that the Defense has with regard to the jurors using the events at the Madison Street Deli to convict Mr. Cromartie of the Junior Food Store crimes. I'm now concerned that the jurors, absent very stringent and directed instructions, will use the Madison Street Deli events as part of their sentencing determination. Non statutory aggravators would be the only way that the Madison Street Deli could come into play during the sentencing phase of this trial. The State has to present aggravating circumstances. The jurors have to find beyond a reasonable doubt the existence of at least one statutory aggravator before they can consider any non-statutory aggravating circumstances.

So I would formally request the Court to issue an order directing that no argument or evidence be resubmitted to the jurors concerning the Madison Street Deli until such time as there had been a determination that the jury has found beyond a reasonable doubt one of the statutory aggravating circumstances. That's one motion, Judge.

THE COURT: All right, sir. Let me go ahead and address that motion if I may. Of course, it's my understanding that the jury may consider all of the evidence presented during the entire trial in regards to deciding what an appropriate sentence is. Deciding, first, whether or not there are aggravating circumstances, and then deciding what an appropriate sentence is.

At this point in time the jury has found the Defendant guilty of the offense of Murder, the offense of Armed Robbery. That, in and of itself, is evidence in the case about which the jury could at this time find at least one statutory aggravating circumstance. So I'm not inclined at this time to enter a Motion in Limine. The State, it appears to me, could, could not present any -- would not have to present any further evidence in the sentencing phase. Could rely on the evidence presented during the guilt-innocence phase and if the jury decided to do so, could find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, if not more than one. And, therefore, I'm going to overrule and deny that Motion in Limine.

MR. MEARS: Your Honor, my next motion would be a motion, assuming for the sake of this motion, the Court has made its ruling with regard to that matter on the basis that the State has proven the existence of one, and I'm not

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 83 of 228

trying to put words in the Court's mouth.

THE COURT: Well, --

MR. MEARS: You've stated that they've proven one statutory aggravator in the sense that they've proven armed robbery --

THE COURT: Maybe that's the wrong terminology. What I mean to say, there's sufficient evidence in the record, in my opinion, for the jury to decide whether or not statutory aggravating circumstances have, in fact, been proved beyond a reasonable doubt by the State.

MR. MEARS: And that's the way I understood the Court to be ruling. However, Your Honor, I, I would respectfully disagree that it's, that it can be handled that way. I simply would argue to the Court that jurors can, in fact, find a Defendant guilty of armed robbery and then not find the statutory aggravating circumstance beyond a reasonable doubt. The finding of guilt does not per se make an aggravating circumstance.

THE COURT: I don't disagree. I'm not, I'm not stating that they're automatically going to have to find aggravating circumstance. I'm simply stating that in my opinion there's sufficient evidence in the record at this time for them to do so, such that, for instance, if the Defense made a -- if the State didn't put up any evidence, the Defense made a motion for a directed verdict in regards to the possible

Case 7:14-cv-00089-MTT Document 18-19 Filed 07/14/14 Page 84 of 228

imposition of the death penalty or imprisonment for life without parole, I think there's sufficient evidence in the record to overrule and deny that motion at this time.

MR. MEARS: I, I understand, Your Honor. I would now move for a directed verdict with regard to the aggravating circumstances absent any further showing by the State, particularly with regard to aggravating circumstance as set forth as §OCGA 17-10-37, which is generally the, called the B-7 aggravator in that the offense of, and murder of Richard A. Slysz was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim. I would move for a directed verdict with regard to that particular aggravating circumstance based upon the State's case-in-chief in that there was no evidence presented, in fact, there was evidence contrarily presented that the murder of Mr. Slysz was a murder which would be contemplated by the aggravating circumstance set forth under B-7 of 17-10-30. The testimony, as I'm sure the Court recalls the testimony of the physician, the testimony of Dr. Parker, excuse me, Dr. Parker and the argument made by Counsel in closing argument that the death was instantaneous upon the shooting of Mr. Slysz with the shots from the .25 caliber revolver would exclude any consideration of the aggravator set forth as B-7 on the State's notice of aggravating circumstances. And I

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 65 of 228

would ask the Court to exclude that particular aggravator from even being submitted to the jurors at this time.

THE COURT: Any response from the State, gentlemen?

MR. MITCHELL: Judge, I just think that'd be a question of fact for the jury, as to whether or not the killing was outrageously wanton or vile based upon the evidence that we've heard. I'd think that there would be sufficient facts in the record that they, they could find that. I think it'd be an issue of fact for the jurors.

MR. MEARS: Your Honor, could I just -- And I don't want to just prolong this. But there's a great deal of confusion among all participants in death penalty trials about what B-7 means. It's the subject of much litigation that's ongoing right now in the state and federal system. Because the B-7 aggravator doesn't, doesn't -- it's not warranted simply because the murder was outrageously or wantonly vile, horrible or inhumane. It has to involve, and I'm referring to the McMicken case, I don't have a cite off the top of my head, but it's McMicken versus State out of Douglas County, where the Court dealt with this type of issue. The murder has to involve torture, depravity of mind, or an aggravated battery to convict them.

What I'm submitting to the Court, Your Honor, is that the second prong, that's my terminology, of that B-7 aggravator clearly cannot be established by the facts that

 Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 66 of 228

have been submitted in this particular case. Any murder is vile. Any murder, you know, no matter what, is, fits the first part. And I think that's what the Courts have held. What -- And you've already charged the jury simply because an individual is found guilty of the offense of murder doesn't entitle a jury to sentence that person to death. See, that's why we have ten statutory aggravators that have to be proven beyond a reasonable doubt. B-7 requires that there be proof beyond a reasonable doubt that the murder involved torture, depravity of mind or an aggravated battery to the victim. There was no testimony of any type of an aggravated battery. There was no testimony of any type of torture to the victim. Depravity of mind cannot, I would submit, Your Honor, be shown by the mere act of shooting someone. There has to be something more. And I believe that's a correct statement of, at least the interpretations of this. And, therefore, I would ask the Court to exclude B-7 as a consideration by this juror, this jury in the sentencing phase of this trial.

THE COURT: All right, sir. Mr. Mears, I'm likewise going to take that under reservation at this time. I've got the McMicken case with me and I just need to review that, that portion of that particular case --

MR. MEARS: And, Judge, so that --

THE COURT: -- before I make that particular ruling.

Mr. Hutchings?

MR. HUTCHINGS: Yes, sir. Could I -- Put that in the file, sir.

MR. MEARS: McMicken dealt with the torture aspects, as the Court is aware. And I want to make sure the Court -- I'm simply citing that as a comparison for the Court to make a ruling in this case. I'm not citing that as controlling on this issue, because McMicken involved whether or not the shooting of two individuals and whether or not the torture could be mental torture of the third party or mental torture of one of the victims. It, it talked --it has its dicta, a lot of the language which I've just tried to present to the Court. And I want to make sure the Court understands I'm submitting it for that purpose.

THE COURT: Thank you, sir.

Any other issues that we need to address at this time regarding the admissibility of evidence during the sentencing phase, gentlemen?

MR. MITCHELL: Nothing from the State, Your Honor.

MR. MEARS: Your Honor, I believe the Rule 3 provides an opportunity for the Defendant to make motions in limine. In anticipation of aggravation, I've done that.

I think it also agrees to any stipulations or provides for any stipulations. Could I ask whether or not the State wishes to offer any stipulations for consideration to the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 88 of 228

jurors rather than the presentation of evidence by the State? I'm asking them if they -- them -- I'm asking Mr. Hardy or Mr. Mitchell if they have any proposed stipulations of fact that they would like for Mr. Cromartie's attorneys to consider rather than the presentation of live evidence or documentary evidence?

MR. HARDY: Well, we'd submit all the evidence which the Court has already evidenced, witnesses and documentary. We'd like to resubmit that at the appropriate time for consideration in the sentencing phase. I think Mr. Kleinrock had asked whether or not Mr. Lundy's video could be shown in lieu of Mr. Lundy appearing in person. And that, that's fine with us. I think they've already taken a video deposition of Mr. Lundy, the man with cancer?

THE COURT: Yes, sir.

MR. HARDY: And he had asked whether or not they could play that. And I think that's why they took the video so they could play it if need be. And there was a letter from Dr. Morley stating the man was ill and could not come to court.

MR. MEARS: And that, that's one of the areas I wanted to make sure that we didn't have any disagreement on, because, yes; I would like to address that. With that stipulation, and I appreciate the stipulation of allowing us to use Mr. Lundy's videotaped deposition. I believe the

letter he has from his doctor indicates that he's not available. And with that stipulation we would like, at the appropriate time, to present that videotaped deposition of Mr. Lundy.

THE COURT: All right, sir. Mr. Hardy, I -- maybe I misinterpreted the statements of the Defense a moment ago. My understanding of the question was whether or not the State would wish for the Defense to consider whether or not the parties could stipulate any, any evidence to the jury that the State would otherwise intend to present. Was that the, the question?

MR. MEARS: Let me rephrase it, Judge, because I wasn't clear. Is the State going to simply offer to the jury all of the evidence that was presented in the guilt-innocence phase, or do they intend to call live witnesses to put that evidence back before the jury? I am prepared to stipulate, without waiving any objections or any reservations of rights with regard to any matter that took place during the sentencing phase, excuse me, the guilt-innocence phase, to stipulate that that evidence has already been presented to them. In other words, some, some prosecutors, Judge, will call the same witnesses back, put them back before the jurors to put the facts back into the record before the jury. And I think they probably have a right to do that. I'm just asking, do they intend to do that? If they don't,

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 70 of 228

or if they want to stipulate any particular fact, any particular witness' testimony, I'm prepared to do that at this time, if they will simply alert me as to which witness or what stipulation they would like to consider.

THE COURT: Gentlemen, my understanding is that any evidence that has already been presented and already admitted in the guilt-innocence phase can be considered by the jury in the sentencing phase.

MR. MEARS: And that's my understanding subject to finding the statutory aggravator. What I'm -- I'm not very articulate, I guess, Judge. What I'm trying to say is, the prosecutors aren't limited to that. Unfortunately, I think they can put up live witnesses again --

THE COURT: Yes, sir.

MR. MEARS: -- you know, put the same evidence up. And what I'm asking, if that's something that's going to be done, I'm willing to stipulate any part that they feel that they need to put back up again as far as a live witness.

THE COURT: Any response, gentlemen?

MR. HARDY: We don't anticipate to call live witnesses to say what they've already said, Your Honor. It's already into evidence.

MR. MEARS: Okay. Then that, that answers that question.

THE COURT: All right, sir. Gentlemen, I believe we've

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 71 of 228

already addressed any issues which may arise regarding specific statutory aggravating circumstances.

Any issues at this time which Counsel are aware of which may arise in regards to closing argument?

MR. HARDY: Not at the time, Your Honor.

THE COURT: The Court's charge?

MR. MEARS: I can't -- We have submitted proposed requests to charge as far as the sentencing phase. Those have been served on the State. I can't anticipate any, any objections that would need to be made at this time with regard to closing argument of Mr. Mitchell. I would simply reconfirm in my own mind, in the sentencing phase the Defendant has the right to close after the presentation of all evidence, that the Defendant has the last closing argument at the sentencing phase.

THE COURT: My understanding is that the State will have the first argument, the Defendant will have the last argument.

MR. MEARS: That, that's my understanding.

THE COURT: All right, sir. Gentlemen, anything at this time prior to bringing the jury back in and finding out what their preferences are at this point in time?

Gentlemen, if they prefer to proceed today, then we may take a very short recess to consider some matters and then we'll decide what to do at that time.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 72 of 228

If you would bring the jury back in. Oh. Would you, Mr. Sheriff, would you ask them to stop for just a moment before they bring them in?

SHERIFF POWELL: Just a moment. Just a moment.

THE COURT: It'll just be a minute. Just be a minute. If you would shut that door. Thank you, sir.

All right. Ladies and gentlemen, we've received a request from the jurors to recess until 9:00 A. M. Monday morning.

Any input from either party?

MR. HARDY: If that's what they want to do, Judge, let's do what they want to do.

MR. MEARS: Your Honor, we would ask the Court to grant that request of the jurors and we would appreciate it if the Court would do that.

THE COURT: All right, sir. Gentlemen, I would intend to give the same cautionary instructions that I have previously given this jury. Does either party wish the Court to consider any other cautionary instructions at this time?

MR. HARDY: Just emphasize that they still are the jury and they will continue to be the jury until the case has reached its finality, Your Honor. And we'd emphasize the other charges, the newspaper, the TV, the talking with friends and neighbors, that kind of thing.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 73 of 228

THE COURT: Yes, sir. Anything else?

MR. MEARS: Your Honor, with regard to opening statements at the sentencing phase, does the Court have any questions with regard to that or any input or any direction to Counsel with regard to possible opening statements at the time of the sentencing phase?

THE COURT: Not at this time.

MR. MEARS: Can we anticipate that we would be allowed, both sides be allowed to make a short opening statement at the sentencing phase?

THE COURT: Gentlemen, ordinarily, it's my understanding that we move into the, to the evidence. Of course, the parties have an opportunity for a concluding argument. I've got some time. Let me consider that.

MR. MEARS: What I would request is some, probably five or ten minutes. The reason I ask it, the Unified Appeal doesn't address that, Judge. And some, I think it's some courts will allow for a brief opening statement. Some courts will allow for expansive opening statement. Some courts have said opening statements will not be allowed. I would appreciate the Court to consider allowing at least a brief five minute opening just so that we can set the stage for the jurors as to what they can expect to hear from us during the sentencing phase. And I -- there's no authority, Judge. I wish there were, but there's no authority where I

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 74 of 228

can say we have a right to open the sentencing phase, either side. I don't know of any case law or any, any statutory law that provides for opening statements at the sentencing phase. For a long time I assumed that there was because everyone was doing it. But some courts have taken the position that opening statements, if made at the sentencing phase, are to be very limited. I can assure the Court if you were to allow us to have a brief opening statement, it would be limited to no more than five minutes. And I would ask you to consider allowing us to do that.

THE COURT: Any response from the State?

MR. HARDY: We'd leave it with the Court, Your Honor.

THE COURT: All right. Gentlemen, one issue I want to bring in, up real quick before we bring the jury back in is this, and that's in regards to the alternate jurors. At this time I am not inclined to excuse the alternates. I think it's still, if, if the case is tried throughout both phases and the jury imposes the death sentence, and the Court overturns the sentence portion of the trial but not the guilt-innocence portion of the trial, then the case is, the sentence phase is tried by a completely different jury than what heard the guilt-innocence phase. It seems appropriate to me that if for some reason we have to excuse one of the jurors for whatever reason, that it would still be appropriate at this time to substitute with an alternate

juror.

Any response?

MR. MEARS: We, we would think that would be appropriate, Your Honor, to keep them.

THE COURT: All right, sir.

MR. MEARS: Judge, at the concluding of all this could we have a brief ex parte conference with the Court with regard to a particular funding issue with a particular witness?

THE COURT: Yes, sir.

MR. MEARS: Thank you.

THE COURT: You can bring the jury in, please, sir.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Mr. Sheriff, could I see you for a moment?

(Whereupon Sheriff Powell confers with the Court at the Bench)

THE COURT: Ladies and gentlemen, it appears that you would like to recess until Monday morning at 9:00 A. M. Is that correct? We will recess until Monday morning at 9:00 A. M.

Ladies and gentlemen, I am going to go over with you again the cautionary instructions that I have given you throughout the week.

Let me caution you and urge you to consider the fact

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 76 of 228

that it's probably more important at this time than at any time during your service on this case that you be very cognizant of the fact that persons may have read in the paper or heard on the news or otherwise the verdict in this case, in the guilt-innocence phase, may be cognizant of reading the newspaper or otherwise that this case is proceeding into a second or penalty phase. And very, very possible, very likely, very probable that some persons are going to be talking about it, be it at ball games, wherever, out in the public, at church and otherwise. You just need to recognize that and be very careful not to be exposed to any talk whatsoever. Number one, about whether or not the verdict in the guilt-innocence phase, whether they agree with it or not. Number two, not to be exposed to any conversations concerning someone else's opinion about what would be an appropriate sentence in this case, from someone who has not been here and has not heard all of the evidence.

So with that in mind, again, do not read anything, and at this time I don't know if any of you have been having someone edit your local paper for you, at this time let me ask that you simply do not look at the local newspaper until your services in this matter are concluded. Don't read any other paper, newspaper that is circulated in this area until this matter is concluded. Do not listen to anything on the radio or TV about this particular case until it's concluded.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 77 of 228

If I have not already said it, don't talk with anyone about this case, allow anyone to talk about it in your presence or within your hearing. In addition, please do not read any magazines, novels or other material which has a violent theme, content, subject matter or plot. Do not watch any movies or television shows that have any violent themes, content, plot or subject matter.

Whatever your decision is in regards to the appropriate punishment and sentence in this case should be based, again, solely on the evidence presented to you during the guilt-innocence phase, the evidence which will be presented to you during the sentencing phase, and the instructions of the law which will be given you by the Court at the appropriate time.

With that in mind, again, please be cautious over the weekend not to be exposed to anything whatsoever by anyone whatsoever about this case.

With that, I hope you have a restful weekend. See you Monday morning.

Everyone remain -- Ladies and gentlemen, we're going to ask everyone to remain here in the courtroom for about five minutes to give you an opportunity to disperse easily.

Thank you.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Any matters that need to be taken up at this time prior to recessing?

MR. HARDY: No, Your Honor. Thank you.

MR. MEARS: Your Honor, could I be -- Could the record reflect as to what precautions are going to be taken with regard to preservation of the items of evidence that have been used? I know they're in the jury room at this point. Is there any particular mechanism for insuring the, insuring that the evidence is not moved, changed, altered in any way during this, this weekend break?

THE COURT: Mr. Mears, of course, the jury room can be locked up. It may be a good idea -- it's my understanding that the Clerk of the Court has had built a special locking cabinet for this particular case which is secured in the Clerk's office. And it may be a good idea for us to simply round that evidence up and secure it that secured locked cabinet in the Clerk's office over the weekend. And we will have it Monday morning.

MR. MEARS: I was -- I would like to ask that that be done if that's possible, Judge.

THE COURT: All right, sir. That shall be done. Anything else?

MR. MEARS: Other than our request for a brief ex parte and I could probably do it at the Bench if the Court will let me just for a moment with the regard to the request for

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 79 of 228

a ex parte hearing considering --

THE COURT: All right, sir.

MR. MEARS: May I approach the Bench?

THE COURT: Yes, sir.

(Whereupon an ex parte hearing was held at the Bench with only Mr. Mears, the Court and court reporter being present)

THE COURT: We'll be in recess until 9:00 A. M. Monday morning.

(Whereupon the Court is recessed for the day, with the proceedings to be resumed on Monday morning.)

* * * * * * * * * * * * * * * * * * * * * * * * *

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 80 of 228

(The eleventh day of proceedings commences at approximately 9:05 A. M. on Monday, September the 29th, 1997, outside of the jury's presence)

THE COURT: Ladies and gentlemen, before we bring the jury in, for purposes of the record, it's the Court's understanding that Counsel, although not authorized by statute or otherwise, Counsel has asked the Court in its discretion to allow a brief opening statement in this particular matter. Is that correct, gentlemen?

MR. HARDY: Yes, sir.

MR. MEARS: That's correct, Your Honor.

THE COURT: All right. Gentlemen, I will, will allow that.

In addition, it's the Court's understanding that Counsel for Defense has requested the Court to send out with the jury for their deliberations a copy of the entire charge in regards to the sentencing phase. Counsel has this morning had an opportunity to review that charge, the charge that the Court proposes to give in this particular matter. Is that correct?

MR. MEARS: That's correct, Your Honor.

THE COURT: And is that the, is that the proposed charge that Counsel desires for the Court to send out?

MR. MEARS: Yes, Your Honor. We would ask the Court to have the charge sent out with the jury. We're still

reserving all objections. However, we feel that it would be beneficial to the process if the jurors had the written request to fall back on if there's any question about what Your Honor actually charged.

THE COURT: The, the entire written request as opposed to simply a listing of these statutory aggravating circumstances. Is that correct?

MR. MEARS: That's correct.

THE COURT: All right, sir.

