## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

RAY JEFFERSON CROMARTIE,          :
    Plaintiff,                            :          Civil Case No. 7:19-cv-00181
                                          :
v.                                        :          THIS IS A CAPITAL CASE
                                          :          **Execution Scheduled for 7 p.m. on**
BRADFIELD SHEALY, et al.,                 :          **Wednesday, October 30, 2019**
    Defendants.                           :

## PLAINTIFF'S REPLY TO DEFENDANTS'
## PRE-ANSWER MOTION TO DISMISS
## AND RESPONSE TO PLAINTIFF'S COMPLAINT

Aren Adjoian (ID No. 325488)
Eric J. Montroy
Federal Community Defender for the
  Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Aren_Adjoian @fd.org
Eric_Montroy@fd.org

Attorneys for Ray Jefferson Cromartie

## INTRODUCTION

Plaintiff Ray Jefferson Cromartie is a Georgia death row inmate who is currently scheduled to be executed after 7:00 p.m. on October 30, 2019. Plaintiff has filed a complaint under 42 U.S.C. § 1983 alleging denials of his rights under the First and Fourteenth Amendments. Plaintiff seeks declaratory and injunctive relief, and a stay of his scheduled execution. Defendants have moved to dismiss the complaint for lack of subject matter jurisdiction and for failing to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(1), (6). As shown below, Defendants have failed to show that the complaint should be dismissed. Given that the complaint is not subject to dismissal, this Court should proceed to consider Plaintiff's allegations of constitutional violations on the merits. Because it is not feasible to do so appropriately in the time remaining before the scheduled execution, this Court should also stay the execution.

The stakes could not be higher. DNA testing could reveal Mr. Cromartie's co-defendant, Corey Clark, to be the man who shot and killed Richard Slysz, the clerk at the Junior Food Store. If so, Mr. Cromartie is not guilty of malice murder, the crime for which he was convicted and sentenced to death. Unless a stay and ultimately relief are granted, we will never know for sure, but Mr. Cromartie will be executed.

1

## I.    STANDARDS OF REVIEW

### A.    Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss based on lack of subject-matter jurisdiction should be granted 'only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief.'" *Harris v. Bd. of Trustees University of Alabama*, 846 F. Supp. 2d 1223, 1232 (N.D. Ala. 2012) (quoting *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001)).

Challenges to subject-matter jurisdiction under Rule 12(b)(1) may be raised either as a facial attack or as a factual attack. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). "Facial attacks on a complaint 'require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [plaintiff's] complaint are taken as true for the purposes of the motion.'" *Id.* (quoting *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir.1980)). Factual attacks question "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (citing *Lawrence*, 919 F.2d at 1529).

A facial attack is essentially an attack on the existence of a federal cause of action. In that situation, "'the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits

of the plaintiff's case' under either Rule 12(b)(6) or Rule 56." *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004) (quoting *Williamson*, 645 F.2d 404, 415 (5th Cir. 1981)). As the Fifth Circuit explained in *Williamson*:

> [N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . .[,] both of which place greater restrictions on the district court's discretion.

*Williamson*, 645 F.2d at 415.

Defendants here make a facial attack on the complaint based on an assertion that Plaintiff's claim is barred by the *Rooker-Feldman* doctrine. Mot. to Dismiss 13-16. This facial challenge should be addressed under Rule 12(b)(6). *Wilson v. Marshall*, No. 2:14-cv-1106-MHT-SRW, 2018 WL 5074689, at *2-3 (N.D. Ala. Sept. 14, 2018) (so treating facial challenge based on the *Rooker-Feldman* doctrine), *adopted*, 2018 WL 5046077 (N.D. Ala. Oct. 17, 2018).

## B.    Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the adequacy of the complaint against the standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The question on a motion to dismiss is "'not whether [Cromartie] will ultimately prevail' on his

procedural due process claim, but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)) (citing *Swierkewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

The court reviewing a motion to dismiss takes the factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262-63 (11th Cir. 2004). The complaint must state a facially plausible claim; this is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

The substantive standard under *Skinner* for plaintiffs alleging a constitutional violation resulting from denial of post-conviction access to DNA is whether the postconviction relief procedures were "fundamentally inadequate to vindicate the substantive rights provided." *Harris v. Lykos*, No. 12-20160, 2013 WL 1223837, at *1 (5th Cir. Mar. 27, 2013) (unpublished) (quoting *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009)). Notably, in *Harris* itself the district court erred by concluding that the plaintiff had "failed to state a claim recognized at law." *Id.* The Fifth Circuit vacated the district court's decision and remanded for further proceedings.

