# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| RAY JEFFERSON CROMARTIE, | : |
| Plaintiff, | : |
| VS. | : |
| | : CIVIL ACTION NO. 7:19-CV-181 (MTT) |
| BRADFIELD SHEALY, Southern Judicial Circuit District Attorney; RANDA WHARTON, Clerk of Superior Court Thomas County, GEORGIA DEPARTMENT OF CORRECTIONS; BENJAMIN FORD, Warden, Georgia Diagnostic and Classification Prison, | : |
| Defendants. | : |

## ORDER

Ray Jefferson Cromartie is scheduled to be executed on October 30, 2019[1] for the April 10, 1994 murder of store clerk, Richard Slysz. *Cromartie v. State*, 270 Ga. 780, 781 n.1, 514 S.E.2d 205, 209 n.1 (1999). He has filed a 42 U.S.C. § 1983 action[2] in which he raises due process and access to courts claims stemming from the state court's denial of his extraordinary motion for new trial and request for DNA testing pursuant to O.C.G.A. § 5-5-41(c). Doc. 1. Specifically, Cromartie alleges his due

---

[1] On October 16, 2019, the Superior Court of Thomas County entered an order setting the seven-day window during which the execution of Ray Jefferson Cromartie may occur to begin at noon, October 30, 2019 and to end seven days later at noon on November 6, 2019. Docs. 1; 8; Oct. 16, 2019 Press Release, Office of the Att'y Gen., http://law.georgia.gov/press-releases.

[2] Cromartie also moved for leave to proceed without prepayment of the filing fee or security therefor pursuant to 28 U.S.C. § 1915(a). Doc. 2. As it appears Cromartie is unable to pay the cost of commencing this action, his application to proceed *in forma pauperis* is hereby **GRANTED**.

1

process rights have been violated because O.C.G.A. § 5-5-41(c), as construed by the Georgia Supreme Court, violates fundamental fairness. (Doc. 4 at 19). He also argues that Georgia's restrictive procedure for obtaining access to DNA testing under O.C.G.A. § 5-5-41(c), and the Georgia Supreme Court's interpretation thereof, deprive him of his fundamental right to access the courts. (Doc. 1 at 23).

Cromartie requests "[a] declaratory judgment that O.C.G.A. § 5-5-41(c), as applied by the Georgia Supreme Court, is unconstitutional"; "[a] preliminary and permanent injunction requiring Defendants to produce and release for DNA testing" ten various items of evidence; and (3) "[a] preliminary and permanent injunction prohibiting Defendants from executing [him] until they can do so in a way that does not violate his rights." Doc. 1 at 25-26.

Cromartie also moved to stay his execution pending disposition of his 42 U.S.C. § 1983 action. Doc. 6.

Defendants have moved to dismiss Cromartie's complaint. Doc. 9. Cromartie has responded to the motion to dismiss (Doc. 10) and filed an amended complaint (Doc. 11).

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Facts

The Georgia Supreme Court summarized the facts of this case in Cromartie's direct appeal:

> Cromartie borrowed a .25 caliber pistol from his cousin Gary Young on April 7, 1994. At about 10:15 p.m. on April 7, Cromartie entered the Madison Street Deli in Thomasville and shot the clerk, Dan Wilson, in the face. Cromartie left after unsuccessfully trying to open the cash register. The tape from the store video camera, while too indistinct to conclusively identify Cromartie, captured a man fitting Cromartie's general description

2

enter the store and walk behind the counter toward the area where the clerk was washing pans. There is the sound of a shot and the man leaves after trying to open the cash register. Wilson survived despite a severed carotid artery. The following day, Cromartie asked Gary Young and Carnell Cooksey if they saw the news. He told Young that he shot the clerk at the Madison Street Deli while he was in the back washing dishes. Cromartie also asked Cooksey if he was "down with the 187," which Cooksey testified meant robbery. Cromartie stated that there was a Junior Food Store with "one clerk in the store and they didn't have no camera."