Mr. Mears, at this time having given the matter consideration, I will, will send the entire charge out based upon the request of the Defense.

MR. MEARS: Thank you, Judge.

THE COURT: Yes, sir.

Any other matters that need to be addressed prior to bringing the jury in?

All right. You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Good morning, ladies and gentlemen.

Ladies and gentlemen, let me briefly go over with you the procedure that we will follow in this second phase.

Prior to the introduction of any evidence, the parties will have an opportunity to make a brief opening statement to you, outlining what they expect the evidence to show

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 82 of 228

during the sentencing phase of this particular trial. Following the opening statements, then the parties will be allowed to offer any evidence for your additional consideration, any evidence which is admissible by law for your additional consideration in determining what is an appropriate penalty, punishment and sentence in this particular matter.

Following the introduction of all of the evidence, the party will have an -- the parties will have an opportunity to make a closing argument or summation to you. That's their opportunity to argue to you what they think the evidence has, in fact, shown you during the penalty phase. In addition, it's their opportunity to try to persuade you to decide on an appropriate penalty in a particular manner and on a specific penalty.

Following the summation or closing arguments, then I will charge you on the law that is applicable for your consideration and for you to follow in determining what is an appropriate sentence.

Now, ladies and gentlemen, let me first inquire whether or not over the weekend any of you did have any exposure whatsoever from any outside sources concerning what should be an appropriate sentence in this particular matter? Now, if I do have an affirmative or positive yes response, then what I need to do is speak with that particular juror or

jurors individually.

So at this time let me ask whether or not over the weekend, since we recessed on Friday afternoon, have any of you read anything about this particular case? Have any of you heard anything, radio, TV or otherwise, about this particular case? Has anyone contacted you and told you not to tell me that they've contacted you in regards to what would be an appropriate penalty in this particular case?

Thank you, ladies and gentlemen.

Gentlemen, are you ready to begin with your opening statements?

MR. HARDY: Please, Your Honor.

MR. MEARS: I think Mr. Bryant would have the opening for us, for the Defense.

MR. HARDY: Please, Your Honor. Mr. Bryant. Mr. Mears.

Good morning again, ladies and gentlemen. I'll keep this brief. Today is Monday and we're starting the second phase of this particular trial. This will be the sentencing phase. You've heard the evidence from the guilt-innocence phase. It was over with Friday afternoon. I think this particular phase of the trial will be quite similar to the other phase of the trial. There'll be -- The State will resubmit all the evidence which you've already heard in the guilt-innocence phase of the trial. And we anticipate that

Mr. Mears will be given an opportunity to call various mitigating witnesses. Then the Judge will give you the charge again, a different charge or an addition to the charge you've already heard. And then you'll retire back to your room to reach a verdict in this particular, excuse me, to reach a sentence in this particular case.

You've gone through the guilt-innocence phase and now we're in the sentencing phase. It's quite similar in the types of steps and the type of procedures. You may or may not be asked to go out to your witness -- to your room while certain matters are discussed. It may or may not happen. But we don't anticipate this being very lengthy, but it is important and please listen and remember what you've already heard. Thank you.

THE COURT: Mr. Bryant?

MR. BRYANT: Thank you, Your Honor.

Good morning, ladies and gentlemen. We are about to embark upon what is sometimes referred to as the second phase of this trial. And it is for most of you, if not all of you, perhaps the most difficult part of this trial. And I'm going to be, at this point, taking a few minutes of time and I appreciate the fact that you've given us your attention through the part of trial that you have so far. And if you will just bear with us a little longer, we hopefully will be able to give you an outline of what you

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 85 of 228

can expect in this part of the trial.

As Mr. Hardy has said, they intend to resubmit the evidence that's already come to you. We, however, in mitigation wish to bring some additional evidence to you that we believe will be important to you as you make your decision today regarding the life of Jeff Cromartie.

There are a couple of people I want to talk to you about very briefly. I'll just give you some names. You'll hear from them. You'll see them. And you'll be able to determine from what they say, we hope that will have information that will help you in deciding this case.

We expect to bring to you Angeline Cromartie, who is Mr. Cromartie's paternal grandmother. She lives over in Grady County and worked out at Pebble Hill for a number of years. And she'll tell you a little bit about Jeff and what she knows about him and what sort of child he was.

I expect also that Jeff's cousin, Charlene Johnson, will be here to testify. We expect that she will talk to you about Jeff and what sort of young man he is.

I expect that Jeff's brother, Anthony Cromartie, will also come to you and tell you about their lives growing up together.

Joe Lundy is a young man who lives here in Thomas County who is very ill with cancer. You will see him on videotape. He is, as I understand it, too ill to be here

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 86 of 228

himself. He has cancer and we have by agreement have taken his deposition and you'll be able to see and hear him as he tells you about Jeff. He is the person who basically considers himself to be Jeff's father. In growing up he -- he was one of the reasons why Jeff was here, was to spend time with him.

And finally, I think we'll bringing to you Jeff's mother, Ms. Estelle. And I think when you hear from her she will tell you about Jeff, his life, how he came to be where he is today.

And we will ask you to pay attention to each of these witnesses as you have done all the witnesses that have come thus far. And we urge you as you make your deliberations and your considerations in this matter to bear in mind what each of these witnesses say and to understand that for them this is a chapter in Jeff's life. And we do ask that you give it earnest and sincere consideration. Thank you.

THE COURT: Mr. Hardy?

MR. HARDY: Your Honor, the State would resubmit all of the evidence which you've heard from last week in the guilt-innocence phase including all the documentary evidence, all the live witnesses, all the photographs, everything that's already been introduced into evidence, Your Honor, for consideration in this particular phase of the trial.

MR. MEARS: Your Honor, we would simply reaffirm and

Case 7:14-cv-00039-WTT Document 18-19 Filed 07/14/14 Page 87 of 228

restate all objections and exceptions to the evidence as it was presented the first time. We would ask the Court to accept those exceptions and objections during this phase as if they were made individually as they were made during the first phase of the trial.

THE COURT: Yes, sir. The Court will do so.

Ladies and gentlemen, as the Court has previously informed you during the trial, during the guilt-innocence phase, I will reinform you at this time and will also inform you again during the charge at the end of the evidence in this case, that you may consider all of the evidence presented to you in this case in determining what is an appropriate sentence in this case. That is, all of the evidence submitted in the guilt-innocence phase of the trial as well as the evidence presented during this particular phase of the trial.

Mr. Hardy, does the State have any additional evidence to present at this time?

MR. HARDY: No, sir. Thank you.

THE COURT: State rest?

MR. HARDY: Yes, sir.

THE COURT: Mr. Mears?

MR. MEARS: Yes, Your Honor.

Your Honor, we at this time would call Ms. Angeline Cromartie to the stand.

THE COURT: Ms. Cromartie, if you would have a seat right here, please, ma'am.

Ms. Cromartie, if you would raise your right hand, please, ma'am? I need to administer the oath to you.

Do you solemnly swear or affirm that the evidence you'll be giving this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MS. CROMARTIE: Would you repeat that?

THE COURT: Yes, ma'am. Do you solemnly swear or affirm that the evidence that you will be giving this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MS. CROMARTIE: Yes. The whole truth.

THE COURT: Thank you, ma'am.

Mr. Mears?

ANGELINE CROMARTIE

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MEARS:

Q Ms. Cromartie?

A Yes, sir.

Q My name is Mike Mears. We've met before.

A Yes, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 89 of 228

Q Met out on the front porch of your house.

A Yes, sir.

Q You recall that. I'm going to ask you some questions and I want you to talk to the ladies and gentlemen of the jury about your answers to the questions.

A All right.

Q I'm going to ask you some questions about your grandson.

A Yes, sir.

Q Okay. First of all, would you please tell the ladies and gentlemen of this jury how old you are and how long you've lived in this community?

A All right. First, I want to speak every -- all, all the whole court.

Q Ms. Cromartie, you, you can sit down. You don't have to stand up.

A Oh, I don't have to --

Q They only make the lawyers stand up. You don't have to do that.

A Well, I want to say good morning to everyone, ya'll. And my name is Angeline Cromartie and I'm Jeff's grandmama. My age is seventy-three. I've done seventy-three. I'm going on seventy-four. And I raised him. And lots of time he enjoy 'cause in the country he can play a lot on my lawn, play. And they like, he like to play ball. And I have more grandchildren.

They come visit me and I be in there cooking. I tell, I say, ya'll children go outside and play. I say, when I get dinner or whatever I got ready for you, I'll let ya'll know. And they just love ball games, playing. And I say, now, listen, I'm gonna tell ya'll while ya'll playing, if you hurt one another, I'm gonna have to kinda be real cross with them. I say, I'll get me a switch and I lay it up on the porch. I say, you never get too old. I said, I'm gonna put this switch on you. You've got to mind grandma. And they'll play all day long out there in the yard. And on Sunday I got them ready. I went to Sunday School, and take them out to Sunday School. I didn't send the other children. I carry them there out to Sunday School and we stay over to church and we're back home. Now, I prepare a meal again. They ran out there in the yard playing with each other and they had a good time. I enjoy fixing for them. I do. I just love to cook. I'm a cook. I just love to cook food. And they enjoy it so very much. And they didn't -- when I said anything to them, they mind grandma. I let 'em know. I say, now, you're gonna mind grandma. I said, I got you a present. I get a little long switch, you know, a little keen one and get them legs. I say, I'm putting my present right here on this porch and don't nobody bother it. And one start cutting up, I might cut up with you. And they'd know to behave. And they, he was a real lower. He mind me. I tell him, I say, you're gonna have to mind me. And he stayed and he had a good time. When he come there, he just

love to come to grandma's house with the other grandchildren. And I just enjoy them.

Q Ms. Cromartie, where did you work most of your, your life?

A Well, most of my time I worked to Archbold Hospital. I did twenty-six years cooking, preparing for the whole, you know, anyone that come in and all patients and one who visit, the whole community who feel like coming and eat. And then when they come and eat they'll come by after they have their dinner and tell me how much they enjoy it. That encouraged me to cook more and put the little sketch and make it kind of bussom (ph.), you know, 'cause they like good eating.

Q Ms. Cromartie --

A They were fun.

Q Have, have you retired from Archbold now?

A Well, I have retired from Archbold, but I felt like I need a little part-time job. I be around the house. All the children going to school and grown too. And I've been out here to the State Hospital and put in an application. I went out there the first day and the lady say, oh, I just like how you talk, and say, you've got this job. I didn't know it was gonna be so quick, you know. And I was in the house, freshening up in the house. I was setting on the porch. Everybody gone. Nobody in the country but me. Children gone to school. And I say, well, the lady hasn't called, talking to myself. The phone rang.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 92 of 228

And I say, "Hello". She say, "Hello, is this Angeline Cromartie"? I said, "Yes, ma'am; it is". She said, "Don't you know -- say, come on out here and get an interview". And I come around there and I say, "How many more till I have to come to get the interview"? She say, "You already got the job".

Q Okay. Now, that's the job you have right now; isn't it?

A Yes, sir.

Q At seventy-three you're still working --

A Working right on; yes, sir. I done, I done did seventy-three and starting on seventy-four now. My birthday was the 3rd of September.

Q Now, Ray Jefferson is your grandson by your son?

A Sure. He out here. He come.

Q Okay. Now, in growing up you say that you disciplined him and he minded you?

A He did.

Q Now, did you see a whole lot of him after he got up into a teenager?

A Well, he was getting a little growner, you know how it is. Children -- He know I didn't play with him, you know. But he'll come in there. When he come home, back home for vacation, he come home and he always tell me, said, "Grandma, I love you". I say, "I love you too, baby". I always talk nice to him. He's glad to have a home. I say, well, spend some time with me, you

Case 7:14-cv-00059-WTT Document 18-19 Filed 07/14/14 Page 93 of 228

know. And he know grandma liked to cook for him. He just come on in. And he gets older and older, every year make him get older, you know, he'll go away, but he'll get a chance to call or write me or something. And, oh, he say, oh, how much I love you, grandma because you just was a good grandma. All my children tell me that. And I say, well, just think my oldest son, let me say this here, my oldest son, he had a birthday the 22nd of September, made him fifty-five years old. He don't stand up and talk back at me. I tell him, I said, now, listen, let me tell you one thing, I'm the oldest now and I'm the mommie. I try to teach and tell the thing what's right to go and take them to church. I don't send them. I carry them. So they say -- my oldest son tell me sometime, he say, mama, I -- I hold him pretty tight talking, you know. Say, mama, say, it look like, sound like you're fussing. I say, I'm not fussing. I said, I'm talking the real thing to you. And here's a help, son, and you go and raise your children and tell them the same, you know.

Q Ms. Cromartie, you know that your grandson has now been convicted of the offense of murder?

A Um-hum (affirmative).

Q You've been told that; haven't you?

A Yes, sir.

Q And this jury has got to decide what's the appropriate punishment for your grandson.

A Um-hum (affirmative).

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 94 of 228

Q Is it your desire to ask this jury to spare your grandson's life and not sentence him to death?

A Well, I'd love to ask them that. Please, please, (unintelligible), please, ma'am, will ya'll don't have him sentenced to death. Give him a chance.

MR. MEARS: Okay. Thank you, Ms. Cromartie.

We have nothing further, Your Honor.

CROSS EXAMINATION

BY MR. HARDY:

Q Good morning.

A Good morning.

Q How you doing?

A I'm all right. How are you?

Q I think your grandson didn't live with you, or didn't have much association with you except when he was a young child because he moved off to Florida and he moved off to Pennsylvania; didn't he?

A Yes. When he had a chance he'd visit me, you know.

Q But he didn't live around you when he got up in age?

A After he was a child coming up, you know, 'cause he was real young then.

Q His teenage years and years after that, he didn't live around you?

A No, sir. I see him every once in a while. He'd have vacation or something and come in.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 95 of 228

Q But you didn't have the influence over him when he got to be a little older, teenager?

A No.

Q Ten or so, because he moved away; didn't he?

A Well, that's right. He was getting older then. He felt like he was, you know.

Q And that was in Florida and Pennsylvania?

A Well, once -- you know, I didn't keep up the place he was during, he was living at. He would write me a letter from up there in Pennsylvania where he have -- well, I mean, I keep in touch with him. He would write me back. But he was growing up then. He didn't come and did like a child growing up like I was, you know.

Q Is Joe Lundy your son?

A Sir?

Q Joe Lundy is your son?

A Yes, sir.

Q And he's, he's the one that's fifty-five, I think, just turned --

A Yeah, that's my -- his name Charlie Cromartie. He out here with me. He come this morning with me.

Q But Joe Lundy, is he the oldest child?

A Yeah, he's --

MR. MEARS: Your Honor, may I speak with Mr. Hardy for a moment, please, sir. Excuse me.

THE COURT: Yes, sir.

(Mr. Mears confers with Mr. Hardy)

BY MR. HARDY:

Q Do you still live at Beachton, ma'am?

A Right, sir.

Q Okay. That's where you grew up and you live?

A I, I come from Florida, down there around Leon County, Florida. But I got married and my husband come over -- that's where his home was, around here in the Beachton area.

Q Yes, ma'am.

A And so after that he passed, and so I just stayed right around in the home and see to raise, you know, my children, they got grown and they got married and they had their children. And so I'm back at home.

MR. HARDY: Thank you, ma'am.

MR. MEARS: Thank you, Ms. Cromartie.

May she step down, Judge?

THE COURT: You may step down.

MR. MEARS: Watch your step there.

Call Ms. Charlotte Johnson.

THE COURT: Ms. Johnson, will you raise your right hand, please, ma'am?

Do you swear or affirm that the evidence you'll be giving this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 97 of 228

nothing but the truth, so help you God?

MS. JOHNSON: Yes, sir.

THE COURT: Thank you, ma'am.

Mr. Mears?

CHARLOTTE JOHNSON

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MEARS:

Q Charlotte, would you tell the ladies and the gentlemen of this jury your full name and what your relationship to Ray Jefferson Cromartie is?

A My name is Charlotte Johnson. And Ray Cromartie is my cousin, first cousin on my mother's side.

Q And --

A He is my aunt, he is my aunt's son. And his mother is just like my mother.

Q What was your maiden name, Ms. Johnson?

A Young.

Q Okay. Are you related to Lisa Young?

A Yes.

Q And what is her relationship to you?

A Lisa Young is my sister.

Q Okay. Now, what part of Thomas County do you live in?

A Thomasville.

Q Okay. And how long have you lived in Thomasville?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 93 of 228

A Forty-one years.

Q Most of your life?

A Yes.

Q Okay. Ms. Johnson, as you were growing up did you have an opportunity to know and be around and associate with Jeff's mother, Estelle?

A Yes, sir.

Q Now, you had indicated that she was like, like a mother to you. Would you just tell the ladies and gentlemen so they'll understand what your relationship was and is to Estelle Cromartie Barreau?

A Well, Estelle, she was sort of like my mother, sort of like, she sort of raised me a little bit. And she was the first one that bought my little prom dress. And we're just real close, you know. And Christian and all kind of ways, you know. We're just -- She's just like a mother to me.

Q And as a result of being that close to Estelle, have you been close to Ray Jefferson Cromartie?

A Yes.

Q Tell the jurors so they'll understand what you're talking about, how and in what relationship you've had with Jeff over these years?

A Well, when Jeff was coming up I was sort of like the babysitter. I mostly keep all of them, you know, 'cause we growed up in a big family, so I was like the, you know like,

mostly babysit for all the children. And so I mostly kept Jeff and his brother and my other cousins. So I was just like the babysitter, like, like the mama with all of the children, like I am now. I mostly, you know, be around lots of children. So I mostly was there for Jeff also.

Q Now, was there a period of time when, after Jeff was born and before he started school, that he and his mother moved away from Thomasville, that you didn't have any contact with him?

A Yes.

Q What happened? Why, why did they move away, if you know? And tell the jurors a little bit about how long you, you were separated from Jeff?

A Well, they moved away after, well, you know, we had a tragic, and our house had got caught on fire, so he lost his -- she lost her other son. And so then after then she had to get away, you know, 'cause everything, all the memories just on her son, so they, they moved and they got away. But I kept in contact with the mother. So that's why they had to leave, 'cause they had a death, we had a death in the family. And we had lost everything. She had lost her son, other son.

Q How old were you when that happened, Charlotte? How old were you when that tragedy occurred?

A I was thirteen.

Q What happened? Tell the ladies and gentlemen of the jury about how the family lost Buddy Cromartie?

A In a fire. He got burnt up.

Q Where was the fire?

A It was on Jackson Street in Thomasville.

Q How old was Jeff then? How old was Jeff?

A Now?

Q No. When the fire occurred. Do you remember?

A Jeff was a baby and the little brother was something like four. So Jeff was probably something about like two.

Q Can you tell the ladies and gentlemen of the jury what happened? Were there just children at home? Were they being left with other children? What happened? Could you tell the ladies and gentlemen how that tragedy occurred?

A It was all children. My mother had came in from work and she was asleep. So it was my sister, Lisa. It was Buddy, the one that got burnt. And it was Jeff. They was all home. My mother was asleep. And found out the house was on fire.

Q Was there ever any, any talk in the family about how the fire started?

A They said it come through, by the heater.

Q Were the children playing with matches?

A They said through the gas heater. They mostly had them little gas heaters back then.

Q Did anyone talk about the children trying to light the heater and that's what caused the fire?

A No, sir.

Q There was no talk about matches or things like that?
A Uh-uh (negative).
Q When the fire broke out, who all was saved from the fire?
A All of them but the little baby, Buddy, the one that died. Lisa got burnt on her forehead. But everybody escaped except for the little baby.
Q And that was Jeff's younger brother?
A He was up under the bed. He was trying to get out so he went up under, back up under the bed. And that's where they found him at. He died through the smoke, I think.
Q After that fire did Jeff's mother go through some hard times?
A Yes. She was in the hospital when it happened.
Q Did it take her a long time to recover from the loss of her baby?
A Yes, sir.
Q Did she leave town as a result of that, or partly as a result of that?
A Yes, sir.
Q And you sort of lost contact with her, at least personally for a period of time after that; didn't you?
A Yes, sir. But then, you know, after I was fixing to get ready to go to the prom in my junior year, she bought my first prom dress.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 102 of 228

Q When did you start having contact with Jeff again? Was it after all of this happened? Was it when he came back to town?