## II.   PLAINTIFF'S DNA CLAIMS ARE NOT BARRED BY THE *ROOKER-FELDMAN* DOCTRINE.

Defendants contend that jurisdiction over Plaintiff's claim is barred by what is known as the *Rooker-Feldman* doctrine. Mot. to Dismiss 13-16. Particularly in light of the fact that the Supreme Court rejected such an argument in *Skinner*, Defendants' argument is without merit.

The *Rooker-Feldman* doctrine occupies a "narrow ground." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005) (rejecting attempts to expand the doctrine). As clarified in *Exxon*, *Rooker-Feldman* "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers . . . inviting district court review and rejection of [the state court's] judgments." 544 U.S. at 284.

In *Skinner*, the Supreme Court rejected application of the *Rooker-Feldman* doctrine to a claim very similar to Plaintiff's. The Court explained why the claim was not barred as follows:

> Skinner does not challenge the adverse [state court] decisions themselves; instead, he targets as unconstitutional the Texas statute they authoritatively construed. . . . [A] state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action. Skinner's federal case falls within the latter category. There was, therefore, no lack of subject-matter jurisdiction over Skinner's federal suit.

*Skinner*, 562 U.S. at 532-33 (footnotes omitted).

Nevertheless, Defendants contend, *see* Mot. to Dismiss 14-15, that jurisdiction is barred by the Eleventh Circuit's decision in *Alvarez v. Attorney General for Florida*, 679 F.3d 1257, 1262 (11th Cir. 2012). Plaintiff's claim here, however, is like that in *Skinner*, not like that in *Alvarez*. As the District Court for the Middle District of Alabama recently held, a claim like Plaintiff's—which attacks the constitutionality of a state DNA statute as authoritatively construed by the state's courts—is not barred by *Rooker-Feldman*. *Wilson*, 2018 WL 5074689, at *11.

*Wilson* makes clear that the type of challenge that may proceed under *Skinner* and *Alvarez* is a "facial challenge to Alabama's DNA law both directly, and as that statute has been authoritatively construed by Alabama courts in cases that are unrelated to her motion for DNA testing." *Wilson*, 2018 WL 5074689, at *11. That is exactly the type of challenge that Plaintiff has brought here. *See* Compl. ¶¶ 44-45, 47-48. In *Alvarez*, in contrast, the plaintiff brought an "as applied" due process claim that "attack[ed] the state court's *application* of Florida's DNA access procedures to the facts of his case," and "expressly abandoned *any* challenge to the facial constitutionality of Florida's procedures." *Alvarez*, 679 F.3d at 1263 (emphasis in original) (quoted in Mot. to Dismiss 15). Here, however, Plaintiff brings a facial challenge, not an as-applied challenge. Thus, as *Wilson* makes clear, Plaintiff's claim is not barred by the *Rooker-Feldman* doctrine.

## III. PROPER PARTY FOR THE REQUESTED REMEDY

Defendants contend that Plaintiff cannot obtain a stay or injunction against his execution without naming the Department of Corrections as a defendant. Mot. to Dismiss 16. In fact, this Court has the authority to issue writs and stays in order to preserve its jurisdiction. 28 U.S.C. § 1651(a). To forestall any question, however, Plaintiff is filing an Amended Complaint naming the Department of Corrections and Warden Ford as defendants.

## IV. PLAINTIFF'S COMPLAINT STATES CLAIMS ON WHICH RELIEF CAN BE GRANTED.

Defendants argue that Plaintiff's claims are subject to dismissal under Rule 12(b)(6) for failure to state a plausible claim for relief. Mot. to Dismiss 17-18. For the reasons that follow, Defendants' arguments fail.

### A. Section 5-5-41, as Authoritatively Construed by the Georgia Courts, Deprived Plaintiff of Due Process.

In seeking dismissal, Defendants rely heavily on *Osborne*. Mot to Dismiss 19-20 (characterizing Plaintiff's claim as "nearly identical" to that in *Osborne*). There is no question that Plaintiff must satisfy the substantive standard set forth in *Osborne*, i.e., he must show that the procedures under O.C.G.A. § 5-5-41(c) "are fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69. But Plaintiff's claim is significantly different from Osborne's.