In the early morning hours of April 10, 1994, Cromartie and Corey Clark asked Thaddeus Lucas if he would drive them to the store so they could steal beer. As they were driving, Cromartie directed Lucas to bypass the closest open store and drive to the Junior Food Store. He told Lucas to park on a nearby street and wait. When Cromartie and Clark entered the store, Cromartie shot clerk Richard Slysz twice in the head. The first shot which entered below Slysz's right eye would not have caused Slysz to immediately lose consciousness before he was hit by Cromartie's second shot directed at Slysz's left temple. Although Slysz died shortly thereafter, neither wound caused an immediate death. Cromartie and Clark then tried to open the cash register but were unsuccessful. Cromartie instead grabbed two 12–packs of Budweiser beer and the men fled. A convenience store clerk across the street heard the shots and observed two men fitting the general description of Cromartie and Clark run from the store; Cromartie was carrying the beer. While the men were fleeing one of the 12–packs broke open and spilled beer cans onto the ground. A passing motorist saw the two men run from the store and appear to drop something.

Cooksey testified that when Cromartie and his accomplices returned to the Cherokee Apartments they had a muddy case of Budweiser beer and Cromartie boasted about shooting the clerk twice. Plaster casts of shoe prints in the muddy field next to the spilled cans of beer were similar to the shoes Cromartie was wearing when he was arrested three days later. Cromartie's left thumb print was found on a torn piece of Budweiser 12–pack carton near the shoe prints. The police recovered the .25 caliber pistol that Cromartie had borrowed from Gary Young, and a firearms expert determined that this gun fired the bullets that wounded Wilson and killed Slysz. Cromartie's accomplices, Lucas and Clark, testified for the State at Cromartie's trial.

*Cromartie v. State*, 270 Ga. 780, 781-82, 514 S.E.2d 205, 209-10 (1999).

**B. Procedural History**

On September 26, 1997, a jury found Cromartie guilty of malice murder, armed robbery, aggravated battery, aggravated assault, and four counts of possession of a firearm during the commission of a crime. *Id.* at 781 n.1, 514 S.E.2d at 209 n.1. On October 1, 1997, the jury sentenced Cromartie to death for the murder. *Id.*

The Georgia Supreme Court affirmed his conviction and sentence on April 2, 1999. *Cromartie*, 270 Ga. at 781, 514 S.E.2d at 209. The United States Supreme Court denied his petition for certiorari on November 1, 1999. *Cromartie v. Georgia*, 528 U.S. 974 (1999).

Cromartie filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, which was denied following an evidentiary hearing. Doc. 1 at 11. The Georgia Supreme Court denied Cromartie's certificate of probable cause application and the United States Supreme Court denied his petition for writ of certiorari. *Cromartie v. Chatman*, 572 U.S. 1064 (2014).

Cromartie filed a 28 U.S.C. § 2254 petition in this Court on March 20, 2014. *Cromartie v. Warden, Georgia Diagnostic and Classification Prison*, 7:14-cv-39-MTT (M.D. Ga.). On March 31, 2017, the Court denied habeas relief and both this Court and the Eleventh Circuit denied a certificate of appealability. Id. at Doc. 81; *Cromartie v. GDCP Warden*, No. 17-12627 (11th Cir.). On December 3, 2018, the United States Supreme Court denied certiorari. *Cromartie v. Sellers*, 2018 WL 4191087, at *1 (U.S. 2018).

On December 28, 2018, Cromartie filed an Extraordinary Motion for New Trial and Postconviction DNA Testing and a Motion for Preservation of Evidence in the

4

Thomas County Superior Court.  Doc. 1 at 12.  Following a June 24, 2019 evidentiary hearing, the court denied Cromartie's motion for DNA testing and new trial on September 16, 2019.  Docs. 1-2; 1-3; 1-4; 1-5; 1-6; 1-7.