A We just started having contact, like, when my grandmother took sick, about thirteen years ago when she got real sick. So we all start meeting each other and coming back 'cause she, she died about thirteen years ago. So we all began, everybody began to associate with each other again.

Q Did Jeff ever, in your presence, ever act disrespectful to you, your mother, his mother or anyone? Did he ever act disrespectful or rude to anyone?

A No. No.

Q How, how would you describe Jeff so the ladies and gentlemen of the jury will know the kind of person that you saw him to be as he was growing up?

A He was like a normal child, you know. Just like caring. He loved his mother. He love all of us, all of us. We was just, all of us just growed up together like a big family, you know. We come from a big family so we always have Thanksgiving, 4th of July and all of us just, we just growed up together. He was just a nice person.

Q Charlotte, you know that Jeff has now been convicted of the offense of murder and he's been convicted by this jury and the jury now has to decide what's the appropriate punishment for Jeff. You understand that?

A Yes.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 169 of 228

Q And you weren't allowed to sit in the courtroom during the trial because you were going to be a witness; isn't that correct?

A Yes.

Q But you've been told what he was convicted of and that now he's facing either life imprisonment or a death sentence. Do you understand that?

A Yes, sir.

Q Is there anything that you can say, anything you want to say to these jurors that might help them make the decision that they should make with regard to whether your cousin is going to be sentenced to death or that he's going to be sentenced to spend the rest of his life in prison? Would you like to say anything to them?

A Yes. I'm just asking ya'll -- I know ya'll made your choice. And I'm asking you to please just forgive. And I know he's going through a lots now. And we, we grieved for the person that died. We did. We wanted to go see the people. I'm just asking ya'll to spare his life and just forgive, just please forgive him and give him another chance. That's all I just ask. God be with all of ya'll.

MR. MEARS: Thank you, Charlotte.

Your witness.

THE COURT: Mr. Hardy, do you have any questions?

CROSS EXAMINATION

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 104 of 228

BY MR. HARDY:

Q Basically, Mr. Cromartie lived in Florida and Pennsylvania during his formative years and away from you?

A Yes, sir.

Q You really had -- didn't have a lot of contact with him, what he did or didn't do, during those years?

A Well, he came home. He come home. Like I said, we had get togethers.

Q Maybe several times a year, once or twice a year? You said Thanksgiving, 4th of July or funerals, that king of thing?

A Yes.

Q And you live in Boston, I think, now?

A Um-hum (affirmative).

Q You don't live in Thomasville. You live in Boston?

A I'm from Thomasville but I stay in Boston.

Q You've been living in Boston, I think, in a trailer over there a number of years; haven't you? Up there on that main street?

A Sir?

Q You live in Boston right now; don't you?

A Um-hum (affirmative).

Q With your family?

A Yes, sir.

Q But he was away from your grandmama or the lady that just testified and you and he was with, growing up in

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 109 of 228

Pennsylvania and Florida?

A Yes.

MR. MEARS: Nothing further.

THE COURT: You may step down.

MR. MEARS: Call Anthony Cromartie.

THE COURT: If you would raise your right hand, please, sir?

Do you solemnly swear that the evidence you'll be giving this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. CROMARTIE: Yes, sir.

THE COURT: Thank you, sir.

ANTHONY JAMES CROMARTIE

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MEARS:

Q Anthony, would you please tell the ladies and gentlemen of this jury your full name, your occupation and where you're living right now?

A My name is Anthony James Cromartie. I reside in Atlanta, Georgia. My occupation, I'm a mail handler for the U. S. Post Office. Been there four years.

Q And what is your age, Anthony?

A I am thirty-four.

Q Are you Jeff's older brother?
A Yes; I am.
Q Okay. And where were you born?
A I was born in Thomasville, Georgia, 1963.
Q And who is your mother?
A Estelle Barreau is my mother.
Q Okay. And is this your grandmother out here?
A Yes; she is.
Q Ms. Angeline?
A Yes; she is.
Q Now, so that the ladies and gentlemen of the jury will know a little bit more about Jeff, would you please tell them a little bit about where you and Jeff lived with your mother after you moved from Thomasville?
A We --
Q Just, just tell them.
A We resided -- We left Thomasville and went to Ohio where my mom was working there. We stayed there approximately, between four and five years. From that time on we moved to Pennsylvania. And when my mom got married we moved to Pennsylvania.
Q And from Pennsylvania where did you move?
A From Pennsylvania we moved to Texas.
Q What part of Texas? Where in Texas?
A It's called Baytown, Texas. It's twenty-three miles

Case 7:14-cv-00039-MTT Document 18 Filed 07/24/14 Page 107 of 228

outside of Houston.

Q Was there a time when you moved from Texas back to, back to Pennsylvania or Ohio?

A Well, at that time I left from Texas and joined the Army, so at that time my mom moved from Texas, she moved to Florida. And from that time, that's where I knew she occupied, there in Florida while, while I was in the Army. Then from there she went, moved back to Atlanta.

Q Now, tell the jury, ladies and gentlemen of the jury, a little bit about what your life was like growing up with just you and Jeff and your mother?

A We was like the three Amigos, one without the other. We don't go nowhere without one. We had a good childhood with my mother. Sometimes it got rough, you know, but that's -- sometimes that's the way life is sometimes though. But we have a loving family, just, it was just the three of us. We had our rough moments in life, but you know, you adapt to them and keep going on.

Q When you say you as a family had some rough moments. Be a little bit more specific? What are you talking about? Financial problems, family problems? How, what kind of roughness did you have in your life?

A Well, there was a point in time where there was financial problems, you know, but, and there was all, also a rough childhood. My mom was married and her husband at the time

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 108 of 228

was abusive to the point with me and my mother and sometimes Ray. That's one time we had to stick together and, and go on with the situation and stuff, you know, and, you know, and deal with it. Sometimes it was rough but we still -- whatever happened it was just still the three of us, you know, mother and her two sons.

Q Did your mother have some bad relationships with some of the men in her life as you were growing up?

A Yes. Most of the men in my mom's life usually were -- two I know of was very abusive, you know, to the point to where it was, it was hard on me, my mom, my brother. And, it's hard to talk about because it's a part of my life I want to put, put behind me, but I know it's still there. But to the point to where, I mean, when I mean abusive, I don't mean just pushing and shoving. I mean to the point to where it was physical abuse with my mother. And the only person I really had to stick by and deal with the situation was me and my brother.

Q Anthony, you and your brother were close growing up; is that correct?

A Close growing up, close now. There'll never be a distance between me and my brother. We always be close.

Q You had a younger brother that was killed in a fire; did you not?

A Yes.

Q How old were you when that fire took place?

A Six years old.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 109 of 228

Q Have you any present, real memory of that fire?

A I don't have presence of the fire, but I have presence of when my cousin Charlotte Johnson came and got me out of school. But she never told me what happened, just told me I had to go home. When I walk home and seeing our house burnt down, you know, I didn't know what was going on. I was told a day later I lost a brother. He died in a fire accident. And from that moment on, you know, the only thing I can remember then is going to his funeral.

Q Anthony, after the death of Buddy, your infant brother, did you and your mother and Anthony start moving around a lot?

A Well, my mom was in the hospital at the time my brother died, so we went to stay with our grandmother. That was a rough part in my mom's life at that time because my mom lost a son. She never got to see his face again. She didn't even go to his funeral, you know. She couldn't take it, you know. She lost one son. That's just like any other mother. What would it be like if you lose a son. So, you know, we moved with our grandmother and stayed with our grandmother for about two or three years, probably longer, until we got back with our mother, when she could, you know, wear out some of this pain that she was going through, to handle me and my brother.

Q Did your mother go through some hard times as a result of her emotional state dealing with this?

A Real hard times. It's -- I know of four or five years

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 110 of 228

after that that was real rough. Like dealing with, dealing with the fact she lost a son, dealing with the fact she never looked at his face again, dealing with the fact that, you know, it was three of us, and now one of us is gone, you know.

Q Let me ask you a question about, again about some of the relationships that your mother had with men during these part, this phase of her life, your life and Jeff's life. Did -- As a result of these relationships, did your mother have financial trouble?

A Yes; we did. I mean, financial problems to where, some of the places where we was staying we wasn't able to pay the rent so we had to move somewhere else that was a little cheaper. Sometimes it got so rough to where we had to ask for support from our church to even help us. But my mom never gave up though, you know. She never stopped loving us. Whatever it took, whatever hell she had to go through to support her two sons, she went through it.

Q Was there -- In these relationships that your mother had, was there any real positive role models for you and Jeff?

A It wasn't in the relationships there wasn't no positive role models at all, at all. The relationships she was in was abusive. I mean, what, what role model can you see coming from to where a man has to hit a woman or even hit children to get his point across. That's no positive role model there. The only positive role model that we had was usually my mom's best

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 119 of 228

friend's husband or neighbors that we knew that was men that was real positive to me and my brother. But being in a relationship, there was none positive. It was mostly abusive. That's what we, we went through life and stuff, but it wasn't that -- because that happened that, you know, things happen in our life. They're just turning points, you know.

Q Did Joe Lundy, Mr. Joe Lundy have any part of your life at any particular time --

A Yes.

Q -- of your life and Jeff's life?

A He had, he just had a bigger part of my life just as much as he has Ray.

Q Tell the ladies and gentlemen of the jury who Joe Lundy was and what part that he played in your life and Jeff's life?

A Okay. I didn't know Joe, Joe Lundy until my older part of life. Joe Lundy was my mom's -- they was real, real close. But he was real positive to Jeff and I. Jeff's, I mean, Ray -- I mean, Joe Lundy's mother is like a grandmother to us and she was always there for us. Even Joe Lundy was like, like a father to us. But with Ray, he was real close with Ray. Him and Ray has a real close bond. They always did. I mean, I was never to the point to where I was never jealous of them, but I just see that it was, the bond was there between them, like a father and son. And the bond is there to this day.

Q Do you know why Joe, Joe Lundy had this relationship

with ya'll and why he had a special relationship with Jeff?

A Well, I don't know how true it is, but Joe Lundy was supposed to have been Ray's father. And that's what was heard, so it was never determined if it was or was not. So, as Joe looked at it as Ray being his first and only child, you know, and the bond just grew from there.

Q Did, did Jeff ever, even to this day, has he ever known who his father was for real, for, you know, positively know who his father was?

A Well, it was told to him that Charlie Cromartie is his son and always will -- I mean, his father and always will be his father. But as coming up, you know, with all this confusion in our family it was never determined, you know, positive who his father was. My mother told him that -- Ray was to the point to where he had to find out himself, you know, because sometimes you tell someone that, it still leaves an open door for them. They have to find out for themself what life's all about.

Q Now, Anthony, you're here. You haven't been able to sit in part of the trial because as a witness you had to stay outside during the trial; is that correct?

A Right.

Q Now, but you know that Jeff has now been convicted of the offense of Murder.

A Right.

Q You understand that?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 113 of 228

A Yes.

Q And you understand that we're not here to argue with that particular verdict, but to try to help the ladies and gentlemen of this jury in the decision that they have to make as to what's the appropriate punishment? You understand that?

A I understand that.

Q Now, the ladies and gentlemen of the jury are looking at you and you've living in Atlanta, you're employed at the postal service. Why couldn't Jeff have had the same life that you've had? Do you have any, any explanation for that?

A We're all, we're all different. We seek different paths in life, you know. Ray sought his path in life. I sought my path in life. You know, he's, he chose to do things that he wants to do. It's -- The opportunity was there but whenever he was ready to accept that opportunity, it was there for him. Because we seek separate paths, I mean, you know, the opportunity wasn't there for him.

Q Did you and Jeff go to the same schools together?

A Yes; we did. Went to the same high school.

Q Did ya'll play football together?

A And when we was little we played football together.

Q Did you ever play on the same team with him?

A Yes.

Q Is there anything that stands out in your mind about your little brother?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 114 of 228

A Yes.

Q It may not mean anything to anyone to you, but please share it with the jury?

A Well, we was small the first time we ever played football, what we call the peewee league or whatever when we was young. As a matter of fact, our first game or second, I remember, my brother played on my team for that day 'cause we was short of people. And I, I played with somewhat -- got to know something about football, running back. And when they kicked the ball off to me, I received the ball. I was running upfield. My brother gave one of the blocks to help me score my first touchdown. I mean, that stands out in my life because that's the first time we're together and really did something together.

Q Now, throwing blocks in football games are not that big a thing in most people's lives. What does that say to you about your continued love for your brother?

A Whatever it takes, or whatever snares come in life, my brother willing to give his own just, or I, myself, so we can make it. I mean, it's just, it's the bond that's been since we was younger. It's never left.

Q Now, you understand, Anthony, that the only choices this jury is going to have is either to sentence Jeff to death or to put him in prison for life without parole or life? You understand that's the only choices they have?

A I understand that, you know.

Case 7:14-cv-00039-MTT Document 1-8 Filed 07/14/14 Page 119 of 228

Q If the jury spares his life, are you going to continue to be there for him even though he's spending the rest of his life in prison?

A I want to say one thing. I don't care where my brother go. I'm there for him. As the old saying goes, you can go to hell and back. I'm still here. The situation now, you know, I'm still here for my brother. That's the love we have. Because the situation arise, I'm not supposed to turn my back on him. I mean, it's just a hand I'm gonna have to deal with, but I, I'm gonna still love my brother regardless.

Q If your brother is sentenced to death by this jury, you know he'll be, he'll be executed. What effect would that have on your life and the lives of your family?

A It'd have a big effect. We've lost a loved one. He have family that he's close to. I have a daughter that's twelve. That's her Uncle Jeff. She hasn't seen him since this incident going on. She asked to see him all the time, you know, want to be with him. I lose another brother and I don't want that to happen.

Q Is there anything that you want to say to this jury before you leave the stand that might let them know how you feel about your brother that you haven't already said, and are you asking this jury to spare your brother's life?

A Yes; I'm asking you to spare his life. But I'm also saying that when you have someone that, that you love and you

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 116 of 228

take him away, the pain continues on and on. It doesn't stop. I love my brother to death. My family do too. That's why we're here to support him. It's the love that's there. I don't want nothing to happen to my brother, never.

MR. MEARS: Thank you, Anthony. Your witness.

CROSS EXAMINATION

BY MR. HARDY:

Q Mr. Cromartie, I think a minute ago you said that people can choose the paths in life they want to go?

A Right.

Q Some people choose one path and some people choose another path?

A Right.

Q And you choose, you've chosen the positive path?

A Yes.

Q And you said that your brother, the opportunity was there for your brother? Is that what you just said, just like it was for you?

A What I mean by that is that the opportunity for him to do anything in life, period, you know. Not to say if it's good or bad. That's for everyone.

Q The opportunity was there?

A To do whatever you want to.

Q You were in the Army and now you work for the post office?

A Yes.

Q And you chose that path?

A Yes.

MR. MEARS: Nothing further, Your Honor.

Please step down.

THE COURT: You may step down.

MR. MEARS: Your Honor, at this time we'd like to be able to put the videotape player before the jury in order to present the videotape of Mr. Lundy's statement.

THE COURT: All right, sir.

Ladies and gentlemen, while the attorneys are setting up the equipment for the videotape deposition of Mr. Lundy, let me inform you that this testimony is to be received by you just as if Mr. Lundy was here in court live and in person testifying before you. The attorneys in this case are required to be prepared for both phases of this case prior to the beginning of the trial in this particular matter. Of course, they had no way of knowing prior to the trial what your verdict would be in regards to the charge of Murder. Therefore, it was their responsibility to be prepared for the sentencing phase if, in fact, this case were to reach the sentencing phase.

I charge you that you should not place any inference whatsoever on the fact that the video was made prior to the actual trial of the guilt-innocence phase of this

Case 7:14-cv-00039-MTT Document 18-8 Filed 07/14/14 Page 118 of 228

particular case.

You're instructed to hear and receive Mr. Lundy's testimony in accordance with the prior instructions that I have given you in regards to credibility of witnesses and it's your determination and your decision as to what weight to give to the testimony of any witness.

Mr. Mears?

(The following is the videotaped deposition of Mr. Joseph Ralph Lundy)

"MR. MEARS: Would you raise your right hand, please.

Do you solemnly swear that the testimony you're about to give in the matter" --

THE COURT: Ladies and gentlemen, can everyone see?

"MR. MEARS: Would you raise your right hand, please.

Do you solemnly swear that the testimony you're about to give in the matter of the State of Georgia versus Jefferson Ray Cromartie will the whole truth and nothing but the truth, so help you God?

MR. LUNDY: I do.

JOSEPH RALPH LUNDY, SR.

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MEARS:

Q Mr. Lundy, if you will speak directly into that microphone so that your voice can be picked up. Can you tell the

 Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 119 of 228

ladies and gentlemen of the jury what your name is and where you live?

A My name is Joseph Ralph Lundy, Sr. I live at 208 W. Jerger Street here in Thomasville, Georgia.

Q Mr. Lundy, how long have you lived in Thomasville?

A Except for a couple of years in Miami and stints, two stints in the military, all of my life.

Q When you were in the military, what branch did you serve in and what was the nature of your service in the military?

A I was a military police. I served in the Army as a military police. And my main duties was to, in certain areas was, when I was in Vietnam it was primarily convoys and post, post patrol and once I got back stateside it was primarily post patrol and town control in conjunction with the civilian authorities.

Q Okay. Mr. Lundy, I'm going to ask you to speak up just a little bit. I'm having trouble hearing you back here, so I want to make sure that everyone on the jury can hear you. Okay?

A All right, sir.

Q Now, Mr. Lundy, you've recently, in the last year, been diagnosed of having cancer; is that correct?

A Yes, sir.

Q Just so the jurors can understand a little bit about your treatment, what kind of medicine are you on, are you taking right now?

A I'm taking Tagamet for my -- I don't have a stomach so I take it for my pouch. I'm taking Ativan, Vistaril, Compazine, Ibuprofen 800, Chromagin. That's a vitamin, in the morning time. I take another vitamin in the evening time. Restoril for sleep. Excuse me.

Q That's okay. I just wanted the jurors to understand in case you have to stop during the middle of this taping, you're on quite a bit of medication right now; is that correct?

A Right. Yes, sir.

Q Now, Mr. Lundy, is, is your cancer in remission right now?

A Yes, sir. It went in remission in May of last year.

Q You understand that we're taking this deposition by videotape in the event your condition worsens and you're not available to testify before these jurors at the trial. You understand that; is that correct?

A Yes, sir.

Q Now, Mr. Lundy, will you tell the ladies and gentlemen of the jury whether or not you know Jefferson Ray Cromartie?

A Yes; I do.

Q And how do you know him and in what capacity have you known him?

A In -- I'm, I'm his dad in his mind and he's my son in my mind. We belong to each other.

Q Would you explain that a little bit to the jurors? Did

you know Jeff's mother?

A Yes; I did.

Q And would you just tell a little bit about how you came to know her and your, your background relationship with Jeff and his mother?

A Well, I've always known his -- I went to school with a couple of his uncles. We were all in the same grade. And it was a time growing up and it was all in the '60s and it was a time when we, everybody sort of socialized. No commitments or anything like that, just socialization.

Q When you came back from Vietnam, you were over there two times; is that correct?

A Correct.

Q When you came back from Vietnam the, the second time, what kind of work did you get involved in?

A Okay. I was still in the military when I came back.

Q Okay. After you got out of the military I should, I should say.

A Oh. Well, when I got out of the military my dad had a logging and pulpwood business and so I did that for a time, a little while, not long. And I started driving a truck. And I did that for a little while, I guess about a year. And then I went to nursing school. And while I was in nursing school, then I went to EMT school. And then when I came out of nursing school I went to work for Dr. Fred Murphy, Jr., who -- he is deceased at

this time, and I worked for him about six or seven years as his assistant.

Q And are you able to do any kind of work right now?

A No, sir.

Q Okay. Now, during the period of time that you knew Jeff's mother, was that here in Thomasville?

A Yes, sir.

Q Okay. Tell the ladies and gentlemen of the jury a little bit about your family and Jeff's relationship to the rest of your family, particularly your mama?