Unlike Osborne, who "attempted to sidestep state process through . . . a federal lawsuit," *Osborne*, 557 U.S. at 71, Plaintiff has attempted to avail himself of the state process. In that respect, Plaintiff, like Skinner, "is better positioned to urge in federal court 'the inadequacy of the state-law procedures available to him in state postconviction relief.'" *Skinner*, 562 U.S. at 530 n.8 (quoting *Osborne*, 557 U.S. at 71). Moreover, Osborne sought to establish a "freestanding right to DNA testing evidence" directly under the due process clause. *Osborne*, 557 U.S. at 61, 72-73. Since Plaintiff does not seek to establish such a right, *Osborne* does not by itself foreclose Plaintiff's claim.

Section 5-5-41(c) purports to grant convicted Georgia defendants a mechanism by which they can obtain DNA testing of critical biological evidence collected in their cases. "Modern DNA testing can provide powerful new evidence unlike anything known before. . . . [T]here is no technology comparable to DNA testing for matching tissues when such evidence is at issue. DNA testing has exonerated wrongly convicted people . . . ." *Osborne*, 557 U.S. at 62 (citations omitted). Consequently, Plaintiff has a "liberty interest in demonstrating his innocence with new evidence under state law." *Id.* at 68.

Section 5-5-41 contains a large number of hurdles that applicants must overcome if they are to obtain DNA testing. Many of these are at least facially reasonable. Two have been used to create almost insuperable barriers: (1) the

conjoined requirements that a post-trial movant show why the motion is brought more than 30 days after trial, O.C.G.A. § 5-5-41(a), with the specific requirement that an applicant for DNA testing show that the "motion is not made for the purpose of delay," § 5-5-41(c)(7)(D); and (2) the requirement to show a "reasonable probability that the petitioner would have been acquitted" if the results of the testing had been available at trial. § 5-5-41(a)(3)(D). A complaint, like Plaintiff's, that a state's DNA testing procedures create a "Catch 22" that effectively precludes a prisoner from obtaining DNA testing, is not subject to dismissal under Rule 12(b)(6). *Wilson*, 2018 WL 5074689 at *14-15.

Nevertheless, Defendants contend that Plaintiff's claim is not actually about the Georgia courts' construction of the statute, just the application of the "obvious meanings" of the statute, and that there cannot be any fundamental unfairness about the statute because it is in some sense "comparable" to the Alaska procedures reviewed in *Osborne* and the federal statute regarding postconviction DNA testing, 18 U.S.C. § 3600. Mot. to Dismiss 20-24. Both assertions are erroneous—Plaintiff does indeed challenge the statute as authoritatively construed by the Georgia courts, and the statute so construed does raise arbitrary and fundamentally unfair barriers to obtaining DNA testing.

### 1. The timing requirements, as construed by the Georgia courts, create fundamentally unfair barriers.

The execution of an innocent person would be the quintessential miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 324-35 (1995). In recognition of that fact, the Georgia legislature adopted the postconviction DNA testing statute, O.C.G.A. § 5-5-41(c), in 2003 (well after the 1997 trial in this case). The General Assembly's intent in enacting the statute was to provide death-sentenced prisoners like Mr. Cromartie an opportunity to obtain and present exculpatory DNA evidence. When it was presented as Senate Bill 119 on May 27, 2003, it was described as a bill "to provide for post-conviction requests for DNA testing in cases where a person is sentenced to death," where "DNA testing may be exculpatory." *See* Georgia Bill History, 2003 Reg. Sess. S.B. 119 (Ga. Gen. Assem. May 27, 2003). The statute was introduced by Lieutenant Governor Mark Taylor and Senator David Adelman. Commenting on the bill, Senator Adelman stated, "It's about doing what is right." *See* Melissa T. Rife, *Peach Sheets – Criminal Procedure*, 20 Ga. St. U. L. Rev. 119, 119 & n.2 (2003). The bill was drafted by the Prosecuting Attorneys' Counsel, the Georgia Bureau of Investigation, the Georgia Innocence Project, and the Georgia Association of Criminal Defense Lawyers. *Id.* at 120.