Cromartie filed an application for discretionary appeal to the Georgia Supreme Court and a motion to stay his execution.  *Cromartie v. State*, S20D0330 (Ga. Sup. Ct.) That Court denied both the application and motion to stay on October 25, 2019.  *Id.*

## II.  ANALYSIS

### A.  Motion to Dismiss Standard of Review

The Federal Rules of Civil Procedure require that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To avoid dismissal pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (internal quotation marks and citation omitted).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1188.  The complaint must "give the defendant fair notice of what the ... claim is and

5

the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted). Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts. *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

In order to state a claim for relief under § 1983, a plaintiff must allege that: (1) an act or omission deprived him of a right, privilege, or immunity secured by the Constitution or a statute of the United States; and (2) the act or omission was committed by a person acting under color of state law. *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1581 (11th Cir. 1995). If a litigant cannot satisfy these requirements, or fails to provide factual allegations in support of his claim or claims, then the complaint is subject to dismissal. *See Chappell v. Rich*, 340 F.3d 1279, 1282-84 (11th Cir. 2003) (affirming the district court's dismissal of a § 1983 complaint because the plaintiff's factual allegations were insufficient to support the alleged constitutional violation).

### B. Prerequisites for Injunctive Relief

A court may grant declaratory or injunctive relief, including a stay of execution, only if the moving party establishes that: "(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1323 (11th Cir. 2019) (citation omitted). "The 'first and most important question' regarding a stay of execution is whether the [plaintiff] is substantially likely to succeed on the merits of his claims.'" *Id.* (citation omitted).

### C. The Court's Jurisdiction

Cromartie alleges that the Defendants' refusal to release the biological evidence for DNA testing violates his right to due process and right to access the courts.[3] Doc. 1 at 4. Generally, a 42 U.S.C. § 1983 complaint is the proper vehicle for Cromartie to raise his due process and access to courts challenges to Georgia's postconviction DNA statute, O.C.G.A. § 5-5-41(c). *Skinner v. Switzer*, 562 U.S. 521, 525 (2011).

Cromartie "challenges the constitutionality of § 5-5-41(c) both on its face and as applied by the Georgia courts." Doc. 1 at 4. Cromartie's "as applied" challenge "attacks the state court's application of [Georgia's] DNA access procedures to the facts of his case." *Alvarez v. Att'y Gen. for Fla.*, 679 F.3d 1257, 1263 (11th Cir. 2012). The success of his "as applied" challenge "would 'effectively nullify' the state court's judgment." *Id.* at 1264 (citation omitted). In other words, his "as applied" challenge "would succeed 'only to the extent that the state court wrongly decided'" to disallow DNA testing. *Id.* (citation omitted). Thus, his "as applied" challenge is barred by the *Rooker/Feldman*[4] doctrine. *Id.* (finding that an "as applied" challenge to Florida's postconviction DNA statute was barred by *Rooker-Feldman* because (1) the state court rendered judgment before the federal action was commenced; (2) the plaintiff in the federal action was the state-court losing party; (3) the plaintiff complained of injuries

---

[3] Cromartie also alleges that the Defendants' refusal to allow DNA testing violates his Eighth Amendment right to be free from cruel and unusual punishment. Doc. 1 at 4. Beyond this conclusory allegation, however, he provides no further support for this argument. *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (finding dismissal appropriate when only conclusory allegations presented).

[4] The *Rooker-Feldman* doctrine derives from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). "The doctrine is a jurisdictional rule that precludes the lower federal courts from reviewing state court judgments." *Alvarez*, 679 F.3d at 1262 (citation omitted).

caused by the state court's judgment; and (4) the plaintiff's claim invited the federal court to review and reject the state court's judgment).

*Rooker-Feldman* does not, however, bar the federal court from exercising subject matter jurisdiction over Cromartie's challenge to the facial constitutionality of O.C.G.A. § 5-5-41(c). *Skinner*, 562 U.S. at 530-32. Thus, the Court may consider Cromartie's arguments to the extent he generally "challenges, as denying him procedural due process, [Georgia's] postconviction DNA statue 'as construed' by the [Georgia] courts." *Id.* at 530.

### D. Failure to Name Proper Parties

Cromartie originally named Bradfield Shealy, District Attorney for the Southern Judicial Circuit, and Randa Wharton, Clerk of the Superior Court of Thomas County, as the Defendants in his 42 U.S.C. § 1983 action. (Doc. 1). In its motion to dismiss, Defendants alleged that while Shealy and Wharton may be the proper parties for his § 1983 due process and access to courts claims, neither has custody of Cromartie or the authority to forestall his execution (Doc. 6).