A Well, my mama, that was her -- Jeff was her heart. He called her Big Mama. And I can remember, like on a lot of occasions when they were getting ready to buy boots, 'cause they had to have special boots that were snake proof and had a steel toe and a whole bunch of other stuff, and, of course, Jeff had to have his too. And so he went in and he got outfitted for his. And so they told him, okay, you're the big boss, you know.

Q Is that back when the family was in the logging business?

A Right.

Q And about how old was Jeff at that time?

A Probably four, five, something like that.

Q And he had to have the same clothes as the rest of them?

A Right.

Q Okay. How did he get along with, with your mama, the lady he called Big Mama?

A Oh, they -- She loved him. He loved her.

Q Is she still in life, Mr. Lundy?

A No, sir. She died in '87.

Q Have you had occasion in the last several years to see and talk with Jeff?

A Yes, sir.

Q Okay. You understand that this testimony is being given in anticipation, in the event that he is convicted of the offense of murder? You understand that?

A Yes, sir.

Q And if you're testifying and this is being presented to a jury, it will be because a jury has already found him guilty of the offense of murder? You understand that?

A Yes, sir.

Q And that this jury is having to consider what type of sentence he's supposed to receive, either death in the electric chair or life in prison?

A Yes, sir.

Q You understand that?

A Yes, sir.

Q Would you tell the jurors a little bit about who you think Jeff Cromartie is, the type of person he is?

A Well, even at a young age I never had problems with

him. Sometimes we might not agree on a point of view, especially after he got grown. But we would -- you know, he'd say, well, I don't agree with that. And I'd say, well, this is why. And, you know, we'd go through it, through things like that. But I guess one of the things that I was most impressed with about him, I remember one day I was in the back yard and I was raking yards and he came up to the rake, took the rake out of my hand, finished the yards, got the mower out, and I didn't ask him to do it and he didn't have to do it. He got the mower out and went up and mowed the yards, cut the hedges, messed them up, but that was okay. At least he tried.

And he and I have -- we didn't have a, a stormy relationship. It was one, I think, where we were really trying to feel one another out and get a feel for each other. The likes and dislikes and what to expect, the thinking processes and that sort of thing.

Q During those times that you had a chance to be with Jeff and he would work in the yard and work around you, did you try and point him in the right direction and show him how he should be going with his life?

A Yes, sir. That was ninety percent of the conversation, because I felt like, I felt that if my -- if our strength is in our youth, then our knowledge must be with our older people and it's up to the older people to direct the strength of the youth. And sometimes we can get through, sometimes not. But that's what

we, that's what --

Q Did there come a time when Jeff moved away from Thomasville and was away and outside of your control or outside of your ability to give him direction?

A Yes, sir.

Q And where did he go? Do you, do you remember?

A I believe he went to Boston and then back over to Cherokee, but I'm not really sure.

Q He was with his mother; is that -- would that be correct to say?

A Well, most, most of the time he was with her, but this was after he had gotten, you know, past, well, twenty-one; right.

Q When you look at Ray, Jeff Ray Cromartie, when you look at him, do you see a son?

A Yes; I do.

Q Do you have other children?

A Yes; I do.

Q Tell the jurors, ladies and gentlemen of the jury about your other children?

A Quita, that's the oldest daughter. She and Jeff are the closer of the two. Latonya and Fentrice and Joseph is my baby. Well, Thad and Joseph.

Q Do you treat Jeff any different than any of your children?

A Put them in a bag and they can fall out together.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 126 of 228

Q And that's the way your, that's the way your mama treated him; wasn't it?

A Right.

Q If this sentence -- this jury were to sentence Jeff to death, you'd be losing a son; wouldn't you?

A Yes, sir; I would.

Q Has Jeff" --

MR. MEARS: Your Honor, may we stop it? May we approach the Bench, please, sir?

THE COURT: Yes, sir.

(Whereupon Counsel confer with the Court at the Bench, during which the following transpired)

MR. MEARS: Judge, I don't know whether or not I used the word electrocution during this. I don't think I used it. I don't want the Court to think I used it -- this was done before the Court's ruling. And the reason I stopped it, I'm not sure whether I used it again during the questioning. I don't know of any curative corrective at this point. But I wanted the Court to know it was, it's not something I did. I had forgotten I even used it in that. And I apologize to the Court for it coming in because I know what the ruling has been. I just don't know any other way to cure it at this point.

THE COURT: Run the tape.

MR. MEARS: Excuse me?

THE COURT: Run the tape.

(Conclusion of Bench conference)

MR. BRYANT: May we resume, Your Honor?

THE COURT: Yes, sir.

(Whereupon the videotape is continued to be played as follows)

"BY MR. MEARS:

Q -- you since you got diagnosed with cancer?

A Yes, sir; he has.

Q Did, did he write you a letter upon --

A Yes; he did.

Q -- learning that? Do you have that letter with you?

A Yes, sir.

Q Can I -- When did you receive that letter? Do you recall?

A In January of '60 -- not '60. January of '96, I believe it was.

Q January of '96. Would you mind just reading that letter so that the ladies and gentlemen of the jury can hear what your son had to say to you when he learned that you had cancer?

A No, sir. I'm don't mind. 'Dear Pops. I just heard about you today and I'm sending you my deepest regrets to you. I wish the best on, on your recovery. I never meant any harm to you. Things happen in life that we have no answers for, but everything happen for a reason. My only wish is that I wish we

had a better relationship with each other and respect each other's views of life. So we are both going through something right now to better our faith in life. I know I will make it through these trials and you have got to have the same attitude about this cancer. So get well so we can spend some time together. Okay? Love always, Jeff'.

Q Mr. Lundy, did it give you comfort in your time of sickness to know that your son was thinking about you?

A Yes, sir; it did.

Q Do you love your son?

A Sure do.

Q Do you have anything you want to ask these jurors now that they've got to make a decision as to whether your son lives or dies?

A I would hope -- when I -- I would hope that they would spare his life because I, out of some tragedy some good can come from it. Maybe he can help counsel some of the younger prisoners who won't be there because if his life is spared he's going to spend the rest of it in, in prison. And maybe he can help those coming through and his, his own experiences and, and point them in the right direction, so maybe some of them won't come back or won't fall into the same trap that he did. But we'll be supportive of him in his time of weakness and we would hope that he would be that same way at somebody else's time of weakness because everybody coming through won't have the strength but I

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 129 of 228

feel like that's something that he could do and I feel like that that was something that he would do.

Q And you understand, Mr. Lundy, that this, these ladies and gentlemen of the jury, after hearing all the evidence in this case, have, have convicted Jeff of the offense of armed robbery and murder?

A Right.

Q You understand that; don't you?

A Yes, sir.

Q And you understand that he's been found guilty of taking the life of another human being?

A Yes, sir.

Q You understand that?

A Yes, sir.

Q Are you still asking these jurors to spare his life?

A Yes, sir.

Q Can you give them a reason why they should spare his life?

A Well, I think taking a life is wrong, but I just don't believe in, in the death penalty. And I feel like if, if his life is spared he won't be out there in society and he could contribute to that next inmate who's coming in who maybe won't have as much time as he does, you know, won't be in there for the rest of his life, and he'll be able to maybe talk to that person and turn them around.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 130 of 228

Q Mr. Lundy, can you look this, look at this jury, even though we're doing it by videotape, can you look at the ladies and gentlemen of this jury and ask them to show mercy and to spare your son's life?

A Yes, sir. As a parent I love him very deeply. And I feel like that there could some good come out of this. And I feel like he won't be a menace. He'll be in prison and working toward helping somebody else because we'll support him, not because we have to but because we love him and there is somebody. As long as he know that there's somebody that care about him, that should make him a stronger person to do his time and to help somebody else along the way.

MR. MEARS: Thank you, Mr. Lundy.

CROSS EXAMINATION

BY MR. HARDY:

Q Good afternoon, Mr. Lundy.

A Good afternoon, sir.

Q How are you doing today?

A I might as well.

Q We had a good talk over at your house Wednesday?

A Wednesday -- Tuesday.

Q Had a good talk Tuesday; didn't we?

A Yes, sir.

Q I think we discussed things about life in general and about our beliefs; did we not?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 131 of 228

A Right.

Q And I think you told me about your children. You didn't tell Mr. Mears that you've got, I think several children. You love these -- You all love them equally; don't you?

A Right, sir.

Q And Jeff left you when he was fairly young; didn't he?

A Right.

Q How young was he when he left?

A Well, Jeff was never really, he never really stayed with me. See, I only had one that really stayed with me.

Q Joseph?

A Joseph.

Q And Joseph and Thad --

A Right, sir.

Q -- they're the ones you mainly raised?

A Right, sir.

Q And you tried to steer them on the -- you have to talk to them all the time because they're here with you basically all their life?

A Right.

Q But Jeff didn't never live with ya'll?

A No, sir.

Q So you didn't get to give him the counseling that you gave Joseph and Thad; did you?

A No, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 132 of 228

Q In fact, you believe in the old fashioned ways of the father is supposed to tell his child what to do and guide his child in being a good child?

A Right, sir.

Q You believe in right and wrong; don't you?

A Right, sir.

Q And you believe in paying for your penalties --

A Right.

Q -- for what you do in life?

A Right.

Q And I think you told me you were an MP in Vietnam?

A Right, sir.

Q And you think probably Agent Orange is what's caused you this problem?

A Right, sir.

Q And you were a nurse, you said?

A Right.

Q And you've always worked for a living; hadn't you?

A I always have.

Q And your wife, Pearl, is here with you today?

A Yes, sir.

Q And Pearl, I think Thad's real close to her; isn't he?

A Yes, sir.

Q And as well as Joseph?

A Right, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 139 of 228

Q I think you also told me the other day that Jeff lived mostly with either his mother in Florida or lived other places?
A Right, sir.
Q And he just came back in your life back in February of '94?
A Right.
Q And you know that's because he had a death in the family, is why he showed up?
A Right.
Q And you really didn't have any influence over him during his formative years, when he was in high school and after high school; did you?
A No, sir.
Q Didn't even know where he came from when he showed up back in town in February?
A No.
Q So you really had no contact with him?
A No, sir.
Q So you really didn't try to teach him the ways of right and wrong like you taught your other children; did you?
A Right; because --
Q You didn't have that chance; did you?
A I didn't have the chance; right.
Q In fact, you wish you had; don't you?
A I sure do.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 134 of 228

Q In fact, you think you maybe could have made his life better if you'd had the influence on him?

A Yes, sir.

Q I think you also told me the other day that, that you don't understand why somebody should lose their life for twenty-two beers; didn't you?

A Right, sir.

Q And, in fact, you didn't even -- that kind of floored you the other day; didn't it? That's not right; is it?

A No, sir.

Q Did that man's life mean anything if it just meant twenty-two beers, Mr. Lundy?

A No, sir.

Q You didn't know him; did you?

A No, sir.

Q You don't know his family; do you?

A No, sir.

Q Don't know what his family is going through or been through; do you?

A No, sir.

Q That wasn't right either; was it?

A No, sir. You know, we used to -- I worked at Southwestern and so we, a bunch of us would usually stop and get those scratch-off tickets, you know, at the store and, you know, sodas or something like that. That was prior to my leaving.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 199 of 228

Q Yes, sir.

A I don't know if he was the same person or not, but, you know, that was the extent of it.

Q He never was a bad person; was he?

A Not that I know of.

Q That letter that he wrote to you was back in January of '96.

A Yes, sir.

Q Today is August the 28th of '97?

A Right, sir.

Q Has he written you any letters between January of '96 and today's date, August the 28th of '97?

A Yes, sir, but I -- my wife would have them.

Q You didn't bring those with you today?

A No, sir.

Q You feel sorry for the family of the victim; don't you?

A Yes, sir.

Q And you empathize with them; don't you?

A Yes, sir.

Q Has your son said that he was going to try to help some other inmate straighten their lives out?

A Yes, sir; we talked about it.

Q You talked about that?

A Yes, sir.

Q When was that? This week or another time?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 196 of 228

A At another time.

Q Counsel them in the ways of sin?

A And the way, you know -- the thing that -- Like I told him, I said, even at this last visit that we had, I said, you realize that if you don't get the death penalty that you'll be in jail for a long time. And I will support you in your time of weakness. Will you be there for somebody else? And he said, told me, yes, he would.

Q You expect your children's support because you're a strong father; aren't you?

A Yes, sir.

Q And you love your family?

A Right, sir.

Q But you could understand that Mr. Slysz's family also had their --

A Right, sir.

Q It's not right to kill innocent people; is it?

A No, sir.

Q And you're a law abiding, honest, good man?

A I sure try to be.

Q You've worked all your life; hadn't you?

A Yes, sir.

Q And you're forty -- Excuse me. Fifty-five years old?

A Fifty-five in October.

Q Yes, sir. And you didn't never expect anything like

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 197 of 228

this to come out of one of your sons; did you?

A No, sir. When this happened, I mean, it was something I had to really wrestle with. I had to really wrestle. I couldn't have been more devastated.

Q You don't think your children should kill people; do you?

A No, sir.

Q Nor shoot people in the head?

A No, sir.

Q That's -- from your training in the military, that's about as bad as it can get; isn't it?

A Well, that's more from my upbringing from my mama.

Q Sir?

A More from the upbringing of my mama.

Q Just to shoot an innocent stranger?

A You know, she just didn't believe in that.

Q You don't either; do you?

A No, sir.

Q Innocent strangers being killed by people for virtually nothing, for no reason.

A Right.

Q You want them to spare his life but he didn't show the same mercy to the victim; did he?

A Evidently not, if he's convicted at this stage.

Q That's pretty bad; isn't it?

A Yes, sir.

Q I think it'd be just about every -- most mothers and fathers would ask the same thing you're asking though; wouldn't they, Mr. Lundy?

A Yes, sir.

Q And you'd expect them to; wouldn't you?

A Yes, sir.

Q But you could understand Mr. Slysz' predicament. He's dead and he had no chance; did he?

A Right, sir.

Q He can't beg for mercy; can he?

A No, sir.

Q That's not good either; is it?

A No, sir.

Q Wish you the best and hope for recovery for you. Okay?

A All right, sir.

Q Thank you for talking to me. All right?

A Thank you, sir.

MR. MEARS: Mr. Lundy, thank you for being here today. Thank you for submitting to this videotaped interview. And, like Mr. Hardy, we all pray for your recovery from this cancer.

MR. LUNDY: Thank you, sir.

MR. MEARS: We have nothing further."

(Conclusion of videotaped deposition)

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 139 of 228

THE COURT: Ladies and gentlemen, does anyone need a brief recess at this point? You need a brief recess, Ms. Leaks?

Ladies and gentlemen, why don't we take about a five to ten minute recess. We'll give each of you an opportunity to use the restroom or any other facilities that you need to prior to resuming this particular matter.

Everyone remain seated while the jury retires.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: We'll take about a ten minute recess.

(Whereupon the Court takes a brief recess, and upon reconvening the following transpired in the jury's presence)

THE COURT: Mr. Mears, you may call your next witness.

MR. MEARS: Call Ms. Estelle Cromartie Barreau, please.

THE COURT: Ms. Cromartie, if you would have a seat right here, please, ma'am.

Would you please raise your right hand?

Do you swear or affirm that the evidence you'll be giving this Court and this jury in the matter now pending before this Court shall be the truth, the whole truth and nothing but the truth, so help you God?

MS. BARREAU: I do.

THE COURT: Thank you, ma'am.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/24/14 Page 140 of 228

Mr. Mears?

LOTTIE ESTELLE BARREAU

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MEARS:

Q Ms. Barreau, would you please -- Pull that microphone up, if you will, so that the jurors can hear you.

And tell the ladies and the gentlemen of this jury your full name and your current address?

A My full name is Lottie Estelle Barreau. My current address is 1361 W. Second Street, Riviera Beach, Florida.

Q Pull the mike on up just a little bit closer. There you go.

Do you mind if I call you Estelle?

A That's what everybody goes by.

Q Okay. Estelle, are you the mother of Ray Jefferson Cromartie?

A Yes; I am.

Q Tell the ladies and gentlemen of this jury where you're from, where you were born, just a little bit about who you are?

A I was born right here in Thomasville in 1946. And I grew up here in Thomasville. I worked here in Thomasville. I left here when I was twenty-five years old.

Q And how old were you when your first child was born?

A I was eighteen.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 141 of 228

Q And who was your first child?
A Anthony Cromartie.
Q And Anthony testified here earlier today; didn't he?
A Yes; he's here.
Q And who is your second child?
A Charlie Cromartie, Jr., which I lost in 1969.
Q And your third child?
A Is Ray.
Q Okay.

MR. MEARS: Your Honor, may I just set these up here?

THE COURT: Yes, sir.

BY MR. MEARS:

Q Estelle, who was your first husband?
A My first husband was Charlie Cromartie.
Q Now, when was Ray born and where was he born?
A Ray was born in 1968 on Patten Street, Patten Street.
Q He wasn't born in the hospital; was he?
A No. I wasn't going to the hospital.
Q Was he helped, was the birth helped by a midwife?
A Yes.
Q Okay. Estelle, I'm just going to show you, so we'll have this in the record, Defendant's Exhibit 21. It's Ray Jefferson Cromartie's birth certificate; is it not?
A Yes.

Q Just look at that just briefly. Does that accurately reflect the times and dates and place of Jeff's birth?

A Yes.

Q Now, where did you go to high school?

A Right here in Thomasville. I, I didn't finish but I went here.

Q Okay. Did you drop out of high school as a result of getting married and having your first child?

A Yes.

Q Okay. Where did you work when you were first, when you first gave birth to Anthony? What kind of work did you do?

A I worked on the plantation when I got married. I worked on the plantation with my mother-in-law for a period of time.

Q What planation was that?

A I've forgot.

Q What kind of work were you doing?

A Helping with her in the kitchen and in the house.

Q Now, you gave birth to three children; is that correct?

A Yes; I did.

Q Now, the ladies and gentlemen have already heard a little bit about the tragic death of Buddy Cromartie, your son. And I know it's painful, but as best you can just tell -- you were, you were not present when the fire started; were you?

A No. I, I was very sick that year, the early part of

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 143 of 228

'69. I had had two previous operations, January and April. And December I got -- November, I got sick and which they had to take, rush me to the hospital. On December the 3rd they, I had to have major surgery. They told me I couldn't have no more children. And the next morning my child got burnt up at my brother-in-law's.

Q What was your brother-in-law's name? Was it the Ponder's?

A My mother?

Q What was the name of the family where your --

A Thomas. Lottie Thomas and Wesley Thomas.

Q Okay. And this was on W. Jackson Street?

A 725 W. Jackson Street.

Q Was there any adult available to take care of the children while they were there during the day?

A My sister was there. She -- Everybody had gone to work they say. And my sister was there and there was a wiring, bad wiring and the fire was burning. It was in the ceiling. And when they left to go to work they said it was fed by the air or the moisture. And my sister stayed -- my son Jeffrey and her oldest son -- oldest daughter Tracy, my sister was working at night. And they said, told her there was a fire and she thought they was just talking about the heater in the house fire. But then they say, Jeff said Tracy burn. And my sister woke up and she took those two kids out the back door. And our house had two

doors that enter. And my sister went around. At that time her daughter, baby daughter, Lisa, the ceiling had fell on her head where the fire was burning her. She grabbed her. But they couldn't find Buddy. And Buddy had crawled up under the bed. He died of suffocation of fire, you know. But they said he would have been scarred for life if he'd of been alive, if he had lived.

Q You weren't present at the funeral?

A No. They -- I had a, had a nervous -- my nerves breaked while I was in the hospital with my son.

Q Just to refresh your memory, and I know it's painful but I want you, to ask you to look at this. This is Defendant's Exhibit 20. It's from the Thomasville Times Enterprise.

A Um-hum (affirmative).

Q Is that the article that appeared about the death of your child?

A I think so. I don't remember.

Q As a result of that tragedy, did you have a breakdown?

A Yes; I did.

Q Who was left to take care of your two, other two surviving sons?

A Well, when I come out of the hospital the doctor that was there told my mama that they should take my two kids away from me because of my nerves. Every time I'd look at the other two it would be reminding me of Buddy. And I couldn't handle it.