In the first decision of the Georgia Supreme Court interpreting the statute after its enactment, two dissenting Justices elaborated on the General Assembly's intent:

> Recognizing that errors in the criminal justice system may lead to the execution of innocent persons, the legislature enacted OCGA § 5-5-41(c) to help insure that only those who are actually guilty will be put to death at the hands of the State. . . .
>
> In providing for this process, the Georgia legislature was responding to a national concern about innocent persons being wrongfully convicted and newly available DNA testing that could right those previous wrongs. . . .
>
> [A] careful examination reveals the legislature's clear intent to insure a fair process by which our criminal justice system could take advantage of the great advances in DNA technology.

*Crawford v. State*, 597 S.E.2d 403, 406 (Ga. 2004) (Fletcher, C.J., & Benham, J., dissenting).[1]

The DNA testing Plaintiff seeks is based on developments in testing methods that only became available after 2003, and for some of the newer testing methods, only within the last two years. App. 59-63, 81-83, 95-96.[2] Moreover, if an attempt had been made to test the material before the technology developed, such an attempt would have destroyed the evidence without producing any meaningful results. *Id.* at 96. As shown in Section 2, *infra*, it is reasonably likely that this testing would lead

---

[1] The majority in *Crawford* did not address the legislature's intent or the dissent's treatment of it. The majority instead simply found that DNA testing in Crawford's case could not be exculpatory. *Crawford*, 597 S.E.2d at 404-06.

[2] Plaintiff filed an Appendix together with the Complaint. ECF Nos. 1-2 through 1-8. Documents in the Appendix are cited as "App." followed by the page number.

to Mr. Cromartie's acquittal of the Madison Street Deli shooting, and of malice murder, or at least to a different sentencing outcome.

The timing requirements that the Georgia courts have read into the statute, however, make it virtually impossible for a prisoner to find the only "right" time in which to seek DNA testing. The specific timing requirement of the DNA statute is that the request not be "made for the purpose of delay." O.C.G.A. § 5-5-41(c)(7)(D). Just making that showing does not really matter, however, because the Georgia courts have construed the DNA testing statute as incorporating an additional requirement that the applicant be "diligent." *Bharadia v. State*, 774 S.E.2d 90, 94 n.5 (Ga. 2014). And the Georgia courts have construed diligence as requiring the applicant to seek such relief as soon as possible. *Ford Motor Co. v. Conley*, 757 S.E.2d 20, 30 (Ga. 2014); *Drane v. State,* 728 S.E.2d 679, 683 (Ga. 2012).

Furthermore, the Georgia legislature prescribed that a person convicted of a crime—including those sentenced to death—could only ever file one Extraordinary Motion for New Trial seeking DNA testing. *See* O.C.G.A. § 5-5-41(b) ("[O]nly one such extraordinary motion shall be made or allowed."). Yet it also offered as a ground for postconviction DNA testing that DNA testing could be sought in the event that technological developments allow for testing that was not previously possible. O.C.G.A. § 5-5-41(c)(3)(B) ("[T]he technology for the [DNA] testing was not available at the time of trial.").

Because a defendant may only file one EMNT *ever*,[3] it is logical that a defendant would pursue such a remedy only when all evidence has been discovered, all arguments marshaled, and when the forensic science for DNA testing has advanced to make the most effective use of any remaining biological evidence. It is absurd and arbitrary to both allow a defendant to wait until the technology to conduct DNA testing has developed, but then deny him for waiting. Yet that is exactly how the Georgia courts have construed the statute.

As applied to DNA testing, this combination of requirements is fundamentally unfair. As established by Dr. Libby's unchallenged testimony, DNA testing of the items Plaintiff wants tested was not available at the time of trial or even the later time at which section 5-5-41(c) was enacted. The science has been rapidly evolving to enable testing of more and more minute traces of material, including touch DNA, and of samples containing biological material from more than one person. The effect of the Georgia Supreme Court's rulings is to place applicants between an arbitrarily constructed Scylla and Charybdis—if they seek DNA testing too soon, the sample will be consumed without producing meaningful results, App. 96, but if they wait a day too long they will be precluded from obtaining DNA testing for lack of "diligence."