O.C.G.A. § 17-10-38 (b) provides that the trial court must direct the "defendant to be delivered to the Department of Corrections for execution of the death sentence . . . ." The Superior Court of Thomas County has issued an execution order for Cromartie. Oct. 16, 2019 Press Release, Office of the Att'y Gen., http://law.georgia.gov/press-releases. Thus, the Department of Corrections is the only party that can be enjoined to prevent his execution. Accordingly, for his motion to stay execution, Cromartie originally failed to join the proper parties.

In response to the Defendants' motion to dismiss, Cromartie filed an amended

8

complaint naming both the Georgia Department of Corrections and Benjamin Ford, Warden of the Georgia Diagnostic and Classification Prison.  Doc. 11.

**E. Inexcusable Delay**

The Defendants do not address the consequences of Cromartie's delay in seeking relief in this Court,[5] but the Court must.  The Supreme Court has instructed courts to consider "the extent to which the inmate has delayed unnecessarily in bringing" an action before granting a stay.  *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004).

Both Cromartie's § 1983 action (Doc. 1) and his motion to stay execution (Doc. 6) were filed within days of his October 30, 2019 scheduled execution.  In his § 1983 action, Cromartie asks the Court to issue a "preliminary and permanent injunction prohibiting Defendants from executing [him] until they can do so in a way that does not violate his rights."  Doc. 1 at 26; *Rutherford v. Crosby*, 438 F.3d 1087, 1092 (11th Cir. 2006) (stating that when a plaintiff's "execution is imminent, there is no practical difference between denying a stay on equitable grounds and denying injunctive relief on equitable grounds in a § 1983 lawsuit.), *vacated on other grounds, Rutherford v. McDonough*, 547 U.S. 1204 (2006).  Of course, Cromartie "is not entitled to a stay of execution 'as a matter of course' simply because he brought a § 1983 claim."  *Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir. 2019) (citations omitted).

Before it can grant Cromartie's preliminary injunction or stay, the Court "must 'consider not only the likelihood of success on the merits and the relative harms to the

---

[5] This is a bit odd because the Superior Court of Thomas County relied, in part, on Cromartie's inexcusable delay when it denied his motion for new trial and request for DNA testing.  Doc. 1-2 at 29-35.

parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim.'" *Long*, 924 F.3d at 1176 (quoting *Nelson*, 541 U.S. at 649-50). "There is a 'strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Id.* (quoting *Nelson*, 541 U.S. at 650). According to the Supreme Court,

> [c]ourts should police carefully against attempts to use such challenges as tools to interpose unjustified delay. Last-minute stays should be the extreme exception, not the norm, and the last-minute nature of an application that could have been brought earlier, or an applicant's attempt at manipulation, may be grounds for denial of a stay.

*Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019); see also *Dunn v. Price*, 139 S. Ct. 1312, 1312 (2019) (citing *Gomez v. United States*, 503 U.S. 653, 654 (1992) (vacating stay of execution because of the "last-minute nature of" the application).

Cromartie's case is not an "extreme exception" that warrants a stay. *Bucklew*, 139 S. Ct. at 1134. Cromartie raises due process and access to courts claims stemming from the state court's September 16, 2019 denial of his extraordinary motion for new trial and request for DNA testing. Cromartie filed his extraordinary motion for new trial and motion for DNA testing in the Superior Court of Thomas County on December 28, 2018, more than twenty-one years after he was convicted. Doc. 1 at 12; *Cromartie*, 270 Ga. at 781 n.1, 514 S.E.2d at 209 n.1.

Cromartie has been represented by counsel throughout his criminal proceedings. Doc. 1-2 at 174-75. Current counsel was appointed by this Court in 2014. *Id.* at 169. All of the evidence that Cromartie now seeks to test existed and was known to counsel prior to his trial. See Doc. 1-2 at 183-86. DNA test results have been admissible in Georgia courts since 1990, seven years before Cromartie's trial. *Caldwell v. State*, 260

10

Ga. 278, 393 S.E.2d 436 (1995). Nevertheless, Cromartie apparently did not seek DNA testing pretrial. See Doc. 1-2 at 31. Additionally, although Georgia's post-trial DNA statute, O.C.G.A. § 5-5-41, was enacted in 2003, Cromartie did not pursue DNA testing until fifteen years later.