They had to put me on Valium, the highest grain of Valium that you can take. Yes, I got hooked on Valium. I had to take them to get up and to go to bed at night. But I, I could not handle my kids and Joe Lundy's mother was there for me. She would take my kids and my parents would keep my kids. But she fell in love with my children and Jeff most of all. And she would take them and keep them when I couldn't have them before when I was sick, the sickness I had previous to. A bond had established between Jeff and her and she kept Jeff a whole of times because there was times I had to go to bed and stay in bed months at a time because I couldn't put my feet on the floor, the previous two operations that I had in '68, end of '68 and the time I had the operations in '69.

Q Estelle, where was Charlie Cromartie during all of this time?

A Me and Charlie had separated.

Q What was the reason for the separation?

A It wasn't no reason. We just couldn't -- we, it was just that, I have to be honest, it was a shotgun wedding. We was made to get married. Yes; we had -- I had got pregnant. I guess a lot of people get pregnant. And, and you get pregnant, that don't mean that you love someone because you're pregnant. It's just that you got caught up in the system. And we did. And we -- my mama said that, that I had to marry, and which we got married and, and -- he was a good person. He was a very good

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 146 of 228

person. But it was hanging over us that we was made to get married and we couldn't stay together. We, we separated during the previous time when I had -- after we separated I come back and I got pregnant with Buddy. And he was -- We separated. He wasn't here. He wasn't here when Buddy was, when Buddy died. And he wasn't here when I had -- I had to raise Jeff all by myself.

Q Did he ever give you any emotional support or any type of support at all with regard to--

A The Court had ordered us to -- him to support one child and me --

Q I'm not talking about financial support, Estelle. I'm talking about when Jeff was born --

A No.

Q -- did he want Jeff?

A No. He, he, he -- One time he said Jeff wasn't his. You know, he never give me support. Jeff and Anthony was my children. They was mine. I didn't ask for nothing. But we had a bond, my two boys and I after I got control of my life. When I got control of my life. They wasn't -- Beforehand, I was doing what I always did. I done more than the father did. I fed them and I clothed them. But I didn't know what love was until I lost my child. When I lost my child, I know what love was.

Q Estelle, how long were you hooked on these drugs?

A Buddy died in'69. They started me on drugs in the

hospital. About '72 or '73. I, I didn't consider myself hooked. I just had to take them to survive. My aunt one day come to me and she said, Estelle, you're gonna have to get away from here, is the only way to survive. And I didn't know what she meant, so I left here. I can't tell you the year. It's -- But I left here and I went to Farrell, Pennsylvania to my uncle's. He helped me. I left my children here because I couldn't help my children. And for one year I was staying away from my kids. And a year to the day that I left I got off of drugs in that year. I got a good job for my children. I come back down here and I got my children from my parents and they never left my sight again.

Q How old was Jeff, approximately how old was he during this period of time?

A He was about six or seven years old.

Q About the time he was beginning to start pre-school and kindergarten --

A He was in the first grade here.

Q Then he started school in Ohio?

A In Ohio. I moved to East Liverpool, Ohio and got a place for them.

Q And where did, where did ya'll move from Ohio? Where did you go from there?

A From Ohio to Farrell, Pennsylvania. I, I got married. I had got married, but prior to the marriage I had got married to a gentleman here and he -- it wasn't legal. He was already

married. I didn't know at the time. But then I married again in Farrell, Pennsylvania. I met, I met a man while I was in the hospital again. I had had -- I had to learn how to walk over again. I lost the use of my legs and I had to -- I was in the hospital for one solid month to learn to walk again.

Q How would you describe the marriage you had to the gentleman who was already married? Was that a good marriage?

A No.

Q What was wrong with that marriage?

A He, he beat me. He -- It just, it just wasn't good.

Q Was he good to your children?

A No. He, he would tell the children -- He was just possessive. We had to do what he wanted us to do.

Q What about your second marriage?

A My marriage to John Major started off very good and, and I thought it would be a good relationship or marriage, but he was a street man. But I had, I had got saved and I lived a life according to that and I stayed married to him seventeen years.

Q As a result of your marriage to John Major, did, did your life take another bad turn?

A Yes.

Q What happened then?

A Well, I, I stayed in West Palm with him. We went, we moved to Texas. And my husband -- First of all, we moved to Texas from Farrell, Pennsylvania. And my husband was, like I

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/21/14 Page 149 of 228

said, a street man and he didn't care where he brought the woman. He brought them in the house. I worked at night. And when I come home in the morning, he would tell me to call before I come home, and I thought it was just to call him to, for him to pick me up. And come to find out it was a call to him so he could take the other woman out of the house.

Q Were your sons exposed to this kind of lifestyle?

A Jeff were. Jeff was, Jeff were, and also his own son was exposed because I had one of his children in Texas.

Q So Jeff grew up with this kind of relationship staring him in the face; didn't he?

A He growed up resenting that. He resent that, this man, why should I let this man come in our house.

Q What else happened to you as a result of your marriage to John Majors? Did you have financial problems?

A Yes; we did. We had financial problems. I worked. He throwed it away.

Q Did you eventually have to declare bankruptcy?

A I didn't declare bankruptcy, but I am now. I can't get nothing. I can't do -- because even my taxes, he said he had filed taxes. He didn't file taxes. He didn't do nothing. It was just a, a front and I thought it was, you know, -- I didn't know. All I know is I worked and tried to provide. As fast as I worked to provide, he would take it and throw it away.

Q Seventeen years of that kind of life?

A Yes.

Q And Jeff was in the middle of that seventeen years; right?

A Yes. I have to be grateful for his uncle, John's brother. He took Jeff under his wings and, and he worked with Jeff and he loved Jeff. He got Jeff into the Job Corps and helped Jeff, you know. They were supportive.

Q Estelle, you've now got your life together; haven't you?

A Yes; I do.

Q And you've married a, a very nice man; haven't you?

A Yes. I have a wonderful husband.

Q What's his name?

A Joseph Barreau.

Q Is he here?

A Yes; he is.

Q All that happened after Jeff was arrested; did it?

A Yes.

Q And, in fact, it was in 1995; wasn't it?

A Yes.

Q Estelle, you haven't been able to sit through the trial; have you?

A No; I have not.

Q Because you're a witness and you had to stay outside?

A Yes.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/24/14 Page 151 of 228

Q But you know from having been told what the facts were as found by this jury? You understand that?

A Yes; I do.

Q And you understand that this jury has found that there was evidence upon which they could base their verdict that your son, Jeff, was convicted and has been convicted of the offense of murder? You understand that?

A Yes; I do.

Q You understand we accept that verdict? You understand that?

A I understand that ya'll accept that verdict; yes.

Q Okay. And you understand that the ladies and gentlemen of this jury now have to decide what the appropriate punishment is based upon that verdict? You understand that?

A Yes; I do.

Q Now, we've asked you to uncover some very bad parts of your life. You've had to sit there in front of strangers and tell them about your life. Are you doing that as a part of your testimony to this jury to try to save your son's life?

A Yes; I am. That and then also let everybody know that my past is done with. It can't be undone.

Q Has, has the family talked about the tragedy of Mr. Slysz's death?

A Yes; we've talked about it.

Q And prayed about it?

A And prayed about it, prayed for the family.
Q You understand that that's a terrible tragedy?
A Yes. It's very terrible. It shouldn't be, it shouldn't have to be.
Q Are you asking this jury to consider sparing your son's life?
A All I'm asking is that you give him a, give him a second chance, is all I ask, give him a second chance.
Q Now, Estelle, you understand that this jury only has three options.
A Yes.
Q All of them probably would mean that your son would die in prison. Life, life without parole or a sentence of death. Do you understand that?
A Yes.
Q And given those options that this jury has, are you still asking them to spare his life and not sentence him to death?
A Yes; I am.
Q Why are you doing that?
A Because that's my son. I love him unconditionally. All I ask is that ya'll just look on him and consider to give him a second chance. My son is a wonderful child. I reckon everybody say that about their child. But I know my child and all I'm asking for ya'll to do, have mercy on my son and have

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 153 of 228

mercy on me as a mother of my son. I've lost one child and God knows, I don't want to lose another one.

Q Buddy Cromartie was a son named after Charlie Cromartie; wasn't he?

A Yes. He was Charlie, Jr.

Q Is that his death certificate?

A I, I've never seen the death certificate.

Q Look at it and see if the information on there is correct?

A I have to get my glasses because I can't see.

MR. MEARS: Your Honor, it's a certified copy of the death certificate. Certified copy of the death certificate. It's Defendant's Exhibit 19. I've shown this to the State.

THE COURT: Any objections on behalf of the State?

MR. HARDY: No, Your Honor.

THE COURT: It's admitted without objection.

BY MR. MEARS:

Q Estelle, have you, have you had any conversations with Charlie Cromartie, Sr. about why he rejected your son?

A Yes. Once I asked him and he, he said that it wasn't his son. Then I brought him up on the date and he put the date together. He knowed then that it was his son.

Q So Jeff has gone through his life not really knowing in his mind who his father was?

A Yes.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 154 of 228

Q Is there any conversation about why Jeff came back to Thomasville in February of 1994?

A He said he just wanted to come home.

Q Coming home?

A Yes.

MR. MEARS: Your witness.

MR. HARDY: No questions, Your Honor.

THE COURT: Ms. Cromartie, you may step down.

MR. MEARS: Your Honor, we have no further evidence to present at this time.

THE COURT: All right. Does the Defense rest?

MR. MEARS: We rest.

THE COURT: Ladies and gentlemen of the jury, the next stage in this particular phase of this trial will be the closing arguments and the charge of the law from the Court.

Prior to the attorneys interposing their closing arguments, I need to have a brief conference with them. I anticipate that conference will take approximately, approximately five minutes. And then following that conference we will begin with the closing arguments.

Let me ask at this time that you retire to your jury room.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: All right. Gentlemen, at this time let me

Case 7:14-cv-00039-MTT Document 18 Filed 07/14/14 Page 199 of 228

direct your attention to the Unified Appeal Procedure, specifically Trial, Section B, 2.

Gentlemen, we have previously had an opportunity to discuss any requests to charge that were submitted to the Court in regards to the penalty phase of this trial. The Court has previously addressed these matters. And at this time give Counsel, the State and the Defense, an opportunity address these specific requests to charge, if requested.

Now, Mr. Mears, as you had acknowledged earlier, prior to interposing the evidence, presenting the evidence this morning, the Court has, has given both parties an opportunity to review the charge that the Court does anticipate, in fact, giving to the jury following the closing arguments. And with that in mind, is that, is that sufficient to give you direction in regards to which of your requests to charge the Court will and will not give?

MR. MEARS: Yes, Your Honor. I, I'm satisfied that the Court has advised us properly of what you will and will not charge and, with that regard, we've submitted written requests to charge and the Court has gone over those. And we have an understanding, we believe, of what the Court is going to charge in this particular case.

THE COURT: All right, sir.

MR. MEARS: We would simply ask the Court to allow us to reserve any objections until such time as a Motion for a

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 186 of 228

New Trial or a notice of appeal is filed in this case.

THE COURT: Yes, sir. And you also, Mr. Mears, in regards to the requests to charge that were presented to the Court, you understand the Court's ruling in regards to those charges, and specifically in regards to what the Court did indicate couldn't be argued to the jury insofar as residual doubt and things of that nature. There's some requests to charge that in the Court's opinion are argumentative, the Court should not charge, but, in fact, would be proper for the Defense to argue such to the jury.

MR. MEARS: That's correct. I understand. And, Your Honor, the Court in its charge that it proposes to give to the jury, you used the language with regard to a verdict that could be rendered with regard to the mercy issue, the jury can render a verdict based upon mercy. It's my understanding I can argue mercy and compassion as a basis for their rendering a verdict. Even though the Court did not give the rather lengthy charge that we requested, you did include that as part of the standard charge the Court's going to give.

THE COURT: Yes, sir.

MR. MEARS: It's my understanding I can, I can argue mercy then to them.

THE COURT: Yes, sir.

Gentlemen, are there any issues in regards to Section

2, B? Any issues raised during the sentencing phase which need to be addressed at this time in regards to rulings on any evidence? I don't believe there are any objections to any evidence during that particular phase.

Gentlemen, let me direct your attention to Section, Part III of the Checklist for the Unified Appeal. I specifically ask at this time, and we'll go back over these particular matters as directed by the Georgia Supreme Court.

Any issues in regards to the admissibility of evidence that was presented? I think not. There were no objections raised. Is that correct, gentlemen?

MR. MEARS: Yes, sir.

THE COURT: Any issues which may arise in regards to the specific statutory aggravating circumstances?

MR. MEARS: Judge, we would renew our objection to the aggravating circumstances that the Court, excuse me, that the State has submitted that the Court charge the jury. It's my understanding that the Court has made adjustments to conform to the evidence with regard to that aggravating circumstance that relates to B-7 aggravator. And the Court has made an attempt, and has, in fact, altered that charge to conform to the evidence as the Court has seen it presented. I wanted to make sure that my objection to the aggravating circumstance in general was still preserved.

Also, my specific objection as far as a directed

Case 7:14-cv-00039-MTT Document 18 Filed 07/24/14 Page 188 of 228

verdict with regard to the third aggravator is restated. I feel that there's been not a sufficient showing either during the case of guilt-innocence nor the presentation of evidence to substantiate any charge on the B-7 aggravator. And I restate that objection at this time.

THE COURT: All right, sir. Thank you, sir.

Mr. Mears, I, just for your direction I would intend to give a charge on the B-7 aggravators, again, as indicated through the requests of charge that Counsel for both parties had an opportunity to review this morning.

Gentlemen, does Counsel for either part anticipate any particular issues in regards to closing argument, any issues that we need to address in regards to closing argument that is going to be presented in a moment?

MR. MEARS: I don't anticipate. I, I have never tried a death penalty case with Mr. Hardy so I'm not aware of what he may or may argue. But I'm confident that there will be no issues that I should anticipate at this point. I intend to argue with regard to the Defense argument the testimony of the mitigation witnesses. I do not intend to argue against, in any substantial detail, the aggravating circumstances. I'm not going to. So I think that sometimes is an area of objection that the prosecutors feel that they should make. I do not intend to go into that in any substantial area. I cannot think of any area that I will

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 189 of 228

argue that should give rise to any particular concern on the State's part.

THE COURT: All right, sir. Gentlemen, I believe we've already covered any issues which may arise in connection with the Court's proposed charge. Is that correct?

MR. HARDY: Yes, sir.

THE COURT: All right, sir. Are there any issues which may arise in connection with the possible verdicts in this case? Counsel has had an opportunity likewise to review a verdict form prepared by the Court. Is that correct?

MR. HARDY: Yes, sir.

MR. MEARS: That's correct.

THE COURT: And with the exception of the count of Defense's objection in regards to the aggravating circumstances the Court is going to charge the jury on, are the parties satisfied with that verdict form?

MR. HARDY: Yes, sir.

MR. MEARS: Yes, sir.

THE COURT: Anything else that needs to be addressed prior to bringing the jury in?

MR. HARDY: No, sir.

MR. MEARS: I can't think of anything.

MR. HARDY: Mr. Mitchell is going to address the jury.

THE COURT: All right, sir. Gentlemen, there's no, no evidence -- I'm just -- I'm, I'm making sure that we have

Case 7:14-cv-00039-MTT Document 18-8 Filed 07/14/14 Page 160 of 228

addressed all these matters on the Checklist as the Supreme Court has directed.

MR. MEARS: Your Honor, it just occurred to me. I've identified -- And we had -- I think the death certificate, Defendant's Exhibit 19, had been identified and offered into evidence. It was offered without objection from the State.

MR. HARDY: Yes, sir. It was. I think all of his items have been offered and admitted.

MR. MEARS: The live, the birth certificate for Ray Jefferson Cromartie which is Defendant's 21 --

THE COURT: 21.

MR. MEARS: 21. I'm not sure that I actually offered that into evidence. If I didn't, I do it now.

THE COURT: It is admitted.

MR. MEARS: Okay. And I have a, a copy of a newspaper article that, the best certification I can give you, was provided as a copy of an article from the Thomasville Times Enterprise. It was identified as Defendant's Exhibit 20. I realize Ms. Estelle Barreau was not able to say that was the article. But it's, I think, self authenticating. And just so the record will reflect, I would tender Defendant's Exhibit 20. I think Mr. Hardy has had an opportunity to view the article.

MR. HARDY: We've seen it, Your Honor.

THE COURT: I beg your pardon?

MR. HARDY: We have -- He's let us look at it a minute ago, Your Honor. It's got a date of the edition in the article.

THE COURT: Any objections?

MR. HARDY: Leave it with the Court, Your Honor.

THE COURT: It's admitted without objection.

MR. MEARS: That's all the evidence, documentary evidence that we'll submit, Your Honor.

THE COURT: All right, sir.

MR. MEARS: Excuse me just a moment, Your Honor.

THE COURT: Mr. Mears, I do need to advise you that any objections to the State's sentencing phase closing argument will be raised, excuse me, will be waived if not raised as soon as the grounds therefor arise.

In addition, Mr. Cromartie, I need to address you at this time, sir. I need to ask whether or not you have any objections to Mr. Mears or Mr. Bryant acting as your Defense Counsel?

MR. CROMARTIE: (Shakes head negatively)

THE COURT: Or any objections as to the manner in which they are conducting your defense?

MR. CROMARTIE: (Shakes head negatively)

THE COURT: You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Mr. Mitchell?

MR. MITCHELL: May it please the Court.

Members of the jury, the State of Georgia would like to take this opportunity to thank you for your service as jurors in this case.

Now, we are in the sentencing phase of this trial. You now have several jobs. One of the first things that you will need to do is determine whether or not there are any aggravating circumstances. The State expects that the Court will instruct you in the law as to three different possible aggravating circumstances. The first being, was the murder of Richard Slysz committed while the Defendant was engaged in the commission of another capital felony. The State of Georgia submits to you that the capital felony in this case is the offense of armed robbery, the armed robbery of the Junior Food Store where Richard Slysz worked.

Secondly, was the murder of Richard Slysz committed for the purpose of receiving money or any other thing of monetary value. The State of Georgia asks you to consider the twenty-two beers taken from the Junior Food Store.

And, thirdly, was the murder of Richard Slysz outrageously or wantonly vile, horrible or inhumane in that it involved depravity of mind or an aggravated battery to the victim.

You should consider all of the evidence heard in the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/24/14 Page 163 of 228

guilt-innocence portion of this trial as well as in this sentencing phase in reaching this decision. You should also consider the mitigating evidence submitted by the Defendant along with the law which will be charged by the Court.

The State of Georgia would like to remind you of the oath as jurors that you took at the beginning of this trial. During the jury selection process most of you, if not all of you, were asked the question, could you impose the death penalty and would you impose the death penalty if you thought that it was warranted based upon the evidence and the law. Each of you responded in the affirmative.

The law requires that you consider all three possible sentences: life, life without the possibility of parole and death. The State of Georgia submits that under all the facts and all the law of this case that there can be only two realistic options which present themselves: death and life without parole. The State of Georgia submits that the aggravating circumstance of armed robbery has been proven in this case beyond a reasonable doubt as well as the other two aggravating circumstances.

After finding the existence of an aggravating circumstance, then you can also consider the other victim in this case, Dan Wilson, who was also shot in the head and has had his carotid artery tied off by Dr. Hall. The State of Georgia would submit that under all the facts of this case

that at the very least a sentence of life without the possibility of parole should be imposed.

Ladies and gentlemen, this case is about Richard Slysz, the victim. This trial is and has been about what happened to Richard Slysz. This trial is about Richard Slysz being shot twice in the head. This trial is about Richard Slysz being shot twice for twenty-two cans of Budweiser beer. Richard Slysz's life was taken away from him. Richard Slysz's life can never be returned. Richard Slysz's life is lost forever. Richard Slysz was a human being working the midnight shift at a convenience store. Richard Slysz lost his life while trying to earn a living.

Ray Jefferson Cromartie gave Richard Slysz absolutely no chance. Ray Jefferson Cromartie did not ask Richard Slysz for any money. He just shot Richard Slysz in the head, twice. Richard Slysz was killed for twenty-two cans of beer without one word being said. Richard Slysz had a self-appointed judge, jury and executioner. And Richard Slysz's judge, jury and executioner that showed him no mercy was Ray Jefferson Cromartie. Richard Slysz was killed without one word being said for twenty-two cans of beer. Twenty-two cans of beer. That's all that Richard Slysz's life was worth to Ray Jefferson Cromartie, twenty-two cans of beer.