---

[3] *See, e.g.*, *Richards v. State*, 563 S.E.2d 856, 858 n.1 (Ga. 2002).

DNA testing—with the ability to scientifically include or exclude a person as the source of biological material associated with a crime—is unlike other evidence, as Georgia recognized in enacting section 5-5-41(c). The requirement that applicants show their motions were not filed for the purpose of delay is appropriate. By adding the diligence requirement as it has been construed, the Georgia Supreme Court has placed an arbitrary and fundamentally unfair burden that is almost impossible for any applicant to meet.

Defendants do not even acknowledge Plaintiff's argument about the unfairness of the way in which the Georgia Supreme Court's timing requirements actually affect people like him who seek DNA testing under the statute. The complaint is not subject to dismissal because it "places the question of whether there are meaningful or reasonable safeguards for due process in [Georgia's] DNA law before the court." *Wilson*, 2018 WL 5074689 at *15.

### 2.   Georgia arbitrarily applies the reasonable probability of a different outcome requirement.

Section 5-5-41(c)(3)(D) requires a court to find a reasonable probability of an acquittal before DNA testing can be ordered. As construed by the Georgia Supreme Court, section 5-5-41(c) precludes testing on this ground if the evidence presented at trial was "overwhelming." *Crawford*, 597 S.E.2d at 405. As applied, this requirement has resulted in a totally subjective review of the trial evidence, with no meaningful assessment of the weaknesses in that evidence or the manner in which

14

DNA test results could offset the trial evidence and change the entire evidentiary picture. As construed by the Georgia Supreme Court, that provision effectively precludes testing to establish innocence, and further precludes testing to establish innocence of the death penalty.

Defendants quibble that *Crawford* did not "construe" section 5-5-41(c)(3)(D), but rather applied the statute to the facts. Mot. to Dismiss 23. But to "construe" a statute is simply to "analyze and explain the meaning" of it. Black's Law Dictionary, CONSTRUE (11th ed. 2019). The Georgia Supreme Court certainly did that in *Crawford*. Indeed, as the dissenting Justices pointed out, "In eviscerating OCGA § 5-5-41, the majority has made it less likely that the statute will achieve its laudable purposes, and far more likely that the execution of innocent people will result." *Crawford*, 597 S.E.2d at 408 (Fletcher, C.J., dissenting).

The undisputed evidence presented at the evidentiary hearing demonstrated that DNA testing may well be powerfully exculpatory, and that without such testing it is indeed "far more likely" that the execution of an innocent person will result. For example, the State's trial theory was that the perpetrator of the Madison Street Deli shooting wore a dark hooded sweatshirt and a dark knit cap, as depicted in the still image from the surveillance video. *See* App. 282. The State called David McRae as a witness at trial; he was the property owner who discovered the items in his yard the morning after the shooting and had no explanation for how they came to be there.

15

App. 1044. Investigators sent the items to the FBI for analysis and the State offered evidence at trial to convince the jury that the shooter wore these items. *See* Pretrial Motion Transcript (10/1/96) at 32; App. 1137-40. These items of physical evidence are likely to yield a DNA profile of the person who was wearing them before discarding them in Mr. McRae's yard after shooting Dan Wilson. App. 71, 126-27.

Plaintiff submitted expert testimony that these items can be tested to yield a profile of the person who wore them. *Id.* at 71. Realistically, there are three possibilities—the DNA profile will be of Gary Young, Mr. Cromartie or some third person. If it was a third person, then the conclusion would probably be that the items are unconnected to the offense. But if DNA testing revealed that the habitual wearer of these items was either Young (the owner of the weapon used) or Mr. Cromartie, it would be extremely incriminating. Recall that much of the evidence against Mr. Cromartie came from Young himself. If Young was not only the owner of the gun but also the wearer of clothing likely worn by the robber on the night of the offense, it is reasonably probable that Mr. Cromartie would have been acquitted.

The only way to support a conclusion that exculpatory DNA evidence on these items would be immaterial is by rejecting (without any apparent basis) the State's trial theory that this clothing had been worn by the shooter. Following *Crawford*, that is exactly what the state trial court did. Left unasked was the crucial question— whether there is a reasonable likelihood that such evidence would have changed the

verdict with respect to Mr. Cromartie's conviction of the Madison Street Deli shooting or his death sentence.