Cromartie alleges in his complaint "that DNA testing has changed dramatically over the years." Doc. 1 at 14. The Court agrees. But Cromartie's complaint also reveals that the DNA testing he wants has been available for years. For example, he says that "touch DNA (the ability to obtain a DNA profile from a very small amount of skin cells left simply by touching an item with one's bare hands or other skin)" was available as early as 2006 or 2007 and was further refined in 2010 and 2011—at least seven years before he filed his state action seeking DNA testing. Doc. 1 at 15. Even the "probabilistic genotyping," which "significantly enhances the ability to evaluate complex DNA mixtures—samples containing DNA from multiple people"—has been available for a least a "couple of years" prior to Cromartie filing his request for DNA testing. Doc. 1 at 15.

Furthermore, it seems that Cromartie's challenge to the facial constitutionality of Georgia's DNA statute could have been made at any time after the enactment of the statute in 2003. *See Dist. Att'y Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, (2009) (finding that a plaintiff need not "exhaust state-law remedies" before filing a 42 U.S.C. § 1983 action but plaintiff could not complain that "procedures [that] are adequate on their face" do not work in practice if he had not filed a state action); *Cunningham v. Dist. Att'y Office for Escambia Cty.*, 592 F.3d 1237, 1274 (11th Cir. 2010) (citation omitted) (stating "where state procedures for postconviction relief [are]

11

inadequate on their face," a plaintiff's "failure to properly pursue state-law remedies [is] excused").

In short, Cromartie's "need for a stay of execution is directly attributable to his own failure to" timely seek DNA testing in the state courts or to timely challenge the facial constitutionality of Georgia's DNA access procedures. *In re Hutcherson*, 468 F.3d 747, 749-50 (11th Cir. 2006). Thus, his delay provides additional grounds for denying Cromartie's motion to stay execution (Doc. 6) and his request for "preliminary and permanent injunction prohibiting Defendants from executing" him (Doc. 1 at 26). See *Dunn v. Ray*, 139 S. Ct. 661, 661 (2019) (quoting *Gomez*, 503 U.S. at 654 (1992) (vacating stay granted by Eleventh Circuit because of the "'last-minute nature of [the] application to stay execution'"); *Bucklew*, 139 S. Ct. at 1134 (citations omitted) (affirming Eighth Circuit's denial of a stay and stating that "'last-minute nature of an application'" could be "'grounds for denial of stay'"); *Price*, 139 S. Ct. at 1312 (quoting *Gomez*, 503 U.S. at 654) (vacating stay granted by Eleventh Circuit due to the "'last minute nature of [the] application to stay execution'").

### F. Challenges to O.C.G.A. § 5-5-41

#### i. Due Process Claim

There is no "freestanding right to access DNA evidence." *Osborne*, 557 U.S. at 73. It is Cromartie's "burden to demonstrate the inadequacy of [Georgia's] procedures for postconviction relief." *Cunningham*, 592 F.3d at 1262 (citation omitted). The "State's process for postconviction relief is constitutionally adequate unless it 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental

12

fairness in operation.'" *Id.* at 1260 (citation omitted). Put simply, O.C.G.A. § 5-5-41(c) is constitutional so long as it comports with fundamental fairness. This Court's ability to interfere with a State's procedures for postconviction relief is limited. The Court "may upset [Georgia's] postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Osborne*, 557 U.S. at 69.

Cromartie argues that "[s]ection 5-5-41(c), as construed by the Georgia Supreme Court violates fundamental fairness in at least two ways." Doc. 1 at 19. First, he argues that the requirements that a defendant show that the request for "DNA testing was not made for the purpose of delay, § 5-5-41(c)(7)(D)," and that his request for a new trial was made diligently or "as soon as possible" under § 5-5-41(a) is fundamentally unfair.[6] Doc. 1 at 19-20. Second, he argues that the Georgia Supreme Court's interpretation of O.C.G.A. § 5-5-41(c)(3)(D)[7], which requires a court to find a reasonable probability of acquittal before DNA testing can be ordered, is fundamentally unfair because it precludes testing when the evidence of guilt presented at trial was overwhelming. Doc. 1 at 21 (citing *Crawford v. State*, 278 Ga. 95, 97, 597 S.E.2d 403, 405 (2004)).

Both arguments are foreclosed by *Osborne*, in which the Supreme Court found "nothing inadequate about the procedures Alaska has provided to vindicate its state

---

[6] O.C.G.A. § 5-5-41(c)(7)(D) provides that the court shall grant the motion for DNA testing if it determines, inter alia, that "the motion is not made for the purpose of delay." O.C.G.A. § 5-5-41(a) provides that "[w]hen a motion for new trial is made after the expiration of a 30 day period from entry of judgment, some good reason must be shown why the motion was not made during such period. . . ."

[7] O.C.G.A. § 5-5-41(d)(3)(D) provides that a motion for DNA testing "shall show or provide" that '[t]he requested DNA testing would raise a reasonable probability that the [plaintiff] would have been acquitted if the results of DNA testing had been available at the time of conviction, in light of all the evidence in the case."

13

right to postconviction relief . . . ." 557 U.S. at 69. The Court noted that Alaska's procedures for postconviction DNA testing, "are not without limits." *Id.* at 70. Alaska's procedures, similar to Georgia's, require the evidence to be "newly available," "diligently pursued,"[8] and "sufficiently material."[9] *Id.* The Court held the procedures, as limited by these requirements, "are not inconsistent with the 'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness.'" *Id.* (citations omitted); *See Cunningham*, 592 F.3d at 1263 (upholding district court's dismissal of complaint, citing *Osborne*, and noting that a State's "procedures will pass muster if they compare favorably with Alaska's"). Cromartie cites no authority for the proposition that procedures and limitations found in O.C.G.A. § 5-5-41, as interpreted by the Georgia

---

[8] Cromartie alleges that the '[b]y adding the diligence requirement as it has been construed, the Georgia Supreme Court has placed an arbitrary and fundamentally unfair burden that is almost impossible for any applicant to meet." Doc. 10 at 15. It seems that diligence requirements are fairly standard in statutes addressing postconviction relief. *Osborne*, 557 U.S. at 69. Georgia simply requires that a defendant seeking an extraordinary motion for new trial "act without delay." *Drane v. State*, 291 Ga. 298, 304, 728 S.E.2d 679, 683 (2012) (citation omitted). "'The obvious reason for this requirement is that litigation must come to an end.'" *Id.* (citation omitted). There is nothing fundamentally unfair in requiring a party to "act without delay" in seeking DNA testing of evidence that was available pretrial. *Id.* This "requirement ensures that cases are litigated when the evidence is more readily available to both the defendant and the State, which fosters the truth-seeking process." *Id.*

[9] Citing *Crawford*, Cromartie argues that the Georgia Supreme Court has interpreted O.C.G.A. 5-5-41(c) to preclude DNA testing when the evidence presented at trial was "'overwhelming.'" 278 Ga. at 97, 597 S.E.2d at 405. According to Cromartie, "this requirement has resulted in a totally subjective review of the trial evidence, with no meaningful assessment of the weaknesses in that evidence or the manner in which DNA test results could offset the trial evidence and change the entire evidentiary picture." Doc. 10 at 16. Just as with the diligence requirement, it seems "materiality" requirements are commonplace in postconviction DNA statutes. *Osborne*, 557 U.S. at 69. On its face O.C.G.A. § 5-5-41(c)(3)(D) requires the state court to consider "in light of all the evidence in the case," whether "DNA testing would raise a reasonable probability that the [plaintiff] would have been acquitted if the results of DNA testing had been available at the time of conviction." This is exactly the analysis undertaken by the Georgia Supreme Court in *Crawford* when it found that, even assuming favorable test results came from DNA tests, the evidence tested "related only peripherally, if at all, to [Crawford's] case, and there was, therefore, not a reasonable likelihood of a different outcome at trial, especially given the overwhelming evidence of Crawford's guilt presented at trial. *Id.* at 98, 597 S.E.2d at 406. This interpretation in no way "effectively precludes testing to establish innocence." Doc. 10 at 16. It is merely a materiality requirement, which the Supreme Court has found constitutional. *Osborne*, 557 U.S. at 69.

14

Supreme Court, have been found to violate fundamental fairness.[10]

    ii. <u>Access to Courts Claim</u>

Cromartie argues that "Georgia's restrictive procedures for obtaining access to DNA testing under O.C.G.A. § 5-5-41(c), and the Georgia Supreme Court's interpretation thereof" deprive him of the fundamental right to access the courts. Doc. 1 at 23. This claim is foreclosed by binding Eleventh Circuit precedent. *See Alvarez*, 679 F.3d at 1265-66; *Cunningham*, 592 F.3d at 1271-73.

To establish a violation of the constitutional right of access to the courts under the Due Process Clause, "'a prisoner must show an actual injury.'" *Alvarez*, 679 F.3d at 1265. To show actual injury, Cromartie must have "'a colorable underlying claim for which he seeks relief.'" *Alvarez*, 679 F.3d at 1266. Cromartie's right of access to the courts claim is premised on his procedural due process challenge to O.C.G.A. § 5-5-41(c). Having concluded that Georgia's postconviction procedure for DNA testing is

---

[10] Just as the Court was finalizing its Order, Cromartie filed a last-minute brief and an amended complaint. Docs. 10; 11. In the brief, he further explains his facial challenge to Georgia's postconviction DNA statute. Doc. 10 at 11-22. But, much of Cromartie's brief contains "as applied" due process challenges, in which Cromartie attacks the state court's denial of his motion for DNA testing. *See* Doc. 10 at 14 ("As established by Dr. Libby's unchallenged testimony, DNA testing . . . was not available at the time of trial . . . ."); Doc. 10 at 16 ("The undisputed evidence presented at the evidentiary hearing demonstrated that DNA testing may well be powerfully exculpatory . . . ."); Doc. 10 at 19 ("Regarding the fired cartridge casings . . . DNA technology have made it possible to lift DNA evidence . . . ."). As explained above, these "as applied" challenges are not properly before the Court. Also, Cromartie relies heavily on a *Wilson v. Marshall*, 2018 WL 5074689 (M.D. Ala. 2018), in which the plaintiff's allegations that called into question the facial constitutionality of Alabama's postconviction statute survived a motion to dismiss. *Id.* at *14. That case is both non-binding and distinguishable. The Court found Alabama's post-conviction DNA statute created a "Catch 22" because it required the plaintiff to demonstrate that the DNA evidence was in good enough condition to yield reliable and accurate test result, without allowing the plaintiff access to the evidence. *Id.* Georgia's statute creates no such dilemma. Additionally, the Alabama statute at issue provided that the state court "**may** order forensic DNA testing" if certain conditions were met. *Id.* (citations omitted) (emphasis added). The district court found this "permissive" language "may provide no guarantee of any due process at all for one who qualifies." *Id.* In contrast, Georgia's statute contains mandatory language: "The court **shall** grant the motion for DNA testing if it determines that the [plaintiff] has met the requirements. . . ." O.C.G.A. § 5-5-41(c)(7). The plaintiff in *Wilson* survived a motion to dismiss because, on its face, the Alabama statute did "not actually guarantee any process by which a [plaintiff] could be entitled to DNA testing." *Id.* at *15. That simply is not the case with Georgia's statute.

consistent with due process, "it follows that it does not improperly interfere with [Cromartie's] right of access to the courts." *Cunningham*, 592 F.3d at 1272. This claim must, therefore, be dismissed.

### III. CONCLUSION

Cromartie's 42 U.S.C. § 1983 action is dismissed for failure to state a claim. His requests for declaratory and injunctive relief, including a stay, are denied due to his unjustified delay in filing this action, and because he has not shown a substantial likelihood of success on the merits.

For these reasons, the Court **GRANTS** Defendants' motion to dismiss (Doc. 9) and **DENIES** Plaintiff's motion to stay execution (Doc. 6).

**SO ORDERED**, this 28th day of October, 2019.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