No one other than Ray Jefferson Cromartie has placed

him in the position that he is in today. Whatever your verdict and whatever happens to Ray Jefferson Cromartie, he has done it to himself. He can blame no one else. This Defendant should be held responsible for his actions. This Defendant should be given just as much mercy as he gave Richard Slysz.

Richard Slysz was sitting out at that Junior Food Store with a pencil in his hand and was shot twice in the head without warning for nothing. Richard Slysz is dead. Richard Slysz didn't get to have a day in court. Richard Slysz didn't get to have a lawyer to defend him and fight for his life. Richard Slysz didn't have the chance to argue to a jury and ask for mercy. Richard Slysz was given absolutely no chance at all. Richard Slysz's executioner, Ray Jefferson Cromartie, decided that Richard Slysz's life was worth nothing and he executed him for twenty-two cans of Budweiser beer.

Where no mercy is shown, how much mercy should be given in return?

THE COURT: Mr. Mears?

MR. MEARS: Good morning. I stood before you on Friday and I hope you will remember this, I said that the attorney's job is not to convince you. That's the job of the evidence. The attorney's job is to frame an argument that will focus your attention on what the attorneys believe

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 186 of 228

your focus should be with regard to making a particular decision.

You heard the evidence. You've rendered a verdict. And we accept that verdict because you rendered the verdict after you had heard all of the evidence. You came to the conclusion that the evidence showed that Jeff committed these crimes.

We're not here this morning to reargue the fact that Jeff Cromartie is responsible for the death of Mr. Slysz. No attorney in their right mind and no attorney with any ounce of humanity would argue to you, or even want you to infer that the death of Richard Slysz was not a tragedy. It was senseless. It was senseless. It was one of those supreme tragedies. But that's not what we're here for today. You've decided who is responsible.

The question now is what do we as a community and as a society do with Ray Jefferson Cromartie. I tried to write out my notes so I wouldn't get too lost with this. But I wanted to make sure that, there were a couple of things that Mr. Mitchell said that I want to address right up front. This decision that you're going to make is not about not punishing Jeff Cromartie. You're going to punish him. The only question is in what manner are you going to punish him. The only three options you have are the most severe punishment that the State of Georgia allows: life, life

without parole and death.

So it's not about not punishing Jeff. It's about how you're going to punish him. And it's not about whether or not he is responsible. That was your verdict and that's already been decided. You see, what -- and, and I wrote this down because I, I knew that it would be a subject that we would all discuss this morning, Mr. Mitchell and I. Because, you see, at this point in large part, what we're deciding is not what he has done. That's been decided. What we're deciding now is what are you going to do. You see, at this point the action about deciding who is responsible, how he was responsible has already been decided. The question now is what are we as a community going to do with Jeff Cromartie. You see, that question reflects who we are as a people and as a community.

I think just about every juror here when I, during the jury selection process, I announced that I was not from Thomas County and would you hold that against me. I'm from Atlanta. And I am not a member of the Thomasville community, though it seems like we've been here for a long time. But I have learned a little bit about this community being here, living here for the past several, several weeks. And there's one thing that stands out about Thomas County and Thomasville. And quite frankly, I was surprised. Being from Atlanta, we have our stereotypes about outside of

Atlanta just like people outside of Atlanta have stereotypes about Atlanta. And I was surprised at the sense of humanity and, and congeniality that I've seen here in this community. But, you see, your verdict today is going to reflect who you are as a community, but perhaps even more importantly, who you are as individuals and what are your values, because it's now the time to decide what you individually are going to do with Ray Jefferson Cromartie. Because, you see, there are twelve of you making this decision. But I believe the Court's instructions will, at least in part, point out that this is an individual decision that each of you have to make. This is not a collective decision that you make, because we're talking about whether another human being is going to live or die.

If you stop and think about it, outside of war, almost no one ever has to make a decision as to whether another human being sitting face to face, outside of war, you never have to make that decision as to whether or not another human being will live or die.

Now, that is a heavy, heavy decision. It's not one that you will make lightly, whatever it is. It can't be. You couldn't have sat through the trial, you couldn't have heard the evidence and you could not have been a member of this community qualified to sit on a jury and not have a sense of responsibility about you. But, you see, one of the

things that I would urge you to remember back to the time you were interviewed for this position that you now hold, each of you swore under oath that you would not automatically vote to kill Ray Jefferson Cromartie because he was convicted of the offense of murder. Each of you said under oath that you would not make that decision until you'd heard all the evidence, you'd heard the law as it applies, and then you went back and deliberated. And you took an oath much like the jurors, excuse me, much like the witnesses took in this case. You took an oath to tell the truth. You took an oath that the responses you gave us during jury selection was the truth, and that is that you wouldn't automatically vote to kill Jeff Cromartie. That you would consider all of the options. You would consider all of the evidence. And you raised your hand when you took that oath.

Do you know why we raise our hands when we take oaths? Because, it goes back to Roman times. It goes back to the time when only free people could give an oath. And in the Roman Empire all slaves were marked with a big "X" in the palm of their hand and were scared permanent. So in order to render an oath you had to prove you were not a slave. And it's a tradition that's stayed with us in our judicial system, our sense of justice because it, it's reflective of the fact that we take oaths very seriously. And we take the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 170 of 228

oaths of office that you now hold to mean it's an individual oath. You didn't take that oath as a large, or part of a larger body of people. You took it individually. You weren't brought in here to say, all twelve of you, twelve of you agree to this. No. You took an oath and you swore that you would be an individual and you would decide this case based upon what you thought was right. We respect that and everyone in this courtroom expects that, and I'm sure you do too.

Now, let's stop and think a minute, if you will. And I, I probably will get a little emotional because it's hard not to do one of these cases and feel some emotion. You see, since July of 1996 Jeff Cromartie has been my responsibility. He's been Mr. Bryant's responsibility. But since July of 1996 his life has been in my hands. I can tell you, there hasn't been too many days in a row at some point during the day I haven't said, "What am I going to do about Jeff Cromartie's case"? Since July of 1996 there has not been very many days pass, either getting up or lying down, that I haven't asked myself the question, "What am I going to do with this case"? It's scary, frightening. It'll drive you crazy. It'll make you absolutely crazy with fear sometimes. But when I sit down and I go over there and sit at that table, when I finish my argument, he's your responsibility. I won't feel any great sense of relief,

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 171 of 228

believe me. But the responsibility for his life will no longer be in, in my scrawny little hands. They'll be in your hearts and within your soul. Whatever you do to him at that point is you. I will sit down and my responsibility for whether another human being lives or dies will become your responsibility.

Now, Mr. Mitchell talked about showing no mercy. He talked about the aggravating circumstance. Quite frankly, the aggravating circumstances in this case, you said that you would not consider what you were going to do until you were proven, it was proven to you beyond a reasonable doubt that at least one aggravating circumstance had been proven beyond a reasonable doubt. Ladies and gentlemen, you've got three to consider in this case. Once you've made that decision, once you've made the decision that one of those aggravators exist, then you get down to whether or not there is a reason in your heart and in your mind and in your soul not to sentence him to death. That's when that takes place.

I don't want to say that the aggravators are there. But I'm not going to stand before you and say that your verdict in the guilt-innocence didn't pretty well take care of that. I'm not going to, hopefully won't insult your intelligence that way. You see, that's just the starting point. That's just the point that you begin. That's just where you begin to decide what will happen to Ray Jefferson

Cromartie.

And, and one of the things that Mr. Mitchell talked about at length was don't show mercy, don't show mercy. He said that Jeff didn't show Richard Slysz any mercy so don't show him any mercy. Well, ladies and gentlemen, that's a lot like, let's kill Jeff Cromartie to show it's wrong to kill people, that's what that'll show them. And then we keep the cycle of killing going on. Killing anyone is wrong. Mr. Slysz's death was wrong. The fact that he was murdered doesn't mean that you have to continue to kill him.

The mitigation evidence and the evidence that you heard this morning was not meant as an excuse. I, I sort of got the impression that's what the State thinks, or they thought, that hearing Ms. Angeline Cromartie, that beautiful seventy-three year old lady, she wanted to stand up and talk to you. You see, you heard from her, not to excuse anything her grandson did. That's not what that was about. You see, you heard from her because it's important for you to know that Jeff Cromartie is a product of this community just as most of you are. Angeline Cromartie spent seventy-three years of her life, most of it on the Pebble Hill Plantation. Most of it in the kitchens at Archbold Hospital. Now, at seventy-three she's embarking on a new career at Southwestern. You see, that's not an excuse not to sentence him to death, that's information that you need to have when

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 173 of 228

you decide the effect of your decision.

You see, when you sentence Jeff Cromartie to death or to life without parole or to life, you're sentencing not only Jeff Cromartie, you're sentencing someone's grandson. A seventy-three year old lady who is part of this community. She never sat at the seats of power. She never sat at the seats of commerce in this county. But it's the Angeline Cromarties in your community that makes it the place it is.

Whatever decision you make with regard to Jeff, you're going to make it with regard to her in one way or the other. It's not just Jeff Cromartie that will be sentenced to death, it's her grandson. That is not a reason not to do it. But it's certainly something you should consider when you're deciding the options available to you as individual jurors.

You heard from Charlotte Johnson. She didn't, wasn't able to give you a whole lot other than the fact that there's a big family here. They've had some hard times. And that she loves him. It's her cousin. So when you sentence Ray Cromartie to whatever sentence you sentence him to, you'll be sentencing someone's cousin. You see, the pattern that -- the evidence is not to excuse but the evidence is, is presented to you to try to give you an idea of the breadth of the decision you're going to make. Each of these individuals were not brought before you, they were

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 174 of 228

not put on that witness stand to excuse anything. But don't you think that if you're going to sentence someone to death or to life without parole or to life imprisonment, you ought to do it knowing who they are and who Jeff Cromartie is? In some small part, it's his family, his friends and those people that love him. You can't write this chapter in his life without having all of the information.

Please don't misunderstand the evidence. It was not presented as an excuse for him. There's not an excuse for murder. If there were an excuse we wouldn't be in a sentencing hearing. If it were an excuse we wouldn't be here deciding what kind of punishment to give him. No. It was simply meant to let you know in, in the brief period of time that we have who he is.

Now, hard life. Well, you know, that's really -- I made myself a note here on that. I was trying to figure out some, something to say to you individually as jurors to try to focus on hard life, because, you see, jurors don't like, by and large, to excuse this. And they don't like to think that, well, because you've had a hard life that's okay to go out and kill somebody. It's not. But, you see, that's not why we're here. It's not an excuse. And I've said that over and over again. I hope that you're listening.

Well, you see, I was thinking of the parable of the sower when Jesus talked about throwing the seeds and some of

the seeds fell on rocks and the dust came along and blew them away and they, and the seeds died. I was thinking also of that parable about some of the seeds fell in the thistles and they grew up a little bit. The thistles wrapped around them and they died. And some of the seeds fell on good soil and they multiplied a hundredfold. Well, see, Jesus was talking about, at least in one part, about the word of God, but he was also talking about people. Some people fall on the rocks, some people fall among the thistles, some people fall in good ground. Some people have roots. Some people are moved from city to city to city. Some people's lives, some people's lives get choked by the adults that they grow up with. Some people's lives get blown away by abusive adults. Some people's lives get strangled in hope. The ability to reason, the ability to think, the ability to care, the ability to be like the rest of us, somehow it gets choked out of us.

The fact that someone has a hard life is not a reason not to sentence them to death for murder. The fact that Jeff Cromartie might have had a hard life, his mother might have had rough times, he might have grown up in a family, successive families of abusive, sorry men, that's not an excuse not to sentence him to death, but it is, don't you think, don't you think it's something you should consider when you're deciding whether to kill him or to show mercy?

You see, showing mercy and giving compassion doesn't take away the tragedy of Richard Slysz's death. Heaven help us if we deserve mercy. I was always taught that mercy is something you got that you didn't deserve. That mercy and compassion was something that we got because God loved us. You see, that's where the prosecutors always handle it.

Mr. Hardy accused me of having a standard closing in -- you know, something they teach us. Well, I must have skipped school that day. I mean, I know we all do a lot of things the same way, but, there's no standard cookie cutter type of argument you make in this case, please believe me. And, and, but, here again, I hear a prosecutor say, don't show mercy because he didn't show mercy. If that were the case, would there ever be any mercy for anything?

I grew up in rural Mississippi. Went to a Baptist church. And I grew up singing a hymn that almost all of ya'll have grown up listening to. I borrowed this from our housekeeper where we're staying this week. "Amazing grace, how sweet the sound. Amazing grace, how sweet the sound that saved a wretch like me. I once was lost but now I'm found, was blind but now I see. Twas grace that taught my heart to fear and grace my fears relieved, how precious did that grace appear the hour I first believed". The author of that hymn was a man named John Newton, N-E-W-T-O-N. John Newton wrote that hymn in the late 1790s after he had become

a Christian. Before John Newton wrote that hymn he was a captain of a slave trader ship. He was responsible for the deaths of thousands of African men, women and children as they were brought from the Horn of Africa into this country. John Newton received grace and he wrote about it.

No one is beyond redemption. John Newton wrote about grace that was bigger than our sins. Because if mercy and grace is not bigger than our sins, and if it's something you have to earn, then it's only the rich that will get it. It's only the righteous that will get it. And heaven help the rest of us. You see, that's not what mercy is. Mercy is the compassion to take the grace that God has given all of us and show it to other people.

Does Jeff Cromartie deserve your mercy? No. None of us deserve mercy. It's something you give. You see, that's the problem of arguing a case like this. That's the problem of, with dealing with things like mercy, because it's hard, it's hard to tell you, please give him mercy. I can't tell you he deserves mercy. Don't give him mercy because his grandmother lived on Pebble Hill Plantation for seventy-three years and is a member of this community. None of those are reasons to grant mercy. But they are reasons for you to consider his life, because mercy has nothing to do with him. Mercy has to do with you and you and you and you.

One other thing about the mitigation witnesses. Why do

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 178 of 228

we celebrate Father's Day and Mother's Day? Have you ever thought about that? I mean, other than Hallmark has a lot of cards out for those particular occasions. You see, we don't celebrate the day. Those are just arbitrary times that come about. Not like Christmas where we celebrate the birth of our Savior. We celebrate fathers and mothers. Why? Because it's important. They're important. We celebrate mothers because they give training to their children. They tell children how you get through the hard times. We celebrate mothers because they're the ones who hopefully show each of us how to be compassionate. And we celebrate fathers because fathers show and give role models about how to be strong when you're really weak. And we celebrate fathers because they show us how we can have understanding when you're really confused.

Should you consider Jeff Cromartie's life and the Father's Days and the Mother's Days in his life when you decide what kind of punishment you're going to give him? I think you should. I think you should. Thistles come in all forms and fashions. And hard rocks are everywhere.

I'm going to sit down now. And I, I want to leave with this one more reference to the scriptures. And it's something we've all grown up with too. In Ecclesiastes, which said, there's a time for everything under the sun. Every purpose under heaven. Now's the time to punish Jeff

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 179 of 228

Cromartie. It's not the time to kill him.

* * * * * * * * * * * * * * * * * * * * * * * * *

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 180 of 228

CHARGE OF THE COURT

THE COURT: Members of the jury, the Defendant in this case, Ray Jefferson Cromartie, has been found guilty of the offense of Murder and it now becomes your duty to determine, within the limits of the law, what punishment will be imposed for this offense.

Now, in arriving at this determination you are authorized to consider all of the evidence presented here in court in both stages of this proceeding presented by the State and the Defendant throughout the trial before you, unless the Court has previously instructed you to consider certain evidence introduced by the State for a limited purpose, in which event such evidence shall not be considered by you in determining punishment.

Now, you shall also consider the facts and circumstances, if any, in extenuation, mitigation and aggravation of punishment.

Now, mitigating or extenuating facts and, or circumstances are those which you, the jury, find do not constitute a justification or excuse for the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame.

Aggravating circumstances are those which you, the jury, find increase the guilt or enormity of the offense, or

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 181 of 228

add to its injurious consequences.

Now, under the laws of this state a person found guilty of Murder shall be punished by death or by life imprisonment without parole or by life imprisonment.

Now, under our law a sentence of death or life imprisonment without parole shall not be imposed unless the jury finds beyond a reasonable doubt that at least one or more statutory aggravating circumstance exists, recommends a sentence of death, or a sentence of life imprisonment without parole in its verdict and designates in its verdict in writing the statutory aggravating circumstance or circumstances which it finds from the evidence to exist in this case beyond a reasonable doubt.

Now, ladies and gentlemen, under the law of this state the following may constitute statutory aggravating circumstances: First, if the offense of Murder was committed while the Defendant was engaged in the commission of another capital felony.

In this connection, I charge you that the offense of Armed Robbery is a capital felony under our law.

Second, if you find that the Defendant committed the offense of Murder for himself or another for the purpose of receiving money or any other thing of monetary value.

Third, if you find that the offense of Murder was outrageously or wantonly vile, horrible or inhumane in that

it involved depravity of mind or an Aggravated Battery to the victim, Richard Slysz, prior to the death of the victim, Richard Slysz.

Now, the State contends that the offense of Murder in this case was outrageously or wantonly vile, horrible or inhumane in that it involved depravity of mind or Aggravated Battery to the victim.

Now, the State has the burden of proving this statutory aggravating circumstance beyond a reasonable doubt. In this regard the State must prove to your satisfaction and beyond a reasonable doubt, first, the offense of Murder was outrageously or wantonly vile, horrible or inhumane, and, second, that it involved at least one of the following: Depravity of mind, or an Aggravated Battery to the victim, Richard Slysz.

Now, an Aggravated Battery occurs when a person maliciously causes bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof.

Now, in order to find that the offense of Murder involved an Aggravated Battery, you must find that the bodily harm to the victim occurred before the victim's death.

Now, depravity of mind is a reflection of an utterly

corrupt, perverted or immoral state of mind. In determining whether or not the offense of Murder in this case involved depravity of mind on the part of the Defendant, then you may consider the age and physical characteristics of the victim, and you may consider the actions of the Defendant prior to and after the commission of the murder.

Now, in order to find that the offense of Murder involved depravity of mind, you must find that the Defendant as the result of his utter corruption, perversion or immorality committed Aggravated Battery upon a living person.

Now, you would not be authorized to return a finding of this statutory aggravating circumstance unless you are convinced beyond a reasonable doubt, not only that the murder involved depravity of mind or an Aggravated Battery to the victim, but that the murder was also outrageously or wantonly vile, horrible or inhumane.

Now, should you be convinced beyond a reasonable doubt as to the existence of this statutory aggravating circumstance, then your verdict should reflect your finding, if you so find that the murder was outrageously or wantonly vile, horrible or inhumane. Your verdict should also reflect your finding, if you should so find, that the murder involved at least one of the following: Depravity of mind or an Aggravated Battery to the victim. And your verdict

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 184 of 228

should specify which, depravity of mind or an Aggravated Battery to the victim, was involved in the murder.

Now, whether or not any one or more of the statutory aggravating circumstances which I have just given you in charge exists beyond a reasonable doubt in this case is a matter solely for you to determine and to deci -- and it is a matter solely for you to determine and to decide from the evidence in this case.

Now, ladies and gentlemen, when you retire to begin your deliberations as to the penalty to be imposed in this case, you will be given a written copy of these jury instructions to be used by you in your deliberations.

Now, I caution and instruct you, however, that these written instructions are not evidence and they're not to be considered by you as evidence in your deliberations. They're merely and solely given to you for the purpose of aiding you in remembering what these instructions are which the Court has given you in this charge and are sent out with you for that purpose alone.

Now, I further charge you that the sentence of death shall not and cannot be imposed unless you find beyond a reasonable doubt that the Defendant either committed the murder himself, he, himself, attempted to kill the victim, or intended that deadly force be used by another to accomplish the criminal enterprise.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 185 of 228

Now, members of the jury, you may set the penalty to be imposed at life imprisonment. It is not required and it is not necessary that you find any extenuating or mitigating fact or circumstance in order for you to set the penalty, penalty to be imposed at life imprisonment.

In other words, whether or not you find any extenuating or mitigating facts and circumstances, you are authorized to fix the penalty in this case at life imprisonment.

Further, if you find from the evidence beyond a reasonable doubt the existence in this case of one or more aggravating statutory circumstances as given you in charge by the Court, then you would be authorized to recommend the imposition of a sentence of life imprisonment without parole or a sentence of death, but you would not be required to do so.

Now, if you find from the evidence in this case beyond a reasonable doubt the existence of one or more aggravating, statutory aggravating circumstances given you in charge by the Court, you would still be authorized to sentence the Defendant to life imprisonment. You may fix the penalty at life imprisonment if you see fit to do so for whatever reason is satisfactory to you or without any reason.

Now, members of the jury, you may return any one of the three verdicts as to penalty in this case: life imprisonment, life imprisonment without parole and death.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 186 of 228

Now, under our law, life imprisonment means that the Defendant will be sentenced to incarceration for the remainder of his natural life, but will be eligible for parole during the term of such sentence.

If you decide to impose a sentence of life imprisonment you would return a verdict which reads: We, the jury, fix the sentence at life imprisonment. If this is your verdict, the Defendant would be sentenced to serve the remainder of his life in the penitentiary.

Now, under our law, life imprisonment without parole means that the Defendant shall be incarcerated for the remainder of his natural life and shall not be eligible for parole unless he is subsequently adjudicated to be innocent of the offense for which he was sentenced.

If you decide to impose a sentence of life imprisonment without parole, then you would return a verdict which reads: We, the jury, fix the sentence at life imprisonment without parole and we find the following statutory aggravating circumstance or circumstances to exist. And here you would mark on the verdict form such aggravating circumstance or circumstances, if any, which you find from the evidence to exist beyond a reasonable doubt in this case and upon which I have instructed you.

Ladies and gentlemen, the third potential or possible verdict is death. And you may return a verdict which reads:

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 187 of 228

We, the jury, fix the sentence at death and we find the following statutory aggravating circumstance or circumstances, to wit: and here you would mark on the verdict form such aggravating circumstance or circumstances, if any, which you find exist beyond a reasonable doubt from the evidence in this case and upon which I have instructed you.

Now, if this, this is your verdict, then the Defendant would be sentenced to be put to death in the manner provided by law.

Now, members of the jury, I caution and instruct you that anything that the Court said or did in its rulings or otherwise at any time during this case was not intended and should not be considered by you or construed by you as any hint, suggestion or opinion as to what your verdict in this case should be. Whatever penalty is to be imposed within the limits of the law that I have instructed you is a matter solely for you members of the jury to determine. And if I have made any remark or done or failed to do any act which may have caused you to believe that I have any opinion or expressed any opinion, then I instruct you to not consider it and to complete disregard it in deciding your verdict in this case.

Now, ladies and gentlemen, whatever your verdict is as to penalty, it must be a unanimous verdict. That is, it

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 188 of 228

must be agreed upon by all of your members. It must be in writing, dated and signed by your foreperson and returned and published into open court.

Now, ladies and gentlemen, we have prepared a verdict form for your use in making up your verdict to be returned and published in open court.

Now, ladies and gentlemen, one other cautionary instruction at this time. It's approximately 12:00 noon. If at any time you wish to recess for lunch, send us a note to that effect and we will recess for lunch. I will bring you in and give you more cautionary instructions.

Ladies and gentlemen, in addition, it has been held in the past that for books, references and other material to be in the jury room, including Bibles, can be cause for reversible error in a particular case. So, let me instruct that if any of you do have any such books, references, Bibles or other materials with you, to leave those with the bailiff while going into the jury room. They will be returned to you at the appropriate time.

Ladies and gentlemen, Mr., Ms. Clark, Ms. Sims, Mr. Henry and Mr. Piland, at this time you will again be separated from the first twelve jurors while they are deliberating and the same instructions would apply. If at some point in time it becomes necessary under law to excuse one of these twelve jurors, then you would replace that

particular juror in the order that you were originally selected.

Ladies and gentlemen, you may now retire to begin your deliberations.

(At approximately 12:05 P. M. the jury retires from the courtroom, after which the following transpired)

THE COURT: Gentlemen, understanding that the Defense wishes to reserve any objections, is the Defense aware of any slip of the tongue or other such matter in regards to the charge given by the Court?

MR. MEARS: No, Your Honor. I know of no slip of the tongue or any inadvertent remarks that were in regard to the charge. Your Honor, we would reserve the right to object and, at the time of a Motion for a New Trial or a notice of appeal.

THE COURT: All right.

MR. MEARS: Your Honor, there were certain items of evidence entered into, during the sentencing phase. Could I ask that they be taken out?

THE COURT: Yes, sir. The exhibits, 21, 19 and 20, I believe, as well as the verdict form and the copy of the charge need to go out to the jury at this time.

MR. HARDY: Along with all the other evidence that was introduced.

THE COURT: Yes, sir. It can go out also.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 196 of 228

Mr. Peters, if you could get -- Mr. Stratford. Is Mr. Nicholson around? To help carry all of this to the jury room.

Gentlemen, again, at this time we need to address the Unified Appeal Procedure. Specifically, Trial Section B, 3.

Gentlemen, let me direct your attention to part 3, C and D of the Checklist for the Unified Appeal. Any issues regarding closing argument or the Court's charge that have not already been addressed?

MR. MEARS: We have none, Your Honor.

THE COURT: We have already -- Gentlemen, we've already addressed the form of the verdict. Counsel had no objections to the form.

Mr. Cromartie, at this time I need to give you an opportunity to state any objections which you may have to your Defense Counsel or to the manner in which Defense Counsel has been conducting your defense. Do you have any objections at this time?

MR. CROMARTIE: (Shakes head negatively)

THE COURT: Ladies and gentlemen, we'll be in recess --

MR. MEARS: Judge, may I present an order to you with regard to the ex parte matter?

THE COURT: Yes, sir.

We'll be in recess while the jury is deliberating.

(Whereupon the Court is recessed to await the verdict

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 191 of 228

of the jury.

At approximately 12:20 P. M. the jury returns to the courtroom, after which the following transpired)

THE COURT: Ms. Blaha, it's my understanding that the jury would like to go ahead and take their lunch recess; is that correct?

MS. BLAHA: Yes, sir.

THE COURT: It's about 12:20. Come back at 1:30? Would that be satisfactory with everyone?

I'm going to simply ask that you recall all the cautionary instructions that I've previously given you. And, again, it may be a good idea for you not to wear your juror label out to lunch so that no one will give you any unsolicited opinions in regards to what your decision should be in this particular matter.

Let me simply ask that you do recall and adhere to all of the cautionary instructions previously given you. If you would, return to your jury by 1:30. Wait till all twelve of you are there and then the bailiff will inform me that all twelve of you are present and I will inform the bailiff to tell you that you may begin your deliberations at that time.

Thank you.

Everyone remain seated while the jury retires.

(Whereupon the jury retires from the courtroom, after which the following transpired)

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 192 of 228

THE COURT: We'll be in recess until 1:30.

(Whereupon the Court is recessed for lunch, after which the jury resumes deliberations.

At approximately 4:05 P. M. the proceedings are reconvened, with the following transpiring outside of the jury's presence)

THE COURT: Gentlemen, we have a question, we have two questions from the jury. The second question is, "May we have a fifteen minute break?" Of course, we will grant that. The first question is, and this is something that we will address. I'm going to go ahead and give them their break and then we'll address it when they come back from their break. That is, "As jurors, we would like to know what happens if we do not come up with a unanimous vote?" And we will address that when they come back from their break.

If you would, ask them to -- Gentlemen, do you have any objections to the bailiff simply telling them that they may take a break at this time?

MR. MEARS: No, Your Honor; we don't.

THE COURT: All right. If you would tell them that they may take a fifteen to twenty minute break at this time and when they come back to the jury room ask them, as we have before, not to begin any deliberations, that we will answer this other question for them before they resume their

deliberations.

All right. And, and, gentlemen, I'll be asking for the State's and the Defense's position insofar as a response to this question when we come back.

MR. MEARS: Your Honor, we'll try to find some law. But if I could just ask the Court -- I'm sure the Court knows this, but there are no Allen charges given in the sentencing phase, and I know the Court knows that --

THE COURT: Legare.

MR. MEARS: And I would be somewhat concerned that any kind of response that the Court gives may be construed as a form of an Allen charge and I just --

THE COURT: I, I don't know that a response is appropriate. I think I've got a case right here that will address that, but while they're on their recess I'll see if I can get that to my finger tips.

MR. MEARS: And I'm sure the Court knows that. I'm just alerting the Court, because that's in the Unified Appeal Rule.

THE COURT: What --

MR. MEARS: About no Allen charge. I know that you know that. I just wanted to make sure that I had brought that to the Court's attention pursuant to the Unified Appeal.

THE COURT: All right. Thank you, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 194 of 228

MR. MEARS: I didn't mean any disrespect to the Court's knowledge in that area, is what I'm saying.

THE COURT: That's fine.

We'll be in recess for about fifteen minutes.

(Whereupon the Court takes a brief recess, and upon reconvening the following transpired outside of the jury's presence)

THE COURT: You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Ms. Blaha, we have a note from the jury. The question is, "We, as jurors, would like to know what happens if we are unable to reach a unanimous vote?" Is that correct?

MS. BLAHA: Yes, sir.

THE COURT: Ms. Blaha, let me inform you and the rest of the jury at this time that I, by law, cannot answer that question for you. And I ask that ya'll return to your jury room to continue your deliberations and try to reach a unanimous verdict in this particular case.

Let me also -- This is an opportune time to go ahead and inform you and ask you, that if at some point in time during your deliberations the majority of you feel it would be best to recess for the day and come back tomorrow morning, let me know that. On the other hand, if the

majority of you wish to continue deliberating this evening for a period of time, then we will try to accommodate you in that respect. And, of course, taking into consideration whether or not any one or more of you have any, any very pressing matters that need your attention this evening. Okay?

MS. BLAHA: Okay.

THE COURT: Thank you.

Mr. Hutchings.

(Whereupon the jury retires from the courtroom, after which the following transpired).

THE COURT: We'll be in recess while the jury is deliberating.

(Whereupon the Court is recessed to await the verdict of the jury.

At approximately 4:55 P. M. the jury returns to the courtroom, after which the following transpired)

THE COURT: Madam Foreperson, it's my understanding the jury would like to recess for the evening?

MS. BLAHA: Yes, sir.

THE COURT: Ladies and gentlemen, will 9:00 A. M. tomorrow morning be satisfactory for us to reconvene?

At this time I'm going to again ask you to recall the cautionary instructions that have previously been given you by the Court. I do anticipate there will be matters in the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 196 of 228

local newspaper, possibly other papers that are circulated in this area regarding this particular matter. In addition, I anticipate there may be matters on some of the local television stations that you do receive in this particular area. So I'm going to ask that you not read any newspapers whatsoever. Do not watch any local news broadcasts whatsoever. In addition, do not allow anyone else to talk with you about the case or read anything to you about the case or discuss it within your presence or within your hearing.

Additionally, if you go by the Madison Street Deli or the intersection of Jackson Street and Pinetree Boulevard, again, please keep your attention diverted away from these particular scenes.

Any other cautionary instructions requested on behalf of the State?

MR. HARDY: No, Your Honor. Thank you.

THE COURT: Or the Defense?

MR. MEARS: Nothing for the Defense.

THE COURT: Ladies and gentlemen, you are excused until 9:00 A. M. tomorrow morning. If you would, report back to the jury room tomorrow morning. As soon as the bailiff informs me that all sixteen of you are here, then I will ask you to come into the courtroom. We will address whether or not any of you over the recess either inadvertently or

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 197 of 228

otherwise were exposed to any outside sources concerning this particular matter and then we will resume the deliberations at that time.

Thank you.

Mr. Sheriff, make sure that hallway is accessible for these jurors so they can get out with no problem.

SHERIFF POWELL: Yes, sir.

(Thereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Ladies and gentlemen, we'll be in recess until 9:00 A. M. tomorrow morning.

(Whereupon the Court is recessed for the day, with the proceedings to be resumed the following A. M.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 198 of 228

(The twelfth day of proceedings commences at approximately 9:00 A. M. on Tuesday, September the 30th, 1997, in the jury's presence)

THE COURT: Good morning, ladies and gentlemen.

Ladies and gentlemen, prior to your resuming your deliberations, I do need to inquire as to whether or not between our recess yesterday afternoon and this morning any of you have read or seen anything about this case? Any of you heard anything about this case, either radio, TV, street talk, coffee shop talk, otherwise? Has anyone talked with you about the case or attempted to talk with you about the case? Any of you talked with anyone about this case?

All right. Thank you, ladies and gentlemen.

Ladies, at this time you may retire to your jury room and resume your deliberations.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: We'll be in recess while the jury is deliberating.

Mr. Sheriff -- Let me -- Ladies and gentlemen, I'm going to ask Sheriff Powell, and this is simply for the jurors' convenience and ease, that when we do recess for lunch or for the evening, I'm going to ask before the jurors actually file, file out of the courtroom, to ask anyone that's, that's outside to step inside the courtroom so that,

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 199 of 228

you know, the jurors will feel comfortable and at ease while they're filing out.

SHERIFF POWELL: Yes, sir.

THE COURT: We'll be in recess while the jury is deliberating.

(Whereupon the Court is recessed to await the verdict of the jury.

At approximately 11:55 A. M. the jury returns to the courtroom, after which the following transpired)

THE COURT: Madam Foreperson, my understanding is that the jury is ready to recess for lunch. Is that correct?

MS. BLAHA: (Nods head affirmatively)

THE COURT: Okay. Let me ask whether or not you wish to come back at 1:00 or 1:15? 1:00 o'clock? Okay.

I'm just going to ask that you recall and abide by all the cautionary instructions that I have previously given you. If ya'll would return to your jury room at 1:00 P. M. The bailiff will inform me when all of you are present and we'll send a message for you to begin your deliberations again.

Thank you.

Mr. Sheriff, have we got the hallway cleared out there?

SHERIFF POWELL: Make sure all the hallways are cleared.

(Whereupon the jury retires from the courtroom,

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 200 of 228

after which the following transpired)

THE COURT: Ladies and gentlemen, we'll just give them a couple of minutes to disperse and then we'll recess for lunch.

(Whereupon there is a brief delay)

THE COURT: We'll be in recess until 1:00 P. M.

(Whereupon the Court is recessed for lunch after which the jury resumes deliberations. At approximately 4:55 P. M. the proceedings reconvene, with the following transpiring outside of the jury's presence)

THE COURT: Mr. Mears, gentlemen, gentlemen, I have just received a note from the jury requesting that we recess for the day.

If you would bring the jury in, please, ma'am.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Good afternoon.

Ladies and gentlemen, I understand that you wish to recess for the evening. Is that correct?

We will at this time recess. I'm going to ask that you report back to the jury room by 9:00 A. M. tomorrow morning. Once all of us are here, then I will ask that you step in the courtroom so that I can again address whether or not any of you have been exposed to anything outside of this

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 201 of 228

courtroom in any manner whatsoever.

I am going to ask that you recall all of the cautionary instructions that I have previously given you and please abide by those cautionary instructions.

Does anyone feel like that I need to go through those again, or do you feel like you know them pretty well at this time?

Okay. Madam Foreperson, let me ask whether or not the jury is making some progress, whether or not the jury has made some progress throughout their deliberations?

MS. BLAHA: Yes, sir; we have made some progress.

THE COURT: Okay. And do you feel like that given continued opportunity to deliberate that you'd have an opportunity to make some more progress?

MS. BLAHA: Yes, sir.

THE COURT: Okay. All right. Ladies and gentlemen, at this time we will recess until 9:00 A. M. tomorrow morning.

Everyone remain seated while the jury retires, please.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Mr. Hutchings, put these notes in the file, please, sir.

Ladies and gentlemen, we're just going to wait a couple of moments to give the jurors an opportunity to disperse.

(Whereupon there is a brief delay)

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 202 of 228

THE COURT: We'll be in recess until 9:00 o'clock tomorrow morning.

(Thereupon the Court is recessed for the day, with the proceedings to be resumed the following A. M.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 203 of 228

(The thirteenth day of proceedings commences at approximately 9:00 A. M. on Wednesday, October the 1st, 1997, outside of the jury's presence)

THE COURT: Gentlemen, it's my understanding that all of the jurors are here. What I would anticipate doing is bringing them in at this time and simply inquiring as to whether or not anyone has been exposed to anything outside of the courtroom and then ask them to resume their deliberations.

You may bring the jury in.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Good morning, ladies and gentlemen.

Ladies and gentlemen, before you resume your deliberations, I need to inquire at this time, ask whether or not since our recess yesterday evening whether or not any of you have been exposed to any sources of information outside of this courtroom that might influence your decision? Of course, that means in regards to the facts of the case or any exposure from outside sources in regards to what would be an appropriate sentence in this case.

At this time let me ask whether or not any of you have read anything about this particular matter since we recessed yesterday afternoon? Whether or not any of you have heard anything about this particular matter since we have recessed

yesterday afternoon? Have any of you talked with anyone about this matter since we recessed yesterday afternoon, including discussions with each other outside of the presence of other jurors deliberating on the case? Has anyone tried to talk with you about this particular matter in any regards whatsoever?

Okay. Ms. Fletcher, what I will do in a moment, I don't want to address that with you in front of the other jurors. Whatever information that you give me does not need to be shared with the other jurors in regards to that particular matter.

Anyone else? Has anyone tried to talk with you and told you not to tell me that they've tried to talk with you about this particular matter? Okay.

All right. Ladies and gentlemen, at this time let me excuse the initial twelve jurors to your jury room at this time. Please don't start your deliberations until we send you word to begin your deliberations. Let me also excuse the alternates at this time to your room. Thank you.

Ms. Fletcher, if you would stay for just a moment, please, ma'am.

(Whereupon the jury retires from the courtroom, after which the following transpired)

THE COURT: Ms. Fletcher, I believe you indicated to me that someone has tried to talk with you about this

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 205 of 228

particular matter. Is that correct?

MS. FLETCHER: I have to assume that's what they -- When I drove through the restaurant place yesterday and they handed my drink, the young lady said to me, "The person that done that was my cousin." And I just took my drink and drove off. But I didn't want to not mention it. I mean, I just --

THE COURT: Sure.

MS. FLETCHER: -- assumed that's what I had to do.

THE COURT: Well, I appreciate your, your candidness with us.

Do you think that they knew you were a juror? Did you have your juror label on, or do you think they may have seen --

MS. FLETCHER: I didn't have it on yesterday. Now, I have had it on, like, last week one day during lunch. I just drove through the window and picked up a sandwich.

THE COURT: Okay. That was the only statement made?

MS. FLETCHER: That was the only statement.

THE COURT: Did you make any response to that statement?

MS. FLETCHER: Oh, no. I drove off.

THE COURT: Okay. Would that statement in any, in any way affect your decision in this particular matter?

MS. FLETCHER: No, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 206 of 228

THE COURT: One way or the other?

MS. FLETCHER: (Shakes head negatively)

THE COURT: Okay. Does either party wish to inquire of Ms. Fletcher in regards to that particular matter? Did ya'll, were ya'll able to hear what she said?

MR. MEARS: I, I don't have any questions. I mean, Ms. Fletcher has answered the Court's questions. I'm satisfied that she will continue appropriately.

THE COURT: All right. Thank you, ma'am.

(Whereupon Ms. Fletcher retires from the courtroom)

THE COURT: Ms. Peters, if you would tell the jury they may begin their deliberations.

Gentlemen, we have a, a card from Ms. Jeanette Sims. Ms. Sims is our third alternate juror. It's in the form of a reminder from a doctor's office that she has an appointment at 2:15 this afternoon. I would anticipate excusing her to go to the appointment and then to return. I don't see at this point in time how that might delay our proceedings whatsoever in this matter.

Is that satisfactory with Counsel?

MR. MEARS: That's fine with us, Judge.

THE COURT: Okay. If you would ask Ms. Peters to ask the alternate, Jeanette Sims, to step in, please.

(Whereupon Ms. Sims enters the courtroom)

THE COURT: Good morning, Ms. Sims.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 207 of 228

MS. SIMS: Good morning.

THE COURT: I understand you have an appointment with Dr. Bridges at 2:15 today.

MS. SIMS: Yes.

THE COURT: Okay. We can accommodate you so that you can make that appointment. What we will do is probably, when we break for lunch we'll probably excuse you at that time and ask you, ask you to report back after your doctor's appointment is concluded. And if for some reason you're not through with your doctor's appointment by 5:00 P. M., then I would think you could return home at that time. And I simply ask that you recall all of the cautionary instructions that we've given you and abide by those instructions and return tomorrow morning at 9:00 A. M. if the jury is still deliberating on this matter.

MS. SIMS: All right. Okay. Thank you.

THE COURT: Yes, ma'am. Do you need your card back?

MS. SIMS: No. I have another one in here.

THE COURT: Okay. Thank you, ma'am.

MS. SIMS: Thank you.

(Whereupon Ms. Sims retires from the courtroom)

THE COURT: Mr. Hutchings, you can put that in the file, please, sir.

We'll be in recess while the jury is deliberating.

(Whereupon the Court is recessed to await the verdict

of the jury.

At approximately 9:55 A. M. the Court reconvenes with the following transpiring outside of the presence of the jury)

THE COURT: Ladies and gentlemen, we have a note from the jury. "We, the jurors, have come to a decision". It appears that we have a verdict.

Is there anything that we need to address prior to bringing the jury in and receiving the verdict?

MR. MEARS: No, sir.

THE COURT: Ms. Peters, if you would bring the jury in, please, ma'am.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Madam Foreperson, it's my understanding that the jury has reached a decision? Has the jury reached a unanimous verdict in regards to an appropriate sentence in this particular case?

MS. BLAHA: Yes, sir.

THE COURT: If you would hand the verdict form to the bailiff, please, ma'am?

Thank you, ma'am.

All right. Ladies and gentlemen, let me inform everyone in the courtroom, I'm going to announce the verdict in just a moment. If you feel that you will be unable to

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 209 of 228

control your emotions, conduct or demeanor, then let me give you an opportunity to excuse yourself at this time. I will not tolerate any outbursts, emotional or otherwise.

All right. The verdict of the jury is: We, the Jury, find beyond a reasonable doubt that statutory aggravating circumstances do exist in this case. The statutory aggravating circumstances found to exist are: The offense of Murder was committed while the Defendant was engaged in the commission of another capital felony, to wit: Armed Robbery. The Defendant committed the offense of Murder for himself or another for the purpose of receiving money or any other thing of monetary value. The offense of Murder was outrageously or wantonly vile, horrible or inhumane in that it involved depravity of mind or it involved an Aggravated Battery to the victim prior to the death of the victim. October the 1st, 1997. Patricia Blaha, Foreperson.

As to the sentence: We, the Jury, fix the sentence at death. October the 1st, 1997. Patricia Blaha, Foreperson.

All right, ladies and gentlemen, at this time I'm going to poll the jury as I did when I received the verdict at the guilt-innocence phase of this particular trial.

I will ask individually whether or not this was your verdict in the jury room. Whether or not it was made by you --

(Whereupon there is a brief interruption in the

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 210 of 228

courtroom)

THE COURT: Ladies and gentlemen, let me ask you to step to your jury room for just a moment.

(Whereupon the jury retires from the courtroom, after the following transpired)

THE COURT: Mr. Sheriff, I assume Mr. Hadley will determine if she needs some medical assistance and call assistance if necessary.

SHERIFF POWELL: Yes, sir.

THE COURT: If you'd ask the jury to step back in, please, ma'am.

(Whereupon the jury returns to the courtroom, after which the following transpired)

THE COURT: Ladies and gentlemen, as I was saying, I will ask each of you individually, if this was your verdict in the jury room? Was it reached by you freely and voluntarily? Is it still your verdict? And, was it based it solely upon the evidence presented here in this courtroom and the instructions of the law as given you by the Court?

Ms. Rhonda Smith. Ms. Smith, was this your verdict in the jury room?

MS. SMITH: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. SMITH: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 211 of 228

THE COURT: Is it still your verdict?

MS. SMITH: Yes, sir.

THE COURT: And was it based solely on the evidence presented in this courtroom?

MS. SMITH: Yes, sir.

THE COURT: And on the instructions of the law as given you by the Court?

MS. SMITH: Yes, sir.

THE COURT: Ms. Marsha Conradi.

MS. CONRADI: Yes, sir.

THE COURT: Ms. Conradi, was this your verdict in the jury room?

MS. CONRADI: Yes, sir; it was.

THE COURT: Was it reached by you freely and voluntarily?

MS. CONRADI: Yes, sir.

THE COURT: Is it still your verdict?

MS. CONRADI: Yes, sir; it is.

THE COURT: And was it based solely upon the evidence presented here in this courtroom and the instructions of the law given you by the Court?

MS. CONRADI: Yes, sir.

THE COURT: Ms. Theresa Fletcher. Ms. Fletcher, was this your verdict in the jury room?

MS. FLETCHER: Yes, sir.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 212 of 228

THE COURT: Was it reached by you freely and voluntarily?

MS. FLETCHER: Yes, sir.

THE COURT: Is it still your verdict?

MS. FLETCHER: Yes, sir.

THE COURT: And was it based solely upon the evidence presented in this courtroom and the instructions of the law given you by the Court?

MS. FLETCHER: Yes, sir.

THE COURT: Ms. Corine Monroe.

MS. MONROE: Yes, sir.

THE COURT: Ms. Monroe, was this your verdict in the jury room?

MS. MONROE: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. MONROE: Yes, sir.

THE COURT: Is it still your verdict?

MS. MONROE: Yes, sir.

THE COURT: And was it based solely upon the evidence presented here in this courtroom and the instructions of the law given you by the Court?

MS. MONROE: Yes, sir.

THE COURT: Ms. Darla Glass.

MS. GLASS: Yes.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 213 of 228

THE COURT: Ms. Glass, was this your verdict in the jury room?

MS. GLASS: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. GLASS: Yes, sir.

THE COURT: Is it still your verdict?

MS. GLASS: Yes, sir.

THE COURT: And was it based solely upon the evidence presented here in this courtroom and the instructions of the law as given you by the Court?

MS. GLASS: Yes, sir.

THE COURT: Ms. Jewell McMickle.

MS. MCMICKLE: Yes.

THE COURT: Ms. McMickle, was this your verdict in the jury room?

MS. MCMICKLE: Yes.

THE COURT: And was it reached by you freely and voluntarily?

MS. MCMICKLE: Yes.

THE COURT: Is it your still your verdict?

MS. MCMICKLE: Yes.

THE COURT: And was it based solely upon the evidence presented here in this courtroom and the instructions of the law given you by the Court?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 214 of 228

MS. MCMICKLE: Yes.

THE COURT: Ms. Patricia Blaha. Ms. Blaha, was this your verdict in the jury room?

MS. BLAHA: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. BLAHA: Yes, sir.

THE COURT: Is it still your verdict?

MS. BLAHA: Yes, sir.

THE COURT: And was it based solely upon the evidence presented here in this courtroom and the instructions of the law given you by the Court?

MS. BLAHA: Yes, sir.

THE COURT: Ms. Charlotte Parker.

MS. PARKER: Yes, sir.

THE COURT: Ms. Parker, was this your verdict in the jury room?

MS. PARKER: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. PARKER: Yes, sir.

THE COURT: Is it still your verdict?

MS. PARKER: Yes, sir.

THE COURT: And was it based solely upon the evidence presented here in this courtroom --

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 215 of 228

MS. PARKER: Yes, sir.

THE COURT: -- and the instructions of the law given you by the Court?

MS. PARKER: Yes, sir.

THE COURT: Ms. Amy Alderson. Ms. Alderson, was this your verdict in the jury room?

MS. ALDERSON: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. ALDERSON: Yes, sir.

THE COURT: Is it still your verdict?

MS. ALDERSON: Yes, sir.

THE COURT: And was it based solely upon the evidence presented here in this courtroom?

MS. ALDERSON: Yes, sir.

THE COURT: And the instructions of the law given you by the Court?

MS. ALDERSON: Yes, sir.

THE COURT: Ms. Natasha Hill. Ms. Hill, was this your verdict in the jury room?

MS. HILL: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. HILL: Yes, sir.

THE COURT: Is it still your verdict?

MS. HILL: Yes, sir.

THE COURT: And was it based solely upon the evidence presented here in this courtroom and the instructions of the law given you by the Court?

MS. HILL: Yes, sir.

THE COURT: Ms. Gladys Leaks.

MS. LEAKS: Yes, sir.

THE COURT: Ms. Leaks, was this your verdict in the jury room?

MS. LEAKS: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. LEAKS: Yes, sir.

THE COURT: Is it still your verdict?

MS. LEAKS: Yes, sir.

THE COURT: And was it based solely upon the evidence presented in this courtroom and the legal instructions given you by the Court?

MS. LEAKS: Yes, sir.

THE COURT: Ms. Annette Connelly. Ms. Connelly, was this your verdict in the jury room?

MS. CONNELLY: Yes, sir.

THE COURT: Was it reached by you freely and voluntarily?

MS. CONNELLY: Yes, sir.

THE COURT: Is it still your verdict?

MS. CONNELLY: Yes, sir.

THE COURT: And was it based solely upon the evidence presented in this courtroom and the legal instructions given you by the Court?

MS. CONNELLY: Yes, sir.

THE COURT: Gentlemen, does either party wish to examine the verdict form?

MR. MEARS: I do, Your Honor.

THE COURT: Gentlemen, are there any matters that need to be taken up prior to dismissing this jury?

MR. HARDY: No, Your Honor. Thank you.

THE COURT: On behalf of the Defense?

MR. MEARS: I can think of nothing at this time, Your Honor.

THE COURT: Mr. Sheriff, in a moment I'm going to dismiss this jury. I'm going to ask everyone to remain in the courtroom for a minimum of five minutes to give this jury an opportunity to disperse.

If you would, please check and see if there is anyone in the hallway. And if we need a few moments to give your deputies an opportunity to remove them to some other area, we will do so. In addition, if you would also have your personal, personnel check the hallways downstairs and the steps and areas outside to make sure this jury may disperse

without any interference or contact whatsoever.

(Whereupon there is a brief delay)

THE COURT: Ladies and gentlemen, I want to thank you for your patience with the Court throughout this particular trial. I know that jury service takes away from your business lives, it takes away from your personal lives and it is indeed a community service that you perform, very difficult community service that you perform.

Let me tell you at this time that occasionally when persons have served on a particular jury, someone may contact them to discuss their findings, how they came to their findings. Attorneys may contact a juror to, to get advice on, on how they might perform differently in the future or something of that nature. It's not uncommon. Whether or not you wish to talk with anyone about this particular matter is a decision for you to make. You are under no obligation whatsoever to talk with anyone about your service on this jury. If anyone attempts to talk with you about your service on this jury and you do not desire to talk with them and they persist, then let me know and I will take steps to resolve that. On the other hand, as I have said, if you do wish to discuss it, then you are at liberty to do so.

Ladies and gentlemen, with that in mind we are going to ask everyone in the courtroom to remain for a minimum of

five minutes, and I feel that, that you will be able to disperse at this time without any inconvenience.

So, at this time you are dismissed.

(Whereupon the jury retires from the courtroom, after which the following transpired)

MR. MEARS: Your Honor, we would ask that all the jurors' notes be taken and placed under seal and made a part of this record. All the jurors' notes. And we would ask that the Court have the bailiffs to put all of the notes that were taken and place them under seal and make them a part of the record.

THE COURT: All right, sir. Do you have any authority for that, Mr. Mears?

MR. MEARS: No, Your Honor. I have no authority for that other than when you had told the jurors that they were to use the notes for themselves, not to share them with anyone else, that the notes -- they were not to take them with them each day. We feel that it would be appropriate under the circumstances for the Court to at least take the notes and place them under seal. That will be an appellate issue at some later time, whether or not they should have been made a part of the record or whether or not the Defense should have access to those notes. I would ask until that issue has been resolved by some appellate court that they be made a part of the record because if some appellate court

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 226 of 228

later were to find that we were entitled to have access to those, to determine whether or not there had been any misconduct amongst the jurors, whether anybody had any -- had not decided the case solely based upon what is here in the court, what evidence was presented to them, then unless the notes themselves are a part of the record, there would be no way to determine whether or not such actions had been taken by the jurors or such conduct had been performed by the jurors. So as a prophylactic measure with regard to that possible avenue of appeal on that particular issue, if the notes are gone, if they're no longer available, should a court rule in our favor with regard to access to the notes, it becomes moot because the notes aren't there. So I would ask the Court to at least, at this stage, have the notes placed under seal and made a part of the record. And not to be opened or seen by anyone until such time as Your Honor orders it or an appellate court orders it. I would ask that that be done.

THE COURT: Any response?

MR. MITCHELL: No, sir. We'll submit it.

THE COURT: Mr. Mears, at this point in time I believe that the jury has dispersed -- Did the jurors --

BAILIFF: They just started down.

THE COURT: Okay. Have they taken their notes with them?

BAILIFF: Yes, sir.

THE COURT: Mr. Mears, based upon my understanding of the law at this time, I don't feel that it's appropriate for us to secure those notes and place them under seal. I think that throughout the course of this trial the jurors have been questioned thoroughly each and every day in regards to whether or not they have been exposed to any outside sources that might affect their decision. I just -- I don't see how anything in the notes that they have taken while here in this courtroom are going to reflect anything to the contrary than what we have already discovered at this time.

MR. MEARS: I understand the Court's ruling.

THE COURT: All right, sir.

Ladies and gentlemen, are we ready to enter into the sentencing phase of this matter, or would anyone want a brief recess before we do so?

MR. MEARS: Could we have a brief recess, Your Honor?

THE COURT: All right, sir. How much time, Mr. Mears?

MR. MEARS: If we could have fifteen minutes. Mr. Kleinrock will address the Court with regard to specific issues on the possible merger of two of the counts. The Court had asked us to look at that and to make any record we needed to make. Mr. Kleinrock has a couple of cases I want to ask him to cite to the Court with regard to the possibility of the merger of the Aggravated Assault and

Aggravated Battery issue. And other than that we'll proceed with the, be prepared to proceed. As I told the Court earlier, I have a motion requesting that -- Excuse me.

(Whereupon there is a brief delay)

MR. MEARS: Judge, could we take a recess and I'll address the Court on this other issue? Could we take a brief recess? I need to talk with my client outside the presence of the Court.

THE COURT: All right, sir. We'll take about a ten minute recess.

Mr. Mears, would it be possible for me to review the cases that Mr. Kleinrock has for the Court's review --

MR. MEARS: Yes, Your Honor.

THE COURT: -- during this recess?

MR. MEARS: Yes, sir.

THE COURT: We'll be in recess for about ten minutes.

(Whereupon the Court takes a brief recess, after which the following transpired)

THE COURT: Gentlemen, is it the Court's understanding that the Defense had a motion for the Court to consider in regards to count one, Aggravated Assault, count two, Possession of a Firearm in regards to that Aggravated Assault? Is it the Defense's position that those convictions merge into count three, Aggravated Battery and count four, Possession of a Firearm During the Commission of

a Felony. Is that correct?

MR. KLEINROCK: Yes, Your Honor; that's correct.

THE COURT: Gentlemen, it's my understanding that the State acknowledges that particular position; is that correct?

MR. HARDY: Yes, sir.

THE COURT: All right, sir. The State has no argument against that position of the Defense?

MR. HARDY: No, sir.

THE COURT: Gentlemen, is there anything further to consider at this time prior to imposition of the sentence?

MR. MEARS: Your Honor, Mr. Cromartie has asked me to address the Court on his behalf and he's asked me to relate to the Court his desire to waive his presence in any further proceedings this morning here in the courtroom. I have indicated to Mr. Cromartie, as has Mr. Bryant, that we do not have the authority to waive his presence for his behalf. That's something he would have to address directly to the Court if he wished to pursue that. I think he wants to address the Court at this time.

THE COURT: Mr. Cromartie, sir, at this time I am going to ask that you remain in the courtroom as the Court imposes the sentence. You may remain seated at the table with your Counsel if you wish to do so.

Anything else at this time, gentlemen?

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 224 of 228

MR. MEARS: No, sir, Your Honor.

THE COURT: Ray Jefferson Cromartie, the jury having found you guilty of count five, the offense of Murder, and the jury having recommended that a sentence of death be imposed, it is considered ordered and adjudged that within the period of time commencing at noon on the 12th day of November, 1997, and ending at noon on the 19th day of November, 1997, that you shall be put to death by the Department of Corrections in the manner provided by law at such penal institution and on such date and at such time within the aforementioned time period as may be designated by the Department of Corrections, all in accordance with the laws of the state of Georgia.

It's the sentence of the Court as to count six, Possession of a Firearm During the Commission of a Felony, specifically count five, that you serve a period of five years in the state penal system. That five years is to be served consecutive to count five.

It's the sentence of the Court for the offense of Aggravated Battery, count three, that you serve a period of twenty years in the state penal system. That time period is to be served consecutive to count six.

It's the sentence of the Court as to count four, Possession of a Firearm During the Commission of a Felony, specifically count three, Aggravated Battery, that you serve

a period of five years in the state penal system. This five years is to be served consecutive to the sentence imposed in count three.

It's the sentence of the Court for the offense of Armed Robbery, count seven, that you serve the remainder of your natural life in the state penal system. The sentence as to count seven is to be served consecutive to the sentence in count four.

It's the sentence of the Court as to count eight, Possession of a Firearm During the Commission of a Felony, specifically count seven, the Armed Robbery, that you serve a period of five years in the state penal system. That five years is to be served consecutive to count seven.

Mr. Cromartie, the Unified Appeal Procedure provides for an automatic appeal in this particular matter to the Georgia Supreme Court.

You have a right to appeal the conviction and sentence in any and all of these counts which you are convicted and sentenced of today.

In addition, you would have a right to petition the Georgia Sentence Review Board for application for reduction of sentence as to all of the sentences with the exception of count five.

Now, any notice of appeal, whether as to conviction, sentence, sentence review, must be filed within thirty days

of this date; otherwise you will have waived your right to any appellate process in this matter.

Mr. Mears and Mr. Bryant would continue to represent you in any appellate process.

Good luck to you.

MR. MEARS: Your Honor, at this time with the Court's permission, we are filing a Motion for Stay of Execution. I have attached a proposed order to that motion asking that this Court enter an order staying the oral order and the subsequent written order which will be entered in this case. We would ask the Court to stay the execution as it's currently set until such time as the transcript of the trial proceedings have been concluded and a Motion for a New Trial has been filed in this particular case occurred. We would ask the Court to consider entering that order today. I have the original and am filing it with Mr. Hutchings today. And there is a proposed order. I've shared this with Mr. Hardy. I don't believe he has any objection to the form of the order. And I would ask the Court to enter such an order today subsequent to the filing of the written order based upon the Court's oral order here today.

THE COURT: All right, sir. Mr. Mears, I'll take that matter under consideration.

Mr. Hutchings, if such an order is entered, you need to copy it to Counsel as soon as you receive it.

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 227 of 228

MR. MEARS: Thank you, Your Honor.

THE COURT: And have it filed.

Mr. Hutchings, let me provide you with the verdict form, please, sir.

Ladies and gentlemen, are there any other matters that needed to be addressed at this time prior to recessing and adjourning?

MR. MEARS: Just one moment, Your Honor.

MR. HARDY: No, sir.

MR. MEARS: Your Honor, we can think of nothing else that we need to present to the Court at this time.

THE COURT: All right. Court is adjourned.

(Thereupon the proceedings are concluded)

Case 7:14-cv-00039-MTT Document 18-19 Filed 07/14/14 Page 228 of 228

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF LOWNDES

I hereby certify that the foregoing proceedings were taken down by me, as stated in the caption, and that the foregoing pages 2818 through 3043 represent a true, correct, and complete transcript of said proceedings.

I further certify that I am neither of kin nor counsel to the parties in this matter, nor am I financially interested in same.

This the 17th day of November, 1997.

Philip G. Vincent

PHILIP G. VINCENT, C.C.R.
CERTIFICATE NO: A238
OFFICIAL COURT REPORTER
SOUTHERN JUDICIAL CIRCUIT