Regarding the fired cartridge casings collected from both the Madison Street Deli and the Junior Food Store, Plaintiff presented evidence that advances in DNA technology have made it possible to lift DNA evidence from them and that the presence of DNA belonging to someone else (particularly Clark and/or Young) would have made a difference to the jury. It is particularly important to know whether Corey Clark handled the murder weapon *and loaded the fatal bullets*. While it may be possible that Clark loaded the gun and then handed it to Mr. Cromartie or allowed him to take it, evidence that Clark loaded the gun, contrary to his testimony, would drastically change the case, making it far more likely that Clark not only loaded the gun but also fired it. Test results showing that Clark loaded the gun would make it reasonably probable that Mr. Cromartie would have been acquitted of malice murder.

The only way to avoid the potentially exculpatory effect of this kind of evidence is that set forth in *Crawford*—just cite the trial evidence as "overwhelming" and ignore what DNA testing could actually tell us about the evidence. After all, critical portions of the trial evidence came from people like Young and Clark—the very people whom DNA testing could implicate as the primary actors in these crimes. Again, Plaintiff's allegations concerning the

fundamental unfairness of Georgia's DNA testing statute, as authoritatively construed by the Georgia Supreme Court, state a claim on which relief can be granted.

## B.    The Access to Courts Claim States a Claim on Which Relief Can be Granted.

Defendants argue that the access to courts claim fails because the due process claim fails. Mot. to Dismiss 24-26. It is the converse that is true—because the due process claim is viable, the access to courts claim is also viable.

## C.    The Equities With Respect to a Stay and Other Forms of Equitable Relief Favor Plaintiff.

In perfunctory fashion, Defendants assert that the equities are in their favor to the extent that Plaintiff's request for a stay of execution and other forms of injunctive relief should be denied. Mot. to Dismiss 26-27. Defendants err.

The "irreparability of the injury that [Plaintiff] will suffer in the absence of a stay [is] self-evident." *Holladay*, 331 F.3d at 1177 (granting stay in capital case). Furthermore, "no substantial harm that will flow to the State of [Georgia] or its citizens from postponing petitioner's execution to determine whether that execution would violate the Eighth Amendment." *Id.* at 1177. The reasoning of *Holladay* applies equally here: no substantial harm will flow to the State of Georgia or its citizens from postponing Mr. Cromartie's execution to determine whether the denial

of access to DNA testing that could prove him innocent violated his right to due process.

In support of their argument, Defendants rely on the concept that Georgia has an interest in carrying out the execution, given that courts have rejected Eighth Amendment challenges to Georgia's lethal injection protocol. Mot. to Dismiss 26-27 (quoting *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1296 (11th Cir. 2016)). *Jones* is irrelevant here. The question here is not whether it would violate the Eighth Amendment for Georgia to execute Mr. Cromartie using its current execution protocol. Rather, the question is whether Georgia has adopted fundamentally unfair DNA testing procedures that preclude Mr. Cromartie from proving that he is innocent of the crime for which Georgia plans to execute him on Wednesday evening.

Mr. Cromartie has shown that his complaint is not subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. That being the case, the remaining equities strongly favor a stay of execution. Otherwise, the courts will treat the claim of a prisoner like Mr. Cromartie—who is about to be executed—as less worthy of careful consideration than that of a prisoner like Betty Wilson, who was convicted of capital murder and sentenced to life in prison. *See Wilson*, 2018 WL 5074689 at *1, 5.

## CONCLUSION

For all of the reasons set forth above and in Plaintiff's prior submissions, this Court should deny the Defendants' motion to dismiss and grant Plaintiff's motion for stay of execution.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Aren Adjoian
Aren Adjoian
Eric J. Montroy
Federal Community Defender for the
 Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Aren_Adjoian @fd.org
Eric_Montroy@fd.org

</div>

Dated:  October 28, 2019            Counsel for the Plaintiff

20

# CERTIFICATE OF SERVICE

I hereby certify that on this date, I served the foregoing pleading on the following person by ECF filing:

Beth Burton, Deputy Attorney General
Sabrina Graham, Senior Assistant Attorney General
Tina M. Piper, Senior Assistant Attorney General
40 Capitol Square, SW
Atlanta, GA 30334

/s/  Aren Adjoian
Aren Adjoian


Dated:        October 28, 2